# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **FARM LABOR ORGANIZING COMMITTEE, VICTOR TOLEDO VENCES, and VALENTIN ALVARADO HERNANDEZ,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Civil Action No.** |
| **v.** | ) ) | |
| **ROY COOPER, in his official capacity as Governor of the State of North Carolina, and MARION R. WARREN, in his official capacity as Director of the North Carolina Administrative Office of the Courts,** | ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## NATURE OF THE ACTION

1.     This action challenges Section 20.5 of North Carolina General Assembly Session Law 2017-108 (also known as "the Farm Act") which was signed into law by Defendant Governor Roy Cooper on July 12, 2017. The Farm Act targets North Carolina's overwhelmingly Latino and immigrant farmworker

1

community by stripping them of two significant legal rights enjoyed by all other workers in the state. First, the Act mandates that agreements by agricultural employers to administer payroll union dues deductions requested by employees (commonly known as "dues checkoff" agreements) shall be invalid and unenforceable. Second, the Act declares that settlement agreements that include a stipulation that an agricultural employer will recognize or enter into an agreement with a union shall be invalid and unenforceable.[1]

2.     The Farm Act obstructs free expression and free association guaranteed by the First Amendment to the Constitution for over 100,000 farmworkers in North Carolina, including Plaintiffs Victor Toledo Vences and Valentin Alvarado Hernandez and their labor union, Plaintiff Farm Labor

---

[1] Section 20.5 of the Farm Act amended N.C. Gen. Stat. § 95-79(b), to add the underlined text:

> (b) Any provision that directly or indirectly conditions the purchase of agricultural products, products or the terms of an agreement for the purchase of agricultural products, or the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. Further, notwithstanding G.S. 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable against public policy in restraint of trade or commerce in the State of North Carolina.

Organizing Committee (FLOC). The Farm Act also violates the Fourteenth Amendment and 42 U.S.C. § 1981 by discriminatorily revoking contractual rights and privileges from a workforce that is overwhelmingly comprised of Latino non-citizens and a union with a membership comprised largely of workers from Mexico working under the H-2A temporary agricultural visa program ("guestworkers"). Additionally, the Farm Act is an unconstitutional Bill of Attainder because it legislatively singles out and punishes FLOC for its organizing activity.

3. In light of ongoing and imminent irreparable harm, Plaintiffs respectfully request preliminary and permanent injunctive relief to ensure that: (1) all Plaintiffs can continue to seek and benefit from voluntary payroll dues deduction agreements with agricultural employers; and (2) Plaintiff FLOC and its members can enter into and benefit from settlement agreements with agricultural employers.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the U.S. Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights, and to secure equitable or other relief for the violation of those rights.

3

5.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Rule 57 of the Federal Rules of Civil Procedure.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). Plaintiff FLOC regularly engages in expressive and associative activities, including union organizing and administering collective bargaining agreements, in this District. Many of FLOC's members live and/or work in this District each year. During the agricultural season immediately preceding this lawsuit, Plaintiff Victor Toledo Vences, a farmworker and member of FLOC, lived, worked, and had his union dues deducted from payroll administered in this District. During the agricultural season immediately preceding this lawsuit, Plaintiff Valentin Alvarado Hernandez, a farmworker and member of FLOC, lived, worked, and had his union dues deducted from payroll administered in this District. Accordingly, a substantial part of the events and omissions giving rise to Plaintiffs' claims have occurred and/or will occur in this District.

7.     Defendant Roy Cooper, ("Defendant Cooper" or "Governor Cooper") is sued in his official capacity, executes the law and administers the government throughout the state, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

8. Defendant Marion R. Warren ("Defendant Warren") is sued in his official capacity, administers courts throughout the state, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

## PARTIES

### Plaintiffs

9. Plaintiff FLOC is a farmworker labor union classified under Section 501(c)(5) of the Internal Revenue Code. Founded in 1967, FLOC's goals are to ensure that farmworkers have a voice in decisions that affect them in the workplace and in their communities and to bring all participants in the agricultural supply chain together to improve working conditions for farmworkers. FLOC currently administers collective bargaining agreements covering about 10,000 farmworkers in North Carolina and is actively organizing to increase its membership and pursue new collective bargaining agreements throughout the state. FLOC currently maintains offices in Dudley, North Carolina; Toledo, Ohio; and Monterrey, in the state of Nuevo León, Mexico.

10. Plaintiff Victor Toledo Vences lived and worked on a farm in Durham County, North Carolina during the 2017 agricultural season immediately preceding the filing of this suit. Plaintiff Toledo Vences is a Mexican national and works in North Carolina under an agricultural "guestworker" visa authorized by 8 U.S.C. §

5

1101(a)(15)(H)(ii)(a), commonly referred to as an "H-2A visa." For nearly twenty years, Mr. Toledo Vences has worked in North Carolina vegetable and tobacco growing operations for several months out of each year. Plaintiff Toledo Vences is a member of FLOC and, since 2005, has authorized his North Carolina employers to deduct weekly dues of 2.5% of his earnings from his pay and to transfer such dues directly to FLOC. Having successfully completed this season's work, Plaintiff Toledo Vences plans to exercise his right to return to North Carolina to work in future agricultural seasons, a right guaranteed by the collective bargaining agreement between FLOC and the North Carolina Growers' Association. Plaintiff Toledo Vences wants to maintain his FLOC membership by authorizing his employers to deduct union dues from his wages and transfer these dues directly to FLOC.

11.     Plaintiff Valentin Alvarado Hernandez lived and worked on a farm in Stokes County, North Carolina during the 2017 agricultural season immediately preceding the filing of this suit. Plaintiff Alvarado Hernandez is a Mexican national and has works in North Carolina under an H-2A visa. For the past three years, Mr. Alvarado Hernandez has worked in North Carolina vegetable and/or tobacco growing operations for several months out of each year. Plaintiff Alvarado Hernandez is a member of FLOC and, since 2016, has authorized his North Carolina employers to deduct weekly dues of 2.5% of his earnings from his pay

and to transfer such dues directly to FLOC. Having successfully completed this season's work, Plaintiff Alvarado Hernandez plans to exercise his guaranteed right to return to North Carolina to work in future agricultural seasons. Plaintiff Alvarado Hernandez wants to maintain his FLOC membership by authorizing his employers to deduct union dues from his wages and transfer these dues directly to FLOC.

**Defendants**

12.     Defendant Cooper is sued in his official capacity as the Governor of North Carolina. Governor Cooper signed the Farm Act, including the provisions challenged in this action, into law on July 12, 2017. Pursuant to Article III, Section 1 of the State Constitution, "the executive power of the State" is vested in Defendant Cooper in his capacity as Governor. Article III, Section 5(4) also provides that it is the duty of Defendant Cooper in his capacity as Governor to "take care that the laws be faithfully executed." Governor Cooper is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

13.     Defendant Warren is sued in his official capacity as the Director of the North Carolina Administrative Office of the Courts (NCAOC). Pursuant to N.C. Gen. Stat. § 7A-343(3a)(c), the Director's duties include "ensur[ing] overall

compliance with federal and State laws" in the court system. Defendant Warren is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

## FACTUAL ALLEGATIONS

### Farmworkers in North Carolina

14.     Agricultural producers in North Carolina rely on the labor of an estimated 100,000 or more workers per year. Many of the state's major crops, such as tobacco, Christmas trees, and sweet potatoes, require significant manual labor to plant, tend, harvest, and pack.

15.     Despite the critical role farmworkers play in the state's economy, they are among the lowest paid workers in the state. In the most recent National Agricultural Worker Survey (conducted in 2013-2014), half of U.S. farmworkers surveyed reported an average family annual income of less than $25,000 per year. Incomes have typically been lower in the eastern United States. In 2005, the average annual farmworker earnings for the region were only $7,150.

16.     Because agricultural work is seasonal and farmworkers are commonly paid for their work on a piece rate basis, earnings are often inconsistent and sporadic. Farmworker families face high rates of poverty and hunger. Nearly one-third of farmworker families surveyed nationally report living below the

poverty line and almost half of North Carolina farmworker households are food insecure.

17.     Agricultural work is consistently ranked among the most dangerous jobs in the nation, with high rates of work-related injury, heat-related illness, and exposure to toxic chemicals like pesticides.

18.     North Carolina leads all other states in the production of tobacco. Nicotine exposure is a significant concern for farmworkers working in tobacco. One quarter of tobacco workers in North Carolina experience green tobacco sickness, with symptoms of headache, dizziness, nausea/vomiting, insomnia, and anorexia each year.

19.     Substandard living conditions in migrant labor camps, where most North Carolina farmworkers live, also cause health issues. Overcrowding, unsafe drinking water, structural deficiencies, rodent and pest infestations, and poor sanitation are documented problems in farmworker housing. Studies in North Carolina show that only 11% of farmworker camps investigated met state migrant housing standards. Farmworkers in North Carolina often live in housing that is isolated from community services and hidden from public view.

20.     Over 90% of North Carolina farmworkers are of Hispanic/Latino descent. Most of North Carolina's farmworkers are of Mexican national origin and speak Spanish as their first language.

21.    In contrast to their employees, over 90% of individuals who operate North Carolina agricultural entities identify themselves as white.

22.    A large majority of North Carolina's farmworkers were born outside of the United States, and many are not United States citizens. In fiscal year 2017, North Carolina agricultural producers received permission to employ over 17,000 H-2A guestworkers. In 2014, North Carolina was the state with the highest number of jobs certified for H-2A visas.

23.    H-2A farmworkers have suffered significant abuses and are highly vulnerable to exploitation.  H-2A workers may be forced to pay illegal recruitment fees in their home country in order to be considered for employment. When they encounter poor or illegal working conditions, H-2A workers are unable to pursue other employment in the United States because their visas do not permit them to work for an employer other than their visa sponsor.  Many face obstacles returning to work on another H-2A visa in the future if they have to leave their employment before the end of the contract for reasons related to illness or injury, or because of family issues in their home country, or if they complain about problems in the workplace.

24.    Farmworkers have historically been, and continue to be, excluded from many basic labor protections at the state and federal level. When the federal Fair Labor Standards Act, Social Security Act, and National Labor Relations Act

were enacted in the 1930s, farmworkers were excluded from most of the protections afforded by these laws. They remain excluded from many of those protections today.

25. In North Carolina, farmworkers are substantially excluded from state minimum wage, overtime, workers' compensation, and youth employment laws.

26. There is ample historical evidence that these exclusions were motivated, at least in part, by legislators' awareness that substantial portions of the excluded workforce were African American. Many of these racially-motivated exclusions were maintained as North Carolina's agricultural workforce became predominantly Latino.

**FLOC's Work in North Carolina**

27. Plaintiff FLOC is a farmworker union of approximately 6,000 dues-paying members nationwide, around 80% of whom work in North Carolina. For over twenty years, FLOC has been the only union organizing and representing farmworkers in North Carolina.

28. In addition to its core work of organizing farmworkers to achieve a voice in their workplace and better working conditions, FLOC participates in general advocacy for the rights and well-being of farmworkers and their families, including advocacy for the rights of Latino immigrants in the state and nation. For

11

example, FLOC members have participated in visits to Washington, DC to advocate for immigration reform, as well as marches, rallies, and other public actions in North Carolina in support of immigrants' and workers' rights. FLOC regularly holds community meetings and events in North Carolina to educate and facilitate dialogue on issues such as: improving relations between immigrant communities and local police; workplace rights; financial aid and scholarships available to college-bound youths; and access to immigration relief such as Deferred Advocacy for Childhood Arrivals (DACA).

29.    FLOC works towards its goals by organizing workers to achieve collective bargaining agreements (CBAs) with agricultural producers in the state, under which farmworkers will be guaranteed certain wages, working conditions, and fair alternative dispute mechanisms for resolving workplace grievances and disputes.

30.    FLOC also publicly engages with the major economic interests at the top of the industry supply chain, such as international tobacco corporations, to convince them to adopt business practices that are fair to both agricultural producers and farmworkers.

31.    The vast majority of FLOC's dues-paying North Carolina members are H-2A guestworkers from Mexico who come to North Carolina each year for up

to ten months to perform seasonal agricultural work. Most of North Carolina's H-2A workers work in tobacco, Christmas trees, and sweet potatoes.

32. FLOC has been organizing in North Carolina since the 1990s. For more than ten years, it has maintained an office located in Dudley, North Carolina.

33. FLOC currently has two CBAs with agricultural producers in the state; these CBAs cover approximately 10,000 workers. One of FLOC's CBAs is with the North Carolina Growers' Association (NCGA), which is comprised of approximately 700 member farms throughout the state. In 2017, NCGA sponsored approximately 60% of the H-2A visas under which H-2A workers work in the state. More than 90% of the FLOC members covered under the CBA with the NCGA are H-2A guest workers.

34. Farmworkers are exempted from the federal National Labor Relations Act. There is no federal or state law requiring union elections, nor any other law that requires mandatory recognition of farmworker unions. Therefore, all CBAs existing between FLOC and agricultural employers in North Carolina are entered into on an entirely voluntary basis.

35. The CBAs provide significant benefits for the farmworkers covered by the agreements, such as guaranteed hourly wages, an orderly and fair process for recruitment and hiring, and a grievance procedure. The CBAs specifically provide that a worker who satisfactorily completes his or her term of employment

13

for an agricultural producer has a right to return the following season. This stipulation reduces the likelihood that workers will be retaliated against for complaining about unsafe or illegal working conditions. The recruitment process established by the CBAs has also largely eliminated the illegal practice of H-2A guestworkers being charged recruitment fees for access to jobs in North Carolina.

36.     The CBAs also provide significant benefits for agricultural producers, including ensuring consistent employment practices among a large group of agricultural producers (thereby reducing incentives to engage in unfair competitive practices like underpaying workers); and a grievance procedure and binding alternative dispute mechanisms (minimizing the potential for costly litigation).

37.     FLOC has pursued and secured CBAs and other improvements to farmworker conditions through various strategies, including public campaigns engaging major industry actors like tobacco corporations, and assisting its members in bringing well-publicized litigation to challenge illegal employment practices.

38.     On occasion, FLOC has also participated in lawsuits as a party to pursue legal issues of importance to its members, such as in a case addressing whether the federal Department of Labor properly reinstated regulations governing minimum wages for H-2A guestworkers. Lawsuits in which FLOC participates, or which FLOC assists its members in bringing by providing legal referrals, are meant

14

to achieve tangible gains for FLOC's members and also to educate the public about the working conditions confronted by farmworkers.

39.     As part of an agreement to settle litigation over employment issues, some FLOC members have negotiated for voluntary union recognition or secured expanded collective bargaining rights as part of a class-wide settlement agreement. In one such case, the defendant employer and the plaintiff farmworkers agreed that it was in their mutual interest to resolve the case in an agreement that included: employer recognition of FLOC as the bargaining representative of workers who sign cards affirming their FLOC membership; an employer pledge to remain neutral on unionization matters in its workforce; dues checkoffs; a guaranteed hourly wage of $11.27/hour (increased from a prior wage of $8 per hour); worker/employer committees to address safety issues, worker housing, and employer competitiveness; and adoption of a binding alternative dispute mechanism for resolving workplace disputes.

40.     Of FLOC's two active CBAs in the state, one is due to expire in November 2019 and the other in December 2020.

41.     During the period covered by a CBA, FLOC must actively administer the CBAs throughout the state. Administration duties include: monitoring and assisting covered workers with the recruitment process in Mexico; monitoring agricultural producers' compliance with the CBAs; assisting members and other

15

affected workers with understanding the CBA terms and their rights under the CBA; training workers on their rights and FLOC's organizing efforts; and assisting covered workers in filing and pursuing grievances.

42.     In addition, FLOC provides other significant assistance to its members, including assisting injured workers and their families in filing workers' compensation or other claims for benefits, assisting workers and their families in obtaining legal counsel for immigration or employment matters, and assisting with repatriation of the remains of H-2A guestworkers who pass away while working in the United States.

43.     Even as FLOC administers CBAs and assists its members, it is constantly seeking to organize new members in order to strengthen its members' bargaining power, improve conditions at farms not currently covered by CBAs, and raise standards for farmworkers throughout the industry.

44.     Given its small staff and limited resources, FLOC faces significant logistical challenges in its statewide CBA administration and organizing work. H-2A workers, as well as many other migrant farmworkers, typically live in isolated, employer-owned labor camps in rural areas throughout the state. Most have no access to personal cars and depend on their employers for transportation to shopping and other town-based resources.

45.    Farmworkers working under H-2A guestworker visas are typically paid by checks, which their employers cash for them or which they take to local stores that offer check cashing services for a fee. Because of the migratory and seasonal nature of their work, language barriers, and their low incomes, many farmworkers in North Carolina lack access to credit cards and bank accounts and conduct most transactions in cash. Because farmworkers live in rural areas, often do not have their own transportation, lack computer access, do not speak English proficiently, and work long hours, even those who do maintain bank accounts have limited access to those accounts. Because H-2A guestworkers and most other migrant farmworkers live in North Carolina temporarily, they are unlikely to have local bank accounts.

46.    Farmworkers' transient jobs and limited access to banking present many obstacles to their ability to make recurring payments, including elective weekly payments like union dues. Indeed, agricultural producers commonly deduct—sometimes legally and sometimes not—the costs of items like meals, tools, or repayments for loans, directly from their employees' wages to ensure that payments for regularly furnished items are consistently and reliably made.

47.    Under the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.8(a)(2), deduction and diversion of wages elected by the employee for his or her benefit, such as union dues or donations to charities, is lawful if the amount or rate

17

of the proposed deduction is known and agreed upon in advance and the employer has written authorization from the employee which (i) is signed on or before the payday(s) for the pay period(s) from which the deduction is to be made; (ii) indicates the reason for the deduction; and (iii) states the actual dollar amount or percentage of wages which shall be deducted from one or more paychecks.

48.     When farmworkers decide to join FLOC, they usually execute a written authorization, compliant with N.C. Gen. Stat. § 95-25.8, requesting that their employer deduct 2.5% of their weekly wages and directly divert such funds to FLOC for the payment of union dues. These authorizations for direct payroll deductions of dues are commonly known as "dues checkoffs."

49.     Under North Carolina law applicable to all industries for decades, union dues may only be deducted from the pay of workers who individually and voluntarily agree to such deductions. *See id;* N.C. Gen. Stat. § 95-82.

50.     Under North Carolina law, workers who authorize dues checkoffs retain the right to withdraw that authorization if they change their mind about union membership. *See* N.C. Gen. Stat. § 95-25.8(a)(2).

51.     Because of FLOC's limited institutional resources, the size and geographic dispersion of FLOC's North Carolina membership, and the fact that most FLOC members lack ready access to banking and credit cards, FLOC relies heavily on its members' elective dues payments — deducted from their wages and

transferred to FLOC pursuant to N.C. Gen. Stat. § 95-25.8 — to sustain its organizing and advocacy work in North Carolina.

52.    H-2A guestworkers in the state live in employer provided housing spread out over approximately 1,000 labor camps. FLOC does not have the resources and staff to collect dues each week from each and every one of its approximately 2,000 dues-paying members located in North Carolina at a given time. To do so would require FLOC staff to make in-person visits to members' labor camp housing during non-working hours.

53.    Farmworkers' work days are often long. During the height of the season, workers are often in the field from sunrise to sunset Monday to Friday, and perform at least half a day's work on Saturday. During the busiest part of the season, farmworkers sometimes work on Sundays. Farmworkers usually spend their limited time off doing chores such as laundry and grocery shopping.

54.    FLOC currently has four full time staff members and one part time staff member working throughout the state. Its membership is widely dispersed, with members located in far western, eastern, southern, and northern sections of the state.

55.    Because the Farm Act prohibits agreements by agricultural producers to honor employees' requests for union dues to be deducted from their payroll, FLOC is currently unable to enter into any new agreements with agricultural

19

producers that provide for such dues checkoffs. This severely harms FLOC's efforts to join new members. In addition, FLOC will be unable to collect dues from most of its current members once its existing CBAs expire.

56.    By preventing FLOC from settling litigation or anticipated litigation as a party, from securing recognition as a bargaining representative in settlements by FLOC members, or from obtaining CBAs in settlements entered into by FLOC members, the Farm Act significantly hinders FLOC's ability to advance and publicize its members' interests through litigation.

**Events Leading to Enactment of the Farm Act**

57.    In the past fifteen years, FLOC has significantly increased its membership in North Carolina and won CBAs covering more of the state's agricultural workforce, including approximately 50% of the H-2A workers in North Carolina. It has also succeeded in conducting highly publicized campaigns to pressure agricultural corporations and producers to negotiate with workers for better working conditions.

58.    In 2004, FLOC won a CBA with the North Carolina Grower's Association (NCGA) that covered nearly 7,000 of the state's H-2A workers.

59.    In 2011, FLOC and the non-profit organization Oxfam America jointly issued "A State of Fear: Human Rights Abuses in North Carolina's Tobacco

20

Fields," a highly publicized report that detailed dangerous working conditions in the state's tobacco fields.

60. In 2012, after a six year long campaign, the major tobacco corporation Reynolds American, Inc. finally agreed to meet with FLOC leaders to discuss working conditions for North Carolina tobacco workers.

61. Throughout the last decade, FLOC members, with the support of their union, have brought numerous claims under the Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act against several North Carolina agricultural producers seeking recovery for wage underpayment and other violations. Such suits have led to recovery of significant amounts of unpaid wages for hundreds of workers, as well as entry into a CBA as part of a settlement that occurred in the course of court-mandated mediation in *Agustina Velasquez et al. v. Burch Equipment, LLC, et al.*, Civ. Action 7:14-CV-303-FL (E.D.N.C., Compl. filed Dec. 31, 2014).

62. On February 23, 2016, FLOC members, including Plaintiff Alvarado Hernandez, filed a class action suit against State Senator Brent Jackson and his company, Jackson Farming, for wage theft. The case, styled *Sanchez Rodriguez, et al. v. Jackson Farming Company of Autryville*, Civ. Action 7:16-CIV-28-D (E.D.N.C.), ended in a court-mediated settlement in September 2016. The

21

settlement was preliminarily approved on January 20, 2017 and received final approval on July 11, 2017.

63. As FLOC has increased its membership in North Carolina and expanded the number of workers covered by union agreements, and as its members have been involved in well-publicized litigation, FLOC's organizing drives have been met with considerable backlash by the North Carolina Farm Bureau, a trade group representing the interests of agricultural producers in the state, and some agricultural producers.

64. As part of this backlash, some agricultural producers and their trade group have successfully pushed for legislation in an attempt to obstruct FLOC's efforts to improve working conditions for farmworkers in the state.

65. In 2013, shortly after FLOC had convinced Reynolds American, Inc. to meet with some of its members to discuss working conditions in North Carolina tobacco fields, grower interest groups successfully lobbied for state legislation targeting FLOC's ability to use market-based pressure to improve conditions for farmworkers. The General Assembly passed an "Agricultural Right to Work Provision," which stated that "[a]ny provision that directly or indirectly conditions the purchase of agricultural products or the terms of an agreement for the purchase of agricultural products upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor

union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina." 2013 North Carolina Laws S.L. 2013-413 (H.B. 74), § 15, codified as N.C. Gen. Stat. § 95-79(b).

66.     This legislation was intended to undermine FLOC's ability to engage with corporate purchasers of agricultural products and secure agreements that would guarantee expanded labor rights in the industry.

67.     In April 2017, North Carolina Senators Brent Jackson, Norman Sanderson, and Andrew Brock introduced the Farm Act, a four page bill, in the North Carolina General Assembly. In its original incarnation, the law did not address farm labor issues, focusing on property matters such as bonding for handlers of agricultural products, agricultural zoning, classification of agricultural land, and the laws governing abandoned livestock. The bill was passed in the Senate on June 12, 2017.

68.     Throughout May and up to late June 2017, the Farm Act was expanded to include sections addressing matters such as the modernization of laws governing forest rangers, forest practice guidelines, agritourism, and regulatory exemptions for agricultural buildings and vehicles.

69.     On June 28, 2017, after the Farm Act had already passed the second of three required readings in the House on the previous day, Representative Jimmy

Dixon (also an owner of Jimmy Dixon Farms in Duplin County), introduced Amendment A3, which added Section 20.5 to the Farm Act.

70. Section 20.5 proposed to amend N.C. Gen. Stat. § 95-79(b), to add the text underlined below:

> (b) Any provision that directly or indirectly conditions the purchase of agricultural products, ~~products or~~ the terms of an agreement for the purchase of agricultural products, or the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. Further, notwithstanding G.S. 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable against public policy in restraint of trade or commerce in the State of North Carolina.

71. Section 20.5 specifies that it "is effective when it becomes law and applies to agreements and settlements entered into, renewed, or extended on or after that date."

72. Section 20.5 was introduced on the House floor around 4:47 PM on June 28, 2017, just prior to the third and final vote to adopt the Farm Act. By that point, the Farm Act had already undergone five public hearings. Because the amendment was introduced on the House floor and maintained in the final

24

conference committee report around 11:00 PM that evening, there was never an opportunity for the public to comment during consideration of the amendment.

73. Debate in the General Assembly regarding the amendment lasted less than ten minutes. Representative Dixon introduced the amendment on the House floor, explaining that:

> This amendment — there are various organizations that for some time over the last couple of weeks had been looking for the right opportunity but weren't necessarily going to do it, here in the Farm Act, although I think it's very applicable. But that's an explanation of why at this point that we're offering an amendment, Farm Bureau and other farm organizations. And over the last couple of days I've heard from a lot of farmers across the state expressing concerns about this and wishing that there was a vehicle to do what this amendment does. It strengthens our Right to Work statutes by declaring certain agreements involving agriculture producers are against the public policy of North Carolina. The amendment would prohibit the use of litigation to force farms to unionize and ensure farmers are not required to collect dues for their employees. This reduces a regulatory burden on farms that is not required under federal law and is completely within the State's purview to regulate.

74. When asked by one representative why such a measure would be necessary given the state's strong right to work laws, Representative Dixon claimed:

> Because of continued harassment from out of state there seems to be a growing wave of folks that are interested in farm labor. It's--some consider it low-hanging fruit to do things like that, and it's just a general tendency for an increase in activity that we consider to be harassment.

25

75.     When asked by the same representative whether he was afraid of farmworker unions organizing, Representative Dixon replied:

> Sir, I'm not afraid of anything, and I understand that food is very important. And so, no, we're not afraid, but an ounce of prevention is worth a pound of cure. And there are predatory folks that make a good living coming around and getting people to be dissatisfied, and a few of us farmers are getting a little bit tired of it and we want some properly measured priority so that we can continue to feed you.

76.     Also on June 28, Representative Dixon was quoted in a newspaper article stating that "the N.C. Farm Bureau and other farm organizations requested the limits on unions. Farmers are under undue pressure to collect union dues and sign union contracts."

77.     On June 28, the amendment passed the House. Because the House and Senate versions of the Farm Act differed, a conference committee was appointed that same night. Representative Dixon chaired the House Conference Committee for the Farm Act and Senator Brent Jackson, owner of Jackson Farming Company and one of the defendants in the 2016 wage theft suit brought by FLOC members, chaired the Senate Conference Committee for the bill. The Conference Committee completed its report the same evening, incorporating the amendment, and it was immediately adopted by both chambers.

78.     The Farm Act was ratified by the General Assembly on June 29, 2017, and signed by Governor Cooper on July 12, 2017.

79.    In the five years preceding the Farm Act's passage, North Carolina's Governors and General Assembly have also repeatedly proposed, and sometimes approved, numerous laws or policies targeting non-citizens in the state. In the same session during which the General Assembly considered and passed the Farm Act, it also considered no fewer than four bills that would have subjected immigrants living and working in the state to increased restrictions, penalties, or scrutiny.

**Effects of the Farm Act on FLOC and its Members**

80.    Since at least 1997, FLOC has been the only farmworker union organizing and representing farmworkers in North Carolina, which means it is the only union impacted by the Farm Act's restrictions.

81.    The Farm Act creates unique and severe hardships for Plaintiff FLOC and its members in North Carolina, including Plaintiffs Toledo Vences and Alvarado Hernandez.

82.    Because of the size and geographic dispersion of FLOC's North Carolina membership, as well as its own limited resources and staff, FLOC lacks the resources and ability to collect weekly dues directly from each of its approximately 2,000 members who are working in the state at a given time.

83.    Union member dues constitute approximately 50-60% of FLOC's annual budget. Timely and consistent collection of dues is essential to FLOC's

27

ability to administer CBAs and provide services to its members. The Farm Act guts FLOC's ability to maintain this essential and irreplaceable source of funding.

84. Because they generally lack ready access to bank accounts, credit cards, and other means of making automatic recurring payments, FLOC members, including Plaintiffs Toledo Vences and Alvarado Hernandez, rely on dues checkoffs to timely and consistently pay their FLOC dues.

85. Without the benefit of dues checkoffs and given their lack of access to banking in North Carolina, FLOC members, including Plaintiffs Toledo Vences and Alvarado Hernandez, will have to set aside cash for payment of dues to FLOC. As a practical matter, this will require members to hold cash on their person or in their personal effects in communal labor camp housing for weeks at a time, exposing them to significant danger of robbery or theft.

86. Because of the Farm Act, FLOC is currently unable to grow its union membership by entering into new agreements with agricultural producers for dues checkoffs. FLOC members are unable to benefit from dues checkoffs and risk losing their ability to associate with FLOC and join in collective activity to improve their well-being and the well-being of other farmworkers. North Carolina farmworkers who are not currently represented by FLOC, but wish to join, are limited in their abilities to gain access to union representation.

87. When FLOC's existing dues checkoff agreements expire in 2019 and 2020, the Farm Act will force FLOC to divert most of its staff resources to dues collection or other fundraising efforts, gutting its ability to administer CBAs, to assist with member grievances, and to organize new workers into the union. As a result, FLOC will be forced to provide less personal assistance to members like Plaintiffs Toledo Vences and Alvarado Hernandez, who have benefitted individually from FLOC's assistance and advocacy with workplace grievances, work-related injuries, wage theft, and other legal matters. North Carolina farmworkers who have not yet had an opportunity to meet with FLOC representatives and learn about the benefits of union membership will have fewer opportunities for these organizing contacts.

88. By invalidating and rendering unenforceable all settlement agreements that stipulate to recognition of FLOC or an agreement between FLOC and agricultural producers, the Farm Act deprives FLOC and its members the ability to secure settlement provisions that they believe are in their best interests.

89. By invalidating and rendering unenforceable all settlement agreements between FLOC and agricultural producers, the Farm Act strips from FLOC the right and ability to settle litigation.

## CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATION OF FREE EXPRESSION AND FREE ASSOCIATION RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### 42 U.S.C. § 1983
### *On Behalf of All Plaintiffs Against All Defendants*

90.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

91.     Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the free expression and free association rights protected under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiff FLOC asserts this claim on behalf of itself and its members.

92.     In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

93.     FLOC is an expressive association that seeks to promote the interests of farmworkers.

94.     FLOC engages in expression, including political advocacy, to advance the interests of its members and the interests of farmworkers generally.

95.     FLOC participates in and assists its members in participating in litigation to express and advance the interests of its members, and the interests of farmworkers generally.

96.     FLOC relies on its members' contributions, made through dues checkoffs, to maintain the association and to engage in protected expression.

97.     FLOC members, including Plaintiffs Toledo Vences and Alvarado Hernandez, wish to associate with FLOC, and with other farmworkers who participate in FLOC, in order to express their views and interests.

98.     FLOC members, including Plaintiffs Toledo Vences and Alvarado Hernandez, wish to contribute to FLOC as they previously have, by dues checkoffs. Other methods for arranging payments would be extremely burdensome for Plaintiffs, subjecting them to great expense and inconvenience, and risk to their property and personal safety.

99.     The Farm Act imposes special burdens on protected expression and association by invalidating dues checkoff agreements that would ensure FLOC receives direct contributions authorized by individual members.

100.    By preventing FLOC, and only FLOC, from entering into dues checkoff agreements, the Farm Act engages in speaker-based discrimination.

101.    The Farm Act imposes special burdens on protected expression and union association by prohibiting settlement agreements and agreements not to sue

that are conditioned "upon an agricultural producer's status as a union or nonunion employer," or "upon an agricultural producer's . . . entry into or refusal to enter into an agreement with a labor union or labor organization."

102. The Farm Act effectively prevents FLOC from expressing and advancing the interests of its members, and North Carolina farmworkers generally, by making it impossible for FLOC to enter into, or benefit from, settlement agreements or agreements not to sue. Because these restrictions on litigation-related expression and association apply only to farmworkers' unions — i.e., FLOC — they amount to speaker-based discrimination.

103. By selectively burdening farmworkers' ability to associate and express their interests through a labor union, the Farm Act burdens speech based on its content and viewpoint.

## COUNT TWO
## VIOLATION OF RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
## 42 U.S.C. § 1983
### *On Behalf of All Plaintiffs Against All Defendants*

104. The foregoing allegations are repeated and incorporated as though fully set forth herein.

32

105. Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. Plaintiff FLOC asserts this claim on behalf of itself and its members.

106. The Farm Act strips rights and privileges from a workforce that is over 90% Latino, over 90% non-citizens, and largely of Mexican descent.

107. The Farm Act solely targets and impacts Plaintiff FLOC, a union whose membership is nearly 100% Latino and over 90% comprised of Mexican H-2A guestworkers.

108. As migrant farmworkers, Plaintiffs Toledo Vences and Alvarado Hernandez and the membership of FLOC are members of a discrete and insular group that lacks political power, in which disfavored racial and ethnic minorities have been and continue to be overrepresented, and which has been historically subject to and continues to be disproportionately subject to *de jure* and *de facto* discrimination, labor exploitation, poverty, human trafficking, debt peonage, and involuntary servitude.

109. The Farm Act deprives Plaintiff FLOC of the equal protection of the laws based on the race, national origin, alienage, and/or migrant farmworker status of its members and on the basis of the race, national origin, alienage, and/or migrant farmworker status of the workforce it is dedicated to organizing and assisting.

33

110. The Farm Act deprives Plaintiffs Toledo Vences and Alvarado Hernandez of the equal protection of the laws based on their race, national origin, alienage, and/or migrant farmworker status.

111. The Farm Act hinders the exercise of Plaintiffs' fundamental First Amendment rights to speech and association based on the identity of the speakers and the content and viewpoint of their speech.

112. The Farm Act invidiously targets North Carolina farmworkers and their sole union and imposes legal disabilities and disadvantages not imposed on other workers or unions in the state.

113. Because the purposes of the Farm Act are to create obstacles to constitutionally-protected speech and association, to effectuate invidious discrimination based on race, national origin, alienage and/or migrant farmworker status of FLOC members, and to punish and silence FLOC, the conceivable state interests supporting the Farm Act are not compelling, important, or legitimate.

114. There is no rational, substantial, or narrowly tailored relationship between any conceivable state interest and the Farm Act's abolition of Plaintiffs' pre-existing legal rights to voluntary dues checkoffs and to negotiate settlement terms that stipulate an agreement with FLOC.

## COUNT THREE
## VIOLATION OF RIGHTS UNDER 42 U.S.C. § 1981 TO CONTRACT, TO BE PARTIES, AND TO LEGAL PROCEEDINGS
## 42 U.S.C. § 1983
### *On Behalf of All Plaintiffs Against All Defendants*

115.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

116.   Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violations of 42 U.S.C. § 1981. Plaintiff FLOC asserts this claim on behalf of itself and its members.

117.   The Farm Act strips the rights to make and enforce contracts, to sue, be parties, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens from a workforce and a union that are both over 90% Latino, over 90% non-citizens, and largely of Mexican ancestry.

118.   The Farm Act unlawfully deprives Plaintiff FLOC of the rights to make and enforce contracts, to sue, to be parties, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens based on the race, ethnicity, and/or alienage of its members and on the basis of the race, ethnicity and/or alienage of the workforce it is dedicated to organizing and assisting.

119.   The Farm Act unlawfully deprives Plaintiffs Toledo Vences and Alvarado Hernandez of the rights to make and enforce contracts, to sue, to be parties, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens based on their race, ethnicity, and/or alienage.

**COUNT FOUR**
**VIOLATION OF PROHIBITION ON BILLS OF ATTAINDER, ART. 1, § 10**
**OF THE UNITED STATES CONSTITUTION**
**42 U.S.C. § 1983**
*On Behalf of Plaintiff FLOC Against All Defendants*

120.   The foregoing allegations are repeated and incorporated as though fully set forth herein.

121.   Plaintiff FLOC asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the Bill of Attainder Clause of Article 1, Section 10 of the United States Constitution. Plaintiff FLOC asserts this claim on behalf of itself and its members.

122.   The Farm Act violates the Bill of Attainder Clause because it impermissibly targets and punishes Plaintiff FLOC, the only farmworker union in North Carolina, by depriving it of the ability to enter into dues checkoff agreements.

123.   The Farm Act additionally violates the Bill of Attainder Clause of Article 1, Section 10 of the United States Constitution because it impermissibly singles out and punishes Plaintiff FLOC and its members by depriving FLOC of the ability to enter into any settlement agreements with agricultural producers as a party to litigation, as well as the ability to enter into agreements with agricultural producers pursuant to stipulations in another party's settlement agreement.

124.   The Farm Act constitutes an unconstitutional Bill of Attainder by punishing Plaintiff FLOC and its members for its organizing activity, advocacy for the rights of farmworkers, and purported acts of "harassment" without a judicial trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(a)  Preliminarily enjoin enforcement of Section 20.5 of the Farm Act;

(b)  Order Defendants to immediately notify their officers, agents, employees, and other persons in active concert or participation with them, including the administrative and judicial officials of all state courts, if a preliminary injunction is entered;

37

(c) Enter a declaratory judgment stating that Section 20.5 violates Plaintiffs' free speech and free association rights under: the First and Fourteenth Amendments of the U.S. Constitution; the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution; 42 U.S.C. § 1981; and the Bill of Attainder Clause (Article I, Section 10) of the U.S. Constitution.

(d) Enter a permanent injunction enjoining the enforcement of Section 20.5 of the Farm Act;

(e) Order Defendants to immediately notify their officers, agents, employees, and other persons in active concert or participation with them, including the administrative and judicial officials of all state courts, if a permanent injunction is entered;

(f) Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920 and as otherwise permitted by law; and

(g) Order such other relief as this Court deems just and equitable.

Respectfully submitted this 15th day of November, 2017,

__/s/ Kristi L. Graunke_____
Kristi L. Graunke
North Carolina Bar No. 51216
kristi.graunke@splcenter.org
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Suite 340
Decatur, GA 30030
Tel.:  334-324-5177

Meredith B. Stewart
Louisiana Bar No. 34109
meredith.stewart@splcenter.org
Southern Poverty Law Center
1055 St. Charles Avenue, Suite 505
New Orleans, LA 70130
Tel.:  504-486-8982
Fax:  504-486-8947

Carol Brooke
North Carolina Bar No. 29126
carol@ncjustice.org
Clermont Ripley
North Carolina Bar No. 36761
clermont@ncjustice.org
North Carolina Justice Center
PO Box 28068
Raleigh, NC 27611
Brooke Tel: 919-856-2144
Ripley Tel: 919-856-2154
Fax: 919-856-2175

Brian Hauss
New York Bar No. 5437751
bhauss@aclu.org
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212-549-2500
Fax: 212-549-2650

Christopher Brook
North Carolina Bar No. 33838
cbrook@acluofnc.org
ACLU of North Carolina
P. O. Box 28004
Raleigh, NC  27611-8004
Tel: 919-834-3466

Robert J. Willis
North Carolina Bar No. 10730
RWillis@rj-willislaw.com
Law Office of Robert J. Willis, P.A.
P.O. Box 1828
Pittsboro, NC 27312
Tel: 919-821-9031
Fax:919-821-1763

*Counsel for Plaintiffs*