# EXHIBIT 23

Expert Declaration of Professor Charlotte Garden

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FARM LABOR ORGANIZING COMMITTEE, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No.1:17-cv-01037 |
| | ) |
| ROY COOPER, et. al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF PROFESSOR CHARLOTTE GARDEN

I, Charlotte Garden, hereby declare and state as follow:

1.      I am submitting this declaration in support of the complaint and motion for preliminary injunction filed by Plaintiffs Farm Labor Organizing Committee ("FLOC"), Victor Toledo-Vences, and Valentin Alvarado-Hernandez. In my view, the portions of North Carolina Senate Bill 615, also known as the Farm Act, that are being challenged in this case seriously impede the efforts of labor organizations, workers, and employers to engage in speech, petitioning, and other expressive activity.

1

**Background**

2.      I am an expert on free expression and association issues affecting labor organizations, including issues related to dues assessment and collection.

3.      I am a tenured Associate Professor employed at the Seattle University School of Law, where I have worked since July 2011.

4.      I routinely teach courses in labor law and constitutional law. For example, I have taught each of the following courses at least once, and several multiple times: Constitutional Law I & II; Labor Law; Appellate Litigation Seminar on Labor and Employment Law; Legislation & Regulation; Civil Rights Amicus Clinic.

5.      My research and writing focuses mainly on unions' and workers' free expression and association, including unions' use of litigation to further their expressive goals. My published academic articles on these topics include the following: *Labor Values are First Amendment Values: Why Union Comprehensive Campaigns are Protected Speech*, 79 FORDHAM L. REV. 2617 (2011); *Citizens, United and* Citizens United*:  The Future of Labor Speech Rights?*, 53 WM. & MARY L. REV. 1 (2011); *Teaching for America: Unions and Academic Freedom*, 43 U. TOL. L. REV. 563 (2012); *Union Made: Labor's Litigation for Social Change*, 88 TULANE L. REV. 193 (2013); *"So Closely Intertwined": Labor Interests and Racial Solidarity*, 81 GEO. WASH. L. REV. 1135 (2013) (with Nancy Leong); *Unions & Campaign Finance Litigation*, 14 NEVADA L.J. 364 (2014); *Citizens*

*United & the First Amendment of Labor Law*, 43 STETSON L. REV. 571 (2014);

*Meta Rights*, 83 FORDHAM L. REV. 855 (2014).

6.      I am also a co-author of a casebook on labor law: *Modern Labor Law In The Private And Public Sectors: Cases And Materials* (with Seth Harris, Joseph Slater and Anne Lofaso) (Carolina Academic Press, 2nd Ed., 2016).

7.      In addition to my teaching and research, I occasionally draft and file amicus briefs, often in cases involving the First Amendment rights of unions.

8.      My other academic positions include a two-year teaching fellowship in the Appellate Litigation Program at Georgetown University Law Center, and one semester as a visiting professor at the University of Alabama Law School.

9.      Before entering law teaching, I was a practicing lawyer. Among other positions, I was employed as an associate at union-side firm Bredhoff & Kaiser, PLLC for about two and one-half years.

10.     I earned my J.D., cum laude, from New York University School of Law in 2003. I also earned an LL.M., with distinction, from Georgetown University Law Center upon my completion of a two-year fellowship in the Appellate Litigation Program.

11.     A true and correct copy of my curriculum vitae is attached as Exhibit A.

**Union Organizing & Dues Checkoff**

12.     The Farm Act states in part that "an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable . . . ."

13.     This language renders invalid and unenforceable what are commonly known as "checkoff" agreements, which typically allow union-represented workers to authorize their employer to deduct the amount of union dues or fees from their paychecks, and remit that amount directly to the union.

14.     Dues checkoff agreements are common in private sector collective bargaining agreements. For example, in 1960, Bureau of Labor Statistics (BLS) researchers observed that "the proportion of workers under agreements with checkoff provisions rose from 20 percent in 1942 to 40 percent in 1946, and to 78 percent by 1951. It has remained at this level since." U.S. Department of Labor, *Union Security and Checkoff Provisions in Major Union Contracts 1958-59*, March 1960, at 11.[1] More than twenty years later, another BLS study found checkoff agreements had become even more common. *Major Collective Bargaining Agreements: Union Security and Dues Checkoff Provisions*, May 1982, at 23 (finding that "[o]f the 1,327 major collective bargaining agreements examined, 1,138 (86 percent), covering 5.2 million workers, contained checkoff

---

[1]*Available at* https://fraser.stlouisfed.org/files/docs/publications/bls/bls_1272_1960.pdf

4

provisions").[2] Similarly, a recent U.S. Department of Labor publication, which was last updated in 2014, observes that "[l]ocal unions receive most of their money from their members in the form of dues payments. A common method of paying union dues is through dues checkoff." US DOL, *Conducting Audits in Small Unions: A Guide for Trustees to a 10-Step Audit*, Revised May 2014, at Ch. 4.[3]

15.     For employers and employees covered by the National Labor Relations Act (NLRA), dues checkoff is a mandatory subject of bargaining.  This means that employers who are covered by the NLRA must bargain in good faith over this topic with the labor unions that represent their employees. *See, e.g.*, *Caroline Farms Division of Textron, Inc. v. NLRB*, 401 F.2d 205, 210 (4th Cir. 1968). While "agricultural laborers" are excluded from the NLRA, 29 U.S.C. § 152(3), this requirement in the NLRA context illustrates that dues checkoff is a core aspect of relations between labor organizations, employers, and employees.

16.     Where labor organizations cannot secure dues checkoff agreements, they must then direct resources to collecting and processing individual member dues, which are a substantial source of revenue for many labor organizations. Conversely, where unions have checkoff agreements, member dues payments are more predictable, and therefore union finances are more secure. As the National Labor

---

[2] *Available at* https://fraser.stlouisfed.org/files/docs/publications/bls/bls_1425-21_1982.pdf
[3] https://www.dol.gov/olms/regs/compliance/comp_pubs/smallunions_2017.pdf

Relations Board recently put it in a case concerning employers' authority to unilaterally terminate checkoff clauses at the expiration of a collective bargaining agreement:

> Cancellation of dues checkoff eliminates the employees' existing, voluntarily-chosen mechanism for providing financial support to the union. By definition, it creates a new obstacle to employees who wish to maintain their union membership in good standing. . . . Such a change also interferes with the union's ability to focus on bargaining, by forcing it to expend time and resources creating and implementing an alternate mechanism for dues collection . . . .

*Lincoln Lutheran of Racine*, 362 N.L.R.B. No. 188 at 3 (2015).

17.     Dues checkoff agreements can be especially valuable for unions in "right to work" states like North Carolina, where unions and employers are forbidden by law from conditioning employment on paying dues or fees to a labor union. Where dues and fees are entirely voluntary, workers' decisions to authorize dues checkoff agreements provide more security to unions trying to anticipate future income and more efficiency and convenience for workers who elect to pay dues.

18.     Where labor organizations have large numbers of low-income and unbanked members, dues collecting and processing activities can be difficult and time-consuming because members will often need to pay dues in small increments and in cash. And labor organizations that have large numbers of migrant or seasonal worker members will face more costs associated with accurately tracking and processing employment-linked dues than would labor organizations whose

6

members are mostly employed on a full-time, year-round basis. There is reason to believe that many FLOC members and potential members fall into all of these categories. First, a recent study of agricultural workers found that in the 2013 and 2014 fiscal years, agricultural workers' "mean and median total family incomes . . . were in the range of $20,000 to $24,999," and "[t]hirty percent of farmworkers had family incomes below poverty." US Department of Labor, *Findings From the National Agricultural Workers Survey (NAWS) 2013-2014*, December 2016, at 37.[4] Second, other research shows that lower-income families of color are more likely to be unbanked than the general population. Sheila C. Bair, *Improving Access to the U.S. Banking System Among Recent Latin American Immigrants*, January 2003, at 19 (citing sources, including a 2001 survey of Latin American immigrant families in which 62% of "respondents making less than $20,000 per year" "had no formal relationship with a depository institution").[5] Third, farm work is often seasonal work, and a significant minority of farmworkers are migrant workers. *NAWS 2013-2014*, at 5 ("[s]ixteen percent of farmworkers interviewed in 2013-2014 were migrants") & 26 ("During the previous year, farmworkers spent an average of 35 weeks employed in farm work, six weeks employed in non-farm work, two weeks abroad, and nine weeks living in the U.S. but not working"). In

---

[4] *Available at* https://www.doleta.gov/agworker/pdf/NAWS_Research_Report_12_Final_508_Compliant.pdf
[5] *Available at* https://publications.iadb.org/handle/11319/741

addition to those factors, dues collection will be more difficult for labor organizations whose members are spread across a large area during their working time as compared to those who work in a single factory or office building. All this means that the Farm Act targets workers and labor organizations that could especially benefit from dues checkoff agreements.

19.    One consequence of the Farm Act will be to make it more difficult for agricultural workers and FLOC to engage in speech, including political speech and expressive association.

20.    Labor organizations use member dues for a variety of activities, including organizing new workers. The extent to which labor organizations should be focused on new organizing (rather than other activities) has been a matter of discussion within the highest levels of the labor movement. For example, in 1995, a slate of candidates running on the motto "Changing to Organize"—a direct reference to the perceived need to increase union spending on organizing new workers—was elected to lead the AFL-CIO. Then, in 2005, a group of unions split from the AFL-CIO to form a new labor federation called Change to Win (CTW); a significant driver of this split was the perception of the CTW unions that the labor movement should devote even more of its resources to new organizing, particularly among service workers.

21.     Union organizing campaigns often engage with community, religious, and advocacy groups, and may also entail petitioning government at the local, state, or federal level. I wrote about one example of such a campaign in my article, *Labor Values are First Amendment Values: Why Union Comprehensive Campaigns are Protected Speech*, 79 Fordham L. Rev. 2617, 2622 (2011). A true and correct copy of this article is attached as Exhibit B. Much of this advocacy by labor organizations and other groups is protected by the First Amendment. *See, e.g.*, *Thornhill v. Alabama*, 310 U.S. 88 (1940) (striking down criminal conviction for picketing on First Amendment grounds); *Thomas v. Collins*, 323 U.S. 516, 533 (1945) (holding that Texas statute requiring union organizers to register with state violated their First Amendment rights).

22.     Agricultural laborers are not covered by the NLRA, and in North Carolina they also lack a statutory mechanism for mandatory union recognition under state law. This means that employers are not required by law to bargain or otherwise engage with labor organizations representing these workers. Where that is the case, workers have limited options to try to improve their working conditions as compared to workers who are covered by the NLRA or another collective bargaining statute. Among those options: they, together with labor organizations, can attempt to gain public or governmental support for their demands through expressive advocacy, as described in the previous paragraph. In other words, labor

organizations like FLOC that organize and represent workers who are not already covered by a collective bargaining statute are relatively likely to engage in organizing activity that has a substantial expressive component.

23.    By making dues collection more expensive and time consuming, the Farm Act will make it more difficult for FLOC to engage in these activities.

24.    In addition, the Farm Act means that workers who want to engage in political advocacy by belonging and contributing financially to FLOC will face more barriers than they would if FLOC were to reach a checkoff agreement with an employer.

25.    One relatively easy way for low-income workers to engage in political advocacy, especially advocacy related to their economic interests, is through a union. Unions have a long track record of political education and advocacy on issues related to workers' interests. Thus, the Supreme Court has recognized that the NLRA's core protection of employees' concerted activity for mutual aid or protection encompasses workplace-based discussion of political issues related to working conditions. *Eastex v. NLRB*, 437 U.S. 556, 565 (1978) (observing that "Congress knew well enough that labor's cause is often advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context," including in "administrative and judicial forums" and through "appeals to legislators").

10

26.     For a more recent example, one can look to numerous labor organizations'

ongoing political advocacy to increase minimum wages within a list of states or

localities, and to otherwise improve minimum labor standards. For a detailed

account of these efforts by labor organizations, *see* Kate Andrias, *The New Labor*

*Law*, 126 YALE L.J. 2 (2016).

27.     As with all political advocacy, there are numerous costs associated with this

work. One way that workers can choose to support and participate in a labor

organization's political advocacy is by becoming a dues-paying member. When a

worker does that, a portion of his or her dues will go to support the political

advocacy. Moreover, in a "right to work" state where no worker can be compelled

to join a labor organization, the choice to join and pay dues itself has an expressive

component.

28.     By invalidating dues checkoff agreements, the Farm Act makes it more

difficult for FLOC to engage in—and its members to support—all of these

expressive activities.

**The Role of Settlements in Union Advocacy**

29.     The Farm Act states in part that "[a]ny provision that directly or indirectly

conditions . . . the terms of an agreement not to sue or settle litigation upon an

agricultural producer's . . . entry into or refusal to enter into an agreement with a

labor union or labor organization is invalid or unenforceable . . . ."

11

30.     The Farm Act thus invalidates any settlement conditioned on union recognition or entry into any agreement with the union.

31.     For example, the Farm Act would invalidate or render unenforceable union recognition agreements, neutrality agreements, or collective bargaining agreements that are reached to settle or avert litigation. While there exists significant variation within each of these types of agreements, these terms generally refer to the following: Union recognition agreements are agreements that an employer will recognize a union as the collective bargaining representative of a group of employees following a demonstration of majority employee support for the union, often through a method such as a card-check. "Card-check" refers to a process in which the employer and the union jointly verify that a majority of bargaining-unit employees have signaled their desire for union representation by signing union authorization cards. Neutrality agreements are agreements that the employer will remain neutral about the prospect of union representation of a group of employees during a union campaign, often in exchange for the union agreeing to forego certain tactics such as picketing the employer. Neutrality agreements operationalize what constitutes "neutrality" in different ways; for example, one variation on a neutrality agreement would be an agreement that both the union and the employer will engage in "high-road" campaigns in which each touts its own accomplishments on behalf of workers without criticizing the other. *See generally*

Modjeska et al., *Neutrality Agreements and Card-Check Recognition Agreements*, in Federal Labor Law: NLRB Practice § 6.6 (Aug. 2017 update).

32.     As one group of commentators observed, "it is clear that neutrality agreements are an important part of the labor landscape today. Both sides see them as a way of eliminating aggressive tactics, maintaining labor peace during the often-volatile organizational period and bringing relatively quick finality to the organizational process." *Id*.; *see also* Laura J. Cooper, *Privatizing Labor Law: Neutrality/Card Check Agreements and the Role of the Arbitrator*, 83 Ind. L.J. 1589, 1592-93 (2008) (discussing reasons that unions and employers enter neutrality agreements). Neutrality, recognition, and similar agreements may also include a mechanism, such as arbitration, for quickly and inexpensively resolving disputes that arise between the union and the employer during the life of the agreement.

33.     Thus, these agreements allow workers to have a meaningful say in whether they desire representation by a labor organization—with many workers ultimately choosing union representation when they make their decision in the context of an organizing campaign conducted under a neutrality, recognition, or similar agreement. *See* Cooper, *Privatizing Labor Law* at 1593-94 (discussing empirical data). Accordingly, unions and employers may seek such agreements as possible

13

"win-win" settlements to pending litigation, particularly when that litigation occurs in the context of adversarial organizing campaigns.

34.    The Farm Act's language could even be interpreted to mean that agreements to settle in-progress or potential litigation are unenforceable when they are reached by agricultural producers and labor unions or labor organizations. In other words, the statute may have the effect of foreclosing the possibility of settlement when FLOC sues, plans to sue, or is sued by agricultural producers.

35.    The Farm Act's restrictions on settling litigation will impair FLOC's ability to engage in expressive advocacy on behalf of agricultural workers.

36.    Labor organizations use an array of tactics, including litigation, to advocate for represented and unrepresented workers' interests. In this way, labor organizations are similar to other social movement organizations that use litigation, like the American Civil Liberties Union or the National Association for the Advancement of Colored People. As part of this advocacy, labor organizations may sue employers.

37.    For example, a list of unions, including the International Union of Electrical, Radio & Machine Workers (IUE), American Federation of State, County, and Municipal Employees (AFSCME), and the United Auto Workers (UAW) pursued a combination of negotiation, litigation, and lobbying to improve pay equity for women workers and end the practice of excluding pregnancy from employer-

14

provided health or disability insurance coverage. These unions were often parties, alongside affected workers, in lawsuits. *See, e.g.*, *UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) (whether employer policy banning women who could bear children from certain dangerous jobs violated Title VII); *General Electric v. Gilbert*, 429 U.S. 125 (1976) (whether employer's disability benefits plan violated Title VII of the Civil Rights Act because it excluded conditions related to pregnancy); *UAW v. Michigan*, 886 F.2d 766 (6th Cir. 1989) (gender pay equity); *AFSCME v. Washington*, 770 F.2d 1401 (9th Cir. 1985) (gender pay equity).

38.    Labor organizations may sue employers in their own names under the associational standing doctrine, which allows organizations to file suit on behalf of their members in federal court when certain conditions are satisfied. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 344 (1977). In *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986), the Supreme Court observed that associational standing allowed the union in that case (the UAW) to vindicate its own political goals in addition to enforcing its members' statutory rights. Thus, the *Brock* Court linked the UAW's litigation to the union's political goal of achieving "legislation on a national scale" that would establish "real social and unemployment insurance, the expense of which is to be borne by the employer and the Government." *Id*. at 286 (internal quotation marks omitted).

15

39.     Likewise, labor organizations sometimes vindicate their own associational and expressive interests by facilitating workers' lawsuits against their employers or other entities. For example, unions may become aware of employer violations of the law during organizing campaigns. When a union then helps affected workers find counsel and file suit, it can be a powerful demonstration of the value of collective action for individual workers.

40.     The Supreme Court has repeatedly recognized unions' own First Amendment interests in facilitating workers' lawsuits. *See United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971) (describing cases establishing that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment").

41.     Thus, as I wrote in my article, *Union Made: Unions' Litigation for Social Change*, "unions were instrumental in establishing that the First Amendment protects associations' rights both to make attorney referrals and to encourage members to enforce their rights through litigation, including by providing legal counsel." 88 Tulane L. Rev. at 202. A true and correct copy of this article is attached as Exhibit C.

42.     Because the Farm Act appears to invalidate or render unenforceable settlement agreements between labor organizations and agricultural producers, it will hamper FLOC's ability to engage in litigation.

43.     First, it goes nearly without saying that settlements often result in quicker and less expensive resolution of cases than litigating to final judgment. Labor organizations' litigation takes a wide variety of different forms, ranging from complex class actions with billions of dollars at stake to much more straightforward cases. One example of the former is *UAW v. General Motors Corp.*, 497 F.3d 615 (6th Cir. 2007), a case on which I worked when I was a practicing attorney. There, the UAW and a class of retirees sued to prevent General Motors (GM) and Ford Motor Co. from unilaterally cutting retiree health benefits, alleging that such a cut would breach collective bargaining agreements between the UAW and the companies. The case settled with the companies agreeing to contribute substantial amounts—more than $3 billion in the case of GM—to trust funds that would in turn be used to pay for retiree health benefits. *Id*. at 624. In the course of approving the settlement agreement, the Sixth Circuit observed that the settlement agreement was beneficial not just because the case involved high-stakes but uncertain questions about the companies' liability, but also because "any such victory would run the risk of being a Pyrrhic one because the cost of insisting on irreversible healthcare benefits might well be—and indeed almost certainly would be—the continuing downward spiral of the companies' financial position." *Id*. at 632. In other words, eliminating the possibility of reaching an enforceable settlement agreement could have left the retirees and the union in a worse position

17

even if they had ultimately won their case—which would have also required an expensive and lengthy litigation process.

44.    Likewise, settlements can result in outcomes that better achieve unions' expressive and other goals than would remedies that can be awarded by a court. These can include settlements that create mechanisms for dialogue and creative problem-solving and compromise between employers and workers, or that otherwise empower workers.

45.    One example is the case *Smithfield v. United Food & Commercial Workers Union*, which I also worked on as a practicing attorney and which I describe in *Labor Values are First Amendment Values: Why Union Comprehensive Campaigns are Protected Speech*. The *Smithfield* case concluded in a settlement in which the company and the union agreed in part to "what both parties believe to be a fair election process by which the employees at Smithfield's Tar Heel plant can choose whether or not to be represented by the UFCW." Joint Statement of Smithfield & UFCW, Oct. 29, 2008.[6] In addition, the two sides agreed to establish a collaborative relationship in the context of a jointly administered "Feed the Hungry Program," a food donation and delivery program. Had the Farm Act applied, this settlement agreement likely would have been unenforceable, so the parties would have been more likely to litigate the case to its conclusion.

---

[6] http://www.ufcw.org/2008/10/29/joint-statement-of-smithfield-and-ufcw/.

Presumably, continued litigation (with the attendant risk of total loss) would have been a worse outcome for the employer-plaintiff and the defendant-union—as well as for the non-party Smithfield workers, who would not have received a new opportunity to choose whether or not to have union representation in connection with the litigation.

46.      In other cases, settlement agreements might result in employers agreeing to participate in a program such as the Fair Food Program or the similar Milk With Dignity Program. Both programs include "know your rights" education for workers, as well as methods for workers to bring complaints about working conditions to the attention of a third party. The Fair Food Program's complaint resolution mechanism is described as follows: "Whenever possible, complaint resolutions include an educational component, consisting of meetings with relevant supervisors and crews, so that all workers on the farm can see that complaints are heard and resolved without retaliation, and the farm's commitment to the Program is reconfirmed." *About the Fair Food Program*.[7] If labor organizations cannot enter enforceable contracts with agricultural producers to settle litigation, worker voice-enhancing programs such as this one would become less likely to be implemented.

---

[7] http://www.fairfoodprogram.org/about-the-fair-food-program/ (last visited Nov. 9, 2017)

Pursuant to 28 U.S.C. § 1746, I hereby declare and state under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

DATED this 15th day of November, 2017.

_Charlotte Garden_

Prof. Charlotte Garden

# EXHIBIT A

Professor Charlotte Garden, Curriculum Vitae

# CHARLOTTE GARDEN

Seattle University School Of Law
901 12th Avenue, Sullivan Hall, PO Box 222000
Seattle, WA 98122-1090
206.398.4073 • gardenc@seattleu.edu

---

## ACADEMIC POSITIONS

**SEATTLE UNIVERSITY SCHOOL OF LAW**, Seattle, WA
*Co-Associate Dean for Research & Faculty Development*, July 2017—Present
*Associate Professor*, May 2015—Present (tenured April 2017)
*Assistant Professor*, July 2011—May 2015
*Litigation Director*, Fred T. Korematsu Center for Law & Equality, April 2014-Present
**Courses Taught:** Constitutional Law I & II; Labor Law; Appellate Litigation Seminar on Labor and Employment Law; Legislation & Regulation; Civil Rights Amicus Clinic

**UNIVERSITY OF ALABAMA SCHOOL OF LAW**, Tuscaloosa, AL
*Visiting Professor*, Fall 2016
   Courses: Labor Law; Special Problems in Labor Law: Work, Regulation, & Technology

**GEORGETOWN UNIVERSITY LAW CENTER**, Washington, DC
*Teaching Fellow*, August 2008 – August 2010
   Course: Appellate Litigation Clinic

**Teaching & Research Interests**: Work Law; Constitutional Law; Statutory Interpretation; Administrative Law; Appellate Practice & Procedure

## EDUCATION

**GEORGETOWN UNIVERSITY LAW CENTER**
LL.M., *with distinction*, October 2010
   Clinical Teaching Fellow, Appellate Litigation Program

**NEW YORK UNIVERSITY SCHOOL OF LAW**
J.D., *cum laude*, May 2003
   *Annual Survey of American Law*, Articles Editor
   Research Assistant, Professor Arthur Miller
   Teaching Assistant, *Religion and the Supreme Court*, Dean John Sexton

**MCGILL UNIVERSITY**
B.A., *Great Distinction*, Sociology and English Literature, June 2000
   First Class Honors
   Students' Society of McGill University Award of Distinction
   David M. Solomon Memorial Award

## JUDICIAL CLERKSHIP

**THE HONORABLE THOMAS L. AMBRO**, United States Court of Appeals for the Third Circuit
*Law Clerk*, August 2010 – July 2011

## LAW REVIEW ARTICLES

*Platform Contradictions* (in progress).

*Constitutional Avoidance in Labor Law* (in progress).

*The Seattle Solution: Collective Bargaining by For-Hire Drivers & Prospects for Pro-Labor Federalism*, __ HARV. L. & POL'Y REV. __ (forthcoming 2018).

*Disrupting Work Law*, __ CHI. L. FORUM __ (forthcoming 2017).

*Comments on the Restatement of Employment Law (Third), Chapter One*, __ EM. RTS. & EMP. POL'Y J. __ (peer reviewed journal; forthcoming 2017) (with Joseph Slater).

*The Deregulatory First Amendment at Work*, 51 HARV. C.R.-C.L. L. REV. 323 (2016).

*Religious Employers & Labor Law: Bargaining in Good Faith?*, 95 B.U. L. REV. 109 (2016).

*Toward Politically Stable NLRB Lawmaking: Rulemaking vs. Adjudication*, 64 EMORY L.J. 1467 (2015).

*Meta Rights*, 83 FORDHAM L. REV. 855 (2014).

*Citizens United & the First Amendment of Labor Law*, 43 STETSON L. REV. 571 (2014).

*Unions & Campaign Finance Litigation*, 14 NEVADA L.J. 364 (2014).

*"So Closely Intertwined": Labor Interests and Racial Solidarity*, 81 GEO. WASH. L. REV. 1135 (2013) (with Nancy Leong).

*Union Made: Labor's Litigation for Social Change*, 88 TULANE L. REV. 193 (2013).

*Teaching for America: Unions and Academic Freedom*, 43 U. TOL. L. REV. 563 (2012).

*Citizens, United and Citizens United: The Future of Labor Speech Rights?*, 53 WM. & MARY L. REV. 1 (2011).

*Labor Values are First Amendment Values: Why Union Comprehensive Campaigns are Protected Speech*, 79 FORDHAM L. REV. 2617 (2011).

# BOOKS

THE CAMBRIDGE HANDBOOK OF U.S. LABOR LAW: REVIVING AMERICAN LABOR FOR A 21ST CENTURY ECONOMY (Edited volume; co-edited with Richard Bales) (Cambridge University Press, in progress, forthcoming 2018)

SHARING THE GAINS OF THE U.S. GLOBAL ECONOMY: PROCEEDINGS OF THE NEW YORK UNIVERSITY 70TH ANNUAL CONFERENCE ON LABOR (Edited volume, co-edited with Samuel Estreicher) (Carolina Academic Press, in progress, forthcoming 2018)

MODERN LABOR LAW IN THE PRIVATE AND PUBLIC SECTORS: CASES AND MATERIALS (with Seth Harris, Joseph Slater and Anne Lofaso) (Carolina Academic Press, 2nd Ed., 2016)

# AWARDS & HONORS

Michael J. Zimmer Memorial Award (2016) (awarded annually to "a rising scholar who values workplace justice and community, and who has made significant contributions to labor and employment law scholarship).

Elected by students as Graduation Marshal (May 2017 & May 2013) and Graduation Hooder (December 2014)

# AMICUS BRIEFS

*Brief of Amici Curiae Labor Economists & Social Scientists in Support of the Petition for Writ of Certiorari*, Villarreal v. RJ Reynolds Tobacco Co. (US Supreme Court, No. 16-971) (with Catherine L. Fisk & Deborah C. Malamud)

*Brief of Amici Curiae Labor Law & Labor Relations Professors in Support of Respondent*, Friedrichs v. California Teachers Ass'n (US Supreme Court, No. 14-915) (with Matthew T. Bodie)

*Brief of Amici Curiae Award-Winning California Teachers, American-Arab Anti Discrimination Committee, Fred T. Korematsu Center for Law & Equality, & American Association of University Professors*, Vergara v. California (Cal. Ct. App., No. B258589) (with Lorraine Bannai & Robert Chang)

*Brief of Amici Curiae Labor & Benefits Law Professors in Support of Respondents*, M&G Polymers v. Tackett (US Supreme Court, No. 13-1010) (with Susan Cancelosi)

*Brief of Amici Curiae Labor Law Professors in Support of Respondent,* Harris v. Quinn (US Supreme Court, No. 11-681) (with Matthew T. Bodie)

*Brief of Amici Curiae Committee of Interns and Residents, SEIU; Doctors Council SEIU; and Korean American Medical Association in Support of Respondent*, University of TX Southwestern Medical Ctr. v. Nassar (US Supreme Court No. 12-484) (with Anjana Malhotra, Robert S. Chang, and Lorraine K. Bannai)

## SELECTED OPINION PIECES, BLOGS, & SHORTER WORKS

Contributor, TAKE CARE BLOG, March 2017-present

*Opinion Analysis: Court offers clear statement of black letter law on international service by mail*, SCOTUSBLOG, May 23, 2017

*Opinion Analysis: Court Unanimously Adopts Abuse-of-Discretion Review for District Court Decisions to Enforce EEOC Subpoenas*, SCOTUSBLOG, April 4, 2017

*Argument Analysis: The Court Dives Into* Water Splash, SCOTUSBLOG, March 23, 2017

*Unions are Wondering: Resist or Assist?*, THE ATLANTIC, March 15, 2017

*Argument Preview: Legal Interpretation in an Unconventional Context*, SCOTUSBLOG, March 15, 2017

*Argument Analysis: Discretion All The Way Down?*, SCOTUSBLOG, Feb. 22, 1017

*Argument Preview: Feats of Strength & Standards of Review*, SCOTUSBLOG, Feb. 14, 2017

*Labor in the Trump Years*, 4 EMORY CORP. GOV. & ACCOUNTABILITY REV. 95 (2017)

*A Cure for Just-In-Time Scheduling* JOTWELL, May 26, 2016 (review of Charlotte Alexander, Anna Haley-Lock, and Nantiya Ruan, *Stabilizing Low-Wage Work: Legal Remedies for Unpredictable Work Hours and Income Instability*, 50 Harv. C.R.-C.L. L. Rev. 1 (2015))

*What Would a Merrick Garland Confirmation Mean for the Future of Gig Work?*, THE ATLANTIC, May 11, 2016

*Does Labor's Future Rest on Justice Scalia's Replacement?*, NEW LABOR FORUM, March 2016

*Friedrichs v. California Teachers Association and Why We Need Nine*, ACSBLOG, March 30, 2016

*What Will Become of Public Sector Unions Now?*, THE ATLANTIC, Feb. 16, 2016

*Why Some States Want Strong Public-Sector Unions*, THE ATLANTIC, Jan. 17, 2016

*The End of Public Sector Agency Fees?*, ACSBLOG, Jan. 12, 2016

*Another Battle in the War Over Union Fees*, SCOTUSblog, Aug. 28, 2015

*Friedrichs v. CTA: Union Fair Share Fees Endangered in One of Next Term's Biggest Cases*, ACSBLOG, July 3, 2015

*Will the Supreme Court Do More Damage To Public Sector Unions?*, ACSBLOG, April 28, 2015

*The Constitution at Work: Everything Old is New Again*, JOTWELL, March 10, 2015 (review of Sophia Z. Lee, THE WORKPLACE CONSTITUTION: FROM THE NEW DEAL TO THE NEW RIGHT)

*Three Lessons From the Fast Food Organizing Movement*, ONLABOR, Dec. 18, 2014

*US Supreme Court Should Uphold Promises Made to Retirees*, JUSTICE WATCH (Blog of Alliance for Justice), Nov. 13, 2014 (with Susan Cancelosi)

*Harris v. Quinn: What's At Stake, & What's Next?*, 21 INT'L UNION RIGHTS JOURNAL 18 (2014)

*Harris v. Quinn's First Amendment Exceptionalism*, ONLABOR, July 15, 2014

*Who Should Pay for Ideological Convictions At Work?*, ACSBLOG, July 7, 2014

*Harris v. Quinn symposium: Decision Will Affect Workers & Limit States' Ability to Effectively Manage Their Workforces*, SCOTUSBLOG, July 2, 2014

*Alito's Cynical Political Payback Theory*, SALON, January 27, 2014

*What George Will Gets Wrong about Unions, Home Healthcare Aides, and the First Amendment*, HUFFINGTON POST, January 21, 2014

*Public Employees, Unions and the First Amendment*, ACSBLOG, December 11, 2013

*Bell Labs: Derrick Bell's Inspirational Pedagogy*, 36 SEATTLE U. L. REV. xx (2013)

## LEGAL PRACTICE EXPERIENCE

**APPELLATE LITIGATION CLINIC, GEORGETOWN UNIVERSITY LAW CENTER**, Washington, DC
***Teaching Fellow & Supervising Attorney***, August 2008 – August 2010
Co-taught clinic and supervised students litigating in the United States Supreme Court and the Federal Courts of Appeals. Argued *Davis v. Fed. Bureau of Prisons*, 334 F. App'x 332 (D.C. Cir. 2009), about the extent to which federal prisoners can be compelled to bring cases via habeas petitions instead of declaratory judgment actions, and *McLean v. United States*, 566 F.3d 391 (4th Cir. 2009), about whether dismissals without prejudice count as "strikes" under the Prison Litigation Reform Act.

**BREDHOFF & KAISER, P.L.L.C.**, Washington, DC
***Associate***, December 2005 – July 2008
Represented labor unions, pension plans, and individuals in trial, appellate, and administrative matters. Cases involved labor law, retiree health benefits, employment discrimination, civil RICO, and constitutional law.

**CHILDREN'S LAW CENTER**, Washington, DC
*Staff Attorney*, November 2004 – November 2005
Represented children in abuse and neglect cases in the District of Columbia.  Investigated cases and advocated for children and families in and outside of court.

**PUBLIC CITIZEN LITIGATION GROUP**, Washington, DC
*Abraham Fuchsberg Fellow*, September 2003 – August 2004
Represented organizations and individuals in cases involving administrative law, open government, class action fairness, and the First Amendment.

**LEGAL AID SOCIETY, JUVENILE RIGHTS DIVISION**, New York, NY
*Project Assistant, Safe Families Project*, December 2002 – June 2003

**QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP**, New York, NY
*Summer Associate*, Summer 2002

**LEGAL AID SOCIETY, COMMUNITY LAW OFFICE**, New York, NY
*Intern*, Summer 2001

## SELECTED PANELS & PRESENTATIONS

- First Amendment Silver Linings for the Labor Movement, SEIU/AFSCME Lawyers' Conference, Washington DC, October 2017

- *Federal and State Protection for Corporate Religious Liberty*, Connecticut Law Review Symposium on *Religious Freedom: Liberty, Legislation and Litigation,* University of Connecticut School of Law, October 2017

- *The Seattle Solution: Collective Bargaining by For-Hire Drivers & Prospects for Pro-Labor Federalism*, Harvard Labor & Worklife Program symposium on *Could Experiments at the State and Local Levels Expand Collective Bargaining and Workers' Collective Action?*, Harvard Law School, September 2017.

- *Platform Contradictions*, Colloquium on Scholarship in Employment & Labor Law, Texas A&M Law School, September 2017

- *Alternative Avenues for Worker Voice in the US*, conference of the Labor Law Research Network, Toronto ON, June 2017.

- *Disrupting Work Law?*, presented at:
  - University of Washington School of Law, faculty colloquium series, April 2017
  - Rutgers Law Review Symposium on *Resolving the Arbitration Dispute in Today's Legal Landscape*, April 2017
  - St. Louis University School of Law, faculty colloquium series, March 2017
  - University of Alabama School of Law, faculty colloquium series, Nov. 2016

- o University of Chicago, Chicago Legal Forum symposium on Law and the Disruptive Workplace, Nov. 2016

- *Employer Religious Objections & Title VII*, Berkeley Journal of Employment & Labor Law Symposium on *The Future of Discrimination Law: Frameworks, Theory, Practice, & People*, UC Berkeley Law, March 2017

- *Constitutional Avoidance in Labor Law*, presented at:
  - o Law & Society, Mexico City, June 2017
  - o Meeting of the Labor Law Group, UCLA, December 2016

- *Towards A Pro Union Supreme Court?*, presented at:
  - o Colloquium on Scholarship in Employment & Labor Law, Seattle WA, Sept. 2016
  - o Law & Society Association Annual Meeting, May 2016

- *Agency Fee Challenges After Friedrichs v. CA Teachers Ass'n*, Annual Conference of the National Center for the Study of Collective Bargaining in Higher Education and the Professions, April 2016

- *The NLRB's New Collier Deferral Standards & Update on Friedrichs v. CA Teachers Ass'n*, 38th Annual Collective Bargaining & Arbitration Conference, Labor & Employment Relations Ass'n, April 2016

- *The Deregulatory First Amendment at Work*, presented at
  - o Hot Topics in Contemporary Labor Relations Law (CLE program, Chicago-Kent College of Law), closing plenary speaker, June 2016
  - o Colloquium on Scholarship in Employment & Labor Law, Bloomington IN, Sept. 2015
  - o Law & Society Association Annual Meeting, May 2015.

- *"A Shot Across the Bow": Politics and the Obama Board*, Emory University School of Law, symposium on The National Labor Relations Board After Eighty Years, April 2015

- *The First Amendment As Threat to Economic Mobility*, Stetson Law, symposium on Inequality, Opportunity, and the Law of the Workplace, March 2015

- *Religious Employers & Labor Law: Bargaining in Good Faith?*, presented at:
  - o University of Alabama School of Law, Oct. 2015
  - o SJ Quinney College of Law – University of Utah, Sept. 2015
  - o University of Wisconsin Law School, Jan. 2015

- *Current Trends in Union Organizing*, Annual Pacific Coast Labor & Employment Law Conference, April 2013, 2015, 2017 (moderator)

- *National Labor Law Trends: Harris v. Quinn*, 38th Annual Collective Bargaining & Arbitration Conference, Labor & Employment Relations Association NW, March 2015

- *Harris v. Quinn: Past, Present & Future*, ABA Section on State & Local Government Bargaining Midwinter Meeting, Jan. 2015 (keynote address)

- *The Corporate Great Awakening*, presented at
    o Law and Society Association, Annual Meeting, June 2014
    o Colloquium on Scholarship in Employment & Labor Law, Sept. 2014
    o Symposium on Zealous Advocacy for Social Change: Transforming an Anti-Labor Environment into a Culture of Civility, West Virginia College of Law, Oct. 2014

- *Citizens United & The First Amendment of Labor Law*, Stetson University College of Law symposium: Taking Stock of *Citizens United:* How the Law Has (and Has Not) Changed Four Years Later, Feb. 2014

- *Meta Rights*, presented at:
    o Washington University School of Law, Nov. 2013
    o Constitutional Law Colloquium, Loyola University Chicago School of Law, Nov. 2013
    o Labor & Employment Colloquium, UNLV Boyd School of Law, Sept. 2013
    o Young Scholars "Schmooze" with Mark Tushnet at the National Convention of the American Constitution Society, June 2013

- *I Would Prefer Not To*, Law and Society Association, Annual Meeting, June 2013

- *Corporate Political Spending: Disclosure/Disunity/Dystopia?*, Albers School of Business & Economics & Center for Business Ethics, Seattle University, May 2013 (panel member)

- *Collective Action & Race, Gender, & Class in Academia*, Symposium on PRESUMED INCOMPETENT: THE INTERSECTIONS OF RACE & CLASS FOR WOMEN IN ACADEMIA, Berkeley Law, March 2013

- *So Closely Intertwined: Labor & Racial Solidarity*, presented at:
    o Interuniversity Research Center on Globalization and Work, *Union Futures, Transformations, Strategies* conference, University of Montreal, Oct. 2012
    o ClassCrits V, University of Wisconsin Law School, Nov. 2012

- *Union Made: Labor's Litigation for Social Change*, presented at:
    o University of Iowa College of Law, Feb. 2013
    o Law and Society Association, Annual Meeting, June 2012
    o Democracy and the Workplace Symposium, UNLV Boyd School of Law, February 2012

- *2012 ACLU Northwest Civil Liberties Conference*, panel on First Amendment and Protest: A Year After Occupy, Lewis & Clark Law School, Sept. 2012

- *Supreme Court Preview*, Seattle University School of Law, Sept. 2012; 2013; 2014; 2015

- *Teaching for America: Educators' Free Speech In and Out of the Classroom*, presented at:
  - Toledo Law Review Symposium: Public Sector Labor Law at the Crossroads, University of Toledo College of Law, October 2011
  - Labor and Employment Law Colloquium, Loyola Law School Los Angeles, Southwestern Law School, and UCLA School of Law, Sept. 2011

- *Citizens, United and Citizens United: The Future of Labor Speech Rights?*, presented at:
  - Denver University – Sturm College of Law, April 2012.
  - Constitutional Law Colloquium, Loyola University Chicago School of Law, Nov. 2010
  - Labor & Employment Law Colloquium, Washington University School of Law & St Louis University Law School, September 2010

- *Labor Values are First Amendment Values: Why Union Comprehensive Campaigns are Protected Speech*, presented at:
  - Fellows' Workshop Series, Georgetown University Law Center, April 2010
  - Fourth Annual Employment & Labor Law Scholars' Forum, Seton Hall University School of Law, January 2010

# SELECTED MEDIA APPEARANCES & INTERVIEWS

*Did The Washington Post Break A Law When It Disciplined A Reporter Over A Jeff Bezos Op-Ed?*, Huffington Post, September 15, 2017

*Labor Day under Trump? Not exactly a picnic*, Seattle Times, September 3, 2018

*Seattle Law Allowing Uber Drivers to Organize Survives Challenge*, Bloomberg BNA, August 25, 2017

*Labor Organizing in Right-to-Work States Is Numbers Game*, Bloomberg BNA, August 25, 2017

*Fired Google Engineer Claims His Rights Were Violated. Trump's Labor Board May Disagree*, Huffington Post, August 8, 2017

*Judge Tosses Federal Lawsuit Against Seattle's Uber Unionization Law*, The Stranger, August 1, 2017

*Uber Renews Push for Arbitration in Waymo Trade-Secrets Case*, Bloomberg, May 18, 2017

*Waymo-Uber Judge Rules Robocar Fight Won't Go to Arbitration*, Bloomberg, May 11, 2017

*Judge Blocks Seattle Law Allowing Uber and Lyft Drivers to Unionize*, Bloomberg, April 5, 2017

*Seattle Driver-for-Hire Union Law Hits Bump in Road*, Bloomberg BNA April 4, 2017

*Waymo Took Legal Action Against Engineer Before Suing Uber*, Bloomberg, March 29, 2017

*Unionize Uber? Legal Fight Over Seattle Drivers Draws National Attention,* Seattle Times, March 29, 2017

*Uber Wants Waymo Robocar Secrets Fight Out of Public View*, Bloomberg, March 27, 2017

*Uber Gears Up to Block Bid to Form a Union in Seattle,* Wall Street Journal, March 22, 2017

Seattle Law Letting Drivers Unionize Survives Uber Legal Attack, Bloomberg March 17, 2017

*Uber Deal Giving Drivers $1 Each Sparks Feud Among Rival Lawyers*, Bloomberg, March 10, 2017

*Can I get fired for going on strike? Your legal rights on A Day Without a Woman*, Mic, March 7, 2017

*The Fallout From "A Day Without Immigrants"*, The Atlantic, Feb. 21, 2017

*Uber Deal Offers Drivers $1 Each To Wipe Away Labor Threats Valued in Billions*, Bloomberg, February 1, 2017

*Uber Sues Seattle Over Driver Unionization Ordinance*, KNKX, January 18, 2017

*The Force Behind Minimum Wage Protests is Slashing Its Spending*, BuzzFeed, December 28, 2016

*Donald Trump's Supreme Court Will Be a Real Threat to Labor – And That's Going to Hurt the Democrats*, Salon, November 17, 2016

*Uber's Drivers Win the Backing of US Labor Watchdog*, Bloomberg, Nov. 2, 2016

*Volkswagen Faces Bumpy Road in Challenge to 'Micro-Union'*, Reuters, Sept. 26, 2016

*Uber's $100 Million Driver Pay Settlement Rejected By Judge*, Bloomberg, Aug. 18, 2016

*Uber in Dare to Judge Says Its Ready to Ditch Driver Settlement*, Bloomberg, Aug. 1, 2016

*Texas Judge Blocks Obama's Union-Buster Rule*, Bloomberg, July 7, 2016

*Amazon Proves Infertile Soil for Unions, So Far*, New York Times, May 16, 2016

*Uber Deals Put Spotlight on Seattle Showdown*, Seattle Times, May 10, 2016

*Lyft Pays Price for Success in Rejected Driver Pay Accord,* Bloomberg, April 7, 2016

*Lawyer in Lyft Accord Vows to Make Uber 'Respect' Drivers*, Bloomberg, Jan. 27, 2016

*Why are Unions So Worried About an Upcoming Supreme Court Case*, The Atlantic, Jan. 8, 2016

*Airport Employers Seek New Hearing on SeaTac Minimum Wage*, Seattle Times, Dec. 15, 2015

*Alaska Airlines, Other Businesses, Continue Legal Battle Over SeaTac Minimum Wage*, KPLU, Dec. 15, 2015

*Seattle Allows Uber, Lyft Drivers To Unionize*, Associated Press, Dec. 14, 2015

*Uber Pushes New Contract on Drivers as Pay Fight Escalates*, Bloomberg, Dec. 11, 2015

*Uber Drivers' Lawsuit Over Pay Just Got Much Costlier*, Bloomberg, Dec. 9, 2015

*Labor Board's Shift in Legal Interpretation Could Allow Many Taxi Drivers to Unionize*, Washington Post, Oct. 29, 2015

*Labor Law has been Frozen for 60 Years. Democrats are Trying to Crack it Open*, Washington Post, Sept. 16, 2015

*Scott Walker Sets Sights on Unions, Outlines Plan to Alter US Labor Law*, Al Jazeera America, Sept. 14, 2015

*The Assault on Unions Is Hurting All Workers*, Newsweek, May 14, 2015

*Amazon Makes Even Temporary Warehouse Workers Sign 18-Month Non-Competes*, The Verge, March 26, 2015

*City Council Member Says Let Uber Drivers Unionize*, Seattle Times, Aug. 31, 2015

*Washington Supreme Court Rules that $15 Minimum Wage Applies at Sea-Tac Airport*, KPLU, Aug. 20, 2015

*State's High Court Extends SeaTac Minimum Wage to Airport Workers*, Seattle Times, Aug. 20, 2015

*Unions Divide Labor Movement Over LA Minimum Wage Exemptions*, Al Jazeera America, May 29, 2015

*Workers Behind Ruthless and Effective Grassroots Campaigns Are Now on Trial for Racketeering*, The Nation, March 13, 2015

*Space Needle Told to Stop Unfair Labor Practices, Rehire Workers*, KPLU, Feb. 2, 2015

*Labor Board Attorney Backs Up Claims McDonald's Violated Labor Rights*, Al Jazeera America, Dec. 19, 2014

*Office Politics*, Slate, Oct. 15, 2014

*Home-Care Aides Don't Owe Union Fees, but Court Stops Short of Overruling a Key Precedent*, ABA Journal, Sept. 1, 2014

*Why a Win for Anti-Choice Protestors Might Also Strengthen Workers' Rights to Strike*, The Nation, July 18, 2014

*Why Harris v. Quinn Isn't as Bad For Workers as it Sounds*, Washington Post, July 1, 2014

*California Unions Fear 'Free-Riders' in Supreme Court Health Ruling*, KPCC, June 30, 2014

*Anti-Union Group Files Federal Lawsuit Against UAW & Volkswagen*, Detroit Free Press, March 13, 2014

*Space Needle Owners Violated Federal Labor Law, Administrative Law Judge Finds*, KPLU, March 7, 2014

*Citizens United Boosts Union Canvassers*, Marketplace (American Public Media) in collaboration with PBS/Frontline, Oct. 10, 2012

## INSTITUTIONAL & EXTERNAL SERVICE

- Academic Assembly, substitute member (Spring 2016)
- Faculty Development Committee
  - Chair (2014-16)
  - Member (2011-12)
- Curriculum Committee, member (2012-14)
- Seattle University Law Review, Faculty Advisor (2013-2017)
- Seattle University School of Law chapter of the American Constitution Society, Faculty Advisor (2013-Present)
- National Native American Law Student Association Moot Court Competition, Faculty Coach (2014 & 2015)
- Seattle University Summer Workshop Series, Co-Organizer (2013-Present)
- Supreme Court Term Preview CLE Program, Co-Organizer (2013-2015)
- Judicial Institute for High School Teachers, Presenter (2014, 2015, 2016, 2017)
- Co-Organizer, Colloquium on Scholarship in Employment & Labor Law, Co-hosted by Seattle University School of Law & University of Washington School of Law, Sept. 2016
- Co-Chair, Labor Rights Collaborative Research Network, Law & Society Association, June 2015-present
- Co-Organizer, *The Thirteenth Amendment Through The Lens of Class & Labor* Conference, Seattle University School of Law, June 2015.

## OTHER AFFILIATIONS & ACTIVITIES

- Member, Labor Law Group, Jan. 2017-Present
- Research Fellow, NYU School of Law Center for Labor & Employment Law, Apr. 2017 – Present
- Executive Committee member, AALS Section on Labor Relations and Employment Law, January 2016-present
- JOTWELL, Work Law Section Co-Editor, January 2016-present; Work Law Section Contributor, 2014-present
- Judge, Louis Jackson National Student Writing Competition, 2015, 2016, 2017

# EXHIBIT B

Charlotte Garden, "Labor Values Are First Amendment Values: Why Union Comprehensive Campaigns Are Protected Speech", *Fordham Law Review* Vol. 79 (6), 2618-2626 (2011), available at http://ir.lawnet.fordham.edu/flr/vol79/iss6/7

**Fordham Law Review**

Volume 79 | Issue 6                                                                   Article 7

2011

# Labor Values Are First Amendment Values: Why Union Comprehensive Campaigns Are Protected Speech

Charlotte Garden

### Recommended Citation

Charlotte Garden, *Labor Values Are First Amendment Values: Why Union Comprehensive Campaigns Are Protected Speech* , 79 Fordham L. Rev. 2617 (2011).
Available at: http://ir.lawnet.fordham.edu/flr/vol79/iss6/7

This Article is brought to you for free and open access by FLASH: The Fordham Law Archive of Scholarship and History. It has been accepted for inclusion in Fordham Law Review by an authorized editor of FLASH: The Fordham Law Archive of Scholarship and History. For more information, please contact tmelnick@law.fordham.edu.

# ARTICLES

# LABOR VALUES ARE FIRST AMENDMENT VALUES: WHY UNION COMPREHENSIVE CAMPAIGNS ARE PROTECTED SPEECH

*Charlotte Garden\**

*Corporate targets of union "comprehensive campaigns" increasingly have responded by filing civil* Racketeer Influenced and Corrupt Organizations Act *(RICO) lawsuits alleging that unions' speech and petitioning activities are extortionate. These lawsuits are the descendants of the Supreme Court's unexplained treatment of much labor speech as less worthy of protection than other types of speech. Starting from the position that speech that promotes democratic discourse deserves top-tier First Amendment protection, I argue that labor speech—which plays a unique role in civil society—should be on an equal footing with civil rights speech. Thus, even if union advocacy qualifies as legal extortion, the First Amendment should trump civil RICO enforcement, with two limited exceptions: speech that is actually malicious, and speech that imminently threatens to force an employer to choose between breaking the law and suffering significant economic harm or shutting its doors altogether.*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................... 2618
I. BACKGROUND ................................................................................ 2621
    A. *Union Comprehensive Campaigns* ......................................... 2621
    B. *Civil RICO as a Response to Union Comprehensive*
       *Campaigns* .......................................................................... 2623
       1. Extortion Liability for Core Union Activity .................... 2624
       2. Recent RICO Lawsuits Targeting Unions ....................... 2626

\* Assistant Professor of Law, Seattle University School of Law (effective August 2011). B.A. McGill University, 2000; J.D. New York University 2003. As an associate at Bredhoff & Kaiser, PLLC, I worked on *Smithfield Foods v. United Food & Commercial Workers International Union*, 585 F. Supp. 2d 789 (E.D. Va. 2008), from when it was filed in October 2007 until leaving the firm in July 2008. I would like to thank Hannah Alejandro, Kate Bushman, Owen Davies, Steve Goldblatt, Mike Gottesman, Mindy Leon, Nancy Leong, Justin Pidot, Robin West, and Brian Wolfman, as well as the participants in the Fourth Annual Employment & Labor Law Scholars' Forum and the Georgetown University Law Center Fellows' Workshop Series, all of whom provided invaluable advice on this paper.

3. The UFCW's Comprehensive Campaign To Organize
   Smithfield's Tar Heel Plant............................................. 2626
4. Smithfield's Extortion Allegation.................................... 2629

II. FIRST AMENDMENT PROTECTION FOR UNION COMPREHENSIVE
   CAMPAIGN SPEECH UNDER CURRENT LAW................................ 2632
   A. *Picketing* ............................................................... 2633
   B. *Boycotts*.................................................................. 2638
   C. *Petitioning* ............................................................. 2642
   D. *Labor Speech as Commercial Speech?* .................................. 2644

III. CIVIL SOCIETY AND THE FIRST AMENDMENT ................................ 2647
   A. *The Role of Civil Society in Promoting Deliberative*
      *Democracy*.......................................................... 2649
      1. Associations and "Checking and Opposing" the State .... 2650
      2. Associations and Interdependence.................................. 2650
      3. Associations as Places and Reasons To Come Together . 2651
      4. Associations as "Schools for Democracy"...................... 2652
   B. *Labor Unions and Civil Society*............................................. 2652
      1. Unions "Checking and Opposing" the State.................... 2653
      2. Unions Promoting Interdependence................................. 2653
      3. Unions as Places and Reasons To Come Together.......... 2656
      4. Unions as "Schools for Democracy" ............................... 2657

IV. FIRST AMENDMENT VALUES AND THINKING SMALL: HOW CIVIL
   RICO POSES A GREATER FIRST AMENDMENT PROBLEM THAN
   NLRB REGULATION OF SPEECH ................................................. 2659
   A. *The NLRB's Potential To Enhance Democracy*...................... 2660
   B. *Civil RICO and First Amendment Balancing* ......................... 2663
      1. False Speech .................................................................. 2665
      2. Comprehensive Campaign Speech in Pursuit of an
         Illegal Goal.................................................................... 2666

CONCLUSION ......................................................................................... 2668

## INTRODUCTION

Union density—the percentage of the eligible workforce that is represented by a union—is falling in the United States. Among private employers, it has been falling since the 1950s and is now well below ten percent, far lower than in previous decades.[1] Unless unions come up with new strategies to organize workers this is unlikely to change, particularly given employers' impressive track records at defeating traditional organizing methods.[2] In response, unions are increasingly waging

---

1. BUREAU OF LABOR STATISTICS, UNION MEMBERS SUMMARY (2011), *available at* http://www.bls.gov/news.release/union2.nr0.htm.

2. *See generally* Kate Bronfenbrenner, *Final Report: The Effects of Plant Closing or Threat of Plant Closing on the Right of Workers To Organize*, DIGITALCOMMONS@ILR INT'L PUBLICATIONS (Sept. 30, 1996), http://digitalcommons.ilr.cornell.edu/ cgi/viewcontent.cgi?article=1000&context=intl.

Case 1:17-cv-01037-UA-LPA   Document 7-24   Filed 11/20/17   Page 38 of 154

"comprehensive campaigns" in pursuit of employer neutrality, recognition, first contracts, and the like.  During comprehensive campaigns, unions deploy a range of tactics, including teaming up with community groups to criticize the company's record on labor, environmental, and other issues of concern to the public and company stakeholders; lobbying city governments to pass resolutions condemning the company; opposing the company in the regulatory arena (such as by opposing permit applications); and organizing boycotts of the employer's goods.[3]

Employers hate comprehensive campaigns.  They can span decades, they can harm the employers' reputations, and they can be costly to fight.  (And, they sometimes result in unionization or a contract.)  Increasingly, employers are responding by filing civil racketeering actions.[4]  These suits allege that a comprehensive campaign is extortionate in that it leverages the employer's fear of economic loss to obtain property, in the form of either a neutrality or card-check agreement or, more tangibly, union dues or increased wages and benefits.[5]  Additionally, they may also allege that the comprehensive campaign's goal was illegal.[6]  For example, in *Smithfield v. United Food & Commercial Workers International Union* (UFCW),[7] the complaint alleged that the union sought to compel company recognition of the union as its employees' exclusive representative, even though the union lacked majority support.[8]  However, other suits simply focus on the fact that employers have no legal obligation to agree to certain union demands, such as remaining neutral during an organizing campaign.[9]

It is unclear what role the First Amendment plays in protecting unions from civil liability under the Racketeer Influenced and Corrupt

---

3. Cynthia L. Estlund, *The Ossification of American Labor Law*, 102 COLUM. L. REV. 1527, 1605 & n.326 (2002).

4. There have been fewer than twenty such suits filed since 1980. James J. Brudney, *Collateral Conflict: Employer Claims of RICO Extortion Against Union Comprehensive Campaigns* 27 & nn.131–33 (Dec. 2009), *available at* http://works.bepress.com/cgi/viewcontent.cgi?article=1001&context=james_brudney. However, the filing of three such suits within the space of a year might suggest that employers are beginning to view civil RICO as a more attractive way of fighting union organizing campaigns. *See generally* Cintas Corp. v. UNITE HERE, 601 F. Supp. 2d 571 (S.D.N.Y.) (complaint filed March 5, 2008, alleging civil RICO violation and trademark infringement), *aff'd*, 355 F. App'x 508 (2d Cir. 2009); Wackenhut Corp. v. Serv. Emps. Int'l Union, 593 F. Supp. 2d 1289 (S.D. Fla. 2009) (complaint filed Nov. 1, 2007 in the Southern District of New York, then transferred to the Southern District of Florida under Case no. 9:07-cv-81090, alleging civil RICO violation); Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union, 585 F. Supp. 2d 789 (E.D. Va. 2008) (complaint filed Oct. 17, 2007, alleging violations of civil RICO and various North Carolina torts).  Similarly, Sodexo recently filed a complaint against the Service Employees International Union and others, bringing civil RICO and tort claims. Complaint at 113–24, Sodexo, Inc. v. Serv. Emps. Int'l Union, No. 1:11-cv-276 (E.D. Va. Mar. 17, 2011).

5. *See supra* note 4.

6. For example, *Smithfield* alleged that the United Food & Commercial Workers's (UFCW) comprehensive campaign had an illegal goal, whereas *Wackenhut* and *Cintas* did not.

7. 585 F. Supp. 2d 789.

8. *See generally* First Amended Complaint, *Smithfield*, 585 F. Supp. 2d 789 (No. 3:07CV641), 2008 WL 1825139.

9. *See infra* notes 77–80 and accompanying text.

Organizations Act (RICO) for their advocacy during comprehensive campaigns. For example, the *Smithfield* court rejected wholesale the union's First Amendment defense, concluding that "the First Amendment simply does not protect extortion."[10] However, it is clear that the same conduct carried out by civil rights protesters pursuing "political" goals would have a much stronger claim to First Amendment protection. In *NAACP v. Claiborne Hardware Co.*,[11] the Supreme Court held that the First Amendment protected coercive speech—speech that was significantly more coercive than that involved in most comprehensive campaigns—when it was part of a civil rights campaign.[12] Importantly, though, the *Claiborne Hardware* Court went on to state that tactically similar labor speech aimed at achieving traditional union goals fell somewhere lower down the ladder because labor's goals are "economic" rather than political.[13] Likewise, the Court has on other occasions stated that labor picketing and secondary boycotts are subject to regulation simply because they are coercive—even if they are motivated by purely political, and not economic, goals.[14]

In this Article, I argue that most labor speech employed in comprehensive campaigns should receive heightened First Amendment protection because of its important role in facilitating democratic discourse and deliberation.[15] Accounts of the First Amendment that focus on popular sovereignty and democratic discourse have failed to consider fully the role of associations in promoting such discourse. Yet associations perform tasks that are crucial to a well-functioning democracy: encouraging deliberation about shared interests and goals; acting as microcosms where members can develop civic skills and a heightened sense of their social roles; providing a check on government by promoting social solidarity independent from the state; and aggregating and amplifying their members' voices.[16]

Thus, my argument is, first, that associational speech belongs on the highest rung of the First Amendment hierarchy, and second, that union speech is an important component of associational speech. In that regard, unions, like other associations, perform deliberation-enhancing and state-checking functions. First, because unions are relatively formal democracies, they can serve as schools for democracy[17] in which members must engage in meaningful deliberation to keep the union running smoothly. Second, unions' relative diversity provides opportunities for members to forge new social bonds, facilitating group interdependence.

---

10. *Smithfield*, 585 F. Supp. 2d at 805 (alterations omitted) (internal quotation marks omitted) (quoting United States v. Boyd, 231 F. App'x 314, 315–16 (5th Cir. 2007)).

11. 458 U.S. 886 (1982).

12. *Id.* at 928–29.

13. *Id.* at 912.

14. *E.g.*, Int'l Longshoremen's Ass'n v. Allied Int'l, Inc., 456 U.S. 212, 225–26 (1982) (holding that secondary boycott launched to protest Soviet invasion of Afghanistan could be enjoined consistent with the First Amendment).

15. In this Article, I will use the words "discourse" and "deliberation" interchangeably.

16. *See generally* JEAN L. COHEN & ANDREW ARATO, CIVIL SOCIETY AND POLITICAL THEORY (1992).

17. *See generally* ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA (1835).

Third, unions can act directly in the political process as a partial counterweight to the interests of those with the easiest access to political power. Fourth, unions may encourage members' political participation, as there is at least some empirical evidence that union members are more likely than the rest of the public to participate in government, by engaging in activities such as volunteering for a political candidate or writing a letter to the editor.

So far, I have focused on only one side of First Amendment balancing. But of course, even top-tier First Amendment protection can be overcome by a compelling and narrowly-tailored state interest. Ultimately, I conclude that the interests advanced by civil RICO cannot surmount unions' First Amendment interests in nonviolent comprehensive campaign advocacy, except if the unions' speech (1) is actually malicious under *New York Times Co. v. Sullivan*[18] or (2) imminently threatens to force the employer to choose between taking an illegal action and suffering serious financial harm.

Part I of this Article describes comprehensive campaigns and the civil RICO lawsuits targeting them. Part II discusses the current state of the law governing First Amendment protection for union expressive activity. Part III argues that speech that enhances civil society, including union speech, deserves the highest level of First Amendment protection because of its role in promoting deliberative democracy. Finally, Part IV argues that the First Amendment should provide a defense to most civil RICO suits, though the National Labor Relations Board (NLRB) may be able to continue to regulate comprehensive campaigns without violating unions' First Amendment rights.

## I. Background

### A. *Union Comprehensive Campaigns*

It is no surprise that union density is falling in the United States and has been for decades. In 2008, only 12.4% of workers—16.1 million workers—belonged to a union.[19] Just fifteen years earlier, 20% of workers belonged to a union,[20] and, in 1945, more than one-third of non-agricultural workers were union members.[21] This decline has continued even though "unionized workers tend to be paid more and are more likely to be covered

---

18. 376 U.S. 254 (1964).

19. Bureau of Labor Statistics, Union Members Summary (2009), *available at* http://www.bls.gov/news.release/archives/union2_01282009.htm. Unions represented another 1.7 million non-members. *Id.*

20. *Id.*

21. Eric Foner, The Story of American Freedom 229 (1998); Daniel B. Cornfield & Bill Fletcher, *The U.S. Labor Movement: Toward a Sociology of Labor Revitalization*, *in* Sourcebook of Labor Markets: Evolving Structures and Processes 61, 61 (Ivar Berg & Arne L. Kalleberg eds., 2001).

by a broader set of employer-provided fringe benefits than nonunion workers."[22]

To reverse this trend, unions have begun waging "comprehensive campaigns." These campaigns, also known as "corporate," "coordinated," or "strategic" campaigns,[23] are prolonged organizing efforts designed to pressure employers into agreeing to union demands. A union may seek employer neutrality during a union organizing drive or an alternative union election process, such as a card-check, instead of an NLRB-sponsored election. Comprehensive campaigns simultaneously target multiple employer pressure points—employees, customers, shareholders, directors, regulators, and the public at large—by "appeal[ing] directly to the public by way of rallies, pickets, speeches, and leafleting in public streets and parks, often with the active support of churches and other community organizations outside the labor movement itself."[24]

Comprehensive campaigns differ from more traditional labor organizing tactics in a few respects. First, they move the locus of the dispute from the plant floor or the picket line out into the community and sometimes across state and national borders. Second, they involve both labor unions and other community, religious, and activist organizations and thus rally a broad base of support that goes beyond labor's immediate constituency. Third, they move away from traditional labor rhetoric and include the concerns of the civil rights, environmental, and consumer protection movements, among others, which sometimes conveys the impression that those organizations— and not the labor union—are the driving force behind the various rallies, press releases, and other campaign events.

However, "comprehensive campaign" is not subject to precise definition. The U.S. Court of Appeals for the D.C. Circuit has observed that the equivalent term "corporate campaign"

> encompasses a wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer. These tactics may include, but are not limited to, litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state or federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public.[25]

---

22. Cornfield & Fletcher, *supra* note 21, at 66 ("[O]ver time, union wages are consistently higher than nonunion wages for all demographic groups.").

23. Much of the literature discussing these campaigns from employers' perspectives uses the term "corporate campaign," whereas unions have come to favor "comprehensive campaign." Brudney, *supra* note 4, at 7 & nn.23–24. This Article uses the term "comprehensive campaign."

24. Estlund, *supra* note 3, at 1605; *see also* Brudney, *supra* note 4, at 1 ("Coordinated campaign tactics include publicity efforts aimed at attracting media attention and consumer interest; regulatory reviews initiated to focus on a company's possible health, safety, environmental, or zoning violations; and investigations of a company's financial status through use of pension funds or other shareholder resources.").

25. Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997).

It is unclear whether comprehensive campaigns actually affect employers' economic performance.[26]  However, employers bringing civil RICO suits claim that they do,[27] and there is some evidence that comprehensive campaigns can convince an employer to agree to maintain a publically neutral stance toward union organizing or to hold an alternative union election, such as a card-check—both of which make it more likely that employees will vote to unionize.[28]

### B. Civil RICO as a Response to Union Comprehensive Campaigns

To state a claim under the civil RICO statute, an employer must plead a pattern or practice of racketeering activity, as evidenced by two or more commissions of "predicate crimes" from an enumerated list.[29]  In civil RICO cases arising out of comprehensive campaigns, the predicate crime alleged is generally extortion.  Though violations of state or federal extortion law can generally be a RICO predicate, the Supreme Court requires that the conduct also qualify as "'generic' extortion," defined as "'obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats.'"[30]

Civil RICO is only the most recent vehicle by which employers have filed lawsuits targeting core labor activity, such as organizing and striking.  In the remainder of this section, I will trace the history of these lawsuits and then describe the most recent round of civil RICO suits, focusing on *Smithfield*.

---

26.  James Gray Pope, *Labor-Community Coalitions and Boycotts:  The Old Labor Law, the New Unionism, and the Living Constitution*, 69 TEX. L. REV. 889, 906 (1991) (citing C. PERRY, UNION CORPORATE CAMPAIGNS 125 (1987)) (concluding that unions' attempts to put direct economic pressure on employers mostly had "nuisance value," and that "the key to union success lies not in economic or direct pressure, but in union appeals to principle that influence public relations"); *cf.* Brudney, *supra* note 4, at 1–2 (stating that unions engaging in comprehensive campaigns "have enjoyed some success which in turn has contributed to a modest rise in private sector union density, the first such increase for decades.").

27.  For example, Smithfield claimed at least $5,900,000 in damages in its complaint against the UFCW. First Amended Complaint, *supra* note 8, ¶ 1, at 91–92; *infra* Part IV.B. According to one press release issued by Hunton & Williams, the law firm that represented Smithfield in its civil RICO lawsuit against the UFCW, "the corporate campaign is a coordinated, negative publicity effort intended to place unbearable financial, legal and social pressure on a targeted employer in order to convince that employer to forego its NLRB rights and agree to the union's organizing demands." Press Release, Gregory B. Robertson & Kurt G. Larkin, Hunton & Williams LLP, RICO:  A New Tool for Employers Facing Union Corporate Campaigns?  (May 2009), *available at* http://www.hunton.com/files/tbl_s47Details\FileUpload265\2664\RICO_A_New_Tool_5.09.pdf.

28.  Brudney, *supra* note 4, at 10 & n.38.

29.  18 U.S.C. § 1961(1) (2006) (defining racketeering activity).

30.  Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393, 409 (2003) (quoting United States v. Nardello, 393 U.S. 286, 290 (1969)); *see* James v. United States, 550 U.S. 192, 222 n.2 (2007) (noting that the Court adopted that definition because the RICO statute leaves extortion undefined).  This is the definition of extortion under the Hobbs Act. *See* 18 U.S.C. § 1951(b)(2); *see also* United States v. Enmons, 410 U.S. 396, 397 (1973).

### 1. Extortion Liability for Core Union Activity

The theory that core union activity, like strikes and boycotts, constitutes criminal conspiracy is not new; prosecutions of workers engaged in collective action date back to at least 1806.[31] Since then, employers' legal theories have evolved alongside Congress's and the courts' modification of the applicable law, but the underlying legal theory—that labor unions have no right to damage an employer's profitability or reputation through collective action, particularly through appeals to the general public—has remained remarkably similar.[32]

Early conspiracy lawsuits against unions often successfully invoked federal antitrust law, and these suits continued even after Congress attempted to exempt core union activity from the reach of antitrust law in the Clayton Act.[33] In *Duplex Printing Press Co. v. Deering*[34] and later cases, the *Lochner*-era Court reasoned that, through activities like picketing and secondary boycotts, unions sought to drag third parties "against [their] will into a concerted plan to inflict damage upon another employer who is in dispute with his employees."[35] That reasoning was not limited to secondary boycotts: any labor protest could be tortious if its effect was to embarrass potential customers away from the business with which the union had a dispute. For example, in *Truax v. Corrigan*,[36] the Court overturned

---

31. Jim Hawkins, *Papers, Petitions, and Parades: Free Expression's Pivotal Function in the Early Labor Movement*, 28 BERKELEY J. EMP. & LAB. L. 63, 68 (2007). Before the 1800s, criminal labor prosecutions were relatively rare and convictions even more unusual. *See* WILLIAM E. FORBATH, LAW AND THE SHAPING OF THE AMERICAN LABOR MOVEMENT 61 (1991) ("[T]here seem to have been relatively few criminal conspiracy trials of trade unionists until the 1870s . . . . In the 1870s and 1880s, however, sanctions grew harsher.").

32. *E.g.*, Duplex Printing Press Co. v. Deering, 254 U.S. 443, 466 (1921); Loewe v. Lawlor, 208 U.S. 274, 301 (1908). In *Duplex Printing Press Co. v. Deering*, the Court concluded that the Clayton Act's labor exemption did not exempt from antitrust liability a union's threats of secondary boycotts and strikes—or the coerced participation of union members in those activities—aimed at pressuring employers to adopt union wage and hour scales. *Duplex Printing Press Co.*, 254 U.S. at 466. The Court stated that, by expanding the locus of the dispute beyond unionized employers, the union had "depart[ed] from its normal and legitimate objects," *id.* at 469, and instead engaged in "a general class war," *id.* at 472. Unsurprisingly, the Court theorized that "business . . . is a property right, entitled to protection against unlawful injury or interference" by labor unions. *Id.* at 465. However, in dissent, Justice Brandeis argued that the Clayton Act authorized "industrial combatants" to "push their struggle to the limits of the justification of self interest." *Id.* at 484, 488 (Brandeis, J., dissenting); *see also* Am. Steel Foundries v. Tri-City Cent. Trades Council, 257 U.S. 184, 204 (1921) (concluding that the Clayton Act does not protect coercion or intimidation, from which "the person sought to be influenced has a right to be free and his employer has a right to have him free"); FORBATH, *supra* note 31, at 60 (stating that, "[b]y the early twentieth century, common law and antitrust doctrine condemned . . . virtually the entire spectrum of peaceful secondary actions").

33. Seth Kupferberg, *Political Strikes, Labor Law, and Democratic Rights*, 71 VA. L. REV. 685, 713 (1985).

34. 254 U.S. 443.

35. *Duplex Printing Press Co.*, 254 U.S. at 474; *see also Am. Steel Foundries*, 257 U.S. at 212 (characterizing the *Duplex Printing Press Co.* boycott as an attempt by the union "to use the right of trade of persons having nothing to do with the controversy . . . to injure the Duplex Company in its interstate trade").

36. 257 U.S. 312 (1921).

an Arizona statute protecting labor strikes and boycotts, holding that it violated the Fourteenth Amendment.[37] The Court explained that labor picketing that forced customers patronizing the struck restaurant to "run the gauntlet of most uncomfortable publicity, aggressive and annoying importunity, libelous attacks and fear of injurious consequences, illegally inflicted, to his reputation and standing in the community" was "moral coercion," before adding that "[v]iolence could not have been more effective."[38]

These cases were far from isolated. "Between 1880 and 1931, by one count, nearly two thousand injunctions were issued prohibiting strikes and labor boycotts."[39] They declined only after Congress passed the Norris-LaGuardia Act, which "deprived federal courts of jurisdiction to issue injunctions in most cases arising from labor disputes."[40] However, Norris-LaGuardia did not spell the end of lawsuits alleging that labor organizing activity was extortionate. In 1973, the Court addressed such a suit in the context of the Hobbs Act. In *United States v. Enmons*,[41] the federal government charged that a union's acts of violence and property destruction constituted extortion under the Hobbs Act because they were aimed at compelling an employer to sign a collective bargaining agreement.[42] It was undisputed that the union's objectives—higher wages—and the accompanying strike were both legal, but the government argued that the union's use of violence amounted to extortion because it sought to obtain "property . . . by wrongful use of actual or threatened force, violence or fear."[43] The Court rejected the government's construction of the Hobbs Act because it would have elevated picket-line violence to a federal racketeering violation.[44] Instead, the Court held that a statutory violation exists only where force, violence, or fear is used to obtain property to which "the alleged extortionist has no lawful claim."[45]

Thus, civil RICO is simply the latest legal theory under which labor unions have faced potential liability for organizing and related activity. As discussed in the next section, these RICO cases have met with mixed results, and it is unclear whether they will ultimately prove successful.

---

37. *Id.* at 340–41.
38. *Id.* at 328.
39. FONER, *supra* note 21, at 123.
40. Kupferberg, *supra* note 33, at 713; *see also* United States v. Hutcheson, 312 U.S. 219, 231–33 (1941) (describing how newly-enacted Norris-LaGuardia Act accomplished what Congress first sought to accomplish through the Clayton Act and holding that its anti-injunction provisions precluded criminal liability for picketing and boycott activity).
41. 410 U.S. 396 (1973).
42. *Id.* at 397.
43. *Id.* (quoting 18 U.S.C. § 1951(b)(2) (2006)).
44. *Id.* at 411.
45. *Id.* at 400.

## 2. Recent RICO Lawsuits Targeting Unions

A growing number of employers have responded to union comprehensive campaigns by filing civil lawsuits based on RICO.[46] For example, in rapid succession between October 2007 and March 2008, Smithfield Foods, Wackenhut Corporation, and Cintas Corporation each filed a lengthy civil complaint alleging that a union (or, in the case of Cintas, two unions), along with other assorted labor organizations and individuals, had violated civil RICO and other causes of action by engaging in a comprehensive campaign.[47] None of those complaints alleged that union violence had taken place during campaign activities. Rather, each alleged that the defendants had committed extortion by threatening to continue the comprehensive campaign until the employer agreed to the union's demands.[48]

Smithfield Foods' recent lawsuit against the UFCW is illustrative because it both describes a comprehensive campaign that involved the tactics discussed above and resulted in a late-stage settlement, rather than a dismissal by a court. However, it also presents a somewhat more complicated case because unlike many other similar lawsuits, such as *Wackenhut Corp. v. Service Employees International Union*[49] and *Cintas Corp. v. UNITE Here*,[50] Smithfield alleged that the union goal was, at least in part, to compel Smithfield to behave illegally.[51] To provide context, I will discuss briefly the UFCW's comprehensive campaign and the resulting lawsuit.

## 3. The UFCW's Comprehensive Campaign To Organize Smithfield's Tar Heel Plant

The *Smithfield* civil RICO lawsuit had its genesis more than twelve years earlier, when the UFCW began trying to organize Smithfield's pork processing plant in Tar Heel, North Carolina. Tar Heel, population sixty-seven, is in southeastern North Carolina, the state with the lowest union density in the country.[52] The Smithfield plant is the largest pork processing plant in the world, employing about 5,000 workers who slaughter and process 32,000 hogs per day.[53]

---

46. Pub. L. No. 91-452, Title IX, 84 Stat. 941 (1970) (codified at 18 U.S.C. §§ 1961–1968); *see* Brudney, *supra* note 4, at 27 nn.131–33 (listing cases).

47. *See supra* note 4.

48. *See, e.g.*, First Amended Complaint, *supra* note 8, ¶ 43, at 12.

49. 593 F. Supp. 2d 1289 (S.D. Fla. 2009).

50. 601 F. Supp. 2d 571 (S.D.N.Y. 2009).

51. *See supra* note 6.

52. Tar Heel, North Carolina, City-Data.com, http://www.city-data.com/city/Tar-Heel-North-Carolina.html (last visited Apr. 20, 2011); Bureau of Labor Statistics, *supra* note 19 (North Carolina's union membership rate is 3.5%).

53. First Amended Complaint, *supra* note 8, ¶ 9, at 3; *Smithfield Tar Heel Plant Votes for Union*, Reuters (Dec. 12, 2008), http://www.reuters.com/article/idUSN1139559220081212;.

The UFCW's early organizing attempts—which did not involve a comprehensive campaign—resulted in NLRB-monitored union elections in 1994 and 1997.[54]  The UFCW lost both elections, but only after Smithfield engaged in what the NLRB later found to have been an array of unfair labor practices during the time leading up to each election, including threatening employees with plant closure, threatening pro-union employees with discipline, interrogating employees about their attitudes toward the union, maintaining surveillance of employees distributing pro-union handbills, suspending and firing pro-union employees, and assaulting and arresting at least one pro-union employee.[55]  Following post-election unfair labor practice proceedings, the NLRB ordered Smithfield to reinstate with backpay those employees who had been wrongfully fired, issued a cease-and-desist order, required Smithfield to provide UFCW with a list of names and addresses of current employees, and ordered Smithfield to post notices.[56]  However, the NLRB declined to issue a bargaining order, which would have compelled Smithfield to bargain with the UFCW without another election.[57]  Moreover, Smithfield's appeal of the NLRB's decision was not completed until 2006—meaning that the Board-ordered remedies were not implemented until nearly a dozen years after the first election.[58]

Following the two unsuccessful NLRB elections, the UFCW changed tactics.  While maintaining a presence in Tar Heel,[59] the UFCW launched a comprehensive campaign.  Consistent with comprehensive campaigns more generally, the UFCW took its campaign to cities around the country and broadened its focus.  It also partnered with groups dedicated to labor, civil rights, and environmental issues, as well as religious groups.  Thus, Smithfield alleged that the UFCW "invest[ed] substantial resources towards events, actions and conduct that ha[s] little to no direct relation to the wages, hours, benefits and working conditions of the employees."[60]  More

---

54.  Smithfield Packing Co., Inc., 344 N.L.R.B. 1, 1 (2004).

55.  *Id.* at 7.

56.  *Id.* at 15–16.

57.  *Id.*  Courts may issue a "bargaining order" requiring an employer to recognize a union as the representative of the relevant bargaining unit when the "employer has committed independent unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside." NLRB v. Gissel Packing Co., 395 U.S. 575, 610 (1969).

58.  *See generally* United Food & Commercial Workers Union Local 204 v. NLRB, 447 F.3d 821 (D.C. Cir. 2006).

59.  For example, the UFCW ran a "workers center" to help employees living and working in eastern North Carolina with workers' compensation, immigration, and other problems, and to attempt to maintain a union presence and workers' support in the area. Bob Geary, *A Fast-Moving Line and a Union Trying To Keep Up*, INDEP. WKLY. (Apr. 4, 2007), http://www.indyweek.com/indyweek/a-fast-moving-line-and-a-union-trying-to-keep-up/Content?oid=1201323 (describing UFCW's role in running workers center); *see also* Yonat Shimron & Barbara Barrett, *Bill's Death Stings Illegal Immigrants*, NEWS & OBSERVER, June 9, 2007, at A12, *available at* http://www.newsobserver.com/2007/06/09/35478/bills-death-stings-illegal-immigrants.html#storylink=misearch.

60.  First Amended Complaint, *supra* note 8, ¶ 39, at 11.

specifically, according to Smithfield, the campaign involved the following:[61]

1.  Making unflattering (and according to Smithfield, untrue) statements, such as that Smithfield was a "racist, anti-immigrant company that feels they can terrorize workers at will,"[62] and distributing flyers and handbills criticizing the company, for example by stating that "There's Blood on Smithfield Products" or that Smithfield mistreats workers in various ways;[63]

2.  Publishing and distributing a report titled "Packaged With Abuse: Safety and Health Conditions and Smithfield Packing's Tar Heel Plant," which criticized the Tar Heel plant's safety record;[64]

3.  Holding protests at grocery stores selling Smithfield products, some of which stopped carrying Smithfield products;[65]

4.  Attributing events to religious, civil rights, immigrant rights, and consumer advocacy groups to conceal the union's orchestration of the comprehensive campaign;[66]

5.  Leading a protest during which participants marched to the home of the president of a store that sold Smithfield products to deliver a large father's day card, which was signed by the children of Smithfield workers and stated that Smithfield workers were abused and mistreated;[67]

6.  Threatening a secondary boycott of stores carrying Smithfield products;[68]

7.  Attempting to convince Smithfield spokesperson Paula Deen to end her relationship with Smithfield;[69]

8.  Encouraging religious bodies and city councils to boycott Smithfield or to pass resolutions condemning the company;[70]

9.  Sending letters criticizing the company to financial analysts;[71]

10.  Protesting at Smithfield's annual shareholders' meetings;[72] and

---

61. The UFCW's comprehensive campaign against Smithfield was similar to other comprehensive campaigns that were the subject of contemporaneous lawsuits. *See, e.g.*, Cintas Corp. v. UNITE HERE, 601 F. Supp. 2d 571, 575 (S.D.N.Y.) (describing campaign, which included claims that the union falsely portrayed company as having engaged in racist, sexist and illegal acts, and targeted company's customers to encourage them to stop doing business with the company), *aff'd*, 355 F. App'x 508 (2d Cir. 2009); Wackenhut Corp. v. Serv. Emps. Int'l Union, 593 F. Supp. 2d 1289, 1290 (S.D. Fla. 2009) (describing SEIU campaign against Wackenhut, including publishing "false and misleading reports disparaging Wackenhut and some of its national customers," persuading Wackenhut customers to boycott the company, and other activities).

62. *E.g.*, First Amended Complaint, *supra* note 8, ¶ 74, at 23.

63. *Id.* ¶ 99, at 29–30.

64. *Id.* ¶¶ 88–95, at 25–28.

65. *Id.* ¶¶ 122–24, at 37–38.

66. *Id.* ¶ 100, at 30.

67. *Id.* ¶¶ 113–15, at 34–35.

68. *Id.* ¶¶ 125–27, at 38–40.

69. *Id.* ¶¶ 131–40, at 41–44.

70. *Id.* ¶¶ 141–54, at 45–50.

71. *Id.* ¶¶ 155–58, at 50–51.

72. *Id.* ¶¶ 159–67, at 51–54.

11. Filing regulatory complaints and opposing Smithfield's regulatory applications, such as Smithfield's application for a water permit, which would have allowed Smithfield to expand operations at the Tar Heel plant.[73]

### 4. Smithfield's Extortion Allegation

According to Smithfield, the UFCW's goal was to force Smithfield to voluntarily recognize the union as the bargaining unit's representative, whether or not a majority of Smithfield employees wanted the representation.[74]   An employer that recognizes a union as the exclusive representative of a bargaining unit violates the NLRA if the union does not enjoy majority support within the unit.[75]   Thus, according to Smithfield, the extortionate threat was that UFCW would continue the comprehensive campaign until the company agreed to an illegal election process.[76]   In other words, the gravamen of Smithfield's complaint was that the UFCW had attempted to extort Smithfield into illegally recognizing the union by saying untrue and embarrassing things about Smithfield that threatened to harm Smithfield's reputation and bottom line.

However, Smithfield apparently did not consider it *necessary* to show that the union sought to compel the company to commit an illegal act in order to establish the extortion predicate for civil RICO.  Rather, Smithfield argued that the union's comprehensive campaign was extortionate even if its goal was only to secure Smithfield's neutrality regarding the prospect of unionization or to obtain a  "card-check" election[77]—both agreements into which Smithfield could have entered perfectly legally.[78]  Thus, Smithfield

---

73. *Id.* ¶¶ 168–72, 179–80, at 54–56, 58–59.

74. *Id.* ¶ 2, at 1 ("Defendants conspired to extort Smithfield's 'voluntary' recognition of Defendants UFCW and Local 400 as the exclusive bargaining representatives of hourly employees at Tar Heel—regardless of the degree of actual employee support for such representation—by injuring Smithfield economically until Smithfield either agreed to Defendants' demands or was run out of business.").

75. Int'l Ladies' Garment Workers' Union v. NLRB, 366 U.S. 731, 738–39 (1961) (holding that it is an unfair labor practice to recognize a minority union as the exclusive representative, even if the employer has a good faith belief that the union actually enjoys majority support); *see also* Kenrich Petrochemicals, Inc., 149 N.L.R.B. 910, 911 (1964) (holding that union and employer committed unfair labor practices when the company recognized the union as the majority representative of its employees despite both parties' knowledge that the union did not represent a majority of employees in the appropriate unit).

76. First Amended Complaint, *supra* note 8, ¶ 238, at 80 (alleging that, some two years after the comprehensive campaign began, the UFCW demanded a "sham 'election,'" among other possibilities).

77. *Id.* ¶ 240 (alleging that UFCW offered to stop its comprehensive campaign if Smithfield agreed to take legal actions such as "sit[ting] idly by while allowing Defendants to accost the Tar Heel employees to sign cards authorizing [UFCW] to represent them for purposes of collective bargaining"); Transcript of Hearing at 58, Smithfield Food, Inc. v. United Food & Commercial Workers Int'l Union, 585 F. Supp. 2d 789 (E.D. Va. 2008) (No. 3:07CV641) (Smithfield attorney stating that "extorting neutrality is just as unlawful as extorting a [sham] election. It's a way they can guarantee they'll win.").

78. NLRB v. Gissel Packing Co., 395 U.S. 575, 597–98 (1969) (holding card-check election is lawful means of ascertaining whether union has support of majority of employees in bargaining unit); Roger C. Hartley, *Non-Legislative Labor Law Reform and Pre-*

also alleged that the UFCW conveyed extortionate threats when, for example, a UFCW contractor stated at a protest that "Smithfield is not listening, so we're going to have to go after their pocketbook."[79] Likewise, the plaintiffs in the *Wackenhut* and *Cintas* cases alleged extortion based on comprehensive campaigns that sought to pressure employers into agreeing to legal card-check or neutrality agreements.[80]

This theory may sound implausible because the notion that activities like peaceful protesting and lobbying can give rise to a charge of extortion is, to say the least, counterintuitive. In that regard, Professor Rick Bales mused that the *Smithfield* lawsuit seemed so implausible that the suit itself might give rise to *company* liability for an unfair labor practice.[81] In this vein, a few arguments that the union's activity simply does not meet the statutory requirements are readily apparent. For example, in *Enmons*, the Supreme Court construed statutory language identical to that contained in the civil RICO statute, and held that union activity—even when accompanied by violence—could not give rise to extortion liability, provided the union's objective was legitimate.[82]

Yet, none of these arguments prevailed in *Smithfield*. Instead, the court held at the motion to dismiss stage that *Enmons* did not control because it

---

*Recognition Labor Neutrality Agreements: The Newest Civil Rights Movement*, 22 BERKELEY J. EMP. & LAB. L. 369, 374–77 (2001) (describing pervasive use of neutrality agreements).

79. First Amended Complaint, *supra* note 8, ¶ 106, at 32.

80. Cintas Corp. v. UNITE HERE, 601 F. Supp. 2d 571, 575 (S.D.N.Y.) (stating that unions sought "card-check/neutrality agreement"), *aff'd*, 355 F. App'x 508 (2d Cir. 2009); Wackenhut Corp. v. Serv. Emps. Int'l Union, 593 F. Supp. 2d 1289, 1296 (S.D. Fla. 2009) (stating that Wackenhut "asserts that SEIU is attempting to 'bend its will' and obtain from it various intangible property rights, including Wackenhut's right to control the form and nature of the union recognition process that applies to its employees; Wackenhut's right to refuse demands for recognition from a 'mixed union' such as SEIU; Wackenhut's right to decline collective bargaining with SEIU; Wackenhut's right to preserve its employees' statutory right to 'free choice,' and Wackenhut's right to conduct business with its customers free from interference, harassment and threats of economic doom from SEIU or its agents").

81. Richard Bates, *NYT on Smithfield's RICO Suit v. UFCW*, WORKPLACE PROF BLOG (Feb. 5, 2008), http://lawprofessors.typepad.com/laborprof_blog/2008/02/nyt-on-smithfie.html (referencing Smithfield lawsuit and noting "the changes to the Board's policies on when filing a frivolous suit might (or might not as the case may be) constitute a ULP"); *see also* Adam Liptak, *A Corporate View of Mafia Tactics: Protesting, Lobbying and Citing Upton Sinclair*, N.Y. TIMES, Feb. 5, 2008, at A14, *available at* http://www.nytimes.com/2008/02/05/us/05bar.html (opining that "what [Smithfield's attorney] calls extortion sounds quite a bit like free speech").

82. United States v. Enmons, 410 U.S. 396, 404 (1973). Further, it is not at all clear that employer-plaintiffs can satisfy "generic" extortion's other requirements, including the mandates that any extortion result in obtaining property or that the use of force, fear, or threats be "wrongful." *See Cintas Corp*, 601 F. Supp. 2d at 577–78 (comprehensive campaign not extortionate because company does not have a right to operate free from criticism); Brudney, *supra* note 4, § III.A. There are other reasons that civil RICO suits might fail. For example, they may be preempted under *San Diego Building Trades Council, Local 2020 v. Garmon*, 359 U.S. 236 (1959) (holding that activity that is arguably encompassed within Sections 7 or 8 of the National Labor Relations Act (NLRA) can be regulated only by the NLRB, and that, even if the NLRB declines jurisdiction, the conduct is not redressable in state court unless it was a traditional tort or conduct marked by violence and imminent threats to public order).

construed only federal law, whereas civil RICO lawsuits can rely on state extortion law.[83]   It then went on to reject each of the union's other arguments based on the civil RICO act's statutory language, labor preemption, and the First Amendment.  (Other courts have rejected labor unions' *Enmons* arguments on other grounds, arguing that *Enmons* either is limited essentially to its facts and applies only to incidents of violence occurring during a strike,[84] or applies only when labor unions are seeking traditional collective bargaining goals such as increased wages.[85])  Ultimately, the Smithfield suit also survived a motion for summary judgment and ended in settlement on the eve of trial.[86]

In contrast, *Wackenhut* and *Cintas* were dismissed pursuant to Federal Rule 12(b)(6) under different legal theories.[87]   The mixed track record of the *Smithfield*, *Wackenhut*, and *Cintas* suits is representative of civil RICO cases targeting comprehensive campaigns generally.[88]   Thus, given the chance that an employer will survive a motion to dismiss, and the prospect of a favorable settlement, civil RICO suits are likely to continue.  Further, the costs associated with defending a civil RICO suit and the prospect of losing such a suit and facing liability for treble damages and attorneys' fees (even if the prospect is small) is likely to deter unions from waging comprehensive campaigns.  As the D.C. Circuit stated in the course of rejecting a civil RICO suit, they are "a potentially powerful weapon to wield against striking workers" that could "reset the labor-management balance."[89]

---

83.  Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union, 585 F. Supp. 2d 789, 800–01 (E.D. Va. 2008); *see also* Herbert R. Northrup & Charles H. Steen, *Union "Corporate Campaigns" as Blackmail: The RICO Battle at Bayou Steel*, 22 HARV. J.L. & PUB. POL'Y 771, 813 (1998) (arguing that *Enmons* does not apply to state law).

84.  *See, e.g.*, Tex. Air Corp. v. Air Line Pilots Ass'n Int'l, No. 88-0804, 1989 WL 146414, at *6 (S.D. Fla. July 14, 1989) (noting that "[n]umerous courts have effectively limited *Enmons* to its facts, creating an exception to the Hobbs Act only for what was at issue in that case—violence committed during the course of a lawful strike called for the purpose of inducing an employer's agreement to legitimate collective-bargaining demands" and citing cases).

85.  *See, e.g.*, *id.* (stating that "[i]n other contexts, the Supreme Court has made clear that to constitute 'legitimate labor objectives,' the goal defendants were seeking to accomplish must have been 'intimately related to wages, hours and working conditions.'" (quoting Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 689–90 (1965))).

86.  *Smithfield Foods, United Food and Commercial Workers Reach Settlement*, TRIANGLE BUS. J. (Oct. 27, 2008), http://www.bizjournals.com/triangle/stories/2008/10/27/daily8.html.

87.  *Cintas Corp.*, 601 F. Supp. 2d at 577–78 (dismissing case after concluding that comprehensive campaign was "lawful 'hard-bargaining'" because Cintas would have received some benefit from a card-check/neutrality agreement); Wackenhut Corp. v. Serv. Emps. Int'l Union, 593 F. Supp. 2d 1289, 1296 (S.D. Fla. 2009) (dismissing case after concluding that union had not sought to "obtain" property as required to establish extortion as a RICO predicate).

88.  Brudney, *supra* note 4, at 27 & n.134 (listing cases and stating that "motions [to dismiss] succeed or fail at roughly comparable levels").

89.  Yellow Bus Lines, Inc. v. Drivers Local Union 639, 913 F.2d 948, 955 (D.C. Cir. 1990).

In sum, it is unclear under current law whether civil RICO liability can attach to comprehensive campaign activity. Moreover, even if civil RICO suits charging labor unions with extortion are ultimately determined to be legally untenable, they could be eclipsed by some other cause of action—for example, Smithfield pressed a variety of tort theories, which also survived a motion to dismiss and a motion for summary judgment. If there is a basis on which to find that labor unions' advocacy enjoys robust constitutional protection, however, then whether labor speech violates civil RICO or another statute will become largely irrelevant because "the point of modern First Amendment law is that speech is often protected even though it violates a law restricting it."[90] Thus, the remainder of this Article addresses whether comprehensive campaigns, even if otherwise subject to civil RICO liability, might nonetheless be protected by the First Amendment.

In the next section, I survey the evolution of the Supreme Court's jurisprudence on labor picketing, boycotting, and petitioning activity, focusing on the difficulty of reconciling the Court's labor speech cases with First Amendment cases involving other speakers.

## II. First Amendment Protection for Union Comprehensive Campaign Speech Under Current Law

Though the Supreme Court has tended to interpret the First Amendment in an increasingly speech-protective way since the 1920s, there have also been cycles of contracting free speech rights, as well as a fair amount of ambiguity in its First Amendment jurisprudence.[91] Even given that lack of clarity, labor speech occupies a relatively uncertain place in the hierarchy of First Amendment protection. At times, labor speech has driven an expansion of free speech rights; for example, it was in a labor case, *Thornhill v. Alabama*,[92] that the Court first found a First Amendment right to picket. But after a period of expansion in the late 1930s and early 1940s, labor speech rights contracted as the Court narrowed or eviscerated its earlier precedents. Now, while cases like *Thornhill* remain good law as applied to speech by other social movements, they are essentially inapplicable to labor speech. The net result is that labor speech is its own category under current First Amendment doctrine, entitled to less protection than that received by both other social movements and commercial entities.

Specifically, the Court has allowed greater restrictions on the types of labor expression commonly found in comprehensive campaigns—such as

---

90. Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances" and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1315 (2005); *see also* Nat'l Org. for Women v. Scheidler, 510 U.S. 249, 264 (1994) (Souter, J., concurring) (noting that conduct that might otherwise be the basis for a civil RICO suit might "be fully protected First Amendment activity").

91. *See generally* Ken I. Kersch, *How Conduct Became Speech and Speech Became Conduct: A Political Development Case Study in Labor Law and the Freedom of Speech*, 8 U. Pa. J. Const. L. 255 (2006).

92. 310 U.S. 88 (1940).

boycotts, picketing, and petitioning activity[93]—than it has allowed in the civil rights context. At the same time, the Court's description of, and justification for, its commercial speech doctrine does not neatly apply to labor speech. Moreover, the Court has not advanced a unified theory of its treatment of labor-related expression.[94] Collectively, the Court's placement of union speech within the First Amendment hierarchy provides at least some support for the argument that a union's expressive activity can be punished as extortionate without violating the First Amendment.

## A. Picketing

As discussed above, until Congress intervened by passing the Norris-LaGuardia Act, courts routinely held that labor union picketing infringed employers' property rights, regularly imposing injunctions or criminal penalties.[95] During that period, the Court viewed picketing as tantamount to violence, essentially unrelated to speech: "the name 'picket' indicate[s] a militant purpose, inconsistent with peaceable persuasion."[96]

That began to change in the 1930s. First, the Court upheld a state statute that expressly allowed peaceful picketing against an employer's Fourteenth Amendment challenge.[97] Then in *Thornhill*, the Court took a dramatic step toward broader protection for labor speech by overturning, on First Amendment grounds, the criminal conviction of a picketing striker. *Thornhill* held that labor speech deserved robust protection based on a truth-seeking theory of the First Amendment: "Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth."[98] Significantly, the Court also directly linked "traditional" labor objectives to the political debates of the day:

> It is recognized now that satisfactory hours and wages and working conditions in industry and a bargaining position which makes these possible have an importance which is not less than the interests of those in

---

93. *See, e.g.*, James Gray Pope, *Labor and the Constitution: From Abolition to Deindustrialization*, 65 TEX. L. REV. 1071, 1073 (1987) (arguing that rule established in *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203 (1964), would be an impermissible content-based prior restraint in any other context). *See generally* Alan Hyde, *Exclusion Is Forever: How Keeping Rights To Strike, Picket, and Other Labour Speech, Separate from Constitutional Rights, Has Proven a Bad Deal for American Labour Unions and Constitutional Law* 3 (Rutgers Sch. of Law Research Paper Series, Paper No. 057, 2009), *available at* http://ssrn.com/abstract=1517844 (noting that the Supreme Court has "upheld severe limitations on the content or message of union speech, picketing, and boycotts, limitations that could not constitutionally be applied to the same conduct carried out by groups other than labour groups"). *Cf.* Amalgamated Food Emps. Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308 (1968) (holding that peaceful labor picketing, absent an impermissible purpose or manner, is protected by the First Amendment).

94. Pope, *supra* note 93, at 1082 (noting that the courts have "declined to develop a unified doctrine of labor liberty" and instead rely on a hodgepodge of doctrines, including those pertaining to commercial rights and speech rights).

95. *See supra* Part I.B.1.

96. Am. Steel Foundries v. Tri-City Cent. Trades Council, 257 U.S. 184, 205 (1921).

97. Senn v. Tile Layers Protective Union, Local No. 5, 301 U.S. 468, 478–80 (1937).

98. Thornhill v. Alabama, 310 U.S. 88, 95 (1940).

the business or industry directly concerned. The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing. . . . Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society. The issues raised by regulations, such as are challenged here, infringing upon the right of employees effectively to inform the public of the facts of a labor dispute are part of this larger problem.[99]

Thus, in the Court's view, labor unions were more than just a collection of workers out to improve their own economic situations; to the contrary, they had broader social relevance.

But the Court soon began to chip away at *Thornhill*'s broad holding. The following year, the Court held in *Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc.*[100] that picketing could be enjoined wholesale once non-trivial violence had taken place on the picket line—and that the resulting injunction need not be narrowly targeted at stopping the violence.[101] One year after that, in *Bakery & Pastry Drivers Local 802 v. Wohl*,[102] the Court suggested in dictum that even nonviolent picketing might permissibly be enjoined if it was "coerci[ve]" or "excessive."[103]

As foreshadowed in *Wohl*, the Court soon upheld an injunction against peaceful picketing because, in the Court's view, the purpose of the picketing was to compel an employer to violate the law.[104] *Giboney v. Empire Storage & Ice Co.* involved a labor dispute between a local affiliate of the Ice and Coal Drivers and Handlers union and some nonunion ice peddlers.[105] To pressure the peddlers to join the union, the union sought to convince ice wholesalers to stop supplying the peddlers—even though it would have been an antitrust violation for the wholesalers to do so.[106] Empire, one of the wholesalers, refused to participate in the union's plan, and the union responded by peacefully picketing with signs that truthfully stated that Empire sold ice to nonunion peddlers.[107] In response, eighty-five percent of the truck drivers who delivered to or from Empire honored the picket line and refused to do business with Empire, reducing Empire's

---

99. *Id.* at 103.

100. 312 U.S. 287 (1941).

101. *Id.* at 294–95. *But cf.* Am. Fed'n of Labor v. Swing, 312 U.S. 321, 325–26 (1941) (overturning on First Amendment grounds injunction against picketing that had been entirely peaceful).

102. 315 U.S. 769 (1942).

103. *Id.* at 775 (striking down injunction of peaceful picket in part because there was no other avenue for the picketers to convey their message, but suggesting that states could limit peaceful picketing under other circumstances).

104. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 504 (1949).

105. *Id.* at 492.

106. *Id.*

107. *Id.*

business by a corresponding amount.[108]     The Court held that the effectiveness of the picket placed Empire in an untenable situation—absent court intervention, its only options were to commit illegal activity or go out of business.[109]

The *Giboney* Court easily rejected the union's First Amendment defense, first stating the general principle that antitrust laws do not violate the First Amendment, even when antitrust conspiracies are formed through speech.[110]  The Court added that the picketing—even if both peaceful and truthful—could not be separated from the union's "single and integrated course of conduct," which included "their powerful transportation combination, their patrolling, their formation of a picket line warning union men not to cross at peril of their union membership, [and] their publicizing," which was aimed at "compel[ling] Empire" to stop selling to the nonunion peddlers.[111] Concluding that picketing "may include conduct other than speech," the Court held that the union's expressive conduct could be restrained because its "sole, unlawful immediate objective was to induce Empire to violate the Missouri law."[112]

Following *Giboney*, the Court repeatedly upheld restrictions on labor picketing, reasoning that even though picketing has a speech component, it also involves conduct, to which the First Amendment does not apply.[113] Thus, the Court stated, "picketing, even though 'peaceful,' involved more than just the communication of ideas" because "the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated."[114]

Significantly, the Court expanded the application of that principle to cases in which the picketing involved neither unlawful means nor ends, but merely contravened state policy.  For example, in *Hughes v. Superior Court*,[115] the Court upheld an injunction against picketing that supported a group's demand for racially proportional employment—even though it

---

108.  *Id.* at 493.
109.  *Id.*
110.  *Id.* at 495–96.
111.  *Id.* at 498.
112.  *Id.* at 501–02.
113.  *E.g.*, Int'l Bhd. of Elec. Workers, Local 501 v. NLRB, 341 U.S. 694, 705 (1951) (permitting injunction against secondary picketing because picketing was tantamount to conduct aimed at accomplishing an unlawful end); Bldg. Serv. Emps. Int'l Union, Local 262 v. Gazzam, 339 U.S. 532, 536–37 (1950) (holding that, while picketing is in part an exercise of free speech, it is "more than speech and establishes a *locus in quo* that has far more potential for inducing action or nonaction than the message the pickets convey"); Hughes v. Superior Court, 339 U.S. 460, 464–65, 469 (1950) (stating that labor picketing is more than free speech and upholding injunction); Int'l Bhd. of Teamsters Union, Local 309 v. Hanke, 339 U.S. 470, 474, 480–81 (1950) (upholding injunction and reasoning that one ingredient of picketing is communication, but picketing does not receive full First Amendment protection).
114.  Int'l Bhd. of Teamsters, Local 695 v. Vogt, 354 U.S. 284, 289 (1957) (quoting Bakery & Pastry Drivers Local 802 v. Wohl, 315 U.S. 769, 776 (1942)).
115.  339 U.S. 460.

would not have been illegal for the picketed employer to accede to the picketers' demand.[116]

Thus, by 1950, states could—without violating the First Amendment—enjoin peaceful and truthful picketing whenever it violated state policy because picketing was part conduct, and coercive conduct at that. Unsurprisingly then, the Court soon acknowledged that *Thornhill*'s application had been sharply circumscribed.[117] Supplanting *Thornhill* was a focus on coercion. The potentially coercive effects of picketing were twofold. First, as to union sympathizers, even entirely peaceful pickets could function primarily as a "signal" calling for an "automatic response."[118] Second, as to everybody else, the picket line would induce compliance out of fear or intimidation, rather than genuine persuasion.[119]

Thus, in First Amendment picketing cases, the Court has focused on whether the picketing had the potential to draw others into labor disputes for reasons unrelated to their independent belief in the union's cause. For example, in deciding when the NLRB could regulate secondary picketing, the Court distinguished cases in which the picketing was likely to be so detrimental to the secondary employer's business that the employer would feel compelled to cooperate with the union in the primary labor dispute (rather than withstand further picketing) from cases in which the picketing would be at most a mere inconvenience to the secondary employer.[120] Likewise, the Court has consistently held that handbilling is not coercive and therefore receives substantial First Amendment protection.[121]

Labor picketing has undoubtedly become less capable of coercion as union density has fallen over time. Thus, in earlier cases like *International*

---

116. *Id.* at 468 (stating that even though "a State chooses to enjoin picketing to secure submission to a demand for employment proportional to the racial origin of the then customers of a business, it need not forbid the employer to adopt such a quota system of his own free will").

117. *Vogt*, 354 U.S. at 291 (stating that *Giboney* was a "decisive reconsideration" of *Thornhill*).

118. NLRB v. Retail Store Emps. Union, Local 1001, 447 U.S. 607, 619 (1980) (Stevens, J., concurring in part and concurring in the result).

119. *E.g.*, NLRB v. Fruit & Vegetable Packers, Local 760, 377 U.S. 58, 82–83 (1964) (Harlan, J., dissenting) ("Because of the very nature of picketing there may be numbers of persons who will refuse to buy at all from a picketed store, either out of economic or social conviction or because they prefer to shop where they need not brave a picket line.").

120. *Compare id.* at 72–73 (majority opinion) (holding that NLRB lacked statutory authority to regulate picketing at supermarket because the picketing only asked consumers not to purchase a particular type of apple, which was unlikely to cause the supermarket to suffer a decline in sales and, therefore unlikely to force the supermarket to join the union's fight against the apple growers), *with Retail Stores Emps. Union*, 447 U.S. at 614–16 (holding that NLRB could regulate secondary picketing consistent with the NLRA and the First Amendment because the secondary employer's primary source of income was derived from selling the picketed product).

121. Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 580 (1988) (holding as a matter of constitutional avoidance that NLRA does not prohibit secondary handbilling and stating that picketing is "'qualitatively 'different from other modes of communication,'" in part because picketing was more "effective" than handbilling and other modes of communication (quoting Babbit v. Farm Workers, 442 U.S. 289, 311 n.17 (1979) (quoting Hughes v. Superior Court, 339 U.S. 460, 465 (1950)))).

*Brotherhood of Electrical Workers, Local 501 v. NLRB*,[122] in which the union caused unionized subcontractors to walk off a job site at which nonunion electrical contractors were working, the union was able to credibly threaten that the contractor would not be able to hire any skilled tradesmen to finish the work without first hiring union electricians.[123] However, given the extremely low rate of union density in most of the country, it seems doubtful that many unions could meaningfully make a similar threat today. Instead, most union picketing will need to rely primarily on its intellectual or emotional persuasiveness. Yet, the Court has not revisited the notion that labor picketing can be limited because of its coercive character.[124]

Further, labor picketing receives less protection than other picketing. The Court's conclusion that labor picketing is only part speech because of its coercive nature has not translated to other types of picketing. Thus, in cases involving picketing by other social movements, the Supreme Court has afforded top-tier First Amendment protection, upholding bans on picketing only where they were narrowly tailored to achieve compelling state interests.[125] The reason for this distinction is unclear, though the Court has suggested that it is not because other types of picketing are somehow less coercive, but instead because labor picketing is economic and not of "broader social concern."[126]

Finally, the Court has never offered a basis for reconciling cases like *Giboney* and *Hughes*, in which the Court held that picketing could be enjoined if it sought to compel an employer to act in contravention of state law or policy, with the Court's cases on incitement of illegal activity.[127] Specifically, in *Brandenburg v. Ohio*, the Court overturned a conviction under the Ohio Criminal Syndicalism Statute for advocating criminal

---

122. 341 U.S. 694 (1951).

123. *Id.* at 697.

124. Although it is counterintuitive, there is precedent for the notion that the amount of First Amendment protection to which particular speech is entitled depends on the likely responses of the listeners. *E.g.*, Brandenburg v. Ohio, 395 U.S. 444, 447–48 (1969); *cf.* Bakery & Pastry Drivers Local 802 v. Wohl, 315 U.S. 769, 775–76 (1942) (Douglas, J., concurring) ("If the opinion in this case means that a State can prohibit picketing when it is effective but may not prohibit it when it is ineffective, then I think we have made a basic departure from [*Thornhill*] . . . .").

125. *E.g.*, Frisby v. Schultz, 487 U.S. 474, 487–88 (1988) (upholding ban on picketing in front of residences, which was challenged by abortion protestors, after holding that the ban was narrowly tailored to achieve a "substantial and justifiable" interest); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 886, 909 (1982) (picketing deployed in support of civil rights boycott was protected by the First Amendment and received maximum First Amendment protection).

126. Carey v. Brown, 447 U.S. 455, 465–66 (1980) (rejecting an Illinois state statute that permitted labor picketing more broadly than other picketing, distinguishing labor picketing from "[p]ublic-issue picketing," which was "'an exercise of . . . basic constitutional rights in their most pristine and classic form'" and of "broader social concern" (alteration in original) (quoting Edwards v. South Carolina, 372 U.S. 229, 235 (1963))); *see, e.g.*, *Claiborne Hardware Co.*, 458 U.S. at 913 ("While States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity . . . .").

127. Volokh, *supra* note 90, at 1321–22 (arguing that *Giboney* is inconsistent with *Brandenburg*, unless *Giboney*'s holding is narrowed to apply only to labor picketing).

activity.[128]  The Court held that "constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of . . . law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."[129]  The government may punish speech inciting others to violate the law only if three conditions are met:  intent to incite lawless action, likelihood of success, and imminence.[130]  *Claiborne Hardware* affirmed that standard in the civil context when it held that Charles Evers's speeches, which threatened violence against boycott-violators, were nonetheless protected speech because appeals that "do not incite lawless action . . . must be regarded as protected speech."[131]

## B. Boycotts

Like picketing, labor boycotts were once deemed violations of the law entitled to no First Amendment protection.[132]  Now, many boycotts and strikes enjoy statutory protection under the NLRA, although the NLRA also prohibits secondary boycotts and strikes by unions.[133]  The Court has upheld the prohibition of secondary boycotts based on the theory that they are coercive:  they compel neutral employers to insert themselves into labor disputes to avoid becoming the targets of union-led boycotts.[134]

For example, in *International Longshoremen's Ass'n v. Allied International*, the Court upheld an NLRB injunction ordering the International Longshoremen's Association (ILA) to cease a secondary boycott involving ILA's refusal to service ships carrying Russian cargo to express displeasure with the Soviet Union's recent invasion of Afghanistan.[135]  The Court rejected the ILA's First Amendment defense, stating that "conduct designed not to communicate but to coerce merits still

---

128. *Brandenburg*, 395 U.S. at 444–45.  *Brandenburg* was decided after both *Giboney* and *Hughes*, but courts have nonetheless continued to apply those cases in the labor context. *E.g.*, Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union, 585 F. Supp. 2d 789, 803 (E.D. Va. 2008).

129. *Brandenburg*, 395 U.S. at 447.

130. *Id.*; *see also* Steven G. Gey, *The* Nuremberg Files *and the First Amendment Value of Threats*, 78 Tex. L. Rev. 541, 547 (2000) ("Under *Brandenberg*, political speech can be regulated only if the speech incites illegal action, is intended by the speaker to instigate that action, and is uttered in a context in which the illegal action is likely to occur immediately.").

131. *Claiborne Hardware Co.*, 458 U.S. at 928; *see also* Gey, *supra* note 130, at 551–52.

132. *E.g.*, Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 438 (1911) (holding that courts can enjoin boycotts when "property is irreparably damaged or commerce is illegally restrained").

133. 29 U.S.C. § 158(b)(4)(ii)(B) (2006).

134. Int'l Longshoremen's Ass'n v. Allied Int'l, Inc., 456 U.S. 212 (1982); *see also* Duplex Printing Press Co. v. Deering, 254 U.S. 443, 466 (1921) (defining secondary boycott as a "combination not merely to refrain from dealing with complainant, or to advise or by peaceful means persuade complainant's customers to refrain ('primary boycott'), but to exercise coercive pressure upon such customers").

135. *Int'l Longshoremen's Ass'n*, 456 U.S. at 224 (stating that the boycott was aimed at "free[ing] ILA members from the morally repugnant duty of handling Russian goods" to protest the recent invasion).

less consideration under the First Amendment [than secondary picketing],"[136] and observing that other avenues of communication were available to the union and its members.[137]   The Supreme Court did so despite its explicit recognition of the inherently political nature of the ILA's protest and that the ILA's members did not stand to gain financially from their boycott.   If anything, the Court held that fact against the union, agreeing with the court of appeals' assessment that it was "more rather than less objectionable that a national labor union" had engaged in a secondary boycott in support of a "'random political objective far removed from what has traditionally been thought to be the realm of legitimate union activity.'"[138] Further, the Court undertook no analysis of the likelihood that the secondary boycott would have any success in persuading the ship owners to attempt to influence Russian policy, stating only that the union had infringed their "rights."[139]

Yet, less than a year later, in *Claiborne Hardware*, the Court took the opposite stance—holding that secondary boycotting and picketing activity were at the core of the First Amendment—in the context of a civil rights organization's secondary boycott.[140]   In *Claiborne Hardware*, the NAACP sought to pressure local government officials to improve racial equality and integration by, in part, boycotting white area merchants.   In other words, the NAACP launched a secondary boycott designed to compel the merchants to pressure the government on the NAACP's behalf.[141]   In support of the boycott, the NAACP engaged in picketing and marches and also designated "store watchers" who were responsible for publicizing the names of individuals who violated the boycott so that those individuals could be socially ostracized.[142]  Isolated incidents of violence also took place.[143]

The businesses sued, claiming the boycott violated a variety of tort and antitrust laws.   The Court held that the First Amendment protected the NAACP's secondary boycott and related activities, even though the conduct was coercive, and despite the incidents of violence.[144]   The Court concluded:

> While States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case.   This Court has recognized that expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'[145]

---

136.  *Id.* at 226.

137.  *Id.* at 227.

138.  *Id.* at 225–26 (quoting Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, 640 F.2d 1368, 1378 (1st Cir. 1981)).

139.  *Id.* at 227.

140.  NAACP v. Claiborne Hardware Co., 458 U.S. 886, 932–34 (1982).

141.  *Id.* at 889.

142.  *Id.* at 903–04.

143.  *Id.* at 923.

144.  *Id.* at 931–34.

145.  *Id.* at 913 (quoting Carey v. Brown, 447 U.S. 455, 467 (1980)).

Thus, the Court rejected the principle that coercive expression, including secondary boycotts, merited less First Amendment protection than non-coercive speech.[146]  Further, it did so by relying on *Thornhill*, which it had long since disavowed in the labor context.[147]

In fact, the Court specifically reaffirmed its earlier labor speech cases, including *Allied International*.  It distinguished those cases—which upheld restrictions on labor picketing and boycotts based on their coercive nature—by stating that labor speech is primarily economic, rather than political, and may be regulated as "part of 'Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife.'"[148]  Specifically, *Claiborne Hardware* stated that the NAACP's campaign

> grew out of a racial dispute with the white merchants and city government of Port Gibson and all of the picketing, speeches, and other communication associated with the boycott were directed to the elimination of racial discrimination in the town.  This differentiates this case from a boycott organized for economic ends, for speech to protest racial discrimination is essential political speech lying at the core of the First Amendment.[149]

Thus, *Claiborne Hardware* apparently revived only part of *Thornhill*, rejecting that Court's statement regarding the necessity of "[f]ree discussion concerning the conditions in industry and the causes of labor disputes" to

---

146.  The Court had previously overturned a prior restraint against coercive leafleting in a non-labor context, stating that:

> The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. . . . But so long as the means are peaceful, the communication need not meet standards of acceptability.

Org. for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971).  However, *Organization for a Better Austin* did not address the extent of its application to labor speech.

147.  *Claiborne Hardware Co.*, 458 U.S. at 909; *see also supra* Part II.A.

148.  *Claiborne Hardware Co.*, 458 U.S. at 912 (quoting NLRB v. Retail Store Emps. Union, Local 1001, 447 U.S. 607, 617–18 (1980) (Blackmun, J., concurring in part and concurring in result)).  Though *Claiborne Hardware Co.* distinguished between economic and political speech in the context of "coercive" speech, it was not the first case in which the Court expressed or implied that political speech was different from, and more important (in First Amendment terms) than, labor speech. *E.g.*, *Carey*, 447 U.S. at 467; Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762–63 & n.17 (1976) (noting that "[t]he interests of the contestants in a labor dispute are primarily economic, but it has long been settled that both the employee and the employer are protected by the First Amendment when they express themselves on the merits of the dispute in order to influence its outcome," and referring to labor speech as "speech of an entirely private and economic character").  Likewise, in *Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies, Inc.*, 312 U.S. 287 (1941), Justice Black stated in dissent that he would have overturned the labor injunction at issue because the speech involved public discussion of conflicting methods of milk distribution, implicitly rejecting—as did the rest of the Court, which upheld the injunction—the notion that discussion of working conditions deserved the same level of First Amendment protection. *Id.* at 302–03 (Black, J., dissenting).

149.  *Claiborne Hardware Co.*, 458 U.S. at 915.

the "effective and intelligent use of the processes of popular government to shape the destiny of modern industrial society."[150]  Moreover, the Court did not confront its earlier statement in *Allied International* that the boycott in that case was purely political and had no economic motive.

One additional basis for distinguishing *Claiborne Hardware* from *Allied International*, though not one identified by the Supreme Court, is that *Claiborne Hardware* involved a consumer boycott, while *Allied International* involved a strike.[151]  That distinction might be important if strikes were necessarily more coercive (by which I mean effective) than consumer boycotts.  However, it is not readily apparent that that is the case, at least not in all situations.  For example, a strike that lasts for only a short time or takes place at just one of a company's several factories may well be less harmful to a company than a prolonged, nationwide (or international) consumer boycott.  Further, the Supreme Court has upheld limits on coercive consumer boycotts sponsored by labor unions.  For example, in *NLRB v. Retail Store Employees Union, Local 1001*,[152] the Court upheld an injunction against a union's call for a consumer boycott based on the boycott's potential to coerce the secondary employer.[153]

Since deciding *Claiborne Hardware*, the Court has continued to hold that boycotts arising from labor disputes do not fall under that case's rule, reasoning that such speech is self-interested and economically-motivated.  For example, in *Federal Trade Commission v. Superior Court Trial Lawyers Ass'n*,[154] the Federal Trade Commission brought an antitrust action against a group of lawyers seeking to influence the District of Columbia government to raise their compensation for representing indigent criminal defendants.[155]  In support of their cause, they essentially went on strike—though without the protections of the Norris-LaGuardia Act—by refusing to accept any more appointments in criminal cases.[156]  The lawyers argued that they were entitled to protection under *Claiborne Hardware*, and that, among other things, they would not have been able to generate support for their cause absent their public boycott.[157]  The Court easily held that the

---

150.  Thornhill v. Alabama, 310 U.S. 88, 103 (1940).

151.  *See, e.g.*, Michael C. Harper, *The Consumer's Emerging Right To Boycott:* NAACP v. Claiborne Hardware *and Its Implications for American Labor Law*, 93 YALE L.J. 409, 426–27 (1984).

152.  447 U.S. 607 (1980).

153.  *Id.* at 616.  In *Retail Store Employees Union*, a union picketed several sellers of Safeco insurance policies in order to protest Safeco's actions.  Though the union simply asked consumers to cancel their Safeco policies, and not to boycott the sellers entirely, the Court nonetheless held that the union had violated the NLRA because its actions were tantamount to asking consumers to boycott the sellers, who derived nearly all of their business from selling Safeco policies. *Id.* at 614–15.  The Court further rejected the union's First Amendment defense, holding that picketing that "predictably encourages consumers to boycott a secondary business . . . imposes no impermissible restrictions upon constitutionally protected speech." *Id.*

154.  493 U.S. 411 (1990).

155.  *Id.* at 414.

156.  *Id.* at 416.

157.  *Id.* at 420–21.  There was also some evidence that the District of Columbia—the supposed victim of the antitrust conspiracy—welcomed the boycott, which generated enough

lawyers' conduct in publicizing their boycott and lobbying the District of Columbia government was protected by the First Amendment.[158] However, the Court rejected the argument that the First Amendment protected the actual boycott, distinguishing *Claiborne Hardware* because, whereas "[t]hose who joined the Claiborne Hardware boycott sought no special advantage for themselves," the trial lawyers sought "an economic advantage for those who agreed to participate."[159] It also rejected the argument that the boycott was protected speech because it was expressive activity on a matter of public concern, noting that "[e]very concerted refusal to do business with a potential customer or supplier has an expressive component," and "[p]ublicity may be generated by any other activity that is sufficiently newsworthy."[160]

### C. Petitioning

Labor petitioning activity, like picketing and boycotting, has received varying levels of First Amendment protection at different times in the Court's history. However, the Court has come nearly full-circle, recently holding as a matter of constitutional avoidance that petitioning activity, even in the labor context, cannot be regulated in most circumstances.[161]

One of the first cases to find broad First Amendment protection for petitioning activity, even if the goal of the activity was anticompetitive, arose in the union context. In *United Mine Workers of America v. Pennington*,[162] the Court held that, although it would ordinarily be an antitrust violation for a union and an employer to collaborate to impose a higher wage scale on a competitor, the First Amendment barred antitrust liability when such collusion related to petitioning activity.[163] Thus, the Court concluded that no antitrust liability attached when the United Mine Workers and a multi-employer association jointly approached the Secretary of Labor to set a minimum wage requirement for coal companies selling to the government, even if the purpose of that agreement was to drive small companies out of the market.[164]

Later, in *Bill Johnson's Restaurants, Inc. v. NLRB*,[165] the Court held that the NLRB could enjoin baseless lawsuits filed to retaliate against

---

public support to make it politically feasible for the District government to raise the compensation rates. *Id.* at 442 (Brennan, J., concurring in part and dissenting in part).

158. *Id.* at 426–27 (majority opinion).

159. *Id.* at 426. The Court also rejected the argument that the lawyers' conduct was entitled to additional First Amendment protection because it facilitated the Sixth Amendment right to competent counsel. *Id.* at 427 n.11 ("*Claiborne Hardware* . . . does not protect every boycott having a constitutional dimension.").

160. *Id.* at 431. Justice Brennan, concurring, suggested that the majority had been "insensitive to the venerable tradition of expressive boycotts." *Id.* at 437 (Brennan, J., concurring in part and dissenting in part).

161. *See, e.g.*, BE & K Constr. Co. v. NLRB, 536 U.S. 516, 536–37 (2002).

162. 381 U.S. 657 (1965).

163. *Id.* at 669–70.

164. *Id.*

165. 461 U.S. 731 (1983).

employees for exercising their rights under the NLRA.[166]  This holding allowed greater regulation of lawsuits filed in the labor context than in the commercial setting, where only "sham" lawsuits could be limited.[167]

However, *Bill Johnson's Restaurants* was short-lived.  In 2002, in *BE & K Construction Co. v. NLRB*,[168] the Court addressed whether the NLRB could "impose liability on an employer for filing a losing retaliatory lawsuit," even if the suit did not meet the sham exception.[169]  The NLRB argued that its actions were less of an infringement on the First Amendment than the antitrust action in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*[170] because NLRB proceedings were initiated by a neutral third party, were less likely to impose high discovery costs on the defending party, and could not result in punitive remedies.[171]  The Court rejected this argument, concluding that "[a]t most . . . these arguments demonstrate that the threat of an antitrust suit may pose a *greater* burden on petitioning than the threat of an NLRA adjudication.  This does not mean the burdens posed by the NLRA raise no First Amendment concerns."[172]

Reviewing the First Amendment interests served by unsuccessful lawsuits, the Court made three points:  first, some unsuccessful lawsuits involve genuine grievances; second, unsuccessful lawsuits can advance First Amendment interests in "'public[ly] airing [] disputed facts,'" raising "matters of public concern," "promot[ing] the evolution of the law," and "add[ing] legitimacy to the court system as a designated alternative to force"; and third, "while baseless suits can be seen as analogous to false statements [which are not entitled to First Amendment protection], that analogy does not directly extend to suits that are unsuccessful but

---

166.  *Id.* at 748–49; *see also infra* Part IV.A.

167.  Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 515–16 (1972) (holding that courts could find antitrust violation because filing anti-competitive lawsuits with the alleged goal of limiting competitor's access to administrative and judicial tribunals fell under the "sham" exception).  "Sham" lawsuits are both "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and motivated by "'an attempt to interfere *directly* with the business relationships of a competitor'"; they are not entitled to First Amendment protection. BE & K Constr. Co. v. NLRB, 536 U.S. 516, 526 (2002) (quoting Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., 508 U.S. 49, 60–61 (1993)).

168.  536 U.S. 516.

169.  *Id.* at 524.

170.  508 U.S. 49.

171.  *BE & K Constr. Co.*, 536 U.S. at 528–29.

172.  *Id.* at 529.  Justice Breyer, concurring, rejected this conclusion, pointing out that antitrust law threatens "treble damages," whereas the NLRB could at most force one side to pay the other's attorneys' fees.  *Id.* at 541 (Breyer, J., concurring).  Justice Breyer also pointed out that "the NLRA finds in the need to regulate an employer's antiunion lawsuits much of its historical reason for being.  Throughout the 19th century, courts had upheld prosecutions of unions as criminal conspiracies. . . . And in the process [the courts] had reinterpreted federal statutes that Congress had not intended for use against the organizing activities of labor unions." *Id.* at 542 (citations omitted).  Thus, Justice Breyer concluded that "an employer's antiunion lawsuit occupies a position far closer to the heart of the labor law than does a defendant's anticompetitive lawsuit in respect to antitrust law." *Id.* at 543.

reasonably based."[173] Next, the Court construed the text of the NLRA, finding no reason to read the Act "to reach all reasonably-based but unsuccessful suits filed with a retaliatory purpose."[174] However, the Court did not decide whether the Board could "declare unlawful any unsuccessful but reasonably based suits that would not have been filed but for a motive to impose the costs of the litigation process, regardless of the outcome."[175] Thus, although the Court did not apply the "sham" rule in the NLRA context, it intimated that it would do so in a future case.[176]

### D. Labor Speech as Commercial Speech?

If, as the Court has suggested, labor speech is, at heart, economic rather than political, then perhaps it should be grouped with commercial speech for First Amendment purposes. In other words, just like a salesman selling cars, perhaps a union representative talking to as-yet-unorganized workers or the public is selling the benefits of unionism, or a bargaining agent trying to obtain higher wages is selling members' work. Such a categorization may even have some advantages for labor speech. For one thing, it would place labor speech within a recognizable category of First Amendment protection. Moreover, inclusion in the commercial speech category would be a promotion for labor speech because at least some commercial speech currently is entitled to more protection than labor speech (though less than political speech).[177] But does the commercial speech doctrine fairly encompass labor speech in its various forms?

Courts have, at times, characterized labor unions as businesses, albeit with specialized missions. For example, in *Thomas v. Collins*,[178] a case

---

173. *Id.* at 532 (majority opinion) (quoting Bill Johnson's Rests., Inc. v. NLRB, 461 U.S. 731, 743 (1983)).

174. *Id.* at 536.

175. *Id.* at 536–37.

176. Justice Scalia stated in his concurrence that the "implication" was that the Court would, in the future, construe the NLRA "in the same way we have already construed the Sherman Act: to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process." *Id.* at 537 (Scalia, J., concurring). Justice Scalia reasoned that the NLRA, if anything, demanded *higher* standards to infringe petitioning activity because the NLRA was enforced by an administrative body instead of an Article III court, and it was doubtful that an administrative agency could be given the authority to punish a reasonably-based suit filed in a court. *Id.* at 537–38.

177. Unlike labor speech, commercial speech can be regulated only when it concerns illegal activity, is misleading, or when it is tailored to directly advance a substantial government interest that could not be served by a more limited restriction. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 563–64 (1980); *see also* James G. Pope, *The Three-Systems Ladder of First Amendment Values: Two Rungs and a Black Hole*, 11 HASTINGS CONST. L.Q. 189, 191 (1984) ("On the ladder of First Amendment values, political speech occupies the top rung, commercial speech rests on the rung below, and labor speech is relegated to a 'black hole' beneath the ladder."); *cf.* Alan Story, *Employer Speech, Union Representation Elections, and the First Amendment*, 16 BERKELEY J. EMP. & LAB. L. 356, 392 n.189 (1995) ("Labor speech 'has been routinely treated as commercial speech subject to virtually plenary regulation' since *Thomas v. Collins*." (quoting Craig Becker, *Democracy in the Workplace: Union Representation Elections and Federal Labor Law*, 77 MINN. L. REV. 495, 599 n.496 (1993))).

178. 323 U.S. 516 (1945).

decided during a period when the Court was expanding labor speech rights, the Supreme Court referred to unions' "economic function" as no barrier to First Amendment protection.[179]  The *Thomas* dissent stated it more bluntly: "Labor unions are business associations; their object is generally business dealings and relationships as is manifest from the financial statements of some of the national unions.  Men are persuaded to join them for business reasons, as employers are persuaded to join trade associations for like reasons."[180]  Even if labor unions did have the same goals and functions as a for-profit corporation, however, that would not end the inquiry.  Rather, whether speech falls into the commercial speech category is determined in part by looking at the function of the speech, not just the identity of the speaker.[181]  Thus, the Supreme Court has characterized commercial speech as "expression related solely to the economic interests of the speaker and its audience"[182] and as "speech which does 'no more than propose a commercial transaction,' [and] is . . . removed from any 'exposition of ideas,' and from 'truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government.'"[183]

Under these definitions, speech that takes place at the bargaining table could arguably qualify as commercial speech, if one accepts that speech about the value of labor is analogous to speech about the value of goods.  The union, as the representative of its members, makes and responds to proposals regarding wages and working conditions in much the same way that a salesman and a buyer might haggle over the price of a good or service.  In contrast, comprehensive campaign speech that takes place away from the bargaining table does much more than propose a commercial transaction, and its intended audience extends well beyond potential union members.  For example, during the Smithfield comprehensive campaign, the UFCW sought to tap into the general public's sense of moral outrage about the company's employment and environmental practices.[184]  Further, even if it could fairly be said that the UFCW was proposing an economic transaction by asking members of the public not to buy Smithfield bacon, that request was tied to dignitary, not economic, interests, which places that

---

179. *Id.* at 531.

180. *Id.* at 556 (Roberts, J., dissenting).  Other courts have since taken a similar view. *E.g.*, Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 723 (1965) (Goldberg, J., dissenting) (stating that "[t]he very purpose and effect of a labor union is to limit the power of an employer to use competition among workingmen to drive down wage rates and enforce substandard conditions of employment").

181. *See, e.g.*, Citizens United v. Fed. Election Comm'n, 130 S. Ct. 876, 898 (2010) (applying strict scrutiny to restrictions on political speech, even if speaker is a corporation).

182. *Cent. Hudson Gas & Elec.*, 447 U.S. at 561.

183. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976) (citations omitted) (quoting Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. 376, 385 (1973); Roth v. United States, 354 U.S. 476, 484 (1957); Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)).

184. *See supra* Part I.B.3.

speech outside the scope of the Supreme Court's commercial speech tests.[185]

It is unclear that organizing speech of any description should ever qualify as commercial speech.[186] To be sure, one could characterize the relationship between unions and members as an exchange of fees (union dues) for services (representation).[187] But unions do more than sell a negotiation service; they also offer a meaningful opportunity for members to exercise their associational rights[188] and to acquire a social identity.[189] Workers may also choose to join labor unions for a variety of reasons in addition to the expectation of improved wages and benefits, such as a desire to amplify their voices at work or in the political realm.

Finally, the reason for granting less First Amendment protection to commercial speech is the supposed durability of that speech—that is, it is

---

185. In distinguishing commercial speech from other types of speech, the Court has focused on both the content of the speech and the motivation of the speaker. This was made most apparent in a pair of cases involving lawyers soliciting clients: *In re Primus*, 436 U.S. 412 (1978), and *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978). In the first, Primus approached a prospective client/plaintiff regarding a suit over the coerced sterilization of women who received Medicaid benefits. *Primus*, 436 U.S. at 415. Though Primus offered her legal services for free, there was some possibility that the American Civil Liberties Union, which sponsored the litigation, would be awarded counsel fees. *Id.* at 429–30. In the second, Ohralik sought to represent car crash victims for a fee. *Ohralik*, 436 U.S. at 450–51. Nonetheless, the Court held that Ohralik's solicitation was commercial speech, which could be punished by the bar association in light of the state's interests in protecting consumers and maintaining attorney standards, *id.* at 437–39, while Primus's solicitation was "political expression and association" that could be regulated only narrowly to prevent specific harms. *Primus*, 436 U.S. at 437–38. Acknowledging the unusual role that speaker motivation was playing, the Court stated that "[n]ormally the purpose or motive of the speaker is not central to First Amendment protection, but it does bear on the distinction between conduct that is 'an associational aspect of "expression",' and other activity subject to plenary regulation by the government." *Id.* at 438 n.32 (quoting Thomas I. Emerson, *Freedom of Association and Freedom of Expression*, 74 YALE L.J. 1, 26 (1964))). Thus, commercial speech was to be distinguished from political speech based on not only its content, but also its motivation.

186. In *DeBartolo*, the Court made clear that it did not mean to "suggest that communications by labor unions are never of the commercial speech variety and thereby entitled to a lesser degree of constitutional protection," but that the leaflets at issue were not "typical commercial speech such as advertising the price of a product or arguing its merits." Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 576 (1988). However, the decision did not give any examples of union speech that would be of the commercial variety, and further, the Court did not say what type of speech the leaflets were, if not commercial speech.

187. *See, e.g.*, Aitken v. Commc'ns Workers of Am., 496 F. Supp. 2d 653, 665 (E.D. Va. 2007) ("While union organizing certainly implicates First Amendment associational interests, it is also true that CWA performs economically valuable services for its members in exchange for a fee, namely union dues—an arrangement which has all the characteristics of a commercial transaction.").

188. NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 113 (1956) (noting that "[t]he right of self-organization depends in some measure on the ability of employees to learn the advantages of self-organization from others"); *see also* Thomas v. Collins, 323 U.S. 516, 534 (1945) (noting that speech and associational rights were at issue in case concerning restriction on labor organizer's speech).

189. *See* Marion Crain & Ken Matheny, *Labor's Identity Crisis*, 89 CALIF. L. REV. 1767, 1785–86 (2001) (describing the AFL's recent attempt to cast the union movement in terms of not only class consciousness but also as a social justice movement).

less likely to be chilled by governmental restriction than political, artistic, or other non-commercial speech entitled to full First Amendment protection. In *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,[190] the Court explained that durable commercial speech required less First Amendment protection than other speech in large part because of its profitability.[191] But this rationale does not translate to either comprehensive campaign speech or other "organizing" speech. Given that union dues average about $400 per member per year,[192] comprehensive campaigns are unlikely to be profit-making ventures. Furthermore, defending civil RICO suits can be extremely expensive.[193] Thus, the possible chilling effect associated with making an incorrect statement about an employer will be much greater than in the typical commercial context.

In sum, even if the Court's decisions are trending toward increased First Amendment protection for labor speech, the Court has yet to place union speech on the same footing as the speech of other social movements or to present a coherent theory of the First Amendment as it applies to labor speech. In the next section, I will argue that labor unions, like other civic associations, contribute significantly to deliberative democracy, and, for that reason, their speech should receive First Amendment protection equivalent to that of other social movements.

### III. CIVIL SOCIETY AND THE FIRST AMENDMENT

The Court's apparent reluctance to set forth a coherent or consistent theory of labor speech and the First Amendment makes some sense in light of the limited consensus as to what speech the First Amendment should protect and, more importantly, why it should be protected.[194] To date, "[t]he Court has not set out anything like a clear theory to explain why and when speech qualifies for the top tier. At times the Court has indicated that speech belong[s] in the top tier if it is part of the exchange of ideas, or if it bears on the political process."[195]

Though the Court has never directly endorsed a conception of the First Amendment that particularly values "civil society"[196] and its contributions

---

190. 425 U.S. 748 (1976).

191. *Id.* at 762–63, 771 n.24.

192. Mark Brenner, *Give Your Union a Dues Checkup*, LABOR NOTES (May 27, 2007, 10:54 PM), http://labornotes.org/node/908 (value for 2004; noting that union dues had fallen by 8.4% from 2000–2004).

193. *See infra* Part IV.B.

194. Steven Shiffrin, *The First Amendment and Economic Regulation: Away From a General Theory of the First Amendment*, 78 Nw. U. L. REV. 1212, 1251–57 (1983) (observing that the Court has been generous about finding First Amendment values and employed an "eclectic" group of tests in various First Amendment contexts).

195. CASS R. SUNSTEIN, DEMOCRACY AND THE PROBLEM OF FREE SPEECH 11 (1995).

196. Ernest Gellner defines civil society as

    'that set of diverse non-governmental institutions which is strong enough to counterbalance the state and, while not preventing the state from fulfilling its role as keeper of the peace and arbitrator between major interests, can nevertheless

to democratic deliberation, there is a discernible strand running through some of the Court's free speech cases that seems to recognize that associations are critical to the sound exercise of popular sovereignty. For example, at least one scholar has suggested that Brandeis's vision of the First Amendment was based on civic virtue and that his classic dissent in *Whitney v. California*[197]—a case about speech at a meeting of the Communist Labor Party, where members debated and voted on a series of proposals related to the organization's purpose and function[198]—speaks not just to self-fulfillment or self-rule, but to "the duty to participate in politics, the importance of deliberation, and the notion that the end of the state is not neutrality but active assistance in providing conditions of freedom . . . ."[199] Similarly, Cass Sunstein argues persuasively that "[t]he placement of sovereignty in 'We the People,' rather than the government . . . . created an ambitious system of 'government by discussion,' in which outcomes would be reached through broad public deliberation."[200]

Thus, Sunstein and others have proposed a reading of the First Amendment that focuses on deliberative democracy, including the need to draw citizens into public life to exercise their right to self-governance, and argues that speech that promotes deliberative democracy deserves robust First Amendment protection.[201] Further, a wealth of legal and social-scientific scholarship argues that civil society (or associational life) is critical to a well-functioning deliberative democracy.[202] In the next section, I will explore the intersection of these arguments and propose that certain labor speech should receive enhanced First Amendment protection. This proposal is based on two premises: first, that a healthy civil society

---

Mark Tushnet, *The Constitution of Civil Society* 75 CHI.-KENT L. REV. 379, 380 (2000) (quoting ERNEST GELLNER, CONDITIONS OF LIBERTY: CIVIL SOCIETY AND ITS RIVALS 5, 193 (1994)).

197. 274 U.S. 357 (1927).

198. *Id.* at 365.

199. Pnina Lahav, *Holmes and Brandeis: Libertarian and Republican Justifications for Free Speech*, 4 J.L. & POL. 451, 460, 466 (1988) ("In Brandeis' opinion, the potential goodness of individuals acting collectively was the source of legitimacy for democracy, and the reason he supported it.").

200. SUNSTEIN, *supra* note 195, at xvi.

201. *E.g.*, SUNSTEIN, *supra* note 195, at 244–52; Martin H. Redish & Abby Marie Mollen, *Understanding Post's and Meiklejohn's Mistakes: The Central Role of Adversary Democracy in the Theory of Free Expression*, 103 NW. U. L. REV. 1303, 1303–04 (2009) ("[A]mong the most prominent and widely accepted theories of the First Amendment are those that explain the Free Speech Clause as either a catalyst for or a protection of democracy itself. Such 'democratic' theories of the First Amendment posit that speech receives constitutional protection because it is essential to a functioning and legitimate democracy."); *see also* STEPHEN BREYER, ACTIVE LIBERTY: INTERPRETING OUR DEMOCRATIC CONSTITUTION 37 (2005) (describing "active liberty" as "the need to make room for democratic decision-making"); Jason Mazzone, *Speech and Reciprocity: A Theory of the First Amendment*, 34 CONN. L. REV. 405, 415–16 (2002) (noting growing emphasis on Sunstein's theory of deliberative democracy).

202. *E.g.*, COHEN & ARATO, *supra* note 16, at vii, viii (noting that "the concept of civil society . . . has become quite fashionable today" and arguing that civil society is "the primary locus for the potential expansion of democracy").

contributes to deliberative democracy; and second, that labor unions are rightly considered a valuable part of civil society. I will also explore how associations, including labor unions, play a role in enhancing deliberation, both by helping members develop the skills required to deliberate and by providing literal and metaphorical space for deliberation.[203]

### A. The Role of Civil Society in Promoting Deliberative Democracy

Associations foster democratic deliberation in two distinct ways. First, they participate directly in social debates by publishing position statements or lobbying elected officials. Second, they create conditions in which deliberation is likely to occur, or instill in their members values that make them more likely to deliberate. This section explores whether and how civil society either participates in democratic deliberation, or facilitates deliberation by promoting conditions, such as freedom, equality, diversity, and connectedness, under which it is more likely to occur.[204]

There are numerous accounts of the links between civil society and democratic self-governance or deliberative democracy.[205] Those links can be grouped into two general categories: first, benefits derived from what the associations themselves do, including what members do in their role as members; and second, benefits derived from what participation in the association might prompt individuals to do in their other social roles. Put more concretely, an association might lobby the government to pass legislation—an example of an association's direct participation in democratic deliberation. Then, a member of that association might be inspired to try to convince her city council to add more bus lines—an example of an individual's participation in democratic life that is a result of, but distinct from, her participation in an association.

---

203. I do not mean to suggest that this is the only theory of the First Amendment under which labor speech should be afforded top-tier protection. However, other theories are beyond the scope of this Article.

204. Cynthia Estlund has called freedom, equality, diversity, and connectedness the "ideal conditions" for democratic deliberation. Cynthia L. Estlund, *Working Together: The Workplace, Civil Society, and the Law*, 89 GEO. L.J. 1, 58 (2000).

205. For example, Jane Mansbridge theorizes that civil society allows for "deliberative enclaves of resistance" or "counterpublics," with a variety of goals:

> 'understanding themselves better, forging bonds of solidarity, preserving the memories of past injustices, interpreting and reinterpreting the meanings of those injustices, working out alternative conceptions of self, of community, of justice, and of universality, trying to make sense of both the privileges they wield and the oppressions they face, understanding the strategic configurations for and against their desired ends, deciding what alliances to make both emotionally and strategically, deliberating on ends and means, and deciding how to act, individually and collectively.'

Linda C. McClain & James E. Fleming, *Some Questions for Civil Society-Revivalists*, 75 CHI.-KENT L. REV. 301, 318 (2000) (quoting Jane Mansbridge, *Using Power/Fighting Power: The Polity*, *in* DEMOCRACY AND DIFFERENCE: CONTESTING THE BOUNDARIES OF THE POLITICAL 46, 58 (Seyla Benhabib ed., 1996)).

Although the two categories will significantly overlap in many cases,[206] I will broadly group the democracy-enhancing benefits of civil society as follows: first, associations acting as associations are better able to "check and oppose" the state than individuals, foster interdependence and cooperation in pursuit of a common goal, and provide a venue and thus a reason for members to come together to deliberate. Second, associations can be "schools for democracy" that improve members' competence and interest in participating in larger democratic life, even outside of the association.

I will discuss these in turn and then discuss labor unions' potential contributions to civil society.

### 1. Associations and "Checking and Opposing" the State

In some undemocratic countries, civil society has literally opposed the state in the sense of undermining dictatorships.[207] In a democracy, though, the relationship is more symbiotic: although civil society influences governmental decision-making and moderates or counterbalances governmental excess, government also protects civil society.[208] At most then, as posited by Emile Durkheim, an early theorist of the value of intermediate associations, associations may help prevent the state from becoming corrupt.[209] Similarly, James Gray Pope has argued in the context of the labor movement that "[m]odern constitutional theory relies on organized groups to offset governmental power and prevent the rise of a ruling class. Group independence has replaced individual independence as the safeguard of democracy."[210]

### 2. Associations and Interdependence

For Durkheim, Alexis de Tocqueville, and others, associations were crucially important for their ability to generate "social capital" and social trust.[211] Robert Putnam defined "social capital" as "'connections among individuals—social networks and the norms of reciprocity and

---

206. For example, when a member of an association goes knocking on doors to fundraise, he is probably acting both as a member and as a neighbor. The same is true when a member of an association drags a friend to a meeting.

207. GELLNER, *supra* note 196, at 193; Roy Godson, *Labor's Role in Building Democracy*, *in* PROMOTING DEMOCRACY: OPPORTUNITIES AND ISSUES 119, 123 (Ralph M. Goldman & William A. Douglas eds., 1988) (describing labor's role in undermining the stability of regimes in Eastern Europe and in decolonizing African countries).

208. COHEN & ARATO, *supra* note 16, at x (noting that "it would be a mistake to see civil society in opposition to the economy and state by definition"); Tushnet, *supra* note 196, at 399.

209. EMILE DURKHEIM, PROFESSIONAL ETHICS AND CIVIC MORALS 3–5 (Cornelia Brookfield trans., 1958).

210. Pope, *supra* note 93, at 1112.

211. Bob Edwards & Michael W. Foley, *Civil Society and Social Capital: A Primer*, *in* BEYOND TOCQUEVILLE: CIVIL SOCIETY AND THE SOCIAL CAPITAL DEBATE IN COMPARATIVE PERSPECTIVE 1, 1 (Bob Edwards, Michael W. Foley & Mario Diani eds., 2000).

trustworthiness that arise from them.'"[212]  Its purpose is to "help people to accomplish things together" by generating the trust necessary for individuals to put self-interest aside, at least temporarily, to act collectively for the common good.[213]  In particular, associations have the potential to bring people together both within and across social groups, generating bonds of trust where there were none before and reinforcing those that already existed.[214]

A closely related concept is interdependence.  When citizens depend on each other for survival and success, they are more likely to form a real community, where the needs of the group can sometimes be put above the needs of the individual, with an unstated expectation of future reciprocity.[215]  Associations play a role in promoting interdependence in at least two ways.  First, they are microcosms of society, in that members of an association depend on each other to make the organization successful.  Second, associations themselves are social actors, capable of depending on others and being depended upon, as when they act in concert with other associations to accomplish shared goals.

### 3.  Associations as Places and Reasons To Come Together

Associations can simply provide a physical place and a reason for individuals to come together to talk about great or small issues.  Thus, in a literal as well as a metaphorical sense, "civil society can offer a multiplicity of spaces in which deliberative democracy, or public deliberation, can take place."[216]  To the extent the Court has endorsed a view of the First Amendment that cares about civil society and its relationship to deliberative democracy, this has been the value that it has identified.

Specifically, the Court has endorsed the idea that citizens must come together to deliberate about how to exercise their sovereignty.  In *De Jonge v. Oregon*,[217] a case involving a meeting of the Communist party, the Court concluded that—at least when speech on "the public issues of the day" was tied to petitioning the government for redress of grievances—"'[t]he very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation.'"[218]  Likewise, in *Thornhill*, the Court unanimously—if briefly—held that labor picketing was protected by the First Amendment because it was "essential to free government" that

---

212.  CYNTHIA ESTLUND, WORKING TOGETHER: HOW WORKPLACE BONDS STRENGTHEN A DIVERSE DEMOCRACY 114 (2003) (quoting ROBERT D. PUTNAM, BOWLING ALONE:  THE COLLAPSE AND REVIVAL OF AMERICAN COMMUNITY 19 (2001)).

213.  *Id.*; *see also* Edwards & Foley, *supra* note 211, at 1.

214.  ESTLUND, *supra* note 212, at 107 (describing Putnam's concepts of "bridging" associations, which bring people together from across different social groups, and "bonding" associations, which bring together people from the same social group).

215.  *See* ROBERT N. BELLAH ET AL., HABITS OF THE HEART:  INDIVIDUALISM AND COMMITMENT IN AMERICAN LIFE 246–47 (1987) (describing the role of interdependence in creating a real community rather than a "lifestyle enclave").

216.  McClain & Fleming, *supra* note 205, at 318.

217.  299 U.S. 353 (1937).

218.  *Id.* at 364–65 (quoting United States v. Cruikshank, 92 U.S. 542, 552 (1875))).

"men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion."[219] Although it is not clear that the *Thornhill* Court thought "education and discussion" could best occur within associations,[220] it would have certainly been logical for the Court to have had associations in mind: the case arose in the context of associational advocacy, and associations are necessarily better at facilitating repeated and ongoing discussion between their members than, say, chance encounters on the street. Further, the Court cited the Continental Congress's letter to the Inhabitants of Quebec, which articulated the value of a free press as, in part, "'its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are ashamed or intimidated, into more honourable and just modes of conducting affairs.'"[221]

#### 4. Associations as "Schools for Democracy"

Associations can also inculcate the skills and desires necessary to become an active participant in deliberation on a larger scale. Accounts of civil society and democracy often use as a starting place Tocqueville's observation that associations act as "schools for democracy"[222] by cultivating certain experiences, attitudes, and abilities. For example, associations may afford their members direct experience with democratic structures—such as electing a president to lead the association—on a scale that makes it easier to see the direct results of one's contribution. Further, to the extent an association's membership is composed of individuals with diverse backgrounds, experiences, and needs, individual members will benefit from developing mechanisms to bridge differences and compromise. Both types of experiences will, in turn, relate to politics on a larger scale.

### B. Labor Unions and Civil Society

When it comes to inculcating the skills, not to mention the desire, to participate in a deliberative democracy, not all associations are created equal. It is implausible that the average cooking club is going to "check and oppose the state." Nor is it likely that the cooking club will teach democratic values or help its members develop a sense of their own political efficacy. To use another example, "it is hardly self-evident how participation in bowling leagues nourishes the habits and skills of citizenship, much less civic virtue and democratic self-government."[223]

---

219. Thornhill v. Alabama, 310 U.S. 88, 95 (1940).

220. *Id.*

221. *Id.* at 102 (quoting 1 JOURNAL OF THE CONTINENTAL CONGRESS 104, 108 (1904)). To be sure, the *Thornhill* Court also articulated Holmes's theory that freedom of speech was valuable because it facilitated testing ideas in the "market of public opinion." *Id.* at 105; *see also* Gitlow v. New York, 268 U.S. 652, 673 (1925) (Holmes, J., dissenting).

222. Thomas C. Kohler, *The Overlooked Middle*, 69 CHI.-KENT L. REV. 229, 230 (1993).

223. McClain & Fleming, *supra* note 205, at 311–12. Professors Linda McClain and James Fleming suggest that, to believe that "the barest indication of connection with others

Labor unions, however, have some advantages over many other civil society institutions when it comes to both checking and opposing the state and acting as a school for democracy.

### 1. Unions "Checking and Opposing" the State

Unions can "channel[] grievances to the government and help[] to explain and assist in the administration and maintenance of the political system" by facilitating communication between citizens and the government.[224]   In the United States, unions have done so largely by "seek[ing] change through political and legal channels" and "engag[ing] in battles to transform cultural understandings."[225]   Thus, unions helped create the public perception that work should be rewarded with "a 'rate of pay commensurate with an American standard of living.'"[226]   They were also instrumental in the fight against Lochnerism that paved the way for laws that improved working conditions.[227]

Further, unions helped secure the "economic independence and material security" that the Framers thought were necessary to meaningful participation in democratic life.[228]   After the New Deal, unions "emerged as the only powerful, organized constituency for social and economic rights"[229] and helped secure passage of the wage and hour laws and workplace safety protections.   Now, unions are key players in national debates over issues like national health care reform and free trade.[230]

### 2. Unions Promoting Interdependence

Unions can enhance interdependence in at least two ways.  First, they make interdependence that already exists within workplaces more

---

[would] seem to support or even to relate to citizenship," one would have to view people as "atomistic individuals, unencumbered selves, or lone rights-bearers." *Id.* at 353.

224.  Godson, *supra* note 207, at 122.

225.  Hawkins, *supra* note 31, at 76–77 (describing labor's use of strikes to change social expectations about working conditions); McClain & Fleming, *supra* note 205, at 319;.

226.  FONER, *supra* note 21, at 199 (quoting 1937 collective bargaining agreement between the UAW and General Motors, and discussing unions' role in creating belief that the Depression was caused by "underconsumption," and that distributing wealth was important to economic stability).

227.  *Id.* at 59 (stating that, in the 1840s, courts viewed "any decision to labor for another as a voluntary contractual agreement that allowed employers full authority over the workplace," while viewing labor unions as conspiracies); *see also* FORBATH, *supra* note 31, at 1 (noting that American unions "never forged a class-based political movement to press for more generous and inclusive protections" for all workers).

228.  William E. Forbath, *Social and Economic Rights in the American Grain: Reclaiming Constitutional Political Economy, in* THE CONSTITUTION IN 2020, at 55, 55 (Jack M. Balkin & Reva B. Siegel eds., 2009).

229.  *Id.* at 60.

230.  *See, e.g., MLKCLC Labor Day Party*, TEAMSTERS LOCAL UNION # 174 (Aug. 31, 2009), http://www.teamsters174.org/news-archives/2009_july-august.htm ("The AFL-CIO Union Movement is fighting for a unique American plan for secure, high-quality health care for all that . . . [m]akes sure everyone gets high-quality health care as good as or better than they have now.").

egalitarian. Second, they create new axes of interdependence among members and between union leadership and members.

Because American labor unions exist in connection with workplaces, they are influenced to a degree by the way workplaces are organized. In turn, one of the defining elements of industrialized society is the differentiation of labor, the primary characteristic of which is interdependence.[231] Thus, "work is the chief—and again for many the only—place outside the family where people are engaged in a common undertaking."[232] However, workplaces are also "involuntar[y]"[233] (in the sense that employees generally have to work to live) and hierarchical. Both traits can impede meaningful connection and undermine workers' autonomy.[234] By helping to equalize the balance of power between employers and employees, unions can improve workplace interdependence.

Once a workplace is unionized, the union and management must work together for the company to be productive (which in turn enhances workers' job security and benefits).[235] Not only does a unionized workforce present the threat of a strike or other economic action, but, because a union contract often makes it harder for an employer to take unilateral action, unionization means that employers will have a greater incentive to maintain a cooperative workplace. Further, whereas employment relationships in the United States are generally severable "at will," collective bargaining agreements typically include a provision that permits employees to be fired only "for cause." They also limit the scope of what employees can be asked to do and other aspects of their working conditions. Thus, unlike in nonunion workplaces, where employees are heavily dependent on employers but the reverse is not necessarily true (particularly for unskilled employees), unionized employers must either work to win the "hearts and

---

231. In *The Division of Labor in Society*, Emile Durkheim identified the differentiation of labor as an important source—perhaps the most important source—of social solidarity in modern society, which he termed "organic solidarity." This was precisely because of work's mandatory qualities: even individuals who did not have a family or participate in other associations would probably have to work and, therefore, to depend on others and be depended on. Thus, Durkheim saw joining a trade union as a moral good in itself. ERNEST WALLWORK, DURKHEIM: MORALITY AND MILIEU 87 (1972). To foster that interdependence, Durkheim advocated organizing society into "occupational groups," which would function as a kind of super-union or trade group. *See* ESTLUND, *supra* note 212, at 111.

232. Kohler, *supra* note 222, at 233–34. Kohler further argues that, "[g]iven the importance of the work-life sphere in contemporary culture, the promotion of employee self-organization could serve as a buffer against the sort of fragmentation of the polity that Tocqueville understood would deform and pervert a democracy." *Id.* at 243.

233. ESTLUND, *supra* note 212, at 4.

234. *Id.* at 131.

235. Although the courts and others have typically thought of this relationship as something like industrial warfare, *e.g.*, Kupferberg, *supra* note 33, at 701–02 & n.76 (describing Congress's intent in enacting the NLRA as protection of workers' democratic rights and reduction of "industrial warfare"), it can be more benignly characterized as interdependence.

minds" of their employees or risk becoming mired in endless disciplinary proceedings and union grievances.[236]

Unions also demonstrate internal interdependence, both between members and union leadership and among members. As to the former, although work may be involuntary, union membership is generally voluntary. In "right to work" states,[237] employees cannot be required to join labor unions at all (even though the unions are still required to represent the interests of non-member employees fairly), and in other states, employees in unionized workplaces can be required to pay, at most, the "agency fee," which is the portion of union dues that goes to representational activities such as bargaining and defending employees in disciplinary proceedings.[238] Further, in exchange for the right to be the exclusive representative of a group of employees, unions are required by law to operate as relatively formal democracies. The law protects the rights of dissenters, and unions owe all members and agency-fee payers a "duty of fair representation."[239] Thus, even though labor unions are, like most workplaces, hierarchical, they have less ability to squelch dissent and dampen debate and deliberation than workplaces.[240]

Moreover, when unions are functioning properly, they facilitate internal interdependence because members must rely on each other (and their elected leadership) to represent fairly the interests of the entire membership. For a union to be effective, its members must be able to speak across the negotiation table with a unified voice. For a union to maintain members, those members must remain confident the union will go to bat for them when they need its advocacy.

Finally, by virtue of their close relationship to workplaces, where workplaces are relatively diverse, it stands to reason that labor unions will also be diverse, particularly those unions that span multiple workplaces.[241] As Cynthia Estlund has noted, workplaces tend to be relatively more diverse than neighborhoods or voluntary associations, making the deliberation at work more likely to include unfamiliar points of view.[242] Correspondingly, a recent Center for Economic and Policy Research report

---

236. Further, with the rise of business unionism, unions and employers are probably more likely than ever to be able to maintain a functional working relationship. In either event, though, well-functioning unions increase employers' dependence on their employees.

237. There are presently twenty-two right-to-work states, which are found mainly in the southeastern and midwestern United States. See *Right to Work States*, NAT'L RIGHT TO WORK LEGAL DEF. FOUND., INC., http://www.nrtw.org/rtws.htm, for a list of right-to-work laws.

238. *See generally* Commc'n Workers of Am. v. Beck, 487 U.S. 735 (1988).

239. Labor Management Reporting and Disclosure Act of 1959, Pub. L. No. 86-257, art. I, 73 Stat. 519 (codified as amended at 29 U.S.C. § 401 (2006)). *See generally* Vaca v. Sipes, 386 U.S. 171 (1967). Of course, unions are democratic to varying degrees. *See* Godson, *supra* note 207, at 119 (noting that "not all trade unions are democratic").

240. ESTLUND, *supra* note 212, at 14 (arguing that the hierarchical nature of most workplaces suppresses their ability to create social capital).

241. Like workplaces, labor unions are subject to antidiscrimination laws, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (2006), and the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a).

242. ESTLUND, *supra* note 212, at 7.

indicates that the labor movement is becoming increasingly diverse along racial and gender lines.[243]   Thus, labor unions, at least those where members participate meaningfully in union affairs, can fulfill some of the same "integrative" functions as workplaces—they too can "conven[e] strangers from diverse backgrounds and induc[e] them to work together toward shared objectives . . . ."[244] Therefore, to use Putnam's terminology, unions are both "bridging" and "bonding" associations.[245]   They are bonding associations because union members generally share a socioeconomic class and, in the case of local unions, a geographic area and often a profession.   They are bridging associations because, like workplaces, unions are relatively diverse as compared to other types of associations.[246]  Thus, the interdependence created at work and enhanced by a union is likely to be broader and more inclusive than that created by associations that are unconnected to the workplace.[247]

### 3.  Unions as Places and Reasons To Come Together

Unions may be less effective than other types of associations at physically bringing people together in a single location.   Generally, attendance at union meetings is non-mandatory, and—particularly if they feel that the union is functioning well and serving their interests—members may not be inclined to participate in union affairs.

This is not to say that deliberation never takes place among union members.  When it does, members will undoubtedly influence each others' views on the political issues of the day.[248]  And when union members take collective action, such as striking or informational picketing, the level of

---

243. JOHN SCHMITT & KRIS WARNER, CTR. FOR ECON. & POLICY RESEARCH, THE CHANGING FACE OF LABOR, 1983–2008 (2009), *available at* http://www.cepr.net/documents/publications/changing-face-of-labor-2009-11.pdf;  *see also* BUREAU OF LABOR STATISTICS, *supra* note 19 (indicating that, whereas men used to belong to unions at much higher rates than women, the "gap between their rates has narrowed considerably since 1983").   Further, labor unions have become more diverse in terms of representing more unskilled and semi-skilled workers than in earlier decades, when unions tended to represent relatively well-off skilled workers. WILLIAM FORM, SEGMENTED LABOR, FRACTURED POLITICS:  LABOR POLITICS IN AMERICAN LIFE 40–41 (1995).

244. ESTLUND, *supra* note 212, at 129.  It may be that, in some unions, participation will be limited to a few committed members, so the potential integrative benefits of physically coming together at the union hall will be minimal.   However, data showing that union members are more politically active than the general public suggests that union membership is still valuable to deliberative democracy.    Presumably, which aspects of union membership—coming together to debate workplace condition and take collective action, being part of an organization that participates actively in politics, having to think about the welfare of other workers while negotiating contracts or processing grievances, or something else—influence democratic citizenship and participation will vary among unions and members.

245. *Id.* at 107 (citing PUTNAM, *supra* note 212, at 22).

246. *See supra* note 243 and accompanying text.

247. ESTLUND, *supra* note 212, at 130.

248. Tushnet, *supra* note 196, at 399.

deliberation is likely to be much higher.  Public collective action also has the effect of reaffirming and reinforcing social identity.[249]

### 4.  Unions as "Schools for Democracy"

Unions are frequently characterized as schools for democracy,[250] and there is reason to believe that union membership contributes to political activism.  Traditionally, it has been the case that "[b]lue-collar workers . . . are politically apathetic, or at least are less likely to vote . . . than their parents."[251]  Union members, however, are more likely than the general public to be registered voters, to vote, to try to influence others' votes, to support a candidate by displaying a bumper sticker or making a campaign contribution, to care about election outcomes, and to follow public affairs.[252]

One reason for this level of participation may be that union members, who elect union leadership (usually at both the local and national or international level), are more accustomed to voting, running for office, or participating in campaigning activity.[253]  Further, because unions often negotiate workplace protections, such as substantive and procedural limitations on discipline and firing,[254] workers may feel more comfortable participating in the political process if they know they cannot be fired for their political stances.  Benefits such as higher wages[255] and more time off work also may contribute to workers' ability to participate in the political process.

---

249.  Hawkins, *supra* note 31, at 74 (stating that "processions and festivals enlivened the unionists' efforts, proclaiming to all their public identity and social ideals with banners like the New York GTU's standard of Archimedes lifting a mountain with a lever").

250. *E.g.*, Godson, *supra* note 207, at 125.

251.  Christopher Grant, *Unions in a Fragmented Society*, 77 CHI.-KENT L. REV. 849, 850 (2002).

252. *The ANES Guide to Public Opinion and Electoral Behavior*, AM. NAT'L ELECTION STUD., http://www.electionstudies.org/nesguide/gd-index.htm (last visited Apr. 20, 2011).  It is unclear whether there is a causal relationship between union membership and political activism, and if there is one, which way it runs.  On one hand, it may be that, given the improved wages and benefits that come with unionization, employees have more resources and time to devote to politics.  On the other, it may be that the most politically aware employees are also the most likely to perceive benefits of unionization, to be aware of the protected status of labor organizing in the workplace, or to have the energy and motivation to organize a union.  Or, there may be a third factor that accounts for both phenomena.  Carole Pateman points to the sense of "political efficacy" or "political competence" as strongly correlative to political participation, and those traits may also make unionization more likely.  CAROLE PATEMAN, PARTICIPATION AND DEMOCRATIC THEORY 46 (1976).

253.  Godson, *supra* note 207, at 125.

254. *Cf.* ESTLUND, *supra* note 212, at 130 (noting that "some employees are required to listen and submit to others who hire them and could fire them, and who control their advancement and conditions of employment" as a limit on workplace civil society); *id*. at 135 (noting that while collective bargaining "looks like a very pale version of democracy and nothing like a republic," it nonetheless "represent[s] the rule of law, the institution of due process, and the opportunity for a real collective voice" in the workplace).

255.  BUREAU OF LABOR STATISTICS, *supra* note 19 (showing that, among full-time workers, union members earned a median of $886 per week, compared to $691 for non-members).

The foregoing suggests that labor unions play a significant role in promoting a robust civil society that checks the state and acts as a democratic training ground.  Thus, if one accepts that the First Amendment broadly protects speech that promotes deliberative democracy, then labor speech—in many of its forms—deserves top-tier First Amendment protection.  This is especially so in the context of comprehensive campaigns and other organizing activity, where unions' speech has significant potential to enhance associational life.[256]  In other words, where unions and workers are actively involved in forming new associations and creating foundational ties among one another, the speech that facilitates those associations is important from a First Amendment perspective.  Further, the claim that union speech is "deliberative" has particular force in the context of comprehensive campaigns.  Comprehensive campaigns generally involve appeals to the public or to government, and they often rely on their moral force to attempt to convince otherwise-uninvolved people to act in a particular way.  Thus, the speech is likely to focus on dignitary concerns (such as a particular employer mistreating workers), the benefits of unionism to the community, or another matter of public concern.

Comprehensive campaigns have deliberative aspects even for employers—who are, after all, the targets of those campaigns.  Because comprehensive campaigns are mainly aimed at the public, employers can attempt to disarm them by taking to the public to both talk and listen.[257]  If employers are convincing, then presumably the public will ignore or discount the union voices; if unions are convincing, then the reverse will be true.  Further, comprehensive campaigns are deliberative in that they are aimed at convincing employers that it is in their own best interest (or, possibly, the best interests of employees) to voluntarily agree to something like a card check.  That unions seek to do so by making it less pleasant for employers to refuse does not necessarily make comprehensive campaigns undeliberative.[258]

---

256. However, organizing speech is not the only labor speech that has the potential to enhance democratic deliberation.  The need to bargain collectively will also bring union members together to deliberate: For example, during bargaining, union members are likely to discuss the merits and fairness of particular offers and counter-offers, and to vote on whether or not to approve a contract.  Bargaining speech, including picketing and secondary activity, also has the potential to make workers feel empowered to, collectively, stand up to management.  The results of successful bargaining—increased wages and job security—may leave workers with more time and money to participate in their unions, in other associations, in their communities more generally, and in the political process.  Finally, bargaining speech may ultimately influence the outcomes of future organizing efforts, creating a virtuous cycle: if a union has a long track record of bargaining that improves wages and working conditions, it is more likely that the union will be able to attract new members within a workplace (in a right-to-work state) or organize new workplaces.  Thus, it is not the case that *only* organizing speech, and not union speech more generally, promotes deliberative democracy.

257. For example, Smithfield ran a series of commercials in which workers touted their good working conditions and radio interviews with Smithfield spokesperson and "celebrity chef" Paula Deen.

258. *See* AMY GUTMANN & DENNIS THOMPSON, DEMOCRACY AND DISAGREEMENT 4 (1996) (stating that "[a] deliberative perspective sometimes justifies bargaining, negotiation, force, and even violence").  This is true particularly if comprehensive campaigns

IV. First Amendment Values and Thinking Small: How Civil RICO
Poses a Greater First Amendment Problem Than NLRB
Regulation of Speech

I have argued that because labor speech can enhance the First Amendment interest in deliberative democracy, it deserves the highest level of First Amendment protection—the same protection that the Court extended to the NAACP in *Claiborne Hardware*.[259]  Because the NAACP's speech was significantly more coercive than the speech that has precipitated employers' civil RICO lawsuits, it seems clear that the speech involved in comprehensive campaigns—at least campaigns free of violence or threats to compel an employer to take illegal action—should be protected.

However, I do not argue that this conclusion necessarily requires the Court to reverse all of its decisions upholding the NLRB's authority to regulate union and employer speech during organizing campaigns and the bargaining process.  First Amendment balancing analyses require courts to weigh the benefits of the speech at issue against the benefits of limiting that speech.[260]  There may be good reason to differentiate regulatory restrictions on union speech imposed and policed by the NLRB from civil lawsuits filed by employers embroiled in labor disputes, given that regulation by the NLRB yields different benefits and imposes different burdens than civil RICO lawsuits.[261]  As Harry Kalven has observed, "'[t]o make a balancing approach meaningful, we must think in narrower terms, recognizing that the strengths of the competing interests may vary in new contexts.'"[262]

Here, because the NLRB—although far from a model of administrative perfection—seeks to protect employees' rights to organize while ensuring union legitimacy, the NLRB's mission also furthers deliberative democracy interests.  Therefore, even after labor speech is afforded top-tier First Amendment protection, the results of First Amendment balancing may favor NLRB regulation over unimpeded speech.  Employers' civil RICO lawsuits targeting comprehensive campaigns, however, are another story.  Though a civil RICO suit itself constitutes petitioning activity, it has a

---

inconvenience, but do not realistically threaten, the companies at which they are aimed. *See supra* notes 24–28 and accompanying text.

259. *See supra* text accompanying notes 140, 144–45.

260. Norman T. Deutsch, *Professor Nimmer Meets Professor Schauer (and Others):  An Analysis of "Definitional Balancing" as a Methodology for Determining the "Visible Boundaries of the First Amendment"*, 39 Akron L. Rev. 483, 485 (2006) (observing that the Court has conducted balancing in speech cases where First Amendment values were implicated on both sides of the equation).

261. Though the Court has not endorsed this distinction—and rejected it in *BE & K Construction Co. v. NLRB*—it seems to view restrictions on labor speech when criminal penalties or hefty fines are at issue with greater skepticism than when faced with an injunction. *Cf.* BE & K Constr. Co. v. NLRB, 536 U.S. 516, 541–42 (2002) (Breyer, J., concurring) (arguing that, because antitrust penalties and litigation costs are greater than those associated with NLRB enforcement proceedings, the First Amendment analysis need not be identical).

262. Shiffrin, *supra* note 194, at 1215 (quoting Kenneth Karst, *The First Amendment and Harry Kalven:  An Appreciative Comment on the Advantages of Thinking Small*, 13 UCLA L. Rev. 1, 18 (1965)).

chilling effect on union speech that has the potential to limit both union speech and unionization itself, even where employees generally agree that they would like to form a union. Thus, civil RICO lawsuits, if anything, stymie deliberative democracy.

### A. The NLRB's Potential To Enhance Democracy

One could understand the NLRA, and the NLRB's efforts to enforce it, as an attempt to preserve the deliberative and state-checking benefits that legitimate unions can provide. In *In re General Shoe Corp.*,[263] the NLRB concluded that its role was to "provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees."[264] In performing this function, the NLRB "regulate[s] otherwise protected speech during representation election campaigns"[265] to protect employees' associational interests, particularly in light of their economic dependence on their employers.[266] These restrictions on unfair methods of either promoting or discouraging unionization can deter abuses (by either side) that would impair workers' exercise of their associational rights. Thus, though it involves restrictions on speech,[267] the "laboratory conditions" doctrine enhances civil society, as well as employees' First Amendment associational interests.[268]

Further, the threat of NLRB sanction is relatively unlikely to chill legitimate speech. The NLRB cannot impose punitive financial penalties—

---

263. 77 N.L.R.B. 124 (1948).

264. *Id.* at 127; *see also* Shawn J. Larsen-Bright, Note, *Free Speech and the NLRB's Laboratory Conditions Doctrine*, 77 N.Y.U. L. REV. 204, 215 (2002).

265. Larsen-Bright, *supra* note 264, at 215; *see also* NLRB v. Gissel Packing Co., 395 U.S. 575, 612 (1969) (concluding that NLRB may order employer to bargain with union if employer has "succeeded in undermining a union's strength and destroying the laboratory conditions necessary for a fair election").

266. *See* Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 778 n.3 (1976) (Stewart, J., concurring) (noting that the Court permitted more speech restrictions in the context of labor elections than political elections to promote "antiseptic conditions," based on employees' competing First Amendment associational interests and dependence on their employers).

267. For example, during organizing campaigns, employers may not threaten to close the plant in retaliation if the employees vote the union in (though employers may state that the plant may close if the workers unionize, provided the statement is not motivated by anti-union animus), nor may they promise to improve working conditions or compensation if employees reject unionization. *See* Julius Getman, *Labor Law and Free Speech: The Curious Policy of Limited Expression*, 43 MD. L. REV. 4, 5–9 (1984).

268. Further, the NLRA is not universally speech-restrictive. In some contexts, the NLRA takes an expansive view of unions' and employers' speech rights. For example, the Court has repeatedly recognized that tempers run high during labor disputes, causing both sides to make extreme statements. Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 64 (1966). At times, the Court has even suggested that permitting such speech could prevent violence by providing a way for labor combatants to blow off steam. Milk Wagon Drivers Union of Chi., Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 296 (1941). Thus, the NLRA preempts defamation suits that do not meet the *New York Times Co. v. Sullivan* actual malice standard because of the risk that state-law defamation liability could "dampen the ardor of labor debate and truncate the free discussion envisioned by the Act [and] . . . might be used as weapons of economic coercion." *Linn*, 383 U.S. at 64.

at most, it can order backpay and attorneys' fees.[269]  Thus, even though the NLRB can significantly burden speech by issuing an injunction that stops the speech altogether, the cost to a union or an employer of "going over the line" is relatively low, so even an active NLRB will not inadvertently chill *future* employer or union speech very much.  Ironically, then, the aspects of the NLRB that render it ineffective at eradicating abusive labor practices make its interventions in labor disputes less problematic from a First Amendment perspective.

The NLRB's potential to improve union legitimacy and enhance workers' associational rights can be seen in some of the existing labor speech cases.  For example, in *NLRB v. Virginia Electric & Power Co.*,[270] the Court upheld the NLRB's power to issue a cease-and-desist order against a company that interrogated its employees about their union sympathies and then facilitated the creation of an "inside union" that would accede to the company's wishes.[271]  The Court rejected the company's argument that its speech was protected by the First Amendment, concluding that the NLRB's penalty was intended to protect workers' rights to form a "legitimate" union, not punish the employer's speech.[272]  In terms of promoting deliberative democracy, the result is the correct one, even though it burdens the employer's speech.  It is unlikely that the "inside union" would have performed any of the democracy-enhancing functions discussed in the previous section.[273]  If anything, it would have been an object-lesson in corruption and the inability of workers to come together to change their situations through concerted action.[274]

---

269.  Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 152 n.6 (2002) (stating that the "[Labor] Board is precluded from imposing punitive remedies"); Republic Steel Corp. v. NLRB, 311 U.S. 7, 10 (1940) (describing purposes of NLRA as remedial, not punitive); *see also* Estlund, *supra* note 3, at 1537.  The NLRB's position is that it has the authority to order attorneys' fees. Micah Berul, *To Bargain or Not To Bargain Should Not Be The Question:  Deterring Section 8(A)(5) Violations in First-Time Bargaining Situations Through a Liberalized Standard for the Award of Litigation and Negotiation Costs*, 18 LAB. LAW. 27, 39–40 (2002).  However, the U.S. Courts of Appeals for the Third and D.C. Circuits have called this position into doubt. Quick v. NLRB, 245 F.3d 231, 255 (3d Cir. 2001); Unbelievable, Inc. v. NLRB, 118 F.3d 795, 805–06 (D.C. Cir. 1997).

270.  314 U.S. 469 (1941).

271.  *See generally id.*

272.  *Id.* at 477.

273.  *See* Kate E. Andrias, *A Robust Public Debate:  Realizing Free Speech in Workplace Representation Elections*, 112 YALE L.J. 2415, 2459–60 (2003) (arguing that the NLRB should be required to regulate employer speech to facilitate employees' exercises of their associational rights).

274.  Likewise, the result in *Building Service Employees International Union, Local 262 v. Gazzam*, 339 U.S. 532 (1950), was correct from the perspective of promoting legitimate civil society.  In that case, the Court upheld an injunction against a union that sought to coerce an employer to coerce his employees to join the union. *Id.* at 540–41.  A labor union that is formed through coercion not only infringes the employees' associational rights, but it is unlikely to encourage further participation in union affairs.  Since the benefits to deliberative democracy come mainly from members' robust participation in an association's affairs, few are likely to accrue in this situation.

Likewise, from a deliberative democracy perspective, the Court's holding in *Bill Johnson's Restaurants*,[275] the predecessor case to *BE & K*,[276] was correct. In *Bill Johnson's Restaurants*, the employer filed a state-court lawsuit, seemingly to retaliate against employees who had filed unfair labor practice charges with the NLRB and engaged in picketing and leafletting.[277] The state-court suit claimed damages for mass picketing, harassment, blocking the entrance to the restaurant, creating a threat to public safety, and libel.[278] In response, the NLRB issued a new complaint against the employer, charging that the lawsuit was filed in retaliation for the employees' exercise of their rights under the NLRA.[279] Weighing the employees' labor rights against the employer's First Amendment right to petition, the Court held that the NLRB could enjoin ongoing lawsuits only when "the plaintiff's position is plainly foreclosed as a matter of law or is otherwise frivolous," but that "the Board should allow such issues to be decided by the state tribunals if there is any realistic chance that the plaintiff's legal theory might be adopted."[280] However, once the suit had concluded, if the employer loses or withdraws its state-court suit, then "the employer has had its day in court, the interest of the State in providing a forum for its citizens has been vindicated, and the Board may then proceed to adjudicate the . . . unfair labor practice case."[281]

The rule articulated in *Bill Johnson's Restaurants* served to promote deliberative democracy because retaliatory lawsuits have great potential to disempower workers. For an employee who has exercised her associational rights to change her working conditions—only to be forced to spend many months or years defending a lawsuit—the clear message will be that the exercise of her rights was not worth it. Further, even where lawsuits are not enjoined, the possibility of a subsequent NLRB proceeding—particularly one that has the potential to recoup attorneys' fees—can have restorative justice value.

If the NLRB's mission was to impose rules and procedures that would protect employees' capacity to form unions, which would in turn contribute to an effective civil society, one could sensibly object that it has largely failed.[282] The law governing union organizing and recognition is a

---

275. *See supra* notes 165–67.

276. *See supra* notes 168–76 and accompanying text.

277. Bill Johnson's Rests., Inc. v. NLRB, 461 U.S. 731, 734 (1983).

278. *Id.*

279. *Id.* at 735–36.

280. *Id.* at 747.

281. *Id.* In *BE & K*, the Court stated that this language was dicta, and rejected it. BE & K Constr. Co. v. NLRB, 536 U.S. 516, 527–28 (2002).

282. Notably, one of the reasons that unions give for running comprehensive campaigns is that the NLRB process has failed to protect workers and create conditions under which workers can form a union free of intimidation and mistreatment. One study suggested that "almost one-in-five union organizers or activists can expect to be fired as a result of their activities in a union election campaign." JOHN SCHMITT & BEN ZIPPERER, CTR. FOR ECON. & POLICY RESEARCH, DROPPING THE AX: ILLEGAL FIRINGS DURING UNION ELECTION CAMPAIGNS 1 (2007), *available at* http://www.cepr.net/documents/publications/unions_2007_01.pdf.

hodgepodge of unclear and shifting restrictions, and enforcement is hardly swift. In addition, the NLRB has proven to be subject to instability tied to its regular political "capture" by the executive branch, alternating between periods of being sympathetic to labor and periods of being sympathetic to employers.[283]  These rules have hardly contributed to a robust union movement.

However, the courts are unlikely to do any better, particularly in light of the Lochnerism that still pervades labor law.[284]  Further, because courts are limited to the controversy before them, they would be left to overturn one aspect of labor law here, and another there, resulting in a see-saw effect in the balance of power between unions and employers.[285]  Mark Tushnet argues that "the idea that legal doctrine could stably distinguish among internal activities that reduce civil society's effectiveness and those that promote it seem strained. . . . [C]ivil society's institutions are likely to be more dependent on legislative grace than protected by constitutional law."[286]  Thus, where the legislative or executive branch attempts to create conditions that will promote civil society,[287] it makes sense for courts to defer to those judgments.

## B. Civil RICO and First Amendment Balancing

In contrast to NLRB proceedings, civil RICO lawsuits can result in judgments awarding treble damages and attorneys' fees (and the attorneys' fees are likely to be much higher than those in an NLRB enforcement proceeding, given the costs associated with formal discovery, summary

---

283. *See, e.g.*, James M. Owens et al., *"Now You Have It, Now You Don't": The NLRB's Fickle Affair with the* Weingarten *Right and the Need for Congress To End the Controversy*, 11 J. INDIVIDUAL EMP. RTS. 155, 156 (2004) (noting the "flip-flopping of the NLRB's decisions regarding the applicability of the *Weingarten* right to the nonunion workplace"); Steven Porzio, *NLRB Chairman Addresses Labor Law Reform at American Bar Association Meeting*, UNIONS AND LAB. L. REFORM BLOG (Nov. 11, 2009), http://www.efcablog.com/2009/11/articles/craig-becker-nlrb/nlrb-chairman-addresses-labor-law-reform-at-american-bar-association-meeting/ (noting that NLRB "Chairman Liebman argued that Congressional inaction has fostered 'deep divisions' and 'controversy' in labor law and has 'facilitated' the NLRB's 'flip-flopping' and 'policy oscillation.'").

284. Pope, *supra* note 93, at 1076 (arguing that the "black hole" of labor law "is traceable to the commodity theory of labor dominant during the *Lochner* era").

285. *See, e.g.*, NLRB v. Retail Store Emps. Union, Local 1001, 447 U.S. 607, 617–18 (1980) (Blackmun, J., concurring) (agreeing to uphold NLRB's finding that a union engaged in an illegal secondary boycott "only because I am reluctant to hold unconstitutional Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife"). Alternatively, if it is correct that "judges don't like labor unions," a steady erosion of labor rights could occur. *See generally* George Schatzki, *It's Simple: Judges Don't Like Labor Unions*, 30 CONN. L. REV. 1365 (1998).

286. Tushnet, *supra* note 196, at 397.

287. The NLRA itself discusses the importance of labor unions to achieving industrial peace and a just society. *See* 29 U.S.C. § 151 (2006) ("The inequality of bargaining power between employees who do not possess full freedom of association of actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce . . . .").

judgment briefing, and the like).[288]  For example, the *Smithfield* plaintiffs sought $5,900,000 in "compensatory and consequential" damages alone, and then asked that the amount be trebled and added to their (undoubtedly substantial) attorneys' fees.[289]  That is to say, even before attorneys' fees, Smithfield was seeking over ten percent of UFCW's 2008 net assets.[290]  Of course, the UFCW also generated its own attorneys' fees during the course of the lawsuit, which likely ran to many millions of dollars.[291]  Therefore, even if civil RICO lawsuits based solely on expressive activity are usually unsuccessful, the threat of such a suit, by itself, has great potential to chill comprehensive campaign speech.  If unions waging comprehensive campaigns are regularly targeted with "bet the union" lawsuits, few unions will choose to—or be able to afford to—engage in them.[292]

Further, civil RICO lawsuits are poor vehicles for advancing First Amendment interests of any color, except insofar as lawsuits themselves advance the First Amendment interests that the Court identified in *BE & K*: airing "genuine grievances" and related information, particularly where the subject of the lawsuit is a matter of public concern; "promot[ing] the evolution of the law"; and legitimating the court system as the acceptable way to resolve disputes in this country.[293]  If civil RICO cases based solely or primarily on expressive activity are unlikely to be successful, employers will file fewer of them; however, that employers will be less likely to air their grievances through civil lawsuits cannot alone outweigh the First Amendment value of protecting the speech involved in comprehensive campaigns.

If I am correct that my First Amendment analysis does not necessarily affect the NLRB's authority to restrict union and employer speech, then the

---

288.  18 U.S.C. § 1964(c) (2006) (civil remedies include treble damages and attorneys' fees).

289.  First Amended Complaint, *supra* note 8, ¶¶ 1–4, at 91–92.

290.  FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT: UNITED FOOD & COMMERCIAL WORKERS (Mar. 26, 2009), *available at* http://erds.dol-esa.gov/query/getOrgQry.do (search for file number 000-056; then follow "Food & Commercial Wkrs National Headquarters" hyperlink; then follow "2008 Report" hyperlink) (listing net assets of $159,521,604).

291.  According to the UFCW's LM-2s, the union paid Bredhoff & Kaiser PLLC, the firm that represented UFCW and the individual defendants in *Smithfield*, $5,579,684 in 2008, the year in which the *Smithfield* lawsuit was filed. *Id.*  In the two previous years, UFCW paid Bredhoff only $99,500 and $23,722, respectively. *See* FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT: UNITED FOOD & COMMERCIAL WORKERS (Mar. 28, 2008), *available at* http://erds.dol-esa.gov/query/getOrgQry.do (search for file number 000-056; then follow "Food & Commercial Wkrs National Headquarters" hyperlink; then follow "2007 Report" hyperlink); FORM LM-2 LABOR ORGANIZATION ANNUAL REPORT: UNITED FOOD & COMMERCIAL WORKERS (Mar. 22, 2007), *available at* http://erds.dol-esa.gov/query/getOrgQry.do (search for file number 000-056; then follow "Food & Commercial Wkrs National Headquarters" hyperlink; then follow "2006 Report" hyperlink). These numbers only include fees attributed to "representational activities."

292.  *See, e.g.*, N.Y. Times Co. v. Sullivan, 376 U.S. 254, 277–78 (1964) (discussing the potential for a lawsuit to chill protected speech); Eugene Volokh, *Crime-Facilitating Speech*, 57 STAN. L. REV. 1095, 1192 (2005) (noting that "[s]peakers who are genuinely not intending to facilitate crime might nonetheless be deterred by the reasonable fear that a jury will find the contrary").

293.  BE & K Constr. Co. v. NLRB, 536 U.S. 516, 532 (2002).

potential for civil RICO suits to deter "illegitimate" union activity that might undermine deliberation—activity that, for example, coerces workers into signing a union authorization card against their will[294]—will be further diminished. First, the NLRB will be able to police the same activity, and, as a neutral third party, it will be less likely than an employer to attempt to suppress legitimate union speech. Second, the NLRB will be able to evaluate the entire context of the labor dispute, whereas a court adjudicating a civil RICO lawsuit will have, at best, a limited ability to take into account background like prior unfair labor practices committed by the employer.[295]

Nonetheless, it may yet be the case that some labor speech has so little value that it would not offend the First Amendment for the speech to form the basis for civil RICO liability (assuming, of course, that the speech met civil RICO's statutory requirements). Speech could be low-value either because it is false or because it is intended to compel illegal employer behavior. I will discuss the First Amendment protection that should apply to speech falling into these categories in turn.

### 1. False Speech

I have argued that comprehensive campaign speech should receive the same First Amendment protection as civil rights speech.[296] That includes the "breathing space" created in *New York Times Co. v. Sullivan*,[297] which held that untrue statements should not form the basis for liability unless they are motivated by "actual malice."[298] The *Sullivan* standard is necessary to prevent union speech from being chilled for two reasons. First, unions will rarely, if ever, be able to determine to a certainty that all the information they receive about a company's employment practices is true. Second, speech about employers' treatment of workers and the potential to unionize a workplace should be regarded as speech on a matter of public concern under *Sullivan*, for all the reasons described above.[299]

---

294. By this, I do not mean union speech that educates workers about the value of unions, which will often contribute to workers' abilities to exercise their associational rights by counterbalancing employers' one-sided, anti-union statements. Rather, I refer to overtly coercive or threatening speech, such as "sign this card or else."

295. *See* San Diego Bldg. Trades Council, Local 2020 v. Garmon, 359 U.S. 236, 244–45 (1959) (holding that NLRB has sole jurisdiction over activity that constitutes unfair labor practices, even if the NLRB declines jurisdiction over that activity).

296. *See supra* Part III.

297. 376 U.S. at 285–87 (holding that the *New York Times* was not liable for defamation when it published an NAACP-sponsored advertisement because it neither knew nor recklessly disregarded whether the published advertisement was false). Applying this standard to labor speech in non-NLRB proceedings will also have the advantage of extending the same standard to union speech in all contexts, as the *Sullivan* standard already applies under the NLRA, though as a matter of statutory interpretation rather than the First Amendment. *See* Linn v. United Plant Guard Workers of Am., Local 114, 383 U.S. 53, 65 (1966).

298. *Sullivan*, 376 U.S. at 279–80.

299. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761 (1985) (declining to apply *Sullivan* standard to speech on matters of private concern, holding that "[i]n light of the reduced constitutional value of speech involving no matters of public

Further, because labor unions (like other organizations) typically cannot maintain close control of unaffiliated protestors, liability should be limited to statements that were actually made, authorized, or ratified by the union.[300]  This would leave, as potential bases for liability, "actually malicious" statements made by the union (such as statements made on "official" posters and flyers, and oral statements made by members of the union leadership) or endorsed by the union, including, for example, statements contained in reports or documents drafted by a union but given to another entity for distribution.

### 2.  Comprehensive Campaign Speech in Pursuit of an Illegal Goal

If a comprehensive campaign aims to compel illegal behavior through false, actually malicious speech, the First Amendment provides no barrier to the application of civil RICO (assuming its other requirements are satisfied).  When a comprehensive campaign employs speech that is either true or at least not recklessly false, however, the question is more complicated.

With some exceptions, the First Amendment usually does not inquire into the speaker's motives to assess the appropriate level of protection to assign speech.[301]  Truthful speech has First Amendment value, even when it is motivated by an illegal goal.  For example, the speech still has potential to educate listeners about issues of public concern (and therefore at least some listeners have an independent First Amendment interest in hearing the speech), regardless of the speakers' motives.[302]  In any event, given that comprehensive campaigns often involve a coordinated effort by individuals and groups who may have different motivations (but who may receive information on which they base their speech from a labor union), it will be difficult, if not impossible, to attribute a single motive to all the expressive activity involved in a comprehensive campaign.[303]

---

concern, we hold that the state interest adequately supports awards of presumed and punitive damages—even absent a showing of 'actual malice'").

300.  This standard would be consistent with the Norris-LaGuardia Act, which provides that

> [n]o officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106 (2006).

301.  Volokh, *supra* note 292, at 1192 (listing instances in which the Court has rejected First Amendment tests that turn on the motives of the speaker).

302.  Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 756–57 & n.15 (1976) (holding that speech about drug prices had First Amendment value, in part because of listeners' First Amendment rights to receive the information).

303.  This issue also arises in the context of assessing damages.  If a court eventually finds a civil RICO violation, it would then have to separate damages attributable to the illegal speech from damages attributable to protected speech.  If a court applied *Claiborne Hardware* to social movements other than labor unions, this inquiry could be extremely difficult.

On the other hand, *Giboney* suggests that the First Amendment does not protect expression aimed at compelling illegal activity, at least where labor picketing is concerned.[304]   But *Giboney* is not the end of the story. Subsequent First Amendment cases, including *Brandenburg,* impose an "imminence" requirement before "inciting" speech loses First Amendment protection and call into question *Giboney's* breadth.[305]   Moreover, it is possible to read *Giboney* narrowly, in a way that is largely consistent with these later Supreme Court cases (including *Claiborne Hardware*).   Finally, *Giboney* relied on a "signal picketing" analysis[306]—i.e., union members would see a picket line and unthinkingly obey it—that does not necessarily apply to comprehensive campaign speech.

In *Giboney*, the Court upheld a restraint on secondary picketing that sought to compel the target company to violate state antitrust law—and caused an immediate eighty-five percent drop in the target company's sales—even though the picketing consisted of truthful speech.[307]   Despite the Court's later broad statements about *Giboney's* holding,[308] the narrow factual situation presented in *Giboney* is consistent with *Brandenburg's* imminence requirement:[309]   *Giboney* stressed the "clear danger, imminent and immediate" that the union would succeed in its goal.[310]   Thus, in light of *Brandenburg's* "imminence" standard, *Giboney* should be read narrowly (and later, more expansive glosses on *Giboney* by the Supreme Court should be rejected), so that the only non-malicious speech that would lose its First Amendment protection is speech that both poses a serious, immediate threat to a company's survival and seeks to compel the employer to act illegally.

Under this standard, comprehensive campaign speech is unlikely to lose First Amendment protection.   Contrary to the picketing in *Giboney*, comprehensive campaigns have—at least so far—failed to inspire an instant response, at least among a large percentage of the target employers' customers and suppliers.   Therefore, in most cases, comprehensive campaigns will not put employers in the same untenable position as the target company in *Giboney*:  they will not be forced to choose between

---

304. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949); *see also* Bldg. Serv. Emps. Int'l Union, Local 262 v. Gazzam, 339 U.S. 532, 533, 541 (1950) (upholding injunction forbidding union from attempting to compel employer to coerce his employees).

305. *See supra* notes 127–30 and accompanying text.

306. *See supra* notes 110–12 and accompanying text.

307. *Giboney*, 336 U.S. at 492–95 (describing picketing that informed the public that Empire sold ice to nonunion peddlers).

308. *See* Cox v. Louisiana, 379 U.S. 559, 563–64 (1965) (stating that *Giboney* applied the general principle that "[a] man may be punished for encouraging the commission of a crime" in the context of a labor dispute).

309. Commentators have stressed the importance of the imminence requirement in protecting speech, given that intent and likelihood of success are somewhat subjective. *See* Volokh, *supra* note 292, at 1193 (stating that "the main barrier to liability under the *Brandenburg* test has generally been the imminence prong").

310. *Giboney*, 336 U.S. at 503.

acquiescing in illegal behavior and imminent shutdown.[311]  It is nonetheless conceivable that, after a comprehensive campaign has been underway for some time, its economic impact will begin to take a toll on an employer such that the employer's acquiescence in an illegal demand becomes imminent.  Still, given the availability of NLRB procedures to enjoin illegal union activity at an earlier stage, this scenario seems unlikely.[312]

CONCLUSION

   Civil RICO lawsuits that seek to impose liability for labor unions' comprehensive campaign activity expose numerous discrepancies between the Court's First Amendment treatment of labor unions and other seemingly similar speakers.   It is doubtful that the Court's distinction between "economic" speech and "political" speech was ever workable, given the extent to which the two are intertwined in most people's daily lives.   It certainly is not workable today, when labor unions and their members are intensely involved in political advocacy over issues that will have great impact on all workers and employers.   Even if labor unions at one time could command large swaths of the public to respect picket lines and other union directives, those days are past.   Thus, it is time for the Court to update its labor speech doctrine.   The Court should take seriously labor unions' positive effects on deliberative democracy and afford them the same level of First Amendment protection that it has provided to the civil rights movement.

---

   311. One reason that comprehensive campaigns do not pose the same threat as the conduct in *Giboney* is that, in *Giboney*, the union could enforce its call for a secondary boycott by subjecting union truck drivers to "fine or suspension" for crossing the picket line to deliver the company's product. *Id.* at 493.  By contrast, comprehensive campaigns appeal to the public at large, over which unions have little influence beyond their powers of persuasion.
   312. A further desirable aspect of a labor law regime in which NLRB proceedings, but not civil lawsuits, are available to employers being targeted by union comprehensive campaigns is that, absent the additional incentive of forcing unions to incur significant attorneys' fees and the settlement value of a civil suit, employers will be less likely to attempt to interfere with union speech that poses little threat to the employers' interests.

# EXHIBIT C

Charlotte Garden, "Union Made: Labor's Litigation for Social Change",
*Tulane Law Review* Vol. 88 (2), 193-256 (2013), available at
http://digitalcommons.law.seattleu.edu/faculty/355

Seattle University School of Law Digital Commons

Faculty Scholarship

2013

# Union Made: Labor's Litigation for Social Change

Charlotte Garden

Follow this and additional works at: http://digitalcommons.law.seattleu.edu/faculty

Part of the Labor and Employment Law Commons, and the Litigation Commons

## Recommended Citation

Charlotte Garden, Union Made: Labor's Litigation for Social Change, 88 *TUL. L. REV.* 193 (2013).
http://digitalcommons.law.seattleu.edu/faculty/355

This Article is brought to you for free and open access by Seattle University School of Law Digital Commons. It has been accepted for inclusion in Faculty Scholarship by an authorized administrator of Seattle University School of Law Digital Commons.

# TULANE

# LAW REVIEW

VOL. 88       DECEMBER 2013       NO. 2

## Union Made:
## Labor's Litigation for Social Change

Charlotte Garden*

*Unions are key repeat players before the United States Supreme Court. Their involvement goes beyond what one might expect (labor) and extends to key cases involving federalism, discrimination, affirmative action, the First Amendment, and workplace health and safety, among others. Though scholars have documented the effects of other union activity, like collective bargaining, on nonunion workers, the role and impact of union participation in nonlabor litigation has largely been ignored in both the public debate over unions in America and in the academic literature about what unions do. This Article focuses on unions' Supreme Court litigation that arises outside of the context of traditional labor law in order to show how union-made law affects interests beyond those of the labor movement, its members, and unionized employers. It reveals how union-made law has significantly affected the structure of American government and society.*

*This Article first describes the many areas in which union Supreme Court litigation has had important social effects extending far beyond core labor interests and explains why, as a practical matter, unions are well-situated to bring or fund these cases. Next, the Article explores three characteristics that have the potential to shape unions' litigation positions: first, unions are more likely than other social movement litigators to litigate defensively as well as offensively; second, unions operate based on majority rule; and third, unions may use litigation as a part of a bargaining strategy. The Article shows how these dynamics have played out in past cases,*

---

*     © 2013 Charlotte Garden. Assistant Professor, Seattle University School of Law. For their suggestions, encouragement, and other assistance, I am grateful to Matthew Bodie, Robert Chang, Brooke Coleman, Owen Davies, Michael Fischl, Steven H. Goldblatt, Nancy Leong, Marley Weiss, and the participants in the University of Iowa College of Law Faculty Speaker Series, the Democracy and the Workplace symposium held at UNLV School of Law, and the 2012 Law and Society annual conference. This Article was selected for inclusion in the New Voices in Labor and Employment Law Program at the 2013 meeting of the Southeastern Association of Law Schools. I am particularly grateful for feedback from Anthony Baldwin, Michael Z. Green, and Paul Secunda during that program. In addition, Paige Hardy and Holly Scott provided invaluable research assistance. Finally, I thank the editors of the *Tulane Law Review* for their careful work on this Article.

Case 1:17-cv-01037-UA-LPA    Document 7-24    Filed 11/20/17    Page 91 of 154

*sometimes with surprising results. Finally, the Article concludes with some observations regarding declining union density in this country.*

I.    INTRODUCTION...........................................................................194
II.   UNIONS AND THE SUPREME COURT ...........................................195
      A.   *Unions' Paths to the Supreme Court* ................................198
      B.   *Subjects of Unions' Supreme Court Litigation*.................209
           1.   Work Law...............................................................210
           2.   Political Participation and Protest ............................217
           3.   Structure of Government..........................................220
           4.   Civil Practice and Procedure ....................................222
           5.   Community Concerns...............................................224
           6.   Industry-Specific Litigation .....................................227
III.  UNIONS' PERSPECTIVES IN LITIGATION .......................................229
      A.   *Unions as Plaintiffs and Defendants*..................................230
      B.   *Labor Solidarity and the Possibility of Divided
           Loyalties*...............................................................................237
      C.   *Valuing Freedom To Bargain* ...........................................245
IV.   UNION LITIGATION AS SOCIAL GOOD.........................................249
      A.   *Collective Action and Litigation*.........................................250
      B.   *Coalitions In and Outside the Labor Movement*...............253
V.    CONCLUSION..............................................................................255

I.    INTRODUCTION

What do unions do? Most people would probably say that they represent workers' interests at the bargaining table and in grievance proceedings and that they participate in electoral politics. But this Article explores an additional way that unions create change within American society, through their litigation—particularly of cases that reach beyond traditional labor law—before the United States Supreme Court. Supreme Court litigation therefore provides a heretofore unexplored route for unions to be agents of social change.

Unions litigate and facilitate others' Supreme Court litigation in a number of ways. Most obviously, and most like their employer counterparts, unions litigate over naturally arising disputes with others. However, at other times, unions litigate more like social movement groups, shaping impact cases designed to achieve change through the courts, or they provide counsel for employees seeking to vindicate workplace rights. Additionally, labor unions and federations collectively have a thriving amicus practice. Through these various

channels, unions have litigated key cases in the areas of federalism, discrimination, affirmative action, and the First Amendment, among others.

This Article begins by describing key areas in which unions' Supreme Court litigation has had important social effects extending far beyond core labor interests and explains why, as a practical matter, unions are well situated to bring or fund these cases. Next, the Article explores three characteristics that can shape unions' litigation positions: first, unions are more likely than other social movement litigators to litigate defensively as well as offensively, meaning that they cannot always choose their litigation vehicles; second, unions operate based on majority rule, and the interests of different groups of members may be in opposition in particular cases; and third, unions may use litigation to facilitate success at the bargaining table. Ultimately, the Article concludes that the importance of unions' nonlabor litigation has been underestimated and that while unions do not litigate precisely like other left-leaning social movement groups, these groups should generally welcome unions' intercessions in the Supreme Court. Finally, the Article proposes that unions' Supreme Court litigation is most likely to succeed as a social change strategy where it occurs in coalition with other groups and recommends that unions should better communicate with their members about the scope and content of their litigation efforts, particularly before the Supreme Court.

## II.   UNIONS AND THE SUPREME COURT

> *Justified or not, the Supreme Court has a*
> *kind of sacred status in American life.*[1]

This Part begins with a brief discussion of the evolution of unions' participation in Supreme Court litigation. The purpose is twofold: first, to discuss several foundational Supreme Court cases in which labor played a key role, and second, to describe how courts' and legislatures' views of labor's Supreme Court work has changed over time. Specifically, it shows that whereas the historical record reveals some early hostility toward union-sponsored litigation, modern doctrine permits unions to take a variety of different roles in litigation. Following this discussion, I create a taxonomy of subject areas that

---

1.    Jon Meacham, *Why Obama Shouldn't Declare War on the Supreme Court*, TIME (Apr. 2, 2012), http://ideas.time.com/2012/04/02/why-obama-shouldnt-declare-war-on-the-supreme-court/.

have prompted union Supreme Court litigation. This discussion both illuminates the scope of unions' influence through litigation and provides necessary background for Part III, where I describe three dynamics that can inform the positions that unions take before the Supreme Court.

Before beginning this discussion, though, it is worthwhile to address two preliminary questions. First, why focus on the Supreme Court, when so few cases end up there?[2] And second, why focus on non-labor law cases? The answers to both questions can be found in this Article's objective, which is to analyze an important way in which unions influence the lives of nonmembers—which is to say, the vast majority of Americans.[3] In addition, unions' Supreme Court work offers a high-profile window into how unions view specific challenges facing workers.

Accordingly, I focus on Supreme Court litigation in part because of its precedential value, but also because of the money and expertise required of those who appear regularly in the Supreme Court. Professor Richard Lazarus has observed that Supreme Court work is increasingly done by a small group of elite lawyers.[4] Their expertise gives them a leg up in obtaining the best possible outcomes for their clients at both the certiorari and merits stages.[5] However, the vast majority of these attorneys work primarily for for-profit clients;[6] only a relatively small number of nonprofits can afford for lawyers to devote the large amount of time necessary to become expert Supreme Court litigators.[7] And, while some private lawyers also perform pro bono work, they do not take on pro bono clients whose interests might conflict with those of the lawyers' paying clients. Thus, Lazarus observed, "[A]lmost all of the [specialty Supreme Court] practices

---

2. *See, e.g., 2011 Term Opinions of the Court*, SUPREME COURT OF THE U.S., http://www.supremecourt.gov/opinions/slipopinions.aspx?Term=11 (last visited Oct. 27, 2013) (listing opinions for all seventy-eight cases heard during the October 2011 Term).

3. Press Release, Bureau of Labor Statistics, *Union Members—2011*, U.S. DEP'T OF LABOR 1 (Jan. 27, 2012), http://www.bls.gov/news.release/archives/union2_01272012.pdf ("In 2011, the union membership rate—the percent of wage and salary workers who were members of a union—was 11.8 percent, essentially unchanged from 11.9 percent in 2010.").

4. *See* Richard J. Lazarus, *Advocacy Matters Before and Within the Supreme Court: Transforming the Court by Transforming the Bar*, 96 GEO. L.J. 1487 (2008).

5. *Id.* at 1515, 1540; Richard J. Lazarus, *Docket Capture at the High Court*, 119 YALE L.J. ONLINE 89, 90-91 (2009) (showing an increasing percentage of successful petitions for certiorari filed by "expert Supreme Court advocates").

6. Lazarus, *supra* note 4, at 1556-58.

7. *Id.* at 1501 (noting that most nonprofit organizations lack in-house Supreme Court expertise, with a few exceptions, such as Public Citizen and the ACLU).

refuse to provide ... help to plaintiffs involved in employment discrimination, tort, and environmental pollution control cases."[8]

Against this backdrop, the labor movement is exceptional in its capacity to advocate before the Supreme Court in a broad range of issue areas, including those eschewed (at least on the plaintiff side) by other Supreme Court experts.    A number of labor lawyers have substantial Supreme Court experience.[9]    In particular, Laurence Gold—former general counsel of the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) and current of-counsel at the union-side labor firm Bredhoff & Kaiser, PLLC—stands out.[10]    He is among the twenty lawyers who have argued the most Supreme Court cases during the twentieth century,[11] and he has developed an enviable reputation as an expert Supreme Court litigator; in the words of one Supreme Court justice:  "Whenever I get a brief signed by Larry Gold, I read it—even if it is an amicus brief—with particular care."[12]  Thus, as compared to other social movement groups, labor unions have uncommon institutional capacity to litigate before the Supreme Court.[13]    And this capacity is often deployed in employment and even environmental cases, precisely the areas where private Supreme Court practitioners are unlikely to provide pro bono assistance and other nonprofits' resources may be stretched thin.

This Article focuses on cases that arise outside of labor law because those are the cases that have the most readily apparent effects on the lives of nonunion members.  This is not to say that labor law does not affect nonunion members—assuredly, it does.  For example,

---

8.    *Id.* at 1560.

9.    For example, before her appointment to the United States Court of Appeals for the Ninth Circuit, Marsha Berzon argued at least five cases before the Supreme Court. Michael Gottesman, now a professor at Georgetown University Law Center, argued seventeen cases.  OYEZ, http://www.oyez.org (last visited Oct. 27, 2013) (search for Berzon and Gottesman to view a list of cases each argued).

10.    *Laurence Gold*, BREDHOFF & KAISER, P.L.L.C., http://www.bredhoff. com/index.php/attorneys/Of-Counsel/Laurence-Gold (last visited Oct. 27, 2013).  I was an associate at Bredhoff & Kaiser from 2005 to 2008.

11.    Lazarus, *supra* note 4, at 1492-93 & n.29.

12.    Conference, *Rex E. Lee Conference on the Office of the Solicitor General of the United States*, 2003 BYU L. REV. 1, 85 (quoting Charles Fried in a panel discussion).

13.    This is not to say that unions are the only nonprofits with significant Supreme Court practices.  Groups like the NAACP LDF and the ACLU have significant Supreme Court practices.  In addition, the United States Chamber of Commerce also participates in Supreme Court litigation on a regular basis and on a wide range of cases.  *See* Nat'l Chamber Litig. Ctr., *About*, U.S. CHAMBER OF COMMERCE, http://www.chamberlitigation.com/about (last visited Oct. 27, 2013); Jeffrey Rosen, *Supreme Court Inc.*, N.Y. TIMES MAG. (Mar. 16, 2008),        http://www.nytimes.com/2008/03/16/magazine/16supreme-t.html?pagewanted= all&_r=0.

some employees who are covered by a union contract are not union members,[14] and labor law protects concerted activities undertaken by nonunion workers.[15]    However, the observation that labor unions litigate cases about labor law is hardly a surprising one.  In contrast, unions' nonlabor litigation both reveals key labor movement priorities and has more potential to influence society as a whole.  Yet it has been largely ignored.[16]

In sum, unions' nonlabor Supreme Court litigation represents a major investment of union resources in cases with effects that reach far beyond unions, union members, and unionized workplaces.  In the next Subpart, this Article recounts a brief history of union Supreme Court litigation, emphasizing the evolving role of unions in litigation and providing several early examples of seminal cases litigated by the labor movement and its adherents.

## A.    *Unions' Paths to the Supreme Court*

*"For my friends, anything—for my enemies, the law."*[17]

Labor unions' decades-long history of Supreme Court litigation predates the advent of federal labor statutes like the National Labor Relations Act (NLRA).  However, early appearances before the Supreme Court rarely provided unions with cause for celebration.  Employers and government lawyers successfully argued that labor union activism was illegal under a range of antitrust and criminal law

---

14.    Workers who are covered by a union contract cannot be required to join a union or pay the full amount of union dues; rather, they can at most be required to pay the "agency fee," which represents the costs of bargaining, grievance administration, and a few other union activities.  In "right to work" states, workers covered by union contracts need not pay even the agency fee, though they are still covered by the union contract.  *See* Charlotte Garden, *Citizens, United and* Citizens United*: The Future of Labor Speech Rights?*, 53 WM. & MARY L. REV. 1, 34, 36-37 (2011).

15.    *See, e.g.*, NLRB v. Wash. Aluminum Co., 370 U.S. 9 (1962).

16.    There are a few exceptions.  *E.g.*, Jaime Eagan, *Making an Impact: The Labor Movement's Use of Litigation To Achieve Social and Economic Justice*, SSRN 21 (June 18, 2011), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1866844 ("Few sources . . . mention labor's involvement in social justice impact litigation.").  Scholars have done empirical studies of the frequency with which unions, among other groups, file Supreme Court amicus briefs.  *E.g.*, Paul M. Collins, Jr. & Lisa A. Solowiej, *Interest Group Participation, Competition, and Conflict in the U.S. Supreme Court*, 32 LAW & SOC. INQUIRY 955 (2007); Joseph D. Kearney & Thomas W. Merrill, *The Influence of Amicus Curiae Briefs on the Supreme Court*, 148 U. PA. L. REV. 743, 752 (2000).  However, those studies do not discuss the types of cases in which unions file amicus briefs or the substance of the briefs themselves.

17.    This phrase has been attributed to former Brazilian President Getúlio Vargas.  Robert Plummer, *Ruses That Spring from Brazil's Woes*, BBC NEWS (Dec. 14, 2005), http://news.bbc.co.uk/2/hi/business/4468042.stm.

theories.[18] On several occasions, these disputes reached the Supreme Court. For example, in *Loewe v. Lawlor*, the well-known *Danbury Hatters* case, the Court held that the Sherman Antitrust Act prohibited a union secondary boycott, subjecting individual strikers (who were named defendants) to treble damages.[19] A series of other cases reinforced this conclusion, even after Congress exempted core union activity from antitrust liability in the Clayton Act.[20] At the same time, the *Lochner*-era[21] Court repeatedly applied the Due Process Clause of the Fourteenth Amendment to strike down state statutes aimed at protecting labor activity.[22]

During the same period, labor activists litigated important First Amendment cases, including *Abrams v. United States*, *Debs v. United States*, and *Whitney v. California*.[23] Each of these cases began with the defendant's criminal conviction for labor-related political activities: Abrams's circulation of flyers calling on the "Workers of the World" to unite against capitalism by going on a general strike;[24] Debs's public speech extolling the virtues of socialism and denouncing war;[25] and Whitney's participation in the Communist Labor Party, which had called for "the organization of the workers into 'revolutionary

---

18.    Charlotte Garden, *Labor Values Are First Amendment Values: Why Union Comprehensive Campaigns Are Protected Speech*, 79 FORDHAM L. REV. 2617, 2624 (2011).

19.    208 U.S. 274, 283-85, 292, 309 (1908), *superseded by statute*, Clayton Antitrust Act, Pub. L. No. 63-212, 38 Stat. 730 (1914).

20.    *E.g.*, Am. Steel Foundries v. Tri-City Cent. Trades Council, 257 U.S. 184 (1921) (holding that the Clayton Act did not eliminate union antitrust liability for certain collective action, including secondary strikes); Duplex Printing Press Co. v. Deering, 254 U.S. 443 (1921) (same), *superseded by statute*, Norris-LaGuardia Act, Pub. L. No. 72-65, 47 Stat. 70 (1932). These cases significantly limited workers' collective action until Congress passed the Norris-LaGuardia Act, which eliminated federal courts' jurisdiction to enjoin labor disputes. 29 U.S.C. § 101 (2006); United States v. Hutcheson, 312 U.S. 219, 231-33 (1941) (concluding that the Norris-LaGuardia Act also eliminated damages liability for picketing and striking).

21.    Lochner v. New York, 198 U.S. 45 (1905), *overruled by* Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421 (1952), *and* Ferguson v. Skrupa, 372 U.S. 726 (1963).

22.    *See, e.g.*, Truax v. Corrigan, 257 U.S. 312 (1921) (striking down a state law protecting picketing activity); Coppage v. Kansas, 236 U.S. 1 (1915) (striking down a state law prohibiting employers from requiring employees to sign "yellow dog contracts," in which the employee agreed to refrain from joining a union).

23.    Whitney v. California, 274 U.S. 357 (1927), *overruled by* Brandenburg v. Ohio, 395 U.S. 444 (1969); Abrams v. United States, 250 U.S. 616 (1919); Debs v. United States, 249 U.S. 211 (1919).

24.    *Abrams*, 250 U.S. at 620-21.

25.    *Debs*, 249 U.S. at 213-15. Eugene Debs was a founding member of the Industrial Workers of the World and of the American Railway Union, which famously defied a court injunction to continue a strike against the Pullman Company. Ahmed A. White, *The Crime of Economic Radicalism: Criminal Syndicalism Laws and the Industrial Workers of the World, 1917-1927*, 85 OR. L. REV. 649, 666-67 (2006).

industrial unions.'"[26] The Supreme Court upheld all three convictions, but *Abrams* and *Whitney* also offered occasions for Justices Holmes and Brandeis to articulate—albeit in a dissent and concurrence[27]—their "profoundly influential,"[28] "seminal"[29] theories of the First Amendment, which continue to undergird our understanding of free speech today.

The passage of the NLRA improved unions' fortunes before the Supreme Court and also led to one of the most influential federalism cases in Supreme Court history. *NLRB v. Jones & Laughlin Steel Corp.* began with what would now be considered a run-of-the-mill unfair labor practice charge, in which a labor union alleged that the company had discriminated against union members.[30] The company argued that Congress lacked the constitutional authority to regulate manufacturing and production, citing "[a]n unbroken line of decisions under the commerce clause."[31] In response, Justice Owen Roberts made his famous "switch in time," creating a five-vote majority in favor of expanded federal authority and setting the stage for the survival of other components of the New Deal.[32]

Even after labor unions were legitimated by the NLRA, federal and state governments periodically manifested discomfort with the idea that labor unions might drive litigation. This discomfort manifested in reform of the Fair Labor Standards Act (FLSA). Unions had seized on the FLSA when it was enacted in 1938, filing "collective actions" against employers who were alleged to have violated wage-and-hour requirements.[33] This practice drew congressional disapproval of suits filed by "outsiders" who were "desirous of stirring up litigation

---

26.    *Whitney*, 274 U.S. at 364.

27.    *Id.* at 372 (Brandeis, J., concurring); *Abrams*, 250 U.S. at 624 (Holmes, J., dissenting).

28.    Robert Post, *Reconciling Theory and Doctrine in First Amendment Jurispru-dence*, 88 CALIF. L. REV. 2353, 2356 (2000).

29.    Ronald K.L. Collins & David M. Skover, *Curious Concurrence: Justice Brandeis's Vote in* Whitney v. California, 2005 SUP. CT. REV. 333, 334.

30.    301 U.S. 1, 22 (1937).

31.    Brief for Jones & Laughlin Steel Corp. at 27, 64, *Jones & Laughlin*, 301 U.S. 1 (No. 419), 1937 WL 34884, at *27, *64; *see also Jones & Laughlin*, 301 U.S. at 25.

32.    Steven G. Calabresi & Nicholas Terrell, *The Number of States and the Economics of American Federalism*, 63 FLA. L. REV. 1, 20 (2011). Scholars debate the accuracy of the phrase "switch in time" as applied to the 1937 Court. Daniel E. Ho & Kevin M. Quinn, *Did a Switch in Time Save Nine?*, 2 J. LEGAL ANALYSIS 69, 71 (2010). However, the resolution of that debate is not necessary here; it is sufficient that *Jones & Laughlin* is today regarded as a critical moment in Supreme Court history.

33.    Scott A. Moss & Nantiya Ruan, *The Second-Class Class Action: How Courts Thwart Wage Rights by Misapplying Class Action Rules*, 61 AM. U. L. REV. 523, 533 (2012).

Case 1:17-cv-01037-UA-LPA    Document 7-24    Filed 11/20/17    Page 98 of 154

without being an employee at all."[34] Accordingly, Congress amended the FLSA in 1947, prohibiting employees from allowing designated representatives to sue on their behalves, and instead requiring them to sue in their own names.[35] This limit still applies today,[36] although, as this Article discusses below, unions continue to educate workers about their FLSA rights and to fund FLSA cases, including some resulting in major federalism-related holdings.[37]

States, too, have at times sought to prevent unions from encouraging their members to pursue legal claims. Ironically, these statutes led to major union victories in court. The Supreme Court has on four occasions rejected state prohibitions on the provision of free legal advice or attorney referrals by associations; three of these cases involved unions. In *Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar*, the Court overturned a state court's order enjoining the Brotherhood's legal referral plan, which was aimed at workers who had been injured on the job, and held that the Brotherhood had a First Amendment right to make legal referrals.[38] Relying on *NAACP v. Button*,[39] decided the previous year, the Court described the legal referral system as integral to the practice of trade unionism: "The right of members to consult with each other in a fraternal organization necessarily includes the right to select a spokesman from their number who could be expected to give the wisest counsel."[40] Additionally, the Court observed that the Brotherhood's efforts were targeted in part at enforcing legislation for which the union had lobbied, including the Safety Appliance Act and the Federal Employers' Liability Act. As the Court put it, the statutes could not fulfill their intended purpose if injured trainmen lacked meaningful access to the courts.[41]

---

34. *Id.* (quoting 93 CONG. REC. 2182 (1947)).
35. Portal-to-Portal Act of 1947, Pub. L. No. 80-49, § 2(e), 61 Stat. 84, 86 (codified as amended at 29 U.S.C. § 252(e) (2006)).
36. *Id.*
37. *See* discussion *infra* Part II.B.1.
38. 377 U.S. 1, 2, 5-6 (1964).
39. 371 U.S. 415, 442 (1963) (holding that the First Amendment protected the NAACP's practice of holding meetings of parents and children to solicit potential plaintiffs for school desegregation cases and concluding that Virginia's interest in regulating the legal profession by prohibiting solicitation by lawyers had to give way to the NAACP's interest in employing "constitutionally privileged means of expression to secure constitutionally guaranteed civil rights").
40. *Bhd. of R.R. Trainmen*, 377 U.S. at 6.
41. *Id.* at 3.

Three years later, the Court addressed another union's legal assistance plan in *United Mine Workers of America, District 12 v. Illinois State Bar Ass'n.*[42] There, the United Mine Workers "had employed a licensed attorney on a salary basis to represent any of its members who wished his services to prosecute workmen's compensation claims before the Illinois Industrial Commission."[43] As in *Brotherhood of Railroad Trainmen*, the Court held that the program was protected by the First Amendment, noting that it had arisen out of the union's perception that the Illinois Workmen's Compensation Statute was at risk of failing to fulfill its promise due to lack of competent enforcement.[44] Finally, in *United Transportation Union v. State Bar of Michigan*, the Court again overturned state bar sanctions imposed on a union for referring its members to attorneys who agreed to a particular fee arrangement.[45] The Court stressed that *Button, Mine Workers*, and *Trainmen* were to be read broadly to establish that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment," including actions designed to help members afford counsel.[46]

Thus, unions were instrumental in establishing that the First Amendment protects associations' rights both to make attorney referrals and to encourage members to enforce their rights through litigation, including by providing legal counsel. Importantly, many advocacy groups advancing a wide range of interests today rely on this principle in order to bring cases designed to spur social change.[47]

In the union context, funding of members' litigation sometimes occurs on a case-by-case basis—for example, a union, believing that an employee has been fired, underpaid, or otherwise mistreated in contravention of federal law, may decide to fund that worker's suit against the employer.[48] However, it can also occur in a more routinized

---

42.    389 U.S. 217 (1967).

43.    *Id.* at 218.

44.    *Id.* at 223-24.

45.    401 U.S. 576, 584-86 (1971) ("[T]he Union sought to protect its members from excessive legal fees by securing an agreement from the counsel it recommends that the fee will not exceed 25% of the recovery, and that the percentage will include all expenses incidental to investigation and litigation.").

46.    *Id.* at 585.

47.    *E.g., About the ACLU,* ACLU, http://www.aclu.org/about-aclu-0 (last visited Oct. 27, 2013); *Who We Are,* LDF, http://www.naacpldf.org/about-ldf (last visited Oct. 27, 2013).

48.    *E.g.,* Catherine L. Fisk, *Union Lawyers and Employment Law,* 23 BERKELEY J. EMP. & LAB. L. 57, 59 (2002) ("Unions and their lawyers have represented store clerks seeking back wages for uncompensated overtime work; Thai garment workers who were held

Case 1:17-cv-01037-UA-LPA    Document 7-24    Filed 11/20/17    Page 100 of 154

fashion, as when a labor union provides access to attorneys as a benefit of union membership. For example, since 1978, the United Auto Workers' (UAW) collective bargaining agreement with auto manufacturers has provided active workers, retirees, and workers' spouses with access to free civil legal services in a range of subject areas (Plan).[49] The Plan was sacrificed in the most recent round of bargaining between the UAW and the major auto companies—a loss that made the front page of the *Detroit Free Press*[50]—and will stop taking new cases at the end of 2013.[51] However, for the last twenty-five years, the Plan, which bills itself as "the largest pre-paid legal services program in the country,"[52] has assisted workers with divorces, personal bankruptcies, and other issues.[53] And, of particular note for purposes of this Article, cases handled by Plan attorneys occasionally reach the United States Courts of Appeals and, on at least one occasion, even the Supreme Court: in *Till v. SCS Credit Corp.*, attorneys from the UAW-DaimlerChrysler Legal Services Plan successfully represented two bankruptcy petitioners arguing that they should be entitled to pay a lower "formula rate" of interest on a loan

---

in virtual slavery in an El Monte, California sweatshop; employees suffering unsafe working conditions at poultry processing plants; and janitors seeking minimum wages." (footnotes omitted)).

49. *See The Plan*, UAW LSP, http://www.uawlsp.com/theplan.asp (last visited Oct. 27, 2013) (describing eligibility criteria for the Plan and listing subject areas in which Plan attorneys will provide assistance). Notably excluded from the Plan's coverage are lawsuits that name the beneficiary worker's employer or union as a defendant. The legal services provided under the Plan are "free" in the sense that members availing themselves of those services do not pay a per-service or hourly fee. However, the Plan is funded in part by union dues, which all members pay. The Plan's Web site asserts that these costs are low: "With efficient practices, the Plan has kept costs down, generally costing approximately $6 per month for each member[—]much less than the cost of just about any other type of benefit." *Statement from the Director, in Legal Services Plan Opening New Cases Through the End of 2013*, UAW LSP, http://www.uawlsp.com/default.asp (last visited Oct. 27, 2013). Further, the Plan's Web site indicates that about 75% of eligible union members take advantage of the Plan at some point in their tenure.

50. *See* Brent Snavely, *GM-UAW Deal Would End Free Divorces, Legal Help*, DETROIT FREE PRESS, Sept. 24, 2011, at A1.

51. *Legal Services Plan Opening New Cases Through the End of 2013*, *supra* note 49 ("Under the terms of the tentative 2011 contract between the UAW and GM, Ford and Chrysler, the Plan will continue to accept new cases on the same basis we have in the past, until December 31, 2013. We will handle all the cases that come in, and continue to handle the cases that have been opened by the end of 2013 until they are completed.").

52. *About Us*, UAW LSP, http://www.uawlsp.com/about.asp (last visited Oct. 27, 2013).

53. In 2008, the Plan's attorneys assisted over 9,000 workers with bankruptcy matters, nearly 7,000 workers with divorces, and nearly 3,000 workers with foreclosures. Brent Snavely, *UAW Fights To Keep Free Legal Services*, DETROIT FREE PRESS, Feb. 17, 2009, at A12.

secured by a $4000 truck, instead of the much higher rate sought by the creditor.[54]

In addition, the Supreme Court has recently allowed unions and other groups a third, hybrid method of litigating in members' interests, termed "associational standing."[55] Associational standing permits groups to litigate on their members' behalves provided three conditions are met: (1) at least one member has been or will be injured, (2) that member could sue individually, and (3) "the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause."[56] This allows unions to enforce members' rights with relatively little participation by the members themselves, a dynamic that can "provide[] for greater and more effective access to the courts," but that also presents risks, including that there may be conflicting interests among the union's membership.[57]

Finally, labor unions and federations appear as amici in a wide range of cases, many of which concern subjects other than labor law. This long-standing practice began in earnest in 1948,[58] when future Supreme Court Justice Arthur Goldberg was appointed general counsel of the CIO and "given a free hand to select labor cases to take to the Supreme Court and to file amicus briefs in cases already

---

54.   541 U.S. 465 (2004).

55.   This principle was first established by the Supreme Court in a decision allowing the UAW to seek a declaratory judgment ensuring that members who had been laid off from work received full trade readjustment benefits. UAW v. Brock, 477 U.S. 274, 286-87 (1986). Then, in *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, the Supreme Court expanded *Brock* to permit a union to sue for damages under the Worker Adjustment and Retraining Notification (WARN) Act on behalf of its members. 517 U.S. 544 (1996).

56.   Warth v. Seldin, 422 U.S. 490, 511 (1975).

57.   Nathaniel B. Edmonds, Comment, *Associational Standing for Organizations with Internal Conflicts of Interest*, 69 U. CHI. L. REV. 351, 351 (2002). Additionally, the *Brown Group* Court identified two other risks: a potential lack of "adversarial intensity" and that "the damages recovered by the association [could] fail to find their way into the pockets of the members on whose behalf injury is claimed." 517 U.S. at 556.

58.   Before 1948, labor federations filed amicus briefs only sporadically, generally in labor or employment law cases, as well as a handful of high-profile civil rights cases. *E.g.*, Brief of AFL, Amicus Curiae, Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275 (1946) (No. 970), 1946 WL 50088 (veterans' reemployment and superseniority); Brief for AFL, Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197 (1938) (No. 19), 1938 WL 39360 (NLRB jurisdiction and procedure); Application for Leave To File Brief Amicus & Brief Amicus Curiae on Behalf of CIO & Certain Affiliated Organizations, Shelley v. Kraemer, 334 U.S. 1 (1948) (No. 72), 1947 WL 44164 (racially restrictive housing covenants).

scheduled for Supreme Court review."[59]    Goldberg interpreted this mandate as an invitation to file briefs that would, in his view, "safeguard[] the interests of the entire labor movement and, indeed, the public interest generally."[60]    This was before it became common practice for interest groups to file amicus briefs in the Supreme Court; one study showed that a grand total of 531 amicus briefs were filed during the ten-year span from 1946 to 1955, as compared to 4,907 amicus briefs filed between 1986 and 1995.[61] Thus, while the CIO was not the only institution to engage regularly in amicus practice in the late 1940s, it was among a relatively small group that did so.

Under Goldberg's leadership, the CIO filed briefs not only in labor cases, but also in civil rights and First Amendment cases. Among them were amicus briefs filed in several cases challenging racial segregation in education[62] and public accommodations.[63]    In those cases, the CIO described its interest in defeating "the power of the states to compel segregation," which "directly affect[s] the efforts of the CIO to build a non-segregated trade union movement in the United States."[64]    Similarly, the CIO fought discriminatory laws enacted in the wake of World War II, including Hawaii's English-only education law[65] and California's statutory denial of fishing licenses to Japanese immigrants.[66] Additionally, during this period, the CIO filed briefs in three cases presenting issues related to the First Amendment rights of protest groups. These cases involved the extent to which the

---

59.    Katherine V.W. Stone, *The* Steelworkers' Trilogy*: The Evolution of Labor Arbitration, in* LABOR LAW STORIES 149, 159 (Laura J. Cooper & Catherine L. Fisk eds., 2005).

60.    *Id.* at 160.

61.    Kearney & Merrill, *supra* note 16, at 752.

62.    Brief for the CIO as *Amicus Curiae*, Brown v. Bd. of Educ., 347 U.S. 483 (1954) (No. 1), 1953 WL 78290; Brief for the CIO as Amicus Curiae, McLaurin v. Okla. State Regents for Higher Educ., 339 U.S. 637 (1950) (No. 34), 1950 WL 78678; Brief for the CIO as Amicus Curiae in Support of Petition for Certiorari, Sweatt v. Painter, 339 U.S. 629 (1950) (No. 44), 1949 WL 50364.

63.    Motion for Leave To File Brief & Brief of CIO *Amicus Curiae*, Henderson v. United States, 339 U.S. 816 (1950) (No. 25), 1949 WL 50336 (challenging segregation in railroad dining cars).

64.    Brief for the CIO as Amicus Curiae, *McLaurin*, *supra* note 62, at 2.

65.    Brief of CIO, Amicus Curiae at 2-3, Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368 (1949) (No. 52), 1948 WL 47231, at *2-3 (challenging on the dual grounds that the law would "augment existing racial, religious and nationalistic discord" and discriminate against non-English speaking teachers).

66.    Brief of CIO *Amicus Curiae*, Takahashi v. Fish & Game Comm'n, 334 U.S. 410 (1948) (No. 533), 1948 WL 47436.

government could prohibit communists from leading labor unions,[67] the right to picket stores in order to encourage them to hire racial minorities,[68] and the availability of civil remedies under the Ku Klux Klan Act to individuals who were systematically assaulted by groups of private citizens.[69]

After the 1955 merger of the AFL and CIO, the newly combined federation continued filing Supreme Court amicus briefs. While the federation's amicus participation has ebbed and flowed over time,[70] the AFL-CIO today remains a prolific filer of amicus briefs.[71]  For example, from the five-year period beginning with the October 2007 Supreme Court Term and ending with the October 2011 Term, the AFL-CIO filed fifteen amicus briefs, eleven of which did not concern labor law.[72]  Some of these briefs were filed in high-profile cases, like *National Federation of Independent Business v. Sebelius*[73] or *Arizona v. United States*,[74] where the AFL-CIO was one of dozens of amici. Others came in cases that received far less amicus attention, like *Kasten v. Saint-Gobain Performance Plastics Corp.*, in which the Court considered whether an oral complaint was sufficient to trigger the FLSA[75]; there, the AFL-CIO filed one of only six amicus briefs.[76] Other AFL-CIO amicus briefs filed during that period came in cases

---

67.   *E.g.*, Brief for the CIO as Amicus Curiae, Am. Commc'ns Ass'n v. Douds, 339 U.S. 382 (1950) (No. 10), 1949 WL 50300.

68.   Brief for the CIO as Amicus Curiae, Hughes v. Superior Court, 339 U.S. 460 (1950) (No. 61), 1949 WL 50403.

69.   Brief for the CIO as Amicus Curiae, Collins v. Hardyman, 341 U.S. 651 (1951) (No. 217), 1950 WL 78611.

70.   Westlaw and Lexis reveal twenty-eight AFL-CIO amicus briefs filed in nonlabor cases between 1971 and 1980, sixty filed between 1981 and 1990, twenty-eight between 1991 and 2000, and thirty-five between 2001 and the present. (List of cases on file with author.) By contrast, the late 1950s and 1960s saw the AFL-CIO file relatively few amicus briefs in cases that did not concern labor law.

71.   Many of these briefs are discussed in this Article. In addition, it is telling that Professors Joseph Kearney and Thomas Merrill selected the AFL-CIO as one of three institutional litigators with a history of filing Supreme Court amicus briefs to study the efficacy of that practice. Kearney & Merrill, *supra* note 16, at 750.

72.   A Westlaw search conducted on September 29, 2013, in the "U.S. Supreme Court Briefs" database for documents filed on dates corresponding to the October 2007 Term to the October 2011 Term that contain "AFL-CIO" or "American Federation of Labor" in the title returns fifteen amicus briefs filed by the AFL-CIO.

73.   Brief of the AFL-CIO as *Amicus Curiae* in Support of Petitioners Suggesting Reversal of the Decision Below on the Minimum Coverage Provision Issue, Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566 (2012) (No. 11-398), 2012 WL 293719.

74.   Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Arizona v. United States, 132 S. Ct. 2492 (2012) (No. 11-182), 2012 WL 1054499.

75.   131 S. Ct. 1325 (2011).

76.   Brief of the AFL-CIO as Amicus Curiae in Support of Petitioner, *Kasten*, 131 S. Ct. 1325 (No. 09-834), 2010 WL 2565286.

concerning international law,[77] the viability of a Title VII class action,[78] the First Amendment,[79] the Uniformed Services Employment and Reemployment Rights Act,[80] consumer arbitration,[81] separation of federal powers,[82] and the Equal Protection Clause of the Fourteenth Amendment.[83]   And, while the efficacy of any particular amicus strategy is beyond the scope of this Article, there is some empirical evidence that AFL-CIO amicus briefs are successful.[84]

The AFL-CIO files amicus briefs far more frequently than the other major American labor federation, Change to Win.[85]   Change to Win filed Supreme Court amicus briefs in only six cases (five of which did not concern labor law) between the 2007 and 2011 Terms.[86] This relatively low amicus participation rate is perhaps unsurprising given Change to Win's pledge to devote three-quarters of its operating

---

77.   *See* Brief of the AFL-CIO as *Amicus Curiae* in Support of Petitioners, Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (2013) (No. 10-1491), 2011 WL 6813560.

78.   *See* Brief of the United Food & Commercial Workers International Union et al. as *Amici Curiae* in Support of Respondents, Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011) (No. 10-277), 2011 WL 794122.

79.   *See* Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Borough of Duryea v. Guarnieri, 131 S. Ct. 2488 (2011) (No. 09-1476), 2011 WL 288884.

80.   *See* Brief of the AFL-CIO as *Amicus Curiae* in Support of Petitioner, Staub v. Proctor Hosp., 131 S. Ct. 1186 (2011) (No. 09-400), 2010 WL 2770107.

81.   *See* Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Rent-A-Center, W., Inc. v. Jackson, 130 S. Ct. 2772 (2010) (No. 09-497), 2010 WL 1393447.

82.   *See* Brief of the Council of Institutional Investors et al. as Amici Curiae Supporting Respondents, Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 130 S. Ct. 3138 (2010) (No. 08-861), 2009 WL 3370511.

83.   *See* Brief *Amicus Curiae* of the National Education Ass'n et al. in Support of Petitioner, Engquist v. Or. Dep't of Agric., 553 U.S. 591 (2008) (No. 07-474), 2008 WL 563435.

84.   Kearney & Merrill, *supra* note 16, at 750 ("We also track the amicus records of the American Civil Liberties Union ('ACLU'), the American Federation of Labor-Congress of Industrial Organizations ('AFL-CIO'), and the States, and find that they enjoy some success as amicus filers, although less than the Solicitor General.").

85.   Ann C. Hodges, *Avoiding Legal Seduction: Reinvigorating the Labor Movement To Balance Corporate Power*, 94 MARQ. L. REV. 889, 892-93 (2011).

86.   *See* Brief of the AFL-CIO & Change to Win as *Amici Curiae* in Support of Respondents, 14 Penn Plaza LLC v. Pyett, 556 U.S. 247 (2009) (No. 07-581), 2008 WL 2817677; Brief of the AFL-CIO & Change to Win as *Amici Curiae* in Support of Respondent, Davenport v. Wash. Educ. Ass'n, 551 U.S. 177 (2007) (Nos. 05-1589, 05-1657), 2006 WL 3735955; Brief of the Alliance for Retired Americans et al. as *Amici Curiae* in Support of Respondent, Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158 (2007) (No. 06-593), 2007 WL 951137; Brief of *Amici Curiae* Change to Win & the Change to Win Investment Group in Support of Respondents, Merck & Co. v. Reynolds, 130 S. Ct. 1784 (2010) (No. 08-905), 2009 WL 3477290; Brief for Change to Win & the CtW Investment Group as *Amici Curiae* in Support of Petitioner, Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008) (No. 06-43), 2007 WL 1701933; Brief of the United Food & Commercial Workers International Union et al. as *Amici Curiae* in Support of Respondents, *supra* note 78.

budget to funding new organizing efforts, leaving fewer resources available for expensive Supreme Court litigation.[87]   Interestingly, though, the briefs that Change to Win did file suggest that it has a somewhat different amicus strategy than the AFL-CIO. In particular, Change to Win, along with the Change to Win Investment Group, filed briefs in two securities litigation cases.[88]  (By contrast, the AFL-CIO did not participate in any Supreme Court securities litigation cases during the same time period.) In these cases, Change to Win sought to expand liability for securities fraud[89] and make it easier for plaintiffs to bring securities cases.[90] This focus goes hand in hand with Change to Win's organizing and advocacy model, which includes shareholder activism.[91]

This Subpart has outlined the primary avenues through which unions engage in Supreme Court advocacy. This is not to suggest that these are the only avenues. In addition, unions may facilitate litigation in less formal ways, for example, by helping workers identify potential violations of their workplace rights and providing attorney referrals.[92]

---

87.    The inaugural chair of Change to Win, Anna Burger, described that federation's goals like this: "Strategic, smart, organizing is our core principle-our North Star .... We will put our money where our mouth is, with three-quarters of our resources going to a groundbreaking organizing crusade." *New Labor Federation Pledges To Carry Out Most Aggressive Organizing Campaign in 50 Years*, CHANGE TO WIN (Sept. 27, 2005), http://www.changetowin.org/news/new-labor-federation-pledges-carry-out-most-aggressive-organizing-campaign-50-years (internal quotation marks omitted); *see also* Hodges, *supra* note 85, at 893.

88.    The Change to Win Investment Group works with union-sponsored pension funds to engage in shareholder activism because

[t]he long-term health of these pension plans, and the retirement security of the workers and families who rely upon them, are threatened by conflicts of interest on Wall Street and in the boardroom, a corporate backlash that seeks to weaken the accountability of executives to shareholders, and outright corporate fraud.

*About CtW Investment Group*, CTW INVESTMENT GROUP, http://www.ctwinvestmentgroup.com/about/ (last visited Oct. 27, 2013).

89.    Brief for Change to Win & the CtW Investment Group as *Amici Curiae* in Support of Petitioner, *supra* note 86, at 4-6.

90.    Brief of *Amici Curiae* Change to Win & the Change to Win Investment Group in Support of Respondents, *supra* note 86, at 3-5.

91.    Sanford M. Jacoby, *Finance and Labor: Perspectives on Risk, Inequality, and Democracy*, 30 COMP. LAB. L. & POL'Y J. 17, 48 (2008) ("As compared to the [Change to Win] unions, the AFL-CIO's national unions are less likely to engage in capital-market activities [in support of organizing].").

92.    Increasingly, unions help fund workers' centers to assist workers in nonunion workplaces. Workers' center staff provide advice on issues like wage and hour violations and immigration law and therefore are a particularly promising avenue through which unions can help nonunion workers assert their rights.   *E.g.*, Victor Narro, *Impacting Next Wave Organizing: Creative Campaign Strategies of the Los Angeles Worker Centers*, 50 N.Y.L. SCH. L. REV. 465, 467 (2005-2006) (describing workers' center strategies, including providing

Additionally, they may recruit named plaintiffs for class actions or urge workers to opt into FLSA collective actions. The next Subpart will briefly describe some of the many substantive areas in which labor unions facilitate in litigation.

## B.   *Subjects of Unions' Supreme Court Litigation*

> *The focus was . . . on shaping the law so that it would benefit the labor movement (and hence America!) over the long run.*[93]

In this Subpart, I illustrate the range of Supreme Court cases in which unions participate as parties or amici. I have grouped these cases into six categories. First, and most prevalent, are cases that concern conditions of employment. These work law cases cover topics like employment discrimination, wage-and-hour law, workplace health and safety, and the Employee Retirement Income Security Act (ERISA). Second, there are democracy-related cases that concern the political process, access to government, and civic engagement more generally, including First Amendment rights to protest. Third, there are cases related to the structure of government—either the relationship between the federal government and the states[94] or the relationship between the branches of the federal government. Fourth, there are cases about civil practice and procedure. Fifth, there are cases about issues of community concern, such as the availability of affordable housing or the protection of the environment. Sixth, and finally, there are industry-specific issues in which unions become involved because they represent workers in the relevant industry.

Three caveats are in order. First, many cases will fall into multiple categories; often, the reason a client decides to sue is substantially different from the reason the Supreme Court agrees to hear the case. To take just one example, unions litigated both *Alden v. Maine*[95] and *Garcia v. San Antonio Metropolitan Transit Authority*[96]—

---

"services such as legal representation, language classes, health care referrals, and advocacy"); Hina Shah & Marci Seville, *Domestic Worker Organizing: Building a Contemporary Movement for Dignity and Power*, 75 ALB. L. REV. 413, 428-29 (2012). *But see* Hodges, *supra* note 85, at 904 (describing an assessment by organizers at the Garment Workers' Center in Los Angeles that "focus on legal actions created significant problems," including that the strategy did not keep workers sufficiently involved in the campaign and that workers came to view the center as a service provider).

93.   Michael Gottesman, *David Feller, Senior Partner*, 24 BERKELEY J. EMP. & LAB. L. 265, 267 (2003).

94.   There are a significant number of cases about the extent to which the NLRA preempts state laws. However, those cases are beyond the scope of this Article.

95.   527 U.S. 706 (1999).

key federalism cases that are regularly featured in constitutional law textbooks[97]—to enforce the FLSA against state governments.[98] Because the underlying wage and hour issues that gave rise to these cases in the first place were relatively ordinary, I group these and similar cases in category three (structure of government), rather than category one (work law). However, this is not to underplay the importance of unions' expensive and time-consuming litigation of work law issues in the Supreme Court.

Second, this is not an exhaustive list of all the cases, or even the categories of cases, in which unions have participated as parties, provided legal representation, or filed amicus briefs. For example, this Subpart generally does not discuss union participation in antitrust or securities cases.[99] Instead, it offers example cases to illustrate the breadth of issues in which unions are involved, as well as to provide a sense of the extent to which unions' litigation positions might align with or diverge from those of other social movement groups.

Third, although the Article sometimes refers to the views of the "labor movement," I do not mean to imply that the labor movement has a monolithic view of the importance or the substantive correctness of particular cases. Where different unions or federations take different views before the Court, I flag them. However, where only one union perspective is advanced before the Court, I do not discuss the likelihood that other unions or federations (or their members) held, but did not express to the Court, other views.

### 1. Work Law

Unsurprisingly, the largest category of unions' nonlabor Supreme Court work falls under the general heading of work law.[100] I include

---

96.   469 U.S. 528 (1985), *superseded by statute*, Fair Labor Standards Amendments of 1985, Pub. L. No. 99-150, 99 Stat. 787.

97.   *E.g.*, ERWIN CHEMERINSKY, CONSTITUTIONAL LAW 178, 303 (3d ed. 2009).

98.   *Alden*, 527 U.S. at 712 (holding that Congress cannot compel states to hear suits relating to violations of federal law in state courts; the plaintiffs were represented by AFL-CIO attorneys); *Garcia*, 469 U.S. at 555-56 (holding that Congress has the power under the Commerce Clause to compel state employers to pay federally mandated minimum wage). Garcia was represented by union lawyers, including the AFL-CIO General Counsel Laurence E. Gold and Amalgamated Transit Union General Counsel Earle Putnam. *Id.* at 529.

99.   *See* discussion *supra* Part II.A.

100.  *See* Eagan, *supra* note 16, at 24-27; Robert J. Rabin, *The Role of Unions in the Rights-Based Workplace*, 25 U.S.F. L. REV. 169, 200-05 (1991) (describing individual unions' practices of providing representation or legal referrals for members' claims under Title VII, the WARN Act, and other employment statutes).

here employment law,[101] employment discrimination,[102] workplace health and safety,[103] and retirement benefits.[104]

Unions play a role in the development of employment law in both union and nonunion workplaces. In unionized workplaces, the connection is obvious: unions often either provide counsel to bargaining unit members or sue in their own names (often alongside individual employees) to enforce members' workplace rights.[105] In nonunion workplaces, the connection is perhaps less clear, but present nonetheless. First, labor lawyers sometimes represent nonunionized workers directly, often (but not always) in connection with an organizing campaign.[106] Second, even if they do not provide representation, they may provide advice and attorney referrals through a workers' center or similar organization.[107] Conversely, unions themselves employ significant numbers of employees, and they sometimes also play a gatekeeping role in employment by operating hiring halls.[108] Thus, unions are sometimes named as defendants in employment-related litigation as well.

As a result, labor unions have been parties to a significant number of work law cases that have reached the Supreme Court; of these, discrimination cases comprise the bulk. Accordingly, this Subpart begins with a discussion of unions' participation in discrimination cases and then turns to other types of work law cases, such as those concerning the constitutional rights of public employees.

---

101. *E.g.*, United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544 (1996).

102. *See* discussion *infra* Part III.

103. *E.g.*, UAW v. Johnson Controls, Inc., 499 U.S. 187 (1991); Dole v. United Steelworkers of Am., 494 U.S. 26 (1990), *superseded by statute*, Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163; Indus. Union Dep't v. Am. Petroleum Inst., 448 U.S. 607 (1980).

104. *E.g.*, Beck v. PACE Int'l Union, 551 U.S. 96 (2007); Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Local 54, 468 U.S. 491 (1984).

105. *E.g.*, AT&T Corp. v. Hulteen, 556 U.S. 701 (2009); *Johnson Controls*, 499 U.S. 187. The Communications Workers of America were a party in the Title VII gender discrimination suit. *AT&T Corp.*, 556 U.S. 701.

106. Fisk, *supra* note 48, at 59-60 (noting that some courts construe the provision of legal services immediately before a union election as a violation of the NLRA).

107. *See* Janice Fine et al., Nat'l Study on Immigrant Worker Ctrs. 2005, *Worker Centers*, ECON. POL'Y INST. 1, http://www.cornellpress.cornell.edu/resources/titles/801401009 32140/extras/Map_Worker-Centers.pdf (last visited Oct. 28, 2013) (listing locations of 137 workers' centers in the United States and listing their affiliate partners, including many unions).

108. Rebecca J. Livengood, *Organizing for Structural Change: The Potential and Promise of Worker Centers*, 48 HARV. C.R.-C.L. L. REV. 325, 332-33 (2013).

Unions have appeared before the Supreme Court both to prosecute Title VII cases and to defend against them. For example, shortly after the enactment of the Civil Rights Act of 1964, unions litigated a series of cases in which they were named as defendants because of the discriminatory impact of union-negotiated seniority systems.[109] These cases involved not only liability issues, but also difficult questions about how to provide remedies to workers who were excluded from desirable jobs because seniority systems entrenched the effects of prior (legal) discrimination.[110] In addition, a handful of other Supreme Court cases arising under employment discrimination statutes involved intentional race discrimination by labor unions.[111] For example, in *Local 28, Sheet Metal Workers' International Ass'n v. EEOC*, the local union defendant unsuccessfully fought a district court's directive that it remedy its history of "particularly egregious"[112] discrimination against nonwhite workers seeking admission to the union by achieving 29% nonwhite membership and creating a fund to be used to recruit minority participants.[113] Then, in *Goodman v. Lukens Steel Co.*, a Steelworkers' local unsuccessfully attempted to defend its policy of declining to process grievances raising race discrimination or harassment based on employer opposition to such claims.[114] Finally, a third case involved discrimination against white employees: in *McDonald v. Santa Fe Trail Transportation Co.*, a Teamsters local unsuccessfully argued that neither Title VII nor 42 U.S.C. § 1981 prevented employers from choosing to fire white employees who had stolen from the company, while retaining black employees accused of the same conduct.[115] However, the Teamsters'

---

109. *E.g.*, E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395 (1977); Int'l Bhd. of Teamsters v. United States, 431 U.S. 324 (1977); Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975) (discussing the propriety of a back pay remedy in a case involving a discriminatory seniority system in which an employer and union were named as defendants).

110. Unions' positions in these cases are discussed in greater detail in Part III.B.

111. Other Supreme Court cases concerned breaches of unions' duty to represent all bargaining unit employees fairly, which occurred when unions discriminated by refusing minority workers entrance into the union. *E.g.*, Johnson v. Ry. Express Agency, Inc., 421 U.S. 454 (1975), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071; Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192 (1944) (inferring a duty to represent all covered employees fairly from the NLRA's exclusive representation provision in a case involving a racially discriminatory seniority system). Because these cases arise under labor statutes, they are beyond the scope of this Article, except to the extent that they also raise nonlabor issues. *See infra* Part II.B.5.

112. 478 U.S. 421, 483 (1986) (Powell, J., concurring).

113. *Id.* at 433, 440, 482.

114. 482 U.S. 656 (1987).

115. 427 U.S. 273, 283-91 (1976).

position was undermined by an AFL-CIO amicus brief that successfully argued that both statutes should apply to white workers.[116]

Then, in *United Steelworkers of America v. Weber*[117] and *Johnson v. Transportation Agency*,[118] unions defended negotiated affirmative action plans designed to correct "manifest imbalances" in workforce composition.[119]   After the Court upheld both plans, the AFL-CIO carefully sought to preserve these holdings by distinguishing the negotiated affirmative action plans at issue in those cases from more ad hoc measures taken by employers in other cases.[120]   For example, the controversial[121] case of *Taxman v. Board of Education* arose when a school district terminated a white teacher instead of a minority teacher with identical seniority and qualifications in order to maintain racial diversity among the teachers within Taxman's department.[122]   Once the Supreme Court granted certiorari, civil rights groups—fearing that the Rehnquist Court would interpret Title VII so as to gut affirmative action programs—financed most of a settlement that removed the case from the Supreme Court docket just days before argument.[123]

---

116.   Motion for Leave To File Brief & Brief for the AFL-CIO as Amicus Curiae, *McDonald,* 427 U.S. 273 (No. 75-260), 1975 WL 173858.

117.   443 U.S. 193 (1979).

118.   480 U.S. 616 (1987).

119.   The *Johnson* plaintiff named only his employer in his suit, which charged that he was passed over in favor of a female employee in violation of Title VII. However, the union, which had agreed to the county's affirmative action plan, intervened in the case as a defendant. Brief of Respondent SEIU Local 715 at i, 2, *Johnson,* 480 U.S. 616 (No. 85-1129), 1986 WL 728167, at \*i, \*2.

120.   In addition, in *Weber* itself, the Steelworkers contrasted cases involving government-imposed quotas to plans that were voluntarily adopted by private employers, arguing that the legislative history of Title VII did not reveal a congressional intent to forbid the latter. However, making that case meant showing that Congress did intend to preclude governmental quotas. Professor Deborah Malamud has argued persuasively that this theory was influential in achieving a win in *Weber.* Deborah C. Malamud, United Steelworkers of America v. Brian Weber, *in* EMPLOYMENT DISCRIMINATION STORIES 173, 176 (Joel Wm. Friedman ed., 2006). However, the Steelworkers' strategy threatened to alienate the union from the civil rights community. *See id.* at 182-86.

121.   *E.g.,* Nat Hentoff, *A Case of Spin in Piscataway,* WASH. POST, Dec. 20, 1997, *available at* 1997 WLNR 7325093. Even many years later, the case remained a flash point, as evidenced by the fact that it was discussed in reference to the Supreme Court nominations of both Samuel Alito, who ruled in favor of Taxman as a judge on the United States Court of Appeals for the Third Circuit, and Elena Kagan, who as a lawyer in the Clinton White House had a role in shaping the administration's position on the case. *The Nomination of Elena Kagan To Be an Associate Justice of the Supreme Court of the United States: Hearing Before the S. Comm. on the Judiciary,* 111th Cong. 818, 823-24 (2010) (testimony of Peter N. Kirsanow); Daniel H. Pollitt, *Veto Alito!,* INDY WK. (Jan. 4, 2006), http://www.indyweek.com/indyweek/veto-alito/Content?oid=1196395.

122.   91 F.3d 1547, 1551 (3d Cir. 1996), *cert. dismissed,* 522 U.S. 1010 (1997).

123.   Leandra Lederman, *Precedent Lost: Why Encourage Settlement, and Why Permit Non-Party Involvement in Settlements?,* 75 NOTRE DAME L. REV. 221, 244-45 (1999);

Apparently sharing this apprehension, the AFL-CIO devoted much of its amicus brief to distinguishing the school district's decision to lay off Taxman from the negotiated plans in *Weber* and *Johnson*, rather than to defending the school district's actions.[124] Thus, while the brief implicitly criticized the school district's actions (and the brief was filed in support of neither party),[125] it was evidently designed to preserve affirmative action to the extent realistically possible, rather than to limit it.[126]

Unions have also fought to expand protections against sex and gender discrimination in employment discrimination. A leading union in this effort, the International Union of Electrical, Radio, and Machine Workers (UE) inaugurated "the modern beginning of the organized pay equity movement in this nation."[127] As part of its work in this vein, UE filed a series of cases charging that employer-sponsored insurance plans violated Title VII when they excluded pregnancy from coverage,[128] reaching the Supreme Court in *General Electric Co. v. Gilbert*.[129] UE did not prevail in *Gilbert*, but Congress later legislatively overruled it with the Pregnancy Discrimination Act.[130] However, another electrical workers' union—the International Brotherhood of Electrical Workers—successfully challenged an employer policy that required female employees to make larger

---

Editorial, *Affirmative Action: Sooner or Later, High Court Will Have To Decide*, WORCESTER TELEGRAM & GAZETTE, Dec. 19, 1997, *available at* 1997 WLNR 6532399 ("The prospect of an adverse ruling prompted civil rights groups to provide the major share of a $433,500 settlement that the school board was required to pay Taxman as the result of trial and appeals court rulings.").

124. Brief of the AFL-CIO & the American Federation of Teachers, AFL-CIO, as Amici Curiae in Support of Neither Party at 2, Piscataway Twp. Bd. of Educ. v. Taxman, 521 U.S. 1117 (1997) (No. 96-679), 1997 WL 528594, at *2.

125. *Id.*

126. Similarly, the AFL-CIO's brief in *Minnick v. California Department of Corrections* both sought to distinguish *Weber* and *Johnson* and—like the state—successfully urged the Court to hold that it lacked jurisdiction to decide the case because there was not yet a final judgment from the lower courts. Brief for the AFL-CIO as Amicus Curiae, Minnick v. Cal. Dep't of Corr., 452 U.S. 105 (1981) (No. 79-1213), 1980 U.S. S. Ct. Briefs LEXIS 2193.

127. MICHAEL W. MCCANN, RIGHTS AT WORK: PAY EQUITY REFORM AND THE POLITICS OF LEGAL MOBILIZATION 50-51 (1994).

128. Brief of International Union of Electrical, Radio & Machine Workers, AFL-CIO-CLC, as Amicus Curiae at 3-4, Geduldig v. Aiello, 417 U.S. 484 (1974) (No. 73-640), 1974 WL 185751, at *3-4 (listing other cases challenging similar insurance policies filed by UE and groups of woman workers and listing UE's efforts to achieve coverage for pregnancy-related health needs at the bargaining table).

129. 429 U.S. 125 (1976), *superseded by statute*, Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2076.

130. Pregnancy Discrimination Act.

contributions to a pension fund than their male counterparts.[131] And the union in *UAW v. Johnson Controls, Inc.*, working with a coalition of advocacy groups,[132] prevailed in its challenge to an employer policy precluding women who could become pregnant from working at jobs involving potential lead exposure.[133] Unions' frequent litigation of sex discrimination cases continues to this day.[134] In addition, unions have filed proemployee briefs in cases involving other antidiscrimination statutes, such as the Americans with Disabilities Act.[135]

Finally, the AFL-CIO, Change to Win, and individual labor unions filed briefs in both *United States v. Windsor* and *Hollingsworth v. Perry*, cases concerning the constitutionality of the federal Defense

---

131. City of L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702 (1978), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071.

132. Caroline Bettinger-Lopez & Susan P. Sturm, International Union, U.A.W. v. Johnson Controls: *The History of Litigation Alliances and Mobilization To Challenge Fetal Protection Policies* 4 (Columbia Law Sch. Pub. Law & Legal Theory Working Paper Grp., Paper No. 07-145, 2007), *available at* http://www.ssrn.com/abstract=982252.

133. 499 U.S. 187, 190, 211 (1991).

134. *See* Brief of the AFL-CIO & the Brotherhood of Maintenance of Way Employes Division, International Brotherhood of Teamsters as *Amicus Curiae* in Support of Respondent, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) (No. 05-259), 2006 WL 622124 (arguing that reassignment to a worse job was an "adverse employment action" for purposes of a Title VII claim based on an employer's retaliation for a union-represented employee's sexual harassment complaint); Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Penn. State Police v. Suders, 542 U.S. 129 (2004) (No. 03-95), 2004 WL 363887 (arguing that the *Ellerth/Faragher* affirmative defense in sexual harassment cases is not available when the plaintiff has been constructively discharged); Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (No. 02-679), 2003 WL 1786612; Brief for the AFL-CIO as *Amicus Curiae* in Support of the Respondent, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) (No. 97-569), 1998 WL 145348; Brief for the AFL-CIO as *Amicus Curiae* in Support of Respondent, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (No. 87-1167), 1988 WL 1025873; Brief of the United Food & Commercial Workers International Union et al., as *Amici Curiae* in Support of Respondents, *supra* note 78.

135. Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440 (2003) (No. 01-1435), 2003 WL 164199 (arguing that physicians are employees for purposes of the ADA); Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, US Airways, Inc. v. Barnett, 535 U.S. 391 (2002) (No. 00-1250), 2001 WL 1023719 [hereinafter Brief of the AFL-CIO in *Barnett*] (arguing that an employer-sponsored seniority plan that was not collectively bargained did not create a vested expectation that open positions would go to the most senior employee, meaning that an employer could be required to offer an open position to a disabled employee as a reasonable accommodation); Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002) (No. 00-1089), 2001 WL 1023522 (arguing that the plaintiff was covered by the ADA because she was substantially limited in performing manual tasks); Brief of the AFL-CIO as *Amici Curiae* in Support of the Petitioners, Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) (No. 97-1943), 1999 WL 86514 (arguing that individuals with impairments that can be corrected through ameliorative measures, like eyeglasses, should nonetheless be covered by the ADA).

of Marriage Act and the California constitutional amendment limiting marriage to unions consisting of one man and one woman.[136] In both briefs, the unions and federations highlighted a list of work-related burdens resulting from discrimination against same-sex couples.[137]

Turning from discrimination cases, unions also frequently litigate cases regarding the constitutional rights of public sector employees. These cases have arisen under the First and Fourth Amendments, as well as the Due Process Clause of the Fifth and Fourteenth Amendments. The National Treasury Employees Union (NTEU), a union that represents employees in thirty-one federal agencies,[138] has been particularly active in this area, litigating both First and Fourth Amendment issues affecting employees of the federal government. For example, in *United States v. NTEU*, the union successfully challenged a subsection of the Ethics in Government Act that prohibited federal employees from accepting compensation for giving speeches or writing articles.[139] That case is one of a string of cases concerning the rights of public employees to exercise their First Amendment rights both in and outside the workplace, many of which featured amicus participation by the AFL-CIO and individual unions.[140] Then, in *NTEU v. Von Raab*, the Court rejected the union's attempt to limit drug testing of certain public employees;[141] that case was decided on the same day as another case presenting a similar issue, brought by unions representing railway employees.[142] These are just a few of the

---

136. Brief of the AFL-CIO et al. as *Amici Curiae* Supporting Respondent Edith Schlain Windsor & Suggesting Affirmance, United States v. Windsor, 133 S. Ct. 2675 (2013) (No. 12-307), http://www.americanbar.org/content/dam/aba/publications/supreme_court_ preview/briefs-v2/12-307_resp_amcu_aflcio-etal.authcheckdam.pdf; Brief of AFL-CIO & Change to Win as *Amici Curiae* Supporting Respondents & Suggesting Affirmance, Hollingsworth v. Perry, 133 S. Ct. 2652 (2013) (No. 12-144), http://www.americanbar.org/ content/dam/aba/publications/supreme_court_preview/briefs-v2/12-144_resp_amcu_aflcio-ctw.authcheckdam.pdf.

137. Brief of the AFL-CIO et al. as *Amici Curiae* Supporting Respondent Edith Schlain Windsor & Suggesting Affirmance, *supra* note 136, at 3-5 (describing higher costs and taxes, denial of access to health care benefits, and deprivation of governmental retirement and financial assistance as effects of discrimination against same-sex married couples); Brief of AFL-CIO & Change to Win as *Amici Curiae* Supporting Respondents & Suggesting Affirmance, *supra* note 136, at 2-4 (same).

138. *About NTEU*, NAT'L TREASURY EMPS. UNION, http://www.nteu.org/NTEU/ (last visited Oct. 27, 2013).

139. 513 U.S. 454, 457, 478-80 (1995).

140. Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, *supra* note 79; Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Garcetti v. Ceballos, 547 U.S. 410 (2006) (No. 04-473), 2005 WL 1767122; Brief for the NTEU as *Amicus Curiae* Supporting Respondent, *Garcetti*, 547 U.S. 410 (No. 04-473), 2005 WL 1749167.

141. 489 U.S. 656, 679 (1989).

142. Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602 (1989).

cases about the constitutional rights of public employees in which unions have been involved.[143]

## 2. Political Participation and Protest

A second set of issues that unions frequently litigate concerns their rights to speech and assembly, including participation in the political process through protest, petitioning, and electioneering.

As discussed above, labor activists often raised First Amendment defenses in response to early criminal prosecutions for labor-related speech and assembly.[144] While these early defenses were unsuccessful, unions' fortunes later improved. Thus, for example, the Court first held that the First Amendment protects picketing in *Thornhill v. Alabama*, in which it overturned a local union president's criminal conviction under an antipicketing and loitering statute.[145] *Thornhill* set the stage for the Court's later decisions robustly protecting picketing and other protests by other social movement groups, including civil rights protesters.[146] Importantly, it was also the first case in which the Court sustained a facial challenge to a statute on overbreadth grounds,[147] giving rise not only to a substantive right, but also a powerful and far-reaching litigation strategy.[148]

Likewise, cases involving labor activists were critical in the development of the freedom of assembly. The Court first overturned a criminal conviction based on the freedom of assembly, simultaneously incorporating the right of assembly against the states, in *De Jonge v.*

---

143. *E.g.*, Motion for Leave To File a Brief Amici Curiae & Brief for the AFL-CIO & for the American Federation of Teachers, AFL-CIO, as Amici Curiae in Support of Respondents at 2, Bd. of Educ. v. Pico, 457 U.S. 853 (1982) (No. 80-2043), 1981 WL 390274, at *2 (discussing the authority of public school officials to remove library books from shelves); Brief for the AFL-CIO as Amicus Curiae at 3-4, Taylor v. McElroy, 360 U.S. 709 (1959) (No. 504), 1959 WL 101670, at *3-4 (discussing the due process right of public employees to challenge security clearance decisions).

144. *See* discussion *supra* Part II.A.

145. 310 U.S. 88, 104, 106 (1940).

146. *E.g.*, NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982).

147. Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 YALE L.J. 853, 863 (1991).

148. *E.g.*, Osborne v. Ohio, 495 U.S. 103, 122 (1990) ("The overbreadth doctrine . . . is indeed 'strong medicine . . . .'" (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973))); *see also* Caitlin E. Borgmann, *Holding Legislatures Constitutionally Accountable Through Facial Challenges*, 36 HASTINGS CONST. L.Q. 563, 598-601 (2009) (arguing that facial challenges better hold legislatures accountable for unconstitutional lawmaking); David H. Gans, *Strategic Facial Challenges*, 85 B.U. L. REV. 1333, 1353-64 (2005) (discussing the importation of the overbreadth doctrine into the right to travel, voting rights, and privacy cases).

*Oregon.*[149]   De Jonge was part of a Communist Party meeting advertised as "a protest against illegal raids on workers' halls and homes and against the shooting of striking longshoremen by Portland police."[150]  The Court further articulated the scope of this right in two subsequent labor cases: *Hague v. CIO,* in which the Court established that streets and parks were public fora, available to labor organizers who wished to educate listeners about the virtues of the relatively new NLRA,[151] and *Thomas v. Collins,* in which the Court overturned the Texas conviction of UAW President R.J. Thomas for publicly soliciting members without a permit, announcing that restrictions on First Amendment rights must be  "justified by clear public interest, threatened . . . by clear and present danger."[152]  Like freedom of speech, freedom of assembly was soon applied to other groups,[153] and the public forum doctrine took on a life of its own in the development of First Amendment jurisprudence.[154]

In recent years, the labor movement has consistently filed amicus briefs in support of protestors.  In some instances, this has placed the labor movement in opposition to its traditional allies.  For example, in *Scheidler v. National Organization for Women, Inc.,* the AFL-CIO argued that the Hobbs Act should not reach certain antiabortion protest activities, even if they involved violence or threats of violence.[155]

Labor's litigation of campaign finance cases has also been controversial.  In particular, labor unions and the AFL-CIO have sometimes fought campaign finance restrictions, which have generally

---

149.   299 U.S. 353, 363-66 (1937).

150.   *Id.* at 358-59; *see also* John D. Inazu, *The Forgotten Freedom of Assembly,* 84 TUL. L. REV. 565, 599 (2010) (discussing *De Jonge* and the right of assembly).

151.   307 U.S. 496, 502, 515-16 (1939).  The Justices in *Hague* did not agree on the rationale for incorporating the First Amendment against the states—Justices Roberts, Black, and Hughes relied on the Privileges and Immunities Clause, while Justice Stone rested on the Due Process Clause, citing *De Jonge,* among other cases.  *Id.* at 510-12, 518-19, 532.

152.   323 U.S. 516, 530 (1945).

153.   *See* Brandenburg v. Ohio, 395 U.S. 444 (1969) (Ku Klux Klan rally); Cox v. Louisiana, 379 U.S. 536 (1965) (protest by black students); Edwards v. South Carolina, 372 U.S. 229 (1963) (same).

154.   *See generally* Richard B. Saphire, *Reconsidering the Public Forum Doctrine,* 59 U. CIN. L. REV. 739 (1991) (discussing the development of the public forum doctrine).

155.   Brief of the AFL-CIO as *Amicus Curiae* in Support of Petitioners at 14, Scheidler v. Nat'l Org. for Women, Inc., 547 U.S. 9 (2006) (Nos. 04-1244, 04-1352), 2005 WL 2148528, at *14; *see also* Brief for the AFL-CIO as Amicus Curiae in Support of Petitioners at 2-4, Hill v. Colorado, 530 U.S. 703 (2000) (No. 98-1856), 1999 WL 1034471, at *2-4 (arguing that a Colorado statute, which limited antiabortion protesters from knowingly approaching within eight feet of a person entering a medical facility in order to distribute handbills or counsel, was a violation of the First Amendment).

applied to corporations and unions.[156]   For example, unions litigated some of the earliest campaign finance cases, challenging the Taft-Hartley Act's ban on union and corporate expenditures in connection with federal elections.[157]  More recently, the AFL-CIO was one of a list of plaintiffs (alongside such varied groups as the National Rifle Association, the National Right to Life Committee, the American Civil Liberties Union (ACLU), national- and state-level political parties, and elected representatives) that challenged portions of the Bipartisan Campaign Finance Reform Act in *McConnell v. FEC*.[158]  And the AFL-CIO filed an amicus brief in support of the petitioners in *Citizens United v. FEC*,[159] along with other campaign finance cases,[160] challenging restrictions on electioneering communications.[161]

On voting rights cases, by contrast, unions are generally aligned with other progressive social movement groups. Thus, for example, in 2008, labor groups were aligned with a long list of other progressive amici on the side of petitioners challenging a state voter photo identification requirement.[162]   Similarly, individual unions and the AFL-CIO filed an amicus brief in *Arizona v. Inter Tribal Council of Arizona, Inc.*, arguing that federal law preempted a state requirement that registering voters show proof of citizenship.[163] The brief cited the unions' "support of nationwide activities to register eligible voters

---

156. I have argued elsewhere that labor unions may be better served by seeking to uphold limits on electioneering, even if those limits cover unions themselves. *See* Garden, *supra* note 14, at 13-14.

157. *E.g.*, United States v. UAW, 352 U.S. 567 (1957) (holding that the use of union dues to finance an election-related television commercial violated the Federal Corrupt Practices Act and remanding for the lower court to consider the constitutionality of the Act in the first instance); United States v. CIO, 335 U.S. 106 (1948).

158. 540 U.S. 93 (2003), *overruled by* Citizens United v. FEC, 558 U.S. 310 (2010).

159. Brief of the AFL-CIO as *Amicus Curiae* in Support of Appellant, *Citizens United*, 558 U.S. 310 (No. 08-205), 2009 WL 2365216.

160. *E.g.*, Brief of the AFL-CIO as *Amicus Curiae* in Support of Appellant, Wis. Right to Life, Inc. v. FEC, 546 U.S. 410 (2006) (No. 04-1581), 2005 WL 3076074; Motion for Leave To File a Brief Amicus Curiae & Brief for the AFL-CIO as Amicus Curiae, FEC v. Nat'l Right To Work Comm., 459 U.S. 197 (1982) (No. 81-1506), 1982 WL 608648.

161. Electioneering communications are communications that mention a candidate by name temporally close to an election.  In particular, unions have expressed concern that electioneering communications bans will make it difficult for unions to lobby incumbent politicians, even if that lobbying is unrelated to an election. *See* Charlotte Garden, *Unions and Campaign Finance Litigation*, 14 NEV. L.J. (forthcoming 2014).

162. *E.g.*, Brief for the Lawyers' Committee for Civil Rights Under Law et al., as *Amici Curiae* in Support of Petitioners, Crawford v. Marion Cnty. Election Bd., 553 U.S. 181 (2008) (Nos. 07-21, 07-25), 2007 WL 3407030.

163. Brief Amicus Curiae of the National Education Ass'n, et al., in Support of Respondents, Arizona v. Inter Tribal Council of Ariz., Inc., 133 S. Ct. 2247 (2013) (No. 12-71), 2013 WL 457385.

through organized voter registration programs and [removal of] barriers to voters casting their ballots in federal, and state, elections."[164] These cases offer a particularly clear illustration of how union litigation of democracy-related cases helps shape the infrastructure in which unions' (and other groups') other political activity occurs.

### 3.   Structure of Government

In a series of cases concerning the structure of American government, labor unions have argued in favor of a strong federal government vis-à-vis the states, as well as for separation of powers principles that insulate congressional lawmaking and Executive Branch officials from outside political pressure.

As stated above, unions have litigated key federalism cases regarding the FLSA's application to state government employees. Although unions could not bring these cases under their own names, their behind-the-scenes participation is evident.[165] For example, Larry Gold argued *Garcia v. San Antonio Metropolitan Transit Authority* on behalf of Garcia, and the case was briefed by Gold and several other prominent labor lawyers, including the general counsel of the union that represented the transit authority's employees.[166] Plainly, it is usually beyond the reach of city employees to hire Supreme Court experts to represent their interests before the Supreme Court, and furthermore, the lawyers did not recoup their fees from the transit authority, despite the United States District Court for the Western District of Texas's observation that "[Garcia] may have been instrumental in arguing the position which the Supreme Court ultimately adopted."[167] Likewise, albeit less successfully, Gold and other union lawyers briefed and argued two Eleventh Amendment cases about whether state employees can subject their employers to suit in order to enforce federal law: *Alden v. Maine,*[168] another FLSA case,

---

164.   *Id.* at 2.

165.   Matthew W. Lampe & E. Michael Rossman, *Procedural Approaches for Countering the Dual-Filed FLSA Collective Action and State-Law Wage Class Action,* 20 LAB. LAW. 311, 313-14 (2005) (suggesting that the percentage of individuals who both fall within the putative class and consent to join the action (the "opt-in" rate) may be higher in union-backed FLSA cases than in cases without union support).

166.   San Antonio Metro. Transit Auth. v. McLaughlin, 684 F. Supp. 158, 159 (W.D. Tex. 1988) (describing Earle Putnam as "Gen. Counsel, Amalgamated Transit Union"); Reply Brief of Appellant Joe G. Garcia on Reargument, Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985) (Nos. 82-1913, 82-1951), 1984 WL 566133.

167.   *McLaughlin,* 684 F. Supp. at 163.

168.   527 U.S. 706 (1999) (holding that states are immune from suit in their own courts).

Case 1:17-cv-01037-UA-LPA   Document 7-24   Filed 11/20/17   Page 118 of 154

and *Kimel v. Florida Board of Regents*,[169] an Age Discrimination in Employment Act (ADEA) case.

In addition, unions have filed numerous amicus briefs in other federalism cases involving the application of employee-protective federal law to states.[170] Perhaps the most surprising of these was the union's position in *White v. Massachusetts Council of Construction Employers, Inc.*, a dormant commerce clause challenge to a Boston mayoral executive order requiring that city-funded projects be staffed by at least half Boston residents.[171] The AFL-CIO appeared in the case on the side of the employers, along with several employer trade groups and the Chamber of Commerce, arguing for the order to be struck down.[172] While one might have expected local unions from surrounding localities to weigh in, the national AFL-CIO's apparent calculation that unions had more to lose than to gain from such requirements is striking, particularly considering the strong link between urban density and union density[173] and the relative ease of organizing workers who live near each other, compared to workers who are scattered throughout sprawling suburbs.

---

169. 528 U.S. 62 (2000) (holding that the ADEA did not validly abrogate states' Eleventh Amendment immunity). In *Alden*, union lawyers Timothy Belcher of the Maine State Employees Association and Donald Fontaine signed Alden's Supreme Court brief. Brief for Petitioners, *Alden*, 527 U.S. 706 (No. 98-436), 1999 WL 9767. Similarly, United Faculty of Florida (UFF) lawyer Thomas Brooks signed Kimel's Supreme Court brief, and Kimel himself was vice president of the Florida State University chapter of UFF. Brief for Petitioners J. Daniel Kimel, Jr., et al., *Kimel*, 528 U.S. 62 (Nos. 98-791, 98-796), 1999 WL 503876; *Dr. Daniel Kimel*, FLA. ST. U., http://www.physics.fsu.edu/faculty/KimelDaniel.htm (last visited Oct. 27, 2013).

170. Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondents, Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721 (2003) (No. 01-1368), 2002 WL 31455480; Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent, Printz v. United States, 521 U.S. 898 (1997) (Nos. 95-1478, 95-1503), 1996 WL 585867; Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondents, New York v. United States, 505 U.S. 144 (1992) (Nos. 91-543, 91-558, 91-563), 1992 U.S. S. Ct. Briefs LEXIS 205.

171. 460 U.S. 204, 205 n.1 (1983). The local labor requirement was added to lessen racial tensions that may have resulted from additional requirements that women and people of color be hired.

172. Motion for Leave To File a Brief Amici Curiae & Brief for the AFL-CIO & the Building & Construction Trades Department, AFL-CIO as Amici Curiae, *White*, 460 U.S. 204 (No. 81-1003), 1982 U.S. S. Ct. Briefs LEXIS 1317; Brief Amicus Curiae of the Chamber of Commerce of the United States, *White*, 460 U.S. 204 (No. 81-1003), 1982 U.S. S. Ct. Briefs LEXIS 1311; Brief *Amicus Curiae* of New England Legal Foundation et al., in Support of Respondents, *White*, 460 U.S. 204 (No. 81-1003), 1982 U.S. S. Ct. Briefs LEXIS 1316.

173. *E.g.*, *Unions and Smart Growth*, GOOD JOBS FIRST (2010), http://www.goodjobsfirst.org/smart-growth-working-families/unions-and-smart-growth.

Unions have also brought key separation of powers cases. For example, unions were among the plaintiffs in both *Bowsher v. Synar*[174] and *Clinton v. City of New York*.[175] In both cases, unions successfully argued that the statutes at issue—the Gramm-Rudman-Hollings Act and the Line Item Veto Act, both of which decreased federal spending, harming governmental employees in the process—violated separation of powers principles.[176] And the AFL-CIO argued in *Morrison v. Olson* that Congress's ability to impose "good cause" limitations on the President's removal of Executive Branch appointees was critical "to insulate executive officers entrusted with the responsibility of administering a particular statutory mandate from immediate political pressures."[177] As the AFL-CIO pointed out in its brief, such limitations also protected NLRB members, as well as members of the Federal Trade Commission, Federal Energy Regulatory Commission, and many others.[178]

### 4.    Civil Practice and Procedure

Civil procedure cases often raise social justice and court access issues. Yet, because the underlying issue is often the one that is of concern to the litigating union, it can be difficult to predict which side of the issue the union will support.

Take, for example, the seminal case of *Conley v. Gibson*, which announced the now-defunct[179] pleading requirement that a complaint need only "set forth a claim upon which relief could be granted."[180] *Conley* began as a duty of fair representation case in which a group of black railway employees alleged in their complaint that their union had failed to take any action when their employer replaced them with white employees and had maintained segregated local unions.[181] In response, the union argued for an interpretation of the Federal Rules of Civil Procedure that would have required the employees to set out detailed factual allegations in their complaint—a position that would have

---

174. 478 U.S. 714 (1986), *superseded by statute*, Act of July 31, 1986, Pub. L. No. 99-366, 100 Stat. 773.

175. 524 U.S. 417 (1998).

176. *Id.* at 420-25; *id.* at 449-53 (Kennedy, J., concurring); *Bowsher*, 478 U.S. at 717-19, 722-27.

177. Brief of the AFL-CIO as *Amicus Curiae* in Support of Neither Party at 1-2, Morrison v. Olson, 487 U.S. 654 (1988) (No. 87-1279), 1988 WL 1031590, at *1-2.

178. *Id.* at 20.

179. *See* Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

180. 355 U.S. 41, 45 (1957), *abrogated by* Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

181. *Id.* at 42-43.

made it more difficult for plaintiffs to survive motions to dismiss.[182] More recently, the union defendant in *Devlin v. Scardelletti* also sought to limit court access by precluding a class member-objector from appealing the district court's approval of a settlement agreement in an ERISA case.[183] In contrast, unions have sought to facilitate access to the civil justice system when they or their members are plaintiffs suing employers, as in cases discussed above, in which unions sought to appear on behalf of their members under principles of associational standing.[184]

In the amicus context, however, unions have regularly sought to enlarge court access for plaintiffs. Thus, the Service Employees International Union (SEIU) and AFL-CIO recently argued in *Rent-A-Center, West, Inc. v. Jackson* that employees should be entitled to have courts decide whether arbitration agreements signed as a condition of employment are unconscionable.[185] Likewise, both labor federations and the United Food and Commercial Workers (UFCW)—a frequent Wal-Mart opponent outside of the courts[186]—argued in *Wal-Mart Stores, Inc. v. Dukes* in favor of a relatively relaxed view of the "commonality" requirement of the Federal Rules of Civil Procedure.[187] Finally, unions have also argued against the expansion of removal jurisdiction (and therefore in favor of plaintiffs' right to have their cases heard in plaintiff-friendly state courts)[188] and requirements that would-be appellants post bonds before proceeding with appeals.[189]

---

182. Brief for Respondents Pat J. Gibson, et al. at 3-4, *Conley*, 355 U.S. 41 (No. 7), 1957 WL 87662, at *3-4.

183. 536 U.S. 1, 4 (2002) (concerning the legality of a pension plan's decision to eliminate cost of living adjustments for covered active workers but not retirees).

184. *See supra* note 55 and accompanying text.

185. Brief Amicus Curiae of SEIU et al. in Support of Respondent, Rent-A-Center, W., Inc. v. Jackson, 130 S. Ct. 2772 (2010) (No. 09-497), 2010 WL 1393446; *see also* Brief of the AFL-CIO as *Amicus Curiae* in Support of Petitioner at 1-2, EEOC v. Waffle House, Inc., 534 U.S. 279 (2002) (No. 99-1823), 2001 WL 575625, at *1-2 (arguing that an agreement requiring arbitration of employment discrimination disputes did not prevent the EEOC from seeking relief on behalf of an employee).

186. *See, e.g., Warehouse Workers Deliver 20,000 Signatures to Bay Area Walmart Board Members*, UFCW (Mar. 1, 2013), http://www.ufcw.org/2013/03/01/warehouse-workers-deliver-20000-signatures-to-bay-area-walmart-board-members/ (describing UFCW efforts to gather signatures petitioning the working conditions in Wal-Mart's supply chain).

187. Brief of the United Food & Commercial Workers International Union et al. as *Amicus Curiae* in Support of Respondents, *supra* note 78, at 2.

188. Brief for the AFL-CIO as Amicus Curiae in Support of Respondents at 2-3, Caterpillar Inc. v. Williams, 482 U.S. 386 (1987) (No. 86-526), 1987 WL 880459, at *2-3.

189. Brief for the AFL-CIO & for the Oil, Chemical & Atomic Workers International Union, AFL-CIO, as Amici Curiae in Support of the Position of Appellee at 2-4, Pennzoil Co. v. Texaco Inc., 481 U.S. 1 (1987) (No. 85-1798), 1986 WL 727513, at *2-4.

In recent years, then, unions have mostly argued in favor of expanding access to courts and counsel, and this advocacy has most often occurred in cases of substantive importance to the labor movement. However, because unions are also sometimes named as defendants in lawsuits,[190] they have at other times made arguments that would limit court access for plaintiffs.

## 5.   Community Concerns

Unions have participated in a significant number of cases raising social justice concerns of importance to their members, as well as to similarly situated nonmembers. For example, the AFL-CIO has drafted amicus briefs supporting laws designed to ensure an adequate supply of affordable housing[191] and health care[192] and to protect the procedural due process rights of government benefits recipients.[193] It has also focused on education and immigration, two examples that I describe in more detail in the remainder of this Subpart.

Unions have participated in relatively few immigration cases before the Supreme Court, but the cases in which they have participated reveal an evolving relationship to immigrant communities. The source of this ambivalence is the perceived effect of immigrant workers on wage rates: a ready supply of workers from outside the country can drive down wages, and further, undocumented workers are especially vulnerable to violations of their workplace rights, meaning

---

190.   *See* discussion *infra* Part III.A.

191.   Brief of the AFL-CIO as Amicus Curiae in Support of Respondent, Yee v. City of Escondido, 503 U.S. 519 (1992) (No. 90-1947), 1992 U.S. S. Ct. Briefs LEXIS 69; Brief of the AFL-CIO as *Amicus Curiae* in Support of Appellees, Pennell v. City of San Jose, 485 U.S. 1 (1988) (No. 86-753), 1987 WL 881297; Motion for Leave To File a Brief as *Amici Curiae* & Brief of the National Urban Coalition, et al., as *Amici Curiae*, James v. Valtierra, 402 U.S. 137 (1971) (No. 154), 1970 WL 122850.

192.   Brief of the AFL-CIO as *Amicus Curiae* in Support of Petitioners Suggesting Reversal of the Decision Below on the Minimum Coverage Provision Issue, *supra* note 73.

193.   Brief for the AFL-CIO as Amicus Curiae at 4-7, Califano v. Yamasaki, 442 U.S. 682 (1979) (No. 77-1511), 1979 WL 199673, at *4-7 (advocating that social security beneficiaries be entitled to request a hearing before the government begins recoupment proceedings); Brief for the AFL-CIO, & for the Plaintiffs in Green, et al. v. Weinberger, et al. (D.D.C. No. 2219-73) as Amici Curiae at 23, Mathews v. Eldridge, 424 U.S. 319 (1976) (No. 74-204), 1975 WL 173413, at *23 (arguing that disability recipients should be entitled to a pretermination hearing); Motion for Leave To File a Brief as Amicus Curiae & Brief for the AFL-CIO as Amicus Curiae at 18-20, Ind. Emp't Sec. Div. v. Burney, 409 U.S. 540 (1973) (No. 71-1119), 1972 WL 135822, at *18-20 (arguing state law unemployment compensation termination procedures were inadequate because of the absence of a pretermination hearing); Brief for the AFL-CIO as Amicus Curiae, Cal. Dep't of Human Res. Dev. v. Java, 402 U.S. 121 (1971) (No. 507), 1971 WL 133378 (arguing the California procedure for appealing an award of unemployment benefits impermissibly burdens the unemployed).

that statutory protections may not be sufficient to keep wages up and maintain improved working conditions. These tensions were on display in *Saxbe v. Bustos*, a 1974 case brought by the United Farm Workers (UFW) Organizing Committee to challenge the practice of allowing "alien commuters"—those who work in the United States but commute back to homes in Canada or Mexico on a daily or seasonal basis—to be treated as lawful permanent residents.[194] The AFL-CIO's amicus brief argued:

> Commuters are a major causitive [sic] factor of the adverse situation facing domestic workers in border areas. For example, a 1961 Department of Labor survey of Laredo and El Paso, Texas showed that "a large number of unemployed American workers had the same occupational skills as the employed alien commuters." In one instance two garment firms employed 88 commuters as sewing machine operators. At this same time, the files of the "Texas Employment Commission contained applications from 156 unemployed American workers with the same occupation." The survey also found that the wages paid by firms employing only American workers were 38% higher than those paid by firms employing alien commuters and that "there were cases where a single firm employing both commuters and Americans would pay the commuters less than the Americans similarly employed."[195]

Similar concerns—but a more proactive and progressive vision—were reflected in the AFL-CIO's recent amicus brief challenging Arizona's punitive immigration law. Specifically, the federation opined that immigration law "should include an improved employment authorization mechanism and operational control of the border between the United States and Mexico as well as an opportunity for the current undocumented population to earn lawful status in the United States."[196] This reflects the modern labor movement's stance that immigrant workers who are already in the country should be granted citizenship or permanent legal status in order to decrease employers' leverage over these workers.[197]

---

194. 419 U.S. 65, 68-69 (1974).

195. Brief for the AFL-CIO as Amicus Curiae at 3, *Saxbe*, 419 U.S. 65 (Nos. 73-300, 73-480), 1974 WL 185649 (citations omitted) (quoting 115 CONG. REC. 7733, 7740 (1969)).

196. Brief of the AFL-CIO as *Amicus Curiae* in Support of Respondent at 2, Arizona v. United States, 132 S. Ct. 2492 (2012) (No. 11-182), 2012 WL 1054499, at *2.

197. *See, e.g.,* Exec. Office of the President, *Fixing Our Broken Immigration System*, WHITE HOUSE 7 (July 2013), http://www.whitehouse.gov/sites/default/files/uploads/ag-rural-report-07292013.pdf ("[F]armworkers who have been working without legal status have been performing vital and challenging work . . . while, in many cases, earning barely subsistence wages."); Press Release, *Give Us a Vote on a Path to Citizenship Now!*, UNITED FARM

Another controversial advocacy area is the legality of affirmative action in education. Unions' advocacy in the area of race and education goes back decades. For example, the CIO argued an English-only education statute was unconstitutional in *Stainback v. Mo Hock Ke Lok Po*[198] and against segregation in *Brown v. Board of Education*,[199] and then the National Education Association argued for strong remedies to fight school segregation in *Swann v. Charlotte-Mecklenburg Board of Education.*[200] Around the same time, unions also argued that state educational funding mechanisms that resulted in dramatically different per-pupil expenditures in different school districts were unconstitutional, though that argument was rejected by the Supreme Court without even holding argument.[201]

More recently, labor federations and teachers' unions have argued that affirmative action policies in education satisfy strict scrutiny because "opportunities for students to interact with their peers from other races in the educational process—opportunities that are fostered by [affirmative action] policies . . .—have substantial, positive impacts that make them better citizens in our democracy and in the workplace."[202] This argument tracks similar arguments made by unions in *Parents Involved in Community Schools v. Seattle School District No. I*[203] and *Grutter v. Bollinger.*[204] However, this is not to say that

---

WORKERS (Aug. 14, 2013), http://ufw.org/_board.php?mode=view&b_code=news_press&b_no=14267 (discussing efforts of the UFW and AFL-CIO to pressure a California congressman "to act on immigration reform with a path to citizenship").

198. Brief of CIO, Amicus Curiae, Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368 (1949) (No. 52), 1948 WL 47231.

199. Brief for the CIO as Amicus Curiae, Brown v. Bd. of Educ., 349 U.S. 294 (1955) (No. 1), 1952 WL 47255.

200. Brief Amicus Curiae for the National Education Ass'n, Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1 (1971) (No. 281), 1970 WL 122662 (arguing in favor of transportation remedies to integrate the school district).

201. Brief Supporting Jurisdictional Statement for Amici Curiae AFL-CIO International Union, UAW Western Center on Law & Poverty, Burruss v. Wilkerson, 397 U.S. 44 (1970) (No. 864), 1969 WL 120240; Motion To File Brief Supporting Jurisdictional Statement & Brief for AFL-CIO American Federation of Teachers International Union, UAW Western Center on Law & Poverty as Amici Curiae, McInnis v. Ogilvie, 394 U.S. 322 (1969) (No. 1033), 1969 WL 120024.

202. Brief *Amicus Curiae* of the National Education Ass'n, et al., in Support of Respondents at 1 & n.2, 3, Fisher v. Univ. of Tex. at Austin, 133 S. Ct. 2411 (2013) (No. 11-345) 2012 WL 3540398, at *1 & n.2, *3 (brief of the National Education Association; twenty-seven state affiliates; the AFL-CIO; the American Federation of Teachers; the American Federation of State, County & Municipal Employees; the SEIU; and the People for the American Way Foundation).

203. Brief *Amicus Curiae* of the National Education Ass'n, et al., in Support of Respondents at 8, Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701 (2007) (Nos. 05-908, 05-915), 2006 WL 2927085, at *8 ("Racial classifications continue to

labor unions and federations have always argued in favor of the legality of affirmative action in education: one much earlier exception came in *DeFunis v. Odegaard*,[205] where the AFL-CIO opposed (though the National Education Association supported)[206] the University of Washington's program of affirmative action in law school admissions—a strategy that the state attributed to the AFL-CIO's desire to "achieve reversal of Courts of Appeals' decisions upholding affirmative action programs in the construction trades."[207]

These two examples reveal shifting priorities over time, but also highlight that the current American labor movement is generally a strong ally of other progressive groups on issues involving race.

6.   Industry-Specific Litigation

Finally, unions sometimes litigate issues of importance to the specific industries in which unionized workers are employed. While this is a smaller category than the others discussed herein, it nonetheless covers a range of subjects. One particularly high profile— if idiosyncratic—example is the Major League Baseball Players Association's encouragement and funding of Curt Flood's failed attempt to invalidate professional baseball's reserve system on antitrust grounds.[208] While Flood lost, his case "heightened awareness among

---

carry great weight in our society—dividing opportunities inequitably and distorting perceptions with stereotypes and prejudice. Confronted with this reality, respondent school districts decided that taking race into account in making student assignments in order to achieve racially integrated public elementary/secondary schools would allow them to fulfill their dual mission of instilling in all children 'the values on which our society rests,' and providing them with the skills and knowledge necessary to realize their full potential." (citation omitted) (quoting Ambach v. Norwick, 441 U.S. 68, 76 (1979) (citing Wisconsin v. Yoder, 406 U.S. 205, 293 (1972)))).

204.   Brief *Amicus Curiae* of AFL-CIO in Support of Respondents at 2, Grutter v. Bollinger, 539 U.S. 306 (2003) (Nos. 02-241, 02-516), 2003 WL 536743, at *2 (arguing that "the challenged policies will reduce employment discrimination" and that reducing employment discrimination is a compelling state interest).

205.   Brief for the AFL-CIO as Amicus Curiae, DeFunis v. Odegaard, 416 U.S. 312 (1974) (No. 73-235), 1974 WL 185629.

206.   Brief of the National Organization for Women Legal Defense & Education Fund, Inc., & the National Education Ass'n as *Amici Curiae*, *DeFunis*, 416 U.S. 312 (No. 73-235), 1974 WL 185631.

207.   Brief of Respondents in Opposition to Amicus Curiae Briefs of the Anti-Defamation League of B'nai B'rith & the AFL-CIO at 4, *DeFunis*, 416 U.S. 312 (No. 73-235), 1974 WL 185628, at *4.

208.   Flood v. Kuhn, 407 U.S. 258 (1972); THE COOPERSTOWN SYMPOSIUM ON BASEBALL AND AMERICAN CULTURE, 2007-2008, at 194 (William M. Simons ed., 2009). Additionally, had Flood recovered damages as a result of his antitrust suit, the money would have gone to the union. Stephen H. Norwood, *Baseball's Forgotten Man: Curt Flood and the Transformation of American Sport*, 37 REVS. AM. HIST. 433, 436 (2009).

his fellow players to the point that they too were willing to fight over the issue" and helped lead owners to agree to a system of grievance arbitration.[209]

Similarly unusual from the perspective of the labor movement as a whole was the involvement of National Writers Union then-president Jonathan Tasini[210] in a case in which the Court rejected publishers' claims that they could reprint articles in databases without the permission of their freelance authors.[211] Before that, the journalist involved in *Bartnicki v. Vopper* also won his case,[212] though there, the union was on the other side; the *Bartnicki* Court held that the First Amendment protected the disclosure of an illegally recorded union negotiator's phone call, a copy of which had been anonymously delivered to Vopper, a radio commentator.[213]

Unions also litigate issues that affect the viability of the industries in which they operate, such as regulatory or trade issues.[214] This type of litigation yields great potential for collaboration (and conflict) with other social movements and within the union movement itself. For example, in *Department of Transportation v. Public Citizen*, the International Brotherhood of Teamsters and environmental groups jointly sought to compel the Federal Motor Carrier Safety Administration (FMCSA) to evaluate and regulate the impact of cross-border operations of Mexico-domiciled trucking companies under the National Environmental Policy Act and the Clean Air Act.[215] While the Teamsters may well care genuinely about environmental issues,[216] it

---

209. James R. Devine, *Curt Flood and a Triumph of the Show Me Spirit*, 77 Mo. L. Rev. 9, 36 (2012).

210. Steven Zeitchik, *Tasini Will Leave National Writers Union*, Publishers Wkly. (Feb. 18, 2003), http://www.publishersweekly.com/pw/print/20030217/26678-tasini-will-leave-national-writers-union.html.

211. N.Y. Times Co. v. Tasini, 533 U.S. 483, 487-88 (2001).

212. 532 U.S. 514, 533-35 (2001).

213. *Id.* at 535.

214. *E.g.*, Air Courier Conference of Am. v. Am. Postal Workers Union, 498 U.S. 517, 519 (1991) (determining whether a union had standing to challenge the Postal Service's decision to allow private couriers to engage in international remailing).

215. 541 U.S. 752, 756 (2004). That suit challenged a pilot program commenced by FMCSA under President George W. Bush, which was subsequently ended.

216. In a recent press release addressing the same issue, Teamsters President Jim Hoffa observed, "FMSCA [sic] is recklessly ignoring the true environmental impact Mexican trucks will have if permitted to travel without restrictions throughout our country." *Teamsters, Sierra Club: FMCSA Fails To Protect Environment from Mexican Trucks*, Teamsters (Aug. 15, 2011), http://www.teamster.org/content/teamsters-sierra-club-fmcsa-fails-protect-environ ment-mexican-trucks. Likewise, the California Teamsters vocally opposed an energy industry-backed proposal to delay enforcement of the Global Warming Solutions Act. Margot Roosevelt, *Global Warming Ballot Initiative: Teamsters and Cities Weigh In*, L.A.

would strain credibility to suggest that the union was not also considering the effects of increased competition and resulting downward pressure on wages that would occur if Mexican-domiciled trucking companies could compete freely with U.S.-based companies.[217]

This Part has outlined several categories of cases in which labor unions have litigated in the Supreme Court. In the following Part, I will turn to the various substantive positions that unions take in these cases. In particular, I will explore characteristics of labor unions that might cause them to support particular substantive positions in litigation that are either similar to or divergent from other institutional litigants.

## III. UNIONS' PERSPECTIVES IN LITIGATION

*Our labor unions are not narrow, self-seeking groups.*[218]

It goes nearly without saying that parties and attorneys are not interchangeable—the identities of each have tremendous influence on the direction a case takes.[219] Under the American adversarial style of litigation, parties and attorneys constantly make substantive and procedural choices that control a case's direction.[220] Parties will decide

---

TIMES (Apr. 23, 2010, 12:14 PM), http://latimesblogs.latimes.com/greenspace/2010/04/global-warming-ballot-initiative-california-ab-32.html.

217. In news coverage of the Teamsters' opposition to FMCSA's decision to allow Mexican-domiciled trucking companies to operate in the United States, the Teamsters couch their concerns in a variety of ways—that trucks from Mexico adhere to less stringent safety standards, that they might pose a national security threat due to concerns about terrorism or drugs smuggling, and that they might lower wages for American truck drivers. *E.g.*, Paul J. Nyden, *Teamsters Oppose New Border Crossing Standards for Mexican Truckers*, CHARLESTON GAZETTE (Mar. 10, 2012), http://www.wvgazette.com/News/201203100075. However, other regulatory issues divide labor unions from other social movement groups or even cause internal rifts within the labor movement. These divides can occur when labor's broader social justice goals stand in tension with unions' traditional concerns, such as maximizing employment for union members. Thus, for example, when President Barack Obama blocked construction of the Keystone XL pipeline, construction unions reacted negatively, while several other large unions including the SEIU, the UAW, the Steelworkers, and the Communications Workers of America backed President Obama's decision alongside environmental groups. Darren Goode, *Keystone Pipeline Sparks Labor Civil War*, POLITICO (Jan. 20, 2012, 2:31 PM), http://www.politico.com/news/stories/0112/71733.html.

218. Senator John F. Kennedy, Speech at Cadillac Square, Detroit, Michigan (Sept. 5, 1960), http://www.presidency.ucsb.edu/ws/index.php?pid=60408.

219. Jeffrey L. Fisher, *A Clinic's Place in the Supreme Court Bar*, 65 STAN. L. REV. 137, 140 (2013) ("[I]t stands to reason that if the quality and experience of lawyers matter everywhere else, they ought to matter in the Supreme Court as well.").

220. Justin Pidot, *Jurisdictional Procedure*, 54 WM. & MARY L. REV. 1, 38 (2012) (stating that in an adversarial system, "permitting parties to control the contours of their cases

whether to litigate at all and what substantive goals to pursue; they will also make certain decisions about litigation strategy. At a more granular level, attorneys decide to articulate arguments in particular ways, to advance or downplay particular legal theories, and even to cite certain cases. And when an advocacy organization or union participates in a case, it will undoubtedly attempt to make these decisions so as best to advance the group's cause:[221] to win the case, but also to win via a decision written in a way that best protects the group's larger interests.[222]

These dynamics, coupled with the extent of unions' participation in a wide range of non-labor law cases, raise questions about what factors shape unions' litigation positions. This Part begins to answer those questions by exploring three factors that appear to have influenced unions' positions in particular cases.

## A.   *Unions as Plaintiffs and Defendants*

### *"Which side are you on?"*[223]

In recent decades, labor unions and federations have increasingly modeled themselves as members of a social justice-oriented movement, rather than as a collection of economic actors dedicated to

---

serves a legitimizing function, creating an impression of fairness that may lead to societal acceptance of court judgments").

221.   For example, in his important article *Serving Two Masters: Integration Ideals and Client Interests in School Desegregation Litigation,* Derrick Bell argued that some NAACP LDF attorneys prioritized the views of clients who favored busing as a remedy in school desegregation cases over clients who favored other strategies for improving their children's education, such as winning increased funding for their existing schools. Derrick A. Bell, Jr., *Serving Two Masters: Integration Ideals and Client Interests in School Desegregation Litigation,* 85 YALE L.J. 470 (1976). Undoubtedly, one could make a similar argument with respect to other impact litigators. Accordingly, the purpose of this Part is not to suggest that litigants other than unions might bring a more "neutral" perspective to litigation. Rather, it is to explore the particular lenses through which labor unions might view their non-labor law cases.

222.   Many of these decisions occur once a case has reached the Supreme Court. But there are also antecedent decisions that can affect the likelihood of a case reaching the Supreme Court in the first place. For example, by paying for others' litigation, unions have direct influence over what cases are brought, and the existence of free representation can alleviate pressure to settle attributable to mounting litigation costs, allowing a party to litigate a case to judgment or to pursue an appeal or a petition for certiorari.

223.   "This line is said to come from a song written by Florence Reese in support of a miners strike in 1932. The song goes: 'They say in Harlan County, there ain't no neutrals there, you'll either be a union man, or a thug for J.H. Blair. Which side are you on? Which side are you on?'" Robert J. Rabin, *The Role of Government in Regulating the Workplace,* 13 LAB. LAW. 1, 5 n.30 (1997).

achieving financial rewards for members.[224]  This move away from "bread and butter" unionism is reflected in labor's growing invocation of social justice issues during organizing campaigns.[225]  But when unions go to court, do they litigate like social movements, or are employers the better analogy?  And what barriers face unions seeking to achieve social justice-oriented change through litigation?[226]

One key difference between unions and other social movement litigators is the greater likelihood that a union will be dragged into court against its will as a defendant.  In this Subpart, I first explore the structural reasons for this difference and then turn to some of its likely effects.

Social movement organizations are today rarely hailed into court as defendants.  While it is not inconceivable that groups like the National Association for the Advancement of Colored People Legal Defense Fund (NAACP LDF), the American Civil Liberties Union (ACLU), or Public Citizen could be sued—for example, a business that has come in for criticism could file a defamation case,[227] or a mistreated employee could bring suit under Title VII—such cases are relatively uncommon.[228]  Further, to the extent lawsuits against these groups arise directly out of the groups' core advocacy efforts, as when a target of protest resorts to the courts for relief, the lawsuit might galvanize the group's own constituency.[229]

---

224.  Marion Crain & Ken Matheny, *Labor's Identity Crisis*, 89 CALIF. L. REV. 1767, 1784-85 (2001) (describing the AFL-CIO's shift, during the mid-1990s, from business unionism to social justice movement unionism).

225.  *Id.* at 1785.

226.  There is some question whether litigation "meets the definition of a social movement activity." Catherine Albiston, *The Dark Side of Litigation as a Social Movement Strategy*, 96 IOWA L. REV. 61, 76 (2011) (describing the skepticism that some scholars express toward this view). However, that question is beyond the scope of this Article; I treat litigation pursued by social movement groups as social movement activity.

227.  *See, e.g.*, Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485 (1984) (suing a consumer group for defamation due to an unfavorable product review); N.Y. Times Co. v. Sullivan, 376 U.S. 254 (1964) (suing a civil rights group for defamation due to a newspaper advertisement).

228.  These examples should be differentiated from those in which a social movement group deliberately engages in conduct designed to elicit a lawsuit. For example, when the Thomas More Law Center "searched for a school district willing to adopt an alternative curriculum [that taught "intelligent design" theories], knowing it would lead to litigation," it was choosing the case that it would litigate just as much as if it were drafting and filing a complaint. Douglas NeJaime, *Winning Through Losing*, 96 IOWA L. REV. 941, 979 (2011).

229.  TAYLOR BRANCH, PILLAR OF FIRE: AMERICA IN THE KING YEARS 1963-65, at 44 (1998) ("[*New York Times Co. v. Sullivan*] fostered emergency coalitions [between civil rights leaders and] precisely those groups most needed for the civil rights movement:  labor unions, religious groups, press outlets, large corporations—anyone who could imagine being victimized by parochial politics or a runaway jury.").

Instead, many of the cases in which these groups participate are those that they have affirmatively chosen and often even designed from the ground up.[230] Consider Public Citizen founder Ralph Nader's characterization of a "public interest lawyer" as "*a lawyer without clients*," one "whose goal would be . . . advancing the public good."[231] To be sure, Article III's "case or controversy" requirement[232] means Nader's public interest lawyer does not operate literally without clients. However, the lawyer can decide, in consultation with other professional advocates and subject matter experts, to target a particular issue and then set about locating an appropriate and willing client. Once located, the client would direct at least some aspects of the litigation,[233] with clients who are themselves advocacy groups or subject matter experts likely playing a more significant role.[234] However, the initial decision to bring the case would have been driven by movement goals, and a lawyer working in the Ralph Nader model would refuse to file a proposed lawsuit that seemed to carry significant potential downsides. This does not mean that a refused potential client will be unable to find another attorney to file a complaint, but the advocacy group will have preserved its name, credibility, and resources for a preferred case.

In contrast, unions are frequent defendants. Unions may be sued for failing to discharge the duty of fair representation that they owe to members[235] or for violating the statutory rights of members or their

---

230. The NAACP LDF's school desegregation campaign is probably the paradigmatic example of controlled and disciplined litigation strategy designed by movement lawyers. MARK V. TUSHNET, MAKING CIVIL RIGHTS LAW: THURGOOD MARSHALL AND THE SUPREME COURT, 1936-1961 (1994). This is not to say that the NAACP was the only organization to attempt to pursue a detailed litigation plan in pursuit of social change. For example, one feminist campaigner recommended the development of a litigation strategy "to litigate women's rights under the Fourteenth Amendment," which "sought to emulate the success of organizations like the NAACP Legal Defense Fund in winning rights through organized litigation." *See, e.g.,* Serena Mayeri, *Constitutional Choices: Legal Feminism and the Historical Dynamics of Change,* 92 CALIF. L. REV. 755, 763-64 (2004). However, disagreement between factions of the women's movement about whether to pursue a Fourteenth Amendment-based litigation strategy, passage of the Equal Rights Amendment, or both persisted for decades. *Id.* at 756-69.

231. Eduardo R.C. Capulong, *Client Activism in Progressive Lawyering Theory,* 16 CLINICAL L. REV. 109, 150 (2009) (alteration in original) (quoting DIANA KLEBANOW & FRANKLIN L. JONAS, PEOPLE'S LAWYERS: CRUSADERS FOR JUSTICE IN AMERICAN HISTORY 418 (2003)).

232. U.S. CONST. art. III, § 2.

233. *See* MODEL RULES OF PROF'L CONDUCT R. 1.2 (2013); *cf.* Bell, *supra* note 221 (discussing the impact of clients' views on litigation strategies on school desegregation).

234. *E.g.,* Dep't of Transp. v. Pub. Citizen, 541 U.S. 752 (2004); Train v. Colo. Pub. Interest Research Grp., 426 U.S. 1 (1976).

235. *E.g.,* Vaca v. Sipes, 386 U.S. 171 (1967).

Case 1:17-cv-01037-UA-LPA   Document 7-24   Filed 11/20/17   Page 130 of 154

own employees.[236]    Likewise, they are often sued by employers, government entities, and even other unions on a variety of theories. This litigation can create precedent on issues that the union would not have affirmatively chosen to pursue and that sometimes call for litigation positions that advance a union's chances in court, even if it would otherwise reject those positions outside of litigation. Avoiding this conundrum means weakening one's litigation position—the disadvantages of which are obvious—or settling.[237]    Settlement bears its own risks, though, including the possibility of demonstrating to other potential plaintiffs that filing a complaint will result in early capitulation.

An array of reasons accounts for this difference between unions and other social movement litigators. First, there is the likelihood of bad publicity associated with suing a venerated social movement group, along with the possibility that the complaint will be dismissed (and attorneys' fees assessed) under an anti-SLAPP statute.[238]    Second, various legal principles protect advocacy groups from liability arising from their work.[239]    Third, social movement groups other than labor unions do not owe their members a statutory duty of fair representation, and they are not statutorily required to choose their leadership democratically. Relatedly, when a majority of employees in a bargaining unit vote to be represented by a union, the union becomes

---

236.  *E.g.*, Reed v. United Transp. Union, 488 U.S. 319 (1989).

237.  *See* Catherine Albiston, *The Rule of Law and the Litigation Process: The Paradox of Losing by Winning*, 33 LAW & SOC'Y REV. 869, 877 (1999) (noting that in the context of Family and Medical Leave Act cases, repeat employer players may choose to "settle cases they expect to lose and litigate those they expect to win" in order to cultivate desirable precedent).

One recent example in which a union attempted to force a settlement in order to avoid adverse Supreme Court precedent came in *Knox v. SEIU, Local 1000*, 132 S. Ct. 2277 (2012). In that case, the local union defendant attempted—unsuccessfully—to moot the case by giving the plaintiff everything that it could have achieved through continued litigation. *Id.* at 2287-88. However, it took this step too late—after the case had already reached the merits stage in the Supreme Court. Counsel for the local union stated at oral argument that the move was taken because "the officers of the union . . . thought about the situation and came to the realization that they have no stake in the procedures that are at issue here." Transcript of Oral Argument at 26, *Knox*, 132 S. Ct. 2277 (No. 10-1121).

238.  *See* Shannon Hartzler, Note, *Protecting Informed Public Participation: Anti-SLAPP Law and the Media Defendant*, 41 VAL. U. L. REV. 1235, 1242 (2007) ("Common features of anti-SLAPP laws include a mechanism for early procedural review and a mandatory award of attorney's fees for a party whose motion to dismiss under the statute is successful.").

239.  *E.g.*, NAACP v. Claiborne Hardware Co., 458 U.S. 886 (1982) (holding that the First Amendment protects secondary consumer boycotts by civil rights groups); NAACP v. Alabama *ex rel.* Patterson, 357 U.S. 449 (1958) (holding that the NAACP was entitled to keep its membership list confidential).

the bargaining representative of all the employees in the unit,[240] including those employees who do not want the representation. These employees may be particularly unlikely to give the union the "benefit of the doubt" when it comes to deciding whether to sue. Fourth, there is the sheer number and size of labor unions to consider—there are simply more opportunities for litigation. Finally, labor unions are involved in their members' lives in a far more direct way than most advocacy groups, in that they are partially responsible for setting the terms and conditions of their members' employment. Thus, whereas disappointment in the actions of a group like the ACLU may lead to membership resignation, disappointment with one's union is more likely to lead to litigation.

Significantly, then, labor unions have less control than other social movement litigators over the cases in which they become involved. Moreover, at any given time, two unions litigating different cases may take opposing litigation positions on an issue. For example, in the employment discrimination context, unions or union-funded attorneys often prosecute suits alleging employer discrimination; but at the same time, unions are sometimes named as defendants in discrimination cases. By the time a case has reached the courts of appeals or the Supreme Court, international unions and labor federations can play a larger role in attempting to rationalize litigation positions (such as by urging settlement), but the earlier litigation cannot be erased, potentially undermining union credibility. This may be so particularly in a context like employment discrimination, where historical incidents of serious race discrimination by the labor movement are well-known.[241]

However, just as the control exercised by other movements over litigation strategy should not be exaggerated, the extent to which unions' choice of litigation vehicle is constrained by exigency and circumstance should not be overstated. In at least some instances, unions, like other social movement groups, plan litigation from the ground up. In fact, Michael Gottesman, describing his early years in practice as a labor lawyer, suggests that was a regular occurrence at his firm:

---

240. 29 U.S.C. § 159(a) (2006). In about half of states, this influence extends to the authority to require that even the unwilling pay fees to the union. Even in "right to work" states, labor unions bargain and process grievances on behalf of the unwilling.

241. Charlotte Garden & Nancy Leong, *"So Closely Intertwined": Labor and Racial Solidarity*, 81 GEO. WASH. L. REV. 1135, 1161-63 (2013).

> We had a mandate from our clients to [shape the law so that it would benefit the labor movement], and thus did not have to compromise the long view for immediate tactical victories. Ideas percolated that could not be deployed in the case under discussion, but they would be "filed away," to be invoked in future cases that came down the pipeline—cases that we would then be on the lookout to find.[242]

For example, take *UAW v. Johnson Controls*. There, union lawyers framed and filed a complaint[243] challenging the employer's "fetal protection policy," which excluded women who were pregnant or capable of becoming pregnant from jobs that involved exposure to lead.[244] The union not only brought the case, but also ensured that it was the first named plaintiff, so that its participation would be evident to anyone looking at the case caption. Among the other named plaintiffs were both male and female employees—women who had been excluded from well-paying jobs under the employer's policy or had undergone sterilization to avoid such exclusion, and men who had been denied transfers to other departments, which they requested in order to avoid lead exposure because of threats to their own reproductive health.[245] The class definition included "'all past, present and future production and maintenance employees' in United Auto Workers bargaining units at nine of Johnson Controls' plants 'who have been and continue to be affected by [the employer's] Fetal Protection Policy implemented in 1982.'"[246] This class definition, along with the selection of the named plaintiffs, made clear to the courts that the issue was important to both male and female workers. Additionally, it also had potential to build solidarity among bargaining unit members by showing why the employer's policy was not simply a "women's issue."

Even when they are named as defendants—and thus dragged into court unwillingly—unions can sometimes nonetheless shape a litigation strategy that pursues labor movement goals beyond just winning in court. This may be easy to do when the plaintiff is a traditional adversary of labor—an employer, for instance, whose behavior can provide a flash point for advocacy in and out of court. Far more challenging are cases in which unions are sued by bargaining

---

242. Gottesman, *supra* note 93, at 267.
243. Marcelo L. Riffaud, Comment, *Fetal Protection and* UAW v. Johnson Controls, Inc.: *Job Openings for Barren Women Only*, 58 FORDHAM L. REV. 843, 843-44 (1990).
244. UAW v. Johnson Controls, Inc., 499 U.S. 187, 192 (1991).
245. *Id.*
246. *Id.* at 192-93 (quoting UAW v. Johnson Controls, Inc., 680 F. Supp. 309, 310 (E.D. Wis. 1988) (alteration in original)).

unit members. Take, for example, *International Union of Electrical, Radio & Machine Workers, AFL-CIO, Local 790 v. Robbins & Myers, Inc.*, in which Dortha Guy, a black employee, sued her employer and union for racial discrimination after she was fired.[247] The United States District Court for the Western District of Tennessee dismissed the case on timeliness grounds,[248] refusing to toll the time in which Guy was required to file a charge with the Equal Employment Opportunity Commission (EEOC) while the union grievance proceeding was pending.[249] After Guy's loss in the district court, she and the union evidently managed to resolve their differences, because the union switched sides to appeal the timeliness issue alongside Guy in a parallel case. The United States Court of Appeals for the Sixth Circuit affirmed the district court, and the Supreme Court granted certiorari in both appeals, consolidating them for argument. Before the Supreme Court, union lawyer Winn Newman[250] and NAACP lawyers representing Guy[251] successfully convinced all nine Justices that an amendment to Title VII that provided a longer time to file a charge with the EEOC applied retroactively.[252] Thus, the union was able to turn a case that began in a defensive posture into an opportunity to advocate for stronger federal court remedies for workers.

Finally, unions and labor federations sometimes signal through their amicus advocacy that positions taken by individual unions are not representative of the views of the larger labor movement. For example, in *McDonald v. Santa Fe Trail Transportation Co.*, the AFL-CIO flatly disagreed with both positions taken by the defendant-respondent local union. Whereas that union argued that white employees were not covered by 42 U.S.C. § 1981 and that Title VII does not protect employees who are accused of stealing from their employers,[253] the AFL-CIO argued the opposite.[254] Less obvious was

---

247.  429 U.S. 229, 232 (1976). Guy alleged she was fired because of her race and that the union then failed to represent her adequately in the grievance process. Guy v. Robbins & Myers, Inc., No. C-74-165, 1974 WL 212, at *1 (W.D. Tenn. May 30, 1974), *aff'd*, 525 F.2d 124 (6th Cir. 1975), *rev'd sub nom.* 429 U.S. 229 (1976).

248.  *Robbins & Myers*, 429 U.S. at 232-33.

249.  *Guy*, 1974 WL 212, at *3.

250.  *Robbins & Myers*, 429 U.S. at 230 (listing counsel). Winn Newman has been called the "grandfather" of pay equity litigation. MCCANN, *supra* note 127, at 61.

251.  Reply Brief for Petitioner, *Robbins & Myers*, 429 U.S. 229 (No. 75-1264), 1976 WL 194370 (listing counsel).

252.  *Robbins & Myers*, 429 U.S. at 241.

253.  Brief of Respondent, Local No. 988, Teamsters, Freight, Tank Line & Automobile Industry Employees at 6, McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273 (1976) (No. 75-260), 1976 WL 181740, at *6.

*Local 28 of the Sheet Metal Workers' International Ass'n v. EEOC*, in which the AFL-CIO simply remained silent—a stance that itself suggests disagreement, given how rarely the AFL-CIO fails to file an amicus brief in support of a labor union litigant in the Supreme Court.[255]

Thus, although labor unions enjoy somewhat less ability to shape their litigation agendas than do other social movement groups, labor unions still successfully pursue strategies to bring their litigation strategies in particular cases into line with the larger interests of workers.

## B.    *Labor Solidarity and the Possibility of Divided Loyalties*

*"An injury to one is an injury to all."*[256]

In this Subpart, I explore how the fact that labor unions are subject to majority rule—they are elected and then face the threat of decertification by their members, and their officers are subject to regular elections[257]—might affect the positions they take in court. In other words, given that litigation usually involves winners and losers, how can unions seek to preserve solidarity if union members are divided? And how do unions navigate members' divergent views when shaping their own stances before the Supreme Court?

There are at least four possible approaches available to a union or federation facing such a scenario. First, it might try to avoid any litigation that might divide members. Second, it might simply adopt the position taken by, or in the apparent interest of, a majority of represented workers. Third, it might try to find a "third way" solution that protects the interests of all union members, and instead imposes

---

254.  Motion for Leave To File Brief & Brief for the AFL-CIO as Amicus Curiae, *supra* note 116, at 5-6.

255.  478 U.S. 421 (1986). However, two local unions, each of whom was "presently involved in litigation concerning the legitimacy of court-ordered or governmentally imposed racial quotas in the employment context" filed a shared amicus brief in support of Local 28. Brief of Local 542, International Union of Operating Engineers & Local 36, International Ass'n of Firefighters, AFL-CIO, as Amici Curiae in Support of Petitioners at 1, *Local 28*, 478 U.S. 421 (Nos. 84-1656, 84-1999), 1985 WL 670076, at *1. In the next Subpart, I discuss another situation in which the AFL-CIO may not participate in Supreme Court litigation involving unions: cases in which union members are among both the plaintiffs and the defendants. However, that was not the situation in *Local 28*.

256.  This is an old Knights of Labor saying. Eric Tucker, *Who's Running the Road? Street Railway Strikes and the Problem of Constructing a Liberal Capitalist Order in Canada, 1886-1914*, 35 LAW & SOC. INQUIRY 451, 455 (2010).

257.  29 U.S.C. § 481(a) (2006) ("Every ... labor organization ... shall elect its officers not less often than once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot.").

costs on outsiders, like employers or unrepresented workers. And fourth, it might adopt a position in the interest of a minority of represented workers, either after persuading the rest of the membership or by simply ignoring their views and instead allowing union lawyers or officers to shape litigation positions. In fact, unions' and federations' record before the Supreme Court reveals examples of each of these strategies at work.

As discussed in the preceding Subpart, unions cannot always avoid unwanted litigation. However, where litigation is optional—for example, amicus practice—unions and federations sometimes simply avoid taking positions in cases involving union members on each side, even where a union is inextricably linked to the facts of the case. This occurred in *Ricci v. DeStefano*, a case challenging New Haven officials' decision to disregard the racially skewed results of a test that was to be used to determine which firefighters would be promoted to lieutenant and captain.[258] All the test takers were represented by the International Association of Firefighters Local 825,[259] and the weighting of the test—which both an expert and representatives of a black firefighters' association said could have produced an adverse impact[260]—was negotiated by the union and mandated by a collective bargaining agreement.[261] Furthermore, the local union had supported the white test takers who wanted to have the test results certified by filing a lawsuit of its own against the city.[262] (That suit was later dismissed in light of the district court's concerns about the union's ability to litigate on behalf of its members, given that "the interests of a significant subset of the Union's members are diametrically opposed to the interests of another significant subset.")[263] In light of all this, the fact that neither the International Association of Firefighters (IAFF) nor the AFL-CIO, of which IAFF is an affiliate, filed a Supreme Court amicus brief creates the inescapable appearance that these bodies

---

258.   557 U.S. 557, 561-63 (2009).

259.   Michael Z. Green, *Reading* Ricci *and* Pyett *To Provide Racial Justice Through Union Arbitration,* 87 IND. L.J. 367, 400 (2012).

260.   Respondents' Brief on the Merits at 7-8, *Ricci,* 557 U.S. 557 (Nos. 07-1428, 08-328), 2009 WL 740763, at *7-8.

261.   *Id.* at 2.

262.   New Haven Firefighters Local 825 v. City of New Haven, No. Civ.3:04CV 1169(MRK), 2005 WL 3531465 (D. Conn. Dec. 22, 2005).

263.   *Id.* at *2-4 (denying the union's associational standing because of the need for individual firefighters to participate in the litigation, in light of the conflict between union members).

simply concluded that silence was preferable to taking a position that might appear to favor one group of union members over another.[264]

A closely related strategy was pursued by the union in *East Texas Motor Freight System, Inc. v. Rodriguez.*[265] There, East Texas Motor Freight and its employees' representative, Teamsters Local 657, were both sued by truck drivers of Mexican ancestry who were disadvantaged by collectively bargained seniority rules that made it difficult for "city drivers" to transfer to better-paid "line driver" positions.[266] As a named defendant, the union argued that it simply had no ability to change the seniority provisions:

> The reply of Petitioner Local 657 is that it is not responsible for the hiring practices of the employers, and that in the applicable collective bargaining proceedings, it has followed the instructions of its affected membership relative to the negotiation of their contractual rights to seniority and transfer between jobs . . . .
>
> This Petitioner also says that it cannot singularly make changes in National and Regional collective bargaining agreements that would affect other local unions and their members, because multi-employer, multi-union agreements, as regulated by the National Labor Relations Act, require the concurrence of the employer and other local unions involved . . . .[267]

That union's decision to undertake the legal equivalent of throwing up its hands stands in contrast to far more proactive efforts undertaken by other unions to manage potential rank-and-file disagreement about litigation positions, including in cases involving discrimination and seniority systems. Before discussing these union strategies, it is useful first to describe briefly the operation of union-negotiated seniority systems and explain why they have the potential to divide union members.

---

264. There were, however, other labor voices in the case; associations of African American and Hispanic firefighters filed briefs supporting New Haven, and other groups of firefighters and an association of police unions filed briefs in support of the white firefighters. Amicus Curiae Brief of Bridgeport Firefighters for Merit Employment, Inc. in Support of Petitioners, *Ricci*, 557 U.S. 557 (Nos. 07-1428, 08-328), 2009 WL 526198; *Amicus* Brief of the Concerned American Firefighters Ass'n, Philadelphia Chapter, in Support of Petitioners, *Ricci*, 557 U.S. 557 (Nos. 07-1428, 08-328), 2009 WL 507010; Brief of the National Ass'n of Police Organizations as *Amici Curiae* in Support of Petitioners, *Ricci*, 557 U.S. 557 (Nos. 07-1428, 08-328), 2009 WL 2809358.

265. 431 U.S. 395 (1977).

266. *Id.* at 397-98.

267. Brief for the Petitioner Teamsters Local Union 657 at 3-4, *Rodriguez*, 431 U.S. 395 (No. 75-651), 1976 WL 194248, at *3-4 (citations omitted).

Negotiated seniority protections are generally facially neutral and constructed without discriminatory intent.[268] These systems can govern competitive seniority—which "determines priorities for job security, promotion, transfer, prerogative in scheduling, training opportunities and 'entitlement[] to ... scarce benefits among competing employees'"—and benefits seniority, which determines "entitlement to certain types of fringe benefits without regard to the status of other employees."[269]

Even well-intentioned systems of competitive seniority can serve to reinforce discriminatory hiring and promotion decisions by making it impossible for discrimination victims to "catch up" to employees hired or promoted before them[270]—that is, unless a court orders retroactive competitive seniority. In such a scenario, then, unions represent (in bargaining) both discrimination victims who are morally and legally entitled to make-whole remedies and the workers who will be displaced even if they played no active role in (or did not even know about) the earlier discrimination and who will feel that they have a vested right to their existing working conditions. Complicating the picture, unions have a strong interest in protecting the integrity of hard-won seniority systems, which provide valuable protections for union members who have invested much in their workplaces and who command relatively high wages because of their many years of service.[271] And the most senior workers will often be the most influential within their unions,[272] with less senior workers most likely to

---

268. *See, e.g.*, Brief for Petitioner International Brotherhood of Teamsters at 27-28, Int'l Bhd. of Teamsters v. United States, 431 U.S. 324 (1977) (Nos. 75-636, 75-672), 1976 WL 181352, at *27-28 (describing the development of the seniority system at issue in that case). Many seniority systems qualify for the Civil Rights Act's carve out for "bona fide seniority or merit system[s]." 42 U.S.C. § 2000e-2(h) (2006) ("Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . .").

269. Michael J. Zimmer, *Title VII: Treatment of Seniority Systems*, 64 MARQ. L. REV. 79, 80 (1980) (quoting Franks v. Bowman Transp. Co., 424 U.S. 747, 766 (1976)).

270. Martha R. Mahoney, *What's Left of Solidarity? Reflections on Law, Race, and Labor History*, 57 BUFF. L. REV. 1515, 1571 (2009) ("When race discrimination at work became illegal in the 1960s, the previous legal regime had left minority workers with disproportionately low seniority and union leadership disproportionately white.").

271. *See* Zimmer, *supra* note 269, at 80 ("Labor has been the strongest proponent of seniority.").

272. Daniel J. Gifford, *Redefining the Antitrust Labor Exemption*, 72 MINN. L. REV. 1379, 1380 (1988) ("Because [the most senior] workers tend to form the core of union

be disadvantaged in the event of seniority integration.[273] Thus, the most influential members of a bargaining unit may feel that they have a less personal stake in the effect of discrimination remedies, but also be very committed to the seniority system for other reasons.

As a result, unions that seek both to promote nondiscriminatory workplaces and preserve seniority protections face a conflict in the event of an allegation of systemic discrimination. Despite this, unions have generally argued that Title VII remedies should include make-whole seniority, though they have also argued for limits on who is eligible for this remedy.[274]  For example, in *Franks v. Bowman Transportation Co.*,[275] in which the Court held that Title VII called for retroactive seniority to be awarded to black truck drivers who had been refused line driver jobs, the Steelworkers union representing the employees took the position that drivers who could prove they had been discriminated against (but not those who could not) were entitled to a make-whole remedy of retroactive seniority.[276] In so arguing, the union forcefully made the case for the importance of seniority, arguing that an employee hired in 1972 instead of 1970 would have an "inferior" career involving fewer fringe benefits (such as vacation days and insurance benefits), less protection from layoffs, fewer promotional opportunities, and less entitlement to desired shifts or particular vacation dates.[277] The union also argued that a make-whole retroactive seniority remedy existed in other contexts, such as when employees were laid off in violation of the collective bargaining agreement.[278] Thus, the union framed its argument in terms of the integrity of union values that benefitted all union members, implicitly making the case that an illegitimate seniority system—one that was infected with race discrimination—was a weak seniority system.

---

membership, union bargaining objectives tend to weight their interests inordinately high vis-à-vis the interests of less senior union members or labor interests as a whole.").

273. Humphrey v. Moore, 375 U.S. 335, 346-47 (1964) ("[Competitive status] [s]eniority [is] of overriding importance, and one of its major functions is to determine who gets or who keeps an available job.").

274. *E.g.*, Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 390-91 (1982) (noting the union argument that a make-whole remedy was available to only 30 employees and that the claims of about 400 other employees were time-barred).

275. 424 U.S. 747 (1976).

276. Brief for Respondent United Steelworkers of America, AFL-CIO, & for AFL-CIO, as Amicus Curiae at 7, *Franks*, 424 U.S. 747 (No. 74-728), 1975 WL 173441, at *7. The union distinguished these drivers from those seeking "preferential" relief, which would have benefitted plaintiffs who had not been personally discriminated against, arguing that Congress intended to permit only the former. *Id.*

277. *Id.* at 24-26.

278. *Id.* at 26.

The Steelworkers union was not the only union that participated in *Franks*. UAW Local 862, which was then a party to other Title VII cases, including one in which a petition for certiorari was pending,[279] filed an amicus brief that pursued a different strategy designed to reconcile the competing concerns of discrimination victims and union members who stood to lose relative seniority.[280] The UAW began by characterizing the interests of both groups of workers as legitimate and understandable: the workers who had benefitted from the seniority system were "blameless citizens" who, like "wronged minorit[ies]," had "fair seniority claims."[281] In making that claim, the UAW focused on the fact that the employer, rather than the employees, had the discriminatory intent, arguing, "[T]he incumbent employees are in no way at fault for the employer's Title VII violation."[282] The UAW had good cause to be concerned about the effect of possible layoffs following seniority integration—the national unemployment rate reached 9% the year *Franks* was decided,[283] and the auto industry had been hit especially hard. The first three months of 1975 saw 300,000 permanent or temporary layoffs in the auto industry,[284] representing 40% of the industry's production workforce.[285]

The UAW's proposed solution avoided pitting discrimination victims against workers who had unwittingly benefitted from discrimination by forcing employers to either keep both groups or else provide "front pay" to laid-off workers. That plan, which the UAW called the "front-pay save-harmless" remedy, would "require[] the wrongdoing employer to hold [incumbent workers and newly hired discriminatees] harmless from layoff losses in work reduction situations."[286] More specifically, the UAW proposed that "following reinstatement of discriminatees the offending employer hold harmless against layoff losses both the discriminatees and [an equal number of]

---

279. Meadows v. Ford Motor Co., 510 F.2d 939 (6th Cir. 1975), *cert. denied sub nom.* Local 862 v. Ford Motor Co., 425 U.S. 998 (1976).

280. Motion for Leave To File Brief for Local 862, UAW, as Amicus Curiae Out of Time & Brief Amicus Curiae, *Franks*, 424 U.S. 747 (No. 74-728), 1975 WL 173444.

281. *Id.* at 3.

282. *Id.* at 4.

283. Bureau of Labor Statistics, *Civilian Unemployment Rate*, U.S. Dep't of Labor (last updated Nov. 8, 2013, 8:06 AM), http://research.stlouisfed.org/fred2/data/UNRATE.txt.

284. Guy Darst, *Auto Industry Layoffs Increase*, Day, May 16, 1980, at 40.

285. *New Ford Layoffs Jolt Auto Industry*, Milwaukee J., Dec. 20, 1974, at 6 (describing American auto companies' intention to lay off 300,000 workers in January 1975, representing "more than 40% of the auto industry's 690,000 blue collar workforce," with 149,000 of those workers on "indefinite layoff").

286. Motion for Leave To File Brief for Local 862, UAW, as Amicus Curiae Out of Time & Brief of Amicus Curiae, *supra* note 280, at 2-3.

his incumbent employees hired between the discriminatees' original rejection and their ultimate hiring."[287] The UAW devoted the remainder of its brief to explaining why the impact of the "front-pay save-harmless" scheme on employers would be relatively small, showing that in other contexts employers had found productive uses for workers whom they were required to pay regardless.[288]

The benefits to unions and unionized workers of such a scheme are plain. For union leadership, the adoption of the plan would mean that the union could put its full weight into fighting employment discrimination without facing opposition from members fearing for their own jobs. This would be of particular importance in industries enduring economic difficulties, where minority employees are often especially vulnerable to layoffs.[289] The scheme would also enlarge the ranks of union membership, increasing the union's power and influence within the company.

Additionally, the union may have been able to leverage the position it had taken in court—that the company owed benefits to both the job applicants against whom they had discriminated and incumbent employees—into increased solidarity between those two groups.[290] In

---

287. *Id.* at 4. The UAW explained its proposal in an elaborate hypothetical involving the facts of another case to which it was a party. That case involved thirty-five discriminatees who had been hired by a Ford plant in Kentucky pursuant to the district court's order. In relevant part, the union explained:

> In a layoff situation of, for example, 35 persons which reaches into but not beyond the ranks of employees with seniority dates between the discriminatees' rejection of 1969 and their hiring in 1974, the first 35 persons (excluding persons hired more recently than the discriminatees) affected would be held harmless. If the remedy should go to the 35 discriminatees, they are in effect given the wage and fringe benefit protection they would have had if they had not been wrongfully rejected when they applied in 1969. If it goes to 35 incumbents, they in turn are protected against any loss caused by the grant of retroactive seniority to the discriminatees. In other words, in any contingency the discrimininatees are restored fully to the job protection they would have had but for the employer's violation of their rights, without prejudicing or diminishing the earned layoff seniority of the incumbent work force.

*Id.* at 7 (footnote omitted).

288. *Id.* at 5-11.

289. Nancy Leong, *Racial Capitalism*, 126 HARV. L. REV. 2151, 2210-12 (2013).

290. Interestingly, while the UAW's plan was not adopted by the Court, the union later managed to achieve similar protections for members through negotiation. In 1984, GM agreed in union negotiations to create the "jobs bank," a program providing retraining benefits for displaced workers, as well as 95% of former wages for laid off employees who had at least one year of seniority, until a new position was found. Sharon Silke Carty, *Labor Talks May Tiptoe Around Jobs Bank*, USA TODAY (July 27, 2007, 1:46 PM), http://usatoday30.usatoday.com/money/autos/2007-07-23-uaw-talks-jobs-bank_N.htm; Erik de Gier, *Paradise Lost Revisited: GM and the UAW in Historical Perspective*, CORNELL UNIV.

other words, by making the employer the common enemy against whom both groups were seeking full employment, the union may have been able to build ties between the two groups, lessening the negative effects of perceived competition between them.[291]

Finally, some unions have made explicit appeals to rank-and-file solidarity in order to win support for litigation designed to eliminate discrimination. This work has sometimes played out behind the scenes, as in *United Steelworkers of America v. Weber.*[292] There, the union initially sought the support of reluctant rank-and-file members for negotiated affirmative action plans by invoking the possibility of a future adverse court decision that would result in a remedy of the court's own devising. The union argued that it was better for the union and employer to work out a plan to deal with the effects of past discrimination in advance, to avoid ceding control to unpredictable judges.[293] To be sure, the Steelworkers' appeal could be viewed as a somewhat cynical attempt to generate support from whites based on

---

ILR Sch. 3 (Sept. 1, 2010), http://digitalcommons.ilr.cornell.edu/cgi/viewcontent.cgi?article=1029&context=intlvf. Much like the proposal in *Franks*, the jobs bank program reduced the threat of layoffs and helped maintain UAW ranks even as the auto industry faced decline.

291. In their famous work, *The Robbers Cave Experiment: Intergroup Conflict and Cooperation*, Muzafer Sherif and his colleagues showed that friction between two groups, which had been created through "conditions of competition and rivalry," could be reduced if the two groups had to work together to achieve a superordinate goal. MUZAFER SHERIF ET AL., THE ROBBERS CAVE EXPERIMENT: INTERGROUP CONFLICT AND COOPERATION 198 (1988). To be sure, the situation presented here is somewhat different than the one Sherif studied. Most importantly, it is not clear that discriminatees and incumbents have a shared superordinate goal. For Sherif, a superordinate goal is one that is "compelling and highly appealing to members of two or more groups in conflict but which cannot be attained by the resources and energies of the groups separately," but here, the precise problem is that white workers obtained jobs at Bowman without the "resources and energies"—indeed, at the expense of—the discriminatees. Muzafer Sherif, *Superordinate Goals in the Reduction of Intergroup Conflict*, 63 AM. J. SOC. 349, 349-50 (1958). However, there is potential for labor unions whose leaders are committed to nondiscrimination to reframe the goal in discrimination cases as obtaining jobs (or at least wages and benefits) for both groups of workers. *See* Catherine Smith, *Queer as Black Folk?*, 2007 WIS. L. REV. 379, 402-03 (discussing the possibility for LGBT advocates to "reframe the debate to achieve gay rights" so as to create superordinate goals shared by communities of color). If both groups can commit to working together to achieve that goal, then Sherif's study suggests that working together in pursuit of that common goal could decrease racial tension among union members. *See also* Daria Roithmayr, *Racial Cartels*, 16 MICH. J. RACE & L. 45, 62 (2010) ("Norms about group identity and outsider exclusion appear to be particularly easy to socialize. Experimental work in social psychology suggests that in contests over scarce resources, group identity norms, particularly norms to exclude, quickly become salient.").

292. 443 U.S. 193 (1979).

293. Malamud, *supra* note 120, at 205 ("[I]t had been the threat of seniority lawsuits—and not ideology—that had been the leadership's source of leverage against recalcitrant whites.").

interest convergence.[294]   However, it occurred in the context of efforts undertaken by union leadership both in court and at the bargaining table to undo the effects of past discrimination, suggesting that even if the appeal was merely strategic, the union's leadership held a broader commitment to racial equality.

More public, but also perhaps more problematic, was the union's statement in *International Brotherhood of Teamsters v. United States*,[295] in a brief arguing against the expansion of the retroactive seniority principles developed in *Bowman.* "Teamsters early understood that employers played off black against white to undercut the wages and conditions the unions were attempting to establish. Accordingly, IBT unions have made special effort to organize minorities, and are color blind with respect to participation in union affairs and application of collective bargaining contracts."[296]   In other words, unlike the Steelworkers' approach to winning over reluctant white rank-and-file members, the Teamsters' invocation of solidarity was deployed as a post-lawsuit defense against charges of discriminatory behavior.

In sum, unions have pursued a variety of strategies to attempt to respond to the divergent interests of members. The most promising of these in terms of promoting long-term solidarity between white workers and workers of color are those that seek to change members' perceptions of the source of the conflict (for example, shifting their focus from competition between discrimination victims and unwitting beneficiaries of discrimination to a discriminating employer), or to persuade members either to consider social justice, or, at a minimum, take a more nuanced and strategic view of their own interests.

In the next Subpart, I turn to another concern relevant to unions' litigation positions:   whether the case supports or threatens unions' freedom or ability to bargain.

## C.   *Valuing Freedom To Bargain*

> *Get it through industrial organization . . . .*[297]

---

294.   Derrick A. Bell, Jr., Brown v. Board of Education *and the Interest-Convergence Dilemma*, 93 HARV. L. REV. 518, 524 (1980) (arguing that school desegregation was achieved when it became pragmatically desirable to powerful white interests).

295.   431 U.S. 324 (1977).

296.   Brief for Petitioner International Brotherhood of Teamsters, *supra* note 268, at 30-31 (footnote omitted).

297.   MELVYN DUBOFSKY, HARD WORK: THE MAKING OF LABOR HISTORY 73 (2000) (listing slogans associated with the Industrial Workers of the World).

Because one primary function of unions is to bargain on behalf of groups of employees, one might expect that they are uniquely sensitive to cases that either limit the scope of their bargaining authority or else decrease their bargaining strength by undermining existing agreements. Conversely, unions may support litigation efforts that would bolster their bargaining power by mandating wages or benefits typically sought through bargaining. Indeed, unions' Supreme Court litigation positions suggest union concern with both issues.

Unions have explicitly invoked freedom to bargain in Supreme Court briefs. For example, consider *Metropolitan Life Insurance Co. v. Massachusetts*, in which the Court reviewed a state law requiring that certain health insurance plans cover minimum mental health care benefits.[298] One may expect unions to have supported this law—unions often support laws strengthening the social safety net both because of their social justice commitments and because they can increase their leverage at the bargaining table by improving workers' alternatives to a collectively bargained agreement. Yet both the AFL-CIO and a New Hampshire-based local union opposed the law, arguing that it was preempted by ERISA. Both unions cited their desire to be free to bargain away mental health benefits (or other benefits that might be required under similar state laws) in exchange for pay or other benefits. As the AFL-CIO stated, "[S]tate laws of the type at issue here make [collective bargaining] more, rather than less, difficult by substituting for private decision-making a state-imposed requirement . . . regardless of whether the employees desire such benefits or would prefer other benefits (or higher wages) instead."[299]

A similar focus on freedom to bargain played out much differently in *14 Penn Plaza LLC v. Pyett*.[300] *Pyett* dealt with labor unions' abilities to waive members' rights to pursue discrimination claims in federal court and instead require them to pursue the negotiated grievance procedure, culminating with arbitration. Unlike in *Metropolitan Life*, the AFL-CIO and Change to Win argued that unions flatly lacked the authority to strike such a deal with employers.

---

298. 471 U.S. 724 (1985).

299. Brief of the AFL-CIO as Amicus Curiae in Support of Appellants at 2, *Metro. Life Ins. Co.*, 471 U.S. 724 (Nos. 84-325, 84-356), 1984 WL 565632, at *2. Similarly, the local union argued, "Such laws frustrate the ability of such plans to provide the benefits requested by their members, and increase both the cost of the plans themselves and of their administration." Brief Amicus Curiae of the International Brotherhood of Electrical Workers Local 421 Health & Welfare Fund et al., in Support of Appellants at 2, *Metro. Life Ins. Co.*, 471 U.S. 724 (Nos. 84-325, 84-356), 1984 WL 565644, at *2.

300. 556 U.S. 247 (2009).

On closer inspection, however, the unions' reasoning in *Pyett* was entirely consistent with *Metropolitan Life*. As the federations explained:

> The ADEA claims advanced by the Plaintiff-Employees in this case challenge an employment action that Local 32BJ agreed to in advance . . . . The Union only agreed to that substitution after receiving assurances that the new provider of security services would not undermine the area wage rates. Local 32BJ decided not to arbitrate the ADEA claims challenging that action based on its view that the agreement the Union had made with Temco in this regard was not discriminatory. If that agreement could be attacked by the adversely affected employees through the contractual grievance-arbitration procedure, it would most certainly undermine "the employer's confidence in the union's authority."[301]

In other words, the federations feared that waiving employees' rights to go to court would actually impair unions' abilities to negotiate meaningfully with employers, because it would cede their control over which grievances reach arbitration.

The AFL-CIO's argument in *Metropolitan Life* would have meant that no Massachusetts employer—union or nonunion—would be required to provide mental health coverage under the statute. However, in other cases, unions have argued for special treatment based on their status as employees' bargaining representatives. That is to say, unions sometimes argue that unions and employers can agree to do things together that would be illegal if done by employers on their own. For example, in *US Airways v. Barnett*, the union distinguished seniority systems contained in collective bargaining agreements from employer created seniority systems, arguing that only collectively bargained seniority systems could trump accommodation of an employee in need of reassignment because of a disability.[302] Similarly, the AFL-CIO has argued:

> [E]mployers and labor organizations should be, and are, free—under the ADEA—to negotiate health insurance plans that favor older workers. And, it is our position that this reading of the ADEA protects

---

301. Brief of the AFL-CIO & Change to Win as *Amici Curiae* in Support of Respondents at 6-7, *Pyett*, 556 U.S. 247 (No. 07-581), 2008 WL 2817677, at *6-7 (citations omitted) (quoting Vaca v. Sipes, 386 U.S. 171, 191 (1967)).

302. Brief of the AFL-CIO in *Barnett*, *supra* note 135, at 4-6.

the interests of all workers in this regard by giving necessary play to the collective bargaining process.[303]

And finally, as discussed above, the Steelworkers argued in *Weber* that a negotiated affirmative action plan was lawful, while a government-imposed plan would exceed the scope of the Civil Rights Act.[304]

So far, this Subpart has focused on cases in which unions litigate with an eye toward preserving union and employer freedom to bargain over particular benefits. However, in other cases, unions have supported increased substantive protections for employees instead of the flexibility to take or leave particular benefits. For example, the AFL-CIO argued in favor of a Maine law requiring employers to offer a severance payment to employees affected by plant closings[305] and a New York law forbidding pregnancy discrimination in employee benefits and requiring employers to offer paid sick leave to pregnant and disabled employees.[306] The difference may be explained by a combination of factors, including the leverage the union is likely to have at the bargaining table, how frequently unions bargain for the benefits at issue, and the union's political commitments. Thus, it is relevant both that union leverage is likely at its nadir when a plant is shutting down and that unions have a particularly strong track record of advocating for equal pay for women and against pregnancy discrimination.

Thus, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers explained in *Geduldig v. Aiello* that its efforts to litigate pregnancy discrimination cases supported its repeated attempts to win insurance coverage for pregnancy-related issues during bargaining.[307] Likewise, in its amicus brief in support of the Affordable Care Act, the AFL-CIO explained:

---

303. Brief of the AFL-CIO & UAW, as *Amici Curiae* in Support of Petitioner at 2, Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581 (2004) (No. 02-1080), 2003 WL 21649479, at *2.

304. *See supra* note 120 and accompanying text.

305. Brief of the AFL-CIO as Amicus Curiae in Support of Appellees, Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987) (No. 86-341), 1987 WL 880547.

306. Motion for Leave To File a Brief Amici Curiae & Brief for the AFL-CIO & the New York State AFL-CIO as Amici Curiae, Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983) (No. 81-1578).

307. Brief of the International Union of Electrical, Radio & Machine Workers, AFL-CIO-CLC, as Amicus Curiae, *supra* note 128, at 4-5 ("As collective bargaining agent, the IUE has during the past two years been engaged in negotiations with approximately 400 employers for the purpose of securing for female employees the right to all the same benefits as other disabled employees for periods of disability due to childbirth or the complications of pregnancy.").

> [It] has an interest in this issue because the collective bargaining agreements negotiated by its affiliated unions almost universally provide for employment-based health insurance for covered employees and their immediate families. The system of employment-related health insurance has come under tremendous pressure from the steadily increasing costs of health insurance coverage. The Affordable Care Act addresses the problem of increasing insurance costs in part by encouraging universal coverage, and the minimum coverage provision is essential to the Act's plan for achieving that purpose.[308]

And, during the 2013 Term, Change to Win and the AFL-CIO filed a joint amicus brief in *Hollingsworth v. Perry*, the case challenging California's Proposition 8. The unions first explained that their interest in the case stemmed from the fact that unions commonly "bargain and advocate for domestic partner benefits in union contracts" and then argued that Proposition 8 harmed workers with same-sex partners.[309]

Evidently, then, unions' litigation positions are influenced by their bargaining goals. However, context matters: Unions' perceptions of their own bargaining strength and the desirability of the benefit at issue determine whether unions seek flexibility or certainty.

## IV. UNION LITIGATION AS SOCIAL GOOD

> *"The law will never make men free;*
> *it is men who have got to make the law free."*[310]

This Part discusses some of the strategic benefits that labor's model of Supreme Court litigation might provide to the larger progressive social movement community and suggests ways that unions could more effectively further the goals of social movement unionism through Supreme Court advocacy.

The Part begins by discussing a critique of litigation-based social change efforts and the "law and organizing" model of social movement litigation. It suggests that unions are inherently well-suited to bundle their litigation efforts with other forms of advocacy and that

---

308. Brief of the AFL-CIO as *Amicus Curiae* in Support of Petitioners Suggesting Reversal of the Decision Below on the Minimum Coverage Provision Issue, *supra* note 73, at 1.

309. Brief of AFL-CIO & Change to Win as *Amici Curiae* Supporting Respondents & Suggesting Affirmance, *supra* note 136, at 1-2.

310. Bryan-Paul Frost, *Religion, Nature, and Disobedience in the Thought of Ralph Waldo Emerson and Henry David Thoreau*, in HISTORY OF AMERICAN POLITICAL THOUGHT 355, 371 (Bryan-Paul Frost & Jeffrey Sikkenga eds., 2003) (quoting Henry David Thoreau, *Slavery in Massachusetts*, *in* WALDEN AND OTHER WRITINGS OF HENRY DAVID THOREAU 663, 669 (Brooks Atkinson ed., 1937)).

many unions adhere to the law and organizing model virtually by default. Next, I turn to the benefits and drawbacks of coalition work in the Supreme Court, focusing on what unions might gain from litigating in coalition with other social movement groups and vice versa. Finally, I suggest that greater publicity of unions' Supreme Court work, including their amicus practice, could benefit both unions and their members.

## A.   *Collective Action and Litigation*

### *"Don't Mourn, Organize!"*[311]

Critics of litigation-focused reform efforts have charged that the pursuit of social change through court decisions "can narrow issues and atomize collective grievances, undermining broader collective action."[312]   Additionally, they argue that the opportunity costs of spending precious time and resources on litigation, rather than other types of activities, may be too great—particularly when "favorable judicial decisions without similarly favorable outcomes on the ground" are relatively frequent occurrences.[313]

However, other scholars have argued that litigation can be an important component of a broader organizing strategy. Derrick Bell observed that a litigation campaign is more than the sum of the resulting decisions: "Litigation can and should serve lawyer and client as a community-organizing tool, an educational forum, a means of obtaining data, a method of exercising political leverage, and a rallying point for public support."[314]   More recently, adherents of the law-and-organizing model have urged attorneys to "supplement conventional litigation strategies with community education programs, link the provision of legal services with membership in organizing groups, and become directly involved in organizing campaigns."[315]   This way, even unsuccessful litigation can yield beneficial results if it spurs other

---

311.   Michael E. Tigar, *Crisis in the Legal Profession: Don't Mourn, Organize!*, 37 OHIO N.U. L. REV. 539, 540 & n.2 (2011) ("Joe Hill, alias of Industrial Workers of the World organizer Joseph Hillstrom, was executed in Utah in 1915. 'Don't Mourn, Organize' is a paraphrase from his last letter." (citing PHILIP S. FONER, THE CASE OF JOE HILL 96 (1965))).

312.   Albiston, *supra* note 226, at 63 (describing criticisms of the use of litigation as a social reform strategy).

313.   NeJaime, *supra* note 228, at 943.

314.   Bell, *supra* note 221, at 513.

315.   Scott L. Cummings & Ingrid V. Eagly, *A Critical Reflection on Law and Organizing*, 48 UCLA L. REV. 443, 447-48 (2001) (footnotes omitted).

forms of collective action.[316]  As Douglas NeJaime has persuasively reasoned: "Litigation loss may, counterintuitively, produce winners. When savvy advocates lose in court, they may nonetheless configure the loss in ways that result in productive social movement effects and lead to more effective reform strategies."[317]

Unions are particularly well situated to mix litigation with other advocacy strategies; in fact, the law and organizing model itself "hails back to a more militant era of labor activism—of 'protests, illicit strikes, and pickets.'"[318]  In fact, the Supreme Court itself recognized this connection in *Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar*[319] and subsequent decisions regarding the legality of union legal referral plans that recognized that unions had a legitimate interest in ensuring that workers were able to enforce their rights under statutes that the unions had lobbied for in the first place.[320]

Today, union tactics—even if less militant—still go hand in hand with traditional litigation efforts.  For example, in *Lawyers, Unite*, Scott Cummings and Ingrid Eagly tell the story of the Workplace Project, an organization created to help Latino workers on Long Island enforce their rights at work.[321]  In one case, the Workplace Project "represented two workers owed several thousand dollars in back wages by their employer."[322]  That representation entailed filing a lawsuit, alongside which the Workplace Project also engaged in a traditional union tactic—picketing outside the defendant-employer's store.[323]  The

---

316.  NeJaime, *supra* note 228, at 954 & n.57 ("[P]roductive indirect effects of litigation [include] raising consciousness, driving fundraising, legitimizing a cause, and influencing other state actors.").

317.  *Id.* at 945.

318.  Jesse Newmark, *Legal Aid Affairs: Collaborating with Local Governments on the Side*, 21 B.U. PUB. INT. L.J. 195, 293 (2012) (quoting Orly Lobel, *The Paradox of Extralegal Activism: Critical Legal Consciousness and Transformative Politics*, 120 HARV. L. REV. 937, 956 (2007)); *see also* Cummings & Eagly, *supra* note 315, at 470 & n.114 ("Labor lawyers are important precursors to the current generation of law and organizing practitioners, who focus on enforcing legal rights enacted as a result of the labor movement. . . .  As advocates committed to the goal of advancing workplace organizing campaigns, labor lawyers continue to merit recognition as important examples of practitioners working within the law and organizing model.").

319.  377 U.S. 1, 5-6 (1964).

320.  *See* discussion *supra* Part II.A.

321.  Scott Cummings & Ingrid Eagly, *Lawyers, Unite*, LEGAL AFF. (2005), http://www. legalaffairs.org/issues/March-April-2005/review_cummings_marapr05.msp.

322.  *Id.*

323.  *Id.*

project achieved a quick settlement on behalf of the workers, which it attributed to the picketing.[324]

While Supreme Court litigation may feel more distant from on-the-ground organizing efforts than the case described in *Lawyers, Unite*, it can still be usefully integrated into a broader organizing strategy. For example, as discussed in the previous Part, unions often simultaneously seek benefits for workers both in the courts and at the bargaining table—union amicus participation in *Perry v. Hollingsworth* offers only the most recent of many examples.[325] Then, when unions win before the Court, they not only improve workers' lives, but they may also win another leverage point—if employers subsequently violate the law, then unions can sue on behalf of aggrieved employees. Even when unions lose before the Court, they may, as NeJaime has suggested, nonetheless ultimately succeed in whole or in part. For example, after their loss in *Alden*, Maine union activists were able to persuade the state to provide "most, but not all, of the protections and benefits that they would have received without sovereign immunity,"[326] including some of the back pay they had unsuccessfully argued before the Court they were owed.[327] Likewise, after losing *General Electric Co. v. Gilbert*,[328] a coalition of unions and other groups succeeded in lobbying Congress to pass the Pregnancy Discrimination Act, and then unions helped ensure employer compliance with the new law through bargaining, grievances, and lawsuits.[329]

A final example reveals the fluidity between unions' Supreme Court litigation and their organizing efforts. In *Citizens United v. FEC*, the AFL-CIO filed an amicus brief arguing that prohibitions on unions' electioneering communications were unconstitutional.[330] However, the Court's decision went farther than the AFL-CIO hoped

---

324.  *Id.*; *see also* Scott L. Cummings & Ingrid V. Eagly, *After Public Interest Law*, 100 Nw. U. L. Rev. 1251, 1269-70 (2006) (reviewing Jennifer Gordon, Suburban Sweatshops: The Fight for Immigrant Rights (2005)) (discussing the Workplace Project's picketing tactics and success).

325.  *See supra* Part III.B.1.

326.  Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity 137 (2008).

327.  *Id.*

328.  429 U.S. 125 (1976), *superseded by statute*, Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2076.

329.  Judith A. Scott, *Why a Union Voice Makes a Real Difference for Women Workers: Then and Now*, 21 Yale J.L. & Feminism 233, 234-35 (2009).

330.  Brief of the AFL-CIO as *Amicus Curiae* in Support of Appellant, *supra* note 159, at 3-4.

striking down the Bipartisan Campaign Reform Act's limits on corporate and union independent expenditures as well.[331] In response, the federation called for a constitutional amendment to limit corporate (though not union) political expenditures.[332] At the same time, the 2012 presidential election saw unions—which were significantly outspent by business interests—take advantage of the *Citizens United* ruling by creating a "Super-PAC" to fund door-to-door canvassing efforts that leveraged unions' abilities to mobilize their members.[333]

In sum, unions' Supreme Court advocacy is often linked to other forms of organizing that may take place before, during, or after litigation. These linkages can be cumulative, with litigation and organizing efforts reinforcing each other. Further, successful organizing efforts can lead to more litigation opportunities, creating a procyclical relationship between law and organizing. Thus, union litigation in pursuit of social change is particularly promising because even where the union loses in court, it may be able to pursue its desired result effectively through its "boots on the ground."

## B.   *Coalitions In and Outside the Labor Movement*

*You are never strong enough that you don't need help.*[334]

Unions may litigate with or without the support of their members, other unions, and outside groups. In this Subpart, I discuss the opportunities that Supreme Court litigation can provide for unions to form or strengthen relationships with all of these constituencies.

Labor's history of working hand in hand with other social movement groups has been mixed. Some of the burgeoning identity-based movements of the 1960s and 1970s viewed the white working class as "'bought off' by their affluence and 'white privilege' . . . too economically comfortable and benefited too much from racism, imperialism, sexism and homophobia to be allies in struggle."[335] Likewise, some unions' support of the Vietnam War did little to endear

---

331.   Citizens United v. FEC, 558 U.S. 310, 319 (2010).

332.   Steven Greenhouse, *Unions Urge Curtailment of 'Super PACs,'* N.Y. TIMES, CAUCUS (Mar. 15, 2012, 11:56 AM), http://thecaucus.blogs.nytimes.com/2012/03/15/unions-urge-curtailment-of-super-pacs/.

333.   Steven Greenhouse, *Labor Leaders Plan To Apply New Clout in Effort for Obama*, N.Y. TIMES (Mar. 11, 2012), http://www.nytimes.com/2012/03/12/us/politics/unions-plan-a-door-to-door-effort-for-2012-election.html.

334.   CESAR CHAVEZ, AN ORGANIZER'S TALE: SPEECHES 236 (Ilan Stavans ed., 2008).

335.   Capulong, *supra* note 231, at 135 (footnote omitted).

them to other progressive causes.[336]　On the other hand, two UAW lawyers were on hand at the inaugural meeting of the National Organization for Women, and they played a role in shaping that organization's approach to the cause of women's equality.[337]　Likewise, many unions have long enjoyed close relationships with civil and immigrants' rights groups.[338]

Supreme Court litigation presents opportunities for unions and other groups to work together on either a long-term or a more temporary basis—"strange bedfellow" coalitions can form for the limited purpose of arguing a particular point of law or more long-lasting alliances can manifest.　For example, effective Supreme Court advocates will typically coordinate amicus briefs so that they do not overlap and instead show a range of policy and doctrinal reasons that one party's position is correct.[339]　Here, labor unions and federations will often have special insights into the particular work-related effects of an issue.　These briefs can be especially powerful in cases in which the connection between the issue presented and American workers is not initially obvious.　For example, in *Grutter v. Bollinger*, the AFL-CIO was seemingly alone among a long list of amici in arguing that diversity in higher education was important because of its impact on

---

336. *Id.* However, other unions opposed the Vietnam War.　Charles B. Craver, *The Impact of Labor Unions on Worker Rights and on Other Social Movements*, 26 A.B.A. J. LAB. & EMP. L. 267, 274 (2011).

337. Mayeri, *supra* note 230, at 790.　While the UAW lawyers supported women's equality, they argued against pursuing it via the Equal Rights Amendment (ERA), citing concerns that the ERA would invalidate a host of labor and employment laws designed to protect women workers. Testifying before the United States Senate, Myra K. Wolfgang, who was then vice president of the Hotel and Restaurant Employees and Bartenders International Union and secretary-treasurer of its local in Detroit, argued:

> There are various kinds of protection for women workers provided by State laws and regulations: (1) minimum wage; (2) overtime compensation; (3) hours of work, meal and rest period; (4) equal pay[;] (5) industrial homework; (6) employment before and after childbirth[;] (7) occupational limitations; and (8) other standards, such as seating and washroom facilities and weight-lifting limitations. It would be desirable for some of these laws to be extended to men, but the practical fact is that an equal rights amendment is likely to destroy the laws altogether rather than bring about coverage for both sexes. Those State laws that are outmoded or discriminatory, should be repealed or amended and should be handled on a case-by-case basis.

*Equal Rights 1970: Hearings on S.J. Res. 61 and S.J. Res. 231 Before the S. Comm. on the Judiciary*, 91st Cong. 31 (1970) (statement of Myra K. Wolfgang, Vice President, Hotel and Restaurant Employees and Bartenders International Union).

338. Garden & Leong, *supra* note 241, at 1160, 1205-06.

339. Charles A. Rothfeld, *Avoiding Missteps in the Supreme Court: A Guide to Resources for Counsel*, 7 J. APP. PRAC. & PROCESS 249, 253-54 (2005).

workplace discrimination.[340]  Conversely, input from other groups can legitimate positions taken by labor unions and federations by helping to assure judges that the union's position has not been skewed by the dynamics described in Part III.

A second question concerns relationships within the union movement:  to what extent should union officers and labor lawyers seek input from other unions or union members in shaping their litigation positions?  This question is particularly salient in the amicus context, where the decision as to whether to file at all, as well as what position to take, is entirely within a union's or federation's discretion. Yet it is the amicus context in which union members have traditionally had the least input, beginning with Arthur Goldberg's "free hand to select labor cases to take to the Supreme Court and to file amicus briefs in cases already scheduled for Supreme Court review."[341]  While this approach is of course expedient, and union and federation officers are elected in part to make decisions in the interest of membership, one may view this model as a lost opportunity to foster communication between union members and union leadership about movement priorities and long-term goals.

V.  CONCLUSION

*There is scarcely an issue that has not been, and is not, influenced by labor's organized efforts or lack of them.*[342]

Labor unions and federations have an extensive record of Supreme Court litigation covering a vast array of substantive areas. Yet, inexplicably, this litigation has escaped the attention of scholarly and other audiences, even as a national debate about the appropriate role of labor unions has taken place.  This inattention is especially surprising because Supreme Court litigation is a significant channel through which unions can affect the lives of nonunion members and the structure of American government more generally.  Attention to the scope of unions' Supreme Court practice is particularly timely in light of the persistent decline over the last several decades in American

---

340. David B. Wilkins, *From "Separate Is Inherently Unequal" to "Diversity Is Good for Business": The Rise of Market-Based Diversity Arguments and the Fate of the Black Corporate Bar*, 117 HARV. L. REV. 1548, 1610 n.260 (2004) ("[I]t is telling that, to my knowledge, the only amicus brief filed in *Grutter* that made continuation of widespread racial discrimination and stereotyping against black Americans in employment the centerpiece of its argument was that of the AFL-CIO. . . . Significantly, no lawyer from a major corporate law firm participated in the drafting of that brief.").

341. Stone, *supra* note 59, at 159.

342. WILLIAM CAHN, A PICTORIAL HISTORY OF AMERICAN LABOR 3 (1972).

labor union membership; in 2012, only 11.3% of wage and salary workers were union members.[343] Therefore, with membership levels reflecting an existential threat to the American labor movement, it is especially important that policy debates focusing on whether to attempt to revive unions or to undercut them take place against the backdrop of a complete picture of what unions do, including through litigation.

---

343.  Press Release, Bureau of Labor Statistics, *Union Members Summary*, U.S. DEP'T OF LABOR (Jan. 23, 2013, 10:00 AM), http://www.bls.gov/news.release/union2.nr0.htm.