# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No. 1:17-cv-01037

| | | |
|---|---|---|
| **FARM LABOR ORGANIZING** | ) | |
| **COMMITTEE, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| **v.** | ) | |
| | ) | |
| **GOVERNOR ROY COOPER, et. al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## NATURE OF THIS ACTION

Plaintiffs Farm Labor Organizing Committee (FLOC), Victor Toledo Vences and Valentin Alvarado Hernandez challenge and move to preliminarily enjoin Section 20.5 of the North Carolina Farm Act of 2017 ("the Farm Act" or "the Act").[1] Section 20.5 amends N.C. Gen. Stat. § 95-79(b) by adding the underlined text:

> (b) Any provision that directly or indirectly conditions the purchase of agricultural products, ~~products or~~ the terms of an agreement for the purchase of agricultural products, <u>or the terms of an agreement not to sue or settle litigation</u> upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an

---

[1] Session Law 2017-108, Senate Bill 615. *See* Ex. 1; Ex. 24 at ¶2.

1

agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. <u>Further, notwithstanding G.S. 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable against public policy in restraint of trade or commerce in the State of North Carolina.</u>

Section 20.5 amends North Carolina's already-existing "right to work" law by adding sweeping new obstacles to farmworkers' abilities to associate with unions and to express support for unionization. The Farm Act bars Plaintiff FLOC (the state's only farmworker union) and farmworkers like Plaintiffs Toledo Vences and Alvardo Hernandez from voluntarily entering into valid and enforceable dues checkoff agreements — agreements that are available to every other worker and union in North Carolina.

The Act also burdens FLOC's ability to both benefit from and enter into settlement agreements, by prohibiting union recognition as a stipulation in any person's settlement, and barring FLOC from entering into *any kind* of enforceable settlement agreement with an agricultural producer. These sweeping restrictions apply only to farmworkers and agricultural producers, and — because FLOC is the only union organizing farmworkers in the state — only to FLOC.

2

The Act violates (1) the First Amendment rights to association and expression, by selectively revoking Plaintiffs' abilities to benefit from dues checkoff and settlement agreements; and (2) the Fourteenth Amendment and the Bill of Attainder Clause, by punitively depriving a politically vulnerable workforce and their sole union of the ability to enter into these agreements. The Act causes irreparable harm by severely burdening Plaintiffs' expressive and associative activities and by undermining FLOC's ability to represent its members. Section 20.5 of the Act should be enjoined.

## FACTUAL BACKGROUND

### I.    Background on Farmworkers in North Carolina.

Each year, more than 100,000 farmworkers work in North Carolina, handling labor-intensive crops like tobacco, Christmas trees, and sweet potatoes. Ex. 2 at 71; Ex. 3 ¶¶12, 24; Ex. 4 ¶6; Ex. 24 ¶3. Plaintiffs Toledo Vences and Alvarado Hernandez (hereinafter "Farmworker Plaintiffs") are two of these farmworkers. They are citizens of Mexico who perform agricultural work in North Carolina for part of the year pursuant to visas authorized by 8 U.S.C. § 1101(a)(15)(H)(ii)(a), commonly referred to as "H-2A guestworker visas." Ex. 5 ¶¶5–6; Ex. 6 ¶¶4–6.

3

Approximately 95% of North Carolina farmworkers are Latino. Ex. 2 at 71. Most North Carolina farmworkers are of Mexican national origin and speak Spanish as their first language. *Id.*; Ex. 3 ¶12. In contrast, 95% of agricultural operators in the state are white. Ex. 7 at 3; Ex. 24 ¶7. Nationwide, nearly 70% of farmworkers are not U.S. citizens. Ex. 8 at 4–5; Ex. 24 ¶6.

Despite the important role that farmworkers play in North Carolina's economy, they are among the lowest paid workers in the state and face high levels of poverty and food insecurity. Ex. 3 ¶¶15–17; Ex. 8 at 37; Ex. 24 ¶5. North Carolina farmworkers also suffer high rates of exposure to unsafe working and living conditions, including high rates of work-related injuries and death. Ex. 3 ¶15; Ex. 9 at 262; Ex. 10; Ex. 11 at 23–31, 35–39; Ex. 24 ¶¶6–8. Migrant farmworkers, including H-2A workers, have long been vulnerable to severe labor exploitation such as human trafficking. Ex. 12 ¶¶2–26; Ex. 13 at 31–33; Ex. 14 at 1–2, 9–41; Ex. 24 ¶¶9–10. H-2A workers who protest poor or illegal working conditions have frequently been fired, deported, and blacklisted. Ex. 12 ¶¶16–19; Ex. 14 at 14–17, 41. Despite these documented abuses, farmworkers have historically been excluded from many labor protections. Ex. 12 ¶¶8–10, 21. These exclusions were substantially motivated by the fact that a high percentage of the workforce at the time of enactment, particularly in the South, was African

4

American. *Id.* ¶¶8–10; *see generally* Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural & Domestic Worker Exclusion from the National Labor Relations Act*, 72 Ohio St. L.J. 95 (2011); Marc Linder, *Farm Workers & the Fair Labor Standards Act: Racial Discrimination in the New Deal*, 65 Tex. L. Rev. 1335 (1987). Such exclusions were significantly maintained as the nation's agricultural workforce became predominantly foreign-born and Latino.[2] Ex. 12 ¶21.

## II. FLOC's Organizing and Advocacy.

For over twenty years, FLOC has been the only union organizing farmworkers in North Carolina. Ex. 4 ¶5. FLOC members, including the Farmworker Plaintiffs, pay 2.5% of their weekly wages as dues to FLOC while they are working in North Carolina. *Id.* ¶45. Members pay their dues via "dues checkoffs," i.e., they give written authorization for their employers to deduct dues from their pay and divert those funds to FLOC. *Id.*

FLOC's core goals are to ensure that all farmworkers in North Carolina receive fair wages, work in safe conditions, and are able to voice concerns about work without fear of retaliation. *Id.* ¶5. FLOC works towards its goals by

---

[2] The Fair Labor Standards Act and Social Security Act have been amended since the 1930s to extend some coverage to farmworkers, but farmworkers are still excluded from overtime pay provisions and remain wholly excluded from the National Labor Relations Act. *See* Perea, *The Echoes of Slavery*, 72 Ohio St. L.J. at 126-27.

organizing workers to achieve collective bargaining agreements (CBAs) with employers, under which farmworkers are guaranteed certain wages and working conditions. *Id.* ¶8. FLOC also publicly urges entities throughout the agricultural supply chain to adopt business practices that are fair to both agricultural producers and farmworkers. *Id.* ¶22.

No federal or state law requires union elections or any other mandatory recognition of farmworker unions. *Id.* ¶10. Therefore, all union recognition or representation agreements between FLOC and agricultural employers in North Carolina, including any agreements by employers to administer dues checkoffs for FLOC members, are voluntarily entered into. *Id.*

FLOC currently has two CBAs with agricultural producers in the state, one due to expire in November 2019 and the other in December 2020. *Id.* ¶18. The CBAs provide significant benefits to workers and employers, such as guaranteed hourly wages, an orderly process for recruitment and hiring, and procedures for grievances and alternative dispute resolution. *Id.* ¶¶11–12.

FLOC has used various strategies to achieve CBAs and other improvements to working conditions, including promoting public campaigns to pressure industry actors like tobacco corporations, and assisting members in bringing litigation to challenge illegal employment practices. *Id.* ¶¶13–17, 30–31. Additionally, FLOC

participates in public events to advocate for the rights of farmworkers and other Latino immigrants. *Id.* ¶¶ 23–25.

FLOC has also participated in litigation as a party, or has assisted its members in bringing litigation, in order to educate the public about farmworkers and achieve tangible gains for members. *Id.* ¶¶13–17, 30–31; *see also* Ex. 6 ¶¶9, 20. As part of settlement agreements with agricultural producers, FLOC members have negotiated for voluntary union recognition, entry into a CBA, or expanded collective bargaining rights. Ex. 4 ¶¶16–17.

### III.    Events Leading to Enactment of the Farm Act.

In the past fifteen years, FLOC has won CBAs that cover approximately 50-60% of the H-2A workers in North Carolina.  *Id.* ¶26. It has also conducted highly public campaigns to advocate that major agricultural interests improve working conditions. *Id.* ¶¶26, 28–29. FLOC's recent successes have prompted backlash from the Farm Bureau and some individual employers. *Id.* ¶¶26–33. For example, in 2013, shortly after FLOC had convinced a tobacco corporation to meet to discuss conditions on North Carolina tobacco farms, the General Assembly passed legislation restricting FLOC's ability to use market-based pressure to convince employers to bargain with FLOC. *Id.* ¶¶34–35; *see also* North Carolina Session Laws 2013-413 (H.B. 74), § 15.

7

The 2017 Farm Act began as a four page Senate bill that did not include anything related to unions. Ex. 15; Ex. 24 ¶11. On the afternoon of June 28, 2017, just before the House held its final vote on the Act, Representative Jimmy Dixon (himself an agricultural producer), introduced the amendment which added Section 20.5 to the Act. Ex. 16; Ex. 24 ¶12. When asked by one representative why such a measure was necessary given the state's strong, existing right to work laws, Dixon answered:

> Because of continued harassment from out of state there seems to be a growing wave of folks that are interested in farm labor. It's--some consider it low-hanging fruit to do things like that and it's just a general tendency for an increase in activity that we consider to be harassment.

Ex. 17 at 3; Ex. 24 ¶13. When asked whether he was afraid of farmworker unions organizing, Dixon replied:

> Sir, I'm not afraid of anything. And I understand that food is very important. And so, no we're not afraid, but an ounce of prevention is worth a pound of cure. And there are predatory folks that make a good living coming around and getting people to be dissatisfied. And a few of us farmers are getting a little bit tired of it and we want some properly measured priority so that we can continue to feed you.

Ex. 17 at 3–4. However, on June 28, Dixon was also quoted in a newspaper stating that "the N.C. Farm Bureau and other farm organizations requested the limits on

unions. Farmers are under undue pressure to collect union dues and sign union contracts." Ex. 18; Ex. 24 ¶14.

Debate regarding the amendment lasted fewer than ten minutes before the amendment passed in the House. *See generally* Ex. 17. Section 20.5 was maintained by the conference committee appointed to reconcile the Senate and House versions, which was chaired by Dixon and Senator Brent Jackson (who had recently settled litigation brought by FLOC members alleging that he underpaid them). Ex. 19; Ex. 24 ¶15; Ex. 4 ¶ 36. The Act passed later that night. Ex. 20; Ex. 24 ¶16. There was never any opportunity for the public to comment during the approximately five hours between when the Amendment was introduced and when the entire Act was passed. Ex. 21; Ex. 22; Ex. 24 ¶¶17–18; Ex. 4 ¶37. The Act was signed by Governor Cooper on July 12, 2017. Ex. 1 at 24.

## IV.    The Farm Act Causes Severe Harm to Plaintiffs.

As a result of the Farm Act, Plaintiffs face extreme burdens and logistical barriers to sustaining their expressive and associative activities. The Act's dues provision devastates FLOC's operations. Dues constitute approximately 50-60% of FLOC's annual budget. Ex. 4 ¶52. Consistent collection of dues is essential to FLOC's ability to administer CBAs and provide services to its members. *Id.*; *see also* Ex. 23 ¶¶16–18.

9

The vast majority of FLOC's dues-paying members are H-2A guestworkers from Mexico who come to North Carolina each year for six to ten months. Ex. 4 ¶6. H-2A guestworkers live in employer-provided housing, mostly located in rural, isolated areas. *Id.* ¶39; Ex. 3 ¶¶18–23. Farmworkers' schedules leave them limited time for non-work activities, and their transient jobs and limited access to banking are obstacles to making recurring payments like weekly union dues. Ex. 3 ¶¶24–32; Ex. 4 ¶¶40–44. For those reasons, FLOC members rely on dues checkoffs. Ex. 4 ¶¶53–54; Ex. 5 ¶¶20–23; Ex. 6 ¶¶14–17.

With only four full time staff members, FLOC cannot collect dues individually from each of 2,000 dues paying members who work in the state during a given week. Ex. 4 ¶¶38, 51. Because the Farm Act now renders invalid any agreements by agricultural employers to honor their employees' requests for dues checkoffs, FLOC's efforts to organize new members are severely hindered. *Id.* ¶48; *see also* Ex. 23 ¶¶16–28. FLOC will also be unable to collect dues from most of its current members once its existing CBAs expire, which will gut its ability to administer CBAs, assist members, and join new members. Ex. 4 ¶¶55–59. As a result, FLOC will be forced to provide less individualized assistance to members like the Farmworker Plaintiffs. *Id.* ¶57. Farmworkers who have not yet had an opportunity to meet with FLOC representatives and learn about the benefits of

10

union representation will have fewer opportunities for these communications. *Id.* ¶58.

The Act also deeply impairs the ability of FLOC and its members to participate in litigation. For example, the Act would invalidate any settlement agreement conditioned on entry into union recognition agreements, agreements to remain neutral about employee union choice, or CBAs. Ex. 23 ¶31. On its face, the Act even invalidates *any* settlement agreement between an agricultural producer and the union, no matter the content. *Id.* ¶34.

This restriction will impair FLOC's ability to engage in expressive advocacy, particularly litigation, on behalf of farmworkers. *Id.* ¶35. Like many other advocacy organizations, unions engage in litigation to advance their political goals in addition to enforcing members' statutory rights. *Id.* ¶38. Moreover, when a union helps affected workers find counsel and file litigation to protect their interests, that can powerfully demonstrate the value of union membership for individual workers. *Id.* ¶39.

The Farm Act substantially impairs FLOC's ability to engage in this kind of advocacy by impairing its right to settle. Settlements offer an efficient and expeditious resolution to litigation. *Id.* ¶43. Indeed, settlements can result in

11

outcomes that are better than court-ordered remedies, including mechanisms to create ongoing dialogue between workers and employers. *Id.* ¶¶44–46.

The Act's obstacles to the associative and expressive activities of FLOC and its members are ongoing and severe. Ex. 4 ¶¶48–59; *see also* Ex. 23 ¶¶ 1, 19, 23–24, 28, 35, 42.

## QUESTIONS PRESENTED

1. Do Plaintiffs demonstrate a likelihood of success on their claims that:

    a. Section 20.5 of the Farm Act violates the First Amendment because it impermissibly burdens Plaintiffs' rights to expression and association and discriminates based on the identity of the speakers and the pro-union viewpoint of Plaintiffs' speech?;

    b. Section 20.5 violates the Equal Protection Clause and the Bill of Attainder Clause because it invidiously and punitively discriminates against farmworkers and FLOC in particular?

2. Do Plaintiffs satisfy the other requirements for a preliminary injunction?

## ARGUMENT

To obtain a preliminary injunction, Plaintiffs must demonstrate that they are likely to succeed on the merits of at least one of their claims; they are likely to suffer irreparable harm if preliminary relief is not granted; the equities favor an injunction; and an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As detailed below, Plaintiffs satisfy these requirements.

## I.    Plaintiffs Are Likely to Succeed on the Merits.

### A. The Farm Act Violates the First Amendment.

"The practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *Citizens Against Rent Control/Coal. for Fair Hous. v. Berkeley, Cal.*, 454 U.S. 290, 294 (1981). Labor unions, such as FLOC, are "an archetype of an expressive association." *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 301 (4th Cir. 1991). Unions are defined by their "political activity"—efforts intended to redress the "economic and social concerns that are [their] raison d'etre." *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 800 (1961) (Frankfurter, J. dissenting); *see also State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 133–34 (2d Cir. 2013). Given the important role unions play in advocating for their members'

13

political, economic, and social interests, "it cannot be questioned that the First Amendment's protection of speech and associational rights extends to labor union activities." *Id.* at 132 (citations omitted); *see also Thomas v. Collins*, 323 U.S. 516 (1945).

The First Amendment prohibits the government from erecting obstacles to protected expression and association. The government cannot "single[] out expressive activity for special regulation" or taxation. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995); *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 583 (1983) (striking down a tax imposed on the sale of large quantities of newsprint and ink because it disproportionately targeted large newspapers). Neither can the government take steps to suppress participation in a protected expressive association. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) ("[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."). The government also cannot prevent expressive associations from participating in litigation to advance their causes. *See NAACP v. Button*, 371 U.S. 415, 429–31 (1963) (NAACP had a First Amendment right to solicit clients for desegregation lawsuits).

14

Here, the Act violates the First Amendment by imposing special burdens on the expression and association of FLOC and its members. In particular, the Act restricts Plaintiffs' ability to benefit from dues checkoff and settlement agreements.

**1. The Act Unconstitutionally Penalizes FLOC and Its Members by Prohibiting Union Dues Checkoffs.**

The Act violates the First Amendment by prohibiting FLOC from negotiating voluntary agreements in which agricultural employers agree to administer union dues deductions at the written request of union members. Such voluntary dues checkoffs are an essential tool for union organizing, particularly where, as here, FLOC and its migrant farmworker members face extreme logistical obstacles to regular dues payment and collection. *See supra* at 10–11. FLOC and its members necessarily rely on dues checkoffs to facilitate the timely and consistent payment of union dues. *See id.* at 9–11.

The First Amendment prohibits the state from imposing this severe burden on the speech and association rights of FLOC and its members. *See Patterson*, 357 U.S. at 460–61; *see also Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 749 (5th Cir. 1993) ("[T]he first amendment is violated by state action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do so.") (citation omitted).

15

The Supreme Court's recent decision in *Ysura v. Pocatello Education Ass'n*, 555 U.S. 353 (2009), and its progeny are instructive. In *Ysura*, a union challenged an Idaho law that banned payroll deductions for private sector unions' political action committee funds and prohibited state and local governments from authorizing public employee payroll deductions for "political purposes." *Id.* at 355–56. The district court struck down the law as applied to local governments and private employers. *Id.* at 357. Notably, neither party appealed the district court's decision with respect to private employers, agreeing that this provision violated the First Amendment. *See id.* at 364 (Ginsburg, J., concurring). Differentiating between a statute that imposes an obstacle on speech and a statute that merely declines to facilitate state support of political speech by public employee unions, the Supreme Court upheld Idaho's ban on "publicly administered payroll deductions for political purposes" because it fell into the latter category. *Id.* at 359.

Following *Ysura*, lower courts have reaffirmed the distinction between permissible government refusal to subsidize dues collection by public sector unions and impermissible government interference with private sector unions' dues checkoff arrangements for their members. In *Wisconsin Education Association Council v. Walker*, 705 F.3d 640 (7th Cir. 2013), for instance, the Seventh Circuit upheld a state statute that prohibited dues checkoffs for most public employee

16

unions because it did "not present a situation where the state itself actively erected an obstacle to speech." *Id.* at 646. The court noted, however, that "[t]he First Amendment would undoubtedly prohibit a state law that itself raised the cost of the Unions' speech." *Id.* at n.2.

Subsequently, a district court struck down an Arizona law that required unions seeking to collect funds via payroll deductions to declare in advance the percentage of those funds to be used for political purposes. *United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1183 (D. Ariz. 2013). The court held that, unlike in *Ysura* and *Wisconsin Education*, the Arizona law "placed an 'obstacle' on union speech that consists of more than just the cost that any party incurs when it speaks." *Id.* at 1185 (citation omitted).

Here, the Act interposes an impermissible government obstacle to FLOC's dues checkoff arrangements, which are voluntarily and independently negotiated with private agricultural producers. The Act's obstacles to private sector negotiation and contracting dramatically raise the costs of FLOC's associative activities, making it all but impossible for the union to perform many of its core functions, let alone advocate for the interests of its members. There is no justification for this interference, particularly since North Carolina, like Arizona,

17

"is a right-to-work state, and employees' choice to pay union dues are already voluntary." *Id.* at 1186.

## 2. The Act Unconstitutionally Penalizes FLOC and Its Members by Prohibiting Settlements.

The Act broadly renders invalid and unenforceable "[a]ny provision that directly or indirectly conditions . . . the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization." Ex. 1 at 23. This provision prevents FLOC from benefiting from settlement agreements conditioned on union recognition or entry into a collective bargaining agreement, two of the most important goals of labor litigation, and may even prevent FLOC from entering into any settlement agreement with an agricultural producer. Ex. 23 ¶31.

The Supreme Court has long recognized the expressive value of litigation. In *NAACP v. Button*, the Court held that the NAACP's assistance with anti-segregation lawsuits was "a form of political expression" and "political association" fully protected by the First Amendment. 371 U.S. at 429, 431. Although "[t]he NAACP is not a conventional political party," the Court recognized that "the litigation it assists, while serving to vindicate the legal rights

18

of members of the American Negro community, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society." *Id.* at 431. Similarly, in *In re Primus*, 436 U.S. 412 (1978), the Court held that the ACLU's solicitation of clients was protected by the First Amendment because "[t]he ACLU engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public" about civil liberties. *Id.* at 431.

By the same token, "unions and union members have rights under the First Amendment to associate and to act collectively to pursue legal action." *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts. Appellate Div. of the Supreme Court of N.Y.*, 852 F.3d 178, 187 (2d Cir. 2017). "This right has attached to the activities of workers who associate with each other to obtain counsel and further their litigation ends, and to the union as a proxy for the workers in their exercise of associational rights." *Id.* at 185. Thus, the Supreme Court has broadly upheld unions' rights to provide legal advice, representation, and other legal services for the benefit of their members. *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 579–80 (1971); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 357, 357–58 (1967); *Bhd. of R.R. Trainmen v. Va. ex rel. Virginia State Bar*, 377 U.S. 1, 8 (1964). "[C]ollective activity undertaken

19

to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transp.* 401 U.S. at 585.

This "right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representation." *Id.* at 585–86. The principle applies with equal force where, as here, a state legislature strips workers of the right to advance their interests through settlement. Litigation in general—and labor litigation in particular— can be complex, time-consuming, uncertain, and expensive. Ex. 23 ¶43. These complexities are amplified where, as in this case, the union's membership is predominantly comprised of migrant workers who face significant logistical barriers to their participation in litigation. The adversarial process is "expensive, unpredictable . . . and, given our scarcity of judges, slow. As a result, the savings to be realized by settlement—in time, money, and risk—are greater than they might be in a quicker, cheaper, and more predictable system." Samuel R. Gross & Kent D. Syverud, *Don't Try: Civil Jury Verdicts in a System Geared to Settlement*, 44 U.C.L.A. L. Rev. 1, 3–4 (1996).

The ability to enter into settlement agreements provides significant benefits to parties, as well as the judicial system. *See Evans v. Jeff D.*, 475 U.S. 717, 736– 37 (1986) ("[F]orcing more cases to trial" would "unnecessarily burden[] the

judicial system, and disserv[e] civil rights litigants"); *Marek v. Chesny*, 473 U.S. 1, 10 (1985) ("[E]ven for those who would prevail at trial, settlement will provide them with compensation at an earlier date without the burdens, stress, and time of litigation."). Settlements can also produce outcomes that achieve the parties' goals better than court-ordered relief. Ex. 23 ¶¶44–46.

By invalidating any settlement conditioned on an agricultural producer's recognition of or entry into an agreement with the union, the Act denies these benefits to FLOC. For all practical purposes, the Act prevents FLOC and its members from using litigation as a tool to secure important benefits, such as union recognition, entry into a CBA, or other labor-related benefits such as an agreement to remain neutral during a union campaign. *Id.* at ¶¶31–32. Indeed, because the Act bars any settlement that stipulates to an agreement between an agricultural producer and a labor union, it prevents FLOC from entering into *any kind of* settlement agreements with an agricultural producer. Ex. 1 at 23; Ex. 23 ¶34.

In short, the Act allows FLOC to benefit from, pursue, or even defend against, litigation only by obtaining a final judgment. The Act makes it impossible for FLOC to realize the benefits of settlement—and, effectively, the benefits of litigation. This restriction on FLOC's ability to meaningfully advance its goals through litigation violates the First Amendment just as surely as if North Carolina

prevented the NAACP from entering into consent decrees to desegregate schools. *See, e.g., Jacksonville Branch, NAACP v. Duval Cty. Sch. Bd.*, 978 F.2d 1574, 1576 (11th Cir. 1992) (consent decree entered into between NAACP and school board to desegregate a public school system).

### 3. The Farm Act Violates the Prohibition Against Speaker- and Viewpoint- Based Discrimination.

The First Amendment violations outlined above are compounded in this case by the Farm Act's discriminatory scope. The provisions at issue here effectively apply to one, and only one, organization: FLOC. "A law that targets a small handful of speakers for discriminatory treatment suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 640 (5th Cir. 2012) (quoting *Minneapolis Star*, 460 U.S. at 585). The connection between discrimination against certain speakers and suppression of expression is particularly evident when the government targets labor unions for special burdens, because union speech is as political as it is economic. *See State Emp. Bargaining Agent Coal.*, 718 F.3d at 134 ("Opposition to labor unions, similarly, has at times been based not only on the perceived economic interests of employers, consumers, and workers, but on the perception that unions advocate radical political ideas.").

22

Like the Arizona law at issue in *United Food*, the Farm Act "singles out a specific group," FLOC, "to be subject to harsh penalties," including practically insurmountable obstacles to fundraising. 934 F. Supp. 2d at 1186. These penalties amount to a limitation on speech and association "by particular speakers to which other speakers are not subject, thereby imposing costs on a particular view"—in this case, the distinct view of FLOC and its farmworker members. *Id.*

Viewpoint discrimination of the sort at issue here is subject to strict scrutiny. *See id.* at 1186–87; *see also Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226–27 (2015). As discussed below, Section 20.5 is not rationally related to any legitimate government interest, and it certainly is not the least restrictive means for furthering any compelling government interest. It thus fails strict scrutiny.

## B. The Farm Act Violates the Equal Protection Clause and Bill of Attainder Clause.

The Act violates the Equal Protection Clause of the Fourteenth Amendment and the Bill of Attainder Clause (Article I, Section 10) of the Constitution by uniquely and punitively stripping from farmworkers and their union the right to make certain legally binding agreements. As this Court has recognized, equal protection and bill of attainder claims may involve analysis of similar and overlapping facts. *See, e.g., Planned Parenthood of Cent. N.C. v. Cansler*, 804 F.

23

Supp. 2d 482, 495-98 (M.D.N.C. 2011). Plaintiffs thus address both claims this section.

### 1. Section 20.5 Violates the Equal Protection Clause because it Does Not Withstand Rational Basis Review.

As set forth above, Plaintiffs' fundamental First Amendment rights are significantly burdened by the Act, which singles out the speech of farmworkers and their union for disadvantaged treatment compared to other private sector workers in the state. Because the Act's classification burdens fundamental First Amendment speech and association rights, it also violates Plaintiffs' right under the Equal Protection Clause.[3] *See Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990), *overruled in non-relevant part by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ("[S]tatutory classifications impinging upon [the fundamental right to engage in political expression] must be narrowly tailored to serve a compelling governmental interest.").

But even if this Court were to apply more deferential rational basis review, the Act violates the Equal Protection Clause, as well as the Bill of Attainder Clause, because it arbitrarily imposes harsh legal disabilities on farmworkers and

---

[3] In their Complaint, Plaintiffs also allege that Section 20.5 violates the Equal Protection Clause and 42 U.S.C. § 1981 because it was motivated, at least in part, by the race, national origin, and/or alienage of North Carolina's farmworker population and FLOC's membership. *See* DE 1 at ¶¶104-119 (Compl).

24

their unions. Under rational basis review applicable to equal protection claims, courts "will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Rational basis review is deferential but not toothless. It is designed to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Id.* at 633.

Section 20.5 was deliberately introduced in a way that guaranteed it received no public hearing and scant debate. *See supra* at 7–9. Vaguely invoking "predatory folks," "a growing wave of folks that are interested in farm labor," and "continued harassment from out of state," Section 20.5's sponsor, Representative Dixon, described FLOC's activities as "making a good living coming around and getting people to be dissatisfied." Ex. 17 at 3–4. At the same time, Dixon affirmed that his fellow agricultural producers were "not afraid of anything," rather, "a few of us" were "getting a little bit tired" of FLOC's organizing activities. *Id.* In statements to the press, Dixon made clear that he was acting at the behest of the Farm Bureau and a few other employers to quell the "undue pressure" posed by FLOC's speech. Ex. 18.

Representative Dixon's additional remarks about being "not afraid of anything" and "an ounce of prevention [being] worth a pound of cure," underscore

that there is no actual government interest addressed by Section 20.5. Ex. 17 at 3. The actual—and indeed, openly expressed—purpose of Section 20.5 is to silence FLOC and its members. *See supra* at 7–9. Agricultural producers in the state are evidently frustrated that FLOC and its members are exercising their First Amendment rights, i.e., "getting people to be dissatisfied" and successfully convincing agricultural producers to enter dues checkoff and settlement agreements. But "a few" agricultural producers' desire to silence speech they dislike is not a compelling government interest. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("mere negative attitudes" or "vague undifferentiated fears" are insufficient to sustain classification); *see also Kelo v. City of New London, Conn.*, 545 U.S. 469, 491 (2005) (Kennedy, J., concurring) ("[A] court applying rational-basis review under the Equal Protection Clause must strike down a government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications.")

While food is indeed "very important," Ex. 17 at 3, there is no rational relation between the legal barriers imposed by the Act and any conceivable legitimate outcome. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary

or irrational." *City of Cleburne,* 473 U.S. at 446. Courts have repeatedly invalidated restrictions that were significantly out of proportion to the purported legitimate ends. *See, e.g., Dep't of Agric. v. Moreno,* 413 U.S. 528, 534 (1973) (interest in preventing fraud did not justify rule denying food stamps to households comprised of unrelated people); *Planned Parenthood*, 804 F. Supp. 2d at 497 (interest in favoring childbirth over abortion did not support "a complete contracting ban" that prohibited Planned Parenthood from receiving funding for non-abortion-related services); *Manwani v. U.S. Dep't of Justice, I.N.S.*, 736 F. Supp. 1367, 1391–92 (W.D.N.C. 1990) (invalidating rule intended to prevent marriage immigration fraud where "at most *a third* of the persons within [the] legislative classification actually possess the trait that Congress has a legitimate interest in reaching" (emphasis in original)).

The interest of concededly "few" agricultural growers in avoiding speech they dislike cannot justify severe burdens to the speech and association interests of over 100,000 farmworkers. *See Plyer v. Doe*, 457 U.S. 202, 220-24 (1982) (weighing government interest in classification against the harsh impact on those affected by it). Nor, given the many other categories of workers in the state deeply

27

involved in ensuring our food supply,[4] is it rational to single out farmworkers and their union for highly disadvantageous treatment. *See City of Cleburne,* 473 U.S. at 450 (city failed to explain why overcrowding concerns justified restrictions on group housing for developmentally disabled persons but not for other group housing); *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1067 (9th Cir. 2014) (striking down policy denying drivers' licenses to one group of immigrants while granting them to similarly situated categories of immigrants).

The Farm Act declares that dues checkoff agreements — valid for all other workers and unions in the state under N.C. Gen. Stat. § 95-25.8 — shall be unenforceable for farmworkers and their union. By imposing these legal disabilities on FLOC and its members without plausible justification and in order to undermine FLOC's organizing activity, the Act raises "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 634–35; *see also Moreno,* 413 U.S. at 534 ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."); *Arizona Dream Act Coal.*, 757 F.3d at 1067 (animus toward recipients of a controversial form of immigration

---

[4] Notably, two of the most significant crops in which North Carolina farmworkers work—tobacco and Christmas trees—are not food. *See* Ex. 4 ¶6.

relief "is not rationally related to a legitimate state interest"). This is especially true where, as here, the law targets a controversial union and a workforce that is overwhelmingly comprised of poor Latino non-citizens, that remains highly segregated by race, and that has been historically subject to racially-motivated exclusions from labor protections. *See supra* at 4–5, 7-9; Ex. 12 ¶¶ 6, 8–10; *cf. Graham v. Richardson*, 403 U.S. 365, 372 (1971) ("Aliens as a class are a prime example of a 'discrete and insular minority' for whom such heightened judicial solicitude is appropriate.") (internal citation omitted). The Farm Act uniquely and harshly impairs the rights of farmworkers and their union to enter into agreements without rational relation to the legislation's purported ends.

### 2.  The Farm Act Is an Unconstitutional Bill of Attainder

By punitively singling out FLOC for harsh legal treatment, the Farm Act also violates the Constitutional prohibition against bills of attainder. A bill of attainder is a law that "singles out an individual or narrow class of persons for punishment without a judicial proceeding." *Planned Parenthood,* 804 F. Supp. 2d at 495 (citing *Lynn v. West*, 134 F.3d 582, 594 n.11 (4th Cir. 1998)). To be a bill of attainder, the legislation must 1) specify affected persons, 2) impose punishment, and 3) fail to provide for judicial trial.  *Planned Parenthood*, 804 F. Supp 2d at 495. Section 20.5 meets each requirement.

First, although FLOC is not identified by name in the Act, it has been the only farmworker union operating in the state for over twenty years. Ex. 4 at ¶5. By specifying that FLOC cannot benefit from dues checkoffs available to other unions, nor enter into settlement agreements available to other unions in the state, Section 20.5 violates the principle that legislatures must accomplish their objectives "by rules of general applicability." *United States v. Brown*, 381 U.S. 437, 461 (1965).

Second, Section 20.5 is punitive. To determine this, courts look at whether a statute falls within the traditional meaning of legislative punishment, fails to further a non-punitive purpose, or is based on a legislative intent to punish. *Planned Parenthood,* 804 F.Supp 2d at 495; *see also Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 473-78 (1977). When the purported punishment does not fall within the traditional understanding of punishment, the courts apply "a functional test . . . analyzing whether the law under challenge viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpuntive legislative purposes." *Nixon*, 433 U.S. at 475–76.

As explained above, Section 20.5 serves no legitimate purpose, and its severe burdens are disproportionate to and attenuated from any conceivable legitimate end. *See id.* at 475 ("Where such legitimate legislative purposes do not

appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers."); *ACORN v. United States*, 618 F.3d 125, 138 (2d Cir. 2010) ("A grave imbalance of disproportion between the burden and the purported nonpunitive purpose suggest punitiveness, even where the statute bears some minimal relation to nonpunitive ends.") (internal citations omitted). Section 20.5 meets the functional test of punishment.

Third, Section 20.5 imposes its punishment—sweeping deprivation of previously-held contractual rights—without any provision for judicial trial.

Because Section 20.5 functions to punish FLOC without a judicial trial, it violates the Bill of Attainder clause.

## II.    Plaintiffs Are Irreparably Harmed By the Farm Act.

Entry of a preliminary injunction is necessary to prevent irreparable harm to Plaintiffs. "[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Moreover, the Act is currently interfering with FLOC's ability to pursue enforceable voluntary agreements that are central to its mission. Ex. 4 ¶¶ 48-49. Absent an injunction, FLOC will need to drastically reorganize its activities and will be unable to sustain the levels of assistance it currently provides to its

members. *Id.* at ¶¶51-59. *See Planned Parenthood*, 804 F. Supp. 2d at 498-99 (recognizing such harms are irreparable).

### III. The Equities and Public Interest Weigh in Favor an Injunction.

As set forth above, Section 20.5 is currently interfering with Plaintiffs' exercise of their constitutional rights. No harm will come to Defendants if Plaintiffs are allowed to continue engaging in the same protected speech activities they engaged in prior to this litigation. *See Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002) ("[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.") (internal quotations omitted). The public interest is served by ensuring that Plaintiffs are no longer subjected to this unconstitutional law. *See id.*

### CONCLUSION

For the reasons stated above, Plaintiffs' Motion for a Preliminary Injunction should be granted.

Respectfully submitted this 20th day of November, 2017,


__/s/ Kristi L. Graunke_____

Kristi L. Graunke
North Carolina Bar No. 51216
kristi.graunke@splcenter.org
Julia Solórzano
Georgia Bar No. 928725
julia.solorzano@splcenter.org
Southern Poverty Law Center
150 E. Ponce de Leon Ave., Ste. 340
Decatur, GA 30030
Graunke Tel.: 334-324-5177
Solórzano Tel: 404-521-6700

Meredith B. Stewart
Louisiana Bar No. 34109
meredith.stewart@splcenter.org
Southern Poverty Law Center
1055 St. Charles Avenue, Ste. 505
New Orleans, LA 70130
Tel.: 504-486-8982
Fax: 504-486-8947

Christopher Brook
North Carolina Bar No. 33838
cbrook@acluofnc.org
ACLU of North Carolina
P. O. Box 28004
Raleigh, NC 27611-8004
Tel: 919-834-3466

Brian Hauss
New York Bar No. 5437751
bhauss@aclu.org
American Civil Liberties Union Foundation[*]
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212-549-2500
Fax: 212-549-2650

Carol Brooke
North Carolina Bar No. 29126
carol@ncjustice.org
Clermont Ripley
North Carolina Bar No. 36761
clermont@ncjustice.org
North Carolina Justice Center
PO Box 28068
Raleigh, NC 27611
Brooke Tel: 919-856-2144
Ripley Tel.: 919-856-2154
Fax: 919-856-2175

Robert J. Willis
North Carolina Bar No. 10730
rwillis@rjwillis-law.com
Law Office of Robert J. Willis, P.A.
P.O. Box 1828
Pittsboro, NC 27312
Tel: 919-821-9031
Fax: 919-821-1763

*Counsel for Plaintiffs*

---

[*] Jacob J. Hutt, Brennan Fellow at the ACLU, contributed substantial research to this brief.

33

## <u>CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATIONS OF LR 7.3(d)</u>

Relying on the word count function of Microsoft Word, I hereby certify that this brief has a word count of 6,887 words, excluding those portions specified in LR 7.3(d) as exempt from the maximum word count. Because this brief exceeds the limit specified in LR 7.3(d), Plaintiffs are separately moving this Court for an extension of the word limitations.

<u>/s/ Kristi L. Graunke    </u>

## CERTIFICATE OF SERVICE

I certify that on November 20, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and mailed true copies of this brief to the following:

Director Marion Warren
c/o Jonathan Harris, Esq., North Carolina Administrative Office of the Courts
901 Corporate Center Drive
Raleigh, North Carolina 27607

Governor Roy Cooper
c/o William McKinney, Esq., Office of the Governor
116 W. Jones Street
Raleigh, North Carolina 27603

Attorney General Josh Stein
Attorney General's Office
9001 Mail Service Center
Raleigh, NC 27699-9001

/s/ Kristi L. Graunke
*Counsel for Plaintiffs*