# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FARM LABOR ORGANIZING          )
COMMITTEE, et al.,             )
                               )
            Plaintiffs,        )
                               )
            v.                 )          1:17cv1037
                               )
JOSHUA STEIN, et al.,          )
                               )
            Defendants.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on the "Motion to Dismiss First Amended Complaint on Behalf of Defendant Warren" (Docket Entry 39)[1] (the "Warren Dismissal Motion"), Defendant Joshua Stein's "Motion to Dismiss First Amended Complaint" (Docket Entry 44) (the "Stein Dismissal Motion," and collectively, the "Dismissal Motions"), the "Motion to Intervene by the North Carolina Farm Bureau Federation, Inc." (Docket Entry 21) (the "Intervention Motion"), and "Plaintiffs' Amended Motion for a Preliminary Injunction" (Docket Entry 34) (the "Preliminary Injunction Motion"). For the reasons that follow, the Court should (i) grant the Warren Dismissal Motion, (ii) deny the Stein Dismissal Motion, (iii) deny the Intervention Motion, and (iv) grant the Preliminary Injunction Motion.

---

1 For legibility reasons, this Opinion omits all-cap font in all quotations.

## BACKGROUND

Asserting constitutional and statutory violations, Victor Toledo Vences, Valentin Alvarado Hernandez (collectively, the "Individual Plaintiffs," and, at times, each an "Individual Plaintiff"), and the Farm Labor Organizing Committee ("FLOC," and collectively with Individual Plaintiffs, the "Plaintiffs") initiated this lawsuit against Roy Cooper, in his official capacity as Governor of the State of North Carolina, and Marion R. Warren, in his official capacity as Director of the North Carolina Administrative Office of the Courts. (See Docket Entry 1 (the "Complaint"), ¶¶ 1, 2, 7, 8.) Shortly thereafter, Plaintiffs filed a motion for preliminary injunction. (See Docket Entry 7.) The North Carolina Farm Bureau Federation, Inc. (the "Farm Bureau") then moved to intervene as a defendant in this action (see Docket Entry 21), and Governor Cooper and Warren moved to dismiss the Complaint (see Docket Entries 24, 27). Subsequently, Plaintiffs filed their "First Amended Complaint for Injunctive and Declaratory Relief" (Docket Entry 31) (the "Amended Complaint"), which replaced Governor Cooper as a defendant with Joshua Stein, in his official capacity as Attorney General of the State of North Carolina. (See id., ¶¶ 7, 8, 12, 13 (identifying Stein and Warren as defendants).) Plaintiffs also filed the instant (amended) Preliminary Injunction Motion, seeking "to preliminary [sic] enjoin Section 20.5 of the

North Carolina General Assembly Session Law 2017-108, SB 615 ('the Farm Act' or 'the Act')."  (Docket Entry 34 at 1.)[2]

According to the Amended Complaint:

"FLOC is a farmworker labor union," whose "goals are to ensure that farmworkers have a voice in decisions that affect them in the workplace and in their communities and to bring all participants in the agricultural supply chain together to improve working conditions for farmworkers."  (Docket Entry 31, ¶ 9.)  "FLOC currently administers collective bargaining agreements covering about 10,000 farmworkers in North Carolina and is actively organizing to increase its membership and pursue new collective bargaining agreements throughout the state."  (Id.)[3]  "Since at least 1997, FLOC has been the only farmworker union organizing and representing farmworkers in North Carolina . . . ."  (Id., ¶ 80.)

Approximately 80% of FLOC's roughly 6,000 dues-paying members work in North Carolina.  (Id., ¶ 27.)  "The vast majority of FLOC's dues-paying North Carolina members are H-2A guestworkers from Mexico who come to North Carolina each year for up to ten months to perform seasonal agricultural work" (id., ¶ 31) pursuant to a "temporary agricultural visa program" (id., ¶ 2).  Individual Plaintiffs fit this profile:  Vences, a Mexican national, "lived

---

2  Docket Entry page citations utilize the CM/ECF footer's pagination.

        3  FLOC's existing collective bargaining agreements expire in 2019 and 2020.  (Id., ¶ 40.)

and worked on a farm in Durham County, North Carolina during the 2017 agricultural season" pursuant to the H-2A visa program, as he has done "[f]or nearly twenty years" in various "North Carolina vegetable and tobacco growing operations" (id., ¶ 10), whereas Hernandez, another Mexican national working under the H-2A visa program, "lived and worked on a farm in Stokes County, North Carolina during the 2017 agricultural season," as he has done "[f]or the past three years" at various "North Carolina vegetable and/or tobacco growing operations" (id., ¶ 11), including an operation owned by one of the North Carolina legislators responsible for the Farm Act (see id., ¶¶ 62, 67, 77).

"FLOC works towards its goals by organizing workers to achieve collective bargaining agreements (CBAs) with agricultural producers in the state, under which farmworkers will be guaranteed certain wages, working conditions, and fair alternative dispute mechanisms for resolving workplace grievances and disputes." (Id., ¶ 29.) "FLOC also publicly engages with the major economic interests at the top of the industry supply chain, such as international tobacco corporations, to convince them to adopt business practices that are fair to both agricultural producers and farmworkers." (Id., ¶ 30.) "FLOC has pursued and secured CBAs and other improvements to farmworker conditions through various strategies, including public campaigns engaging major industry actors like tobacco corporations,

and assisting its members in bringing well-publicized litigation to challenge illegal employment practices." (Id., ¶ 37.)

"On occasion, FLOC has also participated in lawsuits as a party to pursue legal issues of importance to its members, such as in a case addressing whether the federal Department of Labor properly reinstated regulations governing minimum wages for H-2A guestworkers." (Id., ¶ 38.) "Lawsuits in which FLOC participates, or which FLOC assists its members in bringing by providing legal referrals, are meant to achieve tangible gains for FLOC's members and also to educate the public about the working conditions confronted by farmworkers." (Id.) For example, prior to the Farm Act's enactment,

> FLOC assisted some of its members in negotiating for
> voluntary union recognition agreements or an agreement
> for expanded collective bargaining rights as part of a
> class-wide settlement of employment rights litigation
> that was filed by FLOC members. In one such case, the
> defendant employer and the plaintiff farmworkers agreed
> that it was in their mutual interest to resolve the case
> in a settlement agreement that included: employer
> recognition of FLOC as the bargaining representative of
> workers who sign cards affirming their FLOC membership;
> an employer pledge to remain neutral on unionization
> matters in its workforce; dues checkoffs; a guaranteed
> hourly wage of $11.27/hour (increased from a prior wage
> of $8 per hour); worker/employer committees to address
> safety issues, worker housing, and employer
> competitiveness; and adoption of a binding alternative
> dispute mechanism for resolving workplace disputes.

(Id., ¶ 39.)

In sum,

> [t]hroughout the last decade, FLOC members, with the
> support of their union, have brought numerous claims

under the Fair Labor Standards Act and Migrant and
Seasonal Agricultural Worker Protection Act against
several North Carolina agricultural producers seeking
recovery for wage underpayment and other violations.
Such suits have led to recovery of significant amounts of
unpaid wages for hundreds of workers, as well as entry
into a CBA as part of a settlement that occurred in the
course of court-mandated mediation in [one such case].

(Id., ¶ 61.)

At any give time, "approximately 2,000 dues-paying [FLOC]

members [are] located in North Carolina." (Id., ¶ 52; see

also id., ¶ 82.) Most members "live in isolated, employer-owned

labor camps in rural areas throughout the state," without access to

personal transportation. (Id., ¶ 44.) In part "[b]ecause of the

migratory and seasonal nature of their work, language barriers, and

their low incomes, many farmworkers in North Carolina lack access

to credit cards and bank accounts and conduct most transactions in

cash." (Id., ¶ 45.) They also typically work very long hours, up

to seven days a week. (Id., ¶ 53.) These circumstances pose

significant impediments to making recurring payments, such as union

dues. (Id., ¶ 46.) Accordingly, most FLOC members rely on

elective dues checkoff agreements to pay their FLOC membership

fees, pursuant to which their employers "deduct 2.5% of their

weekly wages and directly divert such funds to FLOC for the payment

of union dues" (id., ¶ 48). (Id., ¶ 84.) Since 2005 and 2016,

respectively, Individual Plaintiffs have relied on dues checkoffs

to pay their FLOC dues. (Id., ¶¶ 10, 11.)

Membership dues comprise approximately fifty-to-sixty percent of FLOC's budget. (Id., ¶ 83.) "Because of the size and geographic dispersion of FLOC's North Carolina membership, as well as its own limited resources and staff, FLOC lacks the resources and ability to collect weekly dues directly from each of its approximately 2,000 members who are working in the state at a given time." (Id., ¶ 82.) Thus, prior to the Farm Act's enactment, "it was FLOC's standard practice to negotiate a dues checkoff provision as part of any CBA or other union recognition agreement, in order to facilitate membership for workers who wish to join FLOC." (Id., ¶ 87.)

"As FLOC has increased its membership in North Carolina and expanded the number of workers covered by union agreements, and as its members have been involved in well-publicized litigation, FLOC's organizing drives have been met with considerable backlash by the . . . Farm Bureau . . . and some agricultural producers." (Id., ¶ 63.) In April 2017, three legislators introduced a farming bill, a modified version of which passed the North Carolina Senate on June 12, 2017, and passed the first two of three required readings in the North Carolina House on June 27, 2017, after five public hearings. (See id., ¶¶ 67-69, 72.) A few minutes before five on the evening of June 28, 2017, Representative Jimmy Dixon, who owns Jimmy Dixon Farms in Duplin County, North Carolina, introduced an amendment — the Farm Act — to the farming bill (see

id., ¶¶ 69, 72), which "proposed to amend [North Carolina General Statute Section] 95-79(b)" by adding the underlined text and deleting the stricken text shown below:

> (b) Any provision that directly or indirectly conditions the purchase of agricultural products, ~~products or~~ the terms of an agreement for the purchase of agricultural products, or the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. Further, notwithstanding G.S. 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable against public policy in restraint of trade or commerce in the State of North Carolina.

(Id., ¶ 70 (alterations in original).) The Farm Act "specifie[d] that it is effective when it becomes law and applies to agreements and settlements entered into, renewed, or extended on or after that date." (Id., ¶ 71 (internal quotation marks omitted).)

In introducing the Farm Act, Representative Dixon stated:

> This amendment — there are various organizations that for some time over the last couple of weeks had been looking for the right opportunity but weren't necessarily going to do it, here in the [f]arm [bill], although I think it's very applicable. But that's an explanation of why at this point that we're offering an amendment, Farm Bureau and other farm organizations. And over the last couple of days I've heard from a lot of farmers across the state expressing concerns about this and wishing that there was a vehicle to do what this amendment does. It strengthens our Right to Work statutes by declaring certain agreements involving agriculture producers are against the public policy of North Carolina. The amendment would prohibit the use of litigation to force farms to unionize and ensure farmers are not required to

collect dues for their employees. This reduces a
regulatory burden on farms that is not required under
federal law and is completely within the State's purview
to regulate.

(Id., ¶ 73 (internal quotation marks omitted).) In response to a

question regarding why the Farm Act "would be necessary given the

state's strong right to work laws," he stated:

[b]ecause of continued harassment from out of state there
seems to be a growing wave of folks that are interested
in farm labor. It's — some consider it low-hanging fruit
to do things like that, and it's just a general tendency
for an increase in activity that we consider to be
harassment.

(Id., ¶ 74 (internal quotation marks omitted).)

Finally, in response to a question "whether he was afraid of

farmworker unions organizing, Representative Dixon" stated:

Sir, I'm not afraid of anything, and I understand that
food is very important. And so, no, we're not afraid,
but an ounce of prevention is worth a pound of cure. And
there are predatory folks that make a good living coming
around and getting people to be dissatisfied, and a few
of us farmers are getting a little bit tired of it and we
want some properly measured priority so that we can
continue to feed you.

(Id., ¶ 75 (internal quotation marks omitted).)

The Farm Act passed the House on June 28, 2017, the day of its

introduction. (See id., ¶¶ 72, 77.) Thereafter:

Because the House and Senate versions of the [farming
bill] differed, a conference committee was appointed that
same night. Representative Dixon chaired the House
Conference Committee for the [farming bill] and Senator
Brent Jackson, owner of Jackson Farming Company and one
of the defendants in [a] 2016 wage theft suit brought by
FLOC members, chaired the Senate Conference Committee for
the bill. The Conference Committee completed its report

the same evening, incorporating the amendment, and it was immediately adopted by both chambers.

(Id., ¶ 77.) "Because the [Farm Act] amendment was introduced on the House floor and maintained in the final conference committee report around 11:00 PM that evening, there was never an opportunity for the public to comment during consideration of the amendment." (Id., ¶ 72.) The General Assembly ratified the Farm Act on June 29, 2017, and Governor Cooper signed it into law on July 12, 2017 (id., ¶ 78).

"Because of the Farm Act, FLOC is currently unable to grow its union membership by entering into new agreements with agricultural producers for dues checkoffs." (Id., ¶ 87.) Furthermore, notwithstanding its prior standard practice regarding negotiation of dues checkoff provisions, because of the Farm Act,

> FLOC is unable to negotiate any dues checkoff agreements with any agricultural producers, even though it has had at least one opportunity to negotiate a CBA with an agricultural producer since the Act took effect. FLOC has been unable to negotiate a dues checkoff arrangement because it recognizes that if it did so, FLOC, as well as its members who authorized dues checkoffs, would be subject to investigation and criminal and civil enforcement by Defendant Stein.

(Id.) Additionally, "[w]hen FLOC's existing dues checkoff agreements expire in 2019 and 2020, the Farm Act will force FLOC to divert most of its staff resources to dues collection or other fundraising efforts, gutting its ability to administer CBAs, to assist with member grievances, and to organize new workers into the union." (Id., ¶ 88.) "As a result, FLOC will be forced to provide

10

less personal assistance to members like [Individual Plaintiffs],
who have benefitted individually from FLOC's assistance and
advocacy with workplace grievances, work-related injuries, wage
theft, and other legal matters." (Id.) In addition, "North
Carolina farmworkers who have not yet had an opportunity to meet
with FLOC representatives and learn about the benefits of union
membership will have fewer opportunities for these organizing
contacts." (Id.)

Furthermore,

> [b]y preventing FLOC from settling litigation or
> anticipated litigation as a party, from securing
> recognition as a bargaining representative in settlements
> by FLOC members, or from obtaining CBAs in settlements
> entered into by FLOC members, the Farm Act significantly
> hinders FLOC's ability to advance and publicize its
> members' interests through litigation.

(Id., ¶ 89.) Notably, "[s]ince the Farm Act took effect, FLOC has
had at least one opportunity to assist members who have potential
employment claims to negotiate with their employer for a pre-filing
settlement of such claims." (Id., ¶ 90.) However, "[b]ecause of
the Act, these members are unable to seek a settlement agreement
that includes voluntary recognition of FLOC as their bargaining
representative and dues checkoff. If they did so, they would be
subject to investigation[ and] criminal and civil enforcement by
Defendant Stein." (Id.) "By invalidating and rendering
unenforceable all settlement agreements that stipulate to
recognition of FLOC or an agreement between FLOC and agricultural

11

producers, the Farm Act deprives FLOC and its members [of] the ability to secure and benefit from settlement terms that they believe are in their best interests." (Id., ¶ 91.) Finally, "[b]y invalidating and rendering unenforceable all settlement agreements of any kind between FLOC and agricultural producers, the Farm Act strips from FLOC the right and ability to settle litigation or potential litigation." (Id., ¶ 92.)

As such, Plaintiffs maintain that the Farm Act violates (1) their rights to free expression and free association under the First Amendment, as applied to the states through the Fourteenth Amendment; (2) their rights under the Equal Protection Clause of the Fourteenth Amendment; (3) their rights under 42 United States Code Section 1981; and (4) FLOC's rights under the Bill of Attainder Clause of Article 1, Section 10 of the United States Constitution. (Id., ¶¶ 93-127.) They seek a declaratory judgment to that effect as well as injunctive relief against the Farm Act's enforcement. (See id. at 35-36.)

## DISCUSSION

### I. Dismissal Motions

### A. Relevant Standards

Asserting eleventh-amendment immunity and a lack of standing, Warren and Stein (the "Defendants") seek dismissal of Plaintiffs' Amended Complaint pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules").

12

(See Docket Entry 39 at 1; Docket Entry 40 at 8, 18; Docket Entry 44 at 1; Docket Entry 45 at 7.)  More specifically, Defendants maintain that

> Plaintiffs' Amended Complaint should be dismissed because the Eleventh Amendment bars all the claims brought against [Defendants] in this case, and as a result, this [C]ourt lacks jurisdiction over [them].  Moreover, the Amended Complaint should be dismissed because Plaintiffs[] have failed to demonstrate that they have suffered an injury-in-fact and that any alleged injuries are traceable to [Defendants], and as a result, Plaintiffs lack standing to bring this lawsuit.

(Docket Entry 45 at 7; accord Docket Entry 40 at 8, 23-27.)[4]

The Eleventh Amendment generally shields a State from lawsuits brought by individuals against the State without its consent.  See Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004).  "To ensure

_____

    4 Accordingly, although ostensibly relying on Rules 12(b)(2) and 12(b)(6), Defendants effectively pursue a Rule 12(b)(1) facial challenge to the Court's jurisdiction.  See Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009).  Under such circumstances, Plaintiffs "[are] afforded the same procedural protection as [they] would receive under a Rule 12(b)(6) consideration." Id. (internal quotation marks omitted).  In other words, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." Id.; see also Hutton v. National Bd. of Examiners in Optometry, Inc., 892 F.3d 613, 621 n.7 (4th Cir. 2018) ("In pursuing a facial challenge, the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated.").  Moreover, even if considered under Rule 12(b)(2) standards, at this stage of the proceedings, Plaintiffs would only need to "mak[e] a prima facie showing in support of [their] assertion of jurisdiction." Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014).  And, in analyzing the personal jurisdiction issue, the Court "must construe all relevant pleading allegations in the light most favorable to [P]laintiff[s], assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Id.

the enforcement of federal law, however, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." Id.[5] Under this so-called Ex parte Young exception, "federal courts may exercise jurisdiction over claims against state officials by persons at risk of or suffering from violations by those officials of federally protected rights, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." Republic of Paraguay v. Allen, 134 F.3d 622, 627 (4th Cir. 1998). "The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 330 (4th Cir. 2001). As such, at the motion to dismiss stage, "[f]or purposes of Eleventh Amendment analysis, it is sufficient to determine that [Plaintiffs] allege[] facts that, if proven, would violate federal law and that the requested relief is prospective." South Carolina Wildlife Fed'n v. Limehouse, 549 F.3d 324, 332 (4th Cir. 2008). Finally, eleventh-amendment "sovereign immunity is akin to an affirmative defense, which the defendant bears the burden of demonstrating." Hutto v. South Carolina Ret. Sys., 773 F.3d 536, 543 (4th Cir. 2014).

---

    5 "This standard allows courts to order prospective relief as well as measures ancillary to appropriate prospective relief." Id. (citations omitted).

14

As to standing to pursue this litigation, Plaintiffs must sufficiently allege that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, __ U.S. __, __, 136 S. Ct. 1540, 1547 (2016). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). "When a complaint is evaluated at the pleading stage, however, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the Court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim.'" Hutton v. National Bd. of Examiners in Optometry, Inc., 892 F.3d 613, 620 (4th Cir. 2018) (quoting Lujan, 504 U.S. at 561). "Accordingly, [the Court] accept[s] as true the allegations for which there is sufficient factual matter to render them plausible on their face." Id. (alteration and internal quotation marks omitted).

**B.  Ex Parte Young Analysis**

Relying on the Ex parte Young exception, Plaintiffs pursue claims under 42 U.S.C. § 1983 against Warren "in his official capacity as the Director of the North Carolina Administrative Office of the Courts" (the "AOC") (Docket Entry 31, ¶ 13) and against Stein "in his official capacity as the Attorney General of

the State of North Carolina" (id., ¶ 12).  Defendants dispute the applicability of this exception.  (See generally Docket Entries 39, 40, 44, 45.)   In Defendants' view, North Carolina's eleventh-amendment sovereign immunity shields them from Plaintiffs' claims. (Id.)

As the United States Court of Appeals for the Fourth Circuit has explained:

> Under the *Ex parte Young* exception, a suit in federal court to enjoin a state officer from enforcing an unconstitutional statute is not a suit against the state for purposes of the Eleventh Amendment.  The theory of *Ex parte Young* is that because an unconstitutional statute is void, it cannot cloak an official in the state's sovereign immunity.

Waste Mgmt., 252 F.3d at 329 (citation and internal quotation marks omitted).   Yet, "[i]n making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party."   Ex parte Young, 209 U.S. 123, 157 (1908).  General authority to enforce a state's laws does not suffice.  See Waste Mgmt., 252 F.3d at 331.  Notably, though, the official's duty to enforce the law need not "be declared in the same act which is to be enforced."  Ex parte Young, 209 U.S. at 157.  "The fact that the state officer, by virtue of his office, has some connection with the enforcement of the act, is the

important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists." Id.

"Primarily, th[is special relation] requirement has been a bar to injunctive actions where the relationship between the state official sought to be enjoined and the enforcement of the state statute is significantly attenuated." Limehouse, 549 F.3d at 332-33. "Thus, the [state official's] connection . . . need not be *qualitatively* special; rather, 'special relation' under *Ex parte Young* has served as a measure of *proximity to* and *responsibility for* the challenged state action. This requirement ensures that a federal injunction will be effective with respect to the underlying claim." Id. at 333 (emphasis in original).

### i. Warren

Plaintiffs sue Warren in his capacity as "Director of the AOC," in which role he allegedly "ensur[es] overall compliance with federal and State law" and "researches, formulates legal opinions, gives advice, and makes recommendations on the wide variety of civil, criminal, and constitutional legal concerns faced by and impacting the [North Carolina] Judicial Branch and its officials and employees." (Docket Entry 47 at 3 (alterations and internal quotation marks omitted).) In Plaintiffs' view, "[t]he statute challenged in this action functions primarily through the court system," as (1) those who violate it "are subject to criminal

17

prosecution for a Class H felony and civil enforcement" and (2) it further obliges "courts in North Carolina [to] refuse to enforce or otherwise recognize the legal validity of otherwise enforceable contracts." (Id. at 7-8.) Thus, Plaintiffs posit,

> [a] court order enjoining Warren from enforcing the Farm Act would provide the relief that Plaintiffs seek because Warren is empowered — and indeed has the duty — to provide legal counsel to the courts and otherwise take steps to ensure that the state courts comply with the law. As such, if this Court grants an injunction against. . . the Farm Act, Warren would be required to inform the North Carolina courts of the injunction and ensure that they do not enforce [the Farm Act].

(Id. at 8-9.) In short, Plaintiffs maintain, "because Warren heads an administrative agency that enforces the challenged statute through the state court system, he falls within an exception to Eleventh Amendment sovereign immunity and is therefore a proper defendant." (Id. at 6.)

General authority to enforce state and federal law does not satisfy the Ex parte Young special relationship requirement. See, e.g., Waste Mgmt., 252 F.3d at 331 ("General authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." (internal quotation marks omitted)). Instead, some direct involvement — outside a general duty to uphold the law — must exist before an official possesses the requisite connection to a challenged state action. See, e.g., Limehouse, 549 F.3d at 333-34 (concluding, in action challenging issuance of a final

environmental impact statement (the "FEIS") regarding construction of a bridge (the "Connector") in alleged violation of federal law, that agency director possessed special relationship where, <u>inter alia</u>, (1) "[he] has supervisory authority over the state's participation in the FEIS process," (2) "[he] and his agency are deeply involved in the preparation of the challenged FEIS and the procurement of permits to proceed with construction on the basis of the FEIS," and (3) his agency "will be the agency eventually charged with the actual construction of the Connector").  In this regard, Plaintiffs contend that a state agency's "statutory role in implementing the challenged law" renders the "agency head . . . a proper defendant in actions for injunctive and declaratory relief under *Ex parte Young*."  (Docket Entry 47 at 7 (citing, <u>inter alia</u>, <u>Limehouse</u>, 549 F.3d at 333, <u>Action NC v. Strach</u>, 216 F. Supp. 3d 597, 624-26 (M.D.N.C. 2016), and <u>Red Wolf Coal. v. North Carolina Wildlife Res. Comm'n</u>, No. 2:13cv60, 2014 WL 1922234, at *4 (E.D.N.C. May 13, 2014)).)

As an initial matter, the cases upon which Plaintiffs rely for this proposition reflect direct involvement and active roles in the challenged conduct.  <u>See, e.g.</u>, <u>Action N.C.</u>, 216 F. Supp. 3d at 625 (concluding, in action challenging compliance with the National Voter Registration Act (the "NVRA") that officials whose agencies bore responsibility for (1) "ensuring that voter registration materials and services mandated by . . . the NVRA are made

available through [the agency]," (2) "provid[ing] voter registration services under . . . the NVRA," and/or (3) "ensuring that all [agency] voter registration materials are timely forwarded to the appropriate [election officials]" possessed a special relationship to enforcement of the NVRA (internal quotation marks omitted)); Red Wolf, 2014 WL 1922234, at *4 (concluding, in action alleging "violation of the Endangered Species Act's prohibition on unauthorized takes" that officials who "are clothed with specific statutory duties to *prescribe* the manner of take and set limits on hunting seasons for wild animals classified as non-game animals . . . as well as more generally to *administer* the laws relating to game, freshwater fishes, and other wildlife resources" possessed requisite connection (emphasis in original)). By contrast, insofar as the North Carolina courts play a role in implementing the Farm Act, it arises "merely" from their "general authority to enforce the laws of the state," McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010) (alteration and internal quotation marks omitted), rather than some special connection to the Farm Act. As such, it fails to establish the necessary special relationship for abrogation of North Carolina's sovereign immunity. See id. at 399-401.[6]

---

[6] Further, Plaintiffs do not allege that Warren has issued any advice or legal opinions regarding the Farm Act, let alone that anyone has relied on such advice or opinion to Plaintiffs' detriment. (See generally Docket Entry 31.) As such, Warren's authority to "formulate[] legal opinions, give[] advice, and make[]

Consideration of <u>Ansley v. Warren</u>, No. 1:16cv54, 2016 WL 5213937 (W.D.N.C. Sept. 20, 2016), <u>aff'd</u>, 861 F.3d 512 (4th Cir. 2017), which Plaintiffs highlight as an example of a recent case in which "[t]he AOC Director's role as the head of the North Carolina court system made him a proper defendant" (<u>see</u> Docket Entry 47 at 9), reinforces the conclusion that Warren lacks the necessary relationship in this case.[7] The <u>Ansley</u> plaintiffs challenged the expenditure of public funds to accommodate the recusal of state magistrate judges who possessed "sincerely held religious objection[s]" to performing same-sex marriages. <u>Ansley</u>, 2016 WL 5213937, at *2 (internal quotation marks omitted). As AOC

_____

recommendations" (Docket Entry 47 at 3 (internal quotation marks omitted)) does not establish the necessary special relationship here. <u>See</u> <u>McBurney</u>, 616 F.3d at 400-02.

   7 Plaintiffs also offer "<i>Fisher-Borne v. Smith</i>, 14 F. Supp. 3d 695 (M.D.N.C. 2014)," as an example of a "recent case[] regarding same-sex marriage in North Carolina" in which "[t]he AOC Director's role as the head of the North Carolina court system made him a proper defendant." (Docket Entry 47 at 9.) In that case, though, the AOC Director maintained that he did not qualify as a "proper part[y] to th[e] action," <u>Fisher-Borne v. Smith</u>, No. 1:12cv589, Docket No. 112 at 2 (M.D.N.C. Oct. 7, 2014), and the plaintiffs agreed that the AOC Director and various clerks of court "may be dismissed without prejudice as named [d]efendants," <u>Fisher-Borne v. Smith</u>, No. 1:12cv589, Docket No. 121 at 2 (M.D.N.C. Oct. 9, 2014). Accordingly, that case does not support Plaintiffs' position here. <u>See also, e.g.</u>, <u>Fisher-Borne v. Smith</u>, No. 1:12cv589, Docket No. 118 at 2 (M.D.N.C. Oct. 9, 2014) ("The status reports previously filed by the parties suggest . . . [that t]he Clerks of Superior Court, including the Honorable David L. Churchill, Archie L. Smith, III, and Al Jean Bogle, as well as [AOC Director] John W. Smith, were either not a proper party (Smith) or parties as to whom the cases were moot (Churchill, Smith, and Bogle). As a result, this court understood those parties could be dismissed without prejudice.").

Director, Warren's duties include preparing budgetary estimates, establishing travel reimbursement rates, "determining the number of 'magistrates required for the efficient administration of justice,'" and "'<u>authoriz[ing] expenditures from funds appropriated for these purposes</u>.'"  <u>Id.</u> at *5 (alteration and emphasis in original).  In light of those duties, and noting in particular Warren's "'supervisory control' over the action challenged [t]here — the preparation of budget estimates for the required state funds to operate the judicial department and authorization of expenditures of those funds" — the <u>Ansley</u> court found the necessary "'special relation'" between Warren and "the alleged violation of federal law" to render him an appropriate defendant under <u>Ex parte Young</u>.  <u>Id.</u> at *7.

Here, however, the Amended Complaint alleges no such involvement.  (<u>See generally</u> Docket Entry 31.)  Rather — and tellingly — the <u>only</u> allegations that the Amended Complaint makes against Warren state in their entirety:

> Defendant Marion R. Warren ("Defendant Warren") is sued in his official capacity, administers courts throughout the state, is charged with ensuring the state courts' compliance with federal and state law, is domiciled in the state, and is subject to the personal jurisdiction of this Court.
>
> . . . .
>
> Defendant Warren is sued in his official capacity as the Director of the North Carolina Administrative Office of the Courts (NCAOC).  Pursuant to N.C. Gen. Stat. §§ 7A-340, 7A-341, and 7A-343, the Director of the NCAOC is the administrative head of the NCAOC with

responsibility for carrying out its policies. The
Director's duties include "ensur[ing] overall compliance
with federal and State laws" in the court system. N.C.
Gen. Stat. § 7A-343(3a)(c). Defendant Warren is a person
within the meaning of 42 U.S.C. § 1983 and was acting
under color of state law at all times relevant to this
complaint.

(Id., ¶¶ 8, 13 (alteration in original).) By alleging only a general duty to ensure that North Carolina courts comply with federal and state law, the Amended Complaint fails to establish the necessary special relationship between Warren and the Farm Act. After all, if such a duty sufficed,

then the constitutionality of every act passed by the
legislature could be tested by a suit against [Warren]
. . . . That would be a very convenient way for
obtaining a speedy judicial determination of questions of
constitutional law which may be raised by individuals,
but it is a mode which cannot be applied to the states of
the Union consistently with the fundamental principle
that they cannot, without their assent, be brought into
any court at the suit of private persons.

Ex parte Young, 209 U.S. at 157 (internal quotation marks omitted).

In sum, the Ex parte Young exception does not render Warren a proper defendant in this action. The Court should therefore grant the Warren Dismissal Motion.

### ii. Stein

Unlike with Warren, the Amended Complaint alleges that Stein bears direct enforcement responsibility for violations of the Farm Act. (See Docket Entry 31, ¶¶ 1, 12, 55, 87, 90.) In particular, the Amended Complaint alleges that

[t]he Farm Act targets North Carolina's overwhelmingly
Latino and immigrant farmworker community by stripping

23

them of two significant legal rights enjoyed by all other workers in the state. First, the Act mandates that agreements by agricultural employers to administer payroll union dues deductions requested by employees (commonly known as "dues checkoff" agreements) shall be invalid and unenforceable. Second, the Act declares that settlement agreements that include a stipulation that an agricultural employer will recognize or enter into an agreement with a union shall be invalid and unenforceable. The Act declares that both kinds of agreements are "in restraint of trade or commerce," thereby subjecting parties to such agreements to criminal and civil enforcement action by Defendant Attorney General Joshua Stein.

     . . . .

     Defendant Stein is sued in his official capacity as the Attorney General of the State of North Carolina. Pursuant to N.C. Gen. Stat. §§ 75-1, 75-9, 75-13, and 75-14, the duties of the Attorney General include the authority to investigate and to criminally and civilly prosecute persons and corporations for entering into agreements in restraint of trade or commerce. Defendant Stein is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

(Docket Entry 31, ¶¶ 1, 12 (footnote omitted).)

Under North Carolina law, "[e]very contract, combination . . ., or conspiracy in restraint of trade or commerce in the State of North Carolina is . . . illegal." N.C. Gen. Stat. § 75-1. Moreover, "[e]very person or corporation who shall make any such contract expressly or shall knowingly be a party thereto by implication, or who shall engage in any such combination or

24

conspiracy shall be guilty of a Class H felony." Id.[8]
Significantly,

> [t]he Attorney General of the State of North
> Carolina shall have power, and it shall be his duty, to
> investigate, from time to time, the affairs of all
> corporations or persons doing business in this State,
> which are or may be embraced within the meaning of the
> statutes of this State defining and denouncing trusts and
> combinations against trade and commerce, or which he
> shall be of opinion are so embraced, and all other
> corporations or persons in North Carolina doing business
> in violation of law[] . . . . Such investigation shall
> be with a view of ascertaining whether the law . . . is
> being or has been violated by any such corporation,
> officers or agents or employees thereof, and if so, in
> what respect, with the purpose of acquiring such
> information as may be necessary to enable him to
> prosecute any such corporation, its agents, officers and
> employees for crime, or prosecute civil actions against
> them if he discovers they are liable and should be
> prosecuted.

N.C. Gen. Stat. § 75-9 (emphasis added); see also N.C. Gen. Stat.

§ 75-13 (providing that the Attorney General may initiate and/or

"take charge of and prosecute all cases coming within the purview

of [Chapter 75]"); N.C. Gen. Stat. § 75-14 (providing that "the

Attorney General may prosecute civil actions . . . to obtain a

mandatory order, including (but not limited to) permanent or

temporary injunctions and temporary restraining orders, to carry

out the provisions of [Chapter 75]").

Notwithstanding the foregoing statutory language, Stein

maintains that "Plaintiffs have failed to demonstrate that [he] is

---

8 "A Class H felony conviction carries with it a presumptive
term of imprisonment of up to twenty months." Doe v. Cooper, 842
F.3d 833, 839 (4th Cir. 2016).

responsible for enforcing the challenged provisions of the statute"
(Docket Entry 45 at 10).  As a preliminary matter, this argument
misplaces the burden of persuasion, as "sovereign immunity is akin
to an affirmative defense, which the defendant bears the burden of
demonstrating."  Hutto, 773 F.3d at 543.  As to the substance of
his argument, Stein first emphasizes that the Commissioner of Labor
generally possesses enforcement authority for Chapter 95, which
contains the Farm Act.  (See Docket Entry 54 at 2-3.)  However, the
fact that multiple officials may enforce a provision does not, by
itself, negate the existence of a special relationship with each
such official.  See Limehouse, 549 F.3d at 333 (explaining that
"the [state official's] connection . . . need not be *qualitatively*
special" (emphasis in original)); Does 1-5 v. Cooper, 40 F. Supp.
3d 657, 672-75 (M.D.N.C. 2014) (concluding that, in addition to
"the District Attorneys in each prosecutorial district in North
Carolina," id. at 668, the Attorney General bore requisite
connection); see also Mobil Oil Corp. v. Attorney Gen. of Va., 940
F.2d 73, 76 (4th Cir. 1991) ("The Attorney General also argues that
the act gives her discretionary enforcement authority, and is
intended to be enforced by private suits.  This assertion, even if
true, is irrelevant.  Whether [the plaintiff] has a dispute with
its franchisees does not bear on whether it has a dispute with the
Attorney General." (footnote omitted)).

Furthermore, the Commissioner of Labor enforces the provisions of Chapter 95 through district attorneys, see N.C. Gen. Stat. § 95-4(6), who may enlist the Attorney General's office "to prosecute or assist in the prosecution of criminal cases," N.C. Gen. Stat. § 114-11.6. Thus, rather than refuting the requisite connection, the Commissioner of Labor's enforcement authority further supports the existence of a special relationship between Stein and the Farm Act. See Does 1-5, 40 F. Supp. 3d at 672-74 (concluding, where co-defendant district attorneys bore duty to enforce challenged statute, that, in light of North Carolina General Statute Section 114-11.6, Ex parte Young exception applied to Attorney General, noting that "there is no reason to conclude that Attorney General Cooper does not at the outset have the appropriate statutory authority to enforce a violation of [the challenged statute] in situations where the District Attorneys may be enjoined from such enforcement," id. at 674).[9]

---

[9] Contrary to Stein's contentions (see Docket Entry 54 at 3), the fact that the Attorney General also possesses authority to "take appropriate action in the civil courts of the State to enforce such rules and regulations [as promulgated under Article 1 of Chapter 95]," N.C. Gen. Stat. § 95-13, does not affect whether he possesses authority (1) to prosecute criminal actions for violations of the Farm Act upon request of district attorneys, see N.C. Gen. Stat. §§ 95-4(6), 114-11.6, or (2) as a consequence of his duty to investigate and prosecute (criminally and/or civilly) (A) entities doing business in North Carolina, "which are or may be embraced within the meaning of the statutes of [North Carolina] defining and denouncing trusts and combinations against trade and commerce," N.C. Gen. Stat. § 75-9, as well as (B) "'all . . . corporations or persons in North Carolina doing business in violation of law,'" id. See, e.g., State v. Whitaker, 228 N.C. 352, 45 S.E.2d 860 (1947) (upholding, in appeal defended by the

Stein next argues that, unlike various other statutes, the Farm Act neither explicitly states who will enforce it nor cross-references Chapter 75. (See Docket Entry 45 at 11; Docket Entry 54 at 2-5 (citing, in turn, N.C. Gen. Stat. §§ 133-27, 133-24, 14-113.33, 42A-10, 66-67.5(b), 90-672).) However, the Attorney General's duty to enforce the challenged provisions need not appear in the Farm Act itself for the requisite connection to exist. See Ex parte Young, 209 U.S. at 157. Further, the fact that other statutes, which fall outside Chapter 95, explicitly specify that their violation constitutes "'an unfair trade practice under [North Carolina General Statute Section] 75-1.1'" (Docket Entry 54 at 5 (emphasis added)) does not impact whether violations of the Farm Act also violate Chapter 75. Moreover, the North Carolina Supreme Court has held that violations of multiple provisions in Chapter 95 violated Chapter 75, even though none of those statutes referenced Chapter 75. See Winston Realty Co. v. G.H.G., Inc., 314 N.C. 90, 97, 331 S.E.2d 677, 681 (1985) ("hold[ing] that a violation of either or both [North Carolina General Statute Sections] 95-47.6(2) and (9) as a matter of law constitutes an unfair or deceptive trade practice in violation of [North Carolina General Statute Section] 75-1.1"); State v. Whitaker, 228 N.C. 352, 45 S.E.2d 860 (1947)

Attorney General's Office, Chapter 75 criminal convictions of employer and labor unions for violating North Carolina's right to work laws, codified in relevant part at North Carolina General Statute Sections 95-79(a), 95-80, 95-82), aff'd sub nom. Lincoln Fed. Labor Union No. 19129 v. Northwestern Iron & Metal Co., 335 U.S. 525 (1949).

28

(upholding convictions under Chapter 75 for violating provisions, codified at North Carolina General Statute Sections 95-79(a), 95-80, 95-82, of North Carolina's right to work laws), aff'd sub nom. Lincoln Fed. Labor Union No. 19129 v. Northwestern Iron & Metal Co., 335 U.S. 525 (1949).

In this regard, Whitaker appears especially instructive. In that case, North Carolina obtained criminal convictions under Chapter 75 against an employer and labor unions who entered into an agreement in "violation of Section 2, 3, and 5 of [North Carolina's Right to Work Statute]," Whitaker, 228 N.C. at 353, 356, 366, 45 S.E.2d at 862, 870 (internal quotation marks omitted). See id. at 353-56, 358, 45 S.E.2d at 862-65.[10] Now codified at North Carolina General Statute Section 95-79(a), Section 2 provided that such contracts were "against the public policy and an illegal combination or conspiracy in restraint of trade or commerce in the State of North Carolina." Id. at 354, 45 S.E.2d at 862. As the North Carolina Supreme Court noted, at that time, "Chapter 75 of the General Statutes ma[de] combinations, conspiracies and

---

[10] The Attorney General and his assistants represented North Carolina before the North Carolina Supreme Court in the appeal from the defendants' trial, but the North Carolina Supreme Court decision does not clearly disclose whether they represented North Carolina in the underlying trial. See id. at 355, 358, 45 S.E.2d at 863, 865.

contracts in restraint of trade illegal and punishable as misdemeanors."  Id. at 355, 45 S.E.2d at 863.[11]

Appearing in the same statute as Section 2, the Farm Act provides:

> Any provision that directly or indirectly conditions
> . . . the terms of an agreement not to sue or settle
> litigation upon an agricultural producer's status as a
> union or nonunion employer or entry into or refusal to
> enter into an agreement with a labor union or labor
> organization is invalid and unenforceable as against
> public policy in restraint of trade or commerce in the
> State of North Carolina.  Further . . . an agreement
> requiring an agricultural producer to transfer funds to
> a labor union or labor organization for the purpose of
> paying an employee's membership fee or dues is invalid
> and unenforceable against public policy in restraint of
> trade or commerce in the State of North Carolina.

N.C. Gen. Stat. § 95-79(b) (emphasis added).  The fact that the Farm Act includes substantially the same declaration of agreements as (1) against public policy (2) "in restraint of trade or commerce in the State of North Carolina," as does the other subsection of the same statute, already held enforceable through Chapter 75, strongly counsels that the Farm Act likewise remains subject to enforcement by the Attorney General through Chapter 75.  See National Credit Union Admin. v. First Nat'l Bank & Tr. Co., 522 U.S. 479, 501 (1998) (noting "the established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning"); Northcross v. Board of Educ. of the Memphis City Sch., 412 U.S. 427, 428 (1973)

---

11  Chapter 75 now makes such activity punishable as a felony.
See N.C. Gen. Stat. § 75-1.

("The similarity of language in [two statutes] is, of course, a strong indication that the two statutes should be interpreted pari passu."); see also Sorenson v. Secretary of the Treasury, 475 U.S. 851, 860 (1986) (discussing statutory construction rules, including the "normal rule . . . that identical words used in different parts of the same act are intended to have the same meaning" (internal quotation marks omitted)).

At a minimum, the Farm Act "may be embraced within the meaning of the statutes of [North Carolina] defining and denouncing trusts and combinations against trade and commerce," N.C. Gen. Stat. § 75-9, bringing it within the ambit of North Carolina General Statute Section 75-9 and under the Attorney General's enforcement authority. See also id. (authorizing and obligating Attorney General to investigate and, if appropriate, prosecute "all other corporations or persons in North Carolina doing business in violation of law"). As such, Stein bears the necessary "special relation" to the Farm Act, rendering him a proper defendant under the Ex parte Young exception. See, e.g., Ex parte Young, 209 U.S. at 161 ("[T]he attorney general . . . had a general duty imposed upon him, which includes the right and the power to enforce the statutes of the state, including . . . the act in question, if it were constitutional. His power by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party to [this] suit . . . ."). The Court should

therefore deny Stein's request to dismiss on the basis of sovereign immunity.[12]

## C. Remaining Dismissal Challenges[13]

Stein further argues that Plaintiffs lack standing to pursue this suit, on the grounds that they failed to allege an injury resulting from his enforcement of the Farm Act. (See Docket Entry 45 at 11-21; Docket Entry 54 at 6-11.) Plaintiffs dispute Stein's contentions. (See Docket Entry 49 at 9-24.)

To possess standing, Plaintiffs "must demonstrate a realistic danger of sustaining a direct injury as a result of the [Farm Act's] operation or enforcement." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). However, "[w]hen contesting

---

12  Stein also argues that the Ex parte Young exception does not apply because Plaintiffs "failed to show that there is 'no state forum available to vindicate federal interests' with regard to their claims or that this case 'calls for the interpretation of federal law.' *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 270, 274 (1997)." (Docket Entry 45 at 10 n.2; see also Docket Entry 54 at 1 n.1.) "The fallacy of [Stein's] argument is obvious. Application of the *Ex parte Young* doctrine has not been limited to cases where no state forum is available to decide whether federal law entitles a plaintiff to injunctive relief." Waste Mgmt., 252 F.3d at 330. Rather, this "fundamental reconceptualization of *Ex parte Young*" proposed by two Justices in Coeur d'Alene "was decisively rejected by the other seven Justices." Waste Mgmt., 252 F.3d at 330.

13  Stein divides his remaining dismissal contentions into two groupings. (See Docket Entry 45 at 11 ("II. The Attorney General Is An Improper Party Under 42 U.S.C. § 1983." (emphasis omitted)), 15 ("III. Plaintiffs Lack Standing To Pursue Their [Section] 1983 Claims Against Attorney General Stein." (emphasis omitted)).) However, his "improper party" arguments comprise part of his standing arguments, making joint consideration of these contentions appropriate.

the constitutionality of a criminal statute, it is not necessary that [a] plaintiff first expose himself to actual arrest or prosecution to be entitled to challenge the statute that he claims deters the exercise of his constitutional rights." Id. (internal quotation marks and alterations omitted); see also id. ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." (internal quotation marks omitted)). Moreover, when a plaintiff "is himself an object of the" challenged government stricture, "there is ordinarily little question that the [governmental action] has caused him injury, and that a judgment preventing or requiring the action will redress it." Lujan, 504 U.S. at 561–62.

Here, Stein first contends that Plaintiffs have failed to show a credible threat that he will enforce the Farm Act. (See, e.g., Docket Entry 45 at 11-15; see also id. at 20 ("[E]ven if the Attorney General had the authority to enforce the Farm Act, Plaintiffs have not alleged that the Attorney General has taken, or threatened to take, any action to enforce it.").) North Carolina enacted the Farm Act barely a year ago (see Docket Entry 31, ¶ 1), and only a few months before Plaintiffs filed suit (see Docket Entry 1 at 39). Given the Farm Act's "newly enacted" nature, "[i]t

would be unreasonable to assume that [North Carolina] adopted the [Farm Act] without intending that it be enforced." Mobil Oil, 940 F.2d at 76 (internal quotation marks omitted); see also Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 393 ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."), certified question answered Commonwealth v. American Booksellers Ass'n, Inc., 236 Va. 168, 372 S.E.2d 618 (1988).

Further, Plaintiffs assert that, at the urging of certain farmers (including farmer-legislators), North Carolina enacted the Farm Act to deliberately target FLOC and its members. (See, e.g., Docket Entry 31, ¶¶ 57-81.) Under the circumstances, "[P]laintiffs have alleged an actual and well-founded fear that the law will be enforced against them." American Booksellers, 484 U.S. at 393. In sum:

> This case does not present the Court with a moribund statute. Here, . . . Plaintiffs are faced with a statute . . . so new that it has yet to be fully enforced . . . . Yet, the newness of this statute is also what gives it vigor and potential potency. While the Court knows of no prosecutions under this statute, this is not because the State lacks the will to bring them. Instead, there are no prosecutions because of [the statute's] youth, not the credibility of the threat that the State will enforce it against all people who engage in the conduct encompassed by its prohibitions. This statute is far from moribund; it is not even yet adolescent. Its youth counsels not that it will go unenforced, but instead that the reach of its proscriptions and the zeal of their enforcement remains unknown. The Court [should] find[] Plaintiffs are faced with a statute that is alive and well, and

> backed by a State poised to fully enforce it and a known
> constituency very eager to have it enforced.

Hoffman v. Hunt, 845 F. Supp. 340, 347 (W.D.N.C. 1994) (footnote
omitted).

Nevertheless, Stein maintains that, "to prevail on their
Section 1983 claim, [Plaintiffs] must first show that the Attorney
General acted or threatened to act." (Docket Entry 45 at 13.)[14]
Stein further maintains that "Plaintiffs have failed to show that
the Attorney General has any connection to the harms or injuries
they allegedly suffered," as they "have not alleged that the
Attorney General has taken, or threatened to take, any action to
enforce [the Farm Act]." (Id. at 20.) These arguments echo those
presented in Mobil Oil, where "[t]he gravamen of . . . the Attorney
General's argument [wa]s that unless [the plaintiff] can show that
the Attorney General will enforce the statute, there is no dispute
with the Attorney General." Id., 940 F.2d at 76.

---

14   In making this argument, Stein relies on the McBurney
decision. (See Docket Entry 45 at 13-14.) In that case, the
defendant bore no enforcement authority regarding the challenged
action — denials of records requests under Virginia's Freedom of
Information Act (the "VFOIA") — and thus lacked the necessary
special relationship under Ex parte Young. See McBurney, 616 F.3d
at 399-400. In the absence of such enforcement authority, the
plaintiffs argued that the defendant's "authority to issue official
opinions and advice creates the requisite enforcement connection."
Id. at 400. The Fourth Circuit rejected that argument, explaining
that the defendant "has neither personally denied any of the
[plaintiffs'] VFOIA requests nor advised any other agencies to do
so." Id. at 402. That decision therefore does not support the
proposition that a defendant with enforcement authority for a newly
enacted statute must independently act or threaten to act on such
enforcement authority to qualify as a proper defendant in a Section
1983 suit. See Mobil Oil, 940 F.2d at 76 & n.2.

As the Fourth Circuit explained, such arguments lack merit:

> The Attorney General tries to distance h[im]self from the state, but we think a dispute with a state suffices to create a dispute with the state's enforcement officer sued in a representative capacity. A controversy exists not because the state official is himself a source of injury but because the official represents the state whose statute is being challenged as the source of injury.

Mobil Oil, 940 F.2d at 76 n.2 (alteration and internal quotation marks omitted).

Stein additionally asserts that Plaintiffs have failed to show an injury-in-fact. (Docket Entry 45 at 16-20; Docket Entry 54 at 10-11.) Apparently overlooking Plaintiffs' allegations regarding already-experienced harms (see Docket Entry 31, ¶¶ 87, 90), Stein initially argued that Plaintiffs alleged only a hypothetical and attenuated fear of future injury (see Docket Entry 45 at 17 ("In this case, Plaintiffs have not (and cannot) demonstrate that they have suffered an actual injury. Rather, Plaintiffs complain that they will suffer harm in the future.")). (See generally id. at 15-20.) In his reply brief, however, Stein argues that Plaintiffs' allegations regarding harms experienced "since the passage of the Act" (Docket Entry 49 at 12, 13) "do not constitute an injury-in-fact because the actions they complain they are prevented from taking are not proscribed by the Act." (Docket Entry 54 at 10.) Stein's contentions lack merit.

To begin, Plaintiffs assert that, prior to the passage of the Farm Act, FLOC "pursued and secured CBAs and other improvements to

farmworker conditions through various strategies, including . . . assisting its members in bringing well-publicized litigation to challenge illegal employment practices." (Docket Entry 31, ¶ 37.) For instance, "[b]efore the Farm Act was enacted, FLOC assisted some of its members in negotiating for voluntary union recognition agreements or an agreement for expanded collective bargaining rights as part of a class-wide settlement of employment rights litigation that was filed by FLOC members." (Id., ¶ 39.) These settlements have included "employer recognition of FLOC as the bargaining representative of workers who sign cards affirming their FLOC membership," as well as "dues checkoffs." (Id.) Furthermore, "[p]rior to the Act, it was FLOC's standard practice to negotiate a dues checkoff provision as part of any CBA or other union recognition agreement, in order to facilitate membership for workers who wish to join FLOC." (Id., ¶ 87.)

When farmworkers join FLOC, they typically execute a dues checkoff agreement, "a written authorization, compliant with [North Carolina General Statute Section] 95-25.8, requesting that their employer deduct 2.5% of their weekly wages and directly divert such funds to FLOC for the payment of union dues." (Id., ¶ 48.) Individual Plaintiffs executed such authorizations, paying their FLOC membership fees through dues checkoff agreements during their work in North Carolina in the 2017 and previous agricultural season. (See id., ¶¶ 6, 10, 11.) They wish to continue paying

their FLOC dues through dues checkoffs when they "exercise [their] right to return to North Carolina to work in future agricultural seasons" (id., ¶ 10; accord id., ¶ 11).[15]

_____

15 In this regard, Stein maintains that Individual Plaintiffs fail to allege "an injury or harm that is 'concrete in both a qualitative and temporal sense'" (Docket Entry 45 at 19 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990))), as they "merely assert that they 'plan' on returning to North Carolina to work, and that they want their future employers to deduct union dues from their wages" (id.). As a preliminary matter, because (as discussed below) FLOC possesses standing, whether Individual Plaintiffs "have standing is perhaps a matter of no great consequence." Doe v. Bolton, 410 U.S. 179, 188 (1973). Nevertheless, Individual Plaintiffs' allegations suffice to establish standing, at least at this stage of the proceedings. First, the Amended Complaint alleges that Individual Plaintiffs have worked in North Carolina for several months every year "[f]or nearly twenty years" (Docket Entry 31, ¶ 10) and "[f]or the past three years" (id., ¶ 11), respectively. Further, it alleges that each has a right of rehire that he "plans to exercise . . . to return to North Carolina to work in future agricultural seasons." (Id.; accord id., ¶ 10.) Finally, the Amended Complaint alleges that Individual Plaintiffs have used dues checkoffs to pay their FLOC membership dues since 2005 and 2016, respectively, and wish to continue using dues checkoffs to pay their membership fees in future agricultural seasons, which the Farm Act prohibits. (See id., ¶¶ 10, 11, 56.) Further, even assuming that Vences' dues checkoff remains valid until at least 2019 (see id., ¶¶ 10, 33, 40, 88), because the Amended Complaint does not specify whether Hernandez's previous dues checkoff agreement remains effective for the 2018 agricultural season (see id., ¶ 11), construed in the light most favorable to Plaintiffs, a reasonable inference exists that the Farm Act would prevent at least one Individual Plaintiff from paying his dues through a dues checkoff as early as the 2018 agricultural season. Accordingly, unlike the asserted injury in Whitmore, which involved the possibility that an individual "may eventually secure federal habeas relief[,] . . . . be retried, convicted, and again sentenced to death," id., 495 U.S. at 157, and have his sentence set aside in light of the addition of another individual's crimes to a comparative database, Individual Plaintiffs' allegations neither qualify as "too speculative" nor as "nothing more than conjecture," id. Therefore, Stein's challenge to Individual Plaintiffs' standing fails. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-85 (2000) (concluding that allegations of prior use and desire to resume use of allegedly

FLOC derives the majority of its funding from membership dues. (See id., ¶ 83 ("Union member dues constitute approximately 50-60% of FLOC's annual budget.").) Because of, inter alia, rural isolation, geographic dispersion, lack of access to bank accounts, and long working hours, it generally remains difficult for FLOC members to pay, and for FLOC to collect, membership dues other than through dues checkoff arrangements. (See, e.g., id., ¶¶ 45, 52, 53, 82, 84.) Especially after certain current dues checkoff agreements expire in 2019 and 2020, the Farm Act's invalidation of such agreements will necessitate the diversion of FLOC resources to collect membership dues. (See id., ¶ 88.)

Further, "FLOC does not have the resources and staff to collect dues each week from each and every one of its approximately 2,000 dues-paying members located in North Carolina at a given time." (Id., ¶ 52.) Accordingly, FLOC members, including Individual Plaintiffs, "will have to set aside cash for payment of dues to FLOC," which "will require members to hold cash on their person or in their personal effects in communal labor camp housing for weeks at a time, exposing them to significant danger of robbery or theft." (Id., ¶ 85.) Moreover, the diversion of FLOC resources to collect such dues will harm FLOC's ability to represent and advocate for its members, including Individual Plaintiffs. (Id., ¶ 88.)

---

polluted waterway if pollution stopped satisfied injury-in-fact requirements).

In addition, since the Farm Act's enactment, FLOC "has had at least one opportunity to negotiate a CBA with an agricultural producer," but could not negotiate a dues checkoff in light of the Farm Act's prohibition on such arrangements. (Id., ¶ 87 (alleging that, if it negotiated the dues checkoff, "FLOC, as well as its members who authorized dues checkoffs, would be subject to investigation and criminal and civil enforcement by Defendant Stein").) Additionally, since the Farm Act's enactment, "FLOC has had at least one opportunity to assist members who have potential employment claims to negotiate with their employer for a pre-filing settlement of such claims. Because of the Act, these members are unable to seek a settlement agreement that includes voluntary recognition of FLOC as their bargaining representative and dues checkoff." (Id., ¶ 90 (asserting that, "[i]f they did so, they would be subject to investigation[ and] criminal and civil enforcement by Defendant Stein").)

In Stein's view, "Plaintiffs' contentions do not constitute an injury-in-fact because the actions they complain they are prevented from taking are not proscribed by the Act." (Docket Entry 54 at 10.) According to Stein,

> no reasonable reading of the Farm Act supports Plaintiffs' contention that the Act prohibits FLOC from settling litigation as a party or obtaining a settlement agreement with an agricultural producer "that includes voluntary recognition of FLOC as their bargaining representative." Rather, the statute merely provides that an agricultural producer cannot be forced to enter into an agreement with a labor union or labor

40

organization as a condition of settling litigation or
anticipated litigation.

Second, contrary to Plaintiffs' contentions, the
Farm Act does not prevent parties from entering into dues
checkoff agreements. Rather, the Farm Act simply
provides that an agricultural producer cannot be required
to transfer funds to a labor union or labor organization.
There is nothing in the Farm Act that prevents or
otherwise prohibits an agricultural producer from
voluntarily entering into a dues checkoff agreement or
otherwise voluntarily agreeing to transfer a portion of
an employee's wages to FLOC for the purpose of paying the
employee's membership dues.

(Id. at 10-11 (citations omitted).)

The Farm Act renders

[a]ny provision that directly or indirectly conditions
. . . the terms of an agreement not to sue or settle
litigation upon an agricultural producer's status as a
union or nonunion employer or entry into or refusal to
enter into an agreement with a labor union or labor
organization . . . invalid and unenforceable as against
public policy in restraint of trade or commerce in the
State of North Carolina.

N.C. Gen. Stat. § 95-79(b). It further provides that,

"notwithstanding [North Carolina Statute Section] 95-25.8, an

agreement requiring an agricultural producer to transfer funds to

a labor union or labor organization for the purpose of paying an

employee's membership fee or dues is invalid and unenforceable

against public policy in restraint of trade or commerce in the

State of North Carolina." Id.[16]

_____

16 North Carolina General Statute Section 95-25.8 authorizes
employers to "withhold or divert any portion of an employee's
wages" subject to certain requirements. N.C. Gen. Stat. § 95-
25.8(a). As relevant here (see Docket Entry 31, ¶¶ 10, 11, 48),

[w]hen the . . . rate of the proposed deduction is known

Thus, by its plain terms, the Farm Act prohibits, "as against public policy in restraint of trade or commerce," N.C. Gen. Stat. § 95-79(b), any settlement agreement provisions regarding collective bargaining agreements or voluntary union recognition agreements between agricultural providers and FLOC as well as any settlement agreement between FLOC and an agricultural provider. Further, insofar as "recognition of FLOC as [its members] bargaining representative" (Docket Entry 31, ¶ 90) indirectly conditions a settlement agreement upon "an agricultural producer's status as a union or nonunion employer" and/or "entry into . . . an agreement with a labor union," N.C. Gen. Stat. § 95-79(b), the Farm Act likewise prohibits such agreements. Finally, the Farm Act prohibits farmworker dues checkoff agreements "as against public policy in restraint of trade or commerce," id., regardless of the agricultural producer's and farmworker's compliance with Section 95-25.8.

Accordingly, if Plaintiffs negotiated entry into any such agreements, they would risk investigation and prosecution (by Stein) for "conspir[ing] in restraint of trade or commerce," N.C.

_____

and agreed upon in advance, the employer must have written authorization from the employee which (i) is signed on or before the payday(s) for the pay period(s) from which the deduction is to be made; (ii) indicates the reason for the deduction; and (iii) states the . . . percentage of wages which shall be deducted from one or more paychecks.

N.C. Gen. Stat. § 95-25.8(a)(2).

Gen. Stat. § 75-1, in violation of Chapter 75.  As such,
Plaintiffs' allegations regarding foregone opportunities since the
Farm Act's enactment establish an injury-in-fact.  <u>See, e.g.,</u>
<u>American Booksellers</u>, 484 U.S. at 392 (holding that an injury-in-
fact existed where "the law is aimed directly at plaintiffs, who,
if their interpretation of the statute is correct, will have to
take significant and costly compliance measures or risk criminal
prosecution").  Moreover, particularly at this stage of the
proceedings, Plaintiffs' allegations regarding impending harm from
the invalidation of dues checkoff agreements also suffice to
establish an injury-in-fact.  <u>See, e.g.</u>, <u>id.</u>; <u>see also</u> <u>Mobil Oil</u>,
940 F.2d at 77 (observing that, "[e]ven if [a statute does not
apply to existing contracts], [the plaintiff's] injury is just

deferred; it is still inevitable").[17]  Accordingly, Stein's

standing-related arguments lack merit.

In sum, Plaintiffs possess standing and the <u>Ex parte Young</u>

exception applies to Plaintiffs' suit against Stein.  The Court

should therefore deny the Stein Dismissal Motion.

## II. Intervention Motion

## A.  Preliminary Matters

The Farm Bureau seeks to intervene as a defendant in this

action either as of right, pursuant to Rule 24(a)(2), or

---

17   In this regard, Stein maintains that "FLOC's fear of
injury is too attenuated to support standing" because "FLOC's
collection of dues from its members is entirely dependent on the
conduct of independent actors, i.e. FLOC's members and the
employers," as well as "on the occurrence of a chain of events."
(Docket Entry 45 at 18-19 (citing <u>Clapper v. Amnesty Int'l USA</u>, 568
U.S. 398, 414 (2013)).)  More specifically, according to Stein, a
farmworker must decide to (1) join FLOC and (2) pay the membership
dues through a dues checkoff, which (3) the employer must decide to
honor.  (<u>See</u> <u>id.</u>)  Thus, Stein contends, "[b]ecause the payment of
dues is dependent on so many conditions, and because those
conditions turn on the decisions of independent actors, FLOC's fear
of injury is too attenuated to support standing."  (<u>Id.</u> at 19.)
However, unlike <u>Clapper</u>, which involved potential surveillance of
American-based individuals in communication with individuals
located abroad under a specific governmental surveillance program,
the asserted harms here do not involve actions by multiple
independent actors exercising their discretion.  <u>See</u> <u>Clapper</u>, 568
U.S. at 410-14; <u>see also</u> <u>id.</u> at 414 ("In sum, respondents'
speculative chain of possibilities does not establish that injury
based on potential future surveillance is certainly impending or is
fairly traceable to [the particular surveillance provision].").
Instead, Plaintiffs' dues-related injuries arise from the Farm
Act's prohibition on farmworker dues checkoff agreements rather
than "a highly attenuated chain of possibilities," <u>id.</u> at 410,
involving the discretionary actions of independent individuals.
Accordingly, Stein's <u>Clapper</u>-based argument does not undermine
Plaintiffs' standing.

permissively, pursuant to Rule 24(b)(1)(B). (See Docket Entry 21 at 1.) Defendants "take no position on the [intervention request]," but "Plaintiffs oppose [it]." (Id. at 2; see also Docket Entries dated Jan. 25, 2018, to present (containing response to Intervention Motion from Plaintiffs but not Defendants).)

The Rule in question requires the Court to "permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). In addition, pursuant to this Rule, "the [C]ourt may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In either circumstance, the would-be intervenor must file a "timely motion" to intervene, Fed. R. Civ. P. 24(a) & (b), that "state[s] the grounds for intervention and [is] accompanied by a pleading that sets out the claim or defense for which intervention is sought," Fed. R. Civ. P. 24(c).[18] Finally, when "exercising its discretion [regarding permissive

---

18 The requirement that the proposed "intervenor serve on the existing parties and the court not only its motion to intervene, giving the reasons therefor, but also a pleading 'setting forth the claim or defense for which intervention is sought'" serves to "protect[] existing parties." Bridges v. Department of Md. State Police, 441 F.3d 197, 207-08 (4th Cir. 2006) (quoting Fed. R. Civ. P. 24(c)).

intervention requests], the [C]ourt must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

In this case, the Farm Bureau filed the Intervention Motion on the original defendants' deadline to respond to the Complaint. (See Text Order dated Jan. 9, 2018; see also Docket Entry 21 at 2.) However, rather than attaching a proposed pleading to the Intervention Motion, the Farm Bureau attached a "Proposed Motion to Dismiss and Proposed Memorandum in Support of Proposed Motion to Dismiss" (Docket Entry 21 at 1). (See Docket Entries 21-1, 21-2.) As such, the Farm Bureau and Plaintiffs dispute whether the Intervention Motion complies with the requirements of Rule 24(c). (See Docket Entry 38 at 3-5, 10; Docket Entry 43 at 2 n.1.)

The Fourth Circuit "ha[s] recognized that in very limited circumstances an intervenor can be excused for failing to abide by the letter of Rule 24." Bridges v. Department of Md. State Police, 441 F.3d 197, 208 (4th Cir. 2006) (citing Spring Constr. Co. v. Harris, 614 F.2d 374, 376-77 (4th Cir. 1980)). Both Bridges and Spring Construction involved "'*non-prejudicial technical* defects'" regarding the proposed intervenor's "fail[ure] to file its own pleading at *the same time* that it filed its motion to intervene." Bridges, 441 F.3d at 208 (emphasis in original). More specifically, in Spring Construction, the proposed intervenor filed its complaint a few days after the intervention motion, and in

_Bridges_, an earlier-filed "proposed third amended complaint . . . contained the actual allegations that the would-be plaintiffs would be making against the defendants," thereby "satisfy[ing] in substance the Rule 24(c) requirement that intervenors provide defendants with a copy of their proposed complaint." _Bridges_, 441 F.3d at 208; _see also_ _Spring Constr._, 614 F.2d at 377.

Here, though, the Farm Bureau entirely failed to file a proposed pleading, instead relying on a proposed motion to dismiss for lack of standing. (_See_ Docket Entry 21-1 at 3; Docket Entry 21-2 at 2; Docket Entry 43-1 at 3; Docket Entry 43-2 at 2.) As a consequence of this litigation strategy, although the Farm "Bureau says it wants to intervene to respond to allegations that it intentionally acted to violate Plaintiffs' rights, . . . it never specifies, either in its [Intervention Motion] or in a pleading required by [Rule] 24(c), what its response would be to the particular allegations at issue." (Docket Entry 38 at 10 (asserting that the Farm "Bureau's opacity regarding its role in passing the contested legislation — even as it claims it is entitled to become a party to this lawsuit in order to defend it — underscores that its involvement in this case as a party will only obscure and complicate the issues").) This failure seemingly qualifies as more than a "non-prejudicial technical defect," _Bridges_, 441 F.3d at 208 (emphasis and internal quotation marks omitted). Nevertheless, the Court need not resolve whether the

Farm Bureau's "fail[ure] to abide by the letter of Rule 24," id.,
thwarts its intervention request, for (as discussed below) the
Intervention Motion fails on its merits.

**B.  Intervention of Right**

To establish an entitlement to intervention of right, the Farm
Bureau must "demonstrate:  (1) an interest in the subject matter of
the action;  (2) that the protection of this interest would be
impaired because of the action; and (3) that [its] interest is not
adequately represented by existing parties to the litigation."
Teague v. Bakker, 931 F.2d 259, 260-61 (4th Cir. 1991).  As to the
first requirement, the Farm Bureau maintains that it "has an
interest in the subject matter of the action" because it "has an
interest in [the] enforcement" of the Farm Act, as "the farmers
represented by [the] Farm Bureau are regulated by [it]."  (Docket
Entry 22 at 15 (emphasis omitted).)  Plaintiffs dispute that the
Farm Bureau's asserted interest qualifies as the required
"significantly protectable interest," Teague, 931 F.3d at 261
(internal quotation marks omitted), contending, inter alia, that
the Farm Act does not afford the Farm Bureau's "members any
affirmative protections . . . that they did not previously enjoy"
(Docket Entry 38 at 19 (internal quotation marks omitted)).  See
Stuart v. Huff, No. 1:11cv804, 2011 WL 6740400, at *1 (M.D.N.C.
Dec. 22, 2011) ("It is questionable that each of . . . the proposed
intervenors have 'an interest in the subject matter of the

litigation' as that term has been defined.  Certainly all [proposed intervenors] are interested in the subject matter of the litigation, but that is not the same thing."), aff'd, 706 F.3d 345 (4th Cir. 2013).

The Farm Bureau further asserts that this litigation threatens to adversely impact its interests, as the Farm Act "is of great importance to [the] Farm Bureau and its members."  (Docket Entry 22 at 16.)  In addition, the Farm Bureau maintains that it "could suffer irreparable reputational damage and its members could be subjected to federal investigation, audits, fines, and debarment from the H-2A program" if the Farm Bureau is "unable to defend itself against Plaintiffs' specific allegations that (1) [the] Farm Bureau acted to intentionally obstruct Plaintiffs' exercise of their constitutional rights, and (2) [its] members are exploiting their H-2A workers in violation of the workers' human rights and H-2A program regulations."  (Id.; see also id. at 13 ("Plaintiffs accuse North Carolina farmers of actions that equate to violations of H-2A visa program regulations.").)  According to the Farm Bureau, "[t]hese allegations have been made in the public square and therefore could incite investigations into the claims.  Even if disproven in such a scenario, the potential for undue hardship is substantial and warrants [the] Farm Bureau having an opportunity to defend its members in this forum."  (Id. at 7; see also id. at 9 ("These accusations are demonstrably false, but due to their public

nature nevertheless could expose . . . Farm Bureau members to investigations, audits, fines, and debarment from the H-2A program by the U.S. Department of Labor.").)

Plaintiffs dispute these assertions. First, Plaintiffs maintain that the allegations about which the Farm Bureau complains derive from publically available sources (see Docket Entry 38 at 11) and represent "background . . . context" (id. at 6) that, even if disproven, "would have little or no impact on the constitutional analysis the Court must undertake" (id. at 7). (See also id. ("The [Farm] Bureau's proposed reputational defense of its membership is particularly irrelevant to a determination of Plaintiffs' rights. Whether the [Farm] Bureau's members are complying with H-2A guest worker program regulations has no relevance to whether [the Farm Act] violates Plaintiffs' constitutional rights.").) Plaintiffs further emphasize, inter alia, that (1) the Amended Complaint does not allege that the Farm Bureau or any specific Farm Bureau members violated the H-2A program requirements or farmworkers' rights; (2) this litigation in no manner binds the United States from investigating or enforcing the H-2A program requirements against the Farm Bureau's members; and (3) if the Farm Bureau's members face such enforcement action, "specific fora" exist in which "the accused member may mount a defense," such that, "[i]n the unlikely event that the [Farm] Bureau or its members face harm because of Plaintiffs' allegations, the [Farm] Bureau's lack of party status

will not impair or impede the abilities of the [Farm] Bureau and its members to defend themselves" (id. at 21). (See id. at 11-13.) Finally, Plaintiffs dispute the necessity of the Farm Bureau's intervention on the grounds that "Defendants are already defending [the Farm Act] against Plaintiffs' constitutional claims." (Id. at 21.)

In response, the Farm Bureau narrows the focus of its intervention request to upholding the constitutionality of the Farm Act. (See, e.g., Docket Entry 43 at 3 (asserting that the Farm Bureau "intends to defend the constitutionality of [the Farm Act] in order to protect the interests of its members, not to pursue declaratory judgments that thousands of its individual members are in compliance with the H-2A program"), 5 (asserting that intervention does not risk expansion of discovery to issues regarding, inter alia, farmers' employment practices because "[the Farm Bureau] seeks intervention to defend the interests of its members in preserving the [Farm Act's] protections").)[19]

"It is not necessary to decide [whether the Farm Bureau satisfied the first two elements for Rule 24(a) intervention], however, since the [Farm Bureau] clearly ha[s] not met the third

---

[19]  In addition, the Farm Bureau clarifies that it "articulated its unique interest in opposing those allegations which, if proven, could result in increased government scrutiny against its members" (id. at 4) solely in connection with "its alternative motion for mandatory intervention under Rule 24(a)" (id. at 4 n.3), but "d[oes] not rely on these interests in [seeking] . . . permissive intervention under Rule 24(b)" (id.).

element of the test: [it] ha[s] not shown that [its] interests are not being properly represented by the current Defendants." Stuart, 2011 WL 6740400, at *2. "When the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the [proposed intervenor] must demonstrate adversity of interest, collusion, or nonfeasance." Virginia v. Westinghouse Elec. Corp., 542 F.2d 214, 216 (4th Cir. 1976). Moreover, "where the proposed intervenor shares the same objective as a government party," Stuart v. Huff, 706 F.3d 345, 351 (4th Cir. 2013), "the putative intervenor must mount a strong showing of inadequacy," id. at 352. See also id. (explaining that any lesser requirement "would place a severe and unnecessary burden on government agencies as they seek to fulfill their basic duty of representing the people in matters of public litigation").[20]

---

20 In so holding, the Fourth Circuit observed, "[t]o start, it is among the most elementary functions of a government to serve in a representative capacity on behalf of its people. . . . And the need for government to exercise its representative function is perhaps at its apex where, as here, a duly enacted statute faces a constitutional challenge." Stuart, 706 F.3d at 351. "Moreover, when a statute comes under attack, it is difficult to conceive of an entity better situated to defend it than the government." Id. The Fourth Circuit then concluded:

> [T]o permit private persons and entities to intervene in the government's defense of a statute upon only a nominal showing would greatly complicate the government's job. Faced with the prospect of a deluge of potential intervenors, the government could be compelled to modify its litigation strategy to suit the self-interested motivations of those who seek party status, or else suffer the consequences of a geometrically protracted,

Here, the Farm Bureau's interests align with Defendants, as "[b]oth the government [officials] and the would-be intervenors want the statute to be constitutionally sustained," id. at 352. (See, e.g., Docket Entry 43 at 3 (asserting, in the Farm Bureau's reply brief, that "[its] prior filings make clear that it intends to defend the constitutionality of [the Farm Act] in order to protect the interests of its members, not to pursue declaratory judgments that thousands of its individual members are in compliance with the H-2A program").) Accordingly, the Farm Bureau must "mount a strong showing of inadequacy" to merit intervention of right. Stuart, 706 F.3d at 352. As discussed below, it fails to make such showing.

First, the Farm Bureau maintains that "there is adversity of interest between [the] Farm Bureau and [D]efendants." (Docket Entry 22 at 17.) Specifically, the Farm Bureau contends that its "interests in this litigation go much further and are much more personal, tangible, and pressing than a government official's interest in ensuring that the laws are faithfully executed." (Id. at 18.) However, as the Fourth Circuit has explained,

> stronger, more specific interests do not adverse interests make — and they surely cannot be enough to

> costly, and complicated litigation. In short, the business of the government could hardly be conducted if, in matters of litigation, individual citizens could usually or always intervene and assert individual points of view.

Id. (internal quotation marks omitted).

> establish inadequacy of representation since would-be
> intervenors will nearly always have intense desires that
> are more particular than the state's (or else why seek
> party status at all).  Allowing such interests to rebut
> the presumption of adequacy would simply open the door to
> a complicating host of intervening parties with hardly a
> corresponding benefit.

Stuart, 706 F.3d at 353 (rejecting proposed intervenors' argument that, "as the 'class of beneficiaries protected by the Act,' their interests in defending the Act are 'stronger' and more 'specific' than the state's general interest").

The Farm Bureau further implies that differing litigation strategies justify Rule 24(a) intervention.  (See Docket Entry 43 at 7-8.)  Here, though, the Farm Bureau "share[s] the same objective as the existing government defendants:  upholding the constitutionality of the Act," Stuart, 706 F.3d at 353.  (See, e.g., Docket Entry 43 at 3 (asserting that the Farm Bureau "intends to defend the constitutionality of [the Farm Act]").)  Hence, "the relevant and settled rule is that disagreement over how to approach the conduct of the litigation is not enough to rebut the presumption of adequacy."  Stuart, 706 F.3d at 353; see also Stuart, 2011 WL 6740400, at *2 (rejecting proposed intervenors' arguments "that the existing [d]efendants' decision not to present evidence at a preliminary injunction hearing demonstrates that their interests are not being adequately represented" and "that they would offer additional compelling state interests in support of the Act that the [d]efendants have not brought to the [c]ourt's

attention"). Accordingly, the Farm Bureau fails to demonstrate an adversity of interest sufficient to overcome the strong presumption of Defendants' adequate representation.[21]

Thus, the Farm Bureau lacks entitlement to intervention of right under Rule 24(a).

## C. **Permissive Intervention**

Alternatively, the Farm Bureau seeks permissive intervention under Rule 24(b). (See Docket Entry 21 at 1.) "If intervention of right is not warranted, a court may still allow an applicant to intervene permissively under Rule 24(b), although in that case the court must consider 'whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" Stuart, 706 F.3d at 349 (quoting Fed. R. Civ. P. 24(b)(3)). In this regard, "[i]t is incontrovertible that motions to intervene can have profound implications for district courts' trial management functions. Additional parties can complicate routine scheduling orders, prolong and increase the burdens of discovery

---

21  Given Plaintiffs' and the Farm Bureau's current stance on litigating the Amended Complaints' allegedly reputation-damaging assertions, the Farm Bureau's initial interest in defending against such allegations does not support Rule 24(a) intervention.  Even without such considerations, however, the Farm Bureau's asserted interest would still fail to justify Rule 24(a) intervention.  Put simply, the Farm Bureau has not shown that, if this litigation actually raised such issues, North Carolina government officials would not likewise possess an interest in defending against accusations that "threaten[] the[] very livelihoods" of "North Carolina farmers" (Docket Entry 22 at 19).  (See generally Docket Entries 22, 43.)

and motion practice, thwart settlement, and delay trial." Id. at 350.

The Farm Bureau argues that its intervention will not unduly delay or prejudice the adjudication of the existing parties' rights because it moved to intervene early in the litigation and Plaintiffs' allegations ostensibly render it "a de facto party" (Docket Entry 22 at 2, 12). (See id. at 9-13; Docket Entry 43 at 2-5.) Plaintiffs dispute these assertions, noting as an initial matter that its pleadings "mentioned the [Farm] Bureau only three times in the course of a complaint numbering [over] 3[7] pages and over 124 paragraphs," and "[t]wo of those mentions arose in the context of quoting Representative Jimmy Dixon, the legislator who introduced [the Farm Act]." (Docket Entry 38 at 2-3.)[22] Plaintiffs further contend that the issues that the Farm Bureau originally sought to litigate, namely its putative reputational harm and its members' compliance with the H-2A program requirements, "are largely irrelevant to the disposition of Plaintiffs' claims and will inject substantial burden and delay into these proceedings." (Id. at 5.) Plaintiffs next maintain that permitting the Farm Bureau's intervention would pave the way for intervention by multiple additional parties:

> [i]f the Bureau is allowed to become a party, there is no
> fairly applied limiting principle that would prevent any
> of the tens of thousands of North Carolina agricultural

_____

22 The Complaint measures 39 pages and the Amended Complaint measures 38 pages. (See Docket Entries 1, 31.)

56

producers it claims to represent — or any other interest groups or individuals who may be affected the law — from securing permissive intervention in this case.

(Id. at 13.)  Finally, Plaintiffs contend that "any relevant legal arguments the[ Farm Bureau] intend[s] to assert will be significantly duplicative of those raised by existing [D]efendants," such that "[i]ntervention will require the Court and the existing parties to sift through additional motions and briefing without providing corresponding benefit."  (Id. at 14.)

Under the circumstances, permitting the Farm Bureau to intervene will needlessly complicate and unduly delay the adjudication of the existing parties' rights; it will also needlessly consume both the parties' and the Court's resources. First, insofar as the Farm Bureau seeks intervention to, as initially professed, defend itself against reputational harm and "defend its members against the very serious allegations that they have violated H-2A program regulations" (Docket Entry 22 at 14; see id. at 14-16), those issues seem to hold little relevance to whether the Farm Act violates Plaintiffs' constitutional and statutory rights.  Furthermore, particularly given that the Farm Bureau ostensibly represents "thirty-five thousand farming families" (Docket Entry 43 at 2; see also Docket Entry 22 at 15 (maintaining that the "Farm Bureau represents the interests of tens of thousands of farming families spread across every county of North Carolina")), litigation of those issues would necessarily

consume extensive time and resources (regardless of whether any party engaged in "abusive" discovery (see Docket Entry 43 at 5 (asserting that "it is possible for [the] Farm Bureau to [address these issues] . . . without abusing the discovery process"))). These considerations counsel against intervention. See United States v. North Carolina, No. 1:16cv425, 2016 WL 7335627, at *3 (M.D.N.C. Dec. 16, 2016) (denying Rule 24(b) intervention where it "is likely to significantly complicate the proceedings and unduly expand the scope of discovery in th[e] case, without garnering any ostensible corresponding benefit to the existing parties"); see also Stuart, 706 F.3d at 355 (affirming denial of intervention where it "'would necessarily complicate the discovery process and consume additional resources of the court and the parties'").

Moreover, to permit the Farm Bureau to intervene because (1) the Amended Complaint specifically mentions it, (2) it possesses an interest in the Farm Act's survival, and/or (3) it can present "the unique perspective of North Carolina farmers" (Docket Entry 43 at 6),

would invite [other identified entities[23] as well as the
Farm Bureau's] members to individually petition for
permissive intervention. If such were the case, the
Court could not draw a meaningful line that prevents all
[such entities and individuals] from gaining permissive
intervention in this case, since all would have an
argument for intervention just as tenable as [the Farm
Bureau]. Just dealing with this flood of foreseeable
motions for intervention would cost substantial judicial
resources.

Ohio Valley Envtl. Coal., Inc. v. McCarthy, 313 F.R.D. 10, 31 (S.D.

W. Va. 2015) (denying intervention request). It would be

particularly inappropriate to grant such intervention here, given

the substantial overlap in the legal positions that Defendants and

the Farm Bureau advance. (Compare, e.g., Docket Entries 40, 45

(seeking dismissal on grounds that Plaintiffs lack standing and

Defendants lack enforcement authority), with Docket Entry 43-2

(same).) See Ohio Valley, 313 F.R.D. at 31 (denying intervention

request where it "is likely only to result in duplicative briefing

adding a layer of unwarranted procedural complexity" (internal

quotation marks and brackets omitted).)

Finally, particularly to the extent that the Farm Bureau

"seeks intervention [solely] to defend the interests of its members

_____

        23  For instance, the Amended Complaint alleges that, inter
alia, Representative Dixon (see, e.g., Docket Entry 31, ¶¶ 69, 73-
77), "State Senator Brent Jackson" (id., ¶ 62; see also, e.g., id.,
¶¶ 67, 77), "'other farm organizations'" than the Farm Bureau (id.,
¶¶ 73, 76), "'a lot of farmers across the state'" who contacted
Representative Dixon "'over the last couple of days'" before the
Farm Act's introduction (id., ¶ 73), and "'a few [North Carolina]
farmers [who] are getting a little bit tired of'" FLOC's activities
(id., ¶ 75) all played a role in the Farm Act's passage. As such,
all those entities presumably possess a similar interest in the
Farm Act's continuance.

in preserving the protections of [the Farm Act]" (Docket Entry 43 at 5), it does not need "party status and all the privileges pertaining thereto," <u>Stuart</u>, 706 F.3d at 355, to achieve this objective. Rather, the Farm Bureau "retain[s] the ability to present [its] views in support of the Act by seeking leave to file amicus briefs both in the district court and [in the Fourth Circuit]." <u>Id.</u> Where relevant, the Farm Bureau could use such amicus briefing to "identify, develop, and advance farming-specific factual and legal defenses that may not otherwise occur to the current Defendants" (Docket Entry 43 at 8).[24]

In sum, the Farm Bureau's intervention here "would result in undue delay in adjudication of the merits, without a corresponding benefit to existing litigants, the courts, or the process." <u>Stuart</u>, 2011 WL 6740400, at *3. Accordingly, the Court should deny the Farm Bureau's intervention request.

---

    24    Further, if, contrary to Plaintiffs' current position regarding the relevance of such allegations, this litigation shifts to focus on the purportedly reputation-endangering allegations that trouble the Farm Bureau, the Farm Bureau could at that time seek intervention if amicus status proved inadequate to protect its alleged interests.

## IV. Preliminary Injunction Motion[25]

Finally, Plaintiffs move to preliminarily enjoin Stein from enforcing the Farm Act. (See Docket Entry 34 at 5.) "Courts generally employ preliminary injunctions for the limited purpose of preserving the status quo during the course of litigation in order to prevent irreparable harm and to preserve the ability of the court to render meaningful relief on the merits." Capital Associated Indus., Inc. v. Cooper, 129 F. Supp. 3d 281, 288 (M.D.N.C. 2015). Thus, to succeed on their preliminary injunction request, Plaintiffs must "demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013). Further, although previously courts employed a "'flexible interplay' among all the factors" in considering whether to grant a preliminary injunction, Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., 550 F.2d 189, 196 (4th Cir. 1977), the Fourth Circuit now requires that "each preliminary injunction factor be satisfied as articulated," Pashby, 709 F.3d at 320 (internal quotation marks omitted).

---

25  Plaintiffs requested oral argument on their Preliminary Injunction Motion. (See, e.g., Docket Entry 34 at 5.) However, in the absence of any evidentiary dispute from Stein (the only proper defendant in this litigation) and in light of the recommended disposition of the Preliminary Injunction Motion, the undersigned deemed oral argument unnecessary. See M.D.N.C. LR 7.3(c)(1).

## A.  Factual Background

As relevant to the Preliminary Injunction Motion, the undisputed evidence reflects the following:

Representative Dixon introduced the Farm Act amendment to a pending farm bill shortly before five o'clock on the evening of June 28, 2017.  (Docket Entry 34-18 at 3-6; Docket Entry 34-22 at 2.)  In introducing the Farm Act, Representative Dixon stated that it "would prohibit the use of litigation to force farms to unionize and ensure farmers are not required to collect dues for their employees," thereby "reduc[ing] a regulatory burden on farms that is not required under federal law."  (Docket Entry 34-18 at 4.)  He further indicated that the Farm Act arose from a desire to stop "folks that are interested in farm labor" from "getting people to be dissatisfied" (id. at 5), for, although he denied being "afraid that they're going to organize the farm workers into a union," he expressed that "a few of us farmers are getting a little bit tired of it and we want some properly measured priority so that we can continue to feed you" (id. at 5-6).  In Representative Dixon's view, "[b]ecause of continued harassment from out of state[,] there seems to be a growing wave of folks that are interested in farm labor" as well as "a general tendency for an increase in activity that we consider to be harassment."  (Id. at 5.)

"[S]ince the 1990s, FLOC has been the only union organizing and representing farmworkers in North Carolina."  (Docket Entry 34-

5, ¶ 6; see also id., ¶ 54.)[26]  FLOC's "ultimate goals are to ensure that all farmworkers in North Carolina receive fair wages, work in safe conditions, and are able to voice concerns about work without fear of retaliation."  (Id., ¶ 6.)  "FLOC works towards its goals by organizing workers to achieve collective bargaining agreements (CBAs) with agricultural producers in the state, which guarantee farmworkers certain wages, working conditions, and fair alternative dispute mechanisms for resolving workplace grievances and disputes."  (Id., ¶ 9.)  "[N]o federal or state law requir[es] union elections or . . . mandatory recognition of farmworker unions. . . .  Therefore, FLOC and agricultural employers in North Carolina have voluntarily entered into all existing CBAs in the state."  (Id., ¶ 11.)

Roughly eighty percent of FLOC's 6,000 dues-paying members work in North Carolina.  (Id., ¶ 5.)  "The vast majority" of these "members are H-2A 'guestworkers' from Mexico who come to North Carolina each year for six to ten months to perform seasonal agricultural work."  (Id., ¶ 7.)  Most H-2A guestworkers in North Carolina "work in tobacco, Christmas trees, and sweet potatoes." (Id.)  H-2A workers and other migrant farmworkers "typically live in isolated, employer-owned labor camps in rural areas," without access to personal transportation.  (Id., ¶ 40; accord Docket Entry 34-6, ¶ 21; Docket Entry 34-7, ¶ 15.)  H-2A workers usually receive

---

26  FLOC has maintained an office in North Carolina for more than ten years.  (Id., ¶ 2.)

their pay via "checks which their employers cash for them, or which they must take to local stores that offer check cashing services for a fee." (Docket Entry 34-5, ¶ 43; accord Docket Entry 34-6, ¶ 20; Docket Entry 34-7, ¶ 14.) Migrant farmworkers in North Carolina, including H-2A workers, generally lack access to bank accounts and credit cards and "conduct most transactions by cash." (Docket Entry 34-5, ¶ 44; Docket Entry 34-6, ¶¶ 20-22; Docket Entry 34-7, ¶¶ 14-16.) Due to the seasonal and weather-dependent nature of their work, as well as the piece-rate basis by which they "are often paid," farmworkers' "earnings generally fluctuate throughout the season." (Docket Entry 34-5, ¶ 42.) "In many cases, . . . the transaction fees for wiring weekly dues w[ould] be more than the dues owed." (Id., ¶ 57.)

Member dues comprise roughly fifty-to-sixty percent of FLOC's annual budget, rendering timely, consistent dues collection "essential to FLOC's ability to administer CBAs and provide services to its worker-members." (Id., ¶ 56.) "The Farm Act guts [FLOC's] ability to maintain this essential and irreplaceable source of funding" (id.), as the majority of members "pay their dues through dues checkoffs" (id., ¶ 46) and face significant challenges to utilizing alternative payment methods (see, e.g., id., ¶ 57). Due to "the size and geographic dispersion of FLOC's North Carolina membership as well as [its] own limited resources and staff, FLOC lacks the resources and ability to collect weekly

dues directly from each of [its] approximately 2,000 dues paying members who are working in the state at a given time." (Id., ¶ 55.)[27] In the absence of the weekly dues-checkoffs upon which they rely to pay their membership dues (see id., ¶ 57), FLOC members will need "to hold cash on their person or in their personal property in the labor camp housing for weeks at a time," placing them "at significant risk of robbery or theft" (id., ¶ 58). (See also Docket Entry 34-6, ¶ 21 (attesting to dangers of theft or loss in such circumstances); Docket Entry 34-7, ¶ 15 (same).)

Because of the importance of dues checkoffs for FLOC and its members (see, e.g., Docket Entry 34-5, ¶¶ 55-57), every CBA that "FLOC has negotiated or entered into in North Carolina prior to the Act included a dues checkoff provision." (Id., ¶ 49.) In light of the Farm Act and associated threat of civil enforcement and criminal prosecution, however, FLOC could not pursue a dues checkoff provision in negotiations that it has engaged in with an agricultural producer "on behalf of approximately 35 employees who are FLOC members" since the Farm Act's enactment (and filing of this lawsuit). (Id.) This represents "significant lost

_____

    27   FLOC's "membership is widely dispersed throughout the state, with members located as far west as Tuckasegee, as far east as Jacksonville, as far south as Whiteville and Chadbourn, and as far north as Grassy Creek." (Id., ¶ 39; see also Docket Entry 34-6, ¶ 17 ("In 2017, [an Individual Plaintiff] ha[s] been working for a grower in Rougemont, North Carolina.").) Moreover, FLOC members "covered by [one of the two CBAs that FLOC administers in North Carolina (see Docket Entry 34-5, ¶ 10)] live in employer-provided housing spread out over approximately 1,000 labor camps." (Id., ¶ 48.)

opportunity for FLOC and its members, especially because the agreements [they] negotiate typically last multiple years." (Id.)

Historically, FLOC and its members have obtained "CBAs and other improvements to farmworker conditions through," inter alia, "well-publicized litigation to challenge illegal employment practices." (Id., ¶ 14.) "Lawsuits in which FLOC participates, or which FLOC assists [its] members in bringing by providing legal referrals, are meant to recover unpaid wages and other restitution for workers, to win better conditions for FLOC's members, and also to educate the public about the working conditions confronted by farmworkers." (Id., ¶ 16.) Prior to the Farm Act's enactment, FLOC members obtained "voluntary union recognition or expanded collective bargaining rights," as well as monetary restitution, through settlement agreements. (Id., ¶ 17; see also id., ¶¶ 18, 31.) On threat of civil and criminal enforcement, the Farm Act "prevents [FLOC] from settling litigation if [it is] a party to a lawsuit with an agricultural producer, or to have FLOC recognized as a bargaining representative in settlements by FLOC members, or to have FLOC CBAs voluntarily agreed to in the course of settlements entered into by [FLOC] members." (Id., ¶ 51.)

Since the Farm Act's enactment (and the filing of this lawsuit), FLOC has assisted certain of its "members who have potential legal claims against their employer based on state laws that prohibit retaliation when workers speak up about unsafe

working conditions. . . . in trying to resolve the legal issues without litigation." (Id., ¶ 52.) "Because of the Farm Act, these FLOC members no longer have the option to negotiate for voluntary union recognition agreements with dues checkoff or to secure an agreement for expanded collective bargaining rights as part of a group settlement agreement that would seek restitution and also non-monetary terms to resolve their claims." (Id.) FLOC has similarly assisted certain of its members with "obtaining legal counsel to assert claims for unpaid wages under federal and state laws," but "[b]ecause of the Act, these members will not have the option of seeking a CBA or other union recognition or dues checkoff agreement in addition to monetary compensation." (Id., ¶ 53.)

## B. Analysis

In support of their Preliminary Injunction Motion, Plaintiffs maintain that they "are likely to succeed on the merits of their arguments that," inter alia, "the Farm Act violates . . . the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." (Docket Entry 34 at 3.) They further contend that (1) they "are suffering irreparable harm as a result of the Farm Act," (2) issuance "of an injunction poses no harm to [Stein], as it would restrain enforcement of an unconstitutional law," and (3) "[a]n injunction would be in the public interest." (Id.) In response, Stein raises the same basic arguments that he offered in support of the Stein Dismissal Motion. (Compare Docket Entry 46,

<u>with</u> Docket Entry 45.)  For the reasons previously discussed, those arguments fail.  This failure does not, however, automatically entitle Plaintiffs to a preliminary injunction.  <u>See, e.g.</u>, <u>Nutramax Labs., Inc. v. Pure Supplements Ltd.</u>, No. 0:17cv1260, 2017 WL 2772485 (D.S.C. June 27, 2017) (analyzing unopposed motion for preliminary injunction).

### i.  Likelihood of Success on the Merits

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "[T]he purpose of the [E]qual [P]rotection [C]lause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (internal quotation marks omitted).  Accordingly, although the Equal Protection Clause "does not take from the States all power of classification," <u>Personnel Adm'r v. Feeney</u>, 442 U.S. 256, 271 (1979), it "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992).

Thus, to succeed on their equal protection claim, Plaintiffs

must first demonstrate that [they] ha[ve] been treated
differently from others with whom [they are] similarly

situated and that the unequal treatment was the result of
intentional or purposeful discrimination. Once this
showing is made, the court proceeds to determine whether
the disparity in treatment can be justified under the
requisite level of scrutiny.

Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). Under

this analysis, "[i]f the classification utilized is explicitly

stated on the face of a statute or in the reasons given for its

administration or enforcement, then the equal protection analysis

requires [courts] to determine whether an appropriate relationship

exists between the legislative purpose and the classification

adopted to achieve that purpose." Sylvia Dev. Corp. v. Calvert

Cty., 48 F.3d 810, 819 (4th Cir. 1995). Finally, "if a law neither

burdens a fundamental right nor targets a suspect class, [courts]

will uphold the legislative classification so long as it bears a

rational relation to some legitimate end." Romer v. Evans, 517

U.S. 620, 631 (1996).[28]

---

28  In this regard, the Fourth Circuit has explained:

      Ordinarily, a state regulation or policy will be
presumed to be valid and will be sustained if the
classification is rationally related to a legitimate
state interest. When the state classifies by race,
alienage, or national origin, however, special concerns
are implicated. Such factors are "seldom relevant to the
achievement of any legitimate state interest" and,
therefore, "are deemed to reflect prejudice and antipathy
— a view that those in the burdened class are not as
worthy or deserving as others." Thus, . . .
classifications which are based upon these factors, or
which impinge upon fundamental rights protected by the
Constitution, are subjected to stricter scrutiny,
sustained only if they are narrowly tailored to serve a
compelling state interest.

Plaintiffs contend that the Farm Act "burdens [their] fundamental First Amendment speech and association rights" (Docket Entry 35 at 18), thereby triggering strict scrutiny (see id. at 18-19).[29] They also argue, however, that the Farm Act fails rational basis review. (See id. at 18-22.) Because they establish a likelihood of success under rational basis review, the Court need not determine whether strict scrutiny applies to their Equal Protection Claim.

As a preliminary matter, Plaintiffs assert that the Farm Act intentionally discriminates against farmworkers and their union compared to all other private sector workers and unions in North Carolina. (See id. at 18 (asserting that the Farm Act "uniquely and punitively strip[s] from farmworkers and their union the right to make certain legally binding agreements," thereby "singl[ing] out . . . farmworkers and their union for disadvantaged treatment compared to other private sector workers in the state"); see also id. at 21 (maintaining that the Farm Act treats "farmworkers and their union" differently from "all other workers and unions in the

Morrison, 239 F.3d at 654 (citations omitted).

29    Plaintiffs further assert that the inference of discriminatory treatment triggered by the Farm Act's apparent lack of "plausible justification" gains extra force because "the law targets a controversial union and a workforce that is overwhelmingly comprised of poor Latino non-citizens, that remains highly segregated by race, and that has been historically subject to racially-motivated exclusions from labor protections." (Id. at 22.) Nevertheless, Plaintiffs do not maintain that the Farm Act constitutes a racial or alienage classification that would require strict scrutiny review. (See id. at 18-22.)

state under [North Carolina General Statute Section] 95-25.8").)
Stein disputes neither that contention nor the argument that
Plaintiffs qualify as similarly situated to "all other workers and
unions in the state" (id. at 21), at least as relevant to the
instant matter. (See generally Docket Entry 46.) Moreover, North
Carolina General Statute Section 95-25.8 imposes no limitations
regarding categories of workers permitted to authorize union dues
withholding, see generally id., and the undersigned's research
uncovered no statutory bar on such withholdings by any group of
private sector employees other than farmworkers.[30]

Under these circumstances, Plaintiffs will likely succeed on
the first step of their Equal Protection Claim. See Morrison, 239
F.3d at 654; Sylvia, 48 F.3d at 819. The inquiry thus turns to
whether the differential treatment of farmworkers and their union
bears a rational relationship to a legitimate government interest.
See Romer, 517 U.S. at 631. Stein offers no justification for the
Farm Act (see Docket Entry 46), but in sponsoring the Farm Act,
Representative Dixon offered three rationales for its passage

---

30  In addition, the Farm Act's legislative history reflects
an intent to target "folks that are interested in farm labor" and
particularly those who "make a good living coming around and
getting people to be dissatisfied." (Docket Entry 34-18 at 5.)
Such evidence bears on the Equal Protection Clause analysis.
Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429
U.S. 252, 268 (1977) (observing that, in determining discriminatory
intent, "[t]he legislative or administrative history may be highly
relevant, especially where there are contemporary statements by
members of the decisionmaking body, minutes of its meetings, or
reports").

(see Docket Entry 34-18 at 3-6). First, Representative Dixon maintained that the Farm Act "reduces a regulatory burden on farms." (Id. at 4.) However, the precluded activities (dues checkoffs and certain settlement provisions) arose from voluntary agreements between farmers, farmworkers, and/or FLOC rather than any regulatory mandate. (See Docket Entry 34-5, ¶ 11.) Moreover, the Farm Act does not affect payroll deductions for anything other than payment of union dues. See N.C. Gen. Stat. § 95-79(b). The Farm Act thus does not appear rationally related to reducing farmers' regulatory burdens. See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

Representative Dixon further maintained that the Farm Act restrictions derive from a need to ensure that those farmers who "are getting a little bit tired" of "predatory folks that make a good living coming around and getting people to be dissatisfied" obtain "some properly measured priority so that [they] can continue to feed [people]." (Docket Entry 34-18 at 5-6.) On the current record, concern for the food supply does not bear a rational connection to restrictions on the organizing activity (through voluntary settlements) of all farmworkers and their union, given that (1) two of the three main crops tended by H-2A workers — who comprise the majority of FLOC's membership — do not involve food

(see Docket Entry 34-5, ¶ 7 (explaining that most such "workers work in tobacco, Christmas trees, and sweet potatoes")) and (2) the prohibitions do not apply to any other workers involved in the food supply chain, see, e.g., N.C. Gen. Stat. §§ 95-25.8, 95-79(b). See City of Cleburne, 473 U.S. at 449-50 (finding that proffered explanations failed to "rationally justify" differential treatment of particular group); see also Arizona Dream Act Coal. v. Brewer, 757 F.3d 1053, 1066 (9th Cir. 2014) (finding likely equal protection violation where, inter alia, the asserted underlying "'concern has not been borne out by the numbers'").

As a final justification for the Farm Act, Representative Dixon maintained that "a few" North Carolina farmers have grown "tired" of "harassment" by "folks that are interested in farm labor," including those "coming around and getting [farmworkers] to be dissatisfied." (Docket Entry 34-18 at 5-6; see also Docket Entry 35 at 20 (asserting that the Farm Act's "openly expressed purpose . . . is to silence FLOC and its members")). However, a desire to suppress farmworkers' organizational efforts likely does not constitute a legitimate government interest. See Romer, 517 U.S. at 634 (explaining that "'a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest'" (emphasis and ellipsis in original)).

73

In sum, Plaintiffs have established a likelihood of success on the merits of their Equal Protection Claim.[31]

## ii. Irreparable Harm

Plaintiffs assert that they will suffer irreparable harm without an injunction because, in part, "the Act subjects FLOC, its representatives, and its members to criminal prosecution and civil liability for entering into voluntary agreements that are central to its mission." (Docket Entry 35 at 24.) In addition, because of the Act, FLOC cannot "engage in collective bargaining activity that was its standard practice prior to the Act." (Id.) For instance, since the Farm Act's passage, "FLOC has engaged in negotiations with one agricultural producer in North Carolina" to resolve certain FLOC members' legal claims, but because of the threat of civil and criminal prosecution, FLOC and its members could not negotiate for union recognition, a CBA, and/or dues checkoff in any settlement of this dispute. (Docket Entry 34-5, ¶¶ 49, 51, 52.) The same holds true for another group of FLOC members whom "FLOC has also been assisting . . . to assert claims for unpaid wages." (Id., ¶ 53.) These situations each represent "a significant lost opportunity for FLOC and its members," particularly given that its agreements "typically last multiple years." (Id., ¶ 49.)

--------------------------------

31 As such, the Court need not determine whether Plaintiffs independently established a likelihood of success on their other claims.

"Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate. Thus, when the record indicates that [the] plaintiff's loss is a matter of simple mathematic calculation, a plaintiff fails to establish irreparable injury for preliminary injunction purposes." Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551-52 (4th Cir. 1994) (alteration, citation, and internal quotation marks omitted). However, because "irreparability of harm includes the impossibility of ascertaining with any accuracy the extent of the loss," Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1055 (4th Cir. 1985) (internal quotation marks omitted), intangible injuries often qualify as irreparable. See, e.g., Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm.").

Here, the foregone negotiating opportunities and the harm to FLOC's recruitment abilities likely represent intangible, unquantifiable harms that monetary damages cannot adequately compensate. Accordingly, Plaintiffs have established that, absent an injunction, they will likely suffer irreparable harm. See, e.g., Federal Leasing, Inc. v. Underwriters at Lloyd's, 650 F.2d 495, 500 (4th Cir. 1981) (finding irreparable injury where the "present predicament endangers [the plaintiff's] relations with

customers and investors," noting that "such damage is incalculable[,] not incalculably great or small, just incalculable" (internal quotation marks omitted)); see also Wilson v. Thomas, No. 5:14-cv-85, 2014 WL 7405462, at *3 (E.D.N.C. Dec. 23, 2014) (explaining, in case "implicat[ing] the [E]qual [P]rotection and [D]ue [P]rocess [C]lauses of the Fourteenth Amendment," that, because "plaintiffs allege constitutional harms and have established their likelihood of success on the merits, they have likewise established the existence of irreparable harm based on the infringements of their constitutional rights").

### iii.  **Balance of the Equities**

In addition, Plaintiffs maintain that the "[e]quities [f]avor an [i]njunction" because, inter alia, "[n]o harm will come to [Stein]" if he cannot enforce "a likely unconstitutional law." (Docket Entry 35 at 25 (emphasis omitted).)  In response, Stein identifies no harm that issuance of the injunction would cause (see generally Docket Entry 46) and, indeed, disputes whether he possesses enforcement authority over the Farm Act in the first place (see, e.g., id. at 14 ("[T]he Attorney General does not have enforcement authority under the statute.")).  Under the circumstances, enjoining Stein from enforcing the Farm Act "would not impose any undue burden on [Stein], since the injunction would not . . . impose any burden on the state."  Planned Parenthood of Cent. N.C. v. Cansler, 804 F. Supp. 2d 482, 500 (M.D.N.C. 2011).

Moreover, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted). Thus, particularly in the absence of any asserted harm to Stein, the equities favor Plaintiffs.

### iv. Public Interest

Plaintiffs further contend that issuance of "[a]n injunction would be in the public interest because it would restore the status quo that existed before the recent enactment of the Farm Act" (Docket Entry 34 at 3-4) and would "ensur[e] that Plaintiffs are no longer subjected to this unconstitutional law" (Docket Entry 35 at 25 (citing Giovani Carandola, 303 F.3d at 521)). The Fourth Circuit "has defined the status quo as the last uncontested status between the parties which preceded the controversy." Pashby, 709 F.3d at 320 (internal quotation marks omitted); see also Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 378 (4th Cir. 2012) ("The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy." (internal quotation marks omitted)). Here, the last uncontested status between the parties occurred before enactment of the Farm Act. Thus, an

injunction would serve to preserve the status quo.  Preservation of
the status quo, in turn, serves the public interest.  See, e.g.,
Blackwelder, 550 F.2d at 197 (noting "the 'public interest' in
preserving the status quo ante litem until the merits of a serious
controversy can be fully considered by a trial court").

Moreover, "upholding constitutional rights surely serves the
public interest."  Giovani Carandola, 303 F.3d at 521; see also,
e.g., City of Greensboro v. Guilford Cty. Bd. of Elections, 120 F.
Supp. 3d 479, 490 (M.D.N.C. 2015) (finding, where the plaintiffs
established a likelihood of success on their equal protection claim
regarding new election procedures, that "[t]he public interest is
served by holding the 2015 elections according to a
long-established system, as to which there has not been a
constitutional challenge, rather than a system that poses serious
constitutional concerns"); Wilson, 2014 WL 7405462, at *3 ("As
[the] plaintiffs have shown a likelihood of success on the merits,
the public interest lies with . . . prohibiting what appears to be
a violation of the law.").

Accordingly, under the circumstances presented, issuance of an
injunction would serve the public interest.

### v.  Security Requirement

Finally, Plaintiffs assert that "[they] should not be required
to post a security bond because no harm, pecuniary or otherwise,
will result to [Stein] if an injunction is granted."  (Docket Entry

34 at 4.) Stein does not dispute this assertion. (<u>See</u> Docket Entry 46.) A court possesses authority to "waive the security requirement" when issuing a preliminary injunction. <u>Pashby</u>, 709 F.3d at 332. Here, "[g]iven the lack of any monetary injury to [Stein], no bond [should] be required." <u>Planned Parenthood</u>, 804 F. Supp. 2d at 501 (waiving bond requirement).

In sum, Plaintiffs have established a likelihood of success on the merits, irreparable harm in the absence of an injunction, a favorable balance of the equities, a public interest in the injunction, and grounds for waiver of a security bond. Therefore, the Court should grant Plaintiffs' request to enter an injunction without requiring them to post any bond.

## CONCLUSION

Plaintiffs possess standing to pursue this action, but sovereign immunity shields Warren from suit. Conversely, the <u>Ex parte Young</u> exception applies to Stein, rendering him a proper defendant. Further, the Farm Bureau has not shown entitlement to intervention of right or circumstances warranting permissive intervention as a defendant in this action. Finally, Plaintiffs have established entitlement to issuance of an injunction without posting a bond.

**IT IS THEREFORE RECOMMENDED** that the Court grant the Warren Dismissal Motion (Docket Entry 39).

**IT IS FURTHER RECOMMENDED** that the Court deny the Stein Dismissal Motion (Docket Entry 44).

**IT IS FURTHER RECOMMENDED** that the Court deny the Intervention Motion (Docket Entry 21).

**IT IS FURTHER RECOMMENDED** that the Court grant the Preliminary Injunction Motion (Docket Entry 34) by enjoining Stein from enforcing the Farm Act and waiving the security requirement.

This 21st day of August, 2018.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**