# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### No. 1:17-cv-1037

FARM LABOR ORGANIZING
COMMITTEE, et al.,

*Plaintiffs*,

v.

JOSHUA STEIN,

*Defendant*.

**Memorandum of Law
in Support of Defendant's
Motion for Summary Judgment**

## INTRODUCTION

North Carolina law prohibits agreements—even between willing unions and employers—that would condition employment on being a member of a union. N.C. Gen. Stat. § 95-79(a) states "[t]he right to live includes the right to work," and "the right to work must be protected and maintained free from undue restraints and coercion." Right to work (RTW) policies, including North Carolina's, have been upheld by the Supreme Court as consistent with the Constitution.[1]

The State's RTW policy is not without opposition. As a result, the General Assembly enacted the Agricultural Right to Work Act of 2013, which prohibited conditioning the terms of an agreement to purchase agricultural products on the producer's status as a union or nonunion employer. N.C. Gen. Stat. § 95-79(b) (2013). Such conditions, it was determined, could undermine a producer's ability to choose whether to be a union employer.

---

[1]    *See, e.g.*, *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 531 (1949) (rejecting challenges to RTW statutes, including § 95-78 et seq.).

The law at issue in this case, Section 20.5 of the Farm Act of 2017, Ex. 1, also reinforces the State's RTW policy. First, Section 20.5 ends the potential use of litigation costs as a means to force farmers to sign collective-bargaining agreements (CBAs). Second, Section 20.5 provides that farmers cannot be required to collect dues from workers' paychecks—a task that, as shown by record evidence, creates administrative burdens and also leads to worker-relations issues.

Equally important is what Section 20.5 does *not* do: It does not prohibit lawsuits against agricultural producers. It does not prohibit settlement agreements stemming from those lawsuits or threats to sue. Likewise, it does not prohibit CBAs. Section 20.5 also does not prohibit unions from collecting dues, other than by requiring the farmer to do so.

Finally, Section 20.5 places no limits on union speech, advocacy, or organizing. It does not prohibit anyone from joining a union, nor does it prohibit farmers from recognizing unions. The policy goals in Section 20.5 are consistent with the Constitution and North Carolina's RTW policy. Because that conclusion is shown by uncontestable facts and law, the Court should grant summary judgment in favor of Defendant.

## STATEMENT OF THE CASE

Plaintiffs seek a declaratory judgment that Section 20.5 violates Plaintiffs' free speech and associational rights protected by the United States Constitution. Plaintiffs also contend that the law violates the Bill of Attainder Clause, the Equal Protection Clause, and their rights to contract under 42 U.S.C. § 1981.

Plaintiffs filed their Complaint on November 15, 2017, naming as defendants Governor Roy Cooper and Judge Marion Warren in their official capacities; Plaintiffs filed a

Motion for Preliminary Injunction on November 20, 2017. (DE 1, DE 7). The North Carolina Farm Bureau (NCFB) sought to intervene on January 25, 2018. Defendants filed motions to dismiss that same date. (DE 24, DE 27).

On February 5, 2018, Plaintiffs filed a First Amended Complaint (FAC) adding as Defendant Joshua Stein in his official capacity as Attorney General of North Carolina; voluntarily dismissed Defendant Roy Cooper; and withdrew their Motion for Preliminary Injunction. (DE 30-32). Plaintiffs filed an Amended Motion for Preliminary Injunction on February 6, 2018. (DE 34).

On February 19, 2018, Judge Warren moved to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, failure to state a claim, and Eleventh Amendment immunity. (DE 39). Attorney General Stein moved to dismiss on the same grounds on March 2, 2018. (DE 44).

On August 21, 2018, the Magistrate Judge recommended that Judge Warren's motion be granted and the Attorney General's and the NCFB's motions be denied. (DE 56). The Court adopted the recommendation and entered a preliminary injunction on September 20, 2018. (DE 62). The Attorney General timely filed an Answer (DE 70) and now moves for summary judgment.

<center>**STATEMENT OF FACTS**</center>

North Carolina's Farm Act of 2017[2] contains numerous provisions relating to agriculture, and only Section 20.5(a) is at issue here. It amended the State's Right to Work law, found in N.C. Gen. Stat. § 95-79,[3] as follows:

> (b) Any provision that directly or indirectly conditions the purchase of agricultural ~~products or~~ products, the terms of an agreement for the purchase of agricultural ~~products or~~ products, or the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. <u>Further, notwithstanding G.S. 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable against public policy in restraint of trade or commerce in the State of North Carolina.</u> For purposes of this subsection, the term "agricultural producer" means any producer engaged in any service or activity included within the provisions of section 3(f) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 203, or section 3121(g) of the Internal Revenue Code of 1986, 26 U.S.C. § 3121.

*Id.* This amendment did two things: First, Section 20.5 prohibits the terms of an agreement not to sue or to settle litigation from turning on an agricultural producer's status as a union

---

[2]    N.C. Session Law 2017-108, S.B. 615 (Ex. 1). This brief will refer to the section at issue here as "Section 20.5."

[3]    Although not challenged here, the Agricultural Right to Work Act of 2013 provides an important backdrop to Section 20.5. The 2013 law added the original language in § 95-79(b) prohibiting agricultural purchase agreements from turning on a producer's status as a union or nonunion employer—in other words, it prohibits preferential pricing or access in purchase agreements for union or nonunion employers. *See* N.C. Session Law 2013-413, HB 74, Section 15 (2013) (adding N.C. Gen. Stat. § 95-79(b)); Ex. 2 (NCFB comments on 2013 law). The General Assembly passed the law in response to attempts to convince agricultural purchasers, and specifically a tobacco purchaser, to put unionized-labor provisions in their purchasing agreements. Ex. 3 at 60:24-61:25 (NCFB 30(b)(6) Depo.). The General Assembly determined such tactics harmed the State's RTW policy, and it disallowed them in § 95-79(b).

<center>4</center>

or nonunion employer, or on its entry or refusal to enter into an agreement with a labor organization. This "Settlement Provision" adds to existing language in the statute prohibiting the terms of an agreement to purchase agricultural products from turning on those factors.

Second, Section 20.5 prohibits agreements requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fees, commonly called "checkoff agreements," as against North Carolina's public policy and in restraint of trade and commerce. This "Checkoff Provision" does not prohibit unions from collecting dues in any way, other than requiring farmers to do it for them.

Both provisions apply only prospectively, to agreements entered into after the Farm Act was enacted. Ex. 1 (§ 20.5(b)).

Section 20.5 was added to the 2017 Farm Act through an amendment to the House Bill ultimately concurred in during reconciliation.[4] *See* Ex. 4 at 15-16 (Senate debate transcript). Addressing the amendment, Senator Jackson stated, "Section 20.5 just strengthens our right-to-work statutes by declaring certain agreements involving agricultural producers are [against] public policy." *Id.* On the House side, Representative Dixon's comments included, "The amendment would prohibit the use of litigation to unionize and ensure farmers are not required to collect dues for their employees. This reduces a regulatory burden on farms that is not required under federal law and is completely within the state's purview

---

[4] A broader version of the Checkoff Provision had been introduced earlier in the legislative session as part of a different bill. *See* Ex. 29 (SB 375)

5

to regulate." Ex. 5 at 13 (House reconciliation debate transcript)[5]; *see also* Ex. 6 (NCFB communication about administrative burden); Ex. 3 at 84:10-90:1.

<div align="center">North Carolina's Agricultural Economy</div>

The agricultural industry is the single largest industry in North Carolina, accounting for one-sixth of the State's economy.[6] North Carolina is the number one producer of tobacco and sweet potatoes in the United States. Ex. 7 at 9 (2019 Ag. Stats. Report). It is also number three in fresh market strawberry production and fourth in cucumbers and cantaloupe. *Id.*

There are over 46,000 farms located throughout the State operating on more than 8 million acres of land. *Id.* at 10.[7] Approximately 772,000 people work in the agricultural industry, which constitutes 17.5% of the state's workforce. Walden, *supra* n.6. Together, agriculture and agribusiness contribute more than $91 billion to the State's economy. *Id.*

<div align="center">Farming Is a Difficult Business</div>

The record shows that modern farming is a difficult business. Ex. 8, ¶¶ 5-8 (Decl. of Alton Roberson); Ex. 14 at 56:7-58:16 (Depo. of Alton Roberson, July 14, 2020); Nigel Key et al., *Financial Conditions in the U.S. Agricultural Sector: Historical Comparisons*,

---

[5]    While Rep. Dixon referred to "regulatory burden," context and the record demonstrate he was referring to *administrative* burdens.
[6]    *See* Ex. 7; Michael Walden, Agriculture and Agribusiness, June 2020, *available at* https://cals.ncsu.edu/agricultural-and-resource-economics/ (last visited Aug. 12, 2020).
[7]    S*ee also* U.S. Dep't of Agric., 2019 State Agric. Overview, *available at* https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview (last visited Aug. 14, 2020). *See generally* N.C. Dep't of Agric., http://ncagr.gov/index.htm.

(U.S. Dep't of Agric., Oct. 2019) at 1.[8]  The majority of farms in this country are small, family-run businesses that generate less than \$350,000 in gross cash farm income.  U.S. Dep't of Agric., America's Diverse Family Farms (2019 ed.) at 2-4.[9]  The industry is extremely competitive, as most crops can be grown in many places, domestically and internationally; as a result, prices of commodities grown in-state are determined by national and world markets, with profit margins limited by the prices in the regions and countries with lower labor costs.  *See, e.g.*, U.S. Dep't of Agric., Econ. Research Serv., Commodity Costs and Returns;[10] *see also Financial Conditions in the U.S. Agric. Sector*, *supra* at 1-2 ("After peaking around 2012, the prices of many agricultural commodities fell, leading to lower farm incomes.").

Farming, particularly crop farming, is labor intensive and requires long hours spent in the fields harvesting crops during short growing seasons.  If the crops are not harvested in time, they will spoil in the fields.  As a result, farmers depend on a steady supply of reliable farmworkers willing to work the long hours required, on a seasonal basis, and willing to return season after season.  Ex. 8, ¶¶ 10-12.

Farmers in North Carolina, and elsewhere, have become increasingly reliant on migrant and "guest" workers, the majority of whom come from Mexico and Central America. Steven Zahniser et al., *Farm Labor Markets in the United States and Mexico Pose Challenges for U.S. Agriculture* (U.S. Dep't of Agric., Econ. Res. Serv. Nov. 2018) at 1, 4.

---

[8]      Available at https://www.ers.usda.gov/webdocs/publications/95238/eib-211.pdf.
[9]      Available at https://www.ers.usda.gov/webdocs/publications/95547/eib-214.pdf.
[10]     Available    at    https://www.ers.usda.gov/data-products/commodity-costs-and-returns/documentation.

7

These guestworkers come to the country to work during the growing season and send what they earn back to their families. *See, e.g.*, Banco de México, Revenues by Workers' Remittances;[11] *see also* Ex. 9 at 18:5-19:3, 20:12-19, 22:12-24, 31:15-17. 33:3-5, 35:1-15, 36:19-21 (Hernandez Dep., July 2, 2020).

The H-2A Temporary Agricultural Program ("H-2A") allows farmers to bring foreign-born workers to the United States to perform seasonal farm labor on a temporary basis. Ex. 10 (U.S. DOL H2-A Fact Sheet); Ex. 11 (U.S. DOL H-2A Program Details); *see also* Ex. 9 at 25:14-18.[12] Under the H-2A program, farmers are required to offer workers a specific minimum wage, which cannot be lower than the average wage for farmworkers surveyed in the Farm Labor Survey in the region the prior year—the Adverse Effect Wage Rate (AEWR),[13] and provide housing and transportation. *Id.*[14] North Carolina relies more heavily on the H-2A visa program than many other states.[15] Ex. 12 (2019 Office of Foreign Labor Certification H-2A data).

The labor market for farmworkers has grown increasingly tight in recent years. Steven Zahniser et al., *Farm Labor Markets in the United States and Mexico Pose Challenges*

---

[11]     Available     at     https://www.banxico.org.mx/SieInternet/consultarDirectorioInternetAction.do?accion=consultarCuadro&idCuadro=CE81&locale=en.

[12]     *See generally* U.S. Dep't of Agric., Farmers.gov, H-2A Visa Program, *available at* https://www.farmers.gov/manage/h2a (last visited August 14, 2020).

[13]     The AEWR in North Carolina is currently $12.67, *see* Ex. 11 at 30, which represents an increase of around 12.5% since 2017.

[14]     *See also* U.S. Dep't of Agric., Topics: Farm Economy, Farm Labor, *available at* https://www.ers.usda.gov/topics/farm-economy/farm-labor/#legalstatus (last visited Aug. 14, 2020).

[15]     H-2A positions in North Carolina increased by 42.7% (from 15,135 to 21,605) between 2014 and 2019. *See* https://www.foreignlaborcert.doleta.gov/map/2014/NC.pdf and Ex. 12.

*for U.S. Agriculture* (U.S. Dep't of Agric., Econ. Res. Serv. Nov. 2018) at 1.  As a result, "agricultural employers throughout the United States have reported increased difficulty in recent years in securing adequate supplies of labor at economically viable wages." *Id.*[16]

Challenges faced by farmers include international trade disputes, low commodity prices, catastrophic weather events, and most recently, disruption in the commodity marketplace caused by the COVID-19 pandemic.  Todd Neeley, *More Farms Turn to Bankruptcy in 2019*, Progressive Farmer (Feb. 3, 2020) (https://www.dtnpf.com/agriculture/web/ag/news/farm-life/article/2020/02/03/) (last visited Aug. 12, 2020).  Due to these challenges, in recent years many farm operators have faced economic difficulties.  Key, *supra*, at 1.  For some farmers, the struggling farm economy has forced them to stop farming, Ex. 14 at 56:19-57:18, and others have declared bankruptcy.  *See, e.g.,* Ex. 13 (Niall McCarthy, *U.S. Farm Bankruptcies Reach Eight-Year High*, Statista (Feb. 11, 2020)); Neeley, *supra*; Ex. 15 (farm bankruptcy filings).[17]  Although there are more than 46,000 farms operating in North Carolina today, that amount is 15% less than the number of farms operating 10 years ago.  Ex. 7 at 10.

---

[16]     *See also* Steven Zahniser, et al., *Rising Wages Point to a Tighter Farm Labor Market in the United States*, U.S. Dep't of Agric. (Feb. 15, 2019), *available at* https://www.ers.usda.gov/amber-waves/2019/february/rising-wages-point-to-a-tighter-farm-labor-market-in-the-united-states (last visited Aug. 14, 2020)

[17]     *See also* American Farm Bureau Federation, *The Verdict is In: Farm Bankruptcies Up in 2019* (Jan. 29, 2020), *available at* https://www.fb.org/market-intel/the-verdict-is-in-farm-bankruptcies-up-in-2019 (last visited Aug. 14, 2020).

FLOC's Organizing Efforts

Plaintiff Farm Labor Organizing Committee (FLOC) is currently the only agricultural employee labor organization with a CBA in North Carolina. Ex. 16 at ¶ 18 (Joint Stipulations). FLOC was founded in 1967 in Ohio "to organize workers for the purposes of improving wages and working conditions." Ex. 18 at 27:2-28:1 (FLOC Rule 30(b)(6) Depo.). It began operating in North Carolina in the late 1990s and currently has CBAs in Ohio and North Carolina. Ex. 17 (Pls' interrogatory response #6). FLOC has asserted in this litigation that it has over 6,000 members nationally, with 80 percent of those in North Carolina. Ex. 18 at 69:16-87:3.

At this time, FLOC has only one CBA in North Carolina, but it is with the largest H2-A employer in the nation, the North Carolina Growers' Association (NCGA), a consortium made up of many different farms. *See* Ex. 16 at ¶ 8. FLOC's "active members" are those who work on farms with a FLOC CBA, and who, by signing a union contract, have agreed to pay the union 2.5% of their gross salary as farmworkers. Ex. 18 at 65:3-66:3, 158:7-160:25. FLOC's sole method of collecting dues from those members is using checkoffs as a term of its CBAs, Ex. 17 at 11-13; Ex. 18 at 185:13-186:2, though at least one other agricultural union in the United States uses other collection methods for membership dues, Ex. 19 (articles on Pineros y Campesinos Unidos del Noroeste). FLOC also counts as members, in some sense, "people who have signed union cards" working on non-union farms, including outside of North Carolina. Ex. 18 at 29:17-36:25, 56:12-59:12, 62:17-64:12.

Case 1:17-cv-01037-LCB-LPA   Document 107   Filed 08/14/20   Page 10 of 33

<u>Costs and Burdens of Administering Dues Checkoffs</u>

The Checkoff Provision prohibits agreements requiring farmers to withhold union dues from worker paychecks. Ex. 1 (§ 20.5(a)); Ex. 18 at 139:17-20. This process requires farmers to calculate and deduct 2.5% of each union worker's gross pay each payroll period, consolidate those deductions into a check, and mail the check to FLOC in Ohio every month. Ex. 20 (union paperwork provided to farmers); Ex. 9 at 78:15-17, 79:3-4, 86:9-16; Ex. 18 at 137:21-139:20. Failure to do so incurs monetary penalties on the farmer, *id.*; Ex. 18 at 125:19-126:9, who must make these deductions when instructed by the union, Ex. 21 at art. 3 (FLOC CBA with NCGA).

Administering the collection and remittance of union dues places two types of costs on farmers. The first is administrative. Many farmers personally calculate and process payroll, often by hand—not as a full-time job, but something to "squeeze [] in just ahead of schedule on the day before payday" each week. Ex. 14 at 20:7-21:12; Ex. 22 at 1-20 (dues calculations from farmers). Calculating, withholding, and transmitting union dues adds to the many administrative tasks farmers must find time for *outside* of the hours they spend in the field. *Id.*

Moreover, the administrative costs of checkoffs extend beyond calculating, with-holding, and transmitting dues and include the time necessary to resolve problems and confusion with union membership status. Ex. 23 at 1-5 (communications about dues is-sues); Ex. 24 at 10, 14-18; Ex. 25 at 20-21 (communications about resolving dues issues). This can be true even when those disputes are not ones related to actions by the farmer. *Id.*

11

This latter burden also carries a *relational* cost for farmers, as dues disputes between union and worker can ultimately harm the farmer's relationship with the worker, who might blame the farmer for withholding their pay against his will. Ex. 24 at 1, 5-8, 11-12.[18] Worker relationships are deeply important to farmers: the difference made by good workers can be immense, and farmers have a strong need and desire to avoid conflicts with their workers—particularly conflicts not of their making. Ex. 8 at ¶¶ 11-12; Ex. 14 at 60:3-62:9, 63:17-64:20, 71:19-73:3; Ex. 24 at 1, 6, 8.

Compounding these relational costs is that withdrawing from FLOC can be difficult for workers. Until around 2016, FLOC only allowed members to withdraw in writing, during a 15-day window each year, rejecting resignations outside that period. Ex. 25 at 1, 9-17, 22-23; Ex. 18 at 155:6-157:9, 159:10-166:25. Even after 2016, FLOC continues to make resignations effective only on the member's "anniversary date," so some members are denied the opportunity to resign for nearly an entire year—an entire work season—after submitting a resignation. Ex. 25 at 3-8; Ex. 18 at 164:13-167:25. Workers also may lack knowledge in these technical procedures for resigning, as shown even by the Plaintiff *in this case*, Valentin Alvarado Hernandez, who did not know how to withdraw from FLOC and did not recall having that process explained to him. Ex. 9 at 89:23-90:14, 99:10-12.

Because the farmer is required under the CBA to withhold dues when instructed by the union, a farmworker cannot cease paying if he believes he has been wrongly denied the

---

[18]     Where record documents provided herein are in Spanish without an English translation as part of the document, Defendant has utilized a professional translator and provides the translated version of the document immediately following the Spanish version. The translator's certification is found at Ex. 26.

ability to resign from the union, and the farmer cannot cease withholding even if he agrees with the worker. The worker loses 2.5% of his pay until the union accepts and effectuates his resignation and it is the farmer who has to continue deducting dues over the protest of his employee.

<u>Lawsuits Seen as Coercing Farms into Signing CBAs</u>

Litigation costs can be ruinous for farmers, even when the farmer believes the suit is meritless. Ex. 8 at ¶¶ 8-9; Ex. 14 at 69:6-70:23. Evidence supports the legislature's view that such lawsuits were being used to force farmers to sign CBAs based on litigation costs not related to any union. Ex. 27 at 1-5 (documents regarding lawsuits being filed to induce CBAs); Ex. 3 at 77:19-82:16, 120:20-122:11 (discussing lawsuits and NCFBSUBP4231). Repeatedly, FLOC's general counsel, representing individual farmworkers making individual claims, would offer to "make significant concessions in the monetary terms of any settlement" in exchange for an agreement to enter into a CBA with FLOC—a tactic that found success. Ex. 28 at 2-3, 12, 15-16, 19 (letters threatening suit and offering CBAs); Ex. 18 at 217:21-242:20; Ex. 9 at 63:7-64:19.

## QUESTIONS PRESENTED

1.  A.  Whether Section 20.5 violates the First Amendment when it is a law of general applicability that regulates conduct, not protected speech.

    B.  Whether Section 20.5 violates the First Amendment when it is content and viewpoint neutral and narrowly tailored to serve a substantial government interest.

13

2.    Whether Section 20.5 violates the Equal Protection Clause when it does not burden a fundamental right, applies equally to all organizations and individuals, and is rationally related to a legitimate government interest.

3.    Whether Section 20.5 violates 42 U.S.C. § 1981 when it does not intentionally discriminate on the basis of race and does not deprive rights accorded to others of a different race.

4.    Whether Section 20.5 is a bill of attainder when it applies only prospectively and to any individuals or groups who engage in the regulated conduct.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might "affect the outcome of the suit," and a dispute over a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary judgment inquiry "scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993).

Facial challenges to legislation are "generally disfavored." *United States v. Chappell*, 691 F.3d 388, 392 (4th Cir. 2012). "To succeed in a typical facial attack, [a party] would have to establish 'that no set of circumstances exists under which [a statute] would be valid,' or that the statute lacks any 'plainly legitimate sweep.'" *Id.* at 394 (*quoting United States v. Stevens*, 559 U.S. 460, 472 (2010)).

14

## I.     Section 20.5 Is an Economic Regulation that Neither Implicates nor Violates the First Amendment.

Plaintiffs argue that Section 20.5 violates the First Amendment because enforcement of the act "hinder[s] the exercise of Plaintiffs' . . . rights to speech and association based on the identity of the speakers and the content of their speech."  FAC ¶ 114.  In support, Plaintiffs allege that "the purpose[] of the Farm Act [is] to obstruct constitutionally protected speech and association."  FAC ¶ 116.  Plaintiffs are mistaken on both counts:  Section 20.5 neither hinders any right to speech or association, nor was it intended to do so.  Instead, Section 20.5 focuses on economic regulation of *contracts* between producers and unions, and it does so more narrowly than other union-related contract laws already found to be constitutional.

First, Section 20.5 does not implicate the First Amendment because it regulates conduct and contracts, not speech and association.  The General Assembly may pass laws to declare certain contracts unenforceable as restraints on trade, and it may regulate the collective-bargaining landscape, without implicating the First Amendment.  Indeed, it has *already* done that in broader ways unchallenged in this case.  Second, even if the First Amendment applies, Section 20.5 passes scrutiny because it is a content- and viewpoint-

---

[19]     Defendant continues to assert, and incorporates by reference, the arguments in his motion to dismiss (DE 44, 45) that the Eleventh Amendment bars the claims in this case, and that Plaintiffs lack standing because they cannot demonstrate an injury-in-fact nor show an injury traceable to the Attorney General.

neutral law intended to ease administrative burdens and prevent concerns about coercion undermining the State's RTW policy.

A.   Section 20.5 Does Not Implicate the First Amendment.

Plaintiffs allege that Section 20.5 violates their First Amendment rights to free speech and association. FAC ¶ 114. Such challenges involve a three-step analysis. First, the court must determine whether the speech at issue is even protected by the First Amendment. Second, if the court determines that the speech is protected, the court must determine the standard of review. Third, the court applies the standard of review to the facts of the case. *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). Plaintiffs bear the burden of demonstrating the First Amendment applies. *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). If not, the court "need go no further." *Cornelius*, 473 U.S. at 797; *Barnes v. Glen Theatre*, 501 U.S. 560, 572 (1991) (Scalia, J., concurring) (recognizing that a general law regulating conduct not specifically directed at expression is not subject to First Amendment scrutiny). Plaintiffs cannot meet that burden here.

"The First Amendment protects the right to speak freely, to advocate ideas, and to petition government for redress of grievances, but it does not guarantee the right to collective bargaining." *Fraternal Order of Police v. Ocean City, Md.*, 916 F.2d 919, 921 (4th Cir. 1990). Likewise, state RTW policies themselves do not violate the First Amendment, even though they provide limitations on both companies' and unions' abilities to enter into contractual arrangements they deem beneficial—limitations far more significant than the ones in this case. *See, e.g.*, *Lincoln Fed. Labor Union*, 335 U.S. at 531 ("Nothing in the

16

language of [the RTW] laws indicates a purpose to prohibit speech, assembly, or petition. Precisely what these state laws do is to forbid employers acting alone or in concert with labor organizations deliberately to restrict employment to none but union members."). Section 20.5 is a reinforcement of North Carolina's RTW policy, which itself has been held a constitutional regulation of contracts, not a prohibition on speech or assembly.

### 1. The Checkoff Provision.

Regulating dues checkoffs does not implicate speech protected by the First Amendment. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009) (holding that public employees who wanted to use dues checkoffs to fund political activities did not enjoy a First Amendment right to do so); *Michigan State AFL-CIO v. Schuette*, 847 F.3d 800, 805 (6th Cir. 2017) ("Just as unions do not have a constitutional right to government-subsidized speech, they do not have a constitutional right to corporate-subsidized speech.") (citing *Ysursa*). "The checkoff provision is not a union security device; it is simply an administrative convenience for the collection of dues." *Anheuser-Busch, Inc. v. Int'l Broth. of Teamsters*, 584 F.2d 41, 43 (4th Cir. 1978).

Accordingly, the Fourth Circuit has explained that "administrative convenience" of dues checkoffs, *id.*, does not implicate First Amendment rights, *South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1256 (4th Cir. 1989). This holds true even when "revenues raised through a payroll deduction arrangement would have been available to further the [union's] speech-related activities." *Id.*; *accord Ysursa*, 555 U.S. at 355. Legislation prohibiting checkoffs "does not prohibit, regulate, or restrict the right of the [the union] or any other organization to associate, to solicit members, to express its views, to publish or

17

disseminate material, to engage in political activities, or to affiliate or cooperate with other groups." *Campbell*, 883 F.3d at 1256.

The burden asserted by the plaintiff in *Campbell* and Plaintiffs here is "the loss of dues from members who might have paid, if a more convenient method of collecting dues was available." *Id.*; *cf.* FAC ¶¶ 56, 101. But that burden does not implicate the First Amendment. *See Ysursa*, 555 U.S. at 355-56; *Campbell*, 883 F.3d at 1256. Moreover, that the employers in *Ysursa* and *Campbell* were "public rather than private entities does not change things," in that "the distinction fails to explain why the *unions* would be in any different position now." *Schutte*, 847 F.3d at 805-06.

Laws governing dues checkoff agreements, like Section 20.5, do not implicate the First Amendment because they restrict conduct, not speech or association. *See Ysursa*, 555 U.S. at 355. Indeed, Section 20.5 does not prohibit any form of expression or association by a union or its members. FLOC and any other union that might come to North Carolina may hold rallies and protests, distribute educational materials, recruit new members, and solicit dues from those members. *Cf. Campbell*, 883 F.3d at 1256. They simply may not require farmers to act as part of their accounting staffs. *See* Ex. 22.

Just as the First Amendment does not "confer an affirmative right [for public employees] to use government payroll mechanisms for the purpose of obtaining funds for expression," *id.*, it does not confer a right for agricultural unions to use the payroll systems of North Carolina farmers to fund their organizations. Regulation of dues checkoffs does not implicate the First Amendment, just as the Supreme Court has already held for RTW

18

policies generally—policies that are more restrictive in terms of the agreements they dis-allow, *see Lincoln Fed. Labor Union*, 335 U.S. at 531.

### 2. The Settlement Provision.

The Settlement Provision of Section 20.5 does not implicate the First Amendment either. Plaintiffs contend the provision "strips" FLOC of "the right and ability to settle litigation or potential litigation," FAC ¶ 92, but that is incorrect. Section 20.5 does not prohibit anyone from settling litigation or potential litigation. Rather, it requires only that agreements to settle litigation not be conditioned "upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization." Section 20.5(a).[20] In other words, unions, their members, and individual employees all can still sue or threaten to sue agricultural producers for *any reason* previously allowed by law. And parties can still settle those lawsuits or threats, so long as the settlement is not conditioned on entering into (or *not* entering into) a CBA. Moreover, unions and farmers are still free to enter into CBAs if they choose, just not as a condition of settling a lawsuit. As such, the Settlement Provision only governs conduct as to settlement agreements, and nothing more. It is a contract law.

---

[20]  Plaintiffs also suggest the Settlement Provision prohibits "all settlement agreements of any kind between FLOC and agricultural producers." FAC ¶ 92. That is plainly not the meaning of the statutory language. Even if there were any doubt about that, constitutional avoidance would call for interpreting Section 20.5(a) as prohibiting a settlement agreement from being conditioned on entering into *another agreement* with a labor union or organi-zation, not prohibiting settlements entirely.

19

Furthermore, the Settlement Provision regulates the terms of contracts, not the content of speech,[21] and it is comparable to the innumerable contract regulations found throughout state and federal law.  A settlement agreement, like any contract, may be formed of language, but that does not make it speech under the First Amendment.  "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.  Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society."  *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (internal citations omitted); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972).

*Giboney* and its progeny make clear that the First Amendment is not infringed by protecting against activities and contracts that North Carolina has determined to constitute an unfair restraint on trade.  The Settlement Provision only prevents the use of litigation costs seen as potentially coercing a CBA a farmer otherwise would not enter into; it does this merely by separating out the two processes rather than prohibiting either.  By delinking lawsuits from collective-bargaining agreements, the Settlement Provision governs only the combination of the two—where coercion is conduct rather than speech.

---

[21]    *See, e.g.*, *Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000) ("Issues regarding the formation, construction, and enforceability of a settlement agreement are governed by local contract law.")

B.   Even if the First Amendment Applies, Section 20.5 Is Viewpoint and Content Neutral and Narrowly Tailored to Substantial Governmental Interests.

Even assuming Section 20.5 implicates the First Amendment, the statute is both viewpoint and content neutral, and narrowly tailored to serve substantial government interests.

A statute is content based if it "draw[s] content-based distinctions on its face," *McCullen v. Coakley*, 573 U.S. 464, 479 (2014), or if it regulates speech on only "specified disfavored topics." *Virginia v. Black*, 538 U.S. 343, 362 (2003) (citation omitted). Like the checkoff statute in *Campbell*, Section 20.5 does not "prohibit, regulate, or restrict the right of the [union] or any other organization to associate, to solicit members, to express its views, to publish or disseminate material, to engage in political activities, or to affiliate or cooperate with other groups" 883 F.2d at 1256 (determining that a state law precluding dues checkoffs was "facially neutral"). Neither the Checkoff nor the Settlement Provision prohibits any of those activities; each is narrowly focused on reinforcing North Carolina's RTW policy within the agricultural sector.

Likewise, Section 20.5 does not single out any subset of messages for disfavor—it applies to any union and any agricultural producer. N.C. Gen. Stat. § 95-79(b). The viewpoint is irrelevant and immaterial to the application of the law. Just as the original language of § 95-79(b) prohibits agricultural purchase agreements from turning on the union *or* non-union status of a producer, the Settlement Provision prohibits settlements from turning on

21

either status.[22]  The Checkoff Provision applies regardless of (and without inquiry into) how the proceeds from the checkoff are to be used.  Even the limitation of Section 20.5 to the agricultural sector is viewpoint neutral.  The National Labor Relations Act preempts state laws regarding checkoffs for most types of businesses.  *See, e.g.*, *Int'l Ass'n of Machinists Dist. Ten v. Allen*, 904 F.3d 490, 497-504 (7th Cir. 2018) (explaining NLRA preemption).  But agriculture is one of the few areas *not* preempted by the NLRA in this way.

If found to implicate the First Amendment at all, Section 20.5 is a content- and viewpoint-neutral statute that survives scrutiny if it is "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Reynolds v. Middleton*, 779 F.3d 222, 225-26 (4th Cir. 2015) (citation omitted).  "A content-neutral regulation is narrowly tailored if it does not burden substantially more speech than is necessary to further the government's legitimate interests."  *Id.* at 226 (internal quotations and citation omitted).  It "need not be the least restrictive or least intrusive means of doing so."  *Ward v. Rock against Racism*, 491 U.S. 781, 798 (1989).

Section 20.5 is narrowly tailored to serve a legitimate government interest. The Settlement Provision is narrowly tailored because it does *not* prohibit lawsuits against farmers by anyone on any ground; does not prohibit settlements of those suits; and does not prohibit CBAs.  It simply separates the CBA from the litigation, as the legislature felt that lawsuits

---

[22]     An example of the latter might be a lawsuit between two producers, or an association and a producer, containing a settlement term promising neither party would sign a CBA with a union.  The Settlement Provision prohibits that too.

(and the litigation costs they bring) were being used to unfairly force farmers into signing CBAs, and that such coupling undermined the State's longstanding RTW policy. After all, FLOC's counsel, Ex. 18 at 229:12-23, repeatedly offered to substantially discount the monetary portion of individual plaintiffs' lawsuits—about topics such as back wages—in exchange for a CBA with FLOC, who was backing the suit but not party to it. Ex. 28. There is a substantial interest in regulating lawsuits that legislators see as having coercive effects on North Carolina businesses.

The Checkoff Provision also serves a substantial government interest. Given the importance of agriculture to the North Carolina economy and the slim margins under which farms operate, the legislature reasoned that the Checkoff Provision was necessary to reduce administrative costs and relational costs that come from farms serving a substantial role in the worker-union relationship. *See supra* at 11; Exs. 22-24. *Cf. City of Charlotte v. Int'l Ass'n of Firefighters*, 426 U.S. 283, 286-87 (1976) (finding administrative burdens to be an "sufficient justification" for placing limitations on municipal checkoffs).

Moreover, the Checkoff Provision protects workers from procedures that make it difficult or impossible to withdraw from the union if they choose. The record shows that workers have been forced to pay dues for nearly an entire year after they submitted their resignation. *See supra* at 12. Or, in years past, the union rejected resignations not submitted during a small 15-day window per year. Ex. 25 at 17. Some workers saw multiple rejections over multiple years, paying 2.5 percent of their salary to a union they had *repeatedly* attempted to quit. Ex. 25 at 9-16. When employers withhold worker pay for dues under a CBA requiring it, the worker has no recourse for ceasing his dues payments, and

23

the farmer must continue withholding the dues until the union effectuates the resignation. *E.g.*, Ex. 24 at 1. The Checkoff Provision is narrowly tailored because it prohibits *no* other means of dues collection aside from requiring the farmer to perform that function. *See* Ex. 19 at 4-8.

## II. Section 20.5 Does Not Violate the Equal Protection Clause Because It Does Not Discriminate Against a Suspect Class and Is a Rational Means of Advancing a Legitimate Governmental Purpose.

Plaintiffs allege that Section 20.5 violates the Equal Protection Clause because it "solely targets and impacts Plaintiff FLOC, a union whose membership is nearly 100% Latino and over 90% comprised of Mexican H-2A guestworkers." FAC ¶ 110. The Equal Protection Clause provides that no state may deny any person the equal protection of the law. U.S. Const., amend. 14, sec. 1. However, "laws are presumed to be constitutional under the equal protection clause for the simple reason that classification is the very essence of the art of legislation." *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citation and quotation omitted).

If a statute targets a suspect class or involves a fundamental right, courts will apply a heightened level of scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *Greenville Women's Clinic v. Bryant*, 222 F.3d. 157, 172 (4th Cir. 2000). However, when a statute neither violates a fundamental right nor targets some protected class, such as race, religion, or gender, it is presumed valid and need only to be "related to a legitimate state interest." *City of Cleburne*, 476 U.S. at 440; *see also Greenville Women's Clinic*, 222 F.3d at 172. Moreover, as the Supreme Court has explained, statutes involving economic policy enjoy a "strong presumption of validity." *FCC v. Beach Commc'ns*, 508

24

U.S. 307, 314 (1993). Plaintiffs bear the burden of demonstrating that the statute is not a rational means of advancing a legitimate governmental purpose. *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001).

Section 20.5 does not target a suspect class. It is a facially neutral statute that is generally applicable to any organization and agricultural producer operating in the State. Furthermore, neither unions and their members nor agricultural producers are a suspect class. *See Sweeney v. Pence*, 767 F.3d 654, 669 (7th Cir. 2014) (noting that "[c]ollective bargaining is not a fundamental right, and a union and its members are not suspect classes") (internal quotations and citations omitted).

Plaintiffs claim that the law is discriminatory because it targets farmworkers, the majority of whom are Latino. However, even assuming Section 20.5 disproportionally impacts Latinos, that does not prove the law violates Equal Protection. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *General Bldg. Contractors Ass'n v. Penn.*, 458 U.S. 375, 389-90 (1982). As the U.S. Supreme Court explained, "even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). Accordingly, Plaintiffs must show "[p]roof of racially discriminatory intent or purpose." *Arlington Heights*, 429 U.S. at 264. That is entirely lacking here.

Indeed, Plaintiffs cannot show that the North Carolina General Assembly enacted Section 20.5 "because of" its applicability to Latino, Mexican, and/or non-citizen workers. *Feeney*, 442 U.S. at 279 (explaining that a discriminatory purpose exists only when a law

25

is passed "because of," not merely "in spite of," its effect upon an identifiable group). Here, the demographics of the agricultural industry do not make it such that the legislature cannot regulate it.

Courts have held that there is no fundamental right to being a union member or to dues checkoffs and collective bargaining. *See City of Charlotte v. Int'l Ass'n of Firefighters*, 426 U.S. 283 (1976); *Campbell*, 883 F.2d at 1256. Thus, "disparate treatment in authorizing payroll deductions 'must meet only a relatively relaxed standard of reasonableness in order to survive constitutional scrutiny.'" *City of Charlotte*, 426 U.S. at 286.

The rational basis standard is "quite deferential" and "simply requires courts to determine whether the classification in question is, at a minimum, rationally related to legitimate governmental goals." *Wilkins*, 734 F.3d at 347-48 (citing *City of Cleburne*, 473 U.S. at 440). "Under this deferential standard, the plaintiff bears the burden 'to negate every conceivable basis which might support' the legislation." *Giarratano*, 521 F.3d at 303 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)); *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012). A statute will satisfy rational basis review "if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

As discussed above, Section 20.5 was enacted to reinforce North Carolina's RTW policy, a public policy that has been held to be both constitutional and a legitimate governmental interest. *See Exxon Corp v. Governor of Md.*, 437 U.S. 117, 124 (1978) (recognizing states have an interest in regulating "injurious practices in their internal commercial

26

and business affairs"); *Equip. Mfrs. Inst. v. Janklow*, 300 F.3d 842, 860 (8th Cir. 2002) (recognizing state has significant and legitimate interest in protecting farmers). Moreover, Section 20.5 is rationally related to the State's legitimate governmental interest in reinforcing its RTW policy in the agricultural industry. Indeed, Section 20.5 follows and strengthens the Agricultural Right to Work Act of 2013. Ex. 4 at 16 ("Section 20.5 just strengthens our right-to-work statutes by declaring certain agreements involving agricultural producers against public policy."). The General Assembly considered that allowing farmers to be contractually required to administer dues checkoffs imposed unnecessary administrative and relational burdens. *See supra* at 5; Ex. 3 at 85:7-86:13. The General Assembly also understood that agricultural producers were being threatened with costly litigation in order to induce them to sign CBAs. Ex. 3 at 108:1-115:10, 123:23-129:5.

As a result, Section 20.5 serves to ease administrative burdens of farmers, to keep farmers from being put in the middle of worker-union disputes, and it protects the state's RTW policy from being undermined by litigation seen as coercing farms into signing CBAs. The General Assembly reasonably determined that because the State's longstanding RTW policy was under threat, it needed to take steps to defend it. The record also shows that Section 20.5 makes it easier for farmworkers to withdraw from the union if they choose to do so. *See supra* at 12.

III. **Plaintiffs' § 1981 Claim Fails Because They Cannot Demonstrate Defendant Intentionally Discriminated Against Them Because of Their Race or Deprived Them of a Right Accorded to Others of a Different Race.**

Plaintiffs' also claim that Section 20.5 violates their rights under 42 U.S.C. § 1981 because it "strips" them of the "rights to make and enforce contracts, to sue, be parties, and

27

to the full and equal benefit" of the law.  FAC ¶¶ 120-21.  To prevail on a § 1981 claim, Plaintiffs must show that (1) they are a members of a racial minority; (2) defendant intentionally discriminated against them because of their race; and (3) they were deprived of a right protected under the statute that, under the circumstances, would be accorded to a person of a different race.  *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982); *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). Moreover, because this claim is brought against Defendant in his official capacity, Plaintiffs must also establish that the violation was caused by a custom or policy of the State. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) (noting that to prevail on a § 1981 claim, plaintiff "must show that the violation of his 'right to make contracts' . . . was caused by a custom or policy").

Even assuming, *arguendo*, that Plaintiffs could establish the first element, their claim would still fail.  First, Plaintiffs cannot demonstrate that Defendant intentionally discriminated against them because of their race.  Indeed, "[m]ere conclusory allegations of purposeful discriminatory intent do not sustain plaintiff[s]' burden of proof."  *Lewis v. Ft. Collins*, 903 F.2d 752, 759 (10th Cir. 1990).  As the United States Supreme Court recently explained, "to prevail [on a § 1981 claim], a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *see also Gen. Bldg. Contractors*, 458 U.S. at 390-91.  Here, Plaintiffs have failed to prove

that the General Assembly enacted the statute for race-based purposes. Rather, the evidence shows that the General Assembly enacted the statute to reinforce the State's RTW policy and protect the economic viability of the agricultural sector.

Second, Plaintiffs cannot demonstrate that they were denied a protected right that is otherwise enjoyed by other races. As previously noted, Section 20.5 does not prevent Plaintiffs from bringing a lawsuit, settling a lawsuit, or entering into a CBA. Furthermore, nothing in Section 20.5 denies Plaintiffs any rights that are otherwise enjoyed by individuals of another race. *See, e.g.*, *Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 680 (9th Cir. 1993) (Section 1981 claim failed in part because plaintiffs could not show deprivation of a right that would be enjoyed by vendors of other races, as the ordinance regulated *all* vendors). Indeed, regardless of the demographics of farmers and farmworkers generally, the law applies precisely the same to everyone in those categories regardless of race.

IV.    **Section 20.5 Is Not a Bill of Attainder Because It Applies Only Prospectively and to Any Individual or Group Engaging in the Regulated Conduct.**

Finally, settled law demonstrates that Section 20.5 is not a bill of attainder because it meets none of the required elements for one. To constitute a bill of attainder, a law must (1) apply with specificity to affected persons; (2) impose punishment; and (3) assign guilt without a judicial trial. *See, e.g.*, *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 846-47 (1984). Section 20.5 does none of these things.

Case 1:17-cv-01037-LCB-LPA   Document 107   Filed 08/14/20   Page 29 of 33

First, Section 20.5 does not apply with specificity to Plaintiffs. Although a law need not expressly name its target in order to apply with specificity, it must nonetheless "describe [the targeted class] in terms of conduct which, because it is *past conduct*, operates only as a designation of particular persons." *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 82-83 (1961) (emphasis added). This distinction—between statutes that impermissibly punish past conduct versus those that permissibly address future conduct—is "decisive." *American Communications Ass'n v. Douds*, 339 U.S. 382, 413-14 (1950). "A statute with open-ended applicability, i.e., one that attaches not to specified organizations but to described activities in which an organization may or may not engage, does not single out a particular person or group for punishment." *Ameur v. Gates*, 759 F.3d 317, 330 (4th Cir. 2014) (quoting *Hettinga v. United States,* 677 F.3d 471, 477 (D.C. Cir. 2012)).

"Nor is the statute made an act of 'outlawry' or of attainder by the fact that the conduct which it regulates is described with such particularity that, in probability, few organizations will come within the statutory terms. Legislatures may act to curb behavior which they regard as harmful to the public welfare, whether that conduct is found to be engaged in by many persons or by one." *Communist Party*, 367 U.S. at 88; *see also Nixon v. Administrator of General Services*, 433 U.S. 425, 470-72 (1977) (specificity element was not met even when the law referred to President Nixon *by name* and dealt exclusively with his papers).

Plaintiffs contend Section 20.5 "impermissibly targets and punishes Plaintiff FLOC, the only farmworker union in North Carolina," by "depriving it of the ability to enter into

30

dues checkoff agreements" and by depriving FLOC of the ability to enter into settlement agreements with the terms it deems beneficial. FAC ¶¶ 125-26. But that is simply what regulations do: they prohibit actions that some would like to take, based on the legislature's determination that public policy is benefitted by the restriction. That does not a bill of attainder make, *cf. Communist Party*, 367 U.S. at 86.

Moreover, Section 20.5's restrictions are not limited to labor unions or FLOC specifically. That FLOC is *currently* the only agricultural union operating in the state does not render it immune from legislation affecting its activities. By its terms, Section 20.5 applies to *any* individual or organization. Likewise, the Checkoff Provision applies to *any* agricultural producer and union. And, crucially, Section 20.5 applies only to "agreements and settlements entered into, renewed, or extended on or after" the bill became law. N.C. Gen. Stat. § 95-79(b). Thus Section 20.5 unquestionably addresses only future conduct, which is permissible under the Bill of Attainder Clause. *E.g.*, *Douds*, 339 U.S. at 413-14.

Second, Section 20.5 neither legislatively assigns punishment nor does so without judicial trial. Three approaches inform that analysis. *See Ameur*, 759 F.3d at 329. Under a historical approach—which compares the act to English parliamentary acts sentencing specified individuals to death—Section 20.5 is plainly not a bill of attainder. *Nixon*, 433 U.S. at 474. Looking more functionally, the stated bases for Section 20.5, detailed above, show that it "reasonably can be said to further nonpunitive legislative purposes." *Id.* at

31

475.  The same result inures from the motivational test looking to the legislature's purpose,[23] which was not to "impose a penalty" but rather to *prospectively* regulate the agricultural sector in accordance with the state's RTW policy.

In sum, Section 20.5 is not a bill of attainder.

## CONCLUSION

For the foregoing reasons, Defendant respectfully submits that his Motion for Summary Judgment should be granted.

Respectfully submitted, this 14th day of August, 2020.

<div style="margin-left:40%">

JOSHUA H. STEIN
Attorney General

/s/ Matthew Tulchin
Matthew Tulchin
Special Deputy Attorney General
N.C. State Bar No. 43921
mtulchin@ncdoj.gov

/s/ Phillip A. Rubin
Phillip A. Rubin
Special Deputy Attorney General
N.C. State Bar No. 51963
prubin@ncdoj.gov

N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Tel: 919.716.6900
Fax: 919.716.6763

*Counsel for Defendant*

</div>

---

[23]  Identifying actual legislative motives is a perilous exercise, raising concerns of separation of powers, *e.g.*, *Campbell*, 883 F.2d at 1257, or here, sovereignty.  Regardless, Section 20.5 is not a bill of attainder under any of the three tests, *see Ameur*, 759 F.3d at 329.

32

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Memorandum, including body, headings, and footnotes, contains 8,609 words as measured by Microsoft Word 365.

This the 14th day of August, 2020.

/s/ Matthew Tulchin
Matthew Tulchin
Special Deputy Attorney General