# EXHIBIT 3

Second Declaration of Justin Flores

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-01037-LCB-LPA**

| | |
|---|---|
| **FARM LABOR ORGANIZING** | ) |
| **COMMITTEE, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **JOSHUA STEIN, et al.** | ) |
| | ) |
| **Defendants.** | ) |

<u>**SECOND DECLARATION OF JUSTIN FLORES**</u>

I, Justin Flores, do declare and say the following:

1.      My name is Justin Flores.  I am over eighteen years of age and am competent to give this Declaration.  I am a resident of North Carolina.

2.      I am the Vice President of the Farm Labor Organizing Committee (FLOC). I have been in this position since October 2013.  FLOC has an office located at 4354 US Hwy 117-Alt S, Dudley, NC 28333.  FLOC has had an office in North Carolina for over 10 years.

3.      In addition to serving as the Vice President of FLOC since 2013, I have worked with migrant workers, including FLOC members, in North Carolina since 2009. As a result of my time working with migrant workers and then as Vice President of FLOC, I am familiar with FLOC's work, history, and membership.  I am also very familiar with the working conditions of farmworkers generally in the state.

1

4.      I provided a declaration in support of Plaintiffs' Amended Motion for a Preliminary Injunction in this matter in February 2018 (DE 34-5). This declaration repeats some of the statements I made in the February 2018 declaration, but it also adds updated information and additional details.

**Background on FLOC**

5.      FLOC is a farmworker union of approximately 6,000 dues paying members nationwide. Around 80% of FLOC's members work in North Carolina.

6.      For over twenty years, since the 1990s, FLOC has been the only union organizing and representing farmworkers in North Carolina. Our ultimate goals are to ensure that all farmworkers in North Carolina receive fair wages, work in safe conditions, and are able to voice concerns about work without fear of retaliation.

7.      About 95% of FLOC's dues-paying North Carolina members are H-2A "guestworkers" from Mexico who come to North Carolina each year for five to ten months to perform seasonal agricultural work. In 2017, 2018, and 2019 there were an estimated 20,700, 21,600, and 21,600 H-2A workers in North Carolina. In 2019, NC was the fifth largest user of H-2A workers in nation.[1] Most of North Carolina's H-2A workers work in tobacco, Christmas trees, and sweet potatoes. The height of the agricultural season in North Carolina, and the period in which there are the most farmworkers working in the state, is generally from April to November.

---

[1] *See* https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H2A_Selected_Statistics_FY2019_Q4.pdf

8.     Many farmworkers and FLOC members face a variety of challenges in the workplace and broader community, including wage theft, retaliation for speaking out about workplace issues, dilapidated housing, unsafe work conditions, as well as discrimination in housing and police interactions.

9.     These are especially difficult times for our farmworker members. In addition to the ongoing challenges they face, they are laboring in the COVID-19 pandemic. Because our members typically live in employer-provided labor camp housing and often rely on employers to provide them transportation in vans and buses, they eat, sleep, and travel in crowded group environments. Centers for Disease Control guidelines[2] indicate that these and other factors put farmworkers at risk for contracting the virus. As temporary workers whose immigration status is tied to their employers, our members often fear job loss if they need time off because they are ill or need to see a doctor. Before FLOC's intervention, few employers were paying the required 80 hours paid leave in federal legislation aimed at encouraging sick workers to stay home. As I prepare this declaration, our staff is spending significant time on ensuring members have access to COVID-related medical care and that workers know their rights during the pandemic to not only protect themselves, but their families and the broader community. Since mid-March 2020, FLOC's President and staff have been organizing supply drives and

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-agricultural-workers.html

3

dropping off necessities like Clorox, hand sanitizer, toilet paper, and soap to members who were not able to find or afford these things at the store due to shortages.

10.     FLOC works towards its goals by organizing workers to achieve collective bargaining agreements (CBAs) with agricultural producers in the state, which guarantee farmworkers certain wages, working conditions, and fair alternative dispute mechanisms for resolving workplace grievances and disputes.

11.     FLOC currently has one CBA with agricultural producers in the state, covering approximately 10,000 workers. Another CBA that we had at the time this lawsuit was filed lapsed in 2019 and has not been renewed. FLOC's CBA is with the North Carolina Growers' Association (NCGA), which is comprised of approximately 700 member-growers throughout the state.  In 2019, NCGA sponsored approximately 50% of the H-2A visa workers in the state.  More than 95% of the FLOC members covered under the CBA with the NCGA are H-2A guestworkers. The NCGA CBA will expire in December 2020; we are actively organizing towards its renewal.

12.     There is no federal or state law requiring union elections or any other law that requires mandatory recognition of farmworker unions.  Farmworkers are not covered by the federal National Labor Relations Act. Therefore, FLOC and all of the agricultural employers who are members of the NCGA in North Carolina have voluntarily entered into a CBA that determines their employment relationship with all H-2A workers that the NCGA and its members employ in the state.

13.     The CBA with the NCGA provides significant benefits for the farmworkers covered by that agreement, such as guaranteed hourly wages, an orderly and fair process for recruitment and hiring, and a grievance procedure. The CBA guarantees that a worker who satisfactorily completes his or her term of employment for an agricultural producer has a right to return the following season. This reduces the likelihood that workers will be retaliated against, for example by being blacklisted, for complaining about unsafe or illegal working conditions. The recruitment process established by the CBA with the NCGA has also largely eliminated the illegal practice of H-2A guestworkers who are recruited for NCGA and its agricultural employer members being charged recruitment fees for access to jobs in North Carolina.

14.     The CBA also provides significant benefits for agricultural producers, including consistent employment practices among a large group of agricultural producers (which reduces incentives to engage in unfair competitive practices like underpaying workers); labor peace (no strikes or work stoppages) during the term of the contract; and a grievance procedure and binding alternative dispute mechanisms (minimizing the potential for costly litigation).

15.     All CBAs in which FLOC enters have a "dues checkoff" provision. When farmworkers decide to join FLOC, they generally sign a written form that meets certain requirements under North Carolina law in order to authorize dues checkoffs. This means that our members request in writing that their employer deduct 2.5% of their weekly wages and directly divert such funds to FLOC for the payment of union dues. If a worker

5

covered by a CBA wants to be an active member of FLOC in good standing, they must agree to pay dues while working under a FLOC CBA. All of our dues paying members who are covered by a CBA pay their dues through dues checkoffs.

16.     If growers do not want to participate in dues checkoffs, they have many options. They do not have to agree to a CBA or be part of the NCGA CBA. I know of approximately ten growers who have left the NCGA over the past five years for various reasons. When they left, they were no longer subject to a CBA requiring dues checkoffs. For example, Jackson Farming Company left the NCGA in 2014. Also, some active NCGA members have used farm labor contractors (FLCs) for some of their labor needs, delegating payroll administration responsibilities to those FLCs. In some of those cases, the workers hired through the FLCs are not covered by a CBA and therefore are not subject to the CBA's dues checkoff provision.

17.     FLOC has pursued and secured CBAs and other improvements to farmworker conditions through various strategies, including public campaigns engaging major industry actors like tobacco corporations and assisting our members in bringing well-publicized litigation to challenge illegal employment practices by referring them to attorneys willing to handle such cases.

18.     FLOC has frequently participated in litigation as a party to pursue legal issues of importance to our members, such as a case involving the federal Department of Labor regulations that set the minimum wages for H-2A guestworkers. Most recently, we joined an *amicus* brief in *Kansas v. Garcia*, 140 S. Ct. 791 (2020), arguing that the ability

6

of undocumented immigrant workers to enforce basic federal worker protection statutes would be severely undermined if individual state governments, in addition to the federal government, could prosecute these workers for using another person's social security number to work.

19.     Lawsuits in which FLOC participates, or which FLOC assists our members in bringing by providing legal referrals, are meant to recover unpaid wages and other restitution for workers, to win better conditions for FLOC's members through the relief obtained in the lawsuits and through the ongoing agreements obtained through those lawsuits, and also to educate the public about the working conditions confronted by farmworkers.

20.     Before passage of the Farm Act, some FLOC members negotiated to include voluntary union recognition or expanded collective bargaining rights, in addition to monetary restitution, as part of class-wide settlements to resolve claims asserted under federal and state employment laws.  These negotiations occurred both before and after lawsuits about those claims were filed in court.

21.     In one situation, for example, the defendant employer and the plaintiff farmworkers agreed that it was in their mutual interest to resolve the case in an agreement that includes, in addition to monetary compensation: employer recognition of FLOC as the bargaining representative of workers who sign FLOC membership cards; an employer pledge to remain neutral on unionization efforts in its workforce; payroll dues deductions; a guaranteed hourly wage of $11.27 per hour (increased from a prior wage of $8 per

7

hour); just cause for any employer disciplinary action; worker/employer committees to address safety issues, worker housing, and employer competitiveness; and adoption of a binding alternative dispute mechanism for resolving workplace disputes.

22.     We must actively administer the NCGA CBA throughout the state. Our administration of CBAs involves monitoring and assisting covered workers with the recruitment process in Mexico; monitoring agricultural producers' compliance with the CBAs; assisting members and other workers with understanding the CBA terms and their rights under the CBA; training workers on their rights and FLOC's organizing efforts; and assisting members in filing and pursuing grievances.

23.     FLOC provides other significant assistance to our members, including assisting injured workers and their families in filing workers' compensation or other claims for benefits, assisting workers and their families in obtaining legal counsel for immigration or employment matters, and assisting with repatriation of the remains of H-2A workers who pass away while working in the United States.

24.     Even as FLOC administers CBAs and assists our members, we are constantly seeking to organize new members in order to strengthen our bargaining power, improve conditions at farms not currently covered by CBAs, and raise standards for farmworkers throughout the industry.

25.     Our union is not interested in putting farms out of business or bankrupting them. To do so would be contrary to our members' interests, and we take an agricultural employer's financial situation into account when we're negotiating with them.

26.     In fact, FLOC devotes significant resources to publicly engaging with the major economic interests at the top of the industry supply chain, such as international tobacco conglomerates. We do this to convince them to adopt business practices that are fair to both agricultural producers and farmworkers, because we know if growers receive more money for their crops, we will be in a better position to negotiate for our members and to guarantee the sustainability of the farms our members work on and thus their job security.

27.     In addition to FLOC's core work of organizing farmworkers to achieve a voice in their workplace and better working conditions, we also participate in general advocacy for the rights and well-being of farmworkers and their families, including advocacy for the rights of Latinx immigrants in the state and nation.

28.     FLOC members have participated in visits to Washington, D.C. to advocate for immigration reform, as well as marches, rallies, and other public actions in North Carolina in support of immigrants' and workers' rights causes.

29.     FLOC regularly holds community meetings and events in North Carolina to provide education and discuss issues such as: improving relations and trust between immigrant communities and local police; knowing one's rights in the workplace;

financial aid and scholarships available to college-bound youths; and access to immigration relief such as Deferred Advocacy for Childhood Arrivals (DACA).

**FLOC's History and the Origins of the Farm Act**

30.     In the past fifteen years, FLOC has significantly increased its membership in North Carolina and won CBAs covering more of the state's agricultural workforce, including approximately 50-60% of the H-2A workers in North Carolina.  We have also succeeded in conducting highly publicized campaigns to pressure agricultural corporations and producers to negotiate with workers for better working conditions, including the FLOC-led boycott of Mt. Olive Pickle Company in the late 1990s.

31.     In 2004, in large part due to the successful Mt. Olive boycott, FLOC won a CBA with the NCGA covering nearly 10,000 H-2A workers and other farmworkers who work on NCGA farms.

32.     In 2011, FLOC and the non-profit organization Oxfam America jointly issued "A State of Fear: Human Rights Abuses in North Carolina's Tobacco Fields," a highly publicized report that detailed dangerous working conditions in the state's tobacco fields.

33.     In 2012, after a six year long campaign, the Reynolds American tobacco corporation finally agreed to meet with FLOC leaders to discuss working conditions for North Carolina tobacco workers.

34.     Throughout the last decade, FLOC members, with the support of their union, have brought numerous claims under the Fair Labor Standards Act (FLSA), the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), and the North Carolina Wage and Hour Act (NCWHA) against several North Carolina agricultural producers seeking recovery for wage theft and other violations of these laws.  Through these lawsuits we won significant amounts of unpaid wages for hundreds of workers, as well as a union contract, as part of a court-approved settlement that occurred in the course of court-mandated mediation in *Agustina Velasquez et al. v. Burch Equipment, LLC, et al.*, Civ. Action 7:14-CV-303-FL (E.D. N.C., complaint filed Dec. 31, 2014).

35.     On February 23, 2016, FLOC members, including Valentin Alvarado Hernandez, filed a class action suit against State Senator Brent Jackson and his company, Jackson Farming Company (JFC), for wage theft that occurred in the 2015 agricultural season. The case, styled *Sanchez Rodriguez, et al. v. Jackson Farming Company of Autryville*, Civ. Action 7:16-CIV-28-D (E.D. N.C.), ended in a court-mediated settlement in September 2016. The settlement was preliminarily approved on January 20, 2017 and received final approval on July 11, 2017.  That suit followed an earlier class grievance that FLOC had filed and favorably resolved in 2014 for a group of JFC workers. After that successful 2014 grievance, JFC terminated its membership in the NCGA and thus its participation in FLOC's CBA.

36.     As FLOC has increased our membership in North Carolina and expanded the number of workers covered by union agreements, and as our members have been

involved in well-publicized litigation, FLOC's organizing drives have been met with considerable backlash by some agricultural producers and the North Carolina Farm Bureau, a trade group representing the interests of agricultural producers in the state.

37.    As part of this backlash, some agricultural producers and their associations have successfully pushed for legislation in an attempt to block FLOC's efforts to improve working conditions for farmworkers in the state.

38.    In 2013, shortly after FLOC had successfully convinced the Reynolds American tobacco corporation to meet with some of its members to discuss working conditions in North Carolina tobacco fields, many growers felt that such discussions would lead to increased pressure to negotiate with their workers collectively for better work conditions. Grower interest groups that are against workers exercising their right to organize in the industry lobbied successfully for the General Assembly to pass legislation targeting FLOC's ability to use free market-based pressure to improve conditions for farmworkers. Calling it an "Agricultural Right to Work Provision," the law provided that "[a]ny provision that directly or indirectly conditions the purchase of agricultural products or the terms of an agreement for the purchase of agricultural products upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina."

Case 1:17-cv-01037-LCB-LPA   Document 108-3   Filed 08/14/20   Page 13 of 32

39.     This legislation attempted to undermine FLOC's ability to engage corporate purchasers of agricultural products and sign agreements that would guarantee expanded labor rights in the industry.

40.     In June 2017, the North Carolina General Assembly passed the Farm Act. The legislators most involved in passing the Act were Representatives Jimmy Dixon and Brent Jackson, who both own and operate large farms in the state.  FLOC members, including Plaintiff Alvarado Hernandez, sued Representative Jackson's farm for wage theft in 2015 and engaged in a public campaign to get the seven plaintiffs in the case reinstated after Jackson retaliated against them by blacklisting them from the job for filing the lawsuit. This campaign included press conferences, public petition drives, and publication of the exploitative practices on the farm.

41.     I am not aware of an opportunity for a public hearing or comment given during consideration of Section 20.5 of the Farm Act. Had there been an opportunity, FLOC would have participated and tried to rally support against the bill.

**The Importance of Dues Checkoff to FLOC and its Members**

42.     FLOC currently has two full time staff members and one part time staff member working throughout the state. Our membership is widely dispersed throughout the state, with members located as far west as Tuckasegee, as far east as Jacksonville and Ahoskie, as far south as Whiteville and Chadbourn, and as far north as Grassy Creek.

13

43.     Given our small staff and limited resources, FLOC faces significant logistical challenges in our statewide CBA administration and organizing work. H-2A workers, as well as many other migrant farmworkers, typically live in isolated, employer-owned labor camps in rural areas. Most have no access to personal cars and depend on their employers for transportation to shopping and banking.

44.     Farmworkers' work days are often long. During the height of the season, workers are often in the field from approximately 6:00 AM to 7:00 PM (or later) Monday to Friday, and 6:00 AM to 1 PM or later on Saturday. During the busiest part of the season, farmworkers may even work on Sundays. Farmworkers must spend their limited time off doing laundry, grocery shopping, and sending money home.

45.     Because agricultural work is seasonal and farmworkers are often paid for their work on a piece rate basis and the amount of work they can do depends on the weather, their earnings generally fluctuate throughout the season.

46.     Farmworkers working under H-2A guestworker visas are typically paid by checks which their employers cash for them, or which they must take to local stores that offer check cashing services for a fee.

47.     Because of the migratory and seasonal nature of their work, language barriers, and their low incomes, many farmworkers in North Carolina lack access to credit cards and bank accounts and conduct most transactions by cash. H-2A

14

guestworkers, as well as migrant farmworkers, live in North Carolina only temporarily, and are unlikely to have a local bank account.

48.     Farmworkers' transient jobs and limited access to banking present many obstacles to their ability to make recurring payments, such as elective weekly payments like union dues.  This is why agricultural producers commonly deduct the costs of items like meals, tools, or repayments for loans directly from their employees' wages to ensure that these payments are consistently and reliably made. During my time at FLOC, I have personally reviewed hundreds of paystubs that were shown to me by workers and I regularly see such deductions. The most common deductions are for short-term loans that employers give to workers at the start of the season (before the first paychecks are issued), and the costs of meals provided by employers when workers do not have cooking facilities in their labor camps.

49.     Because of our limited institutional resources, the size and geographic dispersion of FLOC's North Carolina membership, and the fact that most FLOC members lack ready access to banking and credit cards, FLOC relies heavily on its members' dues checkoffs to sustain its organizing and advocacy work in North Carolina.

50.     Most FLOC members that are H-2A guest workers covered by the NCGA CBAs live in employer-provided housing spread out over approximately 1,000 labor camps.  FLOC does not have the resources and staff to collect dues each week from each and every one of our approximately 2,000 dues paying members located in North

Carolina at a given time. This task would require our staff to make in-person visits to most members' labor camp housing during farmworkers' limited non-working hours.

**The Impact of the Farm Act on FLOC and its Members**

51.     The Farm Act says that any voluntary agreements by agricultural producers to honor their employees' requests for dues checkoffs are invalid and unenforceable. FLOC members and employers who made such agreements would be subject to criminal prosecution and civil enforcement.  Unless the Act remains enjoined, FLOC will be unable to negotiate and enter into any new agreements with agricultural producers which provide for dues checkoff.  This really hurts our efforts to join new members and — before the Court preliminarily enjoined the law — had already negatively impacted our work. For example, in December 2017 and January 2018, FLOC engaged in negotiations with one agricultural producer in North Carolina on behalf of approximately 35 FLOC members. As part of those negotiations, FLOC and its members sought a CBA or other agreement to require certain minimum working conditions for employees at the farm. Because the Act was then in effect, we couldn't negotiate for the agreement to include a provision that the employer would honor dues checkoffs for employees who chose to join FLOC. This was a significant change from our regular practice, because every other CBA FLOC has negotiated or entered into in North Carolina prior to the Act included a dues checkoff provision.  Before the Act was preliminarily enjoined, this causes significant lost opportunities for FLOC and its members, especially because the agreements we negotiate typically last multiple years.

52.     In addition to being blocked from entering new dues checkoff agreements, the Act would also prevent us from collecting dues from most of our members covered by current CBAs once those CBAs expire.

53.     If in effect, the Act would also prevent us from settling litigation if we are a party to a lawsuit with an agricultural producer, or having FLOC recognized as a bargaining representative in settlements by FLOC members, or having FLOC CBAs voluntarily agreed to in the course of settlements entered into by members. The Act threatens us with criminal prosecution or civil enforcement if FLOC or our members enter into these settlement agreements. This hurts our ability to advance and publicize our members' interests through litigation.

54.     One example of this impact arose in December 2017 and January 2018, when FLOC assisted approximately 35 FLOC members who have potential legal claims against their employer based on state laws that prohibit retaliation when workers speak up about unsafe working conditions. FLOC had been assisting these workers in trying to resolve the legal issues without litigation. The group includes workers with the following initials: JCCR, RTT, DMR, FLA, YGH, JLA, AGG, JLHG, HPD, ACR, AAZ, MAOA, AGV, MEV, HGP, PGS, JLG, BMS, OSC, CAN, FSC, JIGR, CFG, LALR, DEMC, JIMV, RCJ, EGR, JABP, GYA, JCCS, ERH, MHD, JDSC, CRH, DMOV.  I am not using the full names of these members because I don't want to subject them to potential retaliation for being members of FLOC and seeking assistance to enforce their legal rights. Because the Act was then in effect, these FLOC members no longer had the option

17

to negotiate for voluntary union recognition agreements with dues checkoff or to secure an agreement for expanded collective bargaining rights as part of a group settlement agreement that would seek restitution and also non-monetary terms to resolve their claims.

55.     Since 1997, FLOC is and has been the only farmworker union organizing and representing farmworkers in North Carolina.  This means we are the only union affected by the Farm Act's restrictions.

56.     Because of the size and geographic dispersion of FLOC's North Carolina membership as well as our own limited resources and staff, FLOC lacks the resources and ability to collect weekly dues directly from each of our approximately 2,000 dues paying members who are working in the state at a given time.

57.     Union member dues constitute approximately 50-60% of FLOC's annual budget. Timely and consistent collection of dues is essential to FLOC's ability to administer CBAs and provide services to its worker-members. The Farm Act, if in effect, would gut our ability to maintain this essential and irreplaceable source of funding.

58.     FLOC members rely on weekly dues checkoffs to timely and consistently pay their FLOC dues because they generally do not have ready access to bank accounts, credit and debit cards, and other ways of making automatic, repeated payments.

59.     Wiring dues or using bill pay services are impractical alternatives to dues checkoffs for our membership. I investigated how much it would cost for our members to

18

use Wal-Mart's bill pay service, since many farmworkers are taken by their employers to Wal-Marts in rural towns in order to do their weekly shopping. Wal-Mart's billpay service is offered through Moneygram, and the Moneygram website quotes $3.49 as the lowest transaction fee charged.[3] *See* Exhibit A, a true and accurate copy of the Moneygram billpay website showing this cost. Using the Wal-Mart/Moneygram bill pay website in August 2020,[4] I searched various union names among the existing "biller" parties to whom one can send money through Wal-Mart bill pay and did not find any— the only one that came close was a UAW retiree fund. I further explored the website and investigated how much it would cost to pay a selection of ten different recipients the amount of $10, which is a realistic estimate of how much a member might pay in weekly dues. Even for this small amount, the lowest transaction fee I found was $3.49, and some fees were as high as $8.

60. I also reviewed the options for sending money detailed on the Western Union website in August 2020. Wiring money through this service is still costly if the payer does not have a credit or debit card, usually costing a minimum of $4.99 per transaction for even the smallest transactions.[5] *See* Exhibit B to this Declaration, showing the cost of sending $10 cash to a bank account. The bill pay option appears cheaper, quoting $2.49 as the lowest transaction fee for online bill pay, but this would require the

---

[3] *See* https://www.moneygram.com/mgo/us/en/paybills
[4] *See* https://www.moneygram.com/walmart/us/en/paybills.
[5] *See* https://www.westernunion.com/us/en/web/send-money/start

Case 1:17-cv-01037-LCB-LPA   Document 108-3   Filed 08/14/20   Page 20 of 32

person paying to have a debit or credit card rather than cash, and in my experience, few H-2A workers have these cards.[6]

61.     These transaction fees would end up making weekly dues payments between 50% to 80% more costly for a typical member. Over the course of a five month work season, these transaction fees would add approximately $100-$160 to a worker's total dues payment for the season. For H-2A workers, who are typically paid the federally-mandated minimum of $12.67 an hour and who often have families in Mexico who depend on their wages, the transaction costs quoted by services like Western Union and Wal-Mart bill pay/Moneygram are a significant burden to paying union dues.

62.      In many cases, particularly in weeks where a worker did not work a full 40 hours because of weather or seasonal crop fluctuations, the transaction fees for electronically paying weekly dues through one of these services would likely be more than the dues owed. Many of our members already must pay to wire their wages to family members in Mexico, so having to incur additional costs and time required to make a second, domestic money transfer every week in order to pay union dues would be very costly and burdensome for them.

63.     If farmworkers do not have automatic weekly dues deductions, most farmworkers would have to set aside cash to make regular payment of dues to FLOC.  In practice, this will require workers to hold cash on their person or in their personal

---

[6] *See*  https://www.westernunion.com/us/en/bill-pay/app/billpay-start

property in the labor camp housing for weeks at a time. This practice will put them at significant risk of robbery or theft.

64. If the Farm Act were no longer enjoined, FLOC would be forced to divert most of our staff resources to dues collection or other fundraising efforts, gutting FLOC's ability to administer CBAs, to assist with member grievances, and to organize new workers into the union.

65. If the Farm Act were no longer enjoined, FLOC would be forced to provide less personal assistance to our members with workplace health and safety issues, grievances, work-related injuries, wage theft, and other legal matters.

66. North Carolina farmworkers who have not yet had an opportunity to meet with FLOC representatives and learn about the benefits of union representation would have fewer opportunities to organize.

67. If the Farm Act were no longer enjoined, FLOC would be unable to build our union membership by entering new agreements with agricultural producers for dues checkoffs. FLOC members could not benefit from automatic dues deduction and would risk losing their ability to associate with FLOC and join in collective activity to improve their well-being and the well-being of other farmworkers. North Carolina farmworkers who are not currently represented by FLOC, but who wish to join our union would face obstacles to becoming union members and benefitting from union representation.

Pursuant to 20 U.S.C. § 1746, I declare under penalty of perjury that each statement that I have made above is true and correct.

This 13th day of August, 2020.

Justin Flores

# EXHIBIT A





Log In | Sign Up

# Pay bills, send money to facilities and more in just a few clicks

Enter a biller or inmate facility

Thousands of new billers recently added! Pay your bills online or in-app with MoneyGram starting at $3.49[1]!

Billers include: Federal Bureau of Prisons, Ford, Santander, Ally Auto, Westlake & Capital One Auto and many more.

## How to pay bills online with MoneyGram

Case 1:17-cv-01037-LCB-LPA    Document 108-3    Filed 08/14/20    Page 25 of 32

## To pay a bill online:

**1**  **Register or log in**

Enter your information so that we can verify your identity.

**2**  **Search biller by category or company name\***

Filter by name or receiver code when searching by category.

**3**  **Enter amount you wish to pay**

MoneyGram online allows you to send your information and money with confidence.

**4**  **Provide your account number and payment information**

You can either pay with your credit[2] or debit card, or directly from your bank account.

## How to pay bills in person with MoneyGram

## To pay bills in person

**1**  **Find a MoneyGram location**

Use our locator tool to find the nearest agent location.

**2**  **To pay a bill at a MoneyGram location, have these details handy:**

- Biller or company name

- Account number

- Cash, the amount you need to pay plus fees

Case 1:17-cv-01037-LCB-LPA   Document 108-3   Filed 08/14/20   Page 26 of 32



**Convenient**

Make payments to thousands of companies online or in person at a MoneyGram location.



**Affordable**

Count on MoneyGram for competitive prices



**Reliable**

The company that you are paying usually receives notice of payment within minutes.[3]

[1] Fee varies by biller, industry and face amount

Case 1:17-cv-01037-LCB-LPA   Document 108-3   Filed 08/14/20   Page 27 of 32

[2] Card issuer cash advance fee and associated interest charges may apply.

[3] Payment notification to biller by MoneyGram may occur in real-time or within minutes except Next-Day Service or 2-3 Day Service. Timing of posting of payment by biller is subject biller acceptance of payment, cutoff times and operating hours, which vary by biller and do not typically occur on weekends or holidays. Actual payment posting time determined by biller.

Support         ⌄

Legal Information         ⌄

Corporate         ⌄

©2020 MoneyGram. Licensed as a Money Transmitter by the New York State Department of Financial Services. Massachusetts Check Seller License # CS0025, Foreign Transmittal License # FT89432, NMLS # 898432. Licensed by the Georgia Department of Banking and Finance; NMLS #898432.

# EXHIBIT B

# Send Money Online

## Your receiver's country and send amount



| | Send to |
|---|---|
| | United States |

Send amount
10.00                                          USD

ⓘ Send up to 5,000.00 USD

---

## How does your receiver want the money?



Cash pick up



Bank account[10]

---

## How would you like to pay? [31]

Pay online          **Pay cash in-store**
( 📍near you )
- 3 Business days[1]



Pay in-store

3 Business days[1]
Fee[2] 4.99  USD

Learn how to pay in store

| Confirm the state where you are going to pay for transfer |
|---|

| State |
|---|
| North Carolina |

 Select Continue to lock in exchange rates[2] and fees[2]. Different fees may apply without setting up this transfer online.

+ I have a promo code

## Continue

## Summary

| | |
|---|---|
| Transfer amount | 10.00 USD |
| Transfer fee[2] | + 4.99 USD |
| Promo discount | **Apply promo** |
| Transfer total | 14.99 USD |

Total to receiver

10.00 USD

| | |
|---|---|
| Service time:[1,8] | 3 Business days |

⊖ Legal disclaimers and important info

[1] Date available will be displayed on receipt for international transfers over $15. Service and funds may be delayed or unavailable depending on certain factors including the Service selected, the selection of delayed delivery options, special terms applicable to each Service, amount sent, destination country, currency availability, regulatory issues, consumer protection issues, identification requirements, delivery restrictions, agent location hours, and differences in time zones (collectively, "Restrictions"). Additional restrictions may apply; see our terms and conditions for details.

[2] Western Union also makes money from currency exchange. When choosing a money transmitter, carefully compare both transfer fees and exchange rates. Fees, foreign exchange rates and taxes may vary by brand, channel, and location based on a number of factors. Fees and rates subject to change without notice.

[8] Excludes receiver's bank holidays.

[10] Please use care when providing bank account information. Funds will be paid into in the bank account corresponding to account number you provide. Please Note: The receiver's account must be a local currency payout account.

[31] The price for each type of money transfer is based on many factors, such as the speed of the transfer, destination of funds, and other factors. Choose the funding method that works best for you.

Western Union's Tobacco Purchase or Sale Policy.

My WU service fee reduction are not currently applied to online bill payments or transfers that are set up through the Western Union mobile app and paid for at participating agent locations.

Western Union Financial Services, Inc., P. O. Box 6036, Englewood, CO, 80155

---

/