# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No. 1:17-cv-01037-LCB-LPA

| | | |
|---|---|---|
| **FARM LABOR ORGANIZING** | ) | |
| **COMMITTEE, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| **v.** | ) | |
| | ) | |
| **JOSHUA STEIN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## NATURE OF THIS MATTER

Plaintiffs Farm Labor Organizing Committee ("FLOC") and Valentin Alvarado Hernández[1] move for summary judgment on their claims that Section 20.5 of the Farm Act of 2017[2] ("Section 20.5" or "the Act") violates the First and Fourteenth Amendments to the Constitution.[3] Section 20.5 amended North Carolina's already-existing "right-to-work" law, N.C. Gen. Stat. § 95-79(b) by creating sweeping obstacles to farmworkers' rights to associate with unions and to express support for unionization. DE[4] 34-2 at 23.[5] The Act

---

[1] Plaintiff Victor Toledo Vences's claims were voluntarily dismissed. DE 98.
[2] North Carolina Farm Act of 2017, 2017 Sess. Laws 108, sec. 20.5.
[3] Plaintiffs continue to assert their claims under the Bill of Attainder clause and 42 U.S.C. § 1981 but are not moving for summary judgment on these claims.
[4] All citations to the pre-existing ECF docket are labeled "DE."
[5] Where available, Plaintiffs use the original pagination of documents attached as exhibits. Where no original pagination exists, Plaintiffs will refer to Bates numbers or numbered sections of the relevant documents.

bars FLOC, farmworkers like Alvarado Hernández, and agricultural employers from voluntarily entering into dues checkoff agreements. *Id.* The Act also prohibits union recognition as a stipulation in any settlement and bars FLOC from entering into *any kind* of enforceable settlement agreement with an agricultural producer. *Id.* By declaring the prohibited dues checkoff and settlement agreements "in restraint of trade or commerce," Section 20.5 renders Plaintiffs subject to criminal prosecution and civil liability for entering into these agreements. *See id.*; N.C. Gen. Stat. §§ 75-1, 75-9–75-15.2.

The Act violates the Fourteenth Amendment's Equal Protection Clause because it deprives a vulnerable workforce and their union of the right to enter into mutual agreements available to every other worker and union in the state without rational relation to a legitimate government purpose. It also violates Plaintiffs' First Amendment rights to association and expression by severely and selectively burdening the speech and association rights of FLOC and its members. This Court should enter summary judgment for Plaintiffs and permanently enjoin enforcement of the Act.

## STATEMENT OF FACTS[6]

### I.     Farmworkers in North Carolina

Each year, farms across North Carolina rely on the labor of roughly 100,000 farmworkers to support the state's agricultural industry. Ex. 1 (Jt. Stips.) ¶ 1; Ex. 2 (Arcury

---

[6] The parties have stipulated that documents cited in this brief are authentic within the meaning of Fed. R. Evid. 901, absent good cause showing otherwise. *See* Ex. 1 (Jt. Stip.) ¶ 44.

Rep.) ¶ 18[7]; DE 34-4 (Arcury Decl.) ¶ 12. These farmworkers endure often harsh working

and living conditions, helping North Carolina to lead the nation in the production of crops

---

[7] Plaintiffs cite the reports of three experts: Tom Arcury ("Arcury Rep."), Charlotte Garden ("Garden Rep."), and Robert Korstad ("Korstad Rep."). *See* Ex. 2, 10, 28. On May 12, 2020, Magistrate Judge Auld denied the parties' joint motion to serve their expert reports out of time (DE 95), after the parties asserted that they mistakenly believed that they could informally extend one another's expert report deadlines so long as their reports were exchanged before the ultimate discovery deadline. DE 93 at 2-3, 5. However, Judge Auld noted the parties' agreement that neither side was prejudiced by the late service, and left open the possibility that they could use expert testimony if the delay "was substantially justified or is harmless," Fed. R. Civ. P. 37(c)(1), "questions which must await resolution if/when the Parties ultimately attempt to make such use of any belatedly disclosed expert information witness(es)." DE 95 at 12 n. 4.

Plaintiffs' late service of expert reports was substantially justified or harmless and they should not be precluded from using this testimony under Fed. R. Civ. P. 37(c). Plaintiffs timely disclosed the identities of all three experts to Defendant on March 2, 2020. DE 93-1 ¶ 10. They served Arcury's and Garden's reports on May 1 and Korstad's report on May 14, well before discovery ended on July 15, 2020. *See* Ex. 30, 31. Defendant served rebuttal reports responding to Arcury's and Korstad's reports on May 31 and June 12, respectively. Ex. 32, 33. Defendant had an opportunity to depose all three experts and deposed Arcury. Moreover, Garden's and Arcury's declarations filed in support of Plaintiffs' 2018 preliminary injunction motion (also cited herein) provided Defendant with over two years of detailed notice regarding these experts' opinions. *See* DE 34-4, DE 34-24. Plaintiffs repeatedly cite these experts' reports herein, indicating their relevance to issues in this case. Finally, as Plaintiffs explained in detail in the Joint Motion to serve expert reports out of time (DE 93 – 94), their failure to timely serve the expert reports arose from their mistaken interpretation of the parties' authority to grant one another informal extensions under the Court's scheduling order. *See Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003) (discussing factors relevant to Fed. R. Civ. P. 37(c)(1) analysis); *Haynes v. City of Durham, N.C.*, No. 1:12CV1090, 2016 WL 469608, at *9–11 (M.D.N.C. Feb. 5, 2016) (defendant's belated expert disclosure was harmless where surprise was minimal, plaintiff's counsel was able to depose the expert, and the testimony was relevant).

3

like tobacco and Christmas trees. Ex. 1 ¶¶ 3–5;[8] Ex. 3 (2d Flores Decl.) ¶¶ 7–9.

Whereas 90% of North Carolina growers identify themselves as white, approximately 95% of farmworkers in North Carolina are of Hispanic or Latinx origin.[9] Ex. 1 ¶¶ 2, 11. The majority of North Carolina farmworkers, including Plaintiff Valentin Alvarado Hernandez, are of Mexican origin; many are monolingual Spanish speakers. Ex. 1 ¶ 2; Ex. 4 (2d Alvarado Hernández Decl.) ¶ 4. A substantial portion of North Carolina's farmworkers work pursuant to short term visas authorized by 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ("H-2A"). Ex. 3 ¶ 7. In 2018 and 2019, North Carolina had the fourth and fifth largest number, respectively, of H-2A workers certified for employment in the nation. Ex. 1 ¶ 2; Ex. 3 ¶ 7. Most H-2A workers work in tobacco, sweet potatoes, and Christmas trees. Ex. 3 at ¶ 7.

Farmworkers face a variety of challenges in the workplace and broader community, including wage theft, retaliation for speaking out about workplace issues, dilapidated housing, unsafe work conditions, reliance on employers for basic needs, and discrimination in housing and police interactions. Ex. 3 ¶ 8; Ex. 2 ¶¶ 40–45; DE 34-4 ¶¶ 8, 27–32. In our current pandemic, farmworkers face numerous risks and challenges in protecting

---

[8] Recent government statistics show that North Carolina still leads in tobacco and Christmas tree production. *See* NC Dep't of Agriculture, "Marketing: Field Crops: Tobacco," https://www.ncagr.gov/markets/commodit/horticul/tobacco/index.htm ; NC Dep't of Agriculture, "Marketing: NC Christmas Trees; Quick Facts," https://www.ncagr.gov/MARKETS/commodit/horticul/xmastree/index.htm (last accessed August 14, 2020).
[9] Plaintiffs will refer to Hispanic or Latinx people collectively as "Latinx."

4

themselves from COVID-19 and accessing medical care if they become sick. Ex. 3 ¶ 9.

## II.    FLOC's Advocacy

FLOC is a labor union that uses public advocacy campaigns, litigation, and collective bargaining agreements (CBAs) with agricultural employers to promote fair wages and safe working conditions, to fight discrimination, and to ensure that farmworkers are able to voice concerns about work without fear of retaliation *See* Ex. 3 ¶ 6; Ex. 9 (FLOC Constit.) at 1; Ex. 11 (FLOC 30(b)(6)-Flores Dep.) at 27:4–28:2, 38:20-23. Since it began operating in North Carolina in the late 1990s, FLOC has been the only agricultural labor organization engaging in collective bargaining in the state. *See* Ex. 1 ¶ 18; Ex. 3 ¶ 6.

North Carolina is a "right to work state." N.C. Gen. Stat. § 95-78 establishes that each employee has the right to choose whether to join a union, and N.C. Gen. Stat. § 95-81 prohibits the conditioning of employment on union membership or non-membership. Ex. 1 ¶ 15. Farmworkers are excluded from the National Labor Relations Act. *See* 29 U.S.C. § 152(3). As such, FLOC cannot legally require employers to engage in collective bargaining, and all CBAs between FLOC and agricultural employers in North Carolina are entered into on an entirely voluntary basis. Ex. 1 ¶¶ 13-15, 21; Ex. 3 ¶ 12. Without legally-mandated collective bargaining, FLOC must "gain public or governmental support for their demands through expressive advocacy" such as organizing and litigation. Ex. 10 (Garden Rep.) ¶¶ 34, 67–68; *see also* Ex. 3 ¶¶ 17–19, 26–28.

Roughly 95% of FLOC's North Carolina membership work under seasonal H-2A guestworker visas. Ex. 3 ¶ 11. These workers are uniquely vulnerable to retaliation and

5

other mistreatment without a CBA that ensures seniority-based job tenure, because H-2A regulations do not provide for any right or preference for re-hire based on satisfactory work performance. *See* 20 C.F.R. §§ 655.12, 655.135; Ex. 3 ¶ 13; Ex. 11 at 255:18-25; 256:4-17; 257:23; Ex. 12 (U.S. Gov't Accountability Office, GAO-15-154, *H-2A and H-2B Visa Programs: Increased Prots. Needed for Foreign Workers* (2015)) at 37–38. However, FLOC CBAs provide workers protection through a uniform recruitment system based on seniority, provisions to ensure that workers will not face retaliation for speaking out, and a grievance mechanism to resolve future issues. Ex. 3 ¶ 13; Ex. 11 at 107:13–108:25, 182:22–183:19, 255:24–257:25; Ex. 4 ¶ 19; Ex. 13 (N.C. Growers Ass'n CBA) at 10–19, 28–44.

FLOC's four North Carolina staff members act as organizers within the state— visiting labor camps, speaking with workers about their rights, troubleshooting their issues, and educating the broader community about FLOC's mission. Ex. 11 at 20:21–21:5, 23:17–24:4, 25:9-21. Additionally, FLOC engages in public advocacy to advance farmworker welfare and immigrants' rights. Ex. 3 ¶¶ 26–28.

FLOC has also engaged in campaigns and pursued grievances throughout the agricultural supply chain in an effort to achieve better conditions for farmworkers in North Carolina. *See e.g.* Ex. 10 ¶ 35, Ex. 3 ¶¶ 26, 32–33; Ex. 11 at 204:14–209:9; Ex. 14 (Grievance Reps.). Examples of this are FLOC's six-year campaign against Reynolds American and other major tobacco corporations and a multi-year boycott of Mount Olive

Pickle Co. Ex. 3 ¶¶ 30–31, 33; Ex. 10 ¶ 35. The latter led to a CBA with the North Carolina Growers Association ("NCGA"), the largest H-2A employer in the nation, which employs roughly 50% of the H-2A workers in North Carolina. Ex. 1 ¶¶ 8, 19; Ex. 3 ¶¶ 30–31.

FLOC and its members also use litigation to ensure compliance with existing laws, educate the public, and achieve tangible gains. Ex. 3 ¶¶ 17, 19, 34–35. FLOC participates in litigation as a party or as amicus on issues of concern to its membership and assists its members with legal referrals and negotiations with employers. Ex. 3 ¶¶ 18–19; Ex. 10 ¶¶ 65, 67–68; Ex. 15 (Vargas Olivo Decl.) ¶ 3; Ex. 16 (Carillo Garcia Decl.) ¶ 9. FLOC has supported its members in securing settlements that include voluntary union recognition and entry into CBAs. Ex. 3 ¶¶ 17, 20-21; Ex. 11 at 182:22–183:19.

The large majority of funds used by FLOC to support its organizing and member support work comes from membership dues. Ex. 3 ¶ 57; Ex. 11 at 185:7-9; Ex. 17 (FLOC Financial Statements). FLOC members working under a CBA pay dues in the amount of 2.5% of their weekly wages, collected through dues checkoffs. Ex. 11 at 37:22–38:19, 99:22–100:5. State law requires that employees must provide written authorization for dues to be deducted from their pay, and they retain the right to withdraw that authorization. *See* N.C. Gen. Stat. § 95-25.8; Ex. 1 ¶¶ 16-17. Members must pay dues to remain in good standing and participate in union governance. Ex. 9 at 2–3; Ex. 11 at 42:19–43:22, 58:18–59:12, 98:2-19. While all members may provide input, only members in good standing may participate as delegates in FLOC's convention and vote to change FLOC's mission,

7

priorities, or dues rate. Ex. 9 at 3–4, 7–8; Ex. 11 at 48:4-9, 50:4-23.

## III.    The Enactment of the Farm Act

The success of FLOC and its members in pushing for industry change and securing union protections for thousands of H-2A workers has generated backlash by employers and their representatives. Ex. 3 ¶¶ 36–40; *see also* Ex. 8 (NCFB 30(b)(6)-Sherman Dep.) at 59:19–63:21; 77:19–78:20; 106:20–110:20. FLOC's efforts drew the attention of the North Carolina Farm Bureau ("NCFB"), a membership organization of agricultural producers. Ex. 8 at 40:13–41:1; 53:5–57:19. NCFB has adopted opposition to the unionization of farmworkers as part of its policy platform. Ex. 8 at 62:13–63:21.

In 2016, Plaintiff Alvarado Hernandez and other FLOC members sued Jackson Farming Company (JFC)—the family farm of State Senator Brent Jackson—for wage theft. Ex. 3 ¶ 35; Ex. 27 (Compl., *Sanchez-Rodriguez, et al. v. Jacksons Farming Co. of Autryville,* No. 7:16-CV-28-D, Feb. 13, 2016). As part of their efforts to resolve their claims against JFC prior to filing suit, the plaintiffs unsuccessfully sought a settlement agreement that would include a CBA. Ex. 18 (12/16/2015 Willis Ltr. attached to 4/29/16 Sen. Jackson email) at 2-3. Senator Jackson characterized this effort at pre-filing settlement as "Blackmail." *Id.* After filing suit, FLOC conducted a public pressure campaign to expose and challenge JFC's retaliation against the plaintiffs for asserting their rights. Ex. 3 ¶¶ 35, 40; Ex. 19 (Excerpts from FLOC's Facebook & Twitter). While this litigation against JFC was ongoing, one of Senator Jackson's attorneys and the NCFB began drafting legislative

8

language that would ultimately become Section 20.5 of the Act. Ex. 8 at 74:14–78.25; Ex. 20 (6/22/16 Email exchanges between Derrick, Jackson, & Parker).

In early 2017, NCFB played a leading role in drafting and introducing SB 375, a predecessor to Section 20.5, in the North Carolina General Assembly ("the Legislature"). Ex. 8 at 82:2-17, 92:18-20; Ex. 21 (SB 375). NCFB urged the passage of SB 375 on the asserted basis that deducting union dues creates an administrative burden on farmers. Ex. 8 at 85:7–86:13, 90:19-24. NCFB did not provide any facts, data, or examples to elected officials in support of this argument. *Id.* at 85:7–86:17, 90:19–91:4.

After SB 375 did not pass, NCFB urged that language prohibiting dues checkoffs for farmworker unions, as well as language prohibiting settlement agreements that included an agreement with a farmworker union, be added as a last-minute amendment ("A3") to SB 615, also known as the 2017 Farm Act. Ex. 8 at 93:23–94:9, 100:2-12; DE 34-17 (SB 615 Amendment A3); DE 34-22 (SB 615 Amendment A3 Adopted); DE 34-23 (SB 615 passage); Ex. 3 at ¶41. This amendment, styled as Section 20.5, amended N.C. Gen. Stat. § 95-79(b) to remove the text stricken below and to add the language underlined below:

> (b) Any provision that directly or indirectly conditions the purchase of agricultural products, ~~products or~~ the terms of an agreement for the purchase of agricultural products<u>, or the terms of an agreement not to sue or settle litigation</u> upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. <u>Further, notwithstanding G.S. 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and</u>

9

> unenforceable against public policy in restraint of trade or commerce in the
> State of North Carolina.

DE 34-2 (strikeout and underline in original).

NCFB urged the addition of Section 20.5 because opposing union dues checkoffs "was one of [its] policy positions and an opportunity with a particular Senate bill opened up in order to try to achieve it." Ex. 8 at 104:22-24; *see also id.* at 104:13–105:22.

NCFB provided Representative Dixon, Section 20.5's sponsor, with talking points in support of the amendment. Ex. 8 at 121:9–122:3; Ex. 24 (NCFB talking points). These recited NCFB's argument that dues deductions place an administrative burden on farmers. Ex. 24. The talking points also mentioned lawsuits brought against farmers for the purpose of securing unionization, but NCFB did not make any attempt to measure or document the incidence of such lawsuits to legislators. *Id.*; Ex. 8 at 80:19–82:2, 115:5-13; 117:5–118:12, 127:25–129:20. On the House floor, Representative Dixon delivered the NCFB talking points. *See* DE 34-18 (Farm Act Debate Tr.) at 1-2; Ex. 24. When asked why the amendment was necessary given the state's existing "right-to-work" laws, Representative Dixon answered:

> Because of continued harassment from out of state there seems to be a growing wave of folks that are interested in farm labor. It's--some consider it low-hanging fruit to do things like that and it's just a general tendency for an increase in activity that we consider to be harassment.

DE 34-18 at 3. When asked whether he was afraid of farmworkers organizing, Representative Dixon replied:

> Sir, I'm not afraid of anything. And I understand that food is
> very important. And so, no we're not afraid, but an ounce of
> prevention is worth a pound of cure. And there are predatory
> folks that make a good living coming around and getting
> people to be dissatisfied. And a few of us farmers are getting a
> little bit tired of it and we want some properly measured
> priority so that we can continue to feed you.

*Id.* at 3-5.

Debate regarding Section 20.5 lasted less than 10 minutes in the House, and no additional justification was provided in that time. *See id.* at 1-5. On July 3, 2017, while the Act was awaiting the Governor's signature, Senator Jackson opined that Representative Dixon's media statements that the Act "will enhance our local agricultural community *and possibly be a deterrent to outside organizations in making attempts to establish unions where folks really don't want or need them*" reflected "exactly why this was done." Ex. 8 at 124:9–126:4 (emphasis added); Ex. 25 (7/3/2017 B. Jackson Email).

Despite their extensive efforts to enact Section 20.5, NCFB representatives—including the representative designated to testify on the topic of how agricultural employers administer dues deductions —have been unable to substantiate their claims that dues deduction administratively burdens their members, nor can they identify even one farmer who deducts dues manually instead of by computerized payroll system. Ex. 8 at 85:13-16, 86:3-17, 90:25–91:4; Ex. 22 (NCFB 30(b)(6)-Boyette Dep.) at 39:14-22, 51:16-25, 54:23–55:25; Ex. 23 (NCFB 30(b)(6) Dep. Not.) at 9, ¶VIII. The NCFB also acknowledged that for farmers with computerized payroll systems, "the computer does a lot of the

11

calculation—nearly all of the calculation," Ex. 22 at 39:4-10. "For people who have an automated system, it's a keystroke." *Id.* at 54:18-19. The record also shows that farmers who wanted freedom from FLOC CBAs (and attendant dues checkoffs) could simply opt out — for example, by leaving the NCGA. Ex. 3 ¶¶ 16, 35; Ex. 22 at 90:7-12; 91:10–92:2.

The Latinx community has been historically underrepresented in the Legislature. Although Latinx people comprise 9.8% of North Carolina's population, the Legislature has had no more than two Latinx members since 2013 and none during the 2017-2018 legislative session, when Section 20.5 was enacted. Ex. 6 (Census Data); Ex. 7 (2017-18 General Assembly Demographics); Ex. 8 at 96:3–97:4. From 2010-2018, the Legislature has considered a minimum of eleven pieces of legislation targeting non-citizens, many of which were sponsored by legislators who also sponsored the 2017 Farm Act. Ex. 1 ¶¶ 33–43.

## IV. The Impacts of Section 20.5 on FLOC and its Members

Section 20.5 severely burdens FLOC and its members' expressive and associational activities. *See* Ex. 3 ¶¶ 51–67. Even while enjoined, Section 20.5 has inhibited FLOC's ability to advocate for best practices around voluntary dues checkoffs and freedom of association. Ex. 11 at 204:14–209:9. If not enjoined, the Act would subject Plaintiffs to felony prosecution and civil penalties for seeking a CBA or union agreement as a term of settlement, or dues checkoff agreements under any circumstance. N.C. Gen. Stat. §§ 75-1, 75-9 to 75-15.2; DE 56 at 42–43.

12

The Act would leave FLOC members like Plaintiff Alvarado-Hernandez without viable alternatives to pay their dues. Ex. 3 ¶¶ 58–63; Ex. 4 ¶¶ 14–16; Ex. 5 (Alvarado Hernández Dep.) at 71:21–72:15; Ex. 15 ¶¶ 13–15; Ex. 16 ¶¶ 12–14. The employer-owned labor camps in which most FLOC members reside are far-flung and often isolated, lacking addresses or mailboxes. Ex. 2 ¶¶ 31–32; Ex. 3 ¶¶ 42–43, 50; Ex. 26 (Arcury Dep.) at 80:4–81:8; DE 34-4 ¶¶18–19; Ex. 11 at 53:2-21. Many workers are unfamiliar with using the US postal system to pay bills and lack personal transportation. Ex. 4 ¶¶ 14–16; Ex. 5 at 18:5-13; 48:8-11, 71:21–72:2; Ex. 15 ¶¶ 13–15; Ex. 16 ¶¶ 12–14; Ex. 2 ¶¶ 40–41; DE 34-4 ¶¶ 27–28; Ex. 26 at 81:12-23. Very few, if any, FLOC members have bank accounts or credit cards with which they can pay dues. Ex. 3 ¶¶ 47–49, 58–62; Ex. 11 at 188:16–190:3; Ex. 4 ¶¶ 14–16; Ex. 5 at 71:21–72:2; Ex. 15 ¶¶13–15; Ex. 16 ¶¶ 12–14; Ex. 2 ¶ 45. Due to the geographic dispersion of members and seasonal nature of their employment, FLOC cannot feasibly collect dues from members in person. Ex. 11 at 36:10-20, 76:7–78:5, 79:19–81:16, 82:10-23, 105:15-24, 199:6-16; Ex. 10 ¶ 24. The logistical impracticability of collecting dues by any method other than dues checkoffs would undercut and destabilize FLOC's main source of revenue, and hinder FLOC and its members' ability to recruit new members, as workers are unlikely to join if they have no practical way to pay dues. Ex. 3 ¶¶ 56–57, 64–67; Ex. 10 ¶¶ 3, 29–30, 36; DE 34-24 ¶ 24; Ex. 15 ¶¶ 11-13, 16–17; Ex. 16 ¶¶ 10-13, 15–16.

The settlement provision of Section 20.5 significantly impairs FLOC and its

13

members' ability to use litigation as expressive advocacy to advance the goals of the organization and welfare of its members. Ex.10 ¶¶ 61–71; DE 34-24 ¶¶ 29–46. Without the ability to negotiate for anti-retaliation provisions, members will be less likely to come forward with meritorious legal claims. Ex. 11 at 223:1–228:12, 234:19–237:6. Workers will also be unable to negotiate settlement agreements that include grievance procedures designed to avoid future litigation. *Id.* at 218:20–220:4. FLOC members and their employers will be unable to negotiate less monetary restitution in exchange for union recognition or a CBA. Ex. 11 at 218:20–220:4, 220:23–222:21; 238:4-5. Finally, the Act invalidates *any* settlement agreement between an agricultural producer and FLOC, no matter the content. This severely limits FLOC's options in bringing and resolving litigation on its own behalf or on behalf of its members, because it will be forced to litigate to final judgment regardless of whether a mutually agreeable settlement option exists. Ex. 10 ¶¶ 59, 61–66, 71, Ex. 34-24 ¶¶ 42–46.

## QUESTIONS PRESENTED

Have Plaintiffs demonstrated that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law on their claims that Section 20.5:

1.  Violates the Equal Protection Clause?

2.  Violates the First Amendment?

14

## **ARGUMENT**

To obtain summary judgment, Plaintiffs must show that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law on their claims. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must review the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

### I.      Section 20.5 Violates the Equal Protection Clause.

Section 20.5 violates the Equal Protection Clause of the Fourteenth Amendment by uniquely and punitively stripping from agricultural employers, farmworkers, and farmworker unions, the right to voluntarily enter certain legally binding agreements. To succeed on their equal protection claim, Plaintiffs must first demonstrate that they have been treated differently than others with whom they are similarly situated and that such unequal treatment was intentional. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). This discrimination and intent are clear on the face of the Act, which singles out farmworkers and their unions for differential treatment compared to all other private sector workers in the state. DE 56 at 71; DE 34-2; *see also* N.C. Gen. Stat. § 95-25.8(a)(2) (providing that employees may authorize wage deductions for their convenience).

Once these criteria are met, the Court must apply the appropriate standard of review. *Morrison*, 239 F.3d at 654. Under the least rigorous standard of review, courts "will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

FLOC is a union overwhelmingly comprised of Mexican guestworkers who cannot vote, who live in North Carolina only a few months of the year, and who face other significant barriers to participation and representation in the political process. Ex. 1 ¶¶ 2, 11; Ex. 4 ¶ 4. They labor in a political climate in which a legislature with few to no Latinx members has frequently acted to impose harsh restrictions on non-citizens. *See* Facts, *supra* pp. 4, 12; *see also* Ex. 1 ¶¶ 33-43; Exs. 6-7. FLOC members' situation reflects a long history of racial segregation in agricultural labor and racially motivated legislation to exclude agricultural workers from certain protections under federal and state laws. Ex. 28 (Korstad Rep.) ¶¶ 17-20, 68, 72; *see also* DE 34-13 (Hahamovitch Decl.) ¶¶ 8-21.

In such cases, "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n. 4 (1938); *see also Graham v. Richardson*, 403 U.S. 365, 372 (1971) ("Aliens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate.") (internal citations omitted); *Lawrence v. Texas*, 539 U.S. 558,

16

580 (2003) (O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.").

Even if standard "rational basis" review is applied, the Act violates the Equal Protection Clause because it arbitrarily imposes harsh legal penalties and disabilities on farmworkers and their union that do not exist for any other private sector workers in the state. Rational basis scrutiny is designed to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633. The standard is deferential, but not toothless: "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985); *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (the Equal Protection Clause "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

When this Court applied rational basis review to Section 20.5 at the preliminary injunction stage, it addressed the three supporting rationales offered by its legislative sponsor, Representative Dixon: (1) reduction of regulatory burdens; (2) concern for the food supply; and (3) a desire to suppress farmworkers' labor organizing efforts. DE 56 at 71-73. Extensive discovery has confirmed the Court's preliminary conclusions, leaving no dispute of material fact. NCFB—Section 20.5's drafter and key proponent—has echoed

17

the first and the third reasons[10] advanced by Representative Dixon, explaining that it sought passage of the language that became Section 20.5 to advance its organizational policy to oppose farmworker unionization and to spare its members the alleged burdens of administering dues checkoffs. *See* Facts, *supra* pp. 8-12. The reasons advanced by Representative Dixon and NCFB[11] do not constitute rational relation and legitimate end.

### Rationale 1: "Regulatory Burden"

As this Court has previously noted, "the precluded activities (dues checkoffs and certain settlement provisions) arose from voluntary agreements between farmers, farmworkers, and/or FLOC rather than any regulatory mandate." DE 56 at 72 (citing DE 34-5 ¶ 11). "Moreover, the Farm Act does not affect payroll deductions for anything other than the payment of union dues. The Farm Act thus does not appear rationally related to reducing farmers' regulatory burdens." DE 56 at 72 (internal citation omitted). The evidence shows that dues checkoffs are no different from any other payroll deduction that an employer makes pursuant to N.C. Gen. Stat. § 95-25.8, and are generally achievable through a "keystroke" in a computerized payroll system. Ex. 22 at 39:4-10; 54:18-19; *see*

---

[10] NCFB did not independently advance the second reason offered by Representative Dixon or offer any support for it. *See* Ex. 8 at 115:18-117:4; *see also* Ex. 24 (NCFB talking points).

[11] Plaintiffs also issued public records act requests and served documentary subpoenas on multiple legislators involved with the passage of the 2017 Farm Act. These records furnished no additional reasons for Section 20.5, and the legislators invoked legislative privileges when noticed for depositions, thereby refusing to supply any additional reasons for the Act. Ex. 29 (4/15/20 T. Henderson Ltr.).

*also* Ex. 3 ¶ 48. Further underscoring the Court's observations regarding the entirely voluntary nature of dues checkoffs in agriculture, the evidence shows that growers who do not wish to be subject to such agreements can simply opt out. Ex. 3 ¶ 16; Ex. 22 at 90:7-12. In the name of enacting redundant and unnecessary protections for unwilling employers, Section 20.5's sweeping prohibitions arbitrarily strip farmworkers and willing agricultural employers of the freedom to make these agreements. Courts have repeatedly invalidated restrictions that were similarly overbroad and disproportionate to the purported legitimate ends. *See, e.g., U.S. Dep't of Agric. v. Moreno,* 413 U.S. 528, 534 (1973); *Planned Parenthood of Cent. N. Carolina v. Cansler*, 804 F. Supp. 2d 482, 497 (M.D.N.C. 2011); *Manwani v. U.S. Dep't of Justice, I.N.S.*, 736 F. Supp. 1367, 1391–92 (W.D.N.C. 1990).

**Rationale 2: Food Supply**

This Court earlier determined that concern for the food supply "does not bear a rational connection to restrictions on the organizing activity (through voluntary settlements) of all farmworkers and their union" given that two out of three main crops in which H-2A workers labor (tobacco and Christmas trees) are not food, and "the prohibitions do not apply to any other workers involved in the food supply chain." DE 56 at 73. These findings remain true. *See* Ex. 1 ¶¶ 3-5; Ex. 3 ¶¶ 7-9.

Given the many other categories of workers involved in ensuring our food supply, it remains irrational to target farmworkers and their union for felony criminal penalties and

civil liability simply because they have negotiated voluntary agreements with their employers. DE 56 at 72-73; *see Cleburne*, 473 U.S. at 449-50 (city failed to explain why overcrowding concerns justified restrictions on group housing for developmentally disabled persons but not for other group housing); *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1066-67 (9th Cir. 2014) (striking down policy denying drivers' licenses to one group of immigrants while granting them to similar categories of immigrants); *see also Plyler v. Doe*, 457 U.S. 202, 220-24 (1982) (weighing government interest in classification against the harsh impact on those affected by it).

**Rationale 3: Suppression of Farmworker Unionization**

This Court earlier held that "a desire to suppress farmworkers' organizational efforts likely does not constitute a legitimate government interest." DE 56 at 73. The evidence in this case shows, however, that this illegitimate desire was a central motivation in enacting Section 20.5. NCFB, which drafted the language of the Act and led the legislative effort, testified that it was advanced for the purpose of preventing unionization when a legislative opportunity arose; anti-unionism is a key tenet of the organization's political platform. Ex. 8 at 60:10-13; 62:22–63:21; 104:13-105:15.

The publicly expressed purpose of Section 20.5 is to suppress farmworker unionization. Section 20.5's sponsor claimed that "a few" growers were "tired" of FLOC and its members "getting people to be dissatisfied," i.e., exercising their fundamental First Amendment rights, and trying to persuade agricultural producers to enter dues checkoff

20

and settlement agreements. DE 34-18 at 3-4. But a desire to suppress farmworkers' organizational efforts is not a legitimate government interest. *See Kelo v. City of New London, Conn.*, 545 U.S. 469, 491 (2005) (Kennedy, J., concurring) ("[A] court applying rational-basis review under the Equal Protection Clause must strike down a government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications.").

FLOC has been the only farmworker union operating in North Carolina for over 20 years. Ex. 3 ¶ 6. Section 20.5's settlement prohibitions were drafted in direct response to efforts by FLOC members to negotiate union recognition in a settlement with Senator Brent Jackson's farm. Facts, *supra* pp. 8-9. Other than Senator Jackson's cries of "blackmail," NCFB repeatedly admitted it lacked facts, examples, and data to substantiate the theory that settlements involving union recognition and dues checkoffs agreements burdened agricultural producers. *See* Facts, *supra* pp. 8-11; Ex. 8 at 80:19–82:2, 85:7–86:17, 90:19–91:4, 115:5-13; 117:5–118:12, 127:25–129:20; Ex. 22 at 39:14-22, 51:16-25, 54:23–55:25.[12]

There is no rational relation between the Act's sweeping penalization of voluntary agreements and any legitimate government interest. The interest of "a few" farmers, DE 34-18 at 3-4, in avoiding speech and association they dislike cannot justify severe burdens

---

[12] NCFB agreed that the letter Senator Jackson received was not blackmail. Ex. 8 at 135:15-23.

to the speech and association interests of over 100,000 farmworkers, as well as agricultural employers who want to enter into the kinds of dues checkoffs and settlement agreements proscribed by the Act.

By imposing criminal and civil penalties and legal disabilities on FLOC and its members to advance the anti-union agenda of FLOC's adversaries, the Act raises "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer*, 517 U.S. at 634; *see also Moreno,* 413 U.S. at 534 ("a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."); *Ariz. Dream Act Coal.*, 757 F.3d at 1067 (animus toward recipients of a controversial form of immigration relief "is not a legitimate state interest"). The Act fails rational basis review.[13]

## II. Section 20.5 Violates the First Amendment.

Labor unions like FLOC are "an archetype of an expressive association." *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 301 (4th Cir. 1991); *see also State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 133–34 (2d Cir. 2013). Given the

---

[13] As detailed in Section II *infra*, Plaintiffs' First Amendment rights are significantly burdened by the Act. Because the Act's classification burdens fundamental First Amendment rights, it also violates Plaintiffs' rights under the Equal Protection Clause under a strict scrutiny standard. *See Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990), *overruled in non-relevant part by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ("[S]tatutory classifications impinging upon [the fundamental right to engage in political expression] must be narrowly tailored to serve a compelling governmental interest.").

22

important role unions play in advocating for their members' political, economic, and social interests, "it cannot be questioned that the First Amendment's protection of speech and associational rights extends to labor union activities." *State Emp. Bargaining Agent Coal.*, 718 F.3d at 132 (citations omitted); *see also Thomas v. Collins*, 323 U.S. 516 (1945).

The First Amendment prohibits the government from "singl[ing] out expressive activity for special regulation" or taxation, unless it can demonstrate that the burden on expression is necessary to advance a compelling government interest. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 583 (1983). Neither can the government take steps to suppress participation in protected expressive association. *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) ("[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."). Finally, the government cannot prevent expressive associations from participating in litigation to advance their causes. *See NAACP v. Button*, 371 U.S. 415, 429–31 (1963) (NAACP had a First Amendment right to solicit clients for desegregation lawsuits).

### A. The Act Unconstitutionally Penalizes FLOC and Its Members by Selectively Prohibiting FLOC's Union Dues Checkoffs.

The Act violates the First Amendment by prohibiting FLOC from negotiating voluntary dues checkoff agreements with willing agricultural employers, thereby imposing a substantial burden on FLOC's activities as an expressive association. FLOC members must pay dues in order to remain in good standing and participate in governance of the

23

union. Ex. 9 at 2-4; Ex. 11 at 42:19–43:22, 48:4-9; 49:24–50:23, 58:18–59:12, 98:2-19. Because FLOC's migrant farmworker membership faces significant logistical barriers to alternative means of dues payment, FLOC and its members rely on dues checkoffs to facilitate the timely and consistent payment of union dues. *See* Ex. 2 ¶¶ 31–32, 40–41, 45; Ex. 3 ¶¶ 42-43, 47-50, 58-63; Ex. 4 ¶¶ 14-16; Ex. 5 at 18:5-13, 48:8-11, 71:21–72:15; Ex. 11 at 36:10-20, 53:2-21, 76:10–78:5, 79:19–81:16, 82:10-23, 105:15-24, 188:16–190:3, 199:6-16; Ex. 15 ¶¶13-15; Ex. 16 ¶¶ 12-14; Ex. 26 at 80:4-81:23; DE 34-4 ¶¶18-19, 27-28. The majority of FLOC's income comes from dues checkoffs; dues are essential to FLOC's organizing and operations. Ex. 3 ¶¶ 56-57, 64-67; Ex. 11 at 185:7-9; Ex. 17; Ex. 10 ¶¶ 29, 30, 36; DE 34-24 ¶ 24.

The Act prohibits FLOC (and only FLOC) from negotiating voluntary dues checkoff arrangements with *private* agricultural producers. *See* Ex. 1 ¶ 18, Ex. 3 ¶ 6. As shown by the evidence summarized here and *supra* p. 13, the inability to collect dues via checkoffs and the lack of viable dues-collection alternatives would drain FLOC's resources, severely hinder its recruitment efforts, and ultimately undermine the bargaining power of its membership. Further, prohibiting the only feasible means for existing and potential FLOC members to pay their dues would undercut and destabilize FLOC's main source of revenue to support not only CBA administration but also advocacy and organizing efforts, such as organizing boycotts and other protests, petitioning the government, and supporting political candidates and issues. Ex. 10 ¶ 30; Ex. 34-24 ¶¶ 27–28. By creating obstacles to

farmworkers' ability to become dues-paying members of FLOC and financially support its efforts, the Act has imposed an impermissible burden on FLOC's ability to engage in expressive and associational activities.

The First Amendment prohibits the state from imposing this severe and selective burden on the speech and association rights of FLOC and its members. *See Patterson*, 357 U.S. at 460–61; *see also, e.g.*, *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 749 (5th Cir. 1993) ("[T]he first amendment is violated by state action whose purpose is either to intimidate public employees from joining a union or from taking an active part in its affairs or to retaliate against those who do so."). The Act's differential treatment of dues checkoff agreements with agricultural unions, "unless justified by some special characteristic of [agricultural unions], suggests that the goal of the regulation is not unrelated to suppression of expression [and association], and such a goal is presumptively unconstitutional . . . unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential [treatment]." *Minneapolis Star*, 460 U.S. at 585 (striking down a tax imposed on the sale of large quantities of newspaper and ink because it targeted large newspapers); *see also id.* at 592. ("[R]ecognizing a power in the State not only to single out the press but also to tailor the tax so that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme."). There is no justification for the Act's interference with FLOC's access to union

25

dues, let alone a compelling justification that could survive strict scrutiny under *Minneapolis Star*.

Further, the Act violates the First Amendment's prohibition against speaker- and viewpoint-based discrimination. The Act targets exactly one organization—FLOC, the only farmworker union operating in the state for over 20 years. Ex. 1 ¶ 18; Ex. 3 ¶ 6. "A law that targets a small handful of speakers for discriminatory treatment suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 640 (5th Cir. 2012) (quoting *Minneapolis Star*, 460 U.S. at 592).

The connection between discrimination against certain speakers and suppression of expression is particularly evident when the government targets labor unions for special burdens, because union speech is just as much political as it is economic. *See State Emp. Bargaining Agent Coal.*, 718 F.3d at 133–34 ("Opposition to labor unions, similarly, has at times been based not only on the perceived economic interests of employers, consumers, and workers, but on the perception that unions advocate radical political ideas."). FLOC is no exception, and has engaged in various forms of political speech and advocacy to advance the political and economic wellbeing of farmworkers and immigrants in the United States. *See, e.g.,* Ex. 3 ¶¶ 26-33; Ex. 10 ¶ 35. And, as one of Plaintiffs' expert witnesses has noted: "One relatively easy way for low-income workers

26

to engage in political advocacy, especially advocacy related to their economic interests, is through a union." Ex. 10 ¶ 43.

The Act "singles out a specific group," FLOC, "to be subject to harsh penalties," including practically insurmountable obstacles to fundraising. *United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1186 (D. Ariz. 2013) (striking down a restriction on labor unions' use of payroll deductions for political activity). These penalties amount to a limitation on speech and association "by particular speakers to which other speakers are not subject, thereby imposing costs on a particular view." *Id. See also Minneapolis Star*, 460 U.S. at 591 ("Minnesota's ink and paper tax violates the First Amendment not only because it singles out the press, but also because it targets a small group of newspapers."). As detailed *supra* pp. 8-11, the legislative history of the Act shows that Section 20.5 was intended to advance the anti-union viewpoint of the NCFB by silencing the pro-union speech of FLOC and its members.

Viewpoint discrimination of this sort is subject to strict scrutiny. *See United Food & Commercial Workers*, 934 F. Supp. 2d at 1186 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992)); *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 162–64 (2015). Strict scrutiny requires the government to demonstrate that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)). As discussed *supra*, Section 20.5 is not rationally related to any legitimate

government interest, and it certainly is not the least restrictive means for furthering any compelling government interest. It thus fails strict scrutiny.

### B. The Act Unconstitutionally Penalizes FLOC and Its Members by Prohibiting Settlements.

The Act broadly renders invalid and unenforceable "[a]ny provision that directly or indirectly conditions . . . the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization." DE 34-2 at 23. This provision prevents FLOC from benefiting from settlement agreements conditioned on union recognition or entry into a CBA, two of the most important goals of labor litigation, and prevents FLOC from entering into *any* settlement agreement with an agricultural producer. *See* Ex. 10 ¶¶ 56–59; DE 34-24 ¶¶ 29–34.

In *NAACP v. Button*, the Supreme Court held that the NAACP's assistance with anti-segregation lawsuits was "a form of political expression" and "political association" fully protected by the First Amendment. 371 U.S. at 429, 431. Although "[t]he NAACP is not a conventional political party," the Court recognized that "the litigation it assists, while serving to vindicate the legal rights of members of the American Negro community, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society." *Id.* at 431. Similarly, in *In re Primus*, the Court held that the ACLU's solicitation of clients was protected by the First Amendment because "[t]he ACLU engages in litigation as a vehicle for effective political

28

expression and association, as well as a means of communicating useful information to the public" about civil liberties. 436 U.S. 412, 431 (1978).

By the same token, "unions and union members have rights under the First Amendment to associate and to act collectively to pursue legal action." *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 187 (2d Cir. 2017). "This right has attached to the activities of workers who associate with each other to obtain counsel and further their litigation ends, and to the union as a proxy for the workers in the exercise of associational rights." *Id.* at 185. The Supreme Court has broadly upheld unions' rights to provide legal advice, representation, and other legal services for the benefit of their members. *United Transp. Union v. State Bar of Michigan*, 401 U.S. 576, 579–80 (1971). "[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *Id.* at 585.

This fundamental right is infringed when, as here, a state legislature strips workers of the right to advance their interests through settlement. Litigation can be complex, time-consuming, uncertain, and expensive. Adding to the general complexity and difficulty of labor litigation, FLOC's membership is predominantly comprised of migrant workers who face significant logistical barriers to their participation in litigation. *See* Facts *supra* pp. 12-13. Settlements often result in quicker and less expensive resolution of cases than litigating to final judgment. *See Marek v. Chesny*, 473 U.S. 1, 10 (1985) ("[E]ven for those who would prevail at trial, settlement will provide them with compensation at an earlier date

29

without the burdens, stress, and time of litigation."); *see also* Samuel R. Gross & Kent D. Syverud, *Don't Try: Civil Jury Verdicts in a System Geared to Settlement*, 44 U.C.L.A. L. Rev. 1, 3–4 (1996); Ex. 10 ¶¶ 72–75; DE 34-24 ¶ 43. Particularly in labor litigation, settlements can result in better outcomes for all parties, enabling creative solutions that courts cannot order and creating mechanisms for creative problem-solving and compromise between employers and workers. Ex. 10 ¶¶72-73; DE 34-24 ¶ 44. "[F]orcing more cases to trial" would "unnecessarily burden[] the judicial system, and disserv[e] civil rights litigants." *Evans v. Jeff D.*, 475 U.S. 717, 736-37 (1986).

By invalidating any settlement conditioned on an agricultural producer's recognition of or entry into an agreement with the union, the Act denies these benefits to FLOC. FLOC has repeatedly participated in litigation as a party or as amicus in order to provoke broader change and has supported its members in pursing just compensation for labor law violations through legal referrals and negotiations support. Ex. 3 ¶¶ 17–21; Ex. 5 at 49:9–54:24, 57:12-66:21; *see also* Ex. 10 ¶¶ 65, 67 (discussing cases). The settlement provision significantly impairs FLOC's and its members' abilities to use litigation as expressive advocacy to advance its goals and advocate for the welfare of its members. The Act prevents FLOC and its members from using litigation to negotiate important benefits, such as union recognition, entry into a CBA, or an agreement to remain neutral during a union campaign. Ex. 10 ¶¶ 56-58; DE 34-24 ¶ 31. FLOC and its members will also be

Case 1:17-cv-01037-LCB-LPA    Document 109    Filed 08/14/20    Page 30 of 35

prohibited from negotiating settlement agreements that include grievance procedures designed specifically to avoid future litigation. Ex. 11 at 218:20–220:4.

And, because the Act bars any settlement that includes an agreement between an agricultural producer and a labor union, it prevents FLOC from entering into *any kind of* settlement agreements with an agricultural producer. *See* N.C. Gen. Stat. § 95-79(b); Ex. 10 ¶¶ 59, 71; DE 34-24 ¶ 34. If the Act were not permanently enjoined, FLOC's only option for resolving litigation to which it is a party would be obtaining a final judgment. The Act makes it impossible for FLOC to realize the benefits of settlement—and, effectively, the benefits of litigation. This restriction on FLOC's ability to meaningfully advance its goals through litigation violates the First Amendment as it unconstitutionally impairs its ability to engage in expressive advocacy on behalf of agricultural workers. Ex. 10 ¶¶ 61–64, 71; DE 34-24 ¶¶ 35–42.

Even if the Court were to conclude that the Act's settlement provision does not violate Plaintiffs' rights to engage in expressive advocacy through litigation, it would nonetheless violate FLOC's First Amendment rights for the same reason that the dues checkoff provision does: the blanket prohibition on settlements imposes a selective and unconstitutional burden on FLOC as a protected expressive association. *See* Section II.A, *supra*.

## CONCLUSION

For the reasons stated, Plaintiffs' Motion for Summary Judgment should be granted.

31

Respectfully submitted this 14th day of August, 2020,

/s/ Kristi Graunke
Kristi Graunke
North Carolina Bar No. 51216
kgraunke@acluofnc.org
Jaclyn Maffetore
North Carolina Bar No. 50849
jmaffetore@acluofnc.org
ACLU of North Carolina Legal Foundation
P. O. Box 28004
Raleigh, NC 27611-8004
Tel: 919-834-3466

Julia Solórzano
Georgia Bar No. 928725
julia.solorzano@splcenter.org
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30030-1287
Tel: 404-521-6700

Meredith B. Stewart
Louisiana Bar No. 34109
meredith.stewart@splcenter.org
Southern Poverty Law Center
201 St. Charles Ave, Ste. 2000
New Orleans, LA 70170
Tel.: 504-486-8982

Carol Brooke
North Carolina Bar No. 29126
carol@ncjustice.org
Clermont Ripley
North Carolina Bar No. 36761
clermont@ncjustice.org
North Carolina Justice Center
PO Box 28068

32

Raleigh, NC 27611
Brooke Tel: 919-856-2144
Ripley Tel.: 919-856-2154

Brian Hauss
New York Bar No. 5437751
bhauss@aclu.org
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212-549-2500

Robert J. Willis
North Carolina Bar No. 10730
rwillis@rjwillis-law.com
Law Office of Robert J. Willis, P.A.
P.O. Box 1828
Pittsboro, NC 27312
Tel: 919-821-9031

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATIONS OF LR 7.3(d)

Relying on the word count function of Microsoft Word, I hereby certify that this brief complies with the word limitations set forth in the Court's August 12, 2020 Order (DE 103).

/s/ Kristi L. Graunke
*One of the Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I certify that on August 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve counsel for Defendant.

/s/ Kristi L. Graunke
*Counsel for Plaintiffs*