# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### No. 1:17-cv-1037

FARM LABOR ORGANIZING
COMMITTEE, et al.,

          *Plaintiffs*,

      v.

JOSHUA STEIN,

          *Defendant*.

**Defendant's Memorandum in
Opposition to Plaintiffs' Motion
for Summary Judgment**

## INDEX

INTRODUCTION ............................................................................................. 1

SUPPLEMENTAL STATEMENT OF FACTS ................................................. 2

ARGUMENT.................................................................................................. 10

    I.    Plaintiffs Misapprehend the Legislative Process and Judicial Review of that Process ............................................................................ 10

    II.    Section 20.5 Does Not Discriminate Against a Suspect Class and Is a Rational Means of Advancing a Legitimate Governmental Purpose.......... 12

        A.    Section 20.5 Receives Rational-Basis Scrutiny Under the Equal Protection Clause .................................................... 13

        B.    Section 20.5's Focus on the Agricultural Sector Is Plainly Rational and Advances a Legitimate Governmental Interest ............... 14

        C.    Section 20.5 Is Consistent with the Equal Protection Clause .......... 16

    III.    Section 20.5 Is an Economic Regulation that Neither Implicates nor Violates the First Amendment.................................................... 22

        A.    State "Right to Work" Laws Place More Significant Limits on Union Contractual Arrangements Than Section 20.5, Yet Those Limits Do Not Implicate the First Amendment .................... 22

        B.    The Checkoff Provision Does Not Implicate the First Amendment, and Plaintiffs Have Done Little to Explore Methods of Dues Collection ................................................................ 24

        C.    Plaintiffs Misunderstand the Settlement Provision ......................... 28

CONCLUSION ............................................................................................. 31

CERTIFICATE OF COMPLIANCE ............................................................. 33

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### No. 1:17-cv-1037

FARM LABOR ORGANIZING
COMMITTEE, et al.,

     *Plaintiffs*,

  v.

JOSHUA STEIN,

      *Defendant*.

**Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment**

### INTRODUCTION

Plaintiffs ask this Court to declare Section 20.5 of the 2017 Farm Act unconstitutional under the First Amendment and the Equal Protection Clause.  Plaintiffs cannot, however, overcome the strong presumption that the law is constitutional, and they cannot demonstrate that "no set of circumstances exists under which [the Act] would be valid or that the statute lacks any plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quotation marks and citation omitted).

Indeed, the plain statutory text establishes that the law is an economic regulation that neither implicates nor violates the First Amendment.  The law focuses on economic regulation of contracts between agricultural producers and unions, and it does so more narrowly than other union-related contract laws already found to be constitutional.  Moreover, the law does not discriminate against a suspect class and is consistent with North Carolina's right-to-work principles and longstanding support of the agricultural industry.  Accordingly, Plaintiffs' motion should be denied.

## SUPPLEMENTAL STATEMENT OF FACTS[1]

<u>North Carolina Public Policy</u>

More than 70 years ago, North Carolina's legislature enacted a policy that prohibited employment from being conditioned on membership in a union. *See* N.C. Laws 1947, ch. 328, § 2 (now incorporated at N.C. Gen. Stat. § 95-79(a)). This "right-to-work policy" has been held constitutional by the Supreme Court of the United States as well as by our State's Supreme Court. *See, e.g.*, *State v. Whitaker*, 228 N.C. 352, 368 (1947), *aff'd sub nom. Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 530 (1949).

North Carolina's General Assembly has reinforced its right-to-work policy, most recently in 2017 through the enactment of Section 20.5. As discussed in more detail in Defendant's MSJ memorandum, Section 20.5 prohibits conditioning the terms of an agreement to settle litigation on the entry into a collective-bargaining agreement (CBA). *See* N.C. Gen. Stat. § 95-79(b). It also prohibits agreements that require farmers to withhold employees' union dues and transfer the funds to a labor union or labor organization. *Id.*

Section 20.5 applies equally to any agricultural union or labor organization in North Carolina. The law focuses on agriculture because, unlike other sectors, workers in agriculture are exempt from the National Labor Relations Act (NLRA), which otherwise preempts

---

[1] Defendant incorporates herein the Statement of Facts from his Memorandum in Support of his Motion for Summary Judgment (DE 107 ("Def's MSJ Mem.") at 4-13), and the exhibits attached to that memorandum.

Defendant's exhibits are cited as "Ex.," continuing with Exhibit 30 from the numbering used in Defendant's MSJ. Plaintiffs' exhibits are cited as "Pls' Ex."

most regulations in this area. *See* 29 U.S.C. 152(3); *Bayside Enters. v. NLRB*, 429 U.S. 298, 299-300 (1977).

The law *does not* prevent plaintiffs or prospective plaintiffs from suing or threatening to sue agricultural producers. Nor does it prohibit settlement agreements stemming from those lawsuits or from threats to sue. The law also does not prohibit unions or farmers from collecting dues, only from contractually requiring farmers to do it on the union's behalf.

<u>The Importance of the Agricultural Industry to North Carolina</u>

The agricultural industry is the single largest industry in the State, generating nearly $92.7 billion in annual economic activity and creating approximately 772,000 jobs. Def's MSJ Mem. at 6. In 2017, farms in the State reported that they hired laborers, or contracted with others to provide laborers, at an expense of approximately $1.1. Billion.[2] Section 20.5 applies to all farms in the State, nearly half of which are small farms that operate on less than 49 acres. Ex. 30 at 1 (U.S. Dep't of Agric., 2017 Census of Agriculture, State Profile, North Carolina).

Reflecting the importance of the agricultural industry to the State's economy, the General Assembly declared over 60 years ago that "the policy of the State of North Carolina [is] to promote the efficient production and utilization of the products of the soil as essential to the health and welfare of our people and to promote a sound and prosperous

---

[2] U.S. Dep't of Agric., 2017 Census of Agriculture, Table 4—Farm Production Expenses: 2017 and 2012 at 2, *available at* https://www.nass.usda.gov/AgCensus/2017/North_Carolina.

agriculture and rural life as indispensable to the maintenance of maximum prosperity."
N.C. Laws 1959, ch. 1177, § 4 (codified at N.C. Gen. Stat. § 106-583 (2019)). More re-
cently, the North Carolina Court of Appeals recognized that "'it is the public policy of
North Carolina to encourage farming, farmers, and farmlands.'" *Durham v. Britt*, 117 N.C.
App. 250, 253 (1994) (quoting *Baucom's Nursery Co. v. Mecklenburg Co.*, 62 N.C. App.
396, 398 (1983)).[3]

Over the past decade, the General Assembly has enacted several omnibus Farm
Acts. One aim of many of these farm bills is to reduce the regulatory and administrative
burdens on agricultural producers, and also to address other key issues affecting the State's
agricultural industry. DE 110-2 at 3, ¶ 9 (Decl. of Michael Paul Sherman). This support
is essential to North Carolina farmers. As Mr. Alton Roberson, a small farmer who recently
was forced to retire due to the difficult agricultural economy explained, "When you're self-
employed, especially on farm land that . . . was handed down to you or you accumulated,
your whole heart and soul is in it." Ex. 14 at 59:7-9 (Depo. of Alton Roberson) (DE 107-
15). And farming has gotten significantly more difficult in recent years. *Id.* at 57:4-18;
Ex. 35 at 1, ¶ 4 (Decl. of Rodney Jackson); Def's MSJ Mem. at 6-9.

<u>The H-2A Temporary Agricultural Program</u>

In 2018, an estimated 100,000 laborers were employed on farms in North Carolina.
Ex. 16 at ¶ 1 (joint stipulations) (DE 107-17). Approximately 20% (21,605)[4] of these farm
laborers are so-called H-2A workers—foreign-born laborers brought to the United States

---

[3]     *Accord* N.C. Gen. Stat. § 139-2; N.C. Gen. Stat. § 106-583.
[4]     Ex. 12 (2019 Office of Foreign Labor Certification H-2A data) (DE 107-13).

under the H-2A Temporary Agricultural Program to perform farm labor on a temporary basis. Ex. 10 at 1 (USDL Fact Sheet) (DE 107-11); Ex. 36 at 1 (U.S. DOL H-2A Program Details). H-2A farmworkers come to this country because the opportunities and pay are significantly better here. Ex. 9 at 20:20-21:19, 22:6-8, 32:14-33:2 (Depo. of Plaintiff Hernandez) (DE 107-10).

The H-2A program is highly regulated and provides "numerous worker protections and employer requirements with respect to wages and working conditions." Ex. 31 at 2 (U.S. DOL, Empl. Law Guide).[5] Employers "must meet many specific conditions, including those concerning recruitment, wages, housing, meals, transportation, workers' compensation insurance, tools and supplies, certification and recruitment fees, labor disputes, and other conditions." *Id.*

For example, H2-A workers are guaranteed a specific minimum wage that cannot be lower than the average wage for workers surveyed in the region the prior year and workers are not generally required to have taxes withheld on their wages. *Id.*; Ex. 10 at 1-2 (DE 107-11).[6] Moreover, under the H-2A program, employees are guaranteed "employment hours equal to at least 75% of the workdays in the contract period." Ex. 10 at 2; Ex. 33 at 5 (USDA H-2A Visa Program). That means an employer is required to pay workers even if there is no work for them. *Id.* Employers are also required to keep detailed and accurate

---

[5]     *See also* 20 CFR § 655.135; Ex. 36.
[6]     *See also* U.S. Dep't of the Treasury, IRS: Foreign Agric. Workers on H-2A Visas, *available at* https://www.irs.gov/individuals/international-taxpayers/foreign-agricultural-workers.

5

records regarding the hours offered, hours actually worked, hourly wage rate or piece rate of pay, total earnings for the pay period and all deductions. Ex. 10 at 3.

H-2A workers who believe their rights have been violated may file complaints through the Job Service Complaint System, any DOL Wage and Hour Division office, or an applicable State agency. *Id.*; Ex. 31 at 2. An employer may not discriminate or retaliate against any employee who does so. Ex. 10 at 3 (DE 107-11); Ex. 36. Employers that violate H-2A regulations face stiff civil penalties and potential disbarment from the program. Ex. 31 at 3.

Agricultural employers understand the value of seasonal farmworkers, including H2-A workers. Ex. 34 at 24:14-22, 29:20-31:4 (Depo. of Jackson Farming); Ex. 35 at 1-2, ¶ 5; Ex. 8 at 2, ¶¶ 10-12 (Decl. of Alton Roberson) (DE 107-9); Ex. 14 at 61:14-62:9, 63:23-65:10, 78:8-19 (DE 107-15). These farmworkers are especially valuable at peak harvest time because without their help farmers' considerable investments in crop production could be lost. Ex. 8 at 2-3, ¶ 10 (DE 107-9); Ex. 32 at 13-14, ¶¶ 37-40 (Expert Rebuttal Report of Dr. Stephen Bronars). Thus, farmers are incentivized to treat workers fairly because they depend on reliable workers willing to perform difficult work for long hours and willing to return season after season. Ex. 8 at 2-3, ¶¶ 10-12 (DE 107-9); Ex. 34 at 24:14-22; Ex. 35 at 1-2, ¶ 5; Ex. 32 at ¶¶ 37-40.

<u>FLOC's Membership and Dues-Collection Method</u>

According to Plaintiffs, nearly 95% of FLOC's North Carolina members are H-2A workers. Pls' MSJ Mem. at 5. FLOC cannot ascertain with certainty exactly how many members it has. Pls' Ex. 11 at 56:12-59:12; 75:12-83:4 (30(b)(6) Depo. of J. Flores for

6

FLOC) (DE 108-11).  However, FLOC estimates that there are roughly 6,000 active members nationwide, 80% of which work in North Carolina.  *Id.* at 69:16-87:3, 97:6-16 (DE 108-11).[7]  FLOC members, therefore, constitute less than 5% of the 100,000 farmworkers in North Carolina.

FLOC's sole method of collecting dues from active members is using checkoffs as a term of its CBAs.[8]  Ex. 17 at 11-13 (DE 107-18); Pls' Ex. 11 at 185:13-16 (DE 108-11).  Despite union dues being the primary source of its income, FLOC has never seriously explored alternative methods for collecting dues, other than via dues checkoffs.  *See* Pls' Ex. 11 at 185:13-201:25 (DE 108-11).  FLOC's expert witness concluded that the Checkoff Provision would cause FLOC and its members "severe hardship," Pls' Ex. 2 at 8, ¶ 17 (DE 108-2), yet he admitted that he was not familiar with the composition of FLOC's membership, how FLOC operates, or FLOC's dues collecting practices—and he never researched possible alternative methods for collecting dues.  *See* Pls' Ex. 26 at 22:14-22, 32:16-36:18, 38:2-38:9, 57:11-58:1, 59:17-61:14, 64:9-65:25, 66:22-69:9, 75:4-76:14 (Depo. of Dr. Thomas Arcury) (DE 108-26).

---

[7]     FLOC considers an "active member" to be a member who works on a farm with a FLOC CBA agreement and has agreed to pay the union 2.5% of his gross salary.  Pls' Ex. 11 at 65:3-66:3, 158:7-160:25 (DE 108-11).

[8]     Under the terms of the CBA, growers are required to calculate and deduct the appropriate dues amount from their employees' paychecks every pay period (farmworkers usually get paid every week), consolidate the withholdings, and transfer or send the dues to FLOC at the end of the month.  Ex. 20 at 1-2 (DE 107-21); Pls' Ex. 11 at 137:21-139:20, 148:9-149:15 (DE 108-11).  Failure to do so will result in financial penalties.  *Id.*; Pls' Ex. 11 at 125:19-126:9 (DE 108-11).  FLOC receives consolidated dues payments on a monthly basis yet requires its members to pay dues every week.

In fact, FLOC did not even explore some of the most basic alternatives until *August 2020*, after its deposition and the close of discovery in this case (Pls' Ex. 3 at 18-19, ¶¶ 59-60), at a time when finding any other means of collecting dues might prejudice Plaintiffs' position in this litigation. Given the large number of H-2A workers in North Carolina, FLOC could potentially collect as much as $8.43 million in membership dues per year from them. Ex. 32 at 19, ¶ 54. Considering the union revenue that could be generated from H-2A workers alone, it is reasonable to expect FLOC to devote time and financial resources to the recruitment of union members and the collection of membership dues.

Regardless, just over half of H-2A workers in North Carolina are employed in a contiguous eight-county area that covers less than 11% of North Carolina's land area. Ex. 32 at 19, ¶ 55. Employees of FLOC are out in the fields visiting FLOC members "[e]very day." Pls' Ex. 11 at 104:16-105:1 (DE 108-11). FLOC could hire staff to recruit union members and collect union dues. The union dues that FLOC could collect from H-2A workers employed in this relatively compact area would total about $4.22 million per year. Ex. 32 at 19, ¶ 55.

FLOC has never considered changing the timing or frequency of dues payments, Pls' Ex. 11 at 204:3-13 (DE 108-11), which is something that other agricultural unions have done, *see* Ex. 19 at 4 (DE 107-20). Moreover, FLOC has "associate members" who are workers that are not working under a CBA but still want to be part of the union, and those members are only required to pay their dues annually, usually in cash at one of FLOC's offices. Pls' Ex. 11 at 62:17-64:3 (DE 108-11).

<u>Administrative and Relational Costs of Administering Dues Checkoffs</u>

Requiring farmers to deduct union dues from their employees' gross pay each week, consolidate those deductions into one payment, and transfer the payment to FLOC monthly, imposes significant administrative and relational costs on farmers. Def's MSJ Mem. at 11-13; Ex. 14 at 20:7-21:12 (DE 107-15); Ex. 22 at 1-20 (DE 107-23); Ex. 34 at 38:12-48:1; Ex. 35 at 2-3, ¶¶ 8-11. These costs are especially acute for smaller farmers, who comprise the majority of farmers in North Carolina and generally lack computerized payroll systems. Ex. 30 at 1; Ex. 14 at 20:7-21:12 (DE 107-15); Ex. 22 at 1-20 (DE 107-23).

Even larger farms with computerized payroll systems have to undertake time-consuming efforts to properly withhold and transmit union dues. Ex. 34 at 38:12-48:1 (explaining the process for deducting union dues and how it differs from other deductions); Ex. 35 at 2-3, ¶¶ 8-11. As the CEO of Jackson Farming, Mr. Rodney Jackson, explained, union dues are more complicated even for his farm's accounting software because, among other reasons, the deductions for individual union members must be aggregated and then a check has to be made totaling all members' weekly deductions to be paid to FLOC monthly. Ex. 34 at 42:25-45:7; Ex. 35 at 2-3, ¶¶ 9-10. Mr. Jackson estimated it takes approximately 15 minutes per employee, per week, to ensure dues were properly withheld, consolidated, and transmitted to FLOC. *Id.* at 44:2-44:22. Other deductions, such as worker loans and tax withholding, do not work that way.[9]

---

[9]     H-2A workers do not generally have taxes withheld from their paychecks. *See supra* note 6.

9

Moreover, the administrative burdens involved are not only the calculation, consolidation, and remittance of dues to the union—the burdens also involve resolving inevitable issues and confusion that arises in the process. Def's MSJ Mem. at 11-12 (discussing and citing evidence of efforts to resolve dues issues); Ex. 35 at 3, ¶ 11 (discussing having to help "confused or upset" workers with questions about dues, and with difficulties workers had in leaving the union). Those issues, particularly those relating to the effect of a member's withdrawal and a farmer's continuing duty to withhold dues, led to a dispute between FLOC and the NCGA that required engagement with the Dunlap Commission.[10] Pls' Ex. 11 at 176:12-184:23 (DE 108-11).

## ARGUMENT

### I. Plaintiffs Misapprehend the Legislative Process and Judicial Review of that Process.

Throughout their memorandum, Plaintiffs' repeatedly assert that the North Carolina Farm Bureau (NCFB), which recommended Section 20.5 to legislators, "did not provide any facts, data, or examples to elected officials" in support of the legislation. *E.g.*, Pls' MSJ Mem. at 9, 10, 11, 21. NCFB's role is not legally relevant, in two ways:

First, regardless of NCFB's role in suggesting the law, the Farm Bureau is neither a legislator nor a legislative body. Both NCFB's intent and whether it had data to support its opinions do not drive the constitutional analysis because NCFB didn't pass the Farm

---

[10]    As noted in Def's MSJ Mem., withdrawing from FLOC can be difficult for members. *See* Def's MSJ Mem. at 12-13; *see also* Ex. 25 at 1, 9-17, 22-23 (DE 107-26); Ex. 9 at 89:23-90:14, 99:10-12 (DE 107-10); Pls' Ex. 11 at 155:7-165:13 (DE 108-11).

10

Act into law.[11]  The General Assembly did.  To the extent legislative intent can even be considered here, it is the *General Assembly's* intent that counts.

Second, even the General Assembly did not need the kind of factual proof Plaintiffs assert is needed.  Nor can the whole legislature's intent or knowledge be divined from statements of only a few members.  "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [courts] to eschew guesswork."  *United States v. O'Brien*, 391 U.S. 367, 384 (1968).

Instead of guesswork, when considering the purposes of a statute, the Court is not limited only to the legislative record.  "[B]ecause [courts] never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  *FCC v. Beach Commc'ns*, 508 U.S. 307, 315 (1993).  "Thus, the absence of 'legislative facts' explaining the distinction on the record has no significance in rational-basis analysis."  *Id.* (internal quotations and citation omitted).  The legislature's choice to enact legislation may be based on "rational speculation unsupported by evidence or empirical data."  *Id.*; *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008).[12]

Under the rational-basis scrutiny to which Section 20.5 is properly subject, it is *Plaintiffs* who bear the burden, and they must "negate every conceivable basis which might

---

[11]    Moreover, Plaintiffs are mistaken to assert (Pls' MSJ Mem. at 8) that NCFB drafted the language with one of Sen. Jackson's attorneys.  NCFB Amicus at 21.
[12]    Regardless, Defendant has introduced overwhelming evidence demonstrating the law is rationally related to a legitimate governmental interest.

support" the law. *Giarratano*, 521 F.3d at 303 (citation omitted); *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012). Plaintiffs seek not only to make the analysis come down to the kind of "courtroom factfinding" the Supreme Court has rejected, *Beach Commc'ns*, 508 U.S. at 315, they also seek to place the burden of demonstrating those facts on NCFB, a non-party.[13]

## II.    Section 20.5 Does Not Discriminate Against a Suspect Class and Is a Rational Means of Advancing a Legitimate Governmental Purpose.

Plaintiffs' first claim is that Section 20.5 violates the Equal Protection Clause by "uniquely and punitively stripping from agricultural employers, farmworkers, and farmworker unions, the right to voluntarily enter certain legally binding agreements." Pls' MSJ Mem. at 15, 15-22. However, Section 20.5 does no such thing. Rather, the law eases the administrative and relational burdens on farmers and reinforces the State's right-to-work policy.

Moreover, Plaintiffs cannot show that the General Assembly enacted Section 20.5 "because of" its applicability to Latinx and/or non-citizen workers. *Cf. Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Such a showing is required under the Equal Protection Clause to apply strict scrutiny based on a suspect class. *Id.*; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Instead, rational-basis review applies to the challenged classification and the law easily survives that review.

---

[13]    It appears Plaintiffs may also be suggesting that the General Assembly's decision is due less deference because of the asserted racial composition of the legislature's membership. Pls' MSJ Mem. at 12, 16. Plaintiffs cite no case law in support of that regrettable suggestion.

### A. Section 20.5 Receives Rational-Basis Scrutiny Under the Equal Protection Clause.

Plaintiffs do not appear to argue for a specific standard of review above rational-basis review, other than to suggest that, because "FLOC is a union overwhelmingly comprised of Mexican guestworkers," Section 20.5 might merit some kind of heightened scrutiny. *See* Pls' MSJ Mem. at 16-17. That is incorrect. "[E]ven if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Feeney*, 442 U.S. at 272. "When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Id.*[14]

Here, the classification Plaintiffs challenge is Section 20.5's applicability to farmworkers and farmworker unions, "compared to all other private sector workers in the state." Pls' MSJ Mem. at 15. Neither farmworkers nor unions are suspect classes. *See, e.g.*, *Sweeney v. Pence*, 767 F.3d 654, 669 (7th Cir. 2014) (noting that "[c]ollective bargaining is not a fundamental right, and a union and its members are not suspect classes"); *South*

---

[14] Plaintiffs suggest in a footnote that, "[b]ecause the Act's classification burdens fundamental First Amendment rights, it also violates Plaintiffs' rights under the Equal Protection Clause under a strict scrutiny standard." Pls' MSJ Mem. at 22 n.13. However, no circuit has ever "applied strict scrutiny in examining an equal protection challenge when the First Amendment analysis itself did not require such scrutiny." *Schickel v. Dilger*, 925 F.3d 858, 878 (6th Cir. 2019); *Wagner v. FEC*, 793 F.3d 1, 32-33 (D.C. Cir. 2015) (en banc). Strict scrutiny would only apply to the equal-protection analysis "when the classification *impermissibly interferes* with the exercise of a fundamental right." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (emphasis added); *see also PETA v. Stein*, No. 16-cv-00025-TDS-JEP, 2020 U.S. Dist. LEXIS 103541 at *67-73 (M.D.N.C. June 12, 2020) (applying rational-basis review to equal protection claim in case involving First Amendment rights).

13

*Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1256 (4th Cir. 1989) (observing that "disparate treatment in authorizing payroll deductions 'must meet only a relatively relaxed standard of reasonableness'" (quoting *Charlotte v. Int'l Ass'n of Firefighters*, 426 U.S. 283, 286 (1976))). Thus, the proper standard for addressing Plaintiffs' equal-protection challenge is rational-basis review.

### B. Section 20.5's Focus on the Agricultural Sector Is Plainly Rational and Advances a Legitimate Governmental Interest.

Because the classification Plaintiffs challenge is between farmworkers and their unions "compared to all other private sector workers in the state" (Pls' MSJ Mem. at 15), the proper inquiry is whether the General Assembly's decision to apply Section 20.5 specifically to the agricultural sector is rationally related to some legitimate governmental purpose.[15] It is. Indeed, there is a simple, plainly rational reason North Carolina doesn't apply Section 20.5's Checkoff Provision to other private sector workers in the state: **it can't.** The NLRA regulates dues checkoffs for unions and workers subject to that Act, and it preempts any state law to the contrary. *See, e.g.*, *Int'l Ass'n of Machinists Dist. Ten v. Allen*, 904 F.3d 490, 497-504 (7th Cir. 2018) (explaining NLRA preemption). Agriculture is one of only few select areas to which the NLRA does not apply, 29 U.S.C. § 152(3), and thus it is one of the few areas a state actually *can* regulate dues checkoffs. That alone is a rational basis for focusing on agriculture and not other private sector workers.[16]

---

[15]    *E.g. Armour*, 566 U.S. at 680.

[16]    The NCFB explains how the Checkoff Provision was originally part of a bill that would apply the same requirement to state employees, but that bill was unable to pass the House with that provision. NCFB Amicus Brief at 11-12.

14

Put another way, Plaintiffs acknowledge that to even reach rational-basis review they must "first demonstrate that they have been treated differently than others with whom they are similarly situated and that such unequal treatment was intentional." Pls' MSJ Mem. at 15. Because agricultural workers are uniquely exempted from the NLRA, "farm-workers and their unions" are not even similarly situated to "all other private sector workers in the state." *Id.* Accordingly, Plaintiffs' equal-protection challenge to the Checkoff Provision must fail. Even setting aside NLRA preemption, agriculture is North Carolina's largest industry and is facing a challenging economic climate, *see supra* at 3; acting to protect that specific industry in a targeted way is plainly related to a legitimate purpose as well.[17]

As to the Settlement Provision, it would make little sense to apply it outside of agriculture because of the specific problems it aims to solve. As explained below, the Settlement Provision functions as the narrowest possible way of ending a practice of using litigation costs to farmers as a bargaining tool for union recognition—something the Legislature rationally could determine undermines the State's right-to-work policy. *See also* Def's MSJ Mem. at 13, 19-23.

Indeed, the Settlement Provision of Section 20.5 is simply an expansion of a related provision—unchallenged here—from the Agricultural Right to Work Act of 2013 ("2013 Act"), which prohibits agricultural purchase agreements from turning on a farm's status as

---

[17]     *Accord City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude.").

15

a union or non-union farm.  N.C. Session Law 2013-413, HB 74, Section 15 (adding N.C. Gen. Stat. § 95-79(b)).  Section 20.5 simply adds "or the terms of an agreement not to sue or settle litigation" to the existing language of the statute.  Both of these prohibitions apply only to agriculture because both are addressing problems seen specifically in the agricultural area to undermine North Carolina's right-to-work policy.  N.C. Gen. Stat. §§ 95-78, 95-79(a) (right-to-work policy).[18]

Plaintiffs do not challenge the 2013 Act nor the broader right-to-work policy.  Moreover, they admit to "using lawsuits to negotiate important benefits, such as union recognition, entry into a CBA, or an agreement to remain neutral during a union campaign" (Pls' MSJ Mem. at 30)—a tactic the General Assembly could rationally conclude undermines the right-to-work policy.  The General Assembly's decision to address a problem in the economic sector where the problem is occurring is a rational basis for limiting the Settlement Provision to agriculture.

C.    Section 20.5 Is Consistent with the Equal Protection Clause.

An equal-protection challenge focuses on the rational basis *for the classification challenged*—not a freestanding challenge to the wisdom of the law itself.  *See Armour*, 566 U.S. at 680; *Heller v. Doe*, 509 U.S. 312, 319-20 (1993).  Thus, Plaintiffs' equal-protection challenge fails under the analysis above.  But even if the Court looks more broadly to the

---

[18]    *Accord Dukes*, 427 U.S. at 305 ("We are guided by the familiar principles that a statute is not invalid under the Constitution because it might have gone farther than it did." (quotation marks, alteration, and citation omitted)).

rationality of Section 20.5 as a whole, not just its rationale for focusing on agriculture, the law still passes constitutional scrutiny.

In service of their argument that Section 20.5 has no rational basis, Plaintiffs erect several strawmen as to its rationale. The first is that the law was intended to reduce a "regulatory burden." Pls' MSJ Mem. at 18-19. As Plaintiffs know—and discuss at length in the fact section of their brief—the burdens relieved by the Checkoff Provision are *administrative*, not regulatory. Pls' MSJ Mem. at 9-11. A single legislator, Rep. Dixon, did use the term "regulatory burdens" in his floor speech, but it appears he likely meant "administrative burdens." Regardless, it does not matter because the Court must determine if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification," rather than relying on the statement of one legislator to determine the law's purpose. *Beach Commc'ns*, 508 U.S. at 313.[19]

As to administrative burdens, Plaintiffs assert that "dues checkoffs are no different from any other payroll deduction that an employer makes pursuant to N.C. Gen. Stat. § 95-25.8, and are generally achievable through a 'keystroke' in a computerized payroll system." Pls' MSJ Mem. at 18. That is wrong in several ways. First, record evidence unquestionably shows that some farmers have to calculate FLOC's member dues *by hand* for their employees.[20] *E.g.* Ex. 22 (handwritten dues calculations) (DE 107-23); Ex. 8 at 3, ¶ 12

---

[19]     *See O'Brien*, 391 U.S. at 383-84; Part I, *supra*. Moreover, several sections of the Farm Act of 2017 *do* focus on relieving regulatory burdens. *E.g.*, Farm Act of 2017, North Carolina S.L. 2017-108 (S.B. 615), §§ 2(b), 8(b), 9(a), 20(a).

[20]     The majority of farms in North Carolina are small operations and likely cannot afford the expense of a "computerized payroll system." *See* Ex. 30.

17

(DE 107-9).[21]  Moreover, as the CEO of Jackson Farming explained, even larger farms with computerized payroll systems have to undertake time-consuming efforts to properly withhold, consolidate, and transmit union dues.  Ex. 34 at 38:12-48:1 (explaining the process for deducting union dues, how it differs from other deductions, and how even accounting software does not entirely automate the process); Ex. 35 at 2-3, ¶¶ 8-11.  And again, many farms lack even the automated payroll systems that Mr. Jackson was describing—they do their calculations by hand, and without support staff to aid them.  Ex. 22 (handwritten dues calculations) (DE 107-23).

Under rational-basis review, the Court need not determine whether either side's view of the administrative burdens is right—the Court need only conclude that reducing administrative burdens is a "plausible policy reason for the classification."  *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (cautioning that the only requirement is that legislative facts "rationally may have been considered to be true by the governmental decisionmaker," and the "relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational"); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (under rational-basis test, law need only "advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous").  Defendant submits that there is no material dispute of fact as to that point:

---

[21]     The record in this case absolutely does document farmers calculating union dues by hand.  Moreover, the administrative burdens involved are not only the calculation, consolidation, and remittance of dues to the union—the burdens also involve resolving inevitable issues and confusion that arises in the process.  Def's MSJ Mem. at 11-12 (discussing and citing to evidence of efforts to resolve dues issues).

18

administrative burdens are a rational basis for the law.  *See also* Def's MSJ Mem. at 22-24; *Int'l Ass'n of Firefighters*, 426 U.S. at 286-88 (finding administrative burdens to be an "sufficient justification" for placing limitations on municipal checkoffs; observing that it would make no difference if other forms of deductions were no more difficult to process than union dues).

Moreover, as previously discussed, the burdens from dues checkoffs are not only administrative but *relational*.  Def's MSJ Mem. at 12, 23, 27; Exs. 22-24 (DE 107-23 to 107-25).  When farmers are inserted into the worker-union relationship, workers may blame the farmer for issues in withholding pay—whether those issues are caused by the farmer or not.  Ex. 35 ¶ 11; Def's MSJ Mem. at 12 (citing exhibits 8, 14, and 24).  This burden is exacerbated by the confusion and difficulties associated with withdrawing from FLOC and when a farmer is required to stop withholding dues.  Ex. 9 at 89:23-90:14, 99:10-12 (DE 107-10); Ex. 25 at 3-16 (DE 107-26); Ex. 18 at 164:13-167:25 (DE 107-19); *see also* Pls' Ex. 11 at 179:14-183:19 (DE 108-11) (discussing disagreement regarding withdrawals).

Plaintiffs next erroneously claim that the "food supply" was a rationale for Section 20.5.  Pls' MSJ Mem. at 19.  The General Assembly's rationale was the protection of North Carolina's largest industry—agriculture—not just the "food supply."  Plaintiffs' assertion that tobacco and Christmas trees are not food (*id.*) is undeniable—but it misses the point.  *Agriculture* accounts for one-sixth of the State's economy, and it employs roughly 15 percent of the State's workforce.  *See, e.g.*, Def's MSJ Mem. at 6; NCFB Amicus Brief at 2-4 (DE 110); *supra* at 3.

19

As the NCFB explains, while agriculture is a crucial part of the State's economy, many North Carolina farmers are in "poor financial condition."  NCFB Amicus Brief at 3-4.  This is due, among other things, to a trade dispute with China, weather events, and stiff global competition leading to low commodity prices.  *Id.*; *see also* Def's MSJ Mem. at 8-9.  As former farmer Alton Roberson vividly explained, farming since around 2012 has involved "flipping a coin and only hav[ing] about [a] 50/50 opportunity of making a profit"—"a decision that we no longer cared to participate in."  Ex. 14 at 56:13-57:3 (DE 107-15); Ex. 8 at 1-2, ¶¶ 5-8 (DE 107-9).

In sum, the economic environment for farmers is difficult, their profit margins are low (or non-existent), and many farms have gone bankrupt or out of business.  Def's MSJ Mem. at 6-9.  Accordingly, it is rational for the legislature to conclude that North Carolina farmers faced an increasingly difficult business climate and that reducing costs and burdens on them was consistent with North Carolina's well-established public policy of supporting agriculture.

That is exactly what Section 20.5 does and what numerous Farm Acts have done in North Carolina since 2012.  *See supra* at 3.  Reducing administrative and relational costs is a plausible, rational reason for the Checkoff Provision and a legitimate governmental interest.  *E.g.*, *Int'l Ass'n of Firefighters*, 426 U.S. at 286-87 (finding administrative burdens to be a "sufficient justification" for placing limitations on municipal checkoffs).

Plaintiffs' final strawman is the assertion that "[s]uppression of [f]armworker [u]nionization" was a purpose of Section 20.5.  Pls' MSJ Mem. at 20-22.  To reach such a conclusion requires taking one or two legislators' statements out of context and imputing

them to the entire North Carolina General Assembly. *But see O'Brien*, 391 U.S. at 383-84 (counseling against that). Given their proper context, the statements appear to be talking about the need for the Settlement Provision, described as "prohibit[ing] the use of litigation to force farms to unionize"—a tactic legislators could reasonably have viewed as a form of "harassment." Ex. 5 at 13-14 (N.C. House debate) (DE 107-6).

Regardless, the motives of individual legislators are not an appropriate basis for reviewing a statute's validity under Equal Protection. *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47-48 (1986). "When the legislative purpose is not both obvious and constitutionally impermissible, however, the cases uniformly hold that facially constitutional legislation may not be stricken because of suspect legislative motive." *Holt v. City of Richmond*, 459 F.2d 1093, 1098 (4th Cir. 1972). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [the court] to eschew guesswork." *O'Brien*, 391 U.S. at 384.

Under the appropriate standard of review, it is the statutory text that matters, *see, e.g.*, *id*. The text of Section 20.5 reveals no animus. Like the 2013 Act, Section 20.5 simply prohibits certain contractual agreements viewed by the General Assembly as inconsistent with the State's right-to-work policy. Plaintiffs' arguments against the rational bases for Section 20.5 ignore the plain text of the statute and generally rely on incorrectly characterizing the rationales. Properly considered, numerous bases support the General Assembly's legitimate interests in protecting the State's largest industry and protecting the State's right-to-work policy.

III. **Section 20.5 Is an Economic Regulation that Neither Implicates nor Violates the First Amendment.**

Plaintiffs' next argument is that Section 20.5 violates the First Amendment by "prohibiting FLOC from negotiating voluntary dues checkoff agreements with willing agricultural employers," and by "benefitting from settlement agreements conditioned on union recognition or entry into a CBA." Pls' MSJ Mem. at 23, 28. This argument fails because Section 20.5 regulates conduct, not speech, and it puts no limitation on FLOC's expressive activity. *See* Def's MSJ Mem. at 15-24. Both provisions of Section 20.5 focus on contractual arrangements that threaten the State's right-to-work policy—a policy that the Supreme Court has found not to implicate the First Amendment.

A. State "Right to Work" Laws Place More Significant Limits on Union Contractual Arrangements Than Section 20.5, Yet Those Limits Do Not Implicate the First Amendment.

North Carolina has had for over 70 years a right-to-work policy, codified at N.C. Gen. Stat. § 95-78 et seq., which in practice prohibits certain contractual arrangements found by the General Assembly to strike against it. Specifically, North Carolina has prohibited since 1947 "any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer, or whereby such membership is made a condition of employment or continuation of employment by such employer." N.C. Gen. Stat. § 95-79(a). That is, North Carolina makes it unlawful for unions and employers to enter into "closed shop" agreements requiring all workers to be union members—this is so even when both parties fully desire to enter into such an agreement.

22

A "closed shop" agreement empowers a union to secure dues payments from *every* non-supervisory employee at a union employer, since those employees are required to pay dues as a condition of employment. *See, e.g.*, Ex. 17 at 13 (excerpt of Plaintiffs' discovery responses) (DE 107-18). Closed-shop agreements in North Carolina would obviously give FLOC significant additional revenue to support its advocacy efforts. *See* Pls' Mem. at 24 (describing advocacy efforts). Such agreements would also relieve FLOC of administrative costs in recruiting individual members.

Regardless of the obvious membership and financial benefits closed-shop agreements provide to unions—benefits that would support expressive activities—North Carolina prohibits such agreements. N.C. Gen. Stat. § 95-79(a). In addition, the Supreme Court has upheld North Carolina's right-to-work statute, specifically concluding that it does not implicate the First Amendment. *Lincoln Fed.*, 335 U.S. at 530-31 ("Nothing in the language of the laws indicates a purpose to prohibit speech, assembly, or petition."). As the U.S. Supreme Court recognized, "Precisely what these state laws do is forbid employers acting alone or in concert with labor organizations deliberately to restrict employment to none but union members." *Id.*

Notably, the union's argument in *Lincoln Fed.* is comparable to Plaintiffs' argument here: it contended that the agreements prohibited by right-to-work statutes are "indispensable to achievement of sufficient union membership to put unions and employers on a full equality for collective bargaining," and thus "a closed shop is consequently 'an indispensable concomitant' of 'the right of employees to assemble into and associate together

23

through labor organizations.'" *Id.* The Supreme Court flatly rejected "such an expansive construction of the right to speak, assemble and petition." *Id.*

This Court should reject the similar contention here as to Section 20.5. The existing right-to-work statute prohibits extremely lucrative—and *voluntary*—closed-shop agreements between unions and farmers that would significantly drive agricultural unions' numbers and finances. Section 20.5 merely prohibits one form of dues collection and the use of litigation costs seen as forcing farms into signing CBAs.

B.    The Checkoff Provision Does Not Implicate the First Amendment, and Plaintiffs Have Done Little to Explore Methods of Dues Collection.

Plaintiffs argue that the Checkoff Provision "violates the First Amendment by prohibiting FLOC from negotiating voluntary dues checkoff agreements with willing agricultural employers, thereby imposing a substantial burden on FLOC's activities as an expressive association." Pls' MSJ Mem. at 23. That argument is inseparable from asserting that the right-to-work policy itself, and its closed-shop prohibition, violates the First Amendment the same way. Yet the Supreme Court has not only rejected such a prohibition violates the First Amendment, it has rejected the idea that the First Amendment is implicated at all. *See Lincoln Fed.*, 335 U.S. at 530; *see also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009) (holding dues-checkoffs regulation did not implicate the First Amendment); *Campbell*, 883 F.2d at 1256.

The same holds true here. Plaintiffs are asserting a violation of their free speech rights based on the idea that an economic regulation that they see as disadvantaging them financially burdens their speech because they foresee less funding for it. That reasoning,

24

of course, would make potentially *any* economic regulation a First Amendment issue, so long as a party affected asserts they would have used the money for speech. Such an "attenuated, indirect effect on speech is insufficient to bring the First Amendment into play." *Willis v. Town of Marshall, N.C.*, 426 F.3d 251, 260 (4th Cir. 2005); *accord Lincoln Fed.*, 335 U.S. at 530.

For example, "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities. One liable for a civil damages award has less money to spend on paid political advertisements or to contribute to political causes, yet no one would suggest that such liability gives rise to a valid First Amendment claim." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986); *accord Campbell*, 883 F.2d at 1256 (1989) (rejecting First Amendment argument based on alleged burden, in public-employee check-off prohibition, of "loss of dues from members who might have paid, if a more convenient method of collecting dues was available).

The cases Plaintiffs cite do not suggest otherwise; instead they deal with *direct* regulations on speech. For example, they rely on *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 576 (1983), which examined "a State's power to impose a special tax on the press and, by enacting exemptions, to limit its effect to only a few newspapers." Imposing a "use tax" specifically on paper and ink used in publications (*i.e.*, by the press) carries an obviously direct effect on expression absent here—the use tax was functionally taxing the speech itself.

Likewise with *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 457 (1995), which involved a subsection of the Ethics in Government Act that prohibited receipt of honoraria by government employees for speaking or writing. The Supreme Court considered that prohibition—which required no nexus between the speech and the subject matter of the employee's job—to serve as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.* at 463, 467. By directly prohibiting compensation for the *expression itself*, the regulation in *Nat'l Treasury Emps. Union* directly affected that expression.

Here, in contrast to both of those cases, the Checkoff Provision does not prohibit, prevent, or even discourage speech at all, nor does it regulate any incidental effects of speech. It only prevents union agreements from requiring a farmer to act as treasurer for a union, and it provides no other limitation on how agricultural unions may collect dues. It says nothing whatsoever about how unions may spend dues, speak, petition, assemble, or protest.

Plaintiffs also assert that "the Act targets exactly one organization—FLOC, the only farmworker union operating in the state for over 20 years," and that it "singles out" FLOC to be "subject to harsh penalties." Pls' MSJ Mem. at 26, 27. That is incorrect, and FLOC's status as the only farmworker union *presently* operating in North Carolina does not render

its area of activity immune from regulation—an unavoidable implication of Plaintiffs' argument.[22] As numerous bill-of-attainder cases explain, "Legislatures may act to curb behavior which they regard as harmful to the public welfare, whether that conduct is found to be engaged in by many persons or by one." *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 88 (1961). "A statute with open-ended applicability, *i.e.*, one that attaches not to specified organizations but to described activities in which an organization may or may not engage, does not single out a particular person or group for punishment." *Ameur v. Gates*, 759 F.3d 317, 330 (4th Cir. 2014) (citation omitted). Section 20.5 doesn't target FLOC; it targets conduct deemed by the legislature to be harmful. FLOC's monopoly in this area does not leave the legislature powerless to regulate.

Second, although it does not change the analysis, it is worth noting that FLOC's real burdens under the Checkoff Provision are, at best, unclear. As discussed above, *supra* at 6-8, FLOC has not sufficiently explored other options for collecting dues. It only did research into some basic alternatives (like Wal-Mart billpay) after being deposed and *after the close of discovery* in this three-year-old case.[23]

Moreover, any weighing of burdens should also consider the administrative and relational burdens the Checkoff Provision is intended to relieve. Notably, Plaintiffs suggest

---

[22] Moreover, to prevail on such a "class of one" claim, "it is not sufficient for a plaintiff simply to show that the defendants' actual motive for their disparate treatment was irrational; rather he must negate any reasonably conceivable state of facts that could provide a rational basis for the classification." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 447 (4th Cir. 2004) (internal quotations and citation omitted).

[23] *See* Pls' Ex. 3 at 18-20, ¶¶ 59-64 (Decl. of J. Flores) (DE 108-3) (reflecting an *August 2020* search for basic alternatives to checkoffs, such as Wal-Mart's bill-pay service); Pls' Ex. 11 at 194:6-24, 201:18-25 (DE 108-11).

farmers who dislike checkoffs or other provisions of FLOC's CBA with the North Carolina Growers' Association could "simply opt out" by *leaving the Association entirely*. Pls' MSJ Mem. at 12. However, the Association provides significant benefits to its members in navigating the "complex and sometimes difficult to administer" rules of the H2-A program; and it helps member farms to secure the workers they need. DE 110-1 at 4, ¶¶ 11-12 (Decl. of Jay Boyette). Regardless, even setting all of this aside, the Checkoff Provision does not impact the First Amendment and it would pass any scrutiny applied to it.[24]

## C.    Plaintiffs Misunderstand the Settlement Provision.

Plaintiffs' First Amendment challenge to the Settlement Provision relies on viewing that provision as broader than it really is. *See* Pls' MSJ Mem. at 28-31. Specifically, Plaintiffs contend it prevents FLOC from entering into "*any kind of* settlement agreement[] with an agricultural producer," thus forcing FLOC to obtain a final judgment in any such suits it files. *Id.* at 31 (emphasis in original); *see also id.* at 28. That is incorrect, as shown by the statute's plain text:

> (b) **Any provision that directly or indirectly conditions** the purchase of agricultural products, the terms of an agreement for the purchase of agricultural products, or **the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or non-union employer or entry into or refusal to enter into an agreement**

---

[24]     Plaintiffs also cite to *United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 1167, 1186 (D. Ariz. 2013) (Pls' MSJ Mem. at 27), which struck down a checkoff-related regulation. The regulation there, however, was starkly different: the "objectionable part" of the statute, the court said, was "the part that requires unions and any other identifiable non-exempt speakers, to estimate in advance how much it will spend on political speech and subjects it to a mandatory fine if it exceeds this amount." *Id.* The Checkoff Provision here has no analogue to that, nor to *Boddie v. City of Columbus, Miss.*, 989 F.2d 745, 749 (5th Cir. 1993) (Pls' MSJ Mem. at 25), which involved the termination of a firefighter specifically for his association with a union.

28

**with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina.** …

N.C. Gen. Stat. § 95-79(b) (emphases added).

This language does not prohibit a union from entering into a settlement agreement with a producer or anyone else; it only prohibits a settlement requiring a producer to enter into (or not enter into) *a separate* agreement with a labor union. Plaintiffs' contrary reading upends the plain terms of the statute. Nor would such an interpretation fit with the General Assembly's goal of preventing the specific use of litigation costs to induce farmers into signing CBAs.

The Settlement Provision does not prevent anyone (including unions and their members) from suing anyone else (including agricultural producers). It does not limit the grounds or causes of action on which those lawsuits may be based. It does not prohibit or limit a union's ability to assist workers with their own individual lawsuits or to solicit farmworkers for such suits. And parties may still settle those lawsuits or threats to sue in any way already allowed by law, so long as the settlement is not conditioned on union or non-union status, or on entering into (or *not* entering into) a CBA or other agreement with a union. Likewise, the Settlement Provision does not prevent unions and producers from freely entering into CBAs or other agreements if they choose, so long as that agreement is not a condition of settling a lawsuit or threat to sue.

The Settlement Provision is a contract provision that merely separates lawsuits from agricultural union agreements, to ensure one is not used to unfairly induce the other. *See further* Def's MSJ Mem. at 19-20. This provision, like the Checkoff Provision, simply

29

protects the broader right-to-work policy already upheld against First Amendment challenge.  Indeed, the State's right-to-work statute (upheld in *Lincoln Fed.*) *also* functions to prevent unions and producers from including certain contractual provisions in settlement agreements between them.  Specifically, § 95-79(a) would functionally prohibit a settlement agreement establishing a closed-shop arrangement between union and producer—a provision the United States Supreme Court determined did not implicate the First Amendment.  *See Lincoln Fed.*, 335 U.S. at 527 n.1, 530-31.  The Settlement Provision at issue here is narrower.

In their brief, Plaintiffs rely on *NAACP v. Button*, 371 U.S. 415, 429, 431 (1963) (Pls' MSJ Mem. at 28-29), but *Button* is inapposite.  Indeed, the Settlement Provision is nothing like the provision at issue there, which prohibited "any arrangement by which prospective litigants are advised to seek the assistance of particular attorneys," thus functioning to entirely block the NAACP's legal assistance of private clients in litigation of cases the NAACP identified as important to its interests.  371 U.S. at 433.  Here, unions like FLOC are not barred from assisting in farmworker litigation at all: a union can fund those cases, provide attorneys and support, solicit plaintiffs, and file suit itself on any ground existing in the law.  The only thing FLOC, like any party, may not do is condition settlement of a lawsuit on the signing of a CBA or similar agreement.

Plaintiffs have essentially conceded the justification and basis for the Settlement Provision: "Litigation can be complex, time-consuming, uncertain, and expensive," they candidly admit.  Pls' MSJ Mem. at 29.  Plaintiffs also admit that FLOC "us[es] litigation

to negotiate important benefits, such as union recognition, entry into a CBA, or an agreement to remain neutral during a union campaign." *Id.* at 30.[25] The Settlement Provision simply addresses its goal in the narrowest possible way. In sum, because the Settlement Provision regulates conduct, not speech, it does not implicate the First Amendment.[26]

## CONCLUSION

For the foregoing reasons and those set forth in Defendant's Memorandum in Support of Motion for Summary Judgment, Defendant respectfully submits that Plaintiffs' Motion for Summary Judgment should be denied.

Respectfully submitted, this 14th day of September, 2020.

JOSHUA H. STEIN
Attorney General

/s/ Matthew Tulchin
Matthew Tulchin
Special Deputy Attorney General
N.C. State Bar No. 43921
mtulchin@ncdoj.gov

/s/ Phillip A. Rubin
Phillip A. Rubin
Special Deputy Attorney General
N.C. State Bar No. 51963
prubin@ncdoj.gov

---

[25] *See also* Ex. 35 at 3-4, ¶¶ 13-15 (discussing the "financial drain" of lawsuits seen as being used to force farmers into signing CBAs to which they otherwise would not agree).

[26] Section 20.5 passes rational-basis scrutiny for all the reasons Defendant has explained. *See supra* Part II.C, and Def's MSJ Mem. at 11-13, 22-24, 26-27. Section 20.5 also passes intermediate scrutiny because Defendant has shown a "reasonable fit" between the challenged law and a "substantial" government objective. *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (quotation marks and citation omitted). Protecting the State's largest economic sector is plainly a substantial interest, and both provisions of Section 20.5 narrowly prohibit activities found harmful by the legislature while leaving untouched most related conduct. *See* Def's MSJ Mem. at 11-13.

31

N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
Tel: 919.716.6900

*Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(1), and the Court's order of August 12, 2020 (DE 103), expanding the limit to 8,750 words for MSJ memoranda and responses, the undersigned counsel hereby certifies that the countable portion of the foregoing Memorandum, including body, headings, and footnotes, contains 8,593 words as measured by Microsoft Word 365.

This the 14th day of September, 2020.

/s/ Matthew Tulchin
Matthew Tulchin
Special Deputy Attorney General