**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**Civil Action No. 1:17-cv-01037-LCB-LPA**

| | | |
|---|---|---|
| **FARM LABOR ORGANIZING COMMITTEE, et al.** | ) | |
| **Plaintiffs,** | ) | **ORAL ARGUMENT REQUESTED** |
| **v.** | ) | |
| **JOSHUA STEIN, et al.** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION AND NATURE OF THIS MATTER

Defendant asks this Court to dispose of Plaintiffs Farm Labor Organizing Committee (FLOC) and FLOC member Valentin Alvarado Hernández's lawsuit challenging Section 20.5 of the 2017 Farm Act ("Section 20.5 or "the Act"). Section 20.5 uniquely burdens farmworkers by stripping them of civil rights available to every other private sector worker in North Carolina; specifically, the rights to enter into voluntary dues checkoffs and settlement terms with willing employers. Rather than "reinforce" the state's "right to work" policy, DE 107 at 2, Section 20.5 contravenes it by undermining the rights of farmworkers to freely choose whether to organize a union. As shown in Plaintiffs' Motion for Summary Judgment (DE 108–109) and herein, Plaintiffs are entitled to judgment as a matter of law on their claims that Section 20.5 violates the First Amendment

and the Equal Protection Clause. At minimum, genuine issues of material fact preclude summary judgment for Defendant on Plaintiffs' claims.

## STATEMENT OF FACTS

Plaintiffs incorporate by reference the statement of relevant facts set forth in support of their motion for summary judgment, DE 109 at 2-14, and present herein only those supplemental facts necessary to respond fully to Defendant's arguments.

### I. Farmworkers Face Poverty and Severe Labor Exploitation

Farmworkers, including H-2A "guest" workers, experience high rates of poverty and are vulnerable to severe labor exploitation, including human trafficking. DE 108-2 ¶ 28; DE 108-12 at 28-38; DE 34-14 at 31–33; Ex. 34[1] at 37-38. Ex. 35 at 521, 523; Ex. 36 at 5, 19-24. H-2A workers protesting illegal working conditions have frequently been fired, deported, and blacklisted. DE 108-12 at 37-38, 54-55; Ex. 36 at 23-24, 37.

Farmworkers' working conditions are highly dangerous; among other things, they face pesticide exposure, inadequate access to drinking water and restrooms, and substandard housing. DE 108-2 ¶¶ 25-27; DE 108-3 ¶ 8; DE 108-26 at 82:3 – 83:3. North Carolina had a higher rate of occupational fatalities in agriculture than in any other industry in 2018. Ex. 37.

[1] Plaintiffs rely on Exhibits 1 through 33 submitted in support of their summary judgment motion. *See* DE 108-1 – 108-33. New exhibits filed with this opposition are numbered consecutively with previous exhibits.

## II. FLOC's Elective Dues Checkoffs Do Not Burden Farmers.

When the 2017 Farm Act was debated and enacted, FLOC had only two CBAs in North Carolina. DE 108-3 ¶¶ 11, 34. One of the CBAs lapsed, and currently FLOC's sole CBA is with the North Carolina Grower's Association (NCGA). *Id.* ¶ 11. FLOC CBAs, like all farmworker CBAs, are contracts negotiated and entered into voluntarily. DE 108-1 ¶¶ 13-14, 21; DE 108-3 ¶ 12. Even where a farmer has agreed to a CBA, no employee can be required to join FLOC or to pay dues. DE 108-1 ¶¶ 15-16, 21. Likewise, any individual farmer may refuse to enter into a CBA with FLOC, or to decline to renew an existing CBA. DE 108-1 ¶¶ 13-14, 21; DE 108-3 ¶¶ 12, 16.

FLOC CBAs include a dues checkoff provision. DE 108-3 ¶ 15. State law permits an employee to authorize her employer to make payroll deductions for her own "convenience," including for union dues. *See* N.C. Gen. Stat. § 95-25.8(a)(2); 13 NCAC § 12.0305(b). Farmers subject to a CBA typically calculate members' dues using payroll software and send a monthly check to FLOC for the total dues paid by members. DE 108-11 at 119:2-14; DE 108-13 at 5-6; DE 108-22 at 39:4-10. Farmers covered by the NCGA CBA who prefer not to administer dues deductions can leave the NCGA or use a farm labor contractor to administer payroll. DE 108-3 ¶ 16; *see also* DE 108-22 at 90:17-25; Ex. 39 at 107:19 – 108:25; Ex. 38 ¶ 2 & Ex. A.

Regardless of CBA coverage, farmers routinely make other payroll deductions, including for such items as employee loans or meals. 20 C.F.R. § 655.173(a); DE 108-3 ¶ 48; DE 108-22 at 33:5-23; Ex. 39 at 29:12 – 39:11. Farmers also routinely undertake the

administrative burdens of commodity checkoffs, which require them to contribute a certain percentage of their crop proceeds to support marketing and research. *See* Ex. 39 at 83:23 – 87:7; DE 108-22 at 63:3 – 70:7.

Neither Defendant nor *amicus* North Carolina Farm Bureau (NCFB) has provided information showing how many farmers are unable to calculate their employees' FLOC dues through modern payroll software. DE 108-22 at 39:11-19; 54:22 – 55:25. Plaintiffs contest Defendant's representation that "many farmers personally" calculate FLOC dues "often by hand." DE 107 at 11; *compare* DE 108-22 at 39:4-10; Ex. 39 at 91:10 –92:3; Ex. 40 at 5. Defendant bases these sweeping statements on handwritten or partially handwritten documents from only four farms, DE 107-23, and the testimony of a single farmer who has never entered into a CBA or dues checkoff agreement nor discussed dues deductions with other farmers. *See* DE 107-15 at 23:5-12; 44:3-5. Only four or five unnamed growers have complained about dues deductions to NCFB, a key proponent and drafter of Section 20.5. DE 108-22 at 41:23–42: 22. NCFB has received only two reports of employee confusion about dues deductions. DE 108-22 at 52:3-14.

## III. FLOC-Involved Litigation

In order to improve conditions for farmworkers, FLOC and its members sometimes engage in litigation, including litigation to vindicate their rights to minimum wages under the Fair Labor Standards Act (FLSA) and the North Carolina Wage and Hour Act (NCWHA). DE 108-1 ¶¶ 24-27; DE 108-3 ¶¶ 17-21, 34-35. Only once has FLOC's litigation led to entry into a CBA as a settlement term, and that CBA has since expired without renewal. DE 108-3 ¶ 34; DE 108-8 at 109:18-23. Any settlement of FLSA claims,

and any settlement of NCWHA claims brought under Fed. R. Civ. P. 23, must be approved by a court as fair and reasonable. *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1303 (4th Cir. 1978); *Owino v. IBM Corp.*, No. 1:12-CV-1041, 2013 WL 2947146, at *1 (M.D.N.C. June 14, 2013). Courts have repeatedly approved FLOC members' settlements with farmers as fair and reasonable. *See, e.g.,* Exs. 41–48.

## IV. Farmworkers Who Want to Join FLOC Have No Realistic Alternative to Dues Checkoffs.

Section 20.5's blanket prohibition on dues checkoffs is extremely burdensome for North Carolina farmworkers and their sole union, FLOC. DE 109 at 7, 12-13. Plaintiffs present overwhelming evidence that FLOC members depend on dues checkoffs to timely and safely pay their dues, and that FLOC depends on weekly dues checkoffs to sustain its operations. *Id.*; *see also* DE 108-4 ¶¶ 14-17; DE 108-15 ¶¶ 12-17; DE 108-16 ¶¶ 11-15.

Defendant points to the website of Piñeros y Campesinos Unidos del Noroeste (PCUN), a farmworker union in Oregon, for the proposition that North Carolina farmworkers could pay their weekly dues in person or by credit card. DE 107 at 10. Unlike FLOC members, only a small minority of PCUN members work under a CBA — and those that do pay their union dues via checkoffs. DE 107-20 at 4; Ex. 49 ¶¶ 6-8. PCUN's farmworker members, like FLOC's, lack ready access to credit cards and banking and do not actually use PCUN's online payment portal to pay dues. *Id.* 97% of PCUN members are "associate members" who are not subject to a PCUN CBA. DE 107-20 at 4; Ex. 49 ¶ 10. PCUN's "associate" members pay dues in person on a quarterly or annual basis, but

unlike the overwhelming majority of FLOC members, they are year-round residents with access to transportation. DE 107-20 at 4; Ex. 49 ¶¶ 8-13.

### V. North Carolina Farmers Receive Extensive Taxpayer Support and Are Politically Powerful.

North Carolina farmers, working through NCFB, enjoy extensive political access that enables them to effectively draft and promote legislation advancing their preferred policies. *See* DE 109 at 8–11; *see also* DE 108-8 at 14:25 – 20:17; 24:9 – 33:3; 129:21 – 132:1.

Despite the economic pressures facing some farmers, the U.S. Department of Agriculture projects an increase in net farm income in 2020. Ex. 50. Moreover, farmers' political might has generated billions of dollars in taxpayer-funded federal and state benefits to protect them from market extremes, including specialized relief programs to mitigate the impact of natural disasters and COVID-19. *See id.* at 6-7; Ex. 51; Ex. 52. North Carolina ranked 18th in the nation in the total amount of commodity subsidies received from the federal government between 1995 and 2019: more than $4.4 billion. Ex. 53 at 1, 3. This included more than $741 million in direct payments to farmers. Ex. 54 at 2. For example, the principals of Jackson Farming Company (including Section 20.5 proponent Senator Brent Jackson) received more than $1 million in subsidies during that time period. *See* Ex. 55. Sycamore Farms, Inc., operated by Defendant's witness Alton Roberson, received more than $2.5 million. Ex. 56.

## VI.    Section 20.5 Perpetuates a Long History of Racially Discriminatory Labor Laws.

Section 20.5's attack on North Carolina farmworkers and their sole union is the latest in a long history of legislative efforts to suppress the rights of minority workers in the state. DE 108-28 ¶ 11. The exclusion of farmworkers from basic labor protections, including the FLSA and the National Labor Relations Act, was "at the behest of southern lawmakers who were determined to maintain the subsistence wages of black labor." *Id.* at ¶ 20; *see also* Juan F. Perea, *The Echoes of Slavery: Recognizing the Racist Origins of the Agricultural & Domestic Worker Exclusion from the National Labor Relations Act*, 72 Ohio St. L.J. 95 (2011); Marc Linder, *Farm Workers & the Fair Labor Standards Act: Racial Discrimination in the New Deal*, 65 Tex. L. Rev. 1335 (1987).

In North Carolina, anti-union legislation is historically rooted in racial hierarchy. In the 1940s, as African Americans sought to build political and economic power through unionization, legislators enacted laws intended to diminish the power of their unions. DE 108-28 ¶¶ 20, 39-40, 59-61, 79-87. Race also played a key part in the legislature's passage of minimum wage and unemployment insurance bills that excluded industries dominated by African American workers, including agriculture. *Id.* ¶¶ 68, 72, 74-76.

Section 20.5, like numerous recent anti-immigrant laws passed by the legislature, was enacted during a period in which North Carolina's Latinx and immigrant populations rose dramatically. DE 108-1 ¶¶ 33-43; Ex. 57; Ex. 58 at 1, 3.

## QUESTIONS PRESENTED

Whether genuine issues of material fact preclude summary judgment on Plaintiffs' claims that Section 20.5 violates:

1. The First Amendment?
2. The Equal Protection Clause and 42 U.S.C. § 1981 because race, national origin, and/or alienage discrimination were motivating factors in its enactment?
3. The Equal Protection Clause because it fails heightened and standard rational basis review?
4. The Bill of Attainder Clause?

## ARGUMENT[2]

### I. Defendant Cannot Show that the Act Does Not Violate the First Amendment.

Defendant has failed to demonstrate as a matter of law that Section 20.5 satisfies the First Amendment. Section 20.5 violates the First Amendment by (1) singling out an expressive association, FLOC, for onerous burdens not imposed on any other entity; and (2) restricting the First Amendment right of FLOC and its members to participate in litigation.

[2] In a footnote, Defendant incorporates his earlier Eleventh Amendment and standing defenses, DE 107 at 15 n.19, but provides no reason why this Court should reconsider its earlier rejection of these defenses. *See* DE 56 at 12-44; DE 62. Should the Court reconsider, Plaintiffs respectfully incorporate their prior responses to these defenses. *See* DE 47, 50.

A. The Act Unconstitutionally Targets FLOC for Burdensome and Unjustifiable Regulation.

Defendant argues that Section 20.5 does not implicate the First Amendment because it is a law of general applicability that regulates conduct and contracts, not protected speech and association. DE 107 at 15. But Defendant employs the wrong framework for analysis. Section 20.5 effectively applies to exactly one organization: FLOC, the state's only farmworker union. DE 108-1 ¶ 18. As a labor union, FLOC is "an archetype of an expressive association." *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 301 (4th Cir. 1991); *see also State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 132 (2d Cir. 2013) ("[I]t cannot 'be questioned that the First Amendment's protection of speech and associational rights extends to labor union activities.'" (citation omitted)).

Because Plaintiffs claim that the Act unjustifiably targets one expressive association for burdensome regulations not imposed on any other group, the proper framework for analysis comes from *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983). There, the Supreme Court struck down a state tax imposed on the sale of large quantities of newsprint and ink because it selectively targeted large newspapers without adequate justification. *Id.* at 583. The Court held that "differential treatment" of the press (another archetypal form of expressive association) "unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Id.* at 583, 585. The Court added that the presumption of unconstitutionality was especially strong because the law "target[ed] a small group of newspapers," rather than the press generally.

*Id.* at 591. *Accord, e.g.*, *Leathers v. Medlock*, 499 U.S. 439, 447 (1991); *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 640 (5th Cir. 2012).

Section 20.5 imposes onerous — indeed, insurmountable — burdens on a single expressive association and its members by restricting their ability to benefit from payroll deduction and settlement agreements available to every other entity under North Carolina state law. *See* Facts, *supra* pp. 3, 5-6; DE 109 at 5-7, 12-13. The selective application of these burdens gives rise to a strong presumption of unconstitutionality. *See Minneapolis Star*, 460 U.S. at 583, 591.

None of the cases cited by Defendant concern a *Minneapolis Star* claim, or a statute that imposed *selective burdens* on a single labor union. Instead, Defendant relies on cases upholding government employers' authority to refuse to facilitate employee payroll deductions. These cases turned on the well-established principle that "the government . . . is not required to *assist* others in funding the expression of particular ideas, including political ones." *Ysursa v. Pocatello Education Association*, 555 U.S. 353, 358 (2009) (emphasis added) (citing *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983)); *South Carolina Education Association v. Campbell*, 883 F.2d 1251, 1257 (4th Cir. 1989) ("[T]he First Amendment does not impose an affirmative obligation on the state to assist the program of the association by providing payroll deduction services.").

Section 20.5 does not involve government assistance to unions. Instead, it imposes sweeping restrictions that bar private agricultural employers from voluntarily administering dues deductions authorized by their employees, and from entering into settlement agreements that contemplate a CBA with a farmworker union. *See* N.C. Gen.

Stat. § 95-79(b). In this case, the government uniquely burdens FLOC by preventing private parties from negotiating contracts that benefit it.

Defendant also relies on inapposite cases upholding laws of general applicability. *See Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 531 (1949) (upholding state "right-to-work" laws prohibiting employers from entering into contracts authorizing discrimination against employees based on union membership); *Michigan State AFL-CIO v. Schuette*, 847 F.3d 800, 802-03, 805 (6th Cir. 2017) (upholding a state law prohibiting employers from administering political action committee payroll deductions for most third parties, including unions). These laws did not expressly discriminate against unions, nor did they target a single union or a single category of unions for special disfavor. As a result, the laws did not raise the selective targeting concerns addressed in *Minneapolis Star*.

The question here is not whether the State has the power to regulate contracts generally, but whether it has the authority to impose onerous regulations on a single expressive association without compelling justification. "The power to enact an evenhanded ban does not include the power to enact uneven-handed restrictions." *United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1186 (D. Ariz. 2013) (striking down a law requiring unions, but not other entities, to estimate how much of their members' payroll deductions would be spent on political speech) (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992)).

Defendant argues in the alternative that the Act is content and viewpoint neutral. DE 107 at 21. To the contrary, the Act targets a subset of messages for disfavor, by

selectively depriving a single expressive association of elective payroll deductions that are available to every other entity — and that are affirmatively protected under state law for other unions, as well as clubs and charities. *See* N.C. Gen. Stat. § 95-25.8(a)(2); 13 NCAC § 12.0305(b). The Act also "singles out" FLOC "to be subject to harsh penalties," including practically insurmountable obstacles to fundraising. *United Food*, 934 F. Supp. 2d at 1186. These penalties amount to a limitation on speech and association "by particular speakers to which other speakers are not subject, thereby imposing costs on a particular view"— in this case, the distinct view of FLOC and its farmworker members. *Id.*

The Act's disparate treatment of private payroll deduction and settlement agreements for farmworker unions is presumptively unconstitutional "unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential [treatment]." *Minneapolis Star*, 460 U.S. at 585; *see also NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) ("[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny."). Defendant's burden of a compelling justification is especially heavy because the Act effectively targets a single labor union, FLOC, for restrictions. *See Minneapolis Star*, 460 U.S. at 591-93.

Defendant has failed to demonstrate as a matter of law that he can carry that burden. He asserts interests in reducing agricultural employers' administrative and "relational" costs, and strengthening right-to-work laws by preventing "coercive" settlements. DE 107 at 22-23. Defendant fails to identify any authority recognizing that these are *compelling* government interests. *Cf. City of Charlotte v. Int'l Ass'n of Firefighters*, 426 U.S. 283, 286–87 (1976) (city's interest in reducing its own expenses satisfied "a relatively relaxed

standard of reasonableness”). Some of these asserted interests do not clear the minimal hurdle of legitimacy required by the Equal Protection clause. *See infra* pp. 24-31; DE 109 at 17-22. Defendant also fails to show that Section 20.5’s disparate treatment is necessary to achieve these asserted interests, for the reasons stated *infra* pp. 24-31. *See Minneapolis Star*, 460 U.S. at 591-93.

B. Section 20.5’s Settlement Restriction Unconstitutionally Prevents FLOC and Its Members from Participating in Litigation.

As detailed in Plaintiffs’ brief in support of summary judgment, DE 109 at 28-31, Section 20.5 violates the First Amendment by outlawing settlement agreements conditioned on union recognition or entry into a CBA, and by barring FLOC from entering into *any* settlement agreement with an agricultural producer. Section 20.5 outlaws settlement agreements conditioned on union recognition or entry into a CBA — matters of existential importance to labor unions and two of the most important goals of union-related litigation. DE 108-10 ¶¶ 56–59; DE 34-24 ¶¶ 31–34. Further, because the Act bars any settlement that includes an agreement between an agricultural producer and a labor union, it prevents FLOC from entering into *any kind of* settlement agreement with an agricultural producer. *See* DE 109 at 31. Defendant argues in a footnote that the constitutional avoidance canon requires this Court to construe the Act to prohibit only settlement agreements that are “conditioned on entering into *another agreement* with a labor union or organization, not prohibiting settlements entirely.” DE 107 at 19 n.20. But the plain text of the statute prohibits “[a]ny provision” that “directly or indirectly” conditions settlement on “entry into or refusal to enter into an agreement with a labor union or labor organization.”

The word "agreement" is not modified by the word "another," and there is no indication that such limitation was intended. The Court cannot save the Act by rewriting it. *Boos v. Barry*, 485 U.S. 312, 330 (1988). Neither can the Court "assume that, in [the Act's] subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights." *NAACP v. Button*, 371 U.S. 415, 438 (1963).[3]

Even if Defendant's narrowing construction were valid, Section 20.5's prohibition on settlement agreements that benefit farmworker unions violates the First Amendment rights of FLOC and its members. As explained more fully in Plaintiffs' summary judgment brief, DE 109 at 28-31, the Supreme Court has long recognized the expressive value of litigation to protect the rights of marginalized groups and expressive associations. *See, e.g. In re Primus,* 436 U.S. 412, 431 (1978); *Button,* 371 U.S. at 428-31. Similarly, unions and union members have a First Amendment right to vindicate their collective interests through litigation. *See* DE 109 at 29; *Capital Associated Indus. v. Cooper*, 129 F. Supp. 3d 281, 289–93 (M.D.N.C. 2015) (discussing Supreme Court cases establishing union workers' expressive and associational rights to meaningful access to the courts).

[3] Defendant also suggests that the Act's settlement provision is neutral because it would prohibit two agricultural producers from entering a settlement agreeing that neither would enter into a CBA with a union. DE 107 at 22 n.22. Defendant fails to mention that such agreements between employers would already constitute prohibited illegal anti-competitive conduct under federal law, whereas such agreements between an employer and a union are not illegal when made in pursuit of a goal that is the legitimate subject of a bona-fide labor dispute. *Compare Eichorn v. AT&T Corp.*, 248 F.3d 131, 141-44 (3rd Cir. 2001) with *Webb v. Bladen*, 480 F.2d 306, 308 (4th Cir. 1973). This further illustrates that Section 20.5's settlement provision targets farmworker unions and is not speaker and content neutral.

In this case, the Act's settlement provision would effectively limit FLOC's ability to benefit from, pursue, or even defend against litigation through any means short of obtaining a final judgment. *See* DE 109 at 28-31; DE 108-10 ¶¶ 61–64, 71. By preventing FLOC from realizing the benefits of settlement, the Act significantly hinders the ability of FLOC and its members to advance their collective interests through litigation. "[C]ollective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transp. Union v. State Bar of Michigan*, 401 U.S. 576, 579–80, 585-86 (1971). But "that right would be a hollow promise," *id.*, if states could prevent unions and their members from achieving lawful objectives through settlement.

Defendant argues that the settlement provision does not restrict FLOC's ability to participate in litigation, but merely regulates its ability to benefit from certain types of contracts. DE 107 at 19-20. Yet, he fails to identify any authority holding that a state may selectively restrict an expressive association's ability to enter into or benefit from otherwise lawful agreements as a condition of settling litigation. Such severe legal disabilities cannot be sustained by the conclusory characterization that settlement agreements benefitting FLOC are "coercive," DE 107 at 23,[4] especially because courts have repeatedly judged FLOC members' settlements with farmers to be fair and reasonable. *See* Facts, *supra* p. 5.

[4] Defendant's evidence of "coercion" amounts to farmers finding it offensive that their employees were asserting their statutory rights under the FLSA and NCWHA and had proposed a CBA as a settlement term in exchange for reduced monetary compensation. *See* DE 107 at 13. This does not differ from any other situation in which an employee asserts her statutory rights against an employer and makes a settlement proposal that the employer does not like (and is ultimately free to reject).

## II. Defendant is Not Entitled to Judgment on Plaintiffs' Claims of Race, National Origin and Alienage Discrimination under the Fourteenth Amendment and Section 1981.

The factual record does not justify summary judgment for Defendant on Plaintiffs' claims asserting that Section 20.5 is motivated by race, national origin, and alienage discrimination in violation of the Equal Protection Clause and of 42 U.S.C. § 1981.[5]

The Fourth Circuit has recognized that "outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). The Court "must undertake a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available'" to ascertain the motivations of the General Assembly in passing the Act. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Drawing all inferences in Plaintiffs' favor, *see Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979), the totality of the relevant facts surrounding Section 20.5's enactment show, at minimum, a genuine factual dispute regarding the legislature's motives.

### A. A reasonable trier of fact could conclude that race, national origin, and/or alienage was a motivating factor in enacting Section 20.5.

The Court must apply strict scrutiny to its review of Section 20.5 if Plaintiffs can demonstrate that discrimination on the basis of race, national origin, or alienage was a "motivating factor" in its enactment. *Arlington Heights*, 429 U.S. at 265-66. To assess motivation, courts weigh a non-exhaustive list of relevant factors: (1) disparate impact of

[5] Plaintiffs' Section 1981 claims focus specifically on race, ethnicity, and alienage-based discrimination that led to the enactment of Section 20.5. DE 31 ¶¶ 118–122.

the legislation; (2) historical background, "particularly if it reveals a series of official actions taken for invidious purposes;" (3) the specific sequence of events leading up to the legislation; (4) departures from the normal procedural sequence; (5) "substantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and (6) legislative history, "especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 266-68.

1. *Disparate Impact*

"The impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997). In the name of benefiting a group that is 90% white (North Carolina farmers), the burdens of Section 20.5 fall overwhelmingly on the Latinx non-citizens who comprise almost all of FLOC's membership and 95% of the state's farmworker population. DE 108-1 ¶¶ 2, 11; DE 108-3 ¶ 7. This overwhelming disparate impact indicates legislative intent to undermine the contractual and litigation rights of farmworkers based on who they are.

2. *Historical Background*

The history of labor laws, particularly in North Carolina, reflects a legacy of racially discriminatory exclusions from worker protections and racially motivated restrictions on union organizing. *See* Facts, *supra* p. 7. There is also a significant history of racial discrimination within the agricultural industry, particularly in the southeast. *See, e.g.* *Pigford v. Glickman*, 185 F.R.D. 82, 86–88, 104 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C.

Cir. 2000). As courts have recognized, North Carolina's suppression of minority voices continues to the present day. *See McCrory*, 831 F.3d at 223 ("North Carolina's history of race discrimination and recent patterns of official discrimination" are "particularly relevant" to the intentional discrimination inquiry); *see also N.C. NAACP v. Cooper*, 430 F. Supp. 3d 15, 43 (M.D.N.C. 2019).

3. *Sequence of Events*

As argued by Plaintiffs in support of their summary judgment motion (DE 109 at 6-10), Section 20.5 was passed in reaction to over a decade of organizing and litigating efforts and successes by FLOC and its Latinx, non-citizen members—including FLOC's achievement of a CBA with NCGA, the largest H-2A employer in the nation, and a public advocacy campaign aimed at exposing worker mistreatment on a farm owned by Senator Brent Jackson.

There is striking overlap among the legislators who advocated for Section 20.5 and those sponsoring nearly a decade's worth of anti-immigrant legislation in the state. DE 108-1 ¶¶ 33-43; DE 109 at 12; *see N.C. NAACP*, 430 F. Supp. 3d at 31–32 (where many of the same legislators involved in enacting a prior unconstitutional law were involved in a second, similar law, the overlap was probative of continued discriminatory intent). These legislative activities — conducted in a General Assembly that has had at most two Latinx members — have occurred over a period during which the state's Latinx and immigrant populations have grown substantially. *See* DE 109 at 12; Facts, *supra* p. 7; Ex. 59; *see also Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1191 (M.D. Ala. 2011), *vacated as moot sub nom. Cent. Ala. Fair Hous. Ctr. v. Comm'r, Ala. Dep't of Revenue*, No. 11-

16114-CC, 2013 WL 2372302 (11th Cir. May 17, 2013) ("[L]egislation that comes on the heels of a substantial immigrant influx—in particular, where the legislation . . . has a disproportionate impact on these immigrants—should be eyed carefully."). The sequence of events strongly suggests that the legislature acted with a discriminatory motive. *See, e.g., League of United Latin American Citizens v. Perry,* 548 U.S. 399, 440 (2006); *McCrory*, 831 F.3d at 225-26.

4. *Procedural Departures*

Despite its severe implications for 100,000 of the state's most vulnerable workers, Section 20.5 was enacted in a hasty and non-transparent fashion. *See* DE 109 at 9-11. Section 20.5's supporters deliberately introduced it in a manner that guaranteed no opportunity for public hearing and comment; it was added to the Farm Act in a single evening of legislative maneuvering and with less than ten minutes' debate. *Id.* This type of rushed, last-minute procedure is a hallmark of unconstitutional legislation in North Carolina. *See, e.g.*, *McCrory*, 831 F.3d at 227.

5. *Substantive Departures*

Section 20.5 marks a significant substantive departure from state law and policy related to both union dues and settlement agreements. As noted above, state law allows employees to authorize payroll deductions for their "convenience," including for union dues. *See* N.C. Gen. Stat. § 95-25.8(a)(2); 13 NCAC § 12.0305(b). And, as this Court has already observed, no other class of private sector workers in North Carolina is barred from authorizing such payroll deductions. DE 56 at 71.

Additionally, Section 20.5's sweeping restrictions on settlement agreements conflict with longstanding public policy favoring final settlements to resolve legal disputes, especially labor-related disputes. *See* N.C. Gen. Stat. § 95-32; *Jenkins v. Fields*, 83 S.E.2d 908, 910-911 (N.C. 1954); *Ehrenhaus v. Baker*, 776 S.E.2d 699, 708 (N.C. App. 2015). No other group of workers is similarly restricted.

6. *Legislative History*

The history of Section 20.5 and its predecessor, SB 375, furnish strong evidence that Section 20.5 was passed in order to silence FLOC's overwhelmingly Latinx, non-citizen membership. *See* DE 109 at 9-12. Representative Dixon, the farmer-legislator who introduced the amendment, indicated that farmers and NCFB wanted Section 20.5 because "a few of us farmers are getting a little bit tired" of persons "from out of state" trying to organize farmworkers *Id.* at 10-11. He further urged that Section 20.5 would serve as "a deterrent to outside organizations in making attempts to establish unions where folks really don't want or need them." *Id.* These comments underscore that FLOC — despite being based in North Carolina for over a decade, DE 108-3 ¶¶ 2, 6 — and its predominantly Latinx membership are viewed as outsiders. This supports an inference that discriminatory intent was a motivating factor.

B. <u>A reasonable fact-finder could conclude that race, national origin, and/or alienage of FLOC's constituency caused the enactment of Section 20.5.</u>

Once impermissible discrimination is deemed a motivating factor in a law's passage, "the judicial deference accorded to legislators when balancing numerous competing considerations is no longer justified." *See McCrory*, 831 F.3d at 221 (internal quotations omitted). Viewing the foregoing facts and inferences in the light most favorable

to Plaintiffs, the Act is no longer owed the "strong presumption of validity" on which Defendant relies. DE 107 at 24. As Plaintiffs show, DE 109 at 18-22, and *infra* pp. 22-31, the justifications theorized to defend Section 20.5 are insufficient. But even if permissible rationales existed, there is at least a genuine issue of material fact regarding whether Section 20.5 would have been enacted but for the race, national origin, and alienage of FLOC's members. *See McCrory*, 831 F.3d at 221 (scrutinizing "the legislature's actual non-racial motivations to determine whether they alone can justify the legislature's choices") (emphasis in original).

Section 20.5's history suggests that the Act would not have garnered majority support—and likely would not have been signed into law by the governor—had it not solely impacted FLOC's overwhelmingly Latinx, non-citizen membership. Section 20.5's predecessor, SB 375, aimed to eliminate dues checkoffs for public sector unions in addition to FLOC and did not pass.[6] *See* DE 108-8 at 92:21 – 93:25. The politically marginalized status of FLOC's members—non-voting Latinx immigrants—ensured that the legislature could gut the union's operations without political repercussion. Indeed, the Governor met with *amicus* NCFB, whose members are largely white, to discuss Section 20.5 before signing the Act; he did not similarly meet with those who stood to lose the most from the law—FLOC and its members. *Id.* at 41:18 – 44:14, 129:21 – 132:1; Ex. 38 ¶ 3. The history

[6] *See* Colin Campbell, *Workers' groups like SEANC would lose payroll dues deductions under NC Senate bill,* The News & Observer, April 27, 2017, https://www.newsobserver.com/news/politics-government/statepolitics/article147009689.html

raises a strong inference that those who enacted Section 20.5 supported it because the law's burdens fell almost exclusively on non-voting Latinx immigrants.

Defendant cannot show that Section 20.5 survives rational basis review, much less strict scrutiny. *See infra* pp. 24-31. Because Plaintiffs raise genuine material fact issues related to the role that race, national origin and/or alienage played in the enactment of Section 20.5, the Court should deny summary judgment on Plaintiffs' Equal Protection and Section 1981 claims.

## III. Section 20.5 Violates the Equal Protection Clause Because it Fails Rational Basis Review

Summary judgment for Defendant on Plaintiffs' Equal Protection claim is inappropriate because the evidence overwhelmingly negates—and at minimum raises material questions of fact surrounding—Defendant's asserted rational bases for Section 20.5.

As discussed *supra* pp. 8-15, Section 20.5 burdens fundamental First Amendment rights. *See also* DE 109 at 22–31. Because Section 20.5's classifications implicate these fundamental rights, it also violates the Equal Protection Clause under a strict scrutiny standard. *See Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 666 (1990), *overruled in non-relevant part by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

In the absence of invidious discrimination, however, the Equal Protection clause requires "a *plausible* policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the

governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (internal citations omitted) (emphasis added).

As urged in Plaintiffs' brief in support of summary judgment, a heightened form of rational basis review is appropriate here, because the people most disadvantaged by Section 20.5, Latinx non-citizen farmworkers with limited ability to influence the legislative process, epitomize a "discrete and insular" minority. DE 109 at 16-17. The gap in political power between the agribusiness interests who got Section 20.5 enacted and the people disadvantaged by it could not be wider. Farmworkers are among the most vulnerable and disenfranchised workers in the state. *See* Facts, *supra* p. 2; DE 109 at 2-5, 12. While some farmers may be experiencing hardship,[7] farmers as a group enjoy extensive government support and political power. *See* Facts, *supra* p. 6; DE 109 at 8-12.

Where, as here, a politically underrepresented or disenfranchised minority is the target of a legislative classification, courts have applied heightened scrutiny. Reviewing the Defense of Marriage Act, for example, the Supreme Court weighed the actual "design, purpose, and effect" of the law against proffered justifications in holding that it violated equal protection. *U.S. v. Windsor*, 570 U.S. 744, 764 (2013).

Even where legislation is characterized as purely "economic," DE 107 at 15 — a characterization Plaintiffs dispute given the First Amendment rights implicated by Section

[7] Many issues that Defendant and *amicus* NCFB cite as causing farmer hardship —COVID-19, trade conflict with China, and instances of inclement weather — occurred after the Act's passage and therefore cannot serve as plausible rational bases for its enactment. *See* DE 107 at 8-9; DE 110 at 3-4; *see Nordlinger*, 505 U.S. at 11.

20.5 — "[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013). "Economic legislation" that operates solely to protect the interests of those who have political power and access to make the rules does not satisfy rational basis review. *See, e.g.*, *Birchansky v. Clabaugh*, 421 F. Supp. 3d 658, 681 (S.D. Iowa 2018) (asking "whether the statute in question favors one group over another for the sole reason the former possesses more political power than the latter").

Defendant asserts three rationales in support of Section 20.5:[8] (1) strengthening the state's "right to work" (RTW) policy; (2) eliminating "administrative and relational burdens" of unionization; and (3) "mak[ing] it easier for farmworkers to withdraw from the union[.]" DE 107 at 27. *Amicus* NCFB adds a fourth reason: its long-standing organizational "philosophy" against farmworker unions. DE 110 at 5, 21.

1. *Right to Work Policy*

Defendant posits that Section 20.5 withstands rational basis review because it was "enacted to reinforce" the state's RTW policy in the agricultural industry. DE 107 at 26-27. But RTW laws protect the rights of *all employees*, including farmworkers, to choose whether to join a union. *See* N.C. Gen. Stat. §§ 95-78, 95-81. These include the right to engage in pro-union activities such as paying dues and pursuing legal action against

[8] In their summary judgment brief, Plaintiffs address the rationales advanced by Representative Dixon, some of which overlap with Defendant's. DE 109 at 10-11, 17–22. Plaintiffs respectfully incorporate those arguments by reference.

employers with union assistance. *See Bigelow v. Town of Chapel Hill*, 227 N.C. App. 1, 13, 745 S.E.2d 316, 325 (2013) (employees asserted valid claims under N.C. Gen. Stat. § 95-81 where they alleged "they were fired for engaging in union activities, including recruiting and using union attorneys to assist Plaintiffs in helping other employees file grievances").

Defendant's RTW rationale is doubly implausible given NCFB's avowals that it drafted the legislation to advance its anti-union "philosophy." DE 110 at 5, 21; DE 109 at 20-22. As Representative Dixon's statements make clear, the law was intended to serve the interest of anti-union employers by silencing union speech, not to enhance individual workers' ability to decide for themselves whether to join a union. DE 34-18 at 3-5. This is contrary to the stated intent of the RTW policy, rendering this justification implausible. *See* N.C. Gen. Stat. § 95-78; *Nordlinger*, 505 U.S. at 11; *St. Joseph Abbey*, 712 F.3d at 226–27.

Regardless, Section 20.5 is not reasonably related to the goal of enhancing RTW laws. By forbidding agricultural employers and farmworkers from entering into voluntary dues checkoffs and settlement agreements, Section 20.5 *interferes* with farmworkers' choices to join and organize a union, a result at odds with not only the RTW laws, but also clear state policy favoring settlement of labor disputes. *See* N.C. Gen. Stat. § 95-32 ("It is hereby declared as the public policy of this State that the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes [.]").

Unlike the RTW policy's neutral treatment of pro-and anti-union workers, Section 20.5 uniquely disadvantages pro-union farmworkers by depriving them of the benefit of

voluntary dues checkoffs agreements.[9] And Section 20.5's language uniquely strips farmworker unions of the ability to enter into *any* settlement agreement with an agricultural producer. *See supra* pp. 13-14. Section 20.5 is anti-union in purpose and text, and bears no rational relationship to advancing RTW policy.

2. *Administrative and "Relational" Burdens*

Defendant argues that dues checkoffs pose administrative burdens, especially for farmers who calculate payroll manually. DE 107 at 11-12. Plaintiffs dispute the existence and extent of such burdens, given that farmers routinely make similar types of deductions from their employees' pay, and given the availability of modern payroll software to calculate dues deductions. *See* Facts, *supra* pp. 3-4; DE 109 at 11-12; Ex. 40 at 5. Farmers can manage such accounting; indeed, many subject themselves to onerous *mandatory* commodity dues checkoffs without complaint. Facts, *supra* pp. 3-4; *see, e.g.,* N.C. Gen. Stat. §§ 106-553 – 568, 106-781 – 797.

Even assuming some degree of administrative and "relational" burden, this rationale fails because the categorical exclusion of the agricultural sector from *voluntary* agreements available to all other private sector workers is so attenuated and disproportionate to the

[9] Section 20.5's interference with farmers' and farmworkers' rights to enter into voluntary agreements available to all other private sector employers and workers distinguishes this case from *City of Charlotte v. Int'l Ass'n of Firefighters*, 426 U.S. 283 (1976). *See* DE 110 at 16-17. There, the Supreme Court applied rational basis review to uphold a public employer's refusal to administer its firefighters' union dues checkoffs. *Id.* at 286–87. The City's decision applied solely to its own payroll. It did not block any other employer from agreeing to dues checkoffs. Here, Section 20.5 criminalizes dues checkoffs agreements entered into by all farmers and farmworkers, regardless of their willingness to enter such agreements. This arbitrary deprivation is without rational basis.

goal of reducing burden as to render it arbitrary and irrational. As this Court previously observed, "the precluded activities (dues checkoffs and certain settlement provisions) arose from voluntary agreements between farmers, farmworkers, and/or FLOC rather than any regulatory mandate." DE 56 at 72. "Moreover, the Farm Act does not affect payroll deductions for anything other than the payment of union dues. The Farm Act thus does not appear rationally related to reducing farmers' regulatory burdens." *Id.* (internal citation omitted). Further underscoring the voluntary nature of dues checkoffs in agriculture, growers who do not wish to be subject to such agreements can (and do) simply opt out. *See* Facts, *supra* pp. 3-4. Courts have repeatedly invalidated restrictions that were similarly overbroad and disproportionate to the purported legitimate ends. *See, e.g.*, *U.S. Dep't of Agric. v. Moreno,* 413 U.S. 528, 534 (1973); *Planned Parenthood of Cent. N. Carolina v. Cansler*, 804 F. Supp. 2d 482, 497 (M.D.N.C. 2011).

Defendant and NCFB also fail to explain how Section 20.5 will address the administrative and relational burdens purportedly posed by FLOC member lawsuits. FLOC members would still retain the rights to sue their employers, but Section 20.5 deprives all parties of settlement options that allow for cheaper, more expedient dispute resolution in the future. *See* DE 108-3 ¶ 14 (describing grievance procedure in CBA). And there can be no rational basis for the categorical restriction on FLOC's ability to enter into any settlements with a farmer, a reality Defendant effectively concedes by trying to argue that the statutory text does not mean what it says. *See* DE 107 at 19 n.20.

Defendant's "relational" burden argument fails for two additional reasons. First, sparing farmers from difficult conversations and verbal "conflict" with their employees is

not a legitimate *public* purpose. At bottom, the "relational" interest asserted by Defendant is some farmers' desire to limit farmworkers' freedom to associate, a purpose which demands — and cannot survive — a higher level of scrutiny. *Cf. Baloga v. Pittston Area School District,* 927 F.3d 742, 757 (3rd Cir. 2019) ("A generalized interest in doing business-as-usual . . . cannot categorically outweigh an employee's interest in associating with a union."); *Nunez v. Davis*, 169 F.3d 1222, 1229 (9th Cir. 1999) ("A public employer cannot claim disruption of a close personal relationship to cover up animus toward an employee's speech and a desire to silence the employee."); *Pineros Y Campesinos Unidos del Noroeste v. Goldschmidt*, 790 F. Supp. 216, 221 (D. Or. 1990) (striking down a content-based anti-picketing statute that was enacted to prevent "disruptive third party intervention into labor disputes between farm workers and their employers").

Second, state law explicitly recognizes that dues checkoffs, like employee saving plans and charitable contributions, fall in the category of deductions "for the *convenience* of the employee," i.e., deductions of inherent value and benefit to workers who choose to authorize them. N.C. Gen. Stat. § 95-25.8(a)(2); 13 NCAC § 12.0305(b) (emphasis added). Defendant has not demonstrated as a matter of law that voluntary dues checkoffs cause unique relational problems for employers, distinct from every other category of payroll deduction deemed "for the convenience of the employee" under state law.

3. *Easier Withdrawal of Union Membership*

Defendant also contends that Section 20.5 "makes it easier for farmworkers to withdraw from the union if they choose to do so." DE 107 at 27. This rationale appears nowhere in the legislative history or other background relevant to Section 20.5's

enactment, and thus merits little or no weight. *See Windsor*, 570 U.S. at 764 (emphasizing actual "design, purpose, and effect" of the law). There is no evidence that it is more difficult for farmworkers to withdraw from union membership than for any other private sector worker who authorizes dues checkoffs. Farmers' regular practice of making payroll deductions for items such as loans and meals only compounds the irrationality of singling out union dues for disfavored treatment. Facts, *supra* p. 3. Moreover, N.C. Gen. Stat. §95-25.8(a)(2) imposes safeguards to ensure that workers' payroll deduction authorizations are knowing and voluntary and that workers may revoke such authorizations as needed.

Defendant argues that workers "may lack knowledge in these technical procedures for resigning." DE 107 at 12. FLOC members are advised both in writing and orally regarding how they may withdraw their dues checkoff authorization. DE 108-11 at 155:6-160:25; Ex. 60. According to Defendant, Plaintiff Alvarado Hernández "did not know how to withdraw from FLOC and did not recall having that process explained for him." DE 107 at 12. But Alvarado Hernández repeatedly testified that he did not inquire about how to withdraw *because he did not want to leave the union.* DE 108-5 at 90:1-6; 103:13-22; 105:24 – 106:5.

The implication that farmworkers need special protection *from* union dues checkoffs — contrary to the overwhelming evidence that paying dues would be nearly impossible for most FLOC members without them, *see* Facts, *supra* pp. 5–6; DE 109 at 7, 12–13 — underscores the need for heightened scrutiny in this case. The paternalistic notion that farmworkers are less capable than other workers of making their own decisions about whether to authorize dues checkoffs should be viewed with skepticism by this Court,

especially given the history of invidious legislative efforts to exclude farmworkers from basic workplace protections enjoyed by other workers. *See* Facts, *supra* p. 7.

4. *NCFB's Anti-Union Philosophy*

NCFB urges that Section 20.5 was enacted to suppress unionization in agriculture; opposition to unions and dues checkoffs are among its "philosophy positions." DE 110 at 5. As this Court has previously suggested, anti-union animus is not a rational basis for Section 20.5. *See* DE 56 at 73 ("a desire to suppress farmworkers' organizational efforts likely does not constitute a legitimate government interest.");[10] *see also* DE 109 at 20-22. As discussed *supra*, this basis is particularly irrational because it conflicts with the state's RTW laws establishing each employee's freedom to choose for themselves whether to associate with a union.

By imposing severe legal disabilities on FLOC and its members to advance NCFB's anti-union agenda, the Act raises "the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected," and cannot survive rational basis review. *Romer v. Evans*, 517 U.S. 620, 634 (1996); *see also Moreno*, 413 U.S. at 534 ("[A]

---

[10] Defendant quotes *Sweeney v. Pence*, 767 F.3d 654, 669 (7th Cir. 2014), for the sweeping proposition that there is no fundamental right to engage in collective bargaining. This is incorrect. *See, e.g., Thomas v. Collins*, 323 U.S. 516, 532 (1945); *Labov v. Lalley*, 809 F.2d 220, 222–23 (3d Cir. 1987); *United Fed'n of Postal Clerks v. Blount*, 325 F. Supp. 879, 883 (D.D.C.), *aff'd*, 404 U.S. 802 (1971); *see also Fraternal Order of Police v. Mayor & City Council of Ocean City, Md.*, 916 F.2d 919, 923 (4th Cir. 1990) ("the right to choose a spokesperson to advocate a group's collective views lies implicit in the speech and association rights guaranteed by the First Amendment"). Even if Defendant were correct, Plaintiffs' claims in this case are based on the right to associate with a union and to engage in expressive litigation in coordination with a union, which are clearly fundamental First Amendment rights. *See supra* pp. 8-15; *Thomas*, 323 U.S. at 534; *Capital Associated Indus.*, 129 F. Supp. 3d at 289–93.

bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

## IV. Section 20.5 is a Bill of Attainder

There is ample basis for a reasonable fact-finder to determine that Section 20.5 is a bill of attainder proscribed by Article I, Section 10 of the Constitution. To be a bill of attainder, legislation must apply with specificity to a particular person or group and impose punishment without a judicial trial. *Cansler*, 877 F. Supp. 2d at 322.

Section 20.5 applies with specificity to FLOC, the only union affected by the law. DE 108-1 ¶ 18. A statute need not identify an individual or group by name in order to be a bill of attainder, so long as the targeted group is "easily ascertainable" from the statutory language. *See, e.g.*, *United States v. Brown*, 381 U.S. 437, 448-49 (1965). Nor must a statute define the targeted group exclusively by reference to past conduct. *See id*. at 458-59.

The evidence also shows that Section 20.5 is punitive. A statute is punitive if it does not reasonably further nonpunitive legislative purposes. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475-76 (1977). A "grave imbalance or disproportion between the burden and the purported nonpunitive purpose suggest punitiveness, even where the statute bears some minimal relation to nonpunitive ends." *ACORN v. United States*, 618 F.3d 125, 138 (2d Cir. 2010) (internal citations omitted). As explained above, *see supra* pp. 24-31, Section 20.5 is not reasonably related to the non-punitive rationales offered for it. *See Cansler*, 877 F. Supp. 2d at 324. Meanwhile, its severe burdens—which impose criminal and civil penalties, nullify contracts that are valid for every other union, and will undercut

and destabilize FLOC's main source of revenue—are disproportionate to and attenuated from the purported rationales. *See supra* pp. 24-31; N.C. Gen. Stat. § 95-79(b); N.C. Gen. Stat. §§ 75-1, -9, -13, -14 (penalties applicable to violations of § 95-79(b)).

Evidence of legislative intent bolsters the conclusion that Section 20.5 is punitive. *See Consol. Edison Co. v. Pataki*, 292 F.3d 338, 354-55 (2d Cir. 2002) (legislative intent can support a finding of punitiveness). Senator Jackson characterized FLOC members' December 2015 efforts to negotiate a CBA as part of a settlement of their wage claims as "Blackmail." DE 108-18. In 2016, he began to pursue a legislative means of punishing FLOC for its advocacy. DE 108-8 at 74:14-78:25; DE 108-20. As part of that effort, Senator Jackson's attorney explicitly analyzed how the language that became the settlement portion of Section 20.5 would affect the Senator's ongoing legal disputes with FLOC members. *See id.*; DE 108-18. Punitive intent is also demonstrated by Representative Dixon's statements about "predatory folks . . . getting people to be dissatisfied," unsubstantiated allegations of "harassment" by FLOC, and similar comments ratified by Senator Jackson, which show an intent to punish FLOC and its members for their past organizing activity. *See* DE 109 at 10-11; DE 108-25 (characterizing Section 20.5 as "a deterrent to outside organizations in making attempts to establish unions"). The clear nexus between Senator Jackson's legal disputes with FLOC members and the passage of Section 20.5 raises a strong inference of punitive intent and precludes summary judgment on Plaintiffs' bill of attainder claim.

## CONCLUSION

For the reasons stated herein and in Plaintiffs' brief in support of their motion for summary judgment, DE 109, Plaintiffs respectfully request that this Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted this 14th day of September, 2020,

/s/ Kristi Graunke
Kristi Graunke
North Carolina Bar No. 51216
kgraunke@acluofnc.org
Jaclyn Maffetore
North Carolina Bar No. 50849
jmaffetore@acluofnc.org
ACLU of North Carolina Legal Foundation
P. O. Box 28004
Raleigh, NC 27611-8004
Tel: 919-834-3466

Julia Solórzano
Georgia Bar No. 928725
julia.solorzano@splcenter.org
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30030-1287
Tel: 404-521-6700

Meredith B. Stewart
Louisiana Bar No. 34109
meredith.stewart@splcenter.org
Southern Poverty Law Center
201 St. Charles Ave, Ste. 2000
New Orleans, LA 70170
Tel.: 504-486-8982

Carol Brooke
North Carolina Bar No. 29126
carol@ncjustice.org

Clermont Ripley
North Carolina Bar No. 36761
clermont@ncjustice.org
North Carolina Justice Center
PO Box 28068
Raleigh, NC 27611
Brooke Tel: 919-856-2144
Ripley Tel.: 919-856-2154

Brian Hauss
New York Bar No. 5437751
bhauss@aclu.org
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212-549-2500

Robert J. Willis
North Carolina Bar No. 10730
rwillis@rjwillis-law.com
Law Office of Robert J. Willis, P.A.
P.O. Box 1828
Pittsboro, NC 27312
Tel: 919-821-9031

**CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATIONS OF LR 7.3(d)**

Relying on the word count function of Microsoft Word, I hereby certify that this brief complies with the word limitations set forth in the Court's August 12, 2020 Order (DE 103).

/s/ Kristi L. Graunke
*One of the Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on September 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve counsel for Defendant.

/s/ Kristi L. Graunke
*Counsel for Plaintiffs*