# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

### No. 1:17-cv-1037

FARM LABOR ORGANIZING
COMMITTEE, et al.,

    *Plaintiffs*,

v.

JOSHUA STEIN,

    *Defendant*.

**Defendant's Reply to Plaintiffs' Brief in Opposition to
Defendant's Motion for Summary Judgment**

# INDEX

Argument ........................................................................................................................... 1

I. None of Plaintiffs' Factual Contentions Raise a Disputed Issue of Material Fact that Avoids Summary Judgment for Defendant ................................. 1

II. Defendant Is Entitled to Summary Judgment on the First Amendment Claim ........................................................................................................................ 6

III. Defendant Is Entitled to Summary Judgment on the Equal Protection Claim ........................................................................................................................ 9

IV. Plaintiffs Barely Defend Their Section 1981 and Bill-of-Attainder Claims, and Defendant Should Be Granted Summary Judgment on Both............. 11

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:17-cv-1037

FARM LABOR ORGANIZING
COMMITTEE, et al.,

    *Plaintiffs*,

v.

JOSHUA STEIN,

    *Defendant*.

**Defendant's Reply to Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment**

Defendant respectfully submits this Reply in support of his motion for summary judgment.

## ARGUMENT

I. **None of Plaintiffs' Factual Contentions Raise a Disputed Issue of Material Fact that Avoids Summary Judgment for Defendant.**

None of Plaintiffs' factual contentions prevent summary judgment for Defendant, and we respond here to some of those contentions.

<u>Section 20.5 Does Not Punitively Target FLOC</u>

Much of Plaintiffs' argument is founded on the assertion that Section 20.5 "unjustifiably targets" FLOC as an organization. (*E.g.*, Pls' MSJ Resp. at 9-12, 23, 31 (DE 112)). On the contrary, Section 20.5 is a law of general applicability focused solely on future *conduct* in the agricultural industry—the State's largest. While Section 20.5 addresses issues identified by the legislature through FLOC's *actions*, FLOC is simply the only entity currently contracting to require dues checkoffs administered by farmers and leveraging litigation costs to negotiate CBAs with farms. "Legislatures may act to curb behavior

which they regard as harmful to the public welfare, whether that conduct is found to be engaged in by many persons or by one." *Communist Party v. Subversive Activities Control Bd.*, 367 U.S. 1, 88 (1961). Otherwise, a legislature would be powerless to address public harms engaged in by only one person or group. Plaintiffs' targeting claim fails to show how FLOC is affected any differently than if other agricultural unions decided to organize in North Carolina, subject to the same law. Section 20.5 focuses on behaviors, previously engaged in by FLOC, that were considered by the legislature to be harmful to public welfare going forward.

Administrative Burdens of Dues Checkoffs

Plaintiffs' contention that "FLOC's elective dues checkoffs do not burden farmers" (Pls' MSJ Resp. at 3-4) fails to overcome summary judgment for Defendant in two ways. First, this case does not require the Court or a jury to make factual conclusions about how much administering union checkoffs burdens farmers—it merely requires the Court to conclude that the *legislature* could rationally find those burdens exist and justify the law. *E.g.*, *FCC v. Beach Commc'ns*, 508 U.S. 307, 315 (1993); (Def's MSJ Resp. at 11-12 (DE 111)). The legislature's policy choice is not subject to the kind of "courtroom factfinding" Plaintiffs seek by demanding "evidence" to prove these burdens.[1] *Beach Commc'ns*, 508 U.S. at 315. Indeed, the Supreme Court addressed a similar argument in *Vance v. Bradley*, 440

---

[1] Nor are Plaintiffs correct that rationales not appearing in the legislative history "merit[] little or no weight." (Pls' MSJ Resp. at 28-29). The opposite is true: "[I]t is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315.

U.S. 93, 110-11 (1979), regarding cross-motions for summary judgment about the retirement-age requirement for Foreign Service personnel:

> Appellees seem to believe that appellants had to have current empirical proof that health and energy tend to decline somewhat by age 60 and had to offer such proof for the District Court's perusal before the statute could be sustained. Such evidence of course would argue powerfully for sustaining the statute. . . . In an equal protection case of this type, however, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

*Id.* (citation omitted). Plaintiffs cannot meet that requirement here.

Moreover, the burdens placed on farmers by dues checkoffs *are* demonstrated here. Plaintiffs say farmers "typically" calculate dues using software, but none of their cited facts show what is typical. (Pls' MSJ Resp. at 3). Plaintiffs also complain that Defendant has shown handwritten documents from "only four farms" to demonstrate that many farmers calculate the dues by hand (Pls' MSJ Resp. at 4), but the analysis here doesn't require ascertaining how each of the 46,000 farms in North Carolina handle payroll: the law survives scrutiny if the legislature could rationally believe dues checkoffs cause administrative burdens for farmers. *Pulte Home Corp. v. Montgomery Cnty*, 909 F.3d 685, 693 (4th Cir. 2018); *Vance*, 440 U.S. at 110-11. Defendant has shown that all methods of administering union checkoffs are rationally seen to carry burdens, both for farms using software to administer payroll and those who calculate payroll by hand. (Def's MSJ Resp. at 9).

Plaintiffs also suggest that farmers seeking to avoid the costs of administering dues can either "leave the NCGA [North Carolina Growers Association] or use a farm labor

3

contractor to administer payroll." (Pls' MSJ Resp. at 3). Those suggestions are self-defeating since they both incur costs. The NCGA provides substantial assistance to farmers using H-2A workers—costs to be borne by farmers if they leave the Association. (Def's MSJ Resp. at 28). And hiring a labor contractor to administer payroll obviously costs money. The legislature could consider lessening these costs a rational basis for Section 20.5. (Def's MSJ Resp. at 16-21).[2]

Added to this is the relational burden of administering dues checkoffs. (*See* Def's MSJ Mem. at 11-13, 23 (DE 107); Def's MSJ Resp. at 9-10). Plaintiffs contend that "sparing farmers from difficult conversations and verbal 'conflict' with their employees is not a legitimate *public* purpose" (Pls' MSJ Resp. at 27-28), but that misses the point. Protecting the State's largest industry is a public purpose, and that industry depends on reliable seasonal workers returning season after season—which in turn depends on strong relationships between employers and employees. (Def's MSJ Resp. at 10). Conflict that erodes those relationships can be translated to monetary costs, lost tax revenue for the State, higher food prices for its people, and fewer jobs—and at a minimum, the legislature could rationally conclude that to be true, which what matters here. (*See also id.* (discussing conflicts over resignations)).

---

[2] It is true that farmers can, and sometimes do, make other deductions for their workers, such as meals or employee loans. But those deductions benefit the farmer directly and/or relationally, are at his/her discretion to cease, and are less burdensome because they are purely internal advances of pay not requiring external transmission and accounting. (*See* Def's Ex. 34 at 29:16-40:23 (DE 111-6)).

4

The cases Plaintiffs cite on page 28 of their Response do not hold otherwise.[3] Indeed, reducing administrative burdens from checkoffs has already been recognized as a rational basis for regulation. *Charlotte v. Int'l Ass'n of Firefighters*, 426 U.S. 283, 286-88 (1976) (administrative burdens are an "sufficient justification" for placing limitations on municipal checkoffs and comparisons with burdens of other deductions are "of no import"); *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1256, 1263-64 (4th Cir. 1989). The economic difficulties faced by farmers in the past decade make reducing such burdens even more reasonable.[4]

Finally, Plaintiffs misstate Defendant's argument as to the difficulty union members encounter in terminating their union memberships. Defendant's argument is *not* that farmworkers are "less capable than other workers of making their own decisions about whether to authorize dues checkoffs." (Pls' MSJ Resp. at 29). Rather, FLOC's policies make it difficult to timely withdraw from the union—leading some workers to pay for dues for nearly a full year after submitting their resignation and forcing the farmer to withhold those dues against the worker's will, creating relational costs. (*See* Def's MSJ Mem. at 12-13, 23-24 (citing exhibits)). Such an arrangement may even be inconsistent with North Carolina law. *See* 13 NCAC § 12.0305(c).

---

[3] *Baloga v. Pittston Area School District*, 927 F.3d 742, 756 (3d Cir. 2019), even recognizes an employer's "interest in maintaining an efficient workplace and avoiding disruption."

[4] While the economic troubles faced by farmers are deepened by the recent pandemic and trade issues with China, the challenges started well *before* the passage of Section 20.5. (Def's MSJ Mem. at 6-9; NCFB Amicus Br. at 2-4 (DE 110)).

5

## II. Defendant Is Entitled to Summary Judgment on the First Amendment Claim.

Plaintiffs contend that the "proper framework for analysis" of their First Amendment claim comes from *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983). (Pls' MSJ Resp. at 9). *Minneapolis Star*, however, was a freedom of press case addressing a use tax that effectively targeted a small group within a larger set of similarly situated newspapers; as the First Circuit explains, it was a case "dealing with the State's direct imposition of financial burdens on the dissemination of particular kinds of speech," *Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 47 n.3 (2005). *Minneapolis Star* is a poor fit for this case, which has nothing to do with the press, taxes, or burdens on the dissemination of speech. And even if this case could be analogized to *Minneapolis Star*, later cases explain that "such heightened scrutiny is unwarranted when the differential treatment is justified by some special characteristic of the particular medium being regulated." *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 660-61 (1994) (quotation marks and citation omitted).[5] Here, the State's ability to regulate dues checkoffs is federally preempted as to most economic sectors—but *not* agriculture. (Def's MSJ Resp. at 14-15).

---

[5] *Minneapolis Star* concluded the tax targeted a small group of newspapers because it exempted most from its reach while affecting only a few. 460 U.S. at 591. The comparison here, if any, would be a checkoff law that affected one agricultural union but was crafted to exempt others; FLOC's status as the only agricultural union means *any* law addressing agricultural union activity would be subject to their claim of targeting.

6

A better comparison is the Ninth Circuit's opinion in *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 884-85 (9th Cir. 2018), which involved a First Amendment challenge to a California statute amending the state's prevailing wage law for government contractors. The law at issue excluded "industry advancement fees" from counting toward the prevailing wage unless done pursuant to a collective-bargaining agreement. *Id.*

Like Plaintiffs here, the Associated Builders and Contractors of California Cooperation Committee (ABC-CCC) asserted that the law "'limits the way private speakers . . . may raise money to fund their speech activities,' and therefore infringes its right to free speech." *Id.* at 891. The Ninth Circuit explained that ABC-CCC "swerve[d] off course straight out of the gate by equating a contributor's right to fund an entity's speech with a recipient's right to receive another's financial largesse." *Id.* at 892 (relying on *Regan v. Taxation With Representation*, 461 U.S. 540, 550 (1983)). "[T]here exists no standalone right to receive the funds necessary to finance one's own speech." *Id.*[6] And what is prohibited by the Checkoff Provision here is not anyone's right to contribute funds to a union nor any union's right to expend those funds on advocacy, but rather contracts binding farmers to expend *their own* resources to collect dues on the union's behalf. *Cf. id.* at 895-96.

---

[6] The *Interpipe* plaintiffs sought to rely on *United Food and Commercial Workers Local 99 v. Brewer*, 817 F. Supp. 2d 1118 (D. Ariz. 2011) (PI ruling). The Ninth Circuit explains why that reliance is misplaced: "Both laws affect the contribution decisions of third parties—employees in *United Food* and employers here—which, in turn, affect another entity's ability to amass funds. But the constitutional interest in *United Food* was in the law's regulation of the unions, not in the law's effect of diminishing the funds the unions received." *Interpipe*, 898 F.3d at 894; (*see* Def's MSJ Resp. at 28 n.24 (distinguishing Plaintiffs' reliance on the 2013 *United Food* summary-judgment ruling on the same law, which involved direct regulation of political expenditures)).

7

Plaintiffs also seek to distinguish cases like *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009), by suggesting they focused on "government assistance to unions." (Pls' MSJ Resp. at 10). But as the Sixth Circuit explained in *Michigan State AFL-CIO v. Schuette*, 847 F.3d 800, 805-06 (2017), there is no practical difference *to the union* between a public and private employer in the context of these checkoffs. Therefore, the First Amendment analysis is the same. Plaintiffs fail to engage with that reasoning, and it is decisive: there is no First Amendment right to an employer's administration of a dues checkoff for the union's or its members' benefit, and that is unaffected by whether the employer is public or private. *Id.*; (Def's MSJ Mem. at 17-18 (discussing *Schuette*)).

As to the Settlement Provision, Plaintiffs place great weight on interpreting that provision to mean what it does not say—prohibiting FLOC from settling *any* lawsuit with *any* terms. (Pls' MSJ Resp. at 13-14). Defendant has explained why that interpretation is lacking (Def's MSJ Resp. at 28-30), and Defendant is not asking the Court to "rewrit[e]" the statute but merely apply its plain text. This Court engaged in a thorough consideration of the case law regarding access to courts in *Capital Associated Indus. v. Cooper*, 129 F. Supp. 3d 281, 289-93 (M.D.N.C. 2015) (denial of PI), and Defendant respectfully submits that Plaintiffs cannot show that the Settlement Provision's narrow requirement "deprive[s them] of meaningful access to the courts to vindicate their legal rights," *id.* at 293; *see also* 283 F. Supp. 3d 374, 387-89 (2017) (merits ruling). In contrast, Defendant has shown how the legislature could conclude litigation costs were used to unfairly force farms into signing CBAs. (Ex. 38, ¶¶ 5-6 (Supp. Decl. of R. Jackson)); (Def's MSJ Mem. at 13, 19-23).

8

### III. Defendant Is Entitled to Summary Judgment on the Equal Protection Claim.

Plaintiffs contend that a "reasonable trier of fact could conclude that race, national origin, and/or alienage was a motivating factor in enacting Section 20.5" (Pls' MSJ Resp. at 16-20), but as to Section 20.5 itself, they principally rely on a disparate-impact argument that is, as a matter of law, insufficient for an equal-protection claim.

Plaintiffs' other arguments mostly rely on suggesting the North Carolina General Assembly, and specific legislators, are generally subject to heightened scrutiny based on past cases. (*See* Pls' MSJ Resp. at 17-18). That goes well beyond what this Court held in *NAACP v. Cooper*, 430 F. Supp. 3d 15, 31-32 (M.D.N.C. 2019), *appeal filed*, No. 20-1092 (4th Cir.), which considered the overlap in legislators between a past and present law *on the same topic*—a new voter ID law to replace a prior unconstitutional one. Such a history, of course, provides relevant background for evaluating the purpose of the successor law. But nothing like that exists for Section 20.5.

Likewise, the Fourth Circuit's decision in *NAACP v. McCrory*, 831 F.3d 204, 223-24 (4th Cir. 2016), focused on North Carolina's recent history in the specific area of the challenged regulation: redistricting and voting rights. Here, in contrast, "Plaintiffs' position is weakened significantly by the fact that the evidence presented in this case is largely unconnected to the passage of the actual law in question." *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 966 F.3d 1202, 1228-30 (11th Cir. 2020) (distinguishing *McCrory*).

Plaintiffs would expand the careful reasoning in *McCrory* and *Cooper* to effectively say that certain legislators—and even the whole General Assembly—should be presumed

9

to have discriminatory intent whenever a law they pass has a disparate impact. Such an argument finds no support in law: "The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018). "The ultimate question is whether a discriminatory intent has been proved in a given case," and the burden remains with Plaintiffs on that point. *Id.* (citation and quotation marks omitted). Plaintiffs have not met that burden here.

Indeed, Plaintiffs have shown nothing linking Section 20.5's passage to anyone's race, ethnicity, national origin, or alienage. Instead, Plaintiffs essentially argue that 1) farmworkers in North Carolina are predominantly "Latinx non-citizens," 2) the regulation primarily affects farmworkers, and thus 3) the law was intending to discriminate against farmworkers based on their race, ethnicity, and/or alienage. Bridging the obviously large gap between the second and third points requires Plaintiffs to go far outside the history of Section 20.5 (Pls' MSJ Resp. at 7, 18), and it requires a leap that cannot be reconciled with the Supreme Court's admonition that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324 (cleaned up).

Where Plaintiffs do focus on Section 20.5's passage, their arguments are unconvincing. They argue the law was "enacted in a hasty and non-transparent fashion," but they have not alleged that Section 20.5 was improperly amended to the Farm Act, nor can they show that its amendment to the Act late in the legislative process is irregular (or even unusual) in the give-and-take of legislating. *See generally Common Cause v. Forest*, 838

10

S.E.2d 668, 674 (N.C. App. 2020) (discussing the legislative process). Moreover, a broader version of the Checkoff Provision was included in a prior bill, which was the subject of public debate and commentary.[7]

Plaintiffs' contend that Section 20.5 "marks a significant substantive departure from state law and policy related to both union dues and settlement agreements." (Pls' MSJ Resp. at 19). However, new legislation always changes existing law, and Section 20.5 is an incremental protection of the State's longstanding right-to-work policy. (Def's MSJ Mem. at 22-27).

Defendant has articulated in prior filings why rational-basis review is the appropriate scrutiny for Plaintiffs' equal-protection claims (Def's MSJ Mem. at 24-27; Def's MSJ Resp. at 11-21), and even under the "heightened" rational-basis standard Plaintiffs suggest, summary judgment for Defendant is appropriate.

### IV. Plaintiffs Barely Defend Their Section 1981 and Bill-of-Attainder Claims, and Defendant Should Be Granted Summary Judgment on Both.

Finally, Plaintiffs did not move for summary judgment on their Section 1981 and bill-of-attainder claims, and their threadbare defense fails to raise a genuine issue of material fact on them. Indeed, Plaintiffs appear to simply append "Section 1981" to their equal-protection argument and drop a footnote to say their "Section 1981 claims focus specifically on race, ethnicity, and alienage-based discrimination." (Pls' MSJ Resp. at 16 n.5).

---

[7] That bill passed the Senate but did not pass the House, leading to the narrower version added in Section 20.5. (Decl. of P. Sherman, ¶¶ 15-18 (DE 110-2)).

11

They never respond to Defendant's specific Section 1981 arguments in support of summary judgment. (Def's MSJ Mem. at 27-29).

Plaintiffs briefly address the bill-of-attainder argument, but they elide the actual legal requirements for a law to be a bill of attainder (*see* Pls' MSJ Resp. at 31-32)—including authority holding that laws with open-ended applicability focused on future conduct are not bills of attainder (Def's MSJ Mem. at 29-32).

## CONCLUSION

For the foregoing reasons and those previously briefed, Defendant respectfully submits that he should be granted summary judgment on all counts.

Respectfully submitted, this 28th day of September, 2020.

> JOSHUA H. STEIN
> Attorney General
>
> /s/ Matthew Tulchin
> Matthew Tulchin
> Special Deputy Attorney General
> N.C. State Bar No. 43921
> mtulchin@ncdoj.gov
>
> /s/ Phillip A. Rubin
> Phillip A. Rubin
> Special Deputy Attorney General
> N.C. State Bar No. 51963
> prubin@ncdoj.gov
>
> N.C. Department of Justice
> P.O. Box 629
> Raleigh, NC 27602-0629
> Tel: 919.716.6900
>
> *Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the countable portion of the foregoing Memorandum, including body, headings, and footnotes, contains 3,122 words as measured by Microsoft Word 365.

This the 28th day of September, 2020.

                                                /s/ Matthew Tulchin
                                                Matthew Tulchin
                                                Special Deputy Attorney General