# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

FARM LABOR ORGANIZING        )
COMMITTEE, et al.,           )
                             )
            Plaintiffs,      )
                             )
        v.                   )          1:17cv1037
                             )
JOSHUA STEIN,                )
                             )
            Defendant.       )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on Defendant Joshua Stein's "Motion for Summary Judgment" (Docket Entry 106)[1] (the "Defendant's Motion") and "Plaintiffs' Motion for Summary Judgment" (Docket Entry 108) (the "Plaintiffs' Motion"). For the reasons that follow, the Court should grant in part and deny in part Defendant's Motion and Plaintiffs' Motion (collectively, the "Motions").

## BACKGROUND

"[C]halleng[ing] Section 20.5 of North Carolina General Assembly Session Law 2017-108 (also known as 'the Farm Act')" (Docket Entry 31 ("the Amended Complaint"), ¶ 1), the Farm Labor Organizing Committee ("FLOC") and Valentin Alvarado Hernandez (collectively, the "Plaintiffs") pursue statutory and constitutional claims against Joshua Stein (at times, the

_____

1 For legibility reasons, this Opinion generally omits all-cap font in quotations.

"Defendant"), in his official capacity as Attorney General of the State of North Carolina. (See id., ¶¶ 2, 7, 12.)[2] As relevant to the pending Motions, the record reflects the following:

"FLOC is a farmworker union" (Docket Entry 108-3, ¶ 5),[3] which describes its "ultimate goals a[s ensuring] that all farmworkers in North Carolina receive fair wages, work in safe conditions, and are able to voice concerns about work without fear of retaliation" (id., ¶ 6). "Since 1997, FLOC is and has been the only farmworker union organizing and representing farmworkers in North Carolina." (Id., ¶ 55; see also Docket Entry 108-1, ¶ 18 ("FLOC is the only agricultural employee labor union or labor organization in the state of North Carolina which engages in collective bargaining.").)[4] One way that "FLOC works towards its goals [is]

_____

2 Victor Toledo Vences, a FLOC member who worked for eighteen years, including in 2017, as a farmworker in North Carolina tobacco and vegetable operations (Docket Entry 34-6, ¶¶ 9, 11, 12, 17), also joined in this lawsuit (see, e.g., Docket Entry 31, ¶ 10), but "voluntarily dismisse[d] his claims in this matter without prejudice," in July 2020, because an injury has precluded his "return to work in North Carolina in the seasons subsequent to the 2017 season in which he filed this lawsuit" (Docket Entry 98 at 1). [Docket Entry page citations utilize the CM/ECF footer's pagination.]

3 Founded in Ohio, FLOC currently maintains offices in Mexico, North Carolina, and Ohio, and also operates in Kentucky; in addition, FLOC worked in South Carolina between approximately 2013 and 2018 and in Tennessee within the past ten years. (Docket Entry 108-11 at 8-9.)

4 The parties provided a "Joint Stipulation of Fact," which details, inter alia, information regarding North Carolina agriculture and farmworkers, FLOC, and the Farm Act. (See generally Docket Entries 107-17, 108-1 (the "Joint Stipulation").)
(continued...)

by organizing workers to achieve collective bargaining agreements (CBAs) with agricultural producers in the state, which guarantee farmworkers certain wages, working conditions, and fair alternative dispute mechanisms for resolving workplace grievances and disputes." (Docket Entry 108-3, ¶ 10.)

"Farmworkers are exempted from the federal National Labor Relations Act" (the "NLRA") (Docket Entry 108-1, ¶ 13), and "[t]here is no federal or North Carolina state law requiring elections for farmworker unions, nor any other law that requires mandatory recognition of farmworker unions in North Carolina" (id., ¶ 14). Accordingly, "[a]ll CBAs existing between FLOC and agricultural employers in North Carolina are entered into on an entirely voluntary basis" (id., ¶ 21). "In the past fifteen years, FLOC has increased its membership in North Carolina and won [CBAs] covering more of the state's agricultural workforce, including approximately 50% of the H-2A workers in North Carolina." (Id., ¶ 19.)[5] As of August 2020 (see Docket Entry 108-3 at 23), FLOC "ha[d] one CBA with agricultural producers in the state, covering

---

4(...continued)
For ease of reference, this Opinion cites to the Joint Stipulation at Docket Entry 108-1.

5    "Section 101(a)(15)(H)(ii)(a) of the Immigration and Nationality Act, 8 U.S.C. § 1101, authorizes the admission of foreign workers," known as H-2A workers, "for agricultural jobs." (Docket Entry 108-1, ¶ 6.)

approximately 10,000 workers" (id., ¶ 11).[6]  This CBA, with the
North Carolina Growers' Association (the "NCGA"), was scheduled to
"expire in December 2020," but as of August 2020, FLOC was
"actively organizing towards its renewal." (Id.)[7]

FLOC has "approximately 6,000 dues[-]paying members
nationwide," roughly eighty percent of whom "work in North
Carolina." (Id., ¶ 5.)  Approximately 2,000 dues-paying FLOC
members are "located in North Carolina at a given time." (Id.,
¶ 50.)  "About 95% of FLOC's dues-paying North Carolina members are
H-2A 'guestworkers' from Mexico who come to North Carolina each
year for five to ten months to perform seasonal agricultural work."
(Id., ¶ 7.)  "In 2018, North Carolina was the state with the fourth
largest number of H-2A workers certified for employment in the
state." (Docket Entry 108-1, ¶ 7.)  The NCGA, "which is comprised
of approximately 700 member-growers throughout the state" (Docket
Entry 108-3, ¶ 11), "was the largest H-2A employer in the nation in
2018" (Docket Entry 108-1, ¶ 8).  "In 2019, NCGA sponsored
approximately 50% of the H-2A visa workers in the state," and
"[m]ore than 95% of the FLOC members covered under the CBA with the
NCGA are H-2A guestworkers." (Docket Entry 108-3, ¶ 11.)

---

6  When FLOC initiated the lawsuit, it also administered a
second CBA, which "lapsed in 2019 and has not been renewed." (Id.)

7  The record does not reveal the current status of this CBA.
(See Docket Entries dated July 29, 2020, to present.)

4

"Most of North Carolina's H-2A workers work in tobacco, Christmas trees, and sweet potatoes." (Id., ¶ 7.)[8] "H-2A workers, as well as many other migrant farmworkers, typically live in isolated, employer-owned labor camps in rural areas. Most have no access to personal cars and depend on their employers for transportation to shopping and banking." (Id., ¶ 43.) Particularly during the busiest portion of the season, farmworkers may work seven days a week, often for long hours. (See Docket Entry 108-1, ¶ 9; Docket Entry 108-3, ¶ 44.) H-2A workers usually receive their pay via "checks which their employers cash for them, or which they must take to local stores that offer check cashing services for a fee." (Docket Entry 108-3, ¶ 46.) Migrant farmworkers in North Carolina, including H-2A workers, generally lack access to bank accounts and credit cards and "conduct most transactions by cash." (Id., ¶ 47.) Due to the seasonal and weather-dependent nature of their work, as well as the piece-rate basis by which they "are often paid," farmworkers' "earnings generally fluctuate throughout the season." (Id., ¶ 45.)

FLOC members pay 2.5% of their weekly wages as dues. (See id., ¶ 15.) Assuming "that farmworkers are paid for 40 hours of

_____

8 In 2017, North Carolina was the number one and number two producer nationally of tobacco and Christmas trees, respectively. (Docket Entry 108-1, ¶¶ 3-4.) North Carolina also ranked first in tobacco and sweet potato production in the United States in 2018. (See Docket Entry 107-8 at 9.) That year, "tobacco was the single crop with the highest production value produced in North Carolina, followed by soybeans, corn, hay, and cotton." (Docket Entry 108-1, ¶ 5.)

5

work in a typical week" at the federally mandated minimum wage for H-2A workers (and comparable domestic farmworkers (<u>see</u> Docket Entry 111-4, ¶ 19 & n.8)) of $12.67 an hour, the dues equate to roughly $12.67 per week in 2020, per Defendant's expert's calculation. (<u>Id.</u>, ¶ 54.) FLOC's Vice President, Justin Flores, similarly avers that $10 "is a realistic estimate of how much a member might pay in weekly dues." (Docket Entry 108-3, ¶ 59.)

According to Flores, "FLOC members rely on weekly dues checkoffs to timely and consistently pay their FLOC dues because they generally do not have ready access to bank accounts, credit and debit cards, and other ways of making automatic, repeated payments." (<u>Id.</u>, ¶ 58.) Further, Flores states that "[w]iring dues or using bill pay services are impractical alternatives to dues checkoffs for [FLOC's] membership" because of the costs associated with such services. (<u>Id.</u>, ¶ 59.) Per Flores's investigations, Wal-Mart's bill pay service charges transaction fees ranging from $3.49 to $8 for a $10 payment, and Western Union's money wiring service costs at least $4.99 per transaction. (<u>See</u> <u>id.</u>, ¶¶ 59-60.) Western Union offers a bill pay option of $2.49 for the lowest transaction fee, but that service requires use of a credit or debit card, which, in Flores's "experience, few H-2A workers have." (<u>Id.</u>, ¶ 60.)[9] Accordingly, Flores maintains,

---

9 However, at least one employer, Jackson Farming Company, which employs approximately 95 H-2A workers and does not currently participate in any CBA with FLOC, issues its employees debit cards (continued...)

6

without "automatic weekly dues deductions, most farmworkers would have to set aside cash to make regular payment of dues to FLOC. In practice, that approach will require workers to hold cash on their person or in their personal property in the labor camp housing for weeks at a time," which "will put them at significant risk of robbery or theft." (Docket Entry 108-3, ¶ 63; <u>see also</u> Docket Entry 108-4, ¶¶ 14-16 (averring to challenges Hernandez would face paying his dues if not withheld from his wages).)

Member dues comprise roughly fifty-to-sixty percent of FLOC's annual budget, rendering timely, consistent dues collection "essential to FLOC's ability to administer CBAs and provide services to its worker-members." (Docket Entry 108-3, ¶ 57.) "Because of the size and geographic dispersion of FLOC's North Carolina membership as well as [FLOC's] limited resources and staff, FLOC lacks the resources and ability to collect weekly dues directly from each of [its] approximately 2,000 dues paying members who are working in the state at a given time." (<u>Id.</u>, ¶ 56.) Accordingly, "[a]ll CBAs in which FLOC enters have a 'dues checkoff' provision," which requires farmers to honor FLOC members' requests "that their employer deduct 2.5% of their weekly wages and directly divert such funds to FLOC for the payment of union dues." (<u>Id.</u>, ¶ 15; <u>see also</u> <u>id.</u>, ¶¶ 16, 52.) "All of [FLOC's] dues paying

---

9(...continued)
linked to debit accounts into which it deposits their pay. (<u>See</u> Docket Entry 111-7, ¶¶ 5, 12, 13, 16.)

7

members who are covered by a CBA pay their dues through dues checkoffs." (Id., ¶ 15.)

"Most FLOC members that are H-2A guest workers covered by the NCGA CBA[] live in employer-provided housing spread out over approximately 1,000 labor camps." (Id., ¶ 50.) According to one of Plaintiffs' experts, "[f]armworker camps are often isolated and difficult to find," frequently lacking usable addresses, and are "located miles off paved roads," from which "they cannot be seen." (Docket Entry 108-2, ¶ 32.) "FLOC members in North Carolina are located throughout the state" (Docket Entry 108-1, ¶ 10), "with members located as far west as Tuckasegee, as far east as Jacksonville and Ahoskie, as far south as Whiteville and Chadbourn, and as far north as Grassy Creek" (Docket Entry 108-3, ¶ 42). Yet, according to Defendant's expert, although "H-2A workers are employed in every county in North Carolina," approximately half of those workers "are employed in a contiguous eight-county area that covers less than 11% of North Carolina's land area." (Docket Entry 111-4, ¶ 55.)[10] However, per Plaintiffs' expert, "[f]armworker camps within a given county are dispersed, often miles apart," and "[w]hether a specific camp is used can vary from year to year." (Docket Entry 108-2, ¶ 32.)

_____

10 "Bladen, Duplin, Edgecombe, Greene, Johnston, Nash, Sampson, and Wilson" comprise those eight counties. (Id. at 20 n.40.)

In 2017 and 2018, North Carolina contained approximately 46,400 farms, covering a total of 8.4 million acres. (Docket Entry 107-8 at 10.) Based on 2018 numbers, "[a]griculture and agribusiness — food, fiber, and forestry — account for one-sixth of the state's income and employment." Michael Walden, Agriculture and Agribusiness, June 2020, available at https://cals.ncsu.edu/agricultural-and-resource-economics/wp-content/uploads/sites/12/2017/07/2020_WaldenAgBusinessReport_061220.pdf (last visited Feb. 25, 2021). "In 2018, an estimated 100,000 workers worked as farmworkers in North Carolina." (Docket Entry 108-1, ¶ 1.) "Approximately 95% of farmworkers in North Carolina are of Hispanic/Latino origin, primarily from Mexico," and "[m]any are primarily monolingual in Spanish." (Id., ¶ 2.) Conversely, more than "90% of individuals who operate North Carolina agricultural entities identify themselves as white." (Id., ¶ 11.)

"FLOC engages in legislative advocacy, public education, and litigation aimed at addressing conditions for farmworkers, particularly in North Carolina's tobacco industry." (Id., ¶ 22.) "FLOC's advocacy has included issuing reports on working conditions and meeting with government officials to advocate for regulatory and legislative change." (Id., ¶ 23.)[11] FLOC "ha[s] also succeeded

_____

11    For instance, "[i]n 2011, FLOC and the non-profit organization Oxfam America jointly issued 'A State of Fear: Human Rights Abuses in North Carolina's Tobacco Fields,' a highly publicized report that detailed dangerous working conditions in the state's tobacco fields." (Docket Entry 108-3, ¶ 32.)

9

in conducting highly publicized campaigns to pressure agricultural corporations and producers to negotiate with workers for better working conditions, including the FLOC-led boycott of Mt. Olive Pickle Company in the late 1990s." (Docket Entry 108-3, ¶ 30.) "In 2004, in large part due to the successful Mt. Olive boycott, FLOC won a CBA with the NCGA covering nearly 10,000 H-2A workers and other farmworkers who work on NCGA farms." (Id., ¶ 31.)

"FLOC also assists members in bringing litigation related to their working conditions." (Docket Entry 108-1, ¶ 24; see, e.g., Docket Entry 107-29 (letters from FLOC's counsel to farmers detailing FLOC members' claims).) "As part of an agreement to settle litigation over workplace issues, some farmworkers who are FLOC members have negotiated for voluntary union recognition or expanded collective bargaining rights as part of a class-wide settlement agreement." (Docket Entry 108-1, ¶ 26.) In addition, FLOC "participates in lawsuits as a party or amicus to pursue legal issues of importance to its members." (Id., ¶ 25.)[12] FLOC also, inter alia, (i) administers existing CBAs, (ii) assists workers and their families in (A) obtaining legal counsel for employment or immigration matters and (B) "filing workers' compensation or other claims for benefits," and (iii) "assist[s] with repatriation of the

---

12  The litigation that FLOC and its members pursue frequently involves claims against agricultural producers. (See, e.g., Docket Entry 108-3, ¶¶ 34, 35, 54 (discussing specific legal disputes); Docket Entry 107-29 (letters outlining FLOC members' legal claims); Docket Entries 112-8 to 112-15 (orders approving settlement agreements).)

remains of H-2A guestworkers who pass away while working in the United States." (Id., ¶ 28.)[13]  In addition, FLOC "hold[s] community meetings for education about and discussion of issues relevant to members." (Id.)

As Flores explained:

> FLOC has pursued and secured CBAs and other improvements to farmworker conditions through various strategies, including public campaigns engaging major industry actors like tobacco corporations and assisting our members in bringing well-publicized litigation to challenge illegal employment practices by referring them to attorneys willing to handle such cases.

> FLOC has frequently participated in litigation as a party to pursue legal issues of importance to [its] members, such as a case involving the federal Department of Labor regulations that set the minimum wages for H-2A guestworkers. . . .

> Lawsuits in which FLOC participates, or which FLOC assists [its] members in bringing by providing legal referrals, are meant to recover unpaid wages and other restitution for workers, to win better conditions for FLOC's members through the relief obtained in the lawsuits and through the ongoing agreements obtained through those lawsuits, and also to educate the public about the working conditions confronted by farmworkers.

> Before passage of the Farm Act, some FLOC members negotiated to include voluntary union recognition or expanded collective bargaining rights, in addition to monetary restitution, as part of class-wide settlements to resolve claims asserted under federal and state employment laws.  These negotiations occurred both before

_____

13  Further, since March 2020, FLOC has devoted significant resources (i) to ensuring that its "members have access to COVID-related medical care and that workers know their rights during the pandemic," (ii) organizing supply drives and dropping off necessary supplies to members, and (iii) intervening to ensure that employers provide "the required 80 hours paid leave in federal legislation aimed at encouraging sick workers to stay home." (Docket Entry 108-3, ¶ 9.)

and after lawsuits about those claims were filed in court.

In one situation, for example, the defendant employer and the plaintiff farmworkers agreed that it was in their mutual interest to resolve the case in an agreement that includes, in addition to monetary compensation: employer recognition of FLOC as the bargaining representative of workers who sign FLOC membership cards; an employer pledge to remain neutral on unionization efforts in its workforce; payroll dues deductions; a guaranteed hourly wage of $11.27 per hour (increased from a prior wage of $8 per hour); just cause for any employer disciplinary action; worker/employer committees to address safety issues, worker housing, and employer competitiveness; and adoption of a binding alternative dispute mechanism for resolving workplace disputes.

* * * * * *

Throughout the last decade, FLOC members, with the support of their union, have brought numerous claims under the Fair Labor Standards Act (FLSA), the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), and the North Carolina Wage and Hour Act (NCWHA) against several North Carolina agricultural producers seeking recovery for wage theft and other violations of these laws. Through these lawsuits[, FLOC and its members] won significant amounts of unpaid wages for hundreds of workers, as well as a union contract, as part of a court-approved settlement that occurred in the course of court-mandated mediation in *Agustina Velasquez et al. v. Burch Equipment, LLC, et al.*, Civ. Action 7:14-CV-303-FL (E.D.N.C., complaint filed Dec. 31, 2014).

(Docket Entry 108-3, ¶¶ 17-21, 34 (internal numbering omitted).)[14]

---

14 FLOC has continued to assist its members in resolving potential legal claims since the Farm Act's passage, but, because of the Farm Act, "FLOC members no longer ha[ve] the option to negotiate for voluntary union recognition agreements with dues checkoff or to secure an agreement for expanded collective bargaining rights as part of a group settlement agreement that would seek restitution and also non-monetary terms to resolve their claims." (Id., ¶ 54.)

In addition, FLOC "filed and favorably resolved" a class grievance against North Carolina State Senator Brent Jackson's company, Jackson Farming Company (the "JFC"), in 2014 under the NCGA CBA. (Id., ¶ 35.) "After that successful 2014 grievance, JFC terminated its membership in the NCGA and thus its participation in FLOC's CBA." (Id.)[15]

FLOC's increased membership in North Carolina, its expansion of the number of workers covered by union agreements, and its members' involvement in well-publicized litigation have engendered opposition from certain agricultural producers and the North Carolina Farm Bureau (the "Farm Bureau"). (Id., ¶ 36.) The Farm Bureau "is North Carolina's largest general agriculture membership organization," with a current membership of "approximately 35,000 farm families," who "live in all 100 counties in the State and . . . operate many different farms, large and small." (Docket Entry 110-1, ¶ 2.) The Farm Bureau's "mission [is to] advocate for the interests of its members regarding federal and state legislative and regulatory issues." (Id.) Each year, the Farm Bureau's membership develops and adopts policy positions that guide

_____

15  JFC's president and CEO, Rodney Jackson (see Docket Entry 116-2, ¶ 3), asserts that after JFC left the NCGA, "FLOC, through its members, filed federal lawsuits against [JFC and the Jacksons] when [they] refused to engage in collective bargaining.  [They] continue to believe these lawsuits were intended to pressure [them] into collective bargaining . . . ."  (Id., ¶ 5.)  Jackson further asserts that they "were not the only farmers that were targeted in this way" (id.) and that "[t]hese lawsuits pressure farmers to stay in the [NCGA] to avoid the financial loss that accompanies FLOC lawsuits" (id., ¶ 6).

13

the Farm Bureau's advocacy work with the North Carolina General Assembly. (Docket Entry 110-2, ¶ 4.) The Farm Bureau's membership adopts many of the same policies consistently year after year. (Id., ¶ 5.) The Farm Bureau often refers to such "long[-]standing policies as philosophy positions. Two of those philosophy policies are opposing the unionization of farmworkers and opposing the withholding of union dues from employee paychecks." (Id.)

In 2012, after a six-year campaign, FLOC secured tobacco company Reynolds American's agreement "to meet with FLOC leaders to discuss working conditions for North Carolina tobacco workers." (Docket Entry 108-3, ¶ 33.) In 2013, the Farm Bureau learned about FLOC's effort to encourage Reynolds American to "revis[e its] tobacco production contracts . . . to increase the price [it] would pay for tobacco grown on farms that have union employees." (Docket Entry 110-2, ¶ 11.) "Because this idea was contrary to [Farm Bureau] policy opposing the unionization of farm workers, [the Farm Bureau] drafted legislative language to prohibit that idea, not just in tobacco, but for all commodities." (Id.) This language was ultimately enacted into law (see id.)[16] as an "'Agricultural Right to Work Provision'" (Docket Entry 108-3, ¶ 38), which specifies that:

> "[a]ny provision that directly or indirectly conditions the purchase of agricultural products or the terms of an agreement for the purchase of agricultural products upon

_____

16    Representative Jimmy Dixon sponsored the original bill regarding this law. (Docket Entry 108-1, ¶ 38.)

> an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina."

(Id. (brackets in original).) According to Flores, "[t]his legislation attempted to undermine FLOC's ability to engage corporate purchasers of agricultural products and sign agreements that would guarantee expanded labor rights in the industry." (Id., ¶ 39.)

In 2014 and 2015, Robert Willis, an attorney representing Plaintiffs in this action, sent letters to certain farmers in North Carolina, notifying them of various FLOC members' claims against them under, inter alia, the FLSA, NCWHA, and AWPA. (See Docket Entry 107-29.) "[I]n an effort to attempt to settle [such] claims" (id. at 1) without litigation, the letters indicate that the relevant FLOC members "are willing to discuss making significant concessions in the monetary terms of any settlement of the claims that are described in th[e] letter in exchange for" (id. at 3), inter alia, the farmer entering into a CBA or equivalent agreement with FLOC. (See generally id. at 1-20.) One such letter, dated December 16, 2015, pertained to claims that FLOC members, including Hernandez, threatened to assert against Senator Jackson, Rodney Jackson, and JFC. (See id. at 14-17.) The December 2015 letter apparently failed to resolve the specified claims, as in February 2016, Hernandez and other FLOC members filed a class action suit

15

against Senator "Jackson and his company, [JFC], for unpaid wages."
(Docket Entry 108-1, ¶ 27.)

Two months later, in April 2016, Senator Jackson sent an email
to Jake Parker, the Farm Bureau's Secretary and General Counsel
(see Docket Entry 120 at 7), entitled "Blackmail" (Docket Entry
108-18 at 2).[17]  This email stated, in full, "[n]eed to see if
[another farmer, Tracy] Pope got a similar letter like this"[18] and
attached the December 2015 letter.  (Docket Entry 108-18 at 2-20;
see Docket Entry 108-8 at 35-36).[19]  Two months later, in June 2016,
Senator Jackson forwarded to Parker an email exchange with Senator
Jackson's lawyer in his lawsuit with Hernandez and the other FLOC

---

17  In its deposition in the instant litigation, the Farm
Bureau indicated that it did not "see anything in [the letter] that
[it] would characterize as blackmail."  (Docket Entry 108-8 at 35.)

18  According to the declaration Victor Toledo Vences filed in
support of Plaintiffs' preliminary injunction motion, Vences worked
for Tracy Pope for fifteen years.  (Docket Entry 34-6, ¶ 12.)  A
wage dispute arose in 2014, as to which FLOC helped Vences "file a
grievance against" Pope, who "then paid [Vences] and another worker
for that unpaid time.  [Pope] was very angry that [Vences] had
complained about the wage problem and did not ask [him] to return
to work the next season."  (Id., ¶ 16.)  "Because of the [CBA],
[Vences] was able to return to work for a different grower.  FLOC
also helped [Vences] to file a complaint against the grower [(i.e.,
Pope)] who had retaliated against [Vences] by refusing to hire
[him] back after [he] complained about the wage problem."  (Id.)
In August 2016, the United States District Court for the Eastern
District of North Carolina approved the settlement agreement
resolving Vences's 2016 lawsuit against Pope and his company.  (See
Docket Entry 112-14 at 2-3.)

19  Parker responded to that email by indicating that he would
"check with Julian.  He talked with Tracy."  (Docket Entry 108-18
at 21.)  The Farm Bureau's deposition testimony suggests that
"Julian" also works for the Farm Bureau.  (See Docket Entry 108-8
at 35-36.)

16

members, with an enclosure message of "[f]rom [the lawyer] on the language." (Docket Entry 108-20 at 2.)

The underlying email exchange reflects that Senator Jackson sent Rodney Jackson an email entitled "[h]ere is the language," which stated:

> 23 CERTAIN AGREEMENT TERMS FOR AGRICULTURAL EMPLOYER'S
> STATUS 24 DECLARED INVALID 25 SECTION 17. G.S. 95-79
> reads as rewritten: 26 "§ 95-79. Certain agreements
> declared illegal. 27 (a) Any agreement or combination
> between any employer and any labor union or labor 28
> organization whereby persons not members of such union or
> organization shall be denied the right 29 to work for
> said employer, or whereby such membership is made a
> condition of employment or 30 continuation of employment
> by such employer, or whereby any such union or
> organization 31 acquires an employment monopoly in any
> enterprise, is hereby declared to be against the public
> 32 policy and an illegal combination or conspiracy in
> restraint of trade or commerce in the State of 33 North
> Carolina. 34 (b) Any provision that directly or
> indirectly conditions the purchase of agricultural 35
> products orproducts, [sic] the terms of an agreement for
> the purchase of agricultural products products, [sic] 36
> or the terms of an agreement not to sue or to settle
> pending litigation upon an agricultural 37 producer's
> status as a union or nonunion employer or entry into or
> refusal to enter into an 38 agreement with a labor union
> or labor organization is invalid and unenforceable as
> against public 39 policy in restraint of trade or
> commerce in the State of North Carolina. For purposes of
> this 40 subsection, the term "agricultural producer"
> means any producer engaged in any service or activity 41
> included within the provisions of section 3(f) of the
> Fair Labor Standards Act of 1938, 29 U.S.C. § 42 203, or
> section 312l(g) of the Internal Revenue Code of 1986, 26
> U.S.C. § 3121."

(Docket Entry 108-20 at 3 (highlighting and formatting in original).) Rodney Jackson forwarded that email to Paul Derrick (see id.), a lawyer in Raleigh, who replied:

The portion of it that I have highlighted appears to be the new language. The rest has been around for years and is generally known as North Carolina's "right-to work" statute. Off the top of my head, and depending on what the effective date of the revised statute would be, it could potentially be helpful to us if we could show that any refusal by the plaintiffs to settle our case was based on some agreement, presumably with the NCGA and/or FLOC, to keep the litigation going in order to pressure JFC to become a unionized employer. There certainly isn't any downside to the proposed revision, as far as I can see. Hopefully, however, Bob and the plaintiffs will do the right thing and settle this case sooner, rather than later. If they insist on including union recognition as part of the settlement, however, that could be a problem for them if this revision becomes law.

(Id. at 2.) Rodney Jackson forwarded (without comment) that response to Senator Jackson, who promptly sent it to Parker. (See id.)

Per the Farm Bureau, the language in the email "looks very similar to language that [the] Farm Bureau had drafted" previously. (Docket Entry 108-8 at 20.) Due to the inclusion of line numbers, the Farm Bureau posited that the language "was likely cut and pasted out of a legislative document," which "suggests to [the Farm Bureau's legislative director] that [the Farm Bureau] would have already provided th[e language] to someone at the General Assembly." (Id. at 21.) Although the Farm Bureau cannot recall exactly when it drafted the relevant language, "[i]t was at least a year, or maybe two, prior to the [Farm Act] being enacted." (Id. at 20.)

The FLOC members' suit against Senator Jackson and his company "ended in a court-mediated settlement in September 2016. The

18

settlement was preliminarily approved on January 20, 2017 and received final approval on July 11, 2017." (Docket Entry 108-3, ¶ 35.) Prior to the final approval of that settlement, in April 2017, Senator Jackson and two other senators "introduced the [Farm Act] as Senate Bill 615." (Docket Entry 108-1, ¶ 29.) "In its original form, the Farm Act did not include the amendments set forth in Section 20.5." (Id., ¶ 30.) "The Senate passed the original version of the Farm Act on April 5, 2017." (Id., ¶ 31.)

Also during "the 2017 session of the General Assembly," the Farm Bureau worked with certain state senators to secure the passage of a bill, Senate Bill 375, "that would prohibit the use of payroll withholdings to pay membership dues to any organization organized under 50l(c)(5) and 50l(c)(6) of the Internal Revenue Code," which includes unions as well as certain other membership and business organizations. (Docket Entry 110-2, ¶ 15.)[20] To accomplish this end, Senate Bill 375 proposed revising North Carolina General Statute Section 95-25.8, which governs the withholding of wages. (See Docket Entry 108-21 at 3.) As relevant here, North Carolina General Statute Section 95-25.8 provides:

(a) An employer may withhold or divert any portion of an employee's wages when:

(1) The employer is required or empowered to do so by State or federal law;

───────────

20 Under longstanding North Carolina law, "[u]nion dues may be deducted only from the pay of workers who agree to such deductions." (Docket Entry 108-1, ¶ 16 (citing N.C. Gen. Stat. § 95-82).)

19

(2) When the amount or rate of the proposed deduction is known and agreed upon in advance, the employer must have written authorization from the employee which (i) is signed on or before the payday(s) for the pay period(s) from which the deduction is to be made; (ii) indicates the reason for the deduction; and (iii) states the actual dollar amount or percentage of wages which shall be deducted from one or more paychecks. Provided, that if the deduction is for the convenience of the employee, the employee shall be given a reasonable opportunity to withdraw the authorization; or

(3) When the amount of the proposed deduction is not known and agreed upon in advance, the employer must have written authorization from the employee which (i) is signed on or before the payday(s) for the pay period(s) from which the deduction is to be made; and (ii) indicates the reason for the deduction. Prior to any deductions being made under this section, the employee must (i) receive advance written notice of the actual amount to be deducted; (ii) receive written notice of their right to withdraw the authorization; and (iii) be given a reasonable opportunity to withdraw the authorization in writing.

N.C. Gen. Stat. § 95-25.8(a).

Senate Bill 375 proposed adding a Section (a1), which specified:

Notwithstanding subsection (a) of this section or any other provision of State law, an employer shall not withhold or divert any portion of an employee's wages for the purpose of paying a membership fee or dues to a membership association organized under 26 U.S.C. 501(c)(5) or 26 U.S.C. 501(c)(6). This subsection shall not apply to the extent it conflicts with federal law.

(Docket Entry 108-21 at 3.)

After Senate Bill 375 passed the Senate, the Farm Bureau "worked with State Representative David Lewis to advance the bill. After several attempts to move the bill, [the Farm Bureau] w[as]

20

informed that" Senate Bill 375 "would not be able to pass the House due to opposition from the state employees association. However, [the Farm Bureau] w[as] told that it may be possible to get narrower legislative language that focused only on agriculture through the House." (Docket Entry 110-2, ¶ 16; <u>see also</u> Docket Entry 108-8 at 25 ("[The Farm Bureau] w[as] informed that [Senate Bill 375] was not going to pass; that . . . the language would have also applied to state employees, teachers possibly; and that part of [Senate Bill] 375 was not going to pass the House.").) The Farm Bureau "redrafted the language for Representative Lewis' staff and were told that they would help [the Farm Bureau] find a member to sponsor the language, if [the Farm Bureau] could identify a bill to attach the language to." (Docket Entry 110-2, ¶ 16.) The Farm Bureau suggested adding the language to the Farm Act (<u>id.</u>), and "Representative Lewis' staff identified State Representative Jimmy Dixon, chair of the House Agriculture Committee, to present the amendment during the final day of debate on the Farm Act" (<u>id.</u>, ¶ 17).[21] The Farm Bureau "briefly talked with Representative Dixon about the new language [and] provided him with short talking points to help him understand [the Farm Bureau's] policy position, which he was already aware of and supported." (<u>Id.</u>)

---

    21 Representative Dixon and Senator Jackson both "owned and operated farms in North Carolina at the time that Senate Bill 615, known as the Farm Act, was considered and passed by the General Assembly in 2017." (Docket Entry 108-1, ¶ 12.)

Drafted by Parker (see Docket Entry 108-8 at 32), the Farm Bureau's talking points stated:

> This amendment strengthens our right to work statutes by declaring certain agreements involving agricultural producers are against public policy. The amendment would prohibit the use of litigation to force farms to unionize and ensure farmers are not required to collect dues for their employees. This reduces a regulatory [sic] burden on farms that is not required under federal law and [is] completely within the State's purview to regulate. I have heard from multiple farmers across the State expressing concerns about these activities. I urge you to support the amendment.
>
> If asked, this amendment would not be preempted by federal labor law because agricultural employees are not subject to the [NLRA].
>
> If asked, the amendment does not block a union from organizing or collecting dues from its employees [sic].

(Docket Entry 108-24 at 2 (bold font omitted).)

On June 28, 2017, after the Farm Act had passed the second of three required readings (see Docket Entry 107-6 at 1, 11-12), Representative Dixon introduced Section 20.5 as an amendment to the Farm Act (see id. at 12-15). Section 20.5 proposed to amend North Carolina General Statute Section 95-79(b) by adding the underlined text and deleting the stricken text shown below:

> Any provision that directly or indirectly conditions the purchase of agricultural products[,] ~~products or~~ the terms of an agreement for the purchase of agricultural products, or the terms of an agreement not to sue or settle litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. Further, notwithstanding G.S. 95-25.8, an agreement requiring an agricultural producer

22

> to transfer funds to a labor union or labor organization
> for the purpose of paying an employee's membership fee or
> dues is invalid and unenforceable against public policy
> in restraint of trade or commerce in the State of North
> Carolina.

(Docket Entry 108-1, ¶ 32.)

In introducing Section 20.5, Representative Dixon stated:

> This amendment — there are various organizations that for
> some time over the last couple of weeks have been looking
> for the right opportunity — they weren't necessarily
> going to do it here in the — in the [F]arm [A]ct,
> although I think it's very applicable, but that's an
> explanation of why at this point that we're offering an
> amendment — Farm Bureau and other farm organizations.
>
> And over the last couple of days I've heard from a
> lot of farmers across the state expressing concerns about
> this and wishing that there was a vehicle to do what this
> amendment does. It strengthens our right to work
> statutes by declaring certain agreements involving
> agriculture producers are against the public policy of
> North Carolina.
>
> The amendment would prohibit the use of litigation
> to force farms to unionize and ensure farmers are not
> required to collect dues for their employees. This
> reduces the regulatory [sic] burden on farms that is not
> required under federal law and is completely within the
> state's purview to regulate.

(Docket Entry 107-6 at 12-13.)[22]

In response, Representative Meyer asked why, "[g]iven that

[North Carolina] already ha[s] quite strong right to work

protections, . . . the[] additional protections [in Section 20.5]

---

22   "North Carolina is a 'right to work state.' [North
Carolina General Statute Section] 95-78 establishes that each
employee has the right to individually choose whether to join a
union or decline to join a union. [North Carolina General Statute
Section] 95-81 prohibits the conditioning of employment on union
membership or non-membership." (Docket Entry 108-1, ¶ 15.)

23

are necessary for farms" (id. at 13-14). Representative Dixon replied:

> because of continued harassment from out of state there seems to be a growing wave of folks that are interested in farm labor. It's — some consider it low hanging fruit to do things like that, and it's just a general tendency for an increase in activity that we consider to be harassment.

(Id. at 14.)

Representative Meyer then asked "are you afraid that they're going to organize the farmworkers into a union" (id.), to which Representative Dixon rejoined:

> Sir, I'm not afraid of anything. And I understand that food is very important, and so no, we're not afraid, but an ounce of prevention is worth a pound of cure.

> And there are predatory folks that make a good living coming around and getting people to be dissatisfied, and a few of us farmers are getting a little bit tired of it and we want some properly measured priority so that we can continue to feed you.

(Id. at 14-15.) No further debate occurred before the House passed both Section 20.5 and the amended Senate Bill 615. (See id. at 15.)[23]

Later that day, the House and Senate each appointed a conference committee to reconcile the differences between their versions of Senate Bill 615. (See Docket Entry 107-5 at 14-15; Docket Entry 107-6 at 16; see also Docket Entry 70, ¶ 77 (discussing conference).) "Representative Dixon chaired the House

---

[23] "When the 2017 Farm Act, as amended by the House, went back to the Senate, [the Farm Bureau] informed Senator Jackson that § 20.5 had been added to the bill." (Docket Entry 110-2, ¶ 18.)

24

Conference Committee for the Farm Act and Senator Jackson chaired the Senate Conference Committee for the bill." (Docket Entry 70, ¶ 77.) "[T]he Conference Committee completed its report the same evening, incorporating the [Section 20.5] amendment, and it was adopted by both chambers of the North Carolina [General Assembly]." (Id.) The House engaged in no additional debate about Section 20.5 before adopting the modified Farm Act. (See Docket Entry 107-6 at 17-19.) Thereafter (see Docket Entry 107-5 at 15), Senator Jackson discussed the Committee Report in the Senate, mentioning the Section 20.5 amendment only as follows:

> Section 20.5 just strengthens our right to work statutes by declaring certain agreements involving agricultural producers are I guess [sic] public policy.

(Id. at 16; see also id. at 15-18 (reflecting no other discussion of provision at issue).)[24] The Senate passed the amended Farm Act (see id. at 18-19), which incorporates Section 20.5, on June 28, 2017 (see id. at 1).

Flores has denied "aware[ness] of an opportunity for a public hearing or comment given during consideration of Section 20.5 of the Farm Act. Had there been an opportunity, FLOC would have participated and tried to rally support against the bill." (Docket

---

24  Although the transcript reads "I guess," it appears that wording reflects a transcription error for the word "against." (See, e.g., Docket Entry 107 at 5 ("Addressing the amendment, Senator Jackson stated, 'Section 20.5 just strengthens our right-to-work statutes by declaring certain agreements involving agricultural producers are [against] public policy.'" (brackets in original)).)

Entry 108-3, ¶ 41.)  Following the General Assembly's passage of the modified Farm Act, the bill went to Governor Cooper's office for his consideration.  (<u>See, e.g.</u>, Docket Entry 108-25 at 4.) While the bill remained pending before Governor Cooper, Senator Jackson circulated an Ohio newspaper article regarding the Farm Act to, <u>inter alia</u>, Parker, Representative Dixon, and Representative Lewis.  (<u>See id.</u> at 2.)  The article quotes Representative Dixon as characterizing Section 20.5 "as a 'right-to-work provision'" and stating, "'We believe that it will enhance our local agricultural community and possibly be a deterrent to outside organizations in making attempts to establish unions where folks really don't want them or need them.'"  (<u>Id.</u> at 4.)  In his email, Senator Jackson states, "I think [Representative Dixon's] response was excellent and is exactly why this was done."  (<u>Id.</u> at 2.)

The Farm Bureau met with Governor Cooper while he "was considering the 2017 Farm Act . . . to discuss the bill and to urge him to sign it into law.  Among the issues discussed during the meeting was [Section] 20.5."  (Docket Entry 110-2, ¶ 19.)  More specifically, the Farm Bureau expressed to Governor Cooper and his staff its belief that Section 20.5 "[wa]s good public policy." (Docket Entry 108-8 at 34.)  Either Governor Cooper "or his staff asked questions about the language [in Section 20.5] and what it did and what it did not do."  (<u>Id.</u>)  Governor Cooper and his staff "wanted to know who was impacted, as far as which — you know, what

26

this meant for farmers.  They also asked which organizations were impacted." (Id.)  The Farm Bureau identified "[f]armworker unions" as the organizations that "were impacted" by Section 20.5.  (Id.)

Contemporaneously, "FLOC publicly called on Governor Cooper to veto the Farm Act [] because it contained Section 20.5." (Docket Entry 112-5, ¶ 3.)  However, "no one from FLOC met with or had any other opportunity to directly discuss Section 20.5 with the Governor before or after it was signed into law" (id.), which occurred on July 12, 2017 (Docket Entry 70, ¶ 78).  The Farm Act specified that Section 20.5 "is effective when it becomes law and applies to agreements and settlements entered into, renewed, or extended on or after that date." (Docket Entry 107-2 at 23.)

In addition, since the 2009-2010 legislative session, the North Carolina General Assembly has proposed and/or passed various provisions impacting immigrants. (See Docket Entry 108-1, ¶¶ 33-43 (identifying and describing provisions).)[25]  Legislators involved in sponsoring the Farm Act, including Section 20.5, sponsored certain of those provisions. (See id.)

Following enactment of the Farm Act, Plaintiffs initiated this lawsuit against Governor Cooper, in his official capacity as Governor of the State of North Carolina, and Marion R. Warren, in his official capacity as Director of the North Carolina Administrative Office of the Courts. (See Docket Entry 1 (the

_____

25  Per their descriptions, the provisions adversely impact immigrants. (See id.)

27

"Complaint"), ¶¶ 1, 2, 7, 8.)  Shortly thereafter, Plaintiffs filed a motion for preliminary injunction.  (See Docket Entry 7.)  After Governor Cooper and Warren moved to dismiss the Complaint (see Docket Entries 24, 27), Plaintiffs filed their Amended Complaint, which replaced Governor Cooper as a defendant with Joshua Stein, in his official capacity as Attorney General of the State of North Carolina.  (See Docket Entry 31, ¶¶ 7, 8, 12, 13 (identifying Stein and Warren as defendants).)  Plaintiffs also filed an amended preliminary injunction motion, seeking to preliminarily "enjoin Section 20.5."  (Docket Entry 34 at 1.)

Asserting eleventh-amendment immunity and a lack of standing, Stein and Warren moved to dismiss the Amended Complaint.  (See Docket Entry 39 at 1; Docket Entry 40 at 8, 18; Docket Entry 44 at 1; Docket Entry 45 at 7.)  Concluding that Plaintiffs possessed standing, that sovereign immunity shielded Warren, and that "the Ex parte Young exception applies to Stein, rendering him a proper defendant" (Docket Entry 56 (the "Recommendation") at 79), the Court dismissed Warren from the lawsuit, but allowed it to proceed against Stein (see Docket Entry 62 at 1).  As Stein declined to contest the merits of Plaintiffs' preliminary injunction motion, the Court evaluated Plaintiffs' injunctive request in light of the three reasons that Representative Dixon proffered for Section 20.5's passage.  (See Docket Entry 56 at 67-74; see also Docket Entry 62 at 1 (adopting Recommendation).)  Finding that, inter

*alia*, "Plaintiffs ha[d] established a likelihood of success on the merits of their Equal Protection Claim" (Docket Entry 56 at 74) based on the then-current record and briefing, the Court preliminarily enjoined Defendant from enforcing Section 20.5 (see Docket Entry 62 at 1). The parties thereafter engaged in discovery (see, e.g., Docket Entry 85 at 1-5 (outlining parties' discovery proposal)), and have now moved for summary judgment on all or some of Plaintiffs' claims. (See Docket Entries 106, 108.)[26]

## DISCUSSION

### I. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S.

---

26  Plaintiffs' Motion also "seek[s] entry of a permanent injunction against Defendant" (Docket Entry 108 at 1) and represents that such injunction would (i) prevent irreparable harm to them (see id., ¶ 7), (ii) "pose[] no harm to Defendant, as it would restrain enforcement of an unconstitutional law" (id., ¶ 8), and (iii) "serve the public interest by ensuring that Plaintiffs and other farmworkers may continue to exercise their constitutional rights to expression and association" (id.). The "Brief in Support of Plaintiffs' Motion for Summary Judgment" (Docket Entry 109 at 1) likewise asserts that the Court should "permanently enjoin enforcement of [Section 20.5]" (id. at 2). However, the parties do not address the permanent injunction factors in their summary judgment memoranda. (See Docket Entries 107, 109, 111, 112, 115, 116.) As such, this Opinion does not analyze the propriety of a permanent injunction.

29

242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" <u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." <u>Evans v. Technologies Applications & Serv. Co.</u>, 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." <u>Lewis v. Eagleton</u>, No. 4:08cv2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing <u>Baber v.</u>

Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)),
aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v.
Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that
"[m]ere conclusory allegations and bare denials" or the nonmoving
party's "self-serving allegations unsupported by any corroborating
evidence" cannot defeat summary judgment).  Finally, factual
allegations in a complaint or court filing constitute evidence for
summary judgment purposes only if sworn or otherwise made under
penalty of perjury.  See Reeves v. Hubbard, No. 1:08cv721, 2011 WL
4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation
adopted, slip op. (M.D.N.C. Nov. 21, 2011).

## II. Analysis

### A. Section 20.5

As a preliminary matter, the parties (and the Farm Bureau)
disagree regarding the scope of Section 20.5.  For instance,
Plaintiffs contend that Section 20.5 (i) bars FLOC, farmworkers,
and farmers from entering dues checkoff agreements, (ii) precludes
union recognition in any settlement agreement, and (iii) precludes
FLOC from entering any settlement agreement with a farmer.  (See,
e.g., Docket Entry 109 at 2.)  However, they also treat Section
20.5 as precluding payment of dues through withheld wages, rather
than just prohibiting agreements requiring dues withholding.  (See,
e.g., id. at 24; Docket Entry 112 at 10.)  In turn, Defendant
asserts that Section 20.5 does not (i) "prevent plaintiffs or

31

prospective plaintiffs from suing or threatening to sue agricultural producers," (ii) "prohibit settlement agreements stemming from those lawsuits or from threats to sue," or (iii) "prohibit unions or farmers from collecting dues, only from contractually requiring farmers to do it on the union's behalf." (Docket Entry 111 at 5.) Finally, the Farm Bureau contends that Section 20.5 effectuated the Farm Bureau's policies "opposing the unionization of farmworkers and opposing farmers having to withhold from their employee's paychecks the employee's union dues" by (i) "prohibiting a farmer's status as a union or nonunion employer from being used as a condition for an agreement to sue [sic] or settle litigation; and ([ii] exempting farmers from transferring funds to a labor union or labor organization to pay for an employee's membership fees or dues." (Docket Entry 110-2, ¶ 20.)

Section 20.5 revised North Carolina General Statute Section 95-79. (See Docket Entry 107-2 at 23.) As modified, this statute now provides:

> (a) Any agreement or combination between any employer and any labor union or labor organization whereby persons not members of such union or organization shall be denied the right to work for said employer, or whereby such membership is made a condition of employment or continuation of employment by such employer, or whereby any such union or organization acquires an employment monopoly in any enterprise, is hereby declared to be against the public policy and an illegal combination or conspiracy in restraint of trade or commerce in the State of North Carolina.
>
> (b) Any provision that directly or indirectly conditions the purchase of agricultural products, the terms of an

32

agreement for the purchase of agricultural products, or the terms of an agreement not to sue or settle [sic] litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. Further, notwithstanding [North Carolina General Statute Section] 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable against [sic] public policy in restraint of trade or commerce in the State of North Carolina. For purposes of this subsection, the term "agricultural producer" means any producer engaged in any service or activity included within the provisions of section 3(f) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 203, or section 3121(g) of the Internal Revenue Code of 1986, 26 U.S.C. § 3121.

N.C. Gen. Stat. § 95-79.

"In interpreting a state law, [courts] apply the statutory construction rules applied by the state's highest court." In re DNA Ex Post Facto Issues, 561 F.3d 294, 300 (4th Cir. 2009). Thus, the statutory construction rules of the North Carolina Supreme Court guide the analysis of Section 95-79(b).

Under North Carolina law, "[w]here the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning." Burgess v. Your House of Raleigh, Inc., 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990). "But where a statute is ambiguous, judicial construction must be used to ascertain the legislative will." Id., 388 S.E.2d at 136-37. "The primary rule of construction of a statute is to ascertain the intent of the

33

legislature and to carry out such intention to the fullest extent. This intent must be found from the language of the act, its legislative history[,] and the circumstances surrounding its adoption which throw light upon the evil sought to be remedied." Id., 388 S.E.2d at 137 (internal quotation marks and citation omitted); see also Shaw v. U.S. Airways, Inc., 362 N.C. 457, 460, 665 S.E.2d 449, 451 (2008) ("When interpreting a statute, we ascertain the intent of the legislature, first by applying the statute's language and, if necessary, considering its legislative history and the circumstances of its enactment.").

In regards to the dues issue, the revised statute provides: "notwithstanding [North Carolina General Statute Section] 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fee or dues is invalid and unenforceable [as] against public policy in restraint of trade or commerce in the State of North Carolina." N.C. Gen. Stat. § 95-79(b) (emphasis added) (the "Dues Checkoff Provision"). In turn, Section 95-25.8(a) specifies that "[a]n employer may withhold or divert any portion of an employee's wages when," inter alia, the employer receives "written authorization from the employee" that complies with certain requirements. N.C. Gen. Stat. § 95-25.8(a)(2)-(3) (emphasis added). Accordingly, the specific language of revised Section 95-79(b) merely prohibits agreements requiring farmers to

34

withhold dues under Section 95-25.8(a); it does not strip farmers of their discretionary ability to withhold dues authorized by farmworkers.  Juxtaposing Section 20.5 with Senate Bill 375 reinforces this interpretation of Section 95-79(b), for the General Assembly clearly knew how to preclude employer withholding of union dues, but opted instead through Section 20.5 to prohibit only contractual provisions requiring such withholding (as in the NCGA CBA).  (See Docket Entry 108-21 at 3 (proposing to revise Section 95-25.8 to specify that notwithstanding Section 95-25.8(a), "an employer shall not withhold or divert any portion of an employee's wages for the purpose of paying a membership fee or dues to a membership association organized under 26 U.S.C. 501(c)(5) or 26 U.S.C. 501(c)(6)").)[27]

In addition, Section 20.5 renders

> [a]ny provision that directly or indirectly conditions . . . the terms of an agreement not to sue or settle [sic] litigation upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization . . . invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina.

N.C. Gen. Stat. § 95-79(b) (the "Settlement Provision").[28]

---

27  The Recommendation did not focus on these nuances of the Dues Checkoff Provision.  (See Docket Entry 56 at 71-72.)  However, fuller briefing on a developed record, consideration of Section 375, and close examination of Section 95-79(b) and Section 95-28.5 have clarified the true scope of this provision.

28  As drafted, the statute at a minimum omits a "to" in the phrase "an agreement not to sue or settle litigation," N.C. Gen. (continued...)

Case 1:17-cv-01037-LCB-LPA   Document 124   Filed 02/25/21   Page 35 of 89

As this Court previously held:

> Thus, by its plain terms, [Section 20.5] prohibits, "as against public policy in restraint of trade or commerce," N.C. Gen. Stat. § 95-79(b), any settlement agreement provisions regarding collective bargaining agreements or voluntary union recognition agreements between agricultural providers and FLOC as well as any settlement agreement between FLOC and an agricultural provider. Further, insofar as "recognition of FLOC as [its members'] bargaining representative" indirectly conditions a settlement agreement upon "an agricultural producer's status as a union or nonunion employer" and/or "entry into . . . an agreement with a labor union," N.C. Gen. Stat. § 95-79(b), [Section 20.5] likewise prohibits such agreements.

(Docket Entry 56 at 42 (citation omitted) (ellipsis in original);

see also Docket Entry 62 at 1 (adopting Recommendation).)

Although neither party raises the issue, it bears noting that, "[u]nhappily, the phraseology of [Section 95-79(b)] is not altogether free from ambiguity," Young v. Whitehall Co., 229 N.C.

---

28(...continued)
Stat. § 95-79(b). (Cf. Docket Entry 108-20 at 3 ("[T]he terms of an agreement not to sue or to settle pending litigation upon an agricultural producer's status as a union or nonunion employer . . . ." (highlighting and line number omitted)).) In addition, because, as drafted, "not" could be read to modify the phrase "[to] settle pending litigation," inclusion of the phrase "an agreement to" after the "or" would promote clarity: "an agreement not to sue or [an agreement to] settle litigation," N.C. Gen. Stat. § 95-79(b). In any event, the parties appropriately treat this omission as a typographical error rather than construing the statute to prohibit only an agreement not to sue, "an agreement not to . . . settle," id., and/or "an agreement settle litigation." See State v. Earnhardt, 170 N.C. 725, 86 S.E. 960, 961 (1915) ("The statute . . . should be construed sensibly, and, in order to make sure of the true intent, the meaning of words or phrases may be extended or narrowed or additional terms implied" where "necessary . . . in order to enforce the evident purpose, but this is all subject to the general restriction, that the meaning is to be ascertained from the words of the statute and the subject-matter to which it relates.").

36

360, 367, 49 S.E.2d 797, 801 (1948). In particular, Section 95-79(b) contains ambiguity regarding whether the settlement strictures apply (i) solely to agreements between agricultural producers and labor unions or (ii) more broadly to any settlement agreement a labor union enters. In other words, ambiguity exists regarding whether one should read the statute as prohibiting "[a]ny provision that directly or indirectly conditions . . . the terms of an agreement not to sue or [an agreement to] settle litigation upon an agricultural producer's [i] status as a union or nonunion employer or [ii] entry into or refusal to enter into an agreement with a labor union or labor organization," as the parties generally understand the statute. Alternatively, one could read the statute as prohibiting "[a]ny provision that directly or indirectly conditions . . . the terms of an agreement not to sue or [an agreement to] settle litigation upon [i] an agricultural producer's status as a union or nonunion employer or [ii] entry into or refusal to enter into an agreement with a labor union or labor organization."

The structure of Section 95-79, the legislative history of Section 20.5, and the circumstances surrounding enactment of Section 20.5 confirm the correctness of the first reading. To begin, unlike Section 95-79(a), which applies to all industries in North Carolina, Section 95-79(b) focuses on the agricultural sector, suggesting that its prohibitions apply more narrowly to

37

agreements involving agricultural providers and associated unions. See N.C. Gen. Stat. § 95-79. Moreover, the legislative transcripts reflect a focus solely on interactions with agricultural producers. (See, e.g., Docket Entry 107-6 at 13 ("[Section 20.5] strengthens our right to work statutes by declaring certain agreements involving agriculture producers are against the public policy of North Carolina."); Docket Entry 107-5 at 16 (same).) In addition, the Farm Bureau, who provided the language of Section 20.5 to the General Assembly, informed Governor Cooper and his staff that Section 20.5 only affected farmworker unions. (See Docket Entry 108-8 at 34; Docket Entry 110-2, ¶ 16.) Under the circumstances, Section 20.5 should be construed to apply to settlement agreements between agricultural producers and unions rather than more generally to any union settlement agreement.

## B. First Amendment Challenge

Having resolved the scope of Section 20.5, the analysis turns to the parties' various arguments. Plaintiffs and Defendant each move for summary judgment on Plaintiffs' first-amendment claim. (See Docket Entry 106 at 1; Docket Entry 108 at 1.)[29] The First

---

29  In a footnote, Defendant states:

Defendant continues to assert, and incorporates by reference, the arguments in his motion to dismiss (DE 44, 45) that the Eleventh Amendment bars the claims in this case, and that Plaintiffs lack standing because they cannot demonstrate an injury-in-fact nor show an injury traceable to [Defendant].

(continued...)

38

Amendment decrees that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble . . . ." U.S. Const. amend. I; see also Consolidated Edison Co. of N.Y., Inc. v. Public Serv. Comm'n of N.Y., 447 U.S. 530, 534 (1980) ("The First and Fourteenth Amendments guarantee that no State shall abridge the freedom of speech." (internal quotation marks and brackets omitted)); Louisiana ex rel. Gremillion v. National Ass'n for the Advancement of Colored People, 366 U.S. 293, 296 (1961) ("[F]reedom of association is included in the bundle of First Amendment rights made applicable to the States by the Due Process Clause of the Fourteenth Amendment."). "Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n.5 (1984).

Plaintiffs first contend that the Dues Checkoff Provision violates the First Amendment. (See, e.g., Docket Entry 109 at 22-28.) In particular, they maintain that, as a labor union, FLOC constitutes "an archetype of an expressive association" (id. at 22 (internal quotation marks omitted)), rendering the Dues Checkoff

29(...continued)
(Docket Entry 107 at 15 n.19.)  As Plaintiffs correctly note, Defendant "provides no reason why this Court should reconsider its earlier rejection of these defenses." (Docket Entry 112 at 8 n.2.)

39

Provision "presumptively unconstitutional" (<u>id.</u> at 25 (internal quotation marks omitted)) because of the "harsh penalties, including practically insurmountable obstacles to fundraising" (<u>id.</u> at 27 (internal quotation marks omitted)), that it "selectively" (<u>id.</u> at 2) imposes on FLOC. This contention rests heavily on the notion that <u>Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue</u>, 460 U.S. 575 (1983), provides the "framework for analysis." (Docket Entry 112 at 9 (asserting that, "[b]ecause Plaintiffs claim that [Section 20.5] unjustifiably targets one expressive association for burdensome regulations not imposed on any other group, the proper framework for analysis comes from *Minneapolis Star*").)

That case involved "the question of a State's power to impose a special tax on the press and, by enacting exemptions, to limit its effect to only a few newspapers." <u>Minneapolis Star</u>, 460 U.S. at 576. Specifically, Minnesota altered its tax laws to impose a use tax on the cost of ink and paper used in producing publications, subject to an exemption for the "first $100,000 worth of ink and paper consumed by a publication in any calendar year." <u>Id.</u> at 578. In light of the exemption, only "11 publishers, producing 14 of the 388 paid circulation newspapers in the State, incurred a tax liability in 1974. Star Tribune was one of the 11, and, of the $893,355 collected, it paid $608,634, or roughly two-thirds of the total revenue raised by the tax." <u>Id.</u> "In 1975,

40

13 publishers, producing 16 out of 374 paid circulation papers, paid a tax. That year, Star Tribune again bore roughly two-thirds of the total receipts from the use tax on ink and paper." _Id._ at 579. Contending that the tax violated "the guarantees of freedom of the press and equal protection in the First and Fourteenth Amendments," Star Tribune sued, seeking a refund. _Id._

The United States Supreme Court held that Minnesota's tax violated the First Amendment. In reaching that conclusion, the Supreme Court first observed that, "[c]learly, the First Amendment does not prohibit all regulation of the press. It is beyond dispute that the States and the Federal Government can subject newspapers to generally applicable economic regulations without creating constitutional problems." _Id._ at 581. However, rather than applying "its general sales and use tax to newspapers," Minnesota "created a special tax that applies only to certain publications protected by the First Amendment." _Id._

Observing that "[t]here is substantial evidence that differential taxation of the press would have troubled the Framers of the First Amendment," _id._ at 583, the Supreme Court explored some of the problems inherent in the ability to impose a selective tax on the press, _id._ at 583-85, including that the threat of such taxation "can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important

41

restraint on government," id. at 585. The Supreme Court concluded that "[d]ifferential taxation of the press, then, places such a burden on the interests protected by the First Amendment that [the Supreme Court] cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." Id. After noting that Minnesota failed to offer "adequate justification for the special treatment of newspapers," id. at 590, the Supreme Court further observed that "Minnesota's ink and paper tax violates the First Amendment not only because it singles out the press, but also because it targets a small group of newspapers. The effect of the $100,000 exemption . . . is that only a handful of publishers pay any tax at all, and even fewer pay any significant amount of tax." Id. at 591. The Supreme Court concluded by stating, "[a] tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action. Since Minnesota has offered no satisfactory justification for its tax on the use of ink and paper, the tax violates the First Amendment . . . ." Id. at 592-93.

In sum, Minneapolis Star involves selective taxation of a handful of newspaper publishers. See also id. at 585 ("A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. . . . When the State singles out the press, . . . the political

42

constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute."). The cases Plaintiffs cite in support of applying Minneapolis Star to the instant matter likewise involve taxation and/or regulatory burdens imposed on entities entitled to press-related first-amendment protections. For instance, Plaintiffs contend that "[l]aws that selectively burden an expressive association must satisfy strict scrutiny. *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638-39 (5th Cir. 2012)." (Docket Entry 115 at 8.) They likewise rely on Time Warner for, inter alia, their contention that "'[a] law that targets a small handful of speakers for discriminatory treatment suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.'" (Docket Entry 109 at 26 (quoting Time Warner, 667 F.3d at 640).)

The case from the United States Court of Appeals for the Fifth Circuit cited by Plaintiffs involved "a law that plainly discriminate[d] against a small and identifiable number of cable providers," Time Warner, 667 F.3d at 639, entities that "engage in and transmit speech, and th[us] are entitled to the protection of the speech and press provisions of the First Amendment," id. at 638 (internal quotation marks omitted). Further, because the law "[wa]s not a law of general applicability as it excludes statewide franchises from certain incumbents and singles out elements of the

43

press for special treatment," heightened first-amendment scrutiny applied.  Id. (emphasis added).

Thus, like Minneapolis Star, Time Warner involved a selective press-related burden.  The same holds true for the other cases — specifically, Leathers v. Medlock, 499 U.S. 439 (1991) (see, e.g., Docket Entry 112 at 10) and Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221 (1987) (see, e.g., Docket Entry 115 at 10) — upon which Plaintiffs rely in urging application of the Minneapolis Star "framework" (Docket Entry 112 at 9).  See Leathers, 499 U.S. at 441 ("These consolidated cases require us to consider the constitutionality of a state sales tax that excludes or exempts certain segments of the media but not others."); Arkansas Writers', 481 U.S. at 223 ("The question presented in this case is whether a state sales tax scheme that taxes general interest magazines, but exempts newspapers and religious, professional, trade, and sports journals, violates the First Amendment's guarantee of freedom of the press.").  Further, although Plaintiffs refer to "the press" as "another archetypal form of expressive association" (Docket Entry 112 at 9), they provide no authority for this assertion or for application of Minneapolis Star to a case involving a union, let alone in the circumstances presented here.  (See Docket Entry 109 at 22-28; Docket Entry 112 at 8-13; Docket Entry 115 at 8-11.) Moreover, unlike with the press, a government's selective treatment of unions does not necessarily raise first-amendment concerns.

44

See, e.g., South Carolina Educ. Ass'n v. Campbell, 883 F.2d 1251, 1253-57 (4th Cir. 1989) (rejecting argument that statute permitting payroll deductions for one public sector association, allegedly "a 'similarly situated' but 'less controversial' organization than the [plaintiff union]," id. at 1253, but not plaintiff union violated First Amendment).

In any event, Plaintiffs' Minneapolis Star and intertwined viewpoint discrimination[30] assertions (see Docket Entry 109 at 26-28; Docket Entry 112 at 11-12) rely on a misreading of the Dues Checkoff Provision. Specifically, Plaintiffs contend that the Dues Checkoff Provision precludes payment of union due through employer withholding. (See, e.g., Docket Entry 109 at 13 ("[Section 20.5] would leave FLOC members like Plaintiff Alvarado-Hernandez without viable alternatives to pay their dues."), 25-26 ("There is no justification for [Section 20.5's] interference with FLOC's access to union dues, let alone a compelling justification that could survive strict scrutiny under *Minneapolis Star*."), 27 ("[Section 20.5] singles out a specific group, FLOC, to be subject to harsh penalties, including practically insurmountable obstacles to fundraising." (internal quotation marks omitted)); Docket Entry 112 at 10 (asserting that "Section 20.5 imposes onerous — indeed,

---

30    "Viewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." United Food & Commercial Workers Local 99 v. Bennett, 934 F. Supp. 2d 1167, 1182 (D. Ariz. 2013) (internal quotation marks omitted).

insurmountable — burdens on a single expressive association and its members by restricting their ability to benefit from payroll deduction" and that "it imposes sweeping restrictions that bar private agricultural employers from voluntarily administering dues deductions authorized by their employees" (emphasis added)), 12 (asserting that Section 20.5 "selectively depriv[es] a single expressive association of elective payroll deductions that are available to every other entity").)

As discussed above, however, the Dues Checkoff Provision does not "prohibit unions or farmers from collecting dues, only from contractually requiring farmers to do it on the union's behalf" (Docket Entry 111 at 5). Further, Plaintiffs provide no evidence regarding the impact that the Dues Checkoff Provision, properly understood, imposes on FLOC or its members. (See generally Docket Entries 109, 112, 115; cf. Docket Entry 108-11 at 48 (explaining, in FLOC deposition: "[A]fter this law that would basically ban a CBA that has a guaranteed dues deduction, some of the growers ma[d]e it clear that deducting dues is no big deal and it's certainly not anything that they really care about or feel like it wastes a lot of time. So we thought, maybe some of the — the growers or most or hopefully all would — would sort of voluntarily — we could . . . ask them to deduct dues, and they could either say yes or no." (verbal fillers omitted)).) Accordingly, Plaintiffs

have failed to establish that the Dues Checkoff Provision violates their first-amendment rights. See Clark, 468 U.S. at 293 n.5.

Next, Defendant maintains that "[t]he Settlement Provision of Section 20.5 does not implicate the First Amendment either." (Docket Entry 107 at 19.) In that regard, Defendant argues that "Section 20.5 does not prohibit anyone from settling litigation or potential litigation." (Id.) As the Court previously recognized, however, the Settlement Provision prohibits "any settlement agreement provisions regarding collective bargaining agreements or voluntary union recognition agreements between agricultural providers and FLOC as well as any settlement agreement between FLOC and an agricultural provider." (Docket Entry 56 at 42 (emphasis added); see also Docket Entry 62 at 1 (adopting Recommendation).) Notably, Defendant neglects to develop an argument that, properly understood, the Settlement Provision does not violate the First Amendment. (See Docket Entry 107 at 19-23; Docket Entry 111 at 30-33; Docket Entry 116 at 10.)

The Supreme Court has repeatedly recognized "the basic right to group legal action," including the fact "that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." United Transp. Union v. State Bar of Mich., 401 U.S. 576, 585 (1971); see also, e.g., National Ass'n for Advancement of Colored People v. Button, 371 U.S. 415, 430 (1963) ("[T]here is no longer

47

any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity," including "the right 'to engage in association for the advancement of beliefs and ideas.'"); Capital Associated Indus., Inc. v. Cooper, 129 F. Supp. 3d 281, 290 (M.D.N.C. 2015) ("[A] series of Supreme Court decisions [have] ma[d]e clear that the First Amendment of the United States Constitution protects collective activity to enforce constitutional rights through litigation.").[31]

---

31 The United States Court of Appeals for the Second Circuit summarized these decisions as follows:

> The right to associate freely is not mentioned in the text of the First Amendment, but has been derived over time as implicit in and supportive of the rights identified in that amendment. Thus, drawing upon the rights of both petition and expression, the Supreme Court has held that the First Amendment bears on some situations in which clients and attorneys seek each other out to pursue litigation. One line of cases . . . relies on the expressive value of certain types of associational litigation. In *NAACP v. Button* for example, the Court held that the NAACP's work on anti-segregation cases — and the organization's efforts to recruit plaintiffs for those cases — constituted "modes of expression and association protected by the First and Fourteenth Amendments." 371 U.S. 415, 428-29 (1963). . . . .

> Another line of Supreme Court authority recognizes that clients seeking legal representation — specifically in the context of union activity — have a right protected by the First Amendment to associate with each other to obtain legal representation and vindicate their rights effectively. *See, e.g., Bhd. of R.R. Trainmen v. Va. ex rel. Va. State Bar*, 377 U.S. 1, 5 (1964). In this vein, the Court has held that "the First Amendment's guarantees of free speech, petition, and assembly give railroad workers the right to cooperate" to seek legal counsel, and that "collective activity undertaken to obtain
> (continued...)

Case 1:17-cv-01037-LCB-LPA   Document 124   Filed 02/25/21   Page 48 of 89

As particularly relevant here, the Supreme Court has found that an entity's litigation-related activities warrant first-amendment protection where, <u>inter alia</u>, the entity "engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." <u>In re Primus</u>, 436 U.S. 412, 431 (1978) (ACLU); <u>Button</u>, 371 U.S. at 419-20, 429-30 (NAACP). This remains so, because, as the Supreme Court explained regarding the NAACP:

> In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression. Groups which find themselves unable to achieve their objectives through the ballot frequently turn to the courts. Just as it was true of the opponents of New Deal legislation during the 1930's, for example, no less is it true of the Negro minority today. And under the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances.

>    * * * * * *

---

31(...continued)
meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transp. Union*[,] 401 U.S. [at 585.] This right has attached to the activities of workers who associate with each other to obtain counsel and further their litigation ends, and to the union as a proxy for the workers in their exercise of associational rights.

<u>Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts, App. Div. of the Sup. Ct. of N.Y.</u>, 852 F.3d 178, 184-85 (2d Cir. 2017) (emphasis and certain brackets in original) (parallel citations and parenthetical omitted).

The NAACP is not a conventional political party; but the litigation it assists, while serving to vindicate the legal rights of members of the American Negro community, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society. For such a group, association for litigation may be the most effective form of political association.

Button, 371 U.S. 415, 429-31 (footnotes omitted); see also id. at 429 ("[A]bstract discussion is not the only species of communication which the Constitution protects; the First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion.").

Here, the record establishes that FLOC likewise "engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public," In re Primus, 436 U.S. at 431, bringing its litigation efforts "within the generous zone of First Amendment protection reserved for associational freedoms," id. (See, e.g., Docket Entry 108-1, ¶¶ 22-27; Docket Entry 108-3, ¶¶ 17-21; Docket Entry 108-10, ¶¶ 65-67.) The record further reflects that the litigation that FLOC and its members pursue frequently involves claims against agricultural producers. (See, e.g., Docket Entry 108-3, ¶¶ 34, 35, 54 (discussing specific legal disputes); Docket Entry 107-29 (letters outlining FLOC members' legal claims); Docket Entries 112-8 to 112-15 (orders approving settlement agreements).) However, the Settlement Provision prohibits, inter alia, FLOC from

50

entering into any settlement agreement with an agricultural producer. See N.C. Gen. Stat. § 95-79(b).

As the Supreme Court has observed, settlements serve an important function in our judicial system. See, e.g., Marek v. Chesny, 473 U.S. 1, 10 (1985) (observing that Federal Rule of Civil Procedure 68 "expresses a clear policy of favoring settlement of all lawsuits," which "help[s] to lessen docket congestion," and that, in addition to reducing judicial system burdens, "settlements rather than litigation will serve the interests of plaintiffs as well as defendants" (internal quotation marks omitted)); accord Jenkins v. Fields, 240 N.C. 776, 778, 83 S.E.2d 908, 910-11 (1954) ("The law looks with favor on litigants compromising and settling their differences.").[32]   Indeed, as the parties both agree, "[l]itigation can be complex, timeconsuming, uncertain, and expensive." (Docket Entry 109 at 29; accord Docket Entry 111 at 32.)  In sum, by depriving FLOC of the right to enter into settlement agreements with agricultural providers, the Settlement Provision interferes with FLOC and its members' "collective activity undertaken to obtain meaningful access to the courts[, which] is a fundamental right within the protection of the First Amendment," United Transp. Union, 401 U.S. at 585.

---

32  Further, North Carolina has "declared as the public policy of this State that the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes." N.C. Gen. Stat. § 95-32.

The Settlement Provision therefore "must withstand the 'exacting scrutiny applicable to limitations on core First Amendment rights.'" In re Primus, 436 U.S. at 432. Defendant maintains that the Settlement Provision passes constitutional muster because it "is narrowly tailored to serve a legitimate government interest," in that it "does not prohibit settlements of" lawsuits against farmers, but "simply separates the CBA from the litigation, as the legislature felt that lawsuits (and the litigation costs they bring) were being used to unfairly force farmers into signing CBAs, and that such coupling undermined the State's longstanding [right-to-work] policy." (Docket Entry 107 at 22-23; see also Docket Entry 111 at 31 ("[Section 20.5] does not prohibit a union from entering into a settlement agreement with a producer or anyone else; it only prohibits a settlement requiring a producer to enter into (or not enter into) *a separate* agreement with a labor union." (emphasis in original)).) Contrary to Defendant's contentions, the Settlement Provision does preclude all settlement agreements between FLOC and agricultural producers. (See Docket Entry 56 at 42.) Moreover, in presenting this argument, Defendant tacitly concedes that Section 20.5 "[i]s not drawn narrowly to advance the asserted goal," In re Primus, 436 U.S. at 424, for rather than "simply separat[ing] the CBA from the litigation" (Docket Entry 107 at 22), it broadly prohibits all settlement agreements between FLOC and agricultural producers.

Therefore, the Settlement Provision violates the First Amendment. The Court should grant Plaintiffs summary judgment on that aspect of their first-amendment claim, but award Defendant summary judgment on Plaintiffs' claim that the Dues Checkoff Provision violates their first-amendment rights.

### C. Equal Protection Challenge

The parties also seek summary judgment on Plaintiffs' equal protection claim. (See Docket Entry 106 at 1; Docket Entry 108 at 1; see also Docket Entry 108, ¶ 6.) The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "[T]he purpose of the [E]qual [P]rotection [C]lause . . . is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination . . . ." Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (internal quotation marks omitted). Accordingly, although the Equal Protection Clause "does not take from the States all power of classification," Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 271 (1979), it "keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike," Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

To succeed on their equal protection claim, Plaintiffs

> must first demonstrate that [they] ha[ve] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this

53

> showing is made, the court proceeds to determine whether
> the disparity in treatment can be justified under the
> requisite level of scrutiny.

Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). Under

this analysis, "[i]f the classification utilized is explicitly

stated on the face of a statute or in the reasons given for its

administration or enforcement, then the equal protection analysis

requires [courts] to determine whether an appropriate relationship

exists between the legislative purpose and the classification

adopted to achieve that purpose." Sylvia Dev. Corp. v. Calvert

Cty., 48 F.3d 810, 819 (4th Cir. 1995). "[I]f a law neither

burdens a fundamental right nor targets a suspect class, [courts]

will uphold the legislative classification so long as it bears a

rational relation to some legitimate end." Romer v. Evans, 517

U.S. 620, 631 (1996). However, if the law either burdens a

fundamental right or targets a suspect class, it will only survive

if the State "demonstrate[s] that its classification has been

precisely tailored to serve a compelling governmental interest."

Plyler v. Doe, 457 U.S. 202, 217 (1982).[33]

---

33  Put another way:

> Ordinarily, a state regulation or policy will be
> presumed to be valid and will be sustained if the
> classification is rationally related to a legitimate
> state interest. When the state classifies by race,
> alienage, or national origin, however, special concerns
> are implicated. Such factors are "seldom relevant to the
> achievement of any legitimate state interest" and,
> therefore, "are deemed to reflect prejudice and antipathy
> — a view that those in the burdened class are not as
> (continued...)

54

Here, Plaintiffs contend:

Section 20.5 violates the Equal Protection Clause of the Fourteenth Amendment by uniquely and punitively stripping from agricultural employers, farmworkers, and farmworker unions, the right to voluntarily enter certain legally binding agreements. To succeed on their equal protection claim, Plaintiffs must first demonstrate that they have been treated differently than others with whom they are similarly situated and that such unequal treatment was intentional. *Morrison*[,] 239 F.3d [at 654.] This discrimination and intent are clear on the face of the [Section 20.5], which singles out farmworkers and their unions for differential treatment compared to all other private sector workers in the state. DE 56 at 71; DE 34-2; *see also* N.C. Gen. Stat. § 95-25.8(a)(2) (providing that employees may authorize wage deductions for their convenience).

(Docket Entry 109 at 15.)

As an initial matter, Defendant's "Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment" (Docket Entry 111 at 1) maintains that, "[b]ecause agricultural workers are uniquely exempted from the NLRA, 'farmworkers and their unions' are not even similarly situated to 'all other private sector workers in the state.'" (Id. at 17 (quoting Docket Entry 109 at 15).) Thus, Defendant asserts, "Plaintiffs' equal-protection challenge to the

---

33(...continued)
worthy or deserving as others." Thus, . . . classifications which are based upon these factors, or which impinge upon fundamental rights protected by the Constitution, are subjected to stricter scrutiny, sustained only if they are narrowly tailored to serve a compelling state interest.

Morrison, 239 F.3d at 654 (citations omitted).

55

Checkoff Provision must fail." (Id.)[34] Plaintiffs respond that "the NLRA excludes many other categories of employees," but North Carolina does not similarly subject them to the restrictions Section 20.5 imposes. (Docket Entry 115 at 5 (citing 29 U.S.C. § 152(3) (identifying employees exempt from NLRA, including "any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, . . . or any individual employed as a supervisor")).) Plaintiffs further represent that they "ha[ve] been unable to locate any other state [statute] equivalent to Section 20.5's targeted withdrawal of dues checkoffs and settlement rights from farmworkers, and neither Defendant nor [the Farm Bureau] have cited any." (Docket Entry 115 at 5.) The undersigned's research similarly disclosed no state statute comparable to the Dues Checkoff Provision. Accordingly, Plaintiffs have satisfied that, for purposes of their equal protection challenge, they remain similarly situated to at least "all other private sector employees" exempt from the NLRA.

Turning to the applicable standard, the parties variously assert that "heightened scrutiny is appropriate" (id. at 2 (capitalization and emphasis omitted); accord Docket Entry 109 at 16-17; Docket Entry 112 at 23); that rational basis review applies (see, e.g., Docket Entry 107 at 26-27; Docket Entry 109 at 22 ("[Section 20.5] fails rational basis review")); and that strict

---

34  Notably, Defendant does not raise a similar challenge regarding the Settlement Provision. (See id. at 17-18.)

scrutiny adheres because "Plaintiffs' First Amendment rights are significantly burdened by [Section 20.5]" (Docket Entry 109 at 22 n.13; accord Docket Entry 112 at 22). In this regard, Plaintiffs first argue that "heightened judicial solicitude is appropriate" (Docket Entry 109 at 16 (internal quotation marks omitted)) "because the people most disadvantaged by Section 20.5, Latinx non-citizen farmworkers with limited ability to influence the legislative process, epitomize a 'discrete and insular' minority" (Docket Entry 112 at 23). Plaintiffs further contend that

> [t]he [United States Court of Appeals for the] Fourth Circuit recently held that courts should consider four factors in determining whether to apply heightened scrutiny: whether the disadvantaged class (1) has been historically subject to discrimination; (2) has a defining characteristic that relates to its ability to perform or contribute to society; (3) is definable as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) is a minority lacking political power.

(Docket Entry 115 at 2-3 (citing Grimm v. Gloucester Cty. Sch. Bd., 972 F.3d 586, 611 (4th Cir. 2020), as amended (Aug. 28, 2020)).)

As the Fourth Circuit explained in that cited case, courts consider the identified "four factors to determine whether a group of people constitutes a suspect or quasi-suspect class." Grimm, 972 F.3d at 611. To undertake this analysis, the Court first must properly identify Plaintiffs' proposed class. Although their heightened scrutiny contentions assert that "the people most disadvantaged by Section 20.5 [constitute] Latinx non-citizen farmworkers" (Docket Entry 112 at 23), and that "FLOC is a union

57

overwhelmingly comprised of Mexican guestworkers" (Docket Entry 109 at 16), Plaintiffs do not confine their class solely to H-2A workers. (See, e.g., Docket Entry 115 at 3 ("As Plaintiffs show, all of these factors weigh in favor of applying heightened scrutiny to Section 20.5's targeted discrimination against North Carolina farmworkers and their union.").) Rather, the relevant class consists more generally of all "North Carolina farmworkers and their union" (id.; accord, e.g., Docket Entry 109 at 15 (asserting that Section 20.5 "singles out farmworkers and their unions for differential treatment compared to all other private sector workers in the state")).[35]

In part because Plaintiffs fail to directly apply the suspect-class factors to the instant matter (see Docket Entry 109 at 16-17; Docket Entry 112 at 23; Docket Entry 115 at 2-3), it remains unclear what "obvious, immutable, or distinguishing characteristics" Plaintiffs assert "define[ them] as a discrete group," Grimm, 972 at 611. Based on a footnote in "Plaintiffs' Reply in Support of Summary Judgment" (Docket Entry 115 at 1), Plaintiffs appear to frame their distinguishing characteristic as

_____

35   This broader definition accords with Section 20.5, which does not confine its strictures solely to H-2A workers.  See N.C. Gen. Stat. § 95-79(b); see also Sylvia Dev., 48 F.3d at 819 ("If the classification utilized is explicitly stated on the face of a statute . . ., then the equal protection analysis requires [courts] to determine whether an appropriate relationship exists between the legislative purpose and the classification adopted to achieve that purpose.  On the other hand, if a classification is not explicitly stated, the plaintiff bears the initial burden of proving that a classification was nonetheless intentionally utilized.").

their "overwhelmingly . . . Latinx non-citizen" nature (see id. at 3 n.1 ("With regard to the second factor, neither North Carolina farmworkers' status as farmworkers, nor as a group distinguishable because it is overwhelmingly constituted of Latinx non-citizens, bears any relation to their ability to contribute to or function in society.")). However, Plaintiffs have not established the citizenship status of a majority of North Carolina farmworkers.

In this regard, the parties stipulate that, "[i]n 2018, an estimated 100,000 workers worked as farmworkers in North Carolina." (Docket Entry 108-1, ¶ 1.) Per Flores, "[i]n 2017, 2018, and 2019[,] there were an estimated 20,700, 21,600, and 21,600 H-2A workers in North Carolina." (Docket Entry 108-3, ¶ 7.) Thus, an estimated 80,000 North Carolina farmworkers do not fall within the H-2A classification. The parties do stipulate that "[a]pproximately 95% of farmworkers in North Carolina are of Hispanic/Latino origin, primarily from Mexico. Many are primarily monolingual in Spanish." (Docket Entry 108-1, ¶ 2.) In addition, Flores averred that "[a]bout 95% of FLOC's dues-paying North Carolina members are H-2A 'guestworkers' from Mexico who come to North Carolina each year for five to ten months to perform seasonal agricultural work." (Docket Entry 108-3, ¶ 7.) Relying solely on the foregoing stipulation and averment, Plaintiffs argue that "the burdens of Section 20.5 fall overwhelmingly on the Latinx non-citizens who comprise almost all of FLOC's membership and 95%

59

of the state's farmworker population" (Docket Entry 112 at 17 (citing Docket Entry 108-1, ¶ 2; Docket Entry 108-3, ¶ 7)); however, neither statement upon which Plaintiffs rely for this assertion addresses the citizenship status any non-H-2A farmworkers. (See Docket Entry 108-1, ¶ 2; Docket Entry 108-3, ¶ 7.)

Nor does Plaintiffs' briefing otherwise address the citizenship status of those 80,000 (non-H-2A) farmworkers. (See generally Docket Entries 109, 112, 115.) Conversely, one of Plaintiffs' expert reports states that "the Farm Act was passed in the context of a growing Latinx population in state, many of whom are citizens and will reach voting age over the next decade." (Docket Entry 108-28, ¶ 85.) Another of Plaintiffs' experts, who studies farmworkers in North Carolina (see Docket Entry 108-2, ¶¶ 6-7), reports that "[m]any farmworkers are adult males, but women and children as young as ten years old work legally as farmworkers, and some children under ten years also work with their parents" (id., ¶ 21). Various United States agencies estimate that between 30,000 and approximately 80,000 children aged ten to seventeen worked as farmworkers in the United States each year between 2005 and 2016; of the children involved in Plaintiffs' expert's research projects, "about 80% were born in the United States." (Id., ¶ 22.)

Further, a national survey of agricultural workers, referenced in another one of Plaintiffs' expert reports (see Docket Entry 108-10 at 10 n.8), indicates that "[j]ust more than half of all farmworkers in 2015-2016 had work authorization (51%): 29 percent were U.S. citizens, 21 percent were legal permanent residents, and 1 percent had work authorization through some other visa program," Findings from the National Agricultural Workers Survey (NAWS) 2015-2016: A Demographic and Employment Profile of United States Farmworkers, available at https://www.dol.gov/sites/dolgov/files/ETA/naws/pdfs/NAWS_Research_Report_13.pdf (last visited Feb. 25, 2021). Given that roughly 20% of North Carolina's agricultural workforce "ha[ve] work authorization through some other visa program," id., one cannot even extrapolate from this national survey to conclude that only 29% of North Carolina farmworkers constitute citizens (with another 21% constituting legal permanent residents, a group entitled to benefits not extended those lacking legal residency, see Plyler, 457 U.S. at 219). Thus, on the current record, it remains speculative whether a majority of North Carolina farmworkers qualify as non-citizens.

Moreover, as evidence of historical discrimination, Plaintiffs point to "a political climate in which a legislature with few to no Latinx members has frequently acted to impose harsh restrictions on non-citizens." (Docket Entry 109 at 16.) Given the lack of evidence regarding the "non-citizen" nature of North Carolina

farmworkers, such legislation falls short of establishing "whether the class [in question] has historically been subject to discrimination," Grimm, 972 F.3d at 611. Nor do references to historic racial segregation and associated exclusions in agriculture (see Docket Entry 109 at 16 (citing Docket Entry 108-28, ¶¶ 17-20, 68, 72; Docket Entry 34-13, ¶¶ 8-21)) suffice, for the referenced restrictions largely targeted African American citizens, not Latinx non-citizens (see Docket Entry 108-28, ¶¶ 17-20, 68, 72; Docket Entry 34-13, ¶¶ 8-21).

In sum, Plaintiffs fail to establish that "North Carolina farmworkers and their union" qualify as a suspect or quasi-suspect class, as necessary for application of "heightened scrutiny." (Docket Entry 115 at 2-3.) However, in "Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment" (Docket Entry 112 at 1), Plaintiffs alternatively contend that "[t]he Court must apply strict scrutiny to its review of Section 20.5 if Plaintiffs can demonstrate that discrimination on the basis of race, national origin, or alienage was a 'motivating factor' in its enactment." (Id. at 16 (citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977)).) Pertinent to that contention, the Fourth Circuit recently explained:

> Determining whether a statute was enacted with discriminatory intent is a factual question involving a two-step process. *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). First, the [c]hallengers bear the burden of

showing that racial discrimination was a "'substantial' or 'motivating' factor behind enactment of the law." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Satisfying that burden requires looking at the four factors from the Supreme Court's *Arlington Heights* decision: (1) historical background; (2) the specific sequence of events leading to the law's enactment, including any departures from the normal legislative process; (3) the law's legislative history; and (4) whether the law "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 265-69. And in doing so, the district court must afford the state legislature a "presumption" of good faith. *Abbott*[ *v. Perez*, __ U.S. __, __], 138 S. Ct. [2305,] 2324 [(2018)]. For "a finding of past discrimination" neither shifts the "allocation of the burden of proof" nor removes the "presumption of legislative good faith." *Id.*; *see also City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."); [*North Carolina State Conference of NAACP v.*] *McCrory*, 831 F.3d [204,] 241 [(4th Cir. 2016)] (finding that we cannot "freeze North Carolina election law in place" as it existed before the 2013 Omnibus Law).

North Carolina State Conference of the NAACP v. Raymond, 981 F.3d

295, 303 (4th Cir. 2020) (parallel citations omitted).

As to the fourth factor, Plaintiffs assert, in full:

"The impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997). In the name of benefiting a group that is 90% white (North Carolina farmers), the burdens of Section 20.5 fall overwhelmingly on the Latinx non-citizens who comprise almost all of FLOC's membership and 95% of the state's farmworker population. DE 108-1 ¶¶ 2, 11; DE 108-3 ¶ 7. This overwhelming disparate impact indicates legislative intent to undermine the contractual and litigation rights of farmworkers based on who they are.

(Docket Entry 112 at 17.)

It bears noting that, as even Plaintiffs concede, Section 20.5 imposes limitations on, <u>inter alia</u>, farmers, farmworkers, and FLOC. (<u>See, e.g.</u>, Docket Entry 109 at 15 ("Section 20.5 violates the Equal Protection Clause of the Fourteenth Amendment by uniquely and punitively stripping from agricultural employers, farmworkers, and farmworker unions, the right to voluntarily enter certain legally binding agreements.").) Nevertheless, because Section 20.5 ends FLOC's and its members' ability to include dues checkoff provisions in CBAs — thus leaving such dues withholding at farmers' discretion — and "prevents FLOC and its members from using litigation to negotiate important benefits, such as union recognition, entry into a CBA, or an agreement to remain neutral during a union campaign" (<u>id.</u> at 30), one reasonably may infer the Section 20.5 primarily disadvantages FLOC's largely Latinx non-citizen membership rather than the primarily white farmers for whose benefit the General Assembly enacted the law. (<u>See</u> Docket Entry 107-6 at 12-15.) Accordingly, this (fourth) factor weighs in Plaintiffs' favor.

As to "historical background" (i.e., the first <u>Arlington Heights</u> factor), Plaintiffs maintain:

> The history of labor laws, particularly in North Carolina, reflects a legacy of racially discriminatory exclusions from worker protections and racially motivated restrictions on union organizing. *See* [Docket Entry 112 at] 7. There is also a significant history of racial discrimination within the agricultural industry, particularly in the southeast. *See, e.g.*[,] *Pigford v. Glickman*, 185 F.R.D. 82, 86–88, 104 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000). As courts have recognized, North Carolina's suppression of minority

64

> voices continues to the present day. *See McCrory*, 831
> F.3d at 223 ("North Carolina's history of race
> discrimination and recent patterns of official
> discrimination" are "particularly relevant" to the
> intentional discrimination inquiry).

(Docket Entry 112 at 17-18 ("see also" citation omitted).)

These arguments fall short. First, the historic discrimination in the agricultural sector to which Plaintiffs point involved discrimination against African American citizen farmworkers, especially in the New Deal era and 1940s. (<u>See, e.g., id.</u> at 7.) Similarly, the "significant history of racial discrimination within the agricultural industry" (<u>id.</u> at 17) identified in <u>Pigford</u> involved discrimination against African American farmers. <u>See, e.g.</u>, <u>Pigford</u>, 185 F.R.D. at 85 ("For decades . . . the Department of Agriculture and the county commissioners discriminated against African American farmers when they denied, delayed or otherwise frustrated the applications of those farmers for farm loans and other credit and benefit programs. Further compounding the problem, in 1983 the Department of Agriculture disbanded its Office of Civil Rights and stopped responding to claims of discrimination. These events were the culmination of a string of broken promises that had been made to African American farmers for well over a century."). Finally, the race discrimination involved in recent election litigation similarly affected African Americans. <u>See, e.g.</u>, <u>McCrory</u>, 831 F.3d at 223-25 (explaining that "[t]he record is replete with evidence

65

of instances . . . in which the North Carolina legislature has attempted to suppress and dilute the voting rights of African Americans," id. at 223, and detailing examples).

The generalized, dated, and factually inapposite "historical background" upon which Plaintiffs rely stands in stark contrast to the longstanding, ongoing, and factually similar circumstances that the Fourth Circuit found "support[ed] a finding of discriminatory intent" under the "historical background" factor in the election context. Id. at 227; see id. at 223-27. Consideration of what Plaintiffs characterize as "nearly a decade's worth of anti-immigrant legislation in the state" (Docket Entry 112 at 18) does not change this analysis.[36]

The legislation at issue consists of "a minimum of eleven [provisions]" (Docket Entry 109 at 12)[37] proposed or enacted between the 2009-2010 General Assembly Session and 2017-2018 General Assembly Session. (Docket Entry 108-1, ¶¶ 33-43.) Nine of these

_____

36 Plaintiffs address this legislative activity under the "Sequence of Events" factor (see id. at 18-19 (emphasis omitted)), "[b]ut the appropriate place to consider th[is activity] is under the 'historical background' factor," Raymond, 981 F.3d at 305.

37 More specifically, these provisions took the form of a total of 15 bills, as in two instances, the legislature proposed similar bills on the same topic in different years. (See Docket Entry 108-1, ¶¶ 33-43.) The relevant bills aimed to preclude attendance by undocumented immigrants at state colleges and universities (see id., ¶ 33) and involved a "State Law to Provide for Acceptable ID's" that excluded consular documents from the acceptable means of identification (id., ¶ 35 (internal quotation marks omitted)). This Opinion follows Plaintiffs' example in treating those bills collectively. (See Docket Entry 109 at 12.)

66

bills affected (at least some) non-citizens; the remaining two impacted farmworkers. (See id.) Representative Dixon sponsored two of these bills: the 2013 amendment to North Carolina General Statute Section 95-79 (id., ¶ 38) and a bill during the 2011-2012 Session that "did not include consular documents in its list of 'acceptable forms of identification for use in determining a person's actual identity by a justice, judge, clerk, magistrate, law enforcement officer, or other government official'" (id., ¶ 35). Senator Jackson sponsored another bill, entitled "Modifications/Certain Farm Buildings," which would exempt migrant farmworker housing "from any requirements in the fire prevention code for installation of an automatic sprinkler system" if the housing met certain criteria. (Id., ¶ 40 (internal quotation marks omitted).) Particularly given that Plaintiffs have not established the predominantly non-citizen nature of North Carolina's general farmworker population, this legislative record does little to override the presumption of good faith that attaches to the enactments of the General Assembly. See Raymond, 981 F.3d at 307-09; see also Greater Birmingham Ministries v. Secretary of State for Ala., 966 F.3d 1202, 1228 (11th Cir. 2020) ("The [p]laintiffs' position is weakened significantly by the fact that the evidence presented in this case is largely unconnected to the passage of the actual law in question.").

67

Plaintiffs further assert that "Section 20.5 was passed in reaction to over a decade of organizing and litigating efforts and successes by FLOC and its Latinx, non-citizen members — including FLOC's achievement of a CBA with NCGA, the largest H-2A employer in the nation, and a public advocacy campaign aimed at exposing worker mistreatment on a farm owned by Senator Brent Jackson." (Docket Entry 112 at 18.) Defendant does not directly dispute this contention. (See Docket Entry 116 at 11-13.) Nevertheless, on such facts, it remains equally plausible — indeed, although courts must refrain from relying too heavily on "the comments of a few individual legislators" in ascertaining legislative intent, Raymond, 981 F.3d at 307, perhaps even more plausible given the exchange between Representative Dixon and Representative Meyer (see Docket Entry 107-6 at 12-15) — that anti-union views rather than bias against "Latinx non-citizens" motivated Section 20.5's enactment. Accordingly, the historical background factor provides highly limited, if any, support for Plaintiffs' position.

As to the second factor identified in Arlington Heights (i.e., the relevant sequence of events), Plaintiffs assert that "Section 20.5 was enacted in a hasty and non-transparent fashion." (Docket Entry 112 at 19.) In this regard, Plaintiffs allege:

> Section 20.5 was introduced on the House floor around 4:47 PM on June 28, 2017, just prior to the third and final vote to adopt the Farm Act. By that point, the Farm Act had already undergone five public hearings. Because the amendment was introduced on the House floor and maintained in the final conference committee report

68

around 11:00 PM that evening, there was never an opportunity for the public to comment during consideration of the amendment.

Debate in the General Assembly regarding the amendment lasted less than ten minutes.

(Docket Entry 31, ¶¶ 72-73 (internal numbering omitted).)[38]

The General Assembly approved Section 20.5 in the waning days of a legislative session. See https://www.ncleg.gov/Documents/2#House/2017 (last visited Feb. 25, 2021) (containing no House calendars between June 29, 2017, and August 3, 2017, identified as "Reconvened"); https://www.ncleg.gov/Documents/2#Senate/2017 (last visited Feb. 25, 2021) (containing no Senate calendars between June 30, 2017, and August 3, 2017, identified as "Reconvened Session"). According to the Farm Bureau, at the same time that it received word that Senate Bill 375 "would not be able to pass the House," but that "it may be possible to get narrower legislative language that focused only on agriculture through the House," the "Farm Act was being considered on the House floor." (Docket Entry 110-2, ¶ 16.) The Farm Bureau further indicated that "[i]t was late in the session and there were very few bills that were still pending at the time. However, the 2017 Farm Act was still pending in the House." (Id.) Accordingly, the Farm Bureau proposed adding

---

38 Although Plaintiffs similarly contend in their summary judgment briefing that Section 20.5 received "less than ten minutes' debate" (Docket Entry 112 at 19; accord Docket Entry 109 at 11), they offer no evidence regarding the duration of the debate, the timing of the various events on June 28, 2017, or the number of previous public hearings.

69

Section 20.5 to the Farm Act (id.), and "Representative Lewis' staff identified State Representative Jimmy Dixon, chair of the House Agriculture Committee, to present the amendment during the final day of debate on the Farm Act" (id., ¶ 17).

The Farm Act's legislative history reflects that, after passing its second and third readings in the Senate on June 12, 2017, it went to the House on June 13, 2017; it passed its first reading in the House on June 14, 2017; and the House referred it to various House Committees beginning June 14, 2017. See https://www.ncleg.gov/BillLookUp/2017/S615 (last visited Feb. 25, 2021). All committees appear to have reported the Farm Act out favorably as of June 26, 2017, at which point the House placed it on the calendar for June 27, 2017. Id. The Farm Act passed its second reading on June 27, 2017, and on June 28, 2017, the House adopted Section 20.5 and the Farm Act passed its third reading. Id. On June 28, 2017, the House and Senate appointed committees to reconcile their versions of the Farm Act, and each adopted the Farm Act as amended by Section 20.5. Id. The Senate ordered the Farm Act enrolled on June 29, 2017, and sent it to Governor Cooper, who signed it July 12, 2017. Id.

Although the record confirms that the legislature adopted Section 20.5 with limited debate within one evening, the circumstances surrounding Section 20.5's enactment differ markedly from the situation in McCrory, upon which Plaintiffs rely. (See

70

Docket Entry 112 at 19 ("Section 20.5's supporters deliberately introduced it in a manner that guaranteed no opportunity for public hearing and comment; it was added to the Farm Act in a single evening of legislative maneuvering and with less than ten minutes' debate. *Id.* This type of rushed, last-minute procedure is a hallmark of unconstitutional legislation in North Carolina. *See, e.g.*, *McCrory*, 831 F.3d at 227.").) In that case:

> The district court found that[,] prior to <u>Shelby County</u>, SL 2013-381 numbered only sixteen pages and contained none of the challenged provisions, with the exception of a much less restrictive photo ID requirement. As the court further found, this pre-<u>Shelby County</u> bill was afforded more than three weeks of debate in public hearings and almost three more weeks of debate in the House. For this version of the bill, there was some bipartisan support: "[f]ive House Democrats joined all present Republicans in voting for the voter-ID bill."

> The district court found that SL 2013-381 passed its first read in the Senate on April 25, 2013, where it remained in the Senate Rules Committee. At that time, the Supreme Court had heard argument in <u>Shelby County</u>, but had issued no opinion. "So," as the district court found, "the bill sat." For the next two months, no public debates were had, no public amendments made, and no action taken on the bill.

> Then, on June 25, 2013, the Supreme Court issued its opinion in Shelby County. The very next day, the Chairman of the Senate Rules Committee proclaimed that the legislature "would now move ahead with the full bill," which he recognized would be "omnibus" legislation. After that announcement, no further public debate or action occurred for almost a month. As the district court explained, "[i]t was not until July 23 . . . that an expanded bill, including the election changes challenged in this case, was released."

> The new bill — now fifty-seven pages in length — targeted four voting and registration mechanisms, which had previously expanded access to the franchise, and

71

provided a much more stringent photo ID provision. Post-Shelby County, the change in accepted photo IDs is of particular note: the new ID provision retained only those types of photo ID disproportionately held by whites and excluded those disproportionately held by African Americans. The district court specifically found that "the removal of public assistance IDs" in particular was "suspect," because "a reasonable legislator [would be] aware of the socioeconomic disparities endured by African Americans [and] could have surmised that African Americans would be more likely to possess this form of ID."

Moreover, after the General Assembly finally revealed the expanded SL 2013-381 to the public, the legislature rushed it through the legislative process. The new SL 2013-381 moved through the General Assembly in three days: one day for a public hearing, two days in the Senate, and two hours in the House. The House Democrats who supported the pre-Shelby County bill now opposed it. The House voted on concurrence in the Senate's version, rather than sending the bill to a committee. This meant that the House had no opportunity to offer its own amendments before the up-or-down vote on the legislation; that vote proceeded on strict party lines. The Governor, of the same party as the proponents of the bill, then signed the bill into law. This hurried pace, of course, strongly suggests an attempt to avoid in-depth scrutiny. Indeed, neither this legislature — nor, as far as we can tell, any other legislature in the Country — has ever done so much, so fast, to restrict access to the franchise.

McCrory, 831 F.3d at 227-28 (citations omitted) (ellipsis, emphasis, and certain brackets in original).

Notwithstanding the last-minute addition of Section 20.5 in the final days of the relevant legislative session, the current record simply does not present a comparably "suspicious narrative," id. at 228, to McCrory. However, Plaintiffs assert that "Section 20.5 marks a significant substantive departure from state law and policy related to both union dues and settlement agreements."

72

(Docket Entry 112 at 19.) In particular, Plaintiffs contend that the Dues Checkoff Provision uniquely precludes farmworkers' dues withholding. (Id.) As previously discussed, though, the Dues Checkoff Provision still permits such dues withholding, while restricting only contractual requirements for such withholding.

In addition, Plaintiffs emphasize that "Section 20.5's sweeping restrictions on settlement agreements conflict with longstanding public policy favoring final settlements to resolve legal disputes, especially labor-related disputes." (Id. at 20.) They further contend that "[n]o other group of workers is similarly restricted." (Id.) As North Carolina has "declared as the public policy of this State that the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes," N.C. Gen. Stat. § 95-32, the Settlement Provision does represent a substantive departure from North Carolina law. See Arlington Heights, 429 U.S. at 267 ("Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."). Yet, the record fails to show that such departure stemmed from racial, national origin, and/or alienage considerations rather than, for instance, the anti-union perspective of certain legislators and an influential constituent (see, e.g., Docket Entry 110-2, ¶ 8 (averring that Farm Bureau's State Legislative Director "work[s] with almost every member of the

73

General Assembly in some form or fashion during a legislative
session")).  Under the circumstances, the "sequence of events"
factor, at most, very modestly supports Plaintiffs' position.

As for the last-remaining (third) <u>Arlington Heights</u> factor,
Plaintiffs contend:

> The history of Section 20.5 and its predecessor, SB
> 375, furnish strong evidence that Section 20.5 was passed
> in order to silence FLOC's overwhelmingly Latinx,
> noncitizen membership.  *See* DE 109 at 9-12.
> Representative Dixon, the farmer-legislator who
> introduced the amendment, indicated that farmers and [the
> Farm Bureau] wanted Section 20.5 because "a few of us
> farmers are getting a little bit tired" of persons "from
> out of state" trying to organize farmworkers[.]  *Id.* at
> 10-11.  He further urged that Section 20.5 would serve as
> "a deterrent to outside organizations in making attempts
> to establish unions where folks really don't want or need
> them."  *Id.*  These comments underscore that FLOC —
> despite being based in North Carolina for over a decade,
> DE 108-3 ¶¶ 2, 6 — and its predominantly Latinx
> membership are viewed as outsiders.  This supports an
> inference that discriminatory intent was a motivating
> factor.

(Docket Entry 112 at 20.)

As a preliminary matter, Representative Dixon's "outsider"
comments clearly reference FLOC and its staff (<u>see, e.g.</u>, Docket
Entry Docket Entry 107-6 at 14 ("[T]here are predatory folks that
make a good living coming around and getting people to be
dissatisfied . . . .")), rather than FLOC's "predominantly Latinx
membership" (Docket Entry 112 at 20).  However, "[a]s a
corporation, [FLOC] has no racial identity and cannot be the direct
target of the [legislature's] alleged [racial] discrimination."
<u>Arlington Heights</u>, 429 U.S. at 263.  Moreover, although

74

Representative Dixon's comments reflect an anti-union sentiment,[39] they do not suggest racial, alienage, or national origin discrimination. (See Docket Entry 107-6 at 12-15; see also Docket Entry 108-25 at 2, 4 (documenting that Senator Jackson and Representative Dixon "believe that [Section 20.5] will enhance our local agricultural community and possibly be a deterrent to outside organizations in making attempts to establish unions where folks really don't want them or need them" (internal quotation marks omitted)).) Further, although Representative Dixon's "contemporaneous statements" in proposing Section 20.5 "may be highly relevant," Arlington Heights, 429 U.S. at 268, the admonition that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it," United States v. O'Brien, 391 U.S. 367, 384 (1968), possesses particular force here, as the only ground urged for the Senate's passage of Section 20.5 appeared as follows: "Section 20.5 just strengthens our right to work statutes by declaring certain agreements involving agricultural producers are [against] public policy" (Docket Entry 107-5 at 16).

───────────

39 Neither FLOC's status as a union nor its members' status as union members gives rise to suspect-class status for equal-protection purposes. See City of Charlotte v. Local 660, Int'l Ass'n of Firefighters, 426 U.S. 283, 286 (1976) ("Since it is not here asserted and this Court would reject such a contention if it were made that respondents' status as union members or their interest in obtaining a dues checkoff is such as to entitle them to special treatment under the Equal Protection Clause, the city's practice must meet only a relatively relaxed standard of reasonableness in order to survive constitutional scrutiny.").

75

Finally, to the extent that Plaintiffs focus on Senate Bill 375, the "predecessor" bill, as "strong evidence" of the anti-immigrant and racial discrimination motivating Section 20.5 (Docket Entry 112 at 20), the Court should note that significant differences exist between Senate Bill 375 and Section 20.5, including that Senate Bill 375 entirely precluded dues withholding whereas Section 20.5 precludes only agreements requiring dues withholding, but continues to allow voluntary dues withholding. In any event, Plaintiffs have not shown that Senate Bill 375 manifests racial, alienage, and/or national origin discrimination.

In sum, although a reasonable inference exists that the disparate impact factor weighs in Plaintiffs' favor, as to the remaining Arlington Heights factors, at best, two provide extremely slight support for Plaintiffs' position. Such a limited showing cannot overcome "the presumption of legislative good faith," Raymond, 981 F.3d at 303, associated with Section 20.5. Thus, Plaintiffs have not established that racial, national origin, and/or alienage "discrimination was a substantial or motivating factor behind enactment of the law," id. (internal quotation marks omitted). See Arlington Heights, 429 U.S. at 264-65 (observing that "[the Supreme Court has] made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact").

76

Plaintiffs next maintain that, "[b]ecause [Section 20.5's] classification burdens fundamental First Amendment rights, it also violates Plaintiffs' rights under the Equal Protection Clause under a strict scrutiny standard." (Docket Entry 109 at 22 n.13; accord Docket Entry 112 at 22.) For the reasons discussed above, the Settlement Provision, but not the Dues Checkoff Provision, infringes Plaintiffs' first-amendment rights. Accordingly, strict scrutiny does not apply to Plaintiffs' challenge to the Dues Checkoff Provision.

Plaintiffs further contend that the Dues Checkoff Provision fails to satisfy rational basis review. (See, e.g., Docket Entry 109 at 17.) "The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." Romer, 517 U.S. at 631. Accordingly, "unless a statute affects a fundamental right or some protected class, courts generally accord the legislation a 'strong presumption of validity' by applying a rational basis standard of review." Wilkins v. Gaddy, 734 F.3d 344, 347 (4th Cir. 2013) (quoting Heller v. Doe, 509 U.S. 312, 319 (1993)). "This standard is quite deferential. It simply requires courts to determine whether the classification in question is, at a minimum, rationally related to legitimate governmental goals." Id. at 347-48.

77

As the Fourth Circuit has explained:

> Under this deferential standard, the plaintiff bears the burden to negate every conceivable basis which might support the legislation. Further, the State has no obligation to produce evidence to support the rationality of the statute, which may be based on rational speculation unsupported by any evidence or empirical data. Rather, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. Indeed, a legislative choice is not subject to courtroom fact-finding, and equal protection [analysis] is not a license for the courts to judge the wisdom, fairness, or logic of the legislative choices.

Giarratano v. Johnson, 521 F.3d 298, 303 (4th Cir. 2008) (internal quotation marks and citations omitted) (brackets in original); accord Wilkins, 734 F.3d at 348 ("In other words, the fit between the enactment and the public purposes behind it need not be mathematically precise. As long as Congress has a reasonable basis for adopting the classification, which can include 'rational speculation unsupported by evidence or empirical data,' the statute will pass constitutional muster.").

In examining Plaintiffs' equal protection claim at the preliminary injunction stage, the Court evaluated the reasons Representative Dixon proffered for Section 20.5, including "reduc[ing] the regulatory burden on farms that is not required under federal law" (Docket Entry 107-6 at 13). (See Docket Entry 56 at 71-73.) Now, however, the parties and Farm Bureau all agree

78

that, although the Farm Bureau's talking points and Representative Dixon's comments cite "regulatory" burden (Docket Entry 107-6 at 13; Docket Entry 108-24 at 2), they actually meant "administrative" burden. (See, e.g., Docket Entry 109 at 10; Docket Entry 107 at 6 & n.5; Docket Entry 110 at 11, 17.) Reduction of administrative burdens associated with mandatory dues withholding constitutes a rational basis for the Dues Checkoff Provision. See generally Marcello v. Currey, 364 F. Supp. 3d 155, 162 (D. Conn. 2019) ("conclud[ing] that administrative burden is a rational basis that is sufficient to support the classification at issue").

The record reflects that the NCGA CBA obliged NCGA members to withhold FLOC members' union dues from their wages. (See, e.g., Docket Entry 108-13 at 8-10 (specifying dues collection procedures in NCGA CBA).) The record also suggests that at least some NCGA members perceived this requirement as an administrative burden. (See, e.g., Docket Entry 110-2, ¶ 13 ("The [NCGA CBA] required any [NCGA] member to withhold union dues from the paychecks of their employees who were members of FLOC. [Farm Bureau staff] were aware that some of our members who were also members of the [NCGA] did not like this requirement because it presented an administrative burden for them."); Docket Entry 111-7, ¶¶ 8-10 (detailing JFC's dues checkoff process under NCGA CBA and averring that, inter alia, (i) "[a]t the end of the month, we had to calculate the total amounts withheld for each worker and then tender that amount to

79

FLOC" (id., ¶ 10), and (ii) "[e]ven with the help of accounting software, this process complicated our payroll process and required additional time and expense" (id.)).) FLOC responds "that farmers who wanted freedom from FLOC CBAs (and attendant dues checkoffs) could simply opt out — for example, by leaving the NCGA." (Docket Entry 109 at 12.) In addition, FLOC disputes the extent of administrative burden dues withholding presents. (See, e.g., id. at 11-12, 18-19.) Nevertheless, "[i]t was not irrational for [the legislature] to believe," Wilkins, 734 F.3d at 350, that prohibiting contractual provisions mandating dues withholding (such as in the NCGA CBA) would alleviate administrative burdens for farmers, at least for those who desire to cease such withholding. Thus, because the legislature "ha[d] a reasonable basis for adopting the [Dues Checkoff Provision], . . . [it] pass[es] constitutional muster." Id. at 348.

The analysis differs as to the Settlement Provision. As discussed above, the Settlement Provision impermissibly infringes on Plaintiffs' first-amendment rights. "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." Police Dep't of City of Chi. v. Mosley, 408 U.S. 92, 101 (1972).[40] In other

---

[40] As the Supreme Court has explained:

The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. Thus we have treated as

(continued...)

words, such statutes must "meet[] strict scrutiny." Special Programs, Inc. v. Courter, 923 F. Supp. 851, 854 (E.D. Va. 1996). "Under strict scrutiny, the government has the burden of proving that [the pertinent] classifications are narrowly tailored measures that further compelling governmental interests." Johnson v. California, 543 U.S. 499, 505 (2005) (internal quotation marks omitted); see also Fisher v. University of Tex. at Austin, 570 U.S. 297, 310 (2013) ("Strict scrutiny is a searching examination, and it is the government that bears the burden to prove that the reasons for [the] classification [are] clearly identified and unquestionably legitimate." (internal quotation marks omitted) (second set of brackets in original)).

Defendant maintains that "the Settlement Provision functions as the narrowest possible way of ending a practice of using litigation costs to farmers as a bargaining tool for union recognition" (Docket Entry 111 at 17), a contention that depends on construing the Settlement Provision as "not prohibit[ing] anyone from settling litigation or potential litigation" (Docket Entry 107 at 19). For reasons previously detailed, the Settlement

_____

40(...continued)
        presumptively invidious those classifications that . . .
        impinge upon the exercise of a "fundamental right." With
        respect to such classifications, it is appropriate to
        enforce the mandate of equal protection by requiring the
        State to demonstrate that its classification has been
        precisely tailored to serve a compelling governmental
        interest.

Plyler, 457 U.S. at 216-17 (footnote omitted).

Provision's plain language prohibits, as a restraint of trade, any term of a settlement agreement that involves "entry into . . . an agreement with a labor union or labor organization," N.C. Gen. Stat. § 95-79(b). Defendant's narrow tailoring argument fares no better under the Equal Protection Clause than it does under the First Amendment.

Accordingly, the Court should award summary judgment to Plaintiffs regarding their claim that, by impermissibly burdening their first-amendment rights, the Settlement Provision also violates their rights under the Equal Protection Clause, but should award Defendant summary judgment on the Dues Checkoff portion of Plaintiffs' equal protection claim, as well as any suspect-classification-based equal protection claim.

### D. Section 1981 Challenge

Next, Defendant seeks summary judgment on Plaintiffs' Section 1981 claim, contending that "Plaintiffs cannot demonstrate that Defendant intentionally discriminated against them because of their race." (Id. at 28.) Plaintiffs oppose this request, arguing that "[a] reasonable trier of fact could conclude that race, national origin, and/or alienage was a motivating factor in enacting Section 20.5" (Docket Entry 112 at 16 (emphasis omitted)), and thus that "there is at least a genuine issue of material fact regarding whether Section 20.5 would have been enacted but for the race,

82

national origin, and alienage of FLOC's members" (id. at 21).
(See id. at 16-22.)  Defendant's contention possesses merit.

As relevant here, Section 1981 guarantees "[a]ll persons . . .
the same right . . . to make and enforce contracts . . . as is
enjoyed by white citizens."  42 U.S.C. § 1981(a).  Section 1981
originated as part of the Civil Rights Act of 1866, see Comcast
Corp. v. National Assoc. of African Am.-Owned Media, __ U.S. __,
__, 140 S. Ct. 1009, 1015 (2020), through which "Congress intended
to protect a limited category of rights, specifically defined in
terms of racial equality," General Bldg. Contractors Ass'n, Inc. v.
Pennsylvania, 458 U.S. 375, 384 (1982) (internal quotation marks
omitted); see also id. at 388 (observing that operative portion "of
the 1866 Act was meant to prohibit *all racially motivated*
deprivations of the rights enumerated in the statute" (emphasis in
original) (internal quotation marks omitted)).  "[D]esigned to
eradicate blatant deprivations of civil rights, clearly fashioned
with the purpose of oppressing the former slaves," id. at 388,
Section 1981 "can be violated only by purposeful [racial]
discrimination," id. at 391.  As the Supreme Court recently made
clear, that requirement means that a Section 1981 "plaintiff bears
the burden of showing that race was a but-for cause of its injury."
Comcast, __ U.S. at __, 140 S. Ct. at 1014.  In other words, "[t]o
prevail [on a Section 1981 claim], a plaintiff must initially plead
and ultimately prove that, but for race, it would not have suffered

83

the loss of a legally protected right." Id. at __, 140 S. Ct. at 1019.

Given that standard, Plaintiffs' motivating factor contentions (see Docket Entry 112 at 16-22) miss the mark. See Comcast, __ U.S. at __ - __, 140 S. Ct. at 1014-19 (rejecting argument that plaintiff need only show race constituted motivating factor in challenged action). Plaintiffs' remaining arguments likewise fall short under Section 1981, as they fail to establish that race rather than, for instance, non-racial imbalances in political power caused Section 20.5's enactment. More specifically, Plaintiffs contend:

> Section 20.5's history suggests that the Act would not have garnered majority support — and likely would not have been signed into law by the governor — had it not solely impacted FLOC's overwhelmingly Latinx, non-citizen membership. Section 20.5's predecessor, [Senate Bill] 375, aimed to eliminate dues checkoffs for public sector unions in addition to FLOC and did not pass. The politically marginalized status of FLOC's members — non-voting Latinx immigrants — ensured that the legislature could gut the union's operations without political repercussion. Indeed, the Governor met with [the Farm Bureau], whose members are largely white, to discuss Section 20.5 before signing the [Farm] Act; he did not similarly meet with those who stood to lose the most from the law — FLOC and its members. The history raises a strong inference that those who enacted Section 20.5 supported it because the law's burdens fell almost exclusively on non-voting Latinx immigrants.
>
> . . . . Because Plaintiffs raise genuine material fact issues related to the role that race, national origin and/or alienage played in the enactment of Section 20.5,

the Court should deny summary judgment on Plaintiffs'
        Equal Protection and Section 1981 claims.

(Docket Entry 112 at 21-22 (emphasis added) (citations and footnote

omitted).)[41]

        In other words, Plaintiffs assert that their "politically

marginalized status," which arises from the "non-voting" nature of

FLOC's mainly "non-citizen" members, prompted passage of Section

20.5. (See id.) Because (by Plaintiffs' own reasoning) alienage

rather than race drives the political marginalization they

highlight, Plaintiffs fail to establish "that, but for race, [they]

would not have suffered the loss of a legally protected right."

Comcast, ___ U.S. at ___, 140 S. Ct. at 1019. The Court should

therefore grant Defendant's request for summary judgment on

Plaintiffs' Section 1981 claim.

        **E. Bill of Attainder Challenge**

        Finally, Defendant seeks summary judgment on FLOC's bill of

attainder claim, maintaining that "Section 20.5 does not apply with

specificity to Plaintiffs" (Docket Entry 107 at 30), as it "applies

to *any* individual or organization" (id. at 31 (emphasis in

original)) and "unquestionably addresses only future conduct, which

_____

        41 Plaintiffs did not address their Section 1981 claim
independently of their equal protection claim, except for noting in
a footnote at the start of their argument that "Plaintiffs' Section
1981 claims focus specifically on race, ethnicity, and
alienage-based discrimination that led to the enactment of Section
20.5." (Docket Entry 112 at 16 n.5 (citing Docket Entry 31,
¶¶ 118-122).)

Case 1:17-cv-01037-LCB-LPA   Document 124   Filed 02/25/21   Page 85 of 89

is permissible under the Bill of Attainder Clause" (id.). That position should prevail.

The United States Constitution prohibits bills of attainder. See U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder."). As the Fourth Circuit has explained, "[a] legislative act is an unconstitutional bill of attainder if it singles out an individual or narrow class of persons for punishment without a judicial proceeding." Lynn v. West, 134 F.3d 582, 594 n.11 (4th Cir. 1998); see also United States v. Dorlouis, 107 F.3d 248, 257 (4th Cir. 1997) ("A Bill of Attainder is a legislative determination of guilt which metes out punishment to named individuals."). "To constitute a bill of attainder, the statute must (1) specify affected persons, (2) impose punishment, and (3) fail to provide for a judicial trial." Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey, 167 F.3d 458, 465 (8th Cir. 1999) (citing Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp., 468 U.S. 841, 847 (1984)). "To rise to the level of 'punishment' under the Bill of Attainder Clause, harm must fall within the traditional meaning of legislative punishment, fail to further a nonpunitive purpose, or be based on a [legislative] intent to punish." Id.

Moreover, "[t]he element of specificity may be satisfied if the statute singles out a person or class by name or applies to 'easily ascertainable members of a group.'" Foretich v. United

Case 1:17-cv-01037-LCB-LPA   Document 124   Filed 02/25/21   Page 86 of 89

States, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (emphasis omitted) (quoting United States v. Lovett, 328 U.S. 303, 315 (1946)). However, "'[a] statute with open-ended applicability, i.e., one that attaches not to specified organizations but to described activities in which an organization may or may not engage, does not single out a particular person or group for punishment.'" Ameur v. Gates, 759 F.3d 317, 330 (4th Cir. 2014) (quoting Hettinga v. United States, 677 F.3d 471, 477 (D.C. Cir. 2012)). Finally, "'[o]nly the clearest proof could suffice to establish the unconstitutionality of a statute [as a bill of attainder].'" Id. at 329 (quoting Communist Party of the U.S. v. Subversive Activities Control Bd., 367 U.S. 1, 82-83 (1961)).

Here, Plaintiffs maintain that "[t]here is ample basis for a reasonable fact-finder to determine that Section 20.5 is a bill of attainder . . . ." (Docket Entry 112 at 31.) In support of that contention, Plaintiffs assert:

> Section 20.5 applies with specificity to FLOC, the only union affected by the law. DE 108-1 ¶ 18. A statute need not identify an individual or group by name in order to be a bill of attainder, so long as the targeted group is "easily ascertainable" from the statutory language. *See, e.g.*, *United States v. Brown*, 381 U.S. 437, 448-49 (1965). Nor must a statute define the targeted group exclusively by reference to past conduct. *See id.* at 458-59.

(Docket Entry 112 at 31.) Plaintiffs do not further address the specificity element of this claim. (See id. at 31-32; see also Docket Entries 109, 115 (lacking attainder arguments).)

87

Plaintiffs correctly note that Section 20.5 affects FLOC, long the only farmworker union in North Carolina (<u>see</u> Docket Entry 108-1, ¶ 18; Docket Entry 108-3, ¶ 55).  However, Section 20.5 does not confine its prohibitions to FLOC; rather, it imposes general proscriptions on future agreements related to agricultural producers, which impact, <u>inter alia</u>, farmers, farmworkers, and any union or labor organization that might desire to enter into a settlement agreement with an agricultural producer.  <u>See</u> N.C. Gen. Stat. § 95-79(b).  As such, Plaintiffs have not shown that Section 20.5 satisfies the specificity element necessary for a bill of attainder.  <u>See</u> <u>Ameur</u>, 759 F.3d at 330; <u>see also</u> <u>Hettinga</u>, 677 F.3d at 477-78 (finding that law regulating certain milk producers did not satisfy specificity requirement even though only one family's businesses currently satisfied relevant criteria for regulation, noting, <u>inter alia</u>, that "the [law] would apply to any producer-handler that meets its statutory requirements, not only the [plaintiffs]," <u>id.</u> at 477, and rejecting contention that "because the [law] *currently* applies only to their businesses, it *must* satisfy the specificity requirement," <u>id.</u> (emphasis in original)).  The Court should therefore grant Defendant summary judgment on FLOC's bill of attainder claim.

<u>**CONCLUSION**</u>

Plaintiffs have established that the Settlement Provision violates the First Amendment and, in related fashion, the Equal

88

Protection Clause. However, Plaintiffs failed to show any constitutional violation as to the Dues Checkoff Provision. Further, the record does not support a finding that the legislature enacted Section 20.5 in contravention of the Equal Protection Clause's ban on discrimination against a suspect class or "because of" Plaintiffs' race in contravention of Section 1981. Finally, Section 20.5 does not constitute a bill of attainder.

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion (Docket Entry 106) and Plaintiffs' Motion (Docket Entry 108) be granted in part and denied in part as follows: the Court should enter summary judgment for Plaintiffs on their claims that the Settlement Provision violates their first-amendment and (first-amendment-related) equal-protection rights, but the Court should enter summary judgment for Defendant on Plaintiffs' remaining claims.

This 25th day of February, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
