IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:17-cv-1037

| | |
|---|---|
| FARM LABOR ORGANIZING COMMITTEE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> JOSHUA STEIN, <br><br> *Defendant*. | **Defendant's Objections to the Magistrate Judge's Memorandum Opinion and Recommendation** <br><br> Fed. R. Civ. P. 72(b) |

Defendant Joshua Stein, in his official capacity as Attorney General of North Carolina, by and through counsel, respectfully submits, pursuant to 28 U.S.C. § 636(b), Fed. R. Civ. P. 72(b)(2), and Local Rule 72.4, these objections to the Magistrate Judge's Memorandum Opinion and Recommendation ("M&R") entered on February 25, 2021 (D.E. 124). Specifically, the Attorney General submits the following objections:[1]

1. Defendant objects to the M&R's recommendation to grant partial summary judgment for Plaintiffs on their claims that the "Settlement Provision violates their first-amendment and (first-amendment-related) equal protection rights." (M&R at 89).

---

[1] Defendant does not object to the M&R's recommendations that Defendant is entitled to summary judgment on Plaintiffs' remaining claims.

2.     Defendant objects to the M&R's failure to reconsider and recommend the Court reverse its earlier rejection of Defendant's sovereign immunity and standing defenses.  (M&R at 38–39 n.26).[2]

3.     Defendant objects to the M&R's Background section to the extent it did not address or adopt the facts set forth in Defendant's briefs and supporting exhibits.

## INTRODUCTION

North Carolina law prohibits agreements—even between willing unions and employers—that would condition employment on being a member of a union.  N.C. Gen. Stat. § 95-79(a).  Right to work policies, including North Carolina's, have been upheld by the Supreme Court as consistent with the Constitution.  *See, e.g.*, *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 531 (1949) (rejecting challenges to right-to-work statutes, including § 95-78 *et seq.*).

The law at issue in this case, Section 20.5 of the Farm Act of 2017, reinforces the State's right to work policy.  First, Section 20.5 ends the potential use of litigation costs as a means to force farmers to sign collective-bargaining agreements (CBAs).  Second, Section 20.5 provides that farmers cannot be required to collect dues from workers' paychecks—a task that, as shown by record evidence, creates administrative burdens and leads to worker-relations issues.

---

[2]     Defendant objects to this solely for preservation purposes.  As explained in the briefs filed in support of Defendant's motion to dismiss Plaintiff's Amended Complaint (D.E. 45, 54), the Eleventh Amendment bars all the claims brought against Attorney General Stein in this case, and as a result, this court lacks jurisdiction over him. Moreover, Plaintiffs' have failed to demonstrate that they have suffered an injury-in-fact and that any alleged injuries are traceable to the Attorney General, and as a result, Plaintiffs lack standing to bring this lawsuit.

2

Equally important is what Section 20.5 does *not* do: It does not prohibit lawsuits against agricultural producers, and it does not prohibit settlement agreements stemming from those lawsuits or threats to sue—the M&R erred in concluding otherwise. Likewise, Section 20.5 does not prohibit CBAs. Section 20.5 also does not prohibit unions from collecting dues, other than by requiring the farmer to do so.

Finally, Section 20.5 places no limits on union speech, advocacy, or organizing. It does not prohibit anyone from joining a union, nor does it prohibit farmers from recognizing unions. The policy goals in Section 20.5 are consistent with the Constitution and North Carolina's right to work policy. Because that conclusion is shown by uncontestable facts and law, Defendant is entitled to summary judgment on all of Plaintiffs' claims.

## STATEMENT OF FACTS

Defendant adopts by reference and incorporates his "Statement of Facts" included in his summary judgment brief ("MSJ Br.") and the exhibits attached in support (D.E. 107), his "Statement of Facts" included in his Response to Plaintiffs' summary judgment brief ("MSJ Response Br."), and the exhibits attached in support of his Response (D.E. 111), and in support of his reply brief (D.E. 116).

Defendant specifically objects to the M&R's failure to address or adopt the following facts:

- Facts regarding the importance of the agricultural industry to North Carolina, as set forth in Defendant's MSJ Response Br. at 3-4 and exhibits cited therein (D.E. 111);

3

- Facts regarding farming being a difficult business and the current hardships farm owners and operators in North Carolina face, as set forth in Defendant's MSJ Br. at 6-9 and exhibits cited therein (D.E. 107);

- Facts regarding the costs and burdens of administering dues checkoffs, as set forth in Defendant's MSJ Br. at 11-13 and exhibits cited therein (D.E. 107), and in Defendants' MSJ Response Br. at 9-10 and exhibits cited therein (D.E. 111) These include not only the direct costs of administering the checkoffs, but also the relational costs—which the M&R did not examine. Administering dues for a third party places farmers in the position of treasurer for the union, a role that the evidence produced by Defendant showed to harm farmers' relationships with their workers—relationships that are central to successful farming.

- Facts regarding the use of litigation against farmers to induce their entry into collective bargaining agreements, as set forth in Def. Br. at 13 and exhibits cited therein (D.E. 107). These facts not only provide support for the rationality of the Settlement Provision but also the purpose of, and proper interpretation of, that provision.

The facts cited above, as a whole, serve to place Section 20.5 in its proper context. The law came about to reduce administrative costs and pressures on farmers, who faced some of the most difficult economic circumstances in modern times. The facts established by Defendant, many not included in the M&R, show that reducing these burdens was an important and rational basis for Section 20.5.

4

Defendant also objects to the M&R's inclusion and reliance on FLOC's self-serving statements regarding its cursory efforts to explore some of the most basic dues collecting alternatives—efforts that did not occur until *August 2020*, after its deposition and the close of discovery in this case, at a time when finding any other means of collecting dues might prejudice Plaintiffs' position in this litigation. (M&R at 6-7; D.E. 108-3, ¶¶ 59-60). Defendant further objects to the M&R's inclusion and reliance on any testimony or statements made by Plaintiffs' expert, Dr. Thomas Arcury, regarding FLOC, its membership, its dues collecting methods, or its operations, as the record shows Dr. Arcury lacks personal knowledge of any of those topics. (*See, e.g.,* D.E. 108-26 at 22:12-22, 26:14-21, 33:16-34:2, 34:21-24, 35:19-25, 38:1-9, 65:12-19, 66:16-21).

## LEGAL OBJECTIONS

I.     **The M&R Misinterprets the Settlement Provision and Fails to Apply Settled Principles of Constitutional Avoidance to Its Interpretation.**

Defendant objects to the M&R's recommendation and analysis that this Court should find the Settlement Provision violates the First Amendment and Plaintiffs' First Amendment–related equal protection rights. (*E.g.*, M&R at 47–53, 80–82, 89). The M&R correctly recognizes that, "[i]n interpreting a state law, [courts] apply the statutory construction rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009) (M&R at 33). But it misapplies state (and aligned federal) canons of statutory construction as to the Settlement Provision, in two critical ways:

First, the M&R misinterprets the Settlement Provision, casting it as far broader than its language, context, history, or purpose permit—and then it concludes the Settlement Provision is unconstitutional based on the breadth of that interpretation. This was error.[3]

Second, *even if* the M&R were correct that the Settlement Provision is best read to bar all settlements between an agricultural union and a producer (M&R at 47), the M&R's analysis ended prematurely. Settled rules of constitutional avoidance, found in federal and state case law alike, mandate that the Court must adopt any reasonable construction of the statute that saves it from unconstitutionality. The M&R not only failed to properly apply constitutional avoidance—it failed to consider it at all. Defendant's interpretation of the Settlement Provision is, at a minimum, a reasonable construction; and it passes constitutional scrutiny.

A. The Settlement Provision Does Not Prohibit All Settlements Between Agricultural Unions and Producers.

Defendant objects to the M&R's recommendation that the Court consider the Settlement Provision of Section 20.5 to bar agricultural unions such as FLOC from entering into *any* settlement agreements with an agricultural producer. (M&R at 47). That interpretation of the Settlement Provision comports with none of its text, context,

---

[3]     The M&R (at 47) relies for its interpretation of the Settlement Provision on this Court's adoption of the prior M&R recommending granting of a preliminary injunction. Defendant respectfully submits that this Court did not have the advantage of full merits briefing on the Settlement Provision at the time of the PI order, nor did it have the full record developed during discovery in this case. Defendant submits that, with the briefing and argument now before this Court, the Settlement Provision is due for reexamination.

legislative history, or purpose. It renders most of its text superfluous and, as the M&R recognizes, raises constitutional questions. It is an incorrect interpretation of the provision.

The Settlement Provision enacted the following change into an existing provision, N.C. Gen. Stat. § 95-79(b), originally covering terms of agricultural purchase agreements:

> (b) Any provision that directly or indirectly conditions the purchase of agricultural ~~products or~~ products, the terms of an agreement for the purchase of agricultural products or <u>products, or the terms of an agreement not to sue or settle litigation</u> upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina. . . .

(*See* D.E. 107 at 4 (laying out the changes made by Section 20.5 to North Carolina law)).

Neither the text, the context, the history, or the purpose of the Settlement Provision permits the M&R's interpretation that it prohibits all settlement agreements between agricultural unions and producers. (M&R at 47). Instead, all interpretive guideposts point to a different conclusion: that the Settlement Provision merely prohibits settlement agreements from being *conditioned* upon "an agricultural producer's status as a union or nonunion employer or [the producer's] entry into or refusal to enter into an agreement with a labor union or labor organization." In other words, a settlement agreement between agricultural unions and producers (or any parties) cannot contain, as a term of the settlement, an agreement to recognize a union (or not) or to enter into a CBA or other agreement with a union (or not). That is a far narrower, and the correct, interpretation of the provision.

7

Begin, as always, with the text. If the Settlement Provision is written to prohibit unions like FLOC from entering into any settlement agreement with a producer,[4] then much of its language is superfluous. Indeed, the actual change made to § 95-79(b) by Section 20.5 as to settlements is to add "or the terms of an agreement not to sue or settle litigation." Yet under the M&R's interpretation of the statute, the "terms" of such a settlement agreement *do not matter*, since all such agreements between union and producer would be prohibited regardless of their terms. Neither North Carolina's courts nor federal courts would interpret a statute in such a way as to render the language of a statute superfluous—particularly when the superfluous language would end up being much of the amended portion of the text at issue. *See, e.g.*, *Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013); *State v. Coffey*, 336 N.C. 412, 417–18 (1994).

Nor would the existing language from § 95-79(b), specifically, "provision that directly or indirectly conditions," have any meaning either, because, under the M&R's interpretation, the ban on settlement agreements is unconditional as to unions. To "condition" an agreement on something is to make that thing a premise on which the fulfillment of the agreement depends.[5] For example, *conditioning* an agricultural purchase

---

[4] Notably, the M&R considers the structure of § 95-79, its enactment history, and its purpose in concluding that the Settlement Provision only relates to settlements between agricultural unions and producers, rather than any union settlement agreement. (M&R at 37–38.) But the M&R does not employ any of those tools of construction in concluding that the Settlement Provision relates to *all* settlement agreements, rather than a settlement agreement conditioned on the recognition of the union or entry into a CBA. (*See* M&R at 47).

[5] This is the plain meaning of "conditions" in the context of the statute, but Defendant further notes that dictionary definitions support that meaning also. *See, e.g.*, Merriam-Webster Online, *available at* https://www.merriam-webster.com/dictionary/condition. So does *Black's Law Dictionary*, 11th edition (2019), which includes in its definitions of "condition," "[a] stipulation

8

agreement on whether a farm is unionized would mean the contract depends on whether the farm is unionized or not. Under § 95-79(b), a purchase agreement simply can't require union or non-union status one way or another—it cannot be *conditioned* on that status.

Likewise, a limit on conditioning a settlement agreement on a producer's status as a union or nonunion employer, or its entry into an agreement with a union, means the settlement agreement cannot *depend* on that status or require entry into a union agreement as part of its terms. Nothing about such a limit on *conditions* prevents a union from being a party to a settlement agreement at all. The fact the union is a union is not a *condition* of the settlement. Indeed, this understanding is confirmed by the fact that § 95-79(b) also focuses on "provision[s]" of agreements, not who the parties are.[6] The plain language of the Settlement Provision does not permit it to be read to broadly prohibit unions from entering into settlement agreements.

Had the General Assembly wished to prohibit unions like FLOC from entering into any settlement agreements with agricultural producers, the text doing so would be far simpler and more direct, and it would not focus on the *terms* of an agreement or on what an agreement is *conditioned*. It could simply say that "settlement agreements between

---

or prerequisite in a contract, will, or other instrument, constituting the essence of the instrument." The phrase, "entry into an agreement with a union," cannot refer to the settlement agreement itself, otherwise the agreement is conditioned on entry into itself, which is at once both circular and absurd. It is plainly not what the statutory text intends.

[6] For example, properly understood, the Settlement Provision would also prevent two farmers from settling a boundary dispute with an agreement including a mutual promise not to enter into a CBA with FLOC. It prevents such a term regardless of who the parties are, and it does not provide any different limitations whether a union is a party or not.

agricultural producers and unions are invalid and unenforceable as against the public policy of the state." Yet the Settlement Provision doesn't say that.

The context surrounding the adoption of Section 20.5 confirms Defendant's interpretation. Section 20.5's Settlement Provision modifies existing language from the Agricultural Right to Work Act of 2013 (*See* D.E. 107 at 1–4 & n.3), which sought to end a different practice seen by the legislature as coercive: pressuring agricultural *purchasers* to charge different commodity prices to producers depending on their union status. Section 95-79(b) was added to prohibit the *terms* of a purchase agreement from turning on union status or an agreement with a union—practically speaking, a CBA, just as Section 20.5 applies the same limitation to the *terms* of settlement agreement. Moreover, as Defendant's factual showing demonstrates, the coercive tactic the General Assembly was focused on did not generally pertain to lawsuits by FLOC or any other union specifically; it was lawsuits by *individual plaintiffs*, handled by FLOC's attorney and demanding recognition of FLOC, a non-party to the suit. (*See* D.E. 107 at 13 (citing, among others, Def's Ex. 28 at 2–3, 12, 15–16, 19; Def's Ex. 27 at 1–5)). A ban on all settlements with agricultural unions would not actually address that issue.

Courts will read statutory language in its context, including by consideration of surrounding provisions on the same subject matter. *E.g.*, *New Cingular Wireless PCS, LLC v. Finley*, 674 F.3d 225, 249 (4th Cir. 2012). Here, the Court should examine N.C. Gen. Stat. § 95-79(a), which is the state's right-to-work provision that long preceded the changes made to § 95-79(b) by Section 20.5. Like § 95-79(b), the original right-to-work provision focuses on the *contents* and the *requirements* of agreements; it does not broadly prohibit

10

all agreements between employers and labor unions regardless of their content. Rather it only prohibits certain contract terms (those requiring the hiring of union labor) determined by the General Assembly to undermine the state's right-to-work policy. Section 95-79(b) should be read in harmony with that approach: its original language from 2013 obviously doesn't ban all agricultural purchase agreements, only those with specific terms turning on unionization of farms. And the addition made in 2017, Section 20.5, doesn't ban anyone or any group from entering into a settlement agreement, only one with specific terms turning on unionization of farms.

Further contextual support is cited by the M&R against Defendant on the First Amendment analysis, but it actually supports Defendant's interpretation of the statute. As the M&R observes, North Carolina public policy favors prompt resolution of labor disputes, and the parties agree that lawsuits can be "complex, time consuming, uncertain, and expensive." (M&R at 51). The M&R's observation that a broad reading of the Settlement Provision cuts against this policy (*see* M&R at 51) stands as a strong contextual reason *not* to adopt such a broad reading of it. Properly understood, the Settlement Provision is consonant with and strengthens these policies. Thus, rather than be a "substantive departure from North Carolina law" (M&R at 73), the Settlement Provision as described here is the opposite.

Legislative intent surrounding the passage of Section 20.5 accords as well. North Carolina canons of statutory construction require that courts consider legislative intent and the circumstances surrounding the enactment of legislation when interpreting ambiguous state statutes. *See, e.g.*, *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209 (1990)

11

(citations omitted). The record evidence in this case provides particularly helpful proof of legislative intent, as the North Carolina Farm Bureau (NCFB) was the proponent and author of the language the General Assembly adopted, Plaintiff deposed NCFB in this lawsuit, and NCFB submitted *amicus* briefs in support of Defendant's motion for summary judgment (D.E. 110, 120).

As to the motive for the legislation, NCFB pointed not to settlement agreements with unions writ large, but to litigation designed to force collective-bargaining agreements as a settlement *condition*. (D.E. 107-4 at 78:22–25; 108:5–8, 118:6–8). Indeed, the deposition contains this exchange:

> Q. Let's go to the part dealing with settlements of litigation.
>
> A. My understanding is that it does not allow for a settlement agreement contingent on unionized labor.
>
> Q. Right. It prohibits employers from entering into settlement agreements that would include *as a term* union recognition or a union contract; correct?
>
> A. Yes.

(D.E. 107-4 at 80:7–13) (emphasis added). NCFB's answer (and even Plaintiffs' question) both understand the Settlement Provision correctly: it only prohibits settlement agreements including union recognition or a union contract as a term of the settlement.

Moreover, the threat letters from Bob Willis, referred to on page 15 of the M&R, show that the use of settlements-for-CBAs was the problem the General Assembly sought to solve with the Settlement Provision. (*See, e.g.,* D.E. 107-29 at 3 (offering entry into a CBA in exchange for settling lawsuit against Burch farm), D.E. 107-29 at 12 ("As a part of that settlement, it is my understanding that my clients, as active members in the FLOC

12

union movement, are willing to discuss making significant concessions in the monetary terms of any settlement of the claims that are described in this letter in exchange for some a written agreement by you and your company to enter into a collective bargaining agreement ("CBA") with FLOC."), D.E. 107-29 at 15-16 (same)).  The problem wasn't lawsuits alone, or settlements alone, or attempts to negotiate CBAs; rather, the problem seen by the legislature was using the threat of lawsuits as a cudgel to force farms into CBAs when they would not otherwise agree to one.

Finally, legislators' own statements lend further support for Defendant's interpretation of the statute.  As Rep. Dixon explained when discussing the amendment containing Section 20.5, "The amendment would prohibit the use of litigation to force farms to unionize and ensure farmers are not required to collect dues from their employees."  (D.E. 107-4 at 112:23-113:13 (discussing Rep. Dixon's comments and agreeing they are a "general overview of what the language does"); *id.* at 118:6–8 (explaining that the information NCFB gave to legislators included that "there have been lawsuits filed against farmers; and part of the lawsuit is a proposed settlement agreement to unionize the farm")).

Indeed, as the M&R recognized, and the record clearly shows, one of FLOC's organizational goals is "organizing workers to achieve collective bargaining agreements (CBAs) with agricultural producers in the state."  (M&R at 3).  And the evidence highlighted by Defendant showed the legislature believed that one of the means used to achieve that goal was forcing farmers to choose between expansive litigation costs and signing a CBA as part of a settlement agreement, even when the suit is neither filed by the

13

union nor about union issues directly. (M&R at 10 ("As part of an agreement to settle litigation over workplace issues, some farmworkers who are FLOC members have negotiated for voluntary union recognition or expanded collective bargaining rights as part of a class-wide settlement agreement.") (quoting DE 108, ¶ 26)). The legislative history and the record in this case shows the General Assembly acted to address that specific issue, rather than aiming to prohibit all settlement agreements between agricultural unions and producers.

B.     <u>At a Bare Minimum, Defendant's Interpretation of the Settlement Provision Is Reasonable, and the Court Must Adopt It If Other Interpretations are Unconstitutional</u>.

Defendant's understanding of the Settlement Provision is the correct one, as discussed above. Regardless, "every reasonable construction [of a statute] must be resorted to, in order to save a statute from unconstitutionality." *Legend Night Club v. Miller*, 637 F.3d 291, 300 (4th Cir. 2011) (quoting *Edward J. DeBartolo Corp. v. Fl. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 586, 575 (1988)). Federal courts will construe a statute to avoid constitutional problems "unless such construction is plainly contrary to the intent of Congress." *United States v. Hamilton*, 699 F.3d 356, 367 (4th Cir. 2012) (quoting *Edward J. DeBartolo Corp.*, 485 U.S. at 575). The North Carolina General Assembly deserves no less deference than the United States Congress in this regard. *See, e.g.*, *In re Arcadia Dairy Farms*, 289 N.C. 456, 465–66 (1976) (applying the same canons of constitutional avoidance).

14

Constitutional avoidance is compulsory: a court is "obligated to construe a statute to avoid [constitutional] problems" if it is "fairly possible" to do so. *INS v. St. Cyr*, 533 U.S. 289, 300 (2001) (cleaned up). "The Supreme Court has repeatedly stressed the importance of this doctrine." *al-Marri v. Pucciarelli*, 534 F.3d 213, 244 (4th Cir. 2008) (en banc) (Motz, J., concurring in judgment), *vacated for mootness sub nom. al-Marri v. Spagone*, 555 U.S. 1220 (2009). It is a "cardinal principle of statutory interpretation." *Hamilton*, 699 F.3d at 367.

Much of the doctrine's importance stems from principles of federalism, as "[c]ourts do not lightly ascribe to legislatures an unconstitutional intent." *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 177 (4th Cir. 2010).[7] For that reason, the doctrine employs a "reasonable presumption that [the legislature] did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). This remains true even if the court must adopt a narrowing construction of the statute to save it from constitutionality infirmity. *E.g.*, *Toghill v. Clarke*, 877 F.3d 547, 556 (4th Cir. 2017). At bottom, constitutional avoidance is both a hint at interpretation—the legislature presumably did not intend to pass an unconstitutional statute—and a requirement of

---

[7] Indeed, when applying the presumption that legislatures should be assumed not to have unconstitutional intent, the M&R's First Amendment analysis (M&R at 47–53) becomes a powerful refutation of its construction of the Settlement Provision (M&R at 47). The swiftness with which the M&R dispatched with the Settlement Provision serves as both a strong suggestion against interpreting the statute as broadly as the M&R does, and a prohibition on interpreting it that way. Defendant's interpretation of the Settlement Provision, in contrast, complies with *Ward*'s admonishment about the legislature's presumed intent to pass constitutional statutes.

15

construction: the Court must avoid an interpretation leading to unconstitutionality if possible.

North Carolina's courts agree that constitutional avoidance is the required way to interpret state statutes. "If a statute is reasonably susceptible of two constructions, one of which will raise a serious question as to its constitutionality and the other will avoid such question, it is well settled that the courts should construe the statute so as to avoid the constitutional question." *Milk Commission v. Nat'l Food Stores*, 270 N.C. 323, 331 (1967); *N.C. State Bd. of Educ. v. State*, 371 N.C. 149, 160 (2018); *In re Arthur*, 291 N.C. 640, 642 (1977).

In sum, "[t]he cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid doubt the rule is the same." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937).

The M&R recommends destruction, but the Court cannot do that. Instead, if Defendant's interpretation of the statute is "possible," *id.* at 30—and it is—then the Court must adopt that interpretation to save the statute from a finding of unconstitutionality. As explained above, Defendant's interpretation is the one that *best* aligns its text with its legislative history, its plain purpose, and the record evidence produced in this case. But the Court need not agree or even decide that Defendant's interpretation is the best one. It need only be a plausible one.

16

As explained below, Defendant's interpretation stays well clear of any constitutional concern. Principles of constitutional avoidance and federalism therefore require adopting Defendant's understanding of the Settlement Provision rather than interpreting the provision broadly only to strike it down for its breadth. (*E.g.*, M&R at 47, 52). The M&R erred by not applying principles of constitutional avoidance. (*See also* D.E. 107 at 19 n.20 (observing that constitutional avoidance would apply to the broader interpretation of the Settlement Provision)).[8]

C. <u>Properly Understood, the Settlement Provision Violates Neither Plaintiffs' First Amendment Rights nor Equal Protection.</u>

Defendant has thoroughly briefed how the proper understanding of the Settlement Provision violates neither the First Amendment nor any equal protection rights relating to the First Amendment. (*E.g.*, D.E. 107 at 19–23; D.E. 111 at 28–31; D.E. 116 at 8). The M&R did not address those arguments. (*See* M&R at 52). Rather than repeat them, Defendant asks that the Court consider its arguments found in its summary judgment briefing and will only summarize those arguments very briefly here.

In short: the Settlement Provision regulates the terms of contracts, not the content of speech. (D.E. 107 at 20). "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.

---

[8] The M&R states, "Notably, Defendant neglects to develop an argument that, properly understood, the Settlement Provision does not violate the First Amendment." (M&R at 47). There was no neglect. Rather, Defendant provided a full-throated defense of the Settlement Provision as its text, history, and purpose show it should be interpreted. And, more importantly, Defendant's interpretation avoids any constitutional issues. That suggests that such an interpretation of the Settlement Provision is the correct one.

Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) (internal citations omitted). Statutes regulating the appropriate subjects of contracts do not implicate the First Amendment; otherwise, all contract law becomes constitutional law. (*See* D.E. 107 at 20).

And even if the First Amendment *is* implicated by the Settlement Provision, the provision survives scrutiny as it is "narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Reynolds v. Middleton*, 779 F.3d 222, 225–26 (4th Cir. 2015) (citations omitted); (D.E. 107 at 22). The State has demonstrated the rationality of a determination by its legislature that the tactic of negotiating CBAs via expensive lawsuits strikes against its right-to-work public policy and its determination of how its courts may be fairly used. And the Settlement Provision addresses that concern as narrowly as possible: *not* by prohibiting entry into a CBA by agricultural producers and unions, and *not* by prohibiting lawsuits or settlements between them. Rather it simply separates out the collective-bargaining process from settling lawsuits, so that the latter cannot be used to induce the former.

Defendant notes that, when the Settlement Provision is properly read as Defendant understands it, much of the M&R's First Amendment analysis is inverted. The M&R observes as a point against Defendant's claim for summary judgment that both parties agree, "[l]itigation can be complex, timeconsuming, uncertain, and expensive." (M&R at 51 (quoting D.E. 109 at 29)). But that is precisely why the General Assembly adopted the

Settlement Provision—to prevent the use of time consuming and costly litigation as leverage to force producers to enter into CBAs they did not wish to join. The M&R concludes that the Settlement Provision isn't drawn narrowly to advance its asserted goal (M&R at 52), but that is only because the M&R interprets the Settlement Provision in a way that strips it entirely of its tailoring. Indeed, the M&R claims Defendant "tacitly concedes" that Section 20.5 isn't narrowly tailored, without addressing how Defendant's interpretation of the statute *reflects the tailoring*.

For all the reasons detailed in Defendant's briefing on the cross-motions for summary judgment, the Settlement Provision survives First Amendment scrutiny when interpreted as it should be, and under constitutional avoidance it must be. (*E.g.*, D.E. 107 at 19–23; D.E. 111 at 28–31; D.E. 116 at 8). The M&R's recommendation that this Court grant Plaintiff's equal protection claim as to the Settlement Provision turns entirely on its analysis of the First Amendment claim (*See* M&R at 80–82), and it should be rejected for the same reasons.

## CONCLUSION

For these reasons, and those stated in Defendant's briefing on the cross-motions for summary judgment, the Court should adopt the M&R insofar as it recommends summary judgment for Defendant and further grant summary judgment to Defendant on the issues relating to the Settlement Provision where the M&R recommends to the contrary.[9]

---

[9]     Should the Court choose to adopt the M&R, or otherwise determine the Settlement Provision to be unconstitutional, and issue a permanent injunction as to the enforcement of Section 20.5, the injunction should be limited to the Settlement Provision, and only to the extent it is

Respectfully submitted this the 11th day of March, 2021.

JOSHUA H. STEIN
Attorney General


/s/ Matthew Tulchin
Matthew Tulchin
Special Deputy Attorney General
NC State Bar No. 43921
mtulchin@ncdoj.gov

/s/ Phillip A. Rubin
Phillip A. Rubin
Special Deputy Attorney General
N.C. State Bar No. 51963
prubin@ncdoj.gov

NC Department of Justice
PO Box 629
Raleigh, NC  27602
Tel: 919.716.6900
Fax: 919.716.6763

*Counsel for Defendant Attorney General Stein*

---

interpreted to prevent unions from entering into any settlement agreements at all.  *Accord Legend Night Club*, 637 F.3d at 300 (observing that courts will not strike down an overbroad statute if a limiting construction or partial invalidation can remove the constitutional issue).

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the foregoing Memorandum, including body, headings, and footnotes, contains 5,266 words as measured by Microsoft Word.

This the 11th day of March, 2021.

/s/ Matthew Tulchin
Matthew Tulchin
Special Deputy Attorney General