## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No. 1:17-cv-01037-LCB-LPA

| | | |
|---|---|---|
| **FARM LABOR ORGANIZING** | ) | |
| **COMMITTEE, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| **v.** | ) | |
| | ) | |
| **JOSHUA STEIN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM OPINION AND RECOMMENDATION

Pursuant to Fed. R. Civ. P. 72(b), Plaintiffs Farm Labor Organizing Committee ("FLOC") and Valentin Alvarado Hernández respectfully file their objections to Magistrate Judge Auld's Memorandum Opinion and Recommendation ("the Opinion") (DE 124), addressing the parties' cross-motions for summary judgment (DE 106, DE 108).

Plaintiffs are North Carolina's sole farmworker union and a Mexican migrant farmworker who is a union member. They claim that Section 20.5 of the Farm Act of 2017[1] ("Section 20.5"), violates the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, the Bill of Attainder Clause, and 42 U.S.C. § 1981. Section 20.5 contains two provisions: (1) it bars voluntary agreements that agricultural employers will deduct and remit to a farmworker union any union dues from the wages of farmworkers

---

[1] North Carolina Farm Act of 2017, 2017 Sess. Laws 108, sec. 20.5.

who choose to join that union ("Dues Checkoff Provision"); and (2) it prohibits recognition of a farmworker union as a stipulation in any settlement and bars a farmworker union from entering into any settlement agreement with an agricultural producer ("Settlement Provision"). DE 34-2 (2017 Farm Act) at 23.

Plaintiffs object to the portions of the Opinion recommending that their motion for summary judgment be denied in part, and that Defendants' summary judgment motion be granted in part,[2] and ask that this Court permanently enjoin the entirety of Section 20.5 on the grounds that it violates the First Amendment and Equal Protection Clause.

## STANDARDS OF REVIEW

A district judge reviews objected-to portions of a recommendation on a dispositive motion *de novo*, and "may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3).

Summary judgment "is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, no material facts are disputed and the moving party is entitled to judgment as a matter of law." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . . The evidence of the non-movant is to

_____

[2] Plaintiffs do not object to the recommendation that summary judgment be granted on their claims that the Settlement Provision violates the First Amendment and the Equal Protection Clause.

be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v.*
*Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## OBJECTIONS AND ARGUMENT

I.   **The Court Should Grant Plaintiffs Summary Judgment on Their Claim that the Dues Checkoff Provision Violates the First Amendment.**

A. **The Dues Checkoff Provision is a Speaker-Based Restriction.**

The Magistrate Judge erred in recommending summary judgment in favor of Defendant, rather than Plaintiffs, on Plaintiffs' First Amendment challenge to the Dues Checkoff Provision.

The First Amendment prohibits government actions that indirectly suppress speech and association by imposing selective burdens on disfavored speakers. The seminal case in this area, *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), struck down a state paper-and-ink tax that selectively targeted a handful of large newspapers. The Supreme Court explained that the selective application of the tax "violate[d] the First Amendment not only because it single[d] out the press, but also because it target[ed] a small group of newspapers." *Id.* at 591. *Minneapolis Star* thus established that "[l]aws singling out a small number of speakers for onerous treatment are inherently suspect" and subject to strict scrutiny. *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012). Here, Section 20.5 targets a single expressive association—FLOC, the state's only farmworker union—for onerous treatment.

Labor unions are "an archetype of an expressive association." *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 301 (4th Cir. 1991). "Not only do unions engage directly in partisan electoral politics, but labor unions have been predicated on ideas of worker solidarity that are as much political as economic." *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 133–34 (2d Cir. 2013) (footnotes omitted). FLOC is no exception. It uses public advocacy campaigns, litigation, and collective bargaining agreements (CBAs) with agricultural employers to promote fair wages and safe working conditions, fight discrimination, and ensure that farmworkers are able to voice concerns about work without fear of retaliation. *See* DE 124 at 2–3; DE 109 (Pls. Summ. J. Br.) at 6–7. It engages in public advocacy advancing farmworker welfare and immigrants' rights and has orchestrated campaigns and pursued grievances throughout the agricultural supply chain to achieve better conditions for farmworkers. DE 124 at 2–3; DE 109 at 6–7. The Dues Checkoff Provision — which threatens criminal penalties against anyone who even attempts to enter into a union dues checkoff agreement with an agricultural producer — would make it impossible for FLOC to continue these activities. *See* N.C. Gen. Stat. §§ 75-1, 75-9–75-16 (specifying penalties for engaging in conduct deemed "in restraint of trade"); DE 56 (Prelim. Inj. Op.) at 24-25, 42-43.

In rejecting Plaintiffs' arguments that the Dues Checkoff Provision burdens the expressive and associational rights of FLOC and its members, the Magistrate Judge relied on an incorrectly narrowed interpretation of the provision, asserting that "Section 95-79(b) merely prohibits agreements requiring farmers to withhold dues under Section 95-25.8(a);

it does not strip farmers of their discretionary ability to withhold dues authorized by farmworkers." DE 124 at 31-35, 45.

This interpretation conflicts with the statutory language, which reads, "*notwithstanding* G.S. 95-25.8, an agreement requiring an agricultural producer to transfer funds to a labor union or labor organization for the purpose of paying an employee's membership fees or dues is invalid and unenforceable against public policy in restraint of trade or commerce . . . ." DE 34-2 at 23 (emphasis added). The Opinion interpreted "notwithstanding G.S. 95-25.8" to mean the provision prohibits *binding* agreements, but not all agreements, under 95-25.8. DE 124 at 34-35. However, "[i]n statutes, 'notwithstanding' clauses show that one provision prevails over another in the event of a conflict." *N.L.R.B. v. SW Gen., Inc.,* 137 S. Ct. 929, 932 (2017). Section 20.5 contains such a conflict: section 95-25.8(a)(2) permits employee-authorized wage deductions, including union dues, but section 95-79(b) prohibits them.

N.C. Gen. Stat. 95-25.8(a) specifies that "an employer may withhold or divert any portion of an employee's wages" *only* when it is required by law, or when the employee provides written authorization for the deduction in advance. Thus, a farmer can only legally withhold union dues from farmworker pay if the farmworkers authorize the deduction in accordance with section 95-25.8. *See also* DE 112 (Pls. Opp. to Def. Summ. J. Mot.) at 3, 11-12, 19, 28 (discussing significance of section 95-25.8). Use of "notwithstanding" thus instructs the reader that the prohibition on dues deductions trumps the permissive language of section 95-25.8, leaving no room for the discretionary dues deductions envisioned in the

Opinion. *See N. C. Dep't of Corr. v. N. C. Med. Bd.*, 363 N.C. 189, 201 (2009). ("[W]e give every word of the statute effect, presuming that the legislature carefully chose each word used."). Because section 95-79(b) prohibits agreements between farmers and farmworkers to deduct dues under section 95-25.8 (which is the only way that an employer could lawfully deduct dues from an employee's wages), farmers have no "discretionary ability to withhold dues authorized by farmworkers." DE 124 at 35.[3]

The Opinion's interpretation also irreconcilably conflicts with law governing wage deductions. If a farmer discretionarily withholds union dues as authorized by an employee under section 95-25.8, federal and state laws *require* such deductions to be transmitted to the union. If dues are not transmitted to the union as authorized, the employer has violated the law because the employee has not received all wages when due. *See* N.C. Gen. Stat. § 95-25.6 (employers must pay wages when due); 20 C.F.R. § 655.122(m) (requiring same

---

[3] Contrary to the Opinion, "[j]uxtaposing Section 20.5 with Senate Bill 375," does not demonstrate legislative intent to limit the applicability of Section 20.5 to actual binding contracts. DE 124 at 35. Neither SB 375's proposed language nor the enacted language of Section 20.5 use the term "contract." *See* DE 108-21; DE 34-2 at 23. The key differences— other than the obvious fact that SB 375 would have outlawed dues deductions for a much broader group of workers—are the proposed locations of each law within the statutory scheme and the penalties associated with violations. SB 375 would have amended section 95-25.8 by prohibiting employers from withholding union dues notwithstanding the fact that employers could otherwise legally withhold dues under 95-25.8(a), creating only potential civil liability for employers under the state Wage and Hour Act. *See* N.C. Gen. Stat. § 95-25.22. In contrast, Section 20.5 amended section 95-79's language specifying types of agreements that are considered illegal in "restraint of trade," imposing not just civil but criminal liability for violations for anyone who engages in the prohibited activities. *See* N.C. Gen. Stat. §§ 75-1, 75-9-16; DE 56 at 24-30.

for employers of H-2A workers); 13 N.C. Admin. Code 12.0301(a) (wages are considered unpaid under the wage and hour act when wages were diverted for the employee's benefit but the employee has not received the benefit). Thus, there can be no "discretionary" agreement to deduct dues under section 95-25.8 without requiring an employer to remit those dues to the union. At the same time, this remittance is prohibited by Section 20.5 (because it is pursuant to a statutory authorization requiring those authorized deductions to take place) — and thus any diversion would violate not only Section 20.5 but also state wage and hour law, leading to the ultimate Catch-22. *See* 13 N.C. Admin. Code 12.0305(g)(2) (diversion of wages for purposes not permitted by law, even when authorized by the employee, violates the wage and hour act).

Regardless of how Section 20.5 is interpreted, it is an unconstitutional, targeted burden on Plaintiffs' expression and association. Plaintiffs have shown that FLOC's members face significant logistical barriers to alternative means of dues payment, and FLOC and its members rely on dues checkoffs for timely and consistent payment of union dues. *See* DE 109 at 12–13, 23–24; DE 112 at 7–8. Dues comprise the majority of FLOC's income and are essential to FLOC's organizing and operations. DE 109 at 7, 24. Loss of access to these funds would undercut and destabilize not only CBA administration but also political advocacy and organizing efforts. *See* DE 109 at 24; DE 112 at 5–6. The inability to secure dues checkoff arrangements, especially through binding CBAs, hurts FLOC's work and its ability to join new members. DE 109 at 24–25.

The Magistrate Judge relied on FLOC's statements that it has considered asking growers to deduct dues absent a binding dues checkoff agreement as support for the proposition that the Dues Checkoff Provision is not unduly onerous. DE 124 at 46. This conclusion rests on several errors.

First, the record shows that FLOC's Vice President doubts that it is actually "viable" to convince growers to adopt these informal arrangements as an alternative to dues checkoffs. DE 108-11 at 187:11-18 (Flores Dep.). The extensive evidence of the logistical difficulties of negotiating and maintaining *ad hoc* dues collection arrangements throughout the entire state shows that this fear is not speculative. *See* DE 109 at 12–13, 23–24; DE 112 at 7–8; DE 108-3 (2d Flores Decl.) ¶¶ 42-67; DE 108-11 at 185:17 – 187:23.

Second, attempting even informal "discretionary" agreements could subject FLOC to the threat of civil or criminal liability. *See* N.C. Gen. Stat. §§ 75-1, 75-9 -16; DE 56 at 24-30. This chills FLOC and employers from entering into agreements that may be technically lawful under the Opinion's interpretation, for fear they will be accused of conspiring to enter into a binding agreement. *See* DE 108-3 ¶ 51; *see also* DE 56 at 34 (recognizing Plaintiffs' "well-founded fear" of enforcement).

Third, even under the Opinion's narrowed interpretation, Section 20.5 still singles out FLOC for disfavored treatment, nullifying otherwise lawful contracts available to all other private sector unions. Such provisions are particularly suspect when crafted for the purpose of burdening a disfavored or politically unpopular group of speakers. *Cf. United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) (striking down Alabama law that

invalidated most contracts entered into by undocumented persons) ("The ability to contract is not merely an act of legislative grace . . . . The importance of contracts in the United States is reaffirmed by the Constitution, federal statute, and the Supreme Court.").

Finally, Plaintiffs do not need to demonstrate an actual burden to prevail on their First Amendment selective regulation claim. *See Time Warner Cable*, 667 F.3d at 636–37 ("[plaintiffs] need not prove that they will sustain a quantifiable economic injury"); *cf. Minneapolis Star*, 460 U.S. at 588 (noting that selection for special treatment threatens speakers "not only with the current *differential* treatment, but with the possibility of subsequent differentially *more burdensome* treatment," resulting in "censorial effects.") (emphasis in original).

The selective and onerous regulation imposed on FLOC — and no other entity, *see* DE 108-1 ¶ 18, DE 108-3 ¶ 6 — by the Dues Checkoff Provision is therefore subject to strict scrutiny. Defendant has not demonstrated that: (1) it has a compelling interest in eliminating union dues checkoffs agreement for agricultural employees, or (2) that categorically invalidating union dues checkoff agreements for agricultural employees is the least restrictive means for accomplishing any asserted governmental interest. Plaintiffs are thus entitled to judgment as a matter of law on their First Amendment claim.

## B. The Magistrate Judge erroneously concluded that selective regulation claims are limited to the press.

The Magistrate Judge incorrectly concluded the Dues Checkoff Provision does not implicate the First Amendment because FLOC is not a member of the press. *See* DE 124 at 40–45. The Opinion does not cite any authority supporting its theory that selective

regulation claims are limited to the press or unavailable to expressive associations like unions. Nor does it explain why a law restricting certain cable providers from obtaining statewide franchises, *see id.* at 43-44 (citing *Time Warner Cable*, 667 F.3d at 633–34), raises more serious First Amendment concerns than a law that selectively prevents a single, disfavored labor union from securing its main source of income.

The Fourth Circuit has recognized that concerns about regulations targeting a small number of speakers are not limited to the Press Clause. *See Chesapeake & Potomac Tel. Co. of Virginia v. United States*, 42 F.3d 181, 196 (4th Cir. 1994) (suggesting common carrier regulation would trigger strict scrutiny if it selectively targeted a small number of speakers, even if not members of the press), *vac'd and remanded on other grounds*, 516 U.S. 415 (1996). There is "no reason why a government regulation which discriminates against a particular class of speakers, behind which there is no evidence of an illicit governmental motive, but which is structured in a manner that raises suspicions that its objective was, in fact, the suppression of certain ideas, would not similarly be subject to strict scrutiny." *Id.* (cleaned up).

Speaker-based restrictions raise concerns about content-discrimination because they "run the risk that the State has left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (internal quotation marks omitted). Additionally, when the Government selectively regulates certain speakers, it "deprive[s] the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Citizens United v. FEC*,

558 U.S. 310, 341 (2010). Laws that directly restrict speech based on the identity of the speaker obviously raise these concerns, *see id.*, but so do laws targeting a small number of speakers for regulations not imposed on any other entities. *Time Warner Cable*, 667 F.3d at 640.

The Supreme Court has held that a selective tax may implicate the First Amendment in three distinct ways. *Leathers v. Medlock*, 499 U.S. 439 (1991). First, "[a]bsent a compelling justification, the government may not exercise its taxing power to single out the press." *Id.* at 447 (citations omitted). Second, a tax is "suspect if it targets a small group of speakers," because this raises the "fear" of "censorship of particular ideas or viewpoints." *Id.* (citations omitted). Finally, a "tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech." *Id.* (citations omitted). Had the Supreme Court intended to limit selective regulation claims to laws targeting the press, it would not have added that regulations targeting a small group of "speakers" are "also suspect" under the First Amendment. *See id*. *Accord, e.g.*, *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 739–40 (1st Cir. 1995); *Chesapeake & Potomac Tel. Co.* 42 F.3d at 196–97.

The Opinion cites *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251 (4th Cir. 1989), for the proposition that "a government's selective treatment of unions does not necessarily raise First Amendment concerns." DE 124 at 44–45. *Campbell*, however, concerned the denial of a government subsidy, which is fundamentally different from a restriction on a private party like the one at issue here. In that case, the South Carolina Education

Association ("SCEA") challenged legislation authorizing public employees to establish payroll deductions for charitable contributions and union dues for a favored labor union, while denying union dues checkoffs for other labor unions. *Campbell*, 883 F.2d at 1252–53. The Fourth Circuit ruled that SCEA's exclusion from the voluntary payroll deduction program did not trigger heightened scrutiny, because "the First Amendment does not impose an affirmative obligation on the state to assist [the SCEA] by providing payroll deduction services" for public employee union dues. *Id.* at 1257.

*Campbell* boils down to two simple propositions. First, "the use of *a state payroll system* to collect union dues from public sector employees is a state subsidy of speech." *Wisc. Educ. Ass'n v. Walker*, 705 F.3d 640, 645 (7th Cir. 2013) (citing *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009) (emphasis added). Second, "speaker-based distinctions are [generally] permissible when the state subsidizes speech," because "[n]othing in the Constitution requires the government to subsidize all speech equally." *Wisc. Educ. Ass'n*, 705 F. 3d at 646.

By contrast, the Dues Checkoff Provision affirmatively prohibits private parties from entering into voluntary agreements to administer union dues checkoffs for FLOC. This is not the mere denial of a subsidy; it is a government-imposed restriction on FLOC's ability to negotiate contracts available to every other private sector labor union in the state. *See Ysursa*, 555 U.S. at 364 (Ginsburg, J., concurring in part and concurring in the judgment) ("The parties agree . . . that Idaho's ban on payroll deductions for political activities violates First Amendment limitations *as applied to the private sector*.")

(emphasis added)). A law that selectively restricts a single expressive association is subject to strict scrutiny. Otherwise, the government could effectively destroy all manner of expressive associations through the selective application of taxes and regulatory restrictions.

## II. The Court Should Grant Summary Judgment for Plaintiffs on their Equal Protection Claim.

Plaintiffs are entitled to judgment as a matter of law that Section 20.5 violates the Equal Protection Clause under either heightened scrutiny or rational basis review. Plaintiffs also raise material fact issues precluding summary judgment on their claims that the disproportionately Latinx and non-citizen demographic of North Carolina farmworkers was a motivating factor in the enactment of Section 20.5.

### A. The Opinion Incorrectly Applied Fourth Circuit Precedent.

By excluding North Carolina farmworkers and their sole union, FLOC, from enjoying rights enjoyed by all other private sector workers and unions under North Carolina law,[4] Section 20.5 targets a "discrete and insular" minority and is subject to heightened scrutiny. The Fourth Circuit recently established a framework for analyzing these claims. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020). In *Grimm*, the Court

---

[4] Plaintiffs object to the conclusion that the relevant comparison class is "all other private sector employees' exempt from the NLRA." DE 124 at 56. State law on labor relations does not incorporate the package of private sector worker exclusions set forth in the NLRA, and neither Judge Auld nor Defendant dispute that farmworkers and their unions are the *only* private sector workers treated differently under *state* labor law. *See* DE 124 at 55–56. Whichever classification is used, however, Section 20.5 violates equal protection for the reasons stated *infra*.

concluded that a school board's policies restricting bathroom access for transgender students constituted sex discrimination, but held in the alternative that transgender people are "at least a quasi-suspect class," warranting heightened scrutiny. *Id.* at 610-13. The Court outlined four factors relevant to determining if a class is "quasi-suspect": whether the disadvantaged class (1) has been historically subject to discrimination; (2) has a defining characteristic that relates to its ability to contribute to society; (3) is definable as a discrete group by obvious, immutable, or distinguishing characteristics; and (4) is a minority lacking political power. *Id.* at 611. All four of these factors weigh in favor of considering North Carolina farmworkers a quasi-suspect classification.

1. <u>Farmworkers Have Been Historically Excluded from Basic Labor Protections.</u>

Plaintiffs demonstrated a pattern of exclusions of farmworkers from basic labor protections enjoyed by other private sector workers. *See* DE 112 at 7. These exclusions have frequently intersected with, and been motivated by, discrimination against African Americans. *See id.*; DE 108-28 (Korstad Rept.) ¶¶ 11, 17-20, 63-76. Even as the farmworker population in North Carolina has changed from disproportionately African American to approximately 95% Latinx, the overwhelmingly (*over 90%*) white composition of the agricultural producer class has persisted. DE 108-1 ¶¶ 2, 11; DE 108-28 ¶ 78.

In the case of Section 20.5, the legislature doubled down on these historical practices. Although the racial minority group most heavily (and in the case of North Carolina, almost exclusively) impacted by these laws has changed from African American

to Latinx, the overriding practice of white supremacy remains entrenched in these laws and perpetuated in Section 20.5. Moreover, farmworkers as a group remain disenfranchised and excluded from basic worker protections applicable to other private sector workers, even as they suffer high rates of poverty and dangerous working conditions which underscore the need for such protections. DE 112 at 2; DE 108-2 (Arcury Rept.) ¶¶ 22, 25-28.

2. Farmworkers' Status Does Not Relate to Their Ability to Contribute to Society.

The Opinion does not appear to make a determination under *Grimm*'s second factor. Neither an individual's status as a farmworker, nor the fact that farmworkers are overwhelmingly Latinx non-citizens, bears any relation to their ability to contribute to or function in society. *See Grimm*, 972 F.3d at 612.[5] Nor should this status affect their ability to decide whether to join a union and freely negotiate dues checkoff agreements for their benefit.

3. Farmworkers Are a Discrete Group Defined by Distinguishing Characteristics.

The Magistrate Judge rejected Plaintiffs' argument that farmworkers and their unions are discrete groups defined by the distinguishing characteristics of being largely Latinx and/or non-citizens because "Plaintiffs have not established the citizenship status of a majority of North Carolina farmworkers." DE 124 at 59. This conclusion overlooks the

---

[5] Indeed, in the current pandemic, the state government has deemed farmworkers "essential workers." *See* N.C. Dep't of Health & Human Servs., *Deeper Dive – Group 3*, https://covid19.ncdhhs.gov/vaccines/find-your-spot-take-your-shot/deeper-dive-group-3#frontline-essential-worker (last visited Mar. 11, 2021).

parties' stipulation that the state's farmworkers are approximately 95% Latinx, which is clearly an immutable and distinguishing characteristic even without citizenship data. DE 108-1 ¶ 2. Moreover, it is undisputed that about 95% of the members of FLOC are non-citizen H-2A guestworkers.[6] *Id.* at ¶ 18; DE 108-3 ¶ 7. These undisputed facts, standing alone, satisfy *Grimm*'s third factor.

The Opinion erroneously disregards Plaintiffs' uncontroverted evidence indicating that a majority of farmworkers in the state are not U.S. citizens. The Opinion acknowledged the state's farmworkers are mostly of Mexican origin and many speak only Spanish. DE 124 at 59. But it failed to account for the statement of Plaintiffs' expert, who has conducted field research relating to farmworkers in the state for 25 years, that 90-100% of the adult participants in his studies were born in Mexico, with fewer than 5% speaking any English "beyond a rudimentary level." DE 108-2 ¶ 20.[7] In addition, North Carolina Farm Bureau (NCFB), the key proponent of Section 20.5 and an opposing *amicus* and adverse witness

---

[6] The Magistrate Judge noted that because Section 20.5 facially applies to all farmworkers and farmworker unions, Plaintiffs must either establish that the *Grimm* factors weigh in favor of quasi-suspect class treatment for all North Carolina farmworkers and their unions, or that the classification was intended to target FLOC and its membership. DE 124 at 58 n.35. As set forth *supra* and in this section, Plaintiffs meet both of these burdens because FLOC, as the only farmworker union operating in North Carolina for the last twenty years, is the only union that legislators could have considered when enacting Section 20.5. *See* DE 108-1 ¶ 18; DE 108-3 ¶ 6; *see also* DE 109 at 8-11.

[7] Because people must generally pass an English test to gain citizenship, widespread lack of English proficiency strongly indicates that most farmworkers are not citizens. *See* https://www.uscis.gov/citizenship/learn-about-citizenship/the-naturalization-interview-and-test.

in this case, has publicly stated that approximately half of the state's farmworkers are undocumented immigrants and another 25% are H-2A guestworkers. Ex. 63 (July 2017 article).[8] By NCFB's account, at least 75% of the state's farmworkers are not citizens.

Defendant has offered no data nor made any other effort to dispute Plaintiffs' assertions that North Carolina's farmworkers are disproportionately non-citizens — nor did the Magistrate Judge identify any such data.[9] Accordingly, there is no material fact dispute on this issue. *See* Fed. R. Civ. P. 56 (e)(2).

---

[8] Plaintiffs respectfully request that the Court consider NCFB's statements regarding farmworker demographics in a July 2017 *News and Observer* article attached to these Objections as Exhibit 63. *See* Fed. R. Civ. P. 72(b) (a court may consider "further evidence" in reviewing objections). The statements were made by an *amicus* and attempted intervenor who has represented to this Court that it is generally knowledgeable on matters related to the state's agricultural industry. *See* DE 105 at 2. It is corroborated by evidence offered by Plaintiffs from other sources, and thus bears sufficient indicia of trustworthiness. Fed. R. Evid. 807. It is also more likely to be directly probative on the state's farmworker citizenship demographics than any other data the parties are able to obtain. *Id*. Defendant has notice of the statements in this article and an opportunity to dispute their reliability in his response to these Objections. *Id*. Additionally, Plaintiffs can call NCFB witnesses to testify at trial as to the truth of the statements in this article. *See* Fed. R. Civ. P. 56(c)(2).

[9] Judge Auld pointed out that nationally there are 30,000-80,000 child laborers in agriculture, many of whom are U.S. citizens, and further, that the state's Latinx citizen population is growing. DE 124 at 60. He also contended that it was difficult to extrapolate from U.S. Department of Labor figures indicating that nationally, only 29% of farmworkers are U.S. citizens because North Carolina has a significantly higher percentage of *guestworker* (i.e., non-citizen) farmworkers than the national average. *Id.* at 61. These points do not controvert the strong non-speculative evidence, backed by the NCFB's public statements, indicating that most North Carolina farmworkers are not citizens. Indeed, the differences between federal and state data on farmworker demographics indicate that the state's agricultural industry is significantly *more* dependent on non-citizen workers than the nation as a whole.

Even if farmworker status in North Carolina were not almost entirely correlated with being Latinx or a non-citizen, the state's farmworkers constitute a discrete group defined by distinguishing characteristics under the law. Among other characteristics, they are subject to group-based exclusions from labor protections, are vulnerable to human trafficking and other severe forms of labor exploitation, and experience high rates of poverty and workplace injury. DE 109 at 5; DE 112 at 2.

4. Farmworkers are a Minority Lacking Political Power.

The Magistrate Judge did not directly address *Grimm*'s fourth factor. *See* DE 124 at 61-62. Plaintiffs have marshalled extensive undisputed evidence that farmworkers lack political power in North Carolina.

North Carolina has a long history of passing laws designed to sow divisions among farmworkers, maintain a readily available cheap labor source, and suppress their potential political power. DE 108-28 ¶¶ 14, 19, 61-62. This intended impact persists today. Plaintiffs showed that the over 90% white constituency of agricultural producers is "influential" in the state, (DE 124 at 73; DE 108-1 ¶11; DE 112 at 6), and that two farmer-legislators — including one whose farm had been sued by FLOC members and was the subject of FLOC organizing drive — led the effort to enact Section 20.5. DE 108-1 ¶ 12; DE 109 at 8-11. Plaintiffs demonstrated that farmworkers, and FLOC's membership in particular,[10] are

---

[10] The Opinion cited *City of Charlotte v. Int'l Ass'n of Firefighters*, 426 U.S. 283, 286 (1976) for the proposition that unions and union members are not considered suspect classes. DE 124 at 75 n.39. Here, Plaintiffs have amassed evidence showing that, because of their demographics and the political context, these particular union members and the state's farmworkers in general should be considered quasi-suspect classes. In contrast, the

highly politically disenfranchised and lack political access due to the fact that most are ineligible to vote. *See* DE 109 at 12, 16; DE 112 at 2. The migratory nature of their work, lack of English proficiency, and high rates of poverty also contribute to disenfranchisement. DE 109 at 4-5; DE 108-2 ¶¶ 20, 28; DE 108-3 ¶ 7. Indeed, the history of Section 20.5 shows farmworkers' lack of access to political power. DE 109 at 12; DE 112 at 21, 23.

Under all four of the *Grimm* factors, Plaintiffs show that Section 20.5 targets a quasi-suspect class. The appropriate *minimum* standard of scrutiny under which to evaluate Plaintiffs' summary judgment claims is thus heightened (or intermediate) scrutiny, under which the burden shifts to the state to demonstrate that a classification is substantially related to an important governmental interest. *Grimm*, 972 F.3d at 608. The justification for the classification must be "exceedingly persuasive" and "genuine;" speculation or post-hoc rationalizations are insufficient. *United States v. Virginia*, 518 U.S. 515, 533-34 (1996). As explained below, Defendant's justifications for Section 20.5 fail even rational basis scrutiny and thus cannot meet this much more exacting standard.

### B. Section 20.5 Fails Rational Basis Review Because it Was Motivated by Anti-Union Animus.

The Magistrate Judge also erred in determining that Section 20.5 withstands rational basis review.

---

*Charlotte* plaintiffs made no effort to show why a suspect or quasi-suspect classification was appropriate. *See also* DE 112 at 26 n.9 (distinguishing *Charlotte*).

1. Anti-Union Animus Is Not a Legitimate Governmental Interest

The Opinion failed to properly account for the uncontroverted record evidence demonstrating that Section 20.5 was enacted to further the NCFB's and legislators' anti-union animus. Under rational basis review, the purported basis for the statute does not have to be supported by evidence—rational speculation will suffice. DE 124 at 78. However, where animus against a politically unpopular group appears to have motivated legislation, the Supreme Court has examined, under a "more searching form of rational basis review," *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring), the actual "design, purpose, and effect" of a law. *United States v. Windsor*, 570 U.S. 744, 764 (2013). In such cases, the Court asks whether the actual and purported purposes of a law are grounded in reality and logic, and whether the classification at issue is rationally related to a *legitimate governmental* interest (as opposed to furthering private animus). *See, e.g., id.* at 768–75; *Romer v. Evans*, 517 U.S. 620, 631–35 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446–50 (1985); *Plyler v. Doe*, 457 U.S. 202, 220–30 (1982); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–35 (1973).

Plaintiffs presented overwhelming undisputed evidence that Section 20.5 was motivated by the admitted anti-union animus of its proponents, rather than any administrative burdens or other concerns constituting *legitimate governmental* interests. *See* DE 109 at 8–11, 20–22; DE 112 at 25–26, 30–31; DE 115 at 3, 5. Indeed, the Magistrate Judge noted substantial evidence that anti-union animus had driven the enactment of

Section 20.5. *See* DE 124 at 68, 73, 74-75. And, as this Court earlier recognized, "a desire to suppress farmworkers' organizational efforts likely does not constitute a legitimate government interest." DE 56 at 73.

Because the uncontroverted evidence shows that anti-union (and specifically anti-FLOC animus) was a driving force behind Section 20.5, the Opinion erroneously recommended that the Court hold that Section 20.5 survives rational basis review.

    2.   Section 20.5 Is Not Rationally Related to Reduction of Administrative Burdens

The Opinion also erred in concluding that "[r]eduction of administrative burdens associated with mandatory dues withholding constitutes a rational basis for the Dues Checkoff Provision." DE 124 at 79. This determination is at odds with the Court's previous, correct determination that:

> the precluded activities (dues checkoffs and certain settlement provisions) arose from voluntary agreements between farmers, farmworkers, and/or FLOC rather than any regulatory mandate. Moreover, the Farm Act does not affect payroll deductions for anything other than payment of union dues. The Farm Act thus does not appear rationally related to reducing farmers' regulatory burdens. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

DE 56 at 72.

Regardless of whether the burdens are characterized as "regulatory" or "administrative," DE 124 at 78-79, the Court's original logic still applies: because farmworkers are not covered by the National Labor Relations Act (NLRA) and agricultural producers cannot be compelled to bargain for dues checkoff agreements, any burdens are

voluntarily assumed. DE 108-1 ¶¶ 13-15, 21. Moreover, as alluded to by the Court (DE 56 at 72), North Carolina law permits employees to authorize numerous deductions for their convenience that pose equal or greater administrative burdens to employers. *See* 13 N.C. Admin Code § 12.0305(b) ("Deductions for the convenience of the employee, as that term is used in G.S. 95-25.8, include savings plans, credit union installments, savings bonds, union or club dues, uniform rental or cleaning not required by the employer, parking and charitable contributions."). Yet Section 20.5 eliminates this authorization only for farmworker union dues.

Even assuming some administrative burden associated with dues checkoffs,[11] the categorical exclusion of the agricultural sector from *voluntary* agreements available to all other private sector workers in the state is so attenuated and disproportionate to the goal of reducing administrative burden as to render it arbitrary and irrational. *See* DE 56 at 72; DE 112 at 26–27. This is particularly so here: Section 20.5 restricts the contract rights of an entire workforce for whom dues checkoffs are necessary to exercise their First Amendment and state statutory right to associate with unions. *See* Section I *supra*; DE 109 at 12–13; DE 112 at 5–6. And Section 20.5's prohibitions are backed by threats of criminal prosecution and civil liability for attempting to enter into the forbidden agreements. *See* N.C. Gen. Stat. §§ 75-1, 75-9–16. Courts have repeatedly invalidated restrictions that were

---

[11] The record shows that NCFB, Section 20.5's drafter and main proponent, was unable to substantiate these claims of burden, and it further shows that employers who did not want to participate in dues checkoff agreements were able to avoid them. DE 112 at 3-4.

similarly harsh, overbroad, and disproportionate to the purported legitimate ends. *See, e.g.*, *Cleburne,* 473 U.S. at 450; *Moreno,* 413 U.S. at 534. The Magistrate Judge erred when he recommended finding that Section 20.5's harsh and sweeping restrictions on contractual rights available to every other North Carolina worker were rationally related to the goal of reducing administrative burden on agricultural producers.

### C. The Magistrate Judge Failed to Draw All Reasonable Inferences in Plaintiffs' Favor in Granting Summary Judgment on their Intentional Discrimination Claim Based on Race, National Origin, and Alienage.

The Opinion also erred in recommending summary judgment against Plaintiffs on their claim that race, national origin, and alienage discrimination was a substantial or motivating factor in the passage of Section 20.5.[12] Whether a legislature acted with discriminatory intent is a question of fact. *See Hunt v. Cromartie,* 526 U.S. 541, 549 (1999). For an intentional discrimination claim, in which the ultimate factual question of state of mind is a decisive element, "summary judgment is seldom appropriate." *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979). *See also Hunt,* 526 U.S. at 553 n.9. "[W]hether as a matter of fact any particular state of mind exists can seldom be considered to be beyond reasonable dispute because this depends entirely upon the

---

[12] As set forth above, because Section 20.5 does not survive heightened scrutiny or rational basis review, the Court should grant summary judgment for Plaintiffs on their equal protection claim. In their summary judgment brief, Defendant treated Plaintiffs' assertions that race, national origin, and/or alienage was a motivating or substantial factor in Section 20.5's passage as a distinct claim. Accordingly, Plaintiffs here explain why their evidence supports, at minimum, a denial of Defendant's summary judgment motion as it pertains to Plaintiffs' claims of discrimination based on race, alienage, and/or national origin.

conflicting inferences to be drawn from evidence so likely to be circumstantial or, if direct, self-serving." *Charbonnages*, 597 F.2d at 414.

As set forth below, the Magistrate Judge erroneously engaged in credibility determinations and weighing of the evidence to resolve the dispute, effectively assuming the role of the ultimate fact-finder in presuming that Plaintiffs could not overcome the presumption of legislative good faith.[13]

1. Historical Background

Plaintiffs have put forth sufficient evidence that a reasonable fact-finder could find the racially discriminatory history of farmworker exclusions in federal and state labor protections points to ongoing intentional discrimination, embodied in Section 20.5, against a workforce that is overwhelmingly comprised of a disenfranchised racial minority and in favor of an overwhelmingly white employer class. *See* DE 109 at 4; DE 112 at 7, 17 (summarizing evidence); *Cf. N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 305 (4th Cir. 2020) (recognizing the state's long history of race discrimination "favors finding discriminatory intent"); *Veasey v. Abbott,* 830 F.3d 216, 237 (5th Cir. 2016) (record evidence showing that Texas had a history of justifying racially discriminatory laws with the same "race neutral reason" could support a finding of discriminatory intent). The

---

[13] The Magistrate Judge correctly found that, at minimum "a reasonable inference exists that the disparate impact factor weighs in Plaintiffs' favor," as "one reasonably may infer that Section 20.5 primarily disadvantages FLOC's largely Latinx non-citizen membership rather than the primarily white farmers for whose benefit the General Assembly enacted the law." DE 124 at 64, 76.

Opinion also failed to account for how a reasonable fact-finder might infer anti-Latinx and anti-immigrant sentiment from nearly a decade of proposed legislation that "adversely impact[s]" immigrants. DE 124 at 27 n.25; DE 108-1¶¶33-43; DE 108-28 ¶¶ 11, 20, 39-40, 59-61, 72, 74-76, 79-87.

The Magistrate Judge notes the undisputed nature of Plaintiffs' evidence that Section 20.5 was passed in response to advocacy by FLOC's Latinx, non-citizen members, but nonetheless rejects this undisputed evidence of intentional discrimination, stating that "it remains equally plausible . . . that anti-union views rather than bias against "Latinx non-citizens" motivated Section 20.5's enactment." DE 124 at 68. This all but concedes that a reasonable fact-finder could infer discriminatory intent from the evidence presented on this factor, rendering summary judgment inappropriate.

### 2. Sequence of Events and Substantive Departures

The Opinion's determination that the sequence of events leading to Section 20.5 was not sufficiently "suspicious" to survive summary judgment was also erroneous. While the sequence of events was different in some respects from the circumstances cited from *McCrory*, it was undisputed that Section 20.5 was adopted "with limited debate within one evening," and was added "last-minute . . . in the final days of the legislative session." DE 124 at 70, 72. Moreover, the uncontroverted record shows—or at least raises a strong inference— that House debate on Section 20.5 lasted less than 10 minutes and the Senate debate considerably less. *See* DE 34-18 at 1-5 (House debate transcript on Section 20.5 showing starting point of 2:28:00 and ending point of 2:37:55); DE 34-25 (Guy Decl.) ¶

14 (explaining process of transcribing debate); DE 107-5 at 16 (Senate debate transcript); DE 107-6 at 12-15 (House debate transcript). "Of course, a legislature need not break its own rules to engage in unusual procedures," and further, Plaintiffs should not be required to show procedural irregularity unprecedented in "any other legislature in the country" to overcome summary judgment. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 228 (4th Cir. 2016); *see also Carcaño v. Cooper,* 350 F. Supp. 3d 388, 419 (M.D.N.C. 2018) (allegations that a bill was tacked on to another bill at the last minute and "was introduced, debated, passed, signed, and went into effect within a single day" adequately plead a sequence of events suggesting discrimination). Plaintiffs also demonstrated ways that Section 20.5 is a significant substantive departure from state policy regarding labor relations and payroll deductions, only some of which were noted in the Opinion. DE 112 at 19-20; DE 124 at 72-73.

The Opinion characterized Plaintiffs' evidence on this factor as, "at most, very modestly support[ing] Plaintiffs' position," (DE 124 at 74). Because a reasonable fact finder could find this showing persuasive, Plaintiffs' claim must be allowed to proceed.

3. <u>Legislative History</u>

The Magistrate Judge did not find that the legislative history favored Plaintiffs' claim, specifically disagreeing that any discriminatory inferences could be drawn from Representative Dixon's statements regarding "predatory folks" and "outside organizations." DE 124 at 74-75. A principal reason for rejecting this evidence was a mistaken conviction that FLOC does not have "a racial identity." But the Fourth Circuit

has held that corporations can have an imputed racial identity if they are substantially associated with a racial group based on their aims or the identity of people who run the organization. *See Woods v. City of Greensboro*, 855 F.3d 639, 645-46 (4th Cir. 2017). As a union led and staffed by Latinx people, and with a membership that is over 90% Mexican guestworkers, FLOC has an imputed racial identity. And while the Magistrate Judge may reasonably believe that the references to "predatory folks" and "outsiders" indicate anti-union animus rather than consideration of FLOC's Mexican guestworker membership, another reasonable fact-finder could draw the inference from such statements that FLOC's membership demographics were also a motivating factor in the enactment of Section 20.5.[14]

The Opinion recommends summary judgment based on the Magistrate Judge's conclusion that Plaintiffs "have not established that racial, national origin, and/or alienage discrimination was a substantial or motivating factor behind enactment of the law." DE 124 at 76. But, in *opposing* Defendant's summary judgment motion on these grounds, it was not Plaintiffs' burden to conclusively establish this ultimate issue. Plaintiffs marshalled sufficient evidence in their favor, raising material fact questions as to whether invidious discrimination motivated the enactment of Section 20.5.

---

[14] The Opinion fails to draw reasonable inferences, supported by evidence, about the significance of SB 375's failure to pass the House. Plaintiffs' unrefuted presentation of evidence showed it was not the contents of the bill, but *who would be impacted by the bill*, that led to its failure. DE 108-8 at 92:21-93:25. It was only once the dues checkoff provisions were altered to discretely target a disenfranchised minority group that they were enacted.

## III.   The Court Should Deny Summary Judgment on Plaintiffs' Section 1981 Claim.

The portion of the Opinion recommending summary judgment against Plaintiffs on their 42 U.S.C. §1981 claims rests on fundamental errors of law. The Opinion wrongly contends that §1981 applies only to claims based on race, despite clear and binding precedent extending its protections to alienage-based claims. DE 124 at 83-85. In light of this flawed conclusion, the Opinion fails to draw all reasonable inferences in favor of Plaintiffs.

The Supreme Court has long held that section 1981's command that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts" prohibits discrimination based on alienage, as well as race. *Takahashi v. Fish and Game Comm'n*, 334 U.S. 410, 419-20 (1948); *see also Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 612-13 (1987) (noting that the language of section 1981 was intended to provide "protection for immigrant groups"); *Duane v. GEICO*, 37 F.3d 1036, 1038-41 (4th Cir. 1994) (section 1981 prohibits both public and private alienage discrimination).[15]

The Magistrate Judge discounted relevant material facts that support Plaintiffs' alienage-based claim. Plaintiffs presented sufficient evidence to allow a reasonable fact-finder to conclude that the alienage of those most impacted by Section 20.5 was the but-

---

[15] *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* 140 S. Ct. 1009 (2020), upon which the Opinion relies, neither mentions alienage nor purports to reverse these legal principles.

for cause of its passage. *See* DE 112 at 21-22. Accordingly, summary judgment is inappropriate as to Plaintiffs' section 1981 claim.

### IV. <u>The Court Should Deny Summary Judgment on Plaintiffs' Bill of Attainder Claim.</u>

The Opinion erroneously recommends granting summary judgment on Plaintiffs' claim that Section 20.5 is a bill of attainder on the grounds that Plaintiffs do not sufficiently demonstrate that it specifically targeted FLOC for punitive treatment. DE 124 at 88. In contrast with cases cited in the Opinion, Plaintiffs raise evidence that Section 20.5 was preceded by a 2013 law specifically targeting FLOC, and was passed as a punitive response to FLOC's organizing efforts at Senator Jackson's farm - specifically its efforts to secure a CBA to settle litigation against him. *See* DE 108-3 ¶¶ 36–40; DE 109 at 8-9; DE 112 at 32; DE 124 at 15-19. These facts, coupled with the highly punitive character of Section 20.5, *supra* at Section II.B, create a material fact issue surrounding whether the law was designed and passed to punish FLOC and is an unconstitutional bill of attainder. *See* DE 112 at 31-32.

### V. <u>Section 20.5 Should Be Permanently Enjoined.</u>

The Opinion declined to analyze whether a permanent injunction was appropriate. DE 124 at 29, n.26. "Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Ostergren v. Cucinelli*, 615 F.3d 263, 288-89 (4th Cir. 2010) (internal citation omitted). The Court should enter a permanent injunction based on the factors outlined in Plaintiffs'

summary judgment motion (DE 108 ¶¶7-8), and already found by this Court when it preliminarily enjoined Section 20.5. *See* DE 56 at 74-78. Where, as here, Plaintiffs have shown that they are entitled to judgment that Section 20.5 is unconstitutional, the law should be permanently enjoined. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 938 (4th Cir. 1995) (permanent injunction may be entered "if the affidavits and documentary evidence clearly establish the plaintiff's right to the injunction"); *Bryant v. Woodall,* 363 F. Supp. 3d 611, 632 (M.D.N.C. 2019) (enjoining unconstitutional statute without separately analyzing permanent injunction factors).

## <u>CONCLUSION</u>

Plaintiffs respectfully request that this Court grant summary judgment for Plaintiffs on their First Amendment and Equal Protection claims and permanently enjoin all of Section 20.5.


Respectfully submitted,

/s/ Kristi Graunke
Kristi Graunke
North Carolina Bar No. 51216
kgraunke@acluofnc.org
Jaclyn Maffetore
North Carolina Bar No. 50849
jmaffetore@acluofnc.org
ACLU of North Carolina Legal
Foundation
P. O. Box 28004
Raleigh, NC 27611-8004
Tel: 919-834-3466

30

Julia Solórzano
Georgia Bar No. 928725
julia.solorzano@splcenter.org
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30030-1287
Tel: 404-521-6700

Meredith B. Stewart
Louisiana Bar No. 34109
meredith.stewart@splcenter.org
Southern Poverty Law Center
201 St. Charles Ave, Ste. 2000
New Orleans, LA 70170
Tel.:     504-486-8982

Carol Brooke
North Carolina Bar No. 29126
carol@ncjustice.org
Clermont Ripley
North Carolina Bar No. 36761
clermont@ncjustice.org
North Carolina Justice Center
PO Box 28068
Raleigh, NC 27611
Brooke Tel: 919-856-2144
Ripley Tel.: 919-856-2154
Fax: 919-856-2175

Brian Hauss
New York Bar No. 5437751
bhauss@aclu.org
Arianna Demas
ademas@aclu.org
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212-549-2500
Fax: 212-549-2650

Robert J. Willis
North Carolina Bar No. 10730
rwillis@rjwillis-law.com
Law Office of Robert J. Willis, P.A.
P.O. Box 1828
Pittsboro, NC 27312
Tel: 919-821-9031
Fax: 919-821-1763

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATIONS OF LR 7.3(d)

Relying on the word count function of Microsoft Word, I hereby certify that this brief complies with the 8,000 word limit as set forth in the Court's March 3, 2021 text order.

/s/ Kristi L. Graunke
*One of the Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on March 11, 2021, I electronically filed the foregoing and an exhibit with the Clerk of the Court using the CM/ECF system, which will serve counsel for Defendant.

/s/ Kristi Graunke
*Counsel for Plaintiffs*