IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 1:17-cv-1037

FARM LABOR ORGANIZING
COMMITTEE, et al.,

                    *Plaintiffs*,

        v.

JOSHUA STEIN,

                    *Defendant*.

Defendant's Response to Plaintiffs'
Objections to the Magistrate Judge's
Memorandum Opinion and
Recommendation

Fed. R. Civ. P. 72(b)

Defendant Stein, in his official capacity as Attorney General of North Carolina,

pursuant to Fed. R. Civ. P. 72(b)(2) and Local Rule 72.4, by and through counsel, submits

this response to Plaintiffs' objections (DE 130) to the Magistrate Judge's Memorandum

Opinion and Recommendation (DE 124, *hereinafter* "M&R").

## INTRODUCTION

Plaintiffs ask this Court to declare Section 20.5 of the 2017 Farm Act

unconstitutional under the First Amendment and the Equal Protection Clause. However,

they cannot overcome the strong presumption that the law is constitutional, and they fail to

demonstrate that "no set of circumstances exists under which [the Act] would be valid or

that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460,

472 (2010) (quotation marks and citation omitted).

The plain text of the statute establishes that the Checkoff Provision is an economic

regulation that neither implicates nor violates the First Amendment. Rather, the law is an

economic regulation of contracts between agricultural producers and unions. Furthermore, it is more narrowly tailored than other union-related contract laws previously found to be constitutional. The law does not discriminate against a suspect class and is consistent with North Carolina's right-to-work principles and longstanding support of the agricultural industry. The M&R correctly recommended the Court grant summary judgment on these issues, and others, and Plaintiff's objections to the M&R should be rejected.

## ARGUMENT

I. **THE MAGISTRATE JUDGE PROPERLY CONCLUDED THAT THE DUES CHECKOFF PROVISION DOES NOT VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS.**

Defendant demonstrated in the briefs filed in support of his Motion for Summary Judgment that the Dues Checkoff Provision of Section 20.5 (the "Checkoff Provision") does not violate Plaintiffs' First Amendment rights because (1) the Checkoff Provision is an economic regulation that does not implicate (or violate) the First Amendment; and (2) the Checkoff Provision is both viewpoint and content neutral and narrowly tailored to a substantial government interest. (DE 107 at 15-24 (Def's MSJ Mem.); DE 111 at 22-27 (Def's MSJ Resp.); DE 116 at 6-8 (Def's MSJ Reply)). The Magistrate Judge agreed, in part, and concluded, "Plaintiffs have failed to establish that the Dues Checkoff Provision violates their first-amendment rights." (M&R at 46-47).

Plaintiffs object to this conclusion and argue that the Magistrate Judge erred because the Checkoff Provision "burdens the expressive and associational rights of FLOC and its members." (DE 130 at 4). Plaintiffs assert that the M&R's interpretation of the Checkoff Provision was too narrow and incorrect (DE 130 at 4-7); and that it "erroneously concluded

2

that selective regulation claims are limited to the press" (DE 130 at 9). Plaintiffs' arguments are without merit.

A. The Dues Checkoff Provision is a Permissible Economic Regulation that Does Not Implicate or Violate the First Amendment.

Plaintiffs argue that the Dues Checkoff Provision violates the First Amendment because it "targets a single expressive association–FLOC, the state's only farmworker union–for onerous treatment." (DE 130 at 4). In support of their argument, Plaintiffs rely on *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983). However, *Minneapolis Star* is a freedom of press case involving a use tax that effectively targeted a very small group of newspaper publishers within a larger set of similarly situated publishers. *Id.* at 591. More specifically, it dealt with "the State's direct imposition of financial burdens on the dissemination of particular kinds of speech." *Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 47 n.3 (1st Cir. 2005).

This case is unlike *Minneapolis Star* because it involves the regulation of dues checkoffs. As Defendant previously noted: a union does not have a constitutional right to dues checkoffs. (DE 116 at 7-8; DE 107 at 17-18). And as the Fourth Circuit has explained, "The checkoff provision is not a union security device; it is simply an administrative convenience for the collection of dues." *Anheuser-Busch, Inc. v. Int'l Broth. of Teamsters*, 584 F.2d 41, 43 (4th Cir. 1978). Accordingly, the regulation of that "administrative convenience" does not implicate First Amendment rights. *See South Carolina Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1256 (4th Cir. 1989); *see also Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009); *Michigan State AFL-CIO v. Schuette*,

3

847 F.3d 800, 806 (6th Cir. 2017) ("Just as unions do not have a constitutional right to government-subsidized speech, they do not have a constitutional right to corporate-subsidized speech."). This is true even when the money raised through dues checkoffs "would have been available to further the [union's] speech-related activities." *South Carolina Education Ass'n v. Campbell*, 883 F.2d 1251, 1256 (4th Cir. 1989).

Indeed, laws governing dues checkoff agreements do not implicate the First Amendment because they restrict conduct, not speech or association. *Id.* (explaining that regulating or limiting dues checkoffs "does not prohibit, regulate, or restrict the right of the [the union] or any other organization to associate, to solicit members, to express its views, to publish or disseminate material, to engage in political activities, or to affiliate or cooperate with other groups"). Contrary to Plaintiffs' assertion, the Checkoff Provision does not prohibit any form of expression or association by a union or its members. FLOC and other unions operating in North Carolina may hold rallies and protests, distribute educational materials, recruit new members, and solicit dues from those members. *Cf. id.*

It is immaterial that the Checkoff Provision potentially affects private rather than public entities. *See Schuette*, 847 F.3d at 806; *Sweeney v. Pence*, 767 F.3d 654, 669 (7th Cir. 2014) (upholding Indiana's Right to Work Act, which prevented private employers from imposing mandatory dues or union membership on their employees). Indeed, the private versus public distinction "fails to explain why the *unions* would be in any different position" from a constitutional standpoint. *Schuette*, 847 F.3d at 805-06. The United States Supreme Court and several federal appeals courts have determined that state laws prohibiting government employers from administering payroll deductions for donations to

4

unions do not violate a union's First Amendment rights. *See Ysursa*, 555 U.S. at 356, *Int'l Union of Operating Eng'rs, Local 139 v. Daley*, 983 F.3d 287, 299 (7th Cir. 2020); *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 897 (9th Cir. 2018); *Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013); *Utah Educ. Ass'n v. Shurtleff*, 565 F.3d 1226, 1228 (10th Cir. 2009);2 6. "Absent a burden on a constitutionally cognizable right, the government may regulate what is at best a speech-facilitating mechanism." *Schuette*, 847 F.3d at 806.

Just as the First Amendment does not "confer an affirmative right [for public employees] to use government payroll mechanisms for the purpose of obtaining funds for expression," *Ysursa*, 555 U.S. at 355, it does not confer a right for agricultural unions to use the payroll systems of North Carolina farmers to fund their organizations.

B.      Section 20.5 Is Viewpoint and Content Neutral and Narrowly Tailored
         to Substantial Governmental Interests.

Even if the Checkoff Provision implicated the First Amendment, and it does not, it is both viewpoint and content neutral, and narrowly tailored to serve substantial government interests.

Like the dues-checkoff statute at issue in *Campbell*, the Checkoff Provision is facially neutral—it does not "prohibit, regulate, or restrict the right of the [union] or any other organization to associate, to solicit members, to express its views, to publish or disseminate material, to engage in political activities, or to affiliate or cooperate with other groups" 883 F.2d at 1256. Similarly, the Checkoff Provision does not single out any subset of messages for disfavor: it applies to any agricultural union and any producer. N.C. Gen.

5

Stat. § 95-79(b). Viewpoint is irrelevant and immaterial to the application of the law. The Checkoff Provision applies regardless of (and without inquiry into) how the proceeds from the checkoff are to be used.

The Checkoff Provision also is narrowly tailored to serve a legitimate government interest. Given the importance of agriculture to the North Carolina economy and the slim margins under which farms operate, the legislature reasoned that the Checkoff Provision was necessary to reduce administrative costs and relational costs that come from farms serving a substantial role in the worker-union relationship. *See* (DE 107 at 23-24); *cf. Charlotte v. Int'l Ass'n of Firefighters*, 426 U.S. 283, 286-87 (1976) (finding administrative burdens to be a "sufficient justification" for placing limitations on municipal checkoffs).

Moreover, the Checkoff Provision protects workers from procedures that make it difficult or impossible to withdraw from the union if they choose—an aspect of the law Defendant demonstrated in its summary judgment briefing (*e.g.*, DE 107 at 11–13, 23; D.E. 111 at 9–10, 19; D.E. 116 at 4–5) but the M&R did not discuss. The record shows that workers have been forced to pay dues for nearly an entire year after they submitted their resignation. *See* (DE 107 at 12; DE 107-26 at 9-17). When employers withhold worker pay for dues under a CBA requiring it, the worker has no recourse for ceasing his dues payments, and the farmer must continue withholding the dues until the union effectuates the resignation. This, of course, creates tension between farmworker and farmer. The Checkoff Provision is narrowly tailored because it prohibits no other means of dues collection aside from requiring the farmer to perform that function on the union's behalf. *See* (DE 107-20 at 4-8).

6

Plaintiffs complain that the Checkoff Provision "targets a single expressive association–FLOC, the state's only farmworker union."[1] (DE 130 at 3). However, the Checkoff Provision does not prohibit, prevent, or even discourage speech at all, nor does it regulate any incidental effects of speech. It only prevents union agreements from requiring a farmer to act as treasurer for a union, and it provides no other limitation on how agricultural unions may collect dues. It says (and does) nothing whatsoever about how unions may spend dues, speak, petition, assemble, or protest.

Moreover, even if FLOC's self-proclaimed status as the only farmworker union presently operating in North Carolina were true, that would not render its area of activity immune from regulation—an unavoidable implication of Plaintiffs' argument. "A statute with open-ended applicability, *i.e.*, one that attaches not to specified organizations but to described activities in which an organization may or may not engage, does not single out a particular person or group for punishment." *Ameur v. Gates*, 759 F.3d 317, 330 (4th Cir. 2014) (citation omitted). The Checkoff Provision does not target FLOC (and thus it is not a speaker-based restriction). Instead, the Checkoff Provision targets *conduct* deemed by

---

[1] The accuracy of Plaintiffs' assertion that it is the only farmworker union in North Carolina is debatable. In a recent filing in the Fourth Circuit, the United Farm Workers of America ("UFW"), the self-described oldest and largest farmworkers' union in the nation, disclosed that it was operating in North Carolina. *See* Brief of *Amicus Curiae* United Farm Workers of America in Support of Plaintiffs-Appellees at 2, *PETA v. Stein et al.*, No. 20-1776 (ECF No. 39) (4th Cir. Mar. 1, 2021) ("UFW has thousands of members, many of whom are highly vulnerable migrant and seasonal farmworkers, and serves farmworkers across the country, including in North Carolina."); *id.* at 21 ("Through education, organizing, litigation, and legislation, including online or virtual organizing, UFW's work in North Carolina is an important part of its organizing mission."). Regardless, Defendant is entitled to summary judgment here even if FLOC is, or is assumed to be, the sole farmworker union operating in North Carolina.

the legislature to be harmful. FLOC's alleged monopoly in this area does not leave the legislature powerless to regulate.

C.    The M&R's Interpretation of the Checkoff Provision is Supported by the Plain Language of the Statute, Legislative History, and the Underlying Purpose of the Provision.

Plaintiffs criticize the M&R, claiming that it incorrectly and narrowly interpreted the Checkoff Provision. They seek, instead, a broader interpretation of the provision that they can then attack for its breadth. *See* (DE 130 at 4–7). However, the text, the context, the legislative history, and the purpose of the Checkoff Provision all support the M&R's narrower reading of the statute.

Begin with the text. If the Checkoff Provision is designed to prohibit all dues withholding whatsoever, then the phrase at the beginning of the provision, "an agreement requiring," is meaningless. Under the Plaintiffs' interpretation of the statute, that phrase would make no difference. Neither North Carolina's courts nor federal courts would interpret a statute in such a way as to render the language of a statute superfluous. *See, e.g.*, *Marx v. General Revenue Corp.*, 568 U.S. 371, 386 (2013); *State v. Coffey*, 336 N.C. 412, 417–18 (1994).

Had the General Assembly wished to prohibit farmers from withholding dues checkoffs, the text doing so would be far simpler and more direct, and it would not focus on *an agreement requiring* a farmer to do so. Rather, the General Assembly could have directly prohibited the withholding itself. That is how Plaintiffs ask the Court to read the Checkoff Provision, even though the language does not say that.

8

The context surrounding the adoption of Section 20.5 and the legislative history confirms the Magistrate Judge's (and Defendant's) interpretation of the Checkoff Provision. As demonstrated in the record, the General Assembly has reinforced the State's long-standing "right-to-work" policy over the years and has enacted numerous Farm Acts to support and improve North Carolina's agricultural economy.[2] These omnibus farm bills were intended, in part, to reduce regulatory and other administrative burdens and issues that farmers in North Carolina face.

In 2013, the North Carolina Farm Bureau ("NCFB") learned that a tobacco manufacturer was being pressured into changing the terms of its tobacco purchasing contracts to favor farms that have union employees. (DE 110 at 9). NCFB worked with the General Assembly to strengthen the State's right-to-work policy and pass the Agricultural Right to Work Act of 2013 ("2013 Act"), which prohibits agricultural purchase agreements from turning on a farm's status as a union or non-union farm. N.C. Session Law 2013-413, HB 74, Section 15 (adding N.C. Gen. Stat. § 95-79(b)).

A couple years later, NCFB learned that FLOC's general counsel, representing individual farmworkers, was suing or threatening to sue farmers in an effort to force farmers into signing CBAs with FLOC under threat of onerous litigation costs. Evidence in this case shows that is indeed what was happening, and at a bare minimum that the legislature could have determined that was happening. *See, e.g.*, (DE 107-28; 107-29; DE 107-4 at 77:19-82:16, 120:20-122:11; DE 107-19 at 217:21-242:20). NCFB was also

---

[2]     The agricultural industry is the single largest industry in North Carolina, accounting for one-sixth of the State's economy. *See* (DE 107 at 6 & n.6; DE 110 at 2-4).

aware of the significant administrative and relational costs placed on farmers by provisions in CBAs that required them to administer the collection and remittance of union dues.

In an attempt to address those two issues, NCFB worked with members of the General Assembly to expand upon the 2013 Act and prohibit the use of litigation seen as coercing farms to unionize, as well as the requirement that farmers administer dues checkoffs. State Senator Ralph Hise had been working for years to pass legislation that would bar state employees from using automatic payroll deductions to cover the cost of their union dues. (DE 110-2 at ¶ 15). He supported expanding the scope of his bill regarding state employees' union dues, S. 375, to include agricultural unions. (*Id.*) Another senator agreed to offer draft language proposed by NCFB as an amendment to S. 375. It is notable that S. 375 would have completely prohibited the use of payroll deductions to pay membership dues to any union.[3] Although S. 375 passed the Senate, it failed to advance in the House of Representatives. (*Id.* at ¶ 16).

NCFB worked with members of the General Assembly to redraft the proposed legislation for inclusion in S. 615, the Farm Act. (*Id.* at ¶¶ 16-17). The proposed legislation was ultimately included as Section 20.5. Importantly, the Checkoff Provision in Section 20.5 is far narrower in scope then the language included in S. 375. This narrower language

_____

[3]     S. 375 proposed amending N.C. Gen. Stat. § 95-25.8 to include the following provision: (a1) Notwithstanding subsection (a) of this section or any other provision of State law, an employer shall not withhold or divert any portion of an employee's wages for the purpose of paying a membership fee or dues to a membership association organized under 26 U.S.C. 501(c)(5) or 26 U.S.C. 501(c)(6). This subsection shall not apply to the extent it conflicts with federal law.

S. 375, 2017 Gen. Assem. (N.C. 2017).

reflects the legislative intent to reduce the administrative and relational costs posed by CBA provisions that *require* farmers to withhold dues and transmit them to the union, without going as far as the original language in S. 375, which would have banned such withholding altogether.

The problem was not with the withholding of dues *per se*, but agreements that *required* them to do so and left them with no choice but to comply or face severe financial penalties. Legislators' own statements lend further support for a narrower interpretation of the statute as it actually was enacted. As Rep. Dixon explained when discussing the amendment containing Section 20.5, "The amendment would prohibit the use of litigation to force farms to unionize and ensure farmers *are not required* to collect dues from their employees." (D.E. 107-4 at 112:23-113:13 (emphasis added)). As the M&R correctly observed, "the General Assembly clearly knew how to preclude employer withholding of union dues, but opted instead through Section 20.5 to prohibit only contractual provisions requiring such withholding (as in the NCGA CBA)." (M&R at 35).

Perhaps in light of the strength of that reasoning, Plaintiffs now introduce (DE 130 at 5) a novel argument against the narrower reading of the statute—that the inclusion of the phrase "notwithstanding G.S. 95-25.8," somehow creates a conflict with North Carolina's Wage and Hour Act ("Wage Act"). Yet a closer reading of that statute shows that such an argument is baseless.

Under the Wage Act, employers must pay employees the wages they are due. *See* N.C. Gen. Stat. § 95-25.6. As an exception to this general rule, § 95-25.8(a) provides that "[a]n employer may withhold or divert any portion of an employee's wages." (emphasis

11

added). Thus, the law permits, *but does not require*, employers to withhold employee wages under certain circumstances.

Most relevant here, subdivision (a)(2) applies "[w]hen the amount or rate of the proposed deduction is known and agreed upon in advance." Contrary to Plaintiffs' expansive reading of the statute, its plain language does not envision the fundamental components of contract formation. Rather, the word "agreed" as used in the statute has a less formal connotation, one that suggests the employer and employee have come to an understanding as to how much money, if any, the employer may withhold. Notably, subdivision (a)(2) applies when an employer or employee *proposes* a specific amount of money be deducted from an employee's paycheck. Under the statute, the employer always has discretion to execute the withholding, so long as it is *authorized* by the employee.

This concept of employer discretion flows throughout the statute. Moreover, the statute provides several safeguards to ensure this discretion is not abused. For example, when an employer elects to exercise her discretion to make a withholding, she "must have written authorization from the employee." N.C. Gen. Stat. § 95-25.8(a)(2). This written authorization must: (1) be "signed on or before the payday(s) for the pay period(s) from which the deduction is to be made"; (2) provide the reason for the deduction; and (3) set out the amount or percentage of money to be deducted. *Id.* Thus, the writing memorializes the circumstances surrounding the proposed wage withholding for the protection of both the employer and employee. The safeguards that the writing offers are only applicable when the employer elects to make the withholding.

The statute also provides employees with discretion relating to the withholdings. When the employer elects to make the deduction "for the convenience of the employee, the employee shall be given a reasonable opportunity to withdraw the authorization." N.C. Gen. Stat. § 95-25.8(a)(2). Notably, subdivision (a)(2) provides the employer and employee with flexibility regarding the withholding of wages from the employee's paychecks, for the protection of both parties.

Similarly, subdivision (a)(3) also emphasizes the discretion of employers to withhold employee wages. That provision applies in situations when "the amount of the proposed deduction is *not* known and agreed upon in advance" (emphasis added). If the employer elects to execute the withholding, she must have written authorization from the employee to do so and she must provide the employee with advanced notice of the deduction amount, notice of the employee's right to withdraw the authorization, and a reasonable opportunity to withdraw the authorization in writing. N.C. Gen. Stat. § 95-25.8(a)(3)(i)-(iii). Because the deduction is proposed, the employer is never required to make the deduction.

Contrast the discretion employers have to make withholdings under N.C. Gen. Stat. § 95-25.8(a) with the type of agreements described in § 95-79(b). As the M&R properly concluded, § 95-79(b) applies when an agreement *requires* a farmer to withhold an employee's wages to cover the employee's union dues. That conclusion is supported by the legislative history and the context and purpose behind the enactment of the statute. As the record shows, the statute was enacted because the General Assembly was concerned about mandatory dues check-off provisions contained in CBAs. By forcing farmers to

13

check off employee wages for union dues, these CBA provisions run counter to the concept of employer (and employee) discretion that appears throughout § 95-25.8(a).

Indeed, the General Assembly's enactment of § 95-79(b) is entirely consistent with the Wage Act's emphasis on ensuring that employees are paid the wages they are due, *see* N.C. Gen. Stat. § 95-25.6, while at the same time providing a flexible mechanism by which employers may exercise their discretion to withhold employee wages so long as certain statutory safeguards are satisfied, *see* N.C. Gen. Stat. § 95-25.8(a).

Plaintiffs' argument that "there can be no 'discretionary' agreement to deduct dues under § 95-25.8 without requiring an employer to remit those dues to the union" (DE 130 at 7) is not supported by the plain language of the statute and has no basis in the reality of wage withholding. Plaintiffs conflate the discretionary concepts articulated in § 95-25.8(a) with the obvious rule that farmers who check off union dues from their employees' paychecks must remit those funds to the union. As noted above, § 95-25.8(a) provides employers with discretion to execute wage withholdings, but it does not require employers to make those withholdings. *Id.* (stating "[a]n employer may withhold or divert any portion of an employee's wages") (emphasis added). *If* an employer elects to withhold an employee's wages for a particular purpose, the Wage Act requires the employer to actually transmit the wages for that purpose—an unremarkable requirement that serves to protect to worker from wage theft. Set in proper context, the flaw in Plaintiffs' analysis is apparent.

Nor can the words themselves, "notwithstanding G.S. 95-25.8," in the Checkoff Provision bear the weight of Plaintiffs' interpretation. Plaintiffs assert (DE 130 at 5-6) that the language means the Checkoff Provision "trumps the permissive language of section 95-

14

25.8, leaving no room for the discretionary dues deductions envisioned in the [M&R]." But the language merely ensures § 95-25.8 is not interpreted to override the Checkoff Provision and permit the use of binding CBAs to serve as the type of authorization permitted by § 95-25.8(a). Again, if the General Assembly sought to prohibit even voluntary dues deductions, they could have done it directly—as shown by the language considered and not enacted in S. 375. Instead, the Checkoff Provision and Wage Act represent a commonplace statutory structure: The Wake Act broadly permits voluntary deductions, and the Checkoff Provision prohibits accomplishing such deductions for dues through binding contracts that turn them into nondiscretionary acts.

As the M&R properly recognized, all the interpretive guideposts point to the conclusion that the Checkoff Provision merely prohibits contracts *requiring* a farmer to withhold union dues from employees' paychecks and transfer the funds to a labor union. It provides no other limitation on how agricultural unions may collect dues.

      D.      <u>The M&R's Narrow Interpretation of the Checkoff Provision is Consistent with Canons of Statutory Interpretation and Constitutional Jurisprudence.</u>

As discussed above, the Magistrate Judge's and Defendant's understanding of the Checkoff Provision is the correct one. Regardless, "every reasonable construction [of a statute] must be resorted to, in order to save a statute from unconstitutionality." *Legend Night Club v. Miller*, 637 F.3d 291, 300 (4th Cir. 2011) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). Courts will construe a statute to avoid constitutional problems "unless such construction is plainly contrary to the intent of Congress." *United States v. Hamilton*, 699 F.3d 356, 367

15

(4th Cir. 2012) (quoting *Edward J. DeBartolo Corp.*, 485 U.S. at 575); *In re Appeal of Arcadia Dairy Farms, Inc.*, 289 N.C. 456, 465–66 (1976). Defendant's own objections to the M&R already review the case law and requirements for constitutional avoidance (D.E. 129 at 14–17), and Defendant incorporates that discussion of the avoidance canon here.

Plaintiffs argue that the M&R incorrectly interpreted the Checkoff Provision narrowly and erred in upholding the constitutionality of the statute. They assert that this Court should construe the Checkoff Provision much more broadly, and in doing so should find it unconstitutional. However, if the M&R's and Defendant's narrower interpretation of the statute is plausible—as it plainly is—then the Court must adopt this narrower interpretation to avoid striking it down as unconstitutional. Principles of constitutional avoidance and federalism require adopting the Magistrate Judge's understanding of the Checkoff Provision rather than interpreting the provision broadly only to strike it down for its breadth. Defendant notes that while constitutional avoidance guarantees that the M&R's interpretation of the Checkoff Provision is the right one, the M&R's analysis is the correct one even without resort to the avoidance canon, for all the reasons explained above.

## II. THE M&R PROPERLY CONCLUDED THAT THE DUES CHECKOFF PROVISION DOES NOT VIOLATE PLAINTIFFS' EQUAL PROTECTION RIGHTS.

Defendant showed in his briefs and supporting documents that he is entitled to summary judgment on Plaintiffs' Equal Protection Claim as it relates to the Checkoff Provision.[4] (DE 107 at 24-27; DE 111 at 12-21; DE 116 at 9-11). The M&R reached the

---

[4] Defendant maintains that he has also shown he is entitled to summary judgment on Plaintiffs' Equal Protection Claim as it relates to the Settlement Provision. (D.E. 129 at 17-19).

same conclusion. (M&R 56-80). Plaintiffs now argue that the Magistrate Judge incorrectly applied Fourth Circuit precedent, "failed to recognize that anti-union animus is not a legitimate governmental interest," and erroneously concluded the Checkoff Provision is rationally related to the reduction of administrative burdens. Plaintiffs' arguments fail.

A.    Section 20.5 Receives Rational-Basis Scrutiny Under the Equal
       Protection Clause.

Plaintiffs first contend that the M&R erred by not applying the test set forth in *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020) for determining if a class is "quasi-suspect." (DE 130 at 14). However, *Grimm* is inapplicable here.

*Grimm* involved an equal protection claim brought by a transgender high school student challenging a local school board's policy prohibiting transgender students from using restrooms that did not match their biological sex. *Id.* at 593. In that case, the Court concluded that heightened scrutiny applied "because the bathroom policy rests on sex-based classifications *and* because transgender people constitute at least a quasi-suspect class." *Id.* at 607.

In contrast to the plaintiff in *Grimm,* the Plaintiffs in this case are not transgender high school students—they are a union and union members. And as both the United States Supreme Court and the Fourth Circuit have previously determined, the status as a union and a union member is not entitled to heightened scrutiny under the Equal Protection Clause. *Int'l Ass'n of Firefighters*, 426 U.S. at 286; *Campbell*, 883 F.2d at 1256; *accord Sweeney*, 767 F.3d at 669 (noting that "[c]ollective bargaining is not a fundamental right, and a union and its members are not suspect classes").

17

Plaintiffs criticize Defendant and the Magistrate Judge for failing to dispute Plaintiffs' assertion that North Carolina's farmworkers are disproportionately non-citizens.[5] (DE 130 at 17). However, the fact that a majority of North Carolina's farmworkers might be non-citizens is immaterial to Plaintiffs' equal protection claim. Indeed, "even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose" *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). And it is not enough for the legislature to be aware of the purported disparate impact; rather, even just to shift the burden Plaintiff must show the disparate impact was a "substantial" or "motivating" factor behind the enactment of the law. *E.g.*, *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

Regardless of whether North Carolina's farmworkers are disproportionately non-citizens, Plaintiffs have completely failed to show that the General Assembly was motivated by that fact (or even contemplated it at all) when enacting Section 20.5. (DE 107 at 25-27 (and exhibits cited therein)). Instead, the record demonstrates no such

---

[5] Plaintiffs urge this Court to consider a 2017 newspaper article they attach as an exhibit to their objections to the M&R as "evidence" that the majority of North Carolina farmworkers are largely Latinx and/or non-citizens. (DE 130 at 17 n.8). However, not only is such "evidence" inadmissible, but Plaintiffs fail to explain how or why they (1) failed to disclose such material "evidence" in their initial disclosures (which they amended at the very end of the discovery period); (2) failed to produce it during the lengthy discovery period; and (3) failed to introduce it into the lengthy and fulsome record during summary judgment so that the Magistrate Judge could consider it. Regardless, as explained above and in Defendant's summary judgment briefs, such "evidence" does not support the use of a heightened standard review in this case, nor is it evidence of the necessary discriminatory intent required to support their equal protection claim.

18

motivation was at hand when the legislature passed this economic regulation of its largest industry.

Accordingly, the M&R properly determined that the correct standard for addressing Plaintiffs' equal-protection challenge is rational-basis review.

B. The Checkoff Provision is Rationally Related to a Legitimate Government Interest.

Plaintiffs argue that the M&R failed to account for evidence that the General Assembly enacted Section 20.5 "to further the NCFB's and legislators' anti-union animus." (DE 130 at 20). Attaching the word "animus" to another group's economic policy preferences does not an equal-protection issue make, and the M&R correctly concluded that the Checkoff Provision was supported by a rational basis. Indeed, while the M&R's focus on relieving administrative burdens is more than enough under rational-basis review, further bases support the provision as well.

Under the appropriate standard of review, it is the statutory text that matters. *United States v. O'Brien*, 391 U.S. 367, 384 (1968). The text of Section 20.5 reveals no animus toward any group. Like the 2013 Act, Section 20.5 simply prohibits certain contractual agreements viewed by the General Assembly as inconsistent with the State's right-to-work policy. Plaintiffs' arguments against the rational bases for Section 20.5 ignore the plain text of the statute and generally rely on incorrectly characterizing the rationales.[6]

---

[6]    Section 20.5 is a facially neutral, generally applicable law that broadly applies to agriculture, the State's leading economic sector. The text of the statute does not mention or implicitly reference FLOC, and FLOC's status as the only farmworker union operating in the State does not change this reality. Nor does Section 20.5's text mention or implicitly reference race or alienage.

Moreover, the record in this case does not show, or even raise, an inference of "animus" on the part of NCFB or the General Assembly for any group.[7] On the contrary, the record shows NCFB was simply advocating for its long-standing policy positions in support of its farmer members when working with the General Assembly to enact Section 20.5. It certainly does not support a finding that the General Assembly or NCFB acted with any animus. Plaintiffs' opposition to the State's long-standing right-to-work policy is certainly their right, but it does not mean that anyone who supports the policy, or acts to strengthen or enhance it, is motivated by "animus." Indeed, there are often two-sides to a policy issue, and being on the other side does not constitute "animus."[8]

In sum, the text of Section 20.5 reveals no animus. Like the 2013 Act, Section 20.5 simply prohibits certain contractual agreements viewed by the General Assembly as inconsistent with the State's right-to-work policy—a policy that itself prohibits certain contractual agreements, without offending the Constitution. *Lincoln Fed. Labor Union v.*

---

[7] In support of their argument, Plaintiffs rely on cherry picked remarks of one or two legislators. However, the motives of individual legislators are not an appropriate basis for reviewing a statute's validity under Equal Protection. *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 47-48 (1986). "When the legislative purpose is not both obvious and constitutionally impermissible, however, the cases uniformly hold that facially constitutional legislation may not be stricken because of suspect legislative motivation." *Holt v. Richmond*, 459 F.2d 1093, 1098 (4th Cir. 1972). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for [the court] to eschew guesswork." *O'Brien*, 391 U.S. at 384. In North Carolina, "Testimony, even by members of the Legislature which adopted the statute, as to its purpose and the construction intended to be given by the Legislature to its terms, is not competent evidence upon which the court can make its determination as to the meaning of the statutory provision" *State ex rel. N.C. Milk Comm'n v. Nat'l Food Stores, Inc.*, 270 N.C. 323, 332-33 (1967).

[8] As NCFB explained in its 2nd Amicus Brief, it acted in order to assist its members in accomplishing legitimate policy goals. (DE 120 at 6-7). While Plaintiffs might characterize NCFB's views as "anti-union," others might characterize them as "pro-agriculture or pro-business." *Id.*

20

*Northwestern Iron & Metal Co.*, 335 U.S. 525, 531 (1949). Plaintiffs' arguments against the rational bases for Section 20.5 ignore the plain text of the statute and generally rely on incorrectly characterizing the rationales.

Properly considered, numerous bases support the General Assembly's legitimate interests in protecting the State's largest industry and protecting the State's right-to-work policy. Plaintiffs' "anti-union" argument ignores the plethora of legitimate, non-discriminatory reasons the General Assembly enacted the Checkoff Provision. (*See* DE 107 at 11–13; DE 111 at 9–10; M&R at 79). Indeed, Defendant demonstrated that the General Assembly enacted the Checkoff Provision because it concluded North Carolina farmers faced an increasingly difficult business climate and that reducing costs and burdens on them was consistent with North Carolina's well-established public policy of supporting agriculture. (*Id.*)

Plaintiffs take issue with this and claim that the Checkoff Provision is not rationally related to the reduction of administrative burdens. (DE 130 at 21). However, the record defeats such a claim.[9] Indeed, the evidence submitted in this case shows that administering the collection and remittance of union dues places significant administrative and relational

---

[9]    Plaintiffs criticize NCFB for failing "to substantiate these claims of burden." However, NCFB is not a party to the case, and that is because Plaintiffs vigorously opposed NCFB's motion to intervene. Moreover, as Defendant explained in its response to Plaintiffs' summary judgment brief, any alleged failings of NCFB are not legally relevant, in two ways: First, NCFB is neither a legislator nor a legislative body. Second, even the General Assembly did not need the kind of factual proof Plaintiffs assert is required. Under the rational-basis scrutiny to which Section 20.5 is properly subject, it is *Plaintiffs* who bear the burden, and they must "negate every conceivable basis which might support" the law. *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citation omitted); *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012).

Case 1:17-cv-01037-LCB-LPA   Document 131   Filed 03/25/21   Page 21 of 30

costs on farmers.[10]  *See, e.g.*, (DE 107 at 11-13 (and exhibits cited therein); DE 111 at 9-10 (and exhibits cited therein)).  And importantly, under rational-basis review, the Court need not determine whether either side's view of the administrative burdens is right—the Court need only conclude that reducing administrative burdens is a "plausible policy reason for the classification."  *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (cautioning that the only requirement is that legislative facts "rationally may have been considered to be true by the governmental decisionmaker," and the "relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational"); *Romer v. Evans*, 517 U.S. 620, 632 (1996) (under rational-basis test, law need only "advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous").

    As the M&R correctly recognized, reducing administrative burdens is a plausible, rational reason for the Checkoff Provision and a legitimate governmental interest.  And, as Defendant previously explained, so is reducing the relational costs placed on farmers by provisions in CBAs that required them to administer the collection and remittance of union dues.  *See, e.g.*, (DE 107 at 11–13, 23; D.E. 111 at 9–10, 19; D.E. 116 at 4–5).

---

[10]    The record in this case shows that many farmers calculate union dues by hand.  Moreover, the administrative burdens involved are not only the calculation, consolidation, and remittance of dues to the union—the burdens also involve resolving inevitable issues and confusion that arises in the process.

C.    The General Assembly Did Not Intentionally Discriminate Against Plaintiffs on the Basis of Race, National Origin, or Alienage in Enacting the Checkoff Provision.

Plaintiffs contend that the M&R erred in recommending summary judgment against them on their Equal Protection Claim because they claim that "race, national origin, and alienage discrimination was a substantial or motivating factor in the passage of Section 20.5." (DE 130 at 23). However, Plaintiffs failed to show that the General Assembly enacted Section 20.5 "because of" its applicability to Latinx and/or non-citizen workers. *Cf. Feeney*, 442 U.S. at 279; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

First, nothing in the record indicates that the General Assembly or NCFB considered the race or national origin of farmworkers in working on the law. Second, Section 20.5 is a facially neutral, generally applicable law that broadly applies to agriculture, the State's leading economic sector. The text of the statute does not mention or implicitly reference FLOC or its members, and FLOC's alleged status as the only farmworker union operating in the State does not change this reality. By its terms, the Act applies equally to any union or labor organization in the nation that falls within its scope.

In addition, FLOC's claim that statute treats agricultural unions differently than other unions is not the result of intentional discrimination, but rather the NLRA's lack of preemption for agricultural laborers. *See* 29 U.S.C. § 152(3).[11]    Finally, Plaintiffs

---

[11]    The M&R found that, as to the classification at issue, Plaintiffs had shown they remain "similarly situated to at least 'all other private sector employees' exempt from the NLRA. (M&R at 56). But the only such workers identified in the M&R are individuals in the "domestic service

23

principally rely on a disparate-impact argument that is, as a matter of law, insufficient for an equal-protection claim.

Plaintiffs' other arguments mostly rely on suggesting the General Assembly, and specific legislators, are generally subject to heightened scrutiny based on past cases. However, that goes well beyond what this Court held in *NAACP v. Cooper*, 430 F. Supp. 3d 15, 31-32 (M.D.N.C. 2019) and, more importantly, what the Fourth Circuit held in the appeal of that decision. *See NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020). Indeed, as the Fourth Circuit explained, a court "*must* afford the state legislature a presumption of good faith. For a finding of past discrimination neither shifts the allocation of the burden of proof nor removes the presumption of legislative good faith." *Id.* at 303 (citations and internal quotations omitted); *accord Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018) ("The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination.").

The "ultimate question remains whether a discriminatory intent has been proved in a given case," and the burden remains with Plaintiffs on that point. *Abbott*, 138 S. Ct. at 2325 (citation and quotation marks omitted). Plaintiffs failed to meet that burden in this case and no issue of material fact remains on that point.

---

of any family or person at his home" and "any individual employed as a supervisor." (M&R at 56 (citing 29 U.S.C. § 152(3))). Those two types of workers are not similarly situated to agricultural workers: domestic workers employed in private homes are unlikely groups to collectively bargain when most would likely be the sole employee or one of only a few in each home. Supervisors are typically the group with which employees collectively bargain. Nothing suggests that either group would have been a likely focus of right-to-work legislation, but at any rate, if that is the classification in focus here—farmworkers versus domestic service and management—the legislature's focus on the former is plainly rational here.

24

Indeed, Plaintiffs have shown nothing linking Section 20.5's passage to anyone's race, ethnicity, national origin, or alienage. Instead, Plaintiffs essentially argue that 1) farmworkers in North Carolina are predominantly "Latinx non-citizens," 2) the regulation primarily affects farmworkers, and thus 3) the law was intending to discriminate against farmworkers based on their race, ethnicity, and/or alienage. But Plaintiffs' attempt to reach the third point requires a leap that cannot be reconciled with the record here, the Fourth Circuit's recent decision in *NAACP v. Raymond*, or the Supreme Court's admonition that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324 (cleaned up). In short, nothing shows this law targets any group based on race, ethnicity, national origin, or alienage.

Plaintiffs' focus (and critique) on the manner in which Section 20.5 was enacted is equally unconvincing. They argue the law was "enacted in a hasty and non-transparent fashion," but they have not alleged that Section 20.5 was improperly amended to the Farm Act, nor can they show that its amendment late in the legislative process is irregular (or even unusual) in the give-and-take of legislating. *See generally Common Cause v. Forest*, 838 S.E.2d 668, 674 (N.C. Ct. App. 2020) (discussing the legislative process). Moreover, as the M&R properly noted, the circumstances surrounding the enactment of Section 20.5 differed "markedly from the situation in *McCrory*, upon which Plaintiffs rely." (M&R at 70).

In sum, the Checkoff Provision focuses on economic regulation of contracts between agricultural producers and unions; it does so more narrowly than other union-related contract laws already found to be constitutional; and it does so more narrowly than

25

Plaintiffs ask the Court to construe it. The law does not discriminate against a suspect class, was not motivated by any alleged disparate impact, and is consistent with North Carolina's right-to-work principles and longstanding support of the agricultural industry.

## III. THE M&R PROPERLY RECOMMENDS GRANTING SUMMARY JUDGMENT TO DEFENDANT ON PLAINTIFFS' SECTION 1981 CLAIM.

Plaintiffs assert that the M&R committed fundamental errors of law in recommending summary judgment against Plaintiffs on their Section 1981 claim. They also claim that it discounted relevant material facts that support their claim. Plaintiffs' argument is without merit.

First, Plaintiffs did not move for summary judgment on their Section 1981 claim and their threadbare defense failed to raise a genuine issue of material fact. Rather, Plaintiffs simply appended their Section 1981 claim to their equal protection argument and dropped a footnote to say their "Section 1981 claims focus specifically on race, ethnicity, and alienage-based discrimination." (DE 112 at 16 n.5).

Second, Plaintiffs cannot demonstrate that Defendant intentionally discriminated against them because of their race (or alienage). As the United States Supreme Court recently explained, "[t]o prevail [on a § 1981 claim], a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). Here, Plaintiffs have failed to prove that the General Assembly enacted the statute for race-based (or alienage-based) purposes. Rather, the evidence shows that the General

Assembly enacted the statute to reinforce the State's right-to-work policy and protect the economic viability of the agricultural sector.

Third, Plaintiffs cannot demonstrate that they were denied a protected right that is otherwise enjoyed by other races. As previously noted, Section 20.5 does not prevent Plaintiffs from bringing a lawsuit, settling a lawsuit, or entering into a CBA. Furthermore, nothing in Section 20.5 denies Plaintiffs any rights that are otherwise enjoyed by individuals of another race. Indeed, regardless of the demographics of farmers and farmworkers generally, the law applies precisely the same to everyone in those categories regardless of race or alienage.

## IV. THE M&R PROPERLY RECOMMENDED GRANTING SUMMARY JUDGMENT TO DEFENDANT ON PLAINTIFFS' BILL OF ATTAINDER CLAIM.

Finally, Plaintiffs contend that the M&R erred in recommending granting summary judgment on Plaintiffs' bill of attainder claim because a material issue of fact surrounds "whether the law was designed and passed to punish FLOC and is an unconstitutional bill of attainder." (DE 130 at 29). However, Plaintiffs repeatedly fail to address the legal requirements or controlling legal authority for a law to be a bill of attainder—despite arguing the issue now in two different summary-judgment filings. (DE 112 at 31-32; DE 130 at 29). As Defendant showed and Plaintiff failed to disprove, settled law demonstrates that Section 20.5 is not a bill of attainder because it meets none of the required elements for one. To constitute a bill of attainder, a law must (1) apply with specificity to affected persons; (2) impose punishment; and (3) assign guilt without a judicial trial. *See, e.g., Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 846-47 (1984).

27

Section 20.5 does none of these things. A statute with open-ended, future applicability—like this one—is simply not a bill of attainder. (*See* DE 107 at 29–32; M&R at 85–88.)

## V. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS, AND IF THIS COURT INSTEAD ENTERS ANY INJUNCTIVE RELIEF, IT SHOULD BE NARROW AND TARGETED.

For all the reasons explained herein and in Defendant's prior briefing, the Court should enter summary judgment for Defendant on all claims and dissolve the preliminary injunction in this case. But should the Court determine that summary judgment should be granted to Plaintiffs on any ground, Plaintiffs are correct to observe (DE 130 at 29) that the Court is required to tailor the remedy to fit the nature and extent of the constitutional violation. Defendant has shown that Plaintiffs' expansive reading of the statute, in service of their argument to strike it down, incorrectly interprets Section 20.5. But if this Court disagrees, and if it makes any determination of unconstitutionality notwithstanding the avoidance canon, any injunctive relief should simply narrow the applicability of Section 20.5 to be what Defendant has already contended it is.

## CONCLUSION

For the foregoing reasons, the Court should adopt the M&R insofar as it recommends summary judgment for Defendant. Accounting for Defendant's own objections to the M&R, the Court should ultimately grant summary judgment to Defendant on all claims.

28

Respectfully submitted this the 25th day of March, 2021.

JOSHUA H. STEIN
Attorney General


/s/ Matthew Tulchin
Matthew Tulchin
Special Deputy Attorney General
NC State Bar No. 43921
mtulchin@ncdoj.gov

/s/ Phillip A. Rubin
Phillip A. Rubin
Special Deputy Attorney General
N.C. State Bar No. 51963
prubin@ncdoj.gov

NC Department of Justice
PO Box 629
Raleigh, NC  27602
Tel: 919.716.6900
Fax: 919.716.6763

*Counsel for Defendant Attorney General Stein*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.3(d)(1), the undersigned counsel hereby certifies that the countable portion of the foregoing Memorandum, including body, headings, and footnotes, contains 7,986 words as measured by Microsoft Word, thus complying with this Court Order of March 3, 2021, permitting objections and responses to be no more than 8,000 words.

This the 25th day of March, 2021.

/s/ Matthew Tulchin
Matthew Tulchin
Special Deputy Attorney General