# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No. 1:17-cv-01037-LCB-LPA

| | | |
|---|---|---|
| **FARM LABOR ORGANIZING COMMITTEE, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| **v.** | ) | |
| | ) | |
| **JOSHUA STEIN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM OPINION AND RECOMMENDATION

Pursuant to Fed. R. Civ. P. 72(b), Plaintiffs Farm Labor Organizing Committee ("FLOC") and Valentin Alvarado Hernández respectfully file their response to Defendant Joshua Stein's Objections (DE 129) to Magistrate Judge Auld's Memorandum Opinion and Recommendation ("the Opinion") (DE 124) addressing the parties' cross-motions for summary judgment (DE 106, 107). Defendant raises objections to three aspects of the Opinion: (1) the recommendation that summary judgment be granted for Plaintiffs on their claims that the Settlement Provision violates the First Amendment and their First Amendment-related rights under the Equal Protection Clause of the Fourteenth Amendment; (2) the Magistrate Judge's declining to reconsider and reverse the Court's earlier rejection of Defendant's standing and sovereign immunity defenses; and (3) that the

1

"Background" section of the Opinion does not "address or adopt" various facts in Defendant's summary judgment briefs and exhibits.

All of Defendant's Objections should be overruled. As set forth below, the Magistrate Judge correctly interpreted the Settlement Provision, and even if the Provision were narrowed as urged by Defendant, the Provision still violates the First Amendment. The Magistrate Judge did not err by declining to revisit this Court's 2018 opinion rejecting Defendant's standing and sovereign immunity defenses.[1] Finally, Defendant does not state meritorious or even adequately specific objections regarding the Magistrate Judge's alleged failure to "address or adopt" his proposed facts.

## I. __The Court Should Grant Plaintiffs Summary Judgment on Their Claim That the Settlement Provision Violates the First Amendment.__

The Magistrate Judge correctly recommended summary judgment in favor of Plaintiffs, rather than Defendant, on Plaintiffs' First Amendment challenge to the Settlement Provision. DE 124 at 53.

### A. The Magistrate Judge Correctly Interpreted the Settlement Provision.

---

[1] "[F]or preservation purposes," Defendant objects via footnote to the Magistrate Judge's rejection of his standing and sovereign immunity arguments at the summary judgment stage. DE 129 at 2 n.2. The Magistrate Judge correctly determined that Defendant provided no reason for the Court to reconsider its earlier decision rejecting these arguments and denying Defendant's Motion to Dismiss on these grounds. DE 124 at 38-39 n.29. *See also* DE 56 at 23-44 (MJ Op. & Rec. recommending denial of Def. Mot. to Dismiss); DE 62 at 1 (adopting 56). Defendant's discussion of these issues at summary judgment amounted to a single footnote directing the Court to Defendant's briefing in support of his unsuccessful motion to dismiss. *See* DE 107 at 15 n.19. Even now, Defendant declines to elaborate on its request that this Court reconsider and reverse its 2018 decision. Defendant's objection is meritless, and additionally fails for lack of compliance with Rule 72. *See* Fed. R. Civ. P. 72(b)(2) (objections must be "specific").

In the Opinion, the Magistrate Judge reaffirmed this Court's earlier interpretation of the Settlement Provision, which correctly found that, "by its **plain terms**," DE 56 at 42 (emphasis added), "the Settlement Provision prohibits any settlement agreement provisions regarding collective bargaining agreements or voluntary union recognition agreements between agricultural providers and FLOC <u>as well as</u> any settlement agreement between FLOC and an agricultural provider." DE 124 at 47 (quoting DE 56 at 42, internal quotations omitted) (emphasis original to DE 124, added to DE 56); *see also* DE 62 at 1 (adopting DE 56).

Defendant challenges this interpretation, arguing that the Settlement Provision "merely prohibits settlement agreements from being *conditioned* upon 'an agricultural producer's status as a union or nonunion employer or [the producer's] entry into or refusal to enter into an agreement with a labor union or labor organization.'" DE 129 at 7. According to Defendant, "a settlement agreement between agricultural unions and producers (or any parties) cannot contain, as a term of the settlement, an agreement to recognize a union (or not) or to enter into a [collective bargaining agreement (CBA)] or other agreement with a union (or not)." *Id*.

Defendant misinterprets the Settlement Provision, asking this Court to read in a reference to "a CBA or other agreement," DE 129 at 7, separate from the settlement agreement itself. But the plain text of the statute prohibits "[a]ny provision" that "directly or indirectly" conditions settlement on "the agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union

3

or labor organization." N.C. Gen. Stat. § 95-79(b) (2020). The word "agreement" is not modified by the words "CBA," "other," or "another," and Defendant does not identify anything in the statutory text that indicates such a limitation was intended by the legislature. Furthermore, the phrase "directly or indirectly" indicates the legislature's desire to give the Settlement Provision its broadest possible scope, which undermines Defendant's attempt to save the statute by narrowing it.

"[I]n effectuating legislative intent," it is this Court's "duty to give effect to the words actually used in a statute and not to delete words used or to insert words not used." *Lunsford v. Mills*, 766 S.E.2d 297, 301 (N.C. 2014). The plain text of the Settlement Provision expressly prohibits agricultural providers from settling litigation by recognizing FLOC or entering into agreements with FLOC, whether "directly or indirectly." Any settlement agreement between an agricultural provider and FLOC is necessarily conditioned on entry into an agreement with FLOC, and is therefore prohibited by Section 20.5.

Defendant asserts that the Magistrate Judge's interpretation of the Act would render the statute's references to settlement "terms" and "conditions" superfluous, because all terms and conditions contained in a settlement agreement between a union and agricultural producer are invalid under the Magistrate Judge's interpretation of Section 20.5. Not so. Section 20.5 specifically prohibits any settlement provision that requires an agricultural producer to recognize FLOC or to enter into agreement with FLOC. *See* N.C. Gen. Stat. § 95-79(b) (2020).

4

On the one hand, in the context of a settlement between an individual farmworker and an agricultural producer, the prohibited provision could be an individual term of a settlement agreement that conditions settlement on the agricultural producer's entry into a side agreement with FLOC. On the other hand, in the context of a settlement agreement between FLOC and an agricultural producer, the terms of the agreement stipulating that FLOC will dismiss and release its claim against the agricultural producer would necessarily be conditioned on the agricultural producer's entry into a binding agreement with FLOC. The reference to settlement "terms" and "conditions" encompasses both scenarios, and both are prohibited under Section 20.5.

The statutory structure supports this straightforward interpretation. *See Elec. Supply Co. of Durham v. Swain Elec. Co.*, 403 S.E.2d 291, 294 (N.C. 1991) (holding that statutory interpretation is "guided by the structure of the statute"). The first half of the provision identifies what kinds of actions are covered (the purchase of agricultural products and the settlement of litigation), while the second half identifies what stipulations are prohibited (an agricultural provider's recognition of FLOC or entry into an agreement with FLOC). As Defendant himself acknowledges, DE 129 at 9 n.6, nothing in the provision turns on the identity of the party or parties agreeing to the stipulation. It makes no difference whether the settlement is between an agricultural producer and FLOC or an agricultural producer and one of FLOC's members; in neither case can settlement be conditioned on entry into an agreement with FLOC.

5

Furthermore, Defendant's interpretation of the statute would produce absurdly formalistic results. It would be nonsensical to conclude that the Settlement Provision prohibits FLOC's members from conditioning settlement on an agricultural producer's entry into a side agreement with FLOC, but that FLOC could obtain this result directly simply by joining the lawsuit or filing its own. *See State v. Beck*, 614 S.E.2d 274, 277 (N.C. 2005) (holding that even a literal interpretation of the statutory text will be disregarded if it produces absurd results or results that frustrate the legislative purpose). If, as Defendant contends, the purpose of Section 20.5 is "to prevent the use of time consuming and costly litigation as leverage to force producers to enter into CBAs they did not wish to join," DE 129 at 19, it should not matter whether the litigation is brought by FLOC or its members. In either case, the Act seeks to deter litigation by preventing any settlement that would benefit FLOC.

Defendant attempts to shore up his argument by asserting that the legislative history and other asserted evidence of legislative intent supports his narrowing construction of the Settlement Provision. However, this Court cannot resort to legislative history to disrupt the Provision's plain text. "When, as here, the language of a statute expresses the legislative intent in clear and unambiguous terms, the words employed must be taken as the final expression of the meaning intended unaffected by its legislative history." *Lunsford*, 766 S.E.2d at 303 (citation and internal quotation marks omitted).

In any event, the legislative history does not support Defendant's narrowing construction. Contrary to Defendant's assertions, the context surrounding Section 20.5

does not indicate that "the use of settlements-for-CBAs was the [only] problem the General Assembly sought to solve with the Settlement Provision." DE 129 at 12. As Defendant's own exhibits reflect, the farmworkers who brought meritorious claims of violations of their legal rights were willing to settle for much less than a full CBA: namely, an agreement allowing for "freedom of association," "the right . . . to engage in concerted activity," and "an alternative dispute resolution (ADR) system" with FLOC as their representative in disputes. *See* DE 107-29 (Demand Ltrs.) at 3, 16; *see also* DE 108-3 (2d Flores Decl.) ¶¶ 19-21, 34, 53-54 (discussing different agreements sought by FLOC members in settlement negotiations). This suggests that the proponents of Section 20.5 were hostile to *any* settlement that would expand the rights of North Carolina farmworkers trying to organize a union — not merely settlements requiring union recognition or a separate CBA.

The context surrounding the Agricultural Right to Work Act of 2013 ("HB 74") similarly fails to support Defendant's narrowing construction. HB 74 added the original text of N.C. Gen. Stat. § 95-79(b), which Section 20.5 amends. Defendant asserts that HB 74 was drafted "to prohibit the *terms* of a purchase agreement from turning on union status or an agreement with a union – practically speaking, a CBA," in order to end the "coercive" practice of "pressuring agricultural *purchasers* to charge different commodity prices to producers depending on their union status." DE 129 at 10 (emphasis in original). But as with his interpretation of Section 20.5, Defendant's interpretation of HB 74 ignores both the plain text and the context of the statute's prohibitions. Section 95-79(b) not only restricts "the *terms* of a purchase agreement." DE 129 at 10 (emphasis in original). It also

plainly prohibits a purchaser from entering into an agreement with a union that would make

a producer's engagement with a union a precondition to certain buying arrangements, or to

a purchaser's willingness to buy from a producer at all:

> Any provision that directly or indirectly conditions **the purchase of agricultural products** <u>or</u> the terms of an agreement for the purchase of agricultural products upon an agricultural producer's status as a union or nonunion employer or entry into or refusal to enter into an agreement with a labor union or labor organization is invalid and unenforceable as against public policy in restraint of trade or commerce in the State of North Carolina.

> "HB 74", 2013 N.C. Sess. Laws 413, §15 (emphasis added).

As with Section 20.5, the breadth of HB 74's prohibitions is no accident: the record

reflects that the North Carolina Farm Bureau ("NCFB") drafted its text and sought its

passage specifically to outlaw an agreement between FLOC and corporate tobacco

purchasers, under contemplation at the time of HB 74's introduction, that would have

promoted better conditions for farmworkers. *See* DE 108-3 ¶¶ 37-39 ("This legislation

attempted to undermine FLOC's ability to engage corporate purchasers of agricultural

products and sign agreements that would guarantee expanded labor rights in the industry");

DE 108-8 (NCFB 30(b)(6) Dep. – Sherman) at 58:13 – 62:20 (noting that NCFB drafted

HB 74 in direct response to FLOC's effort to require a tobacco company to include "a

provision related to unionized labor" "as part of their contract with farmers"). Thus, while

the text of § 95-79(b) does prohibit certain "terms of an agreement for the purchase of

agricultural products," what HB 74 most sought to end was a contemplated agreement with

FLOC. Far from supporting Defendant's narrowed construction, the context of HB 74

8

further demonstrates that § 95-79(b) is intended to target **both** the "*terms*" of agreements that serve to benefit FLOC, **and** agreements with FLOC itself.

Defendant alternatively argues that the canon of constitutional avoidance precludes the Magistrate Judge's interpretation of the Act, incorrectly asserting that the Court must impose a narrowing construction if it is "fairly possible to do so." DE 129 at 15 (quotation marks omitted). To be sure, federal courts enjoy wide latitude in interpreting federal statutes to avoid constitutional problems, *see United States v. Hamilton*, 699 F.3d 356, 367-68 (4th Cir. 2012), but federal courts are more constrained in their ability to impose narrowing constructions on state statutes.

While federal courts have the power to give federal statutes "an authoritative construction," they "lack jurisdiction authoritatively to construe state legislation." *United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 369 (1971); *accord Virginia Soc'y for Human Life, Inc. v. Caldwell*, 152 F.3d 268, 270 (4th Cir. 1988). Thus, "[w]hen a state statute has unconstitutional applications and has not been given a narrowing construction by the state court that saves it from those applications, federal courts 'must be careful not to encroach upon the domain of a state legislature by rewriting a law to conform it to constitutional requirements.'" *Toghill v. Clarke*, 877 F.3d 547, 556 (4th Cir. 2017) (quoting *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011)).

A federal court may only impose a narrowing construction on a state statute if the construction is "*reasonable and readily apparent*." *Id.* (quoting *Boos v. Barry*, 485 U.S. 312, 330 (1988)). Here, Defendant's proposed narrowing construction of the Settlement

9

Provision is not "reasonable and readily apparent" from the statutory text. Instead, as the Magistrate Judge correctly concluded, the Act's "plain terms" prohibit FLOC from entering into settlement agreements with agricultural producers. Regardless of whether Defendant's construction of the Settlement Provision could be adopted by the North Carolina courts, it cannot be adopted by this Court.

In the First Amendment context, an additional consideration supports federal courts' reluctance to impose narrowing constructions that are not readily apparent from the face of the challenged statute. When a statute threatens criminal penalties against speech, the mere threat of prosecution will often be sufficient to deter First Amendment protected activity. *See NAACP v. Button*, 371 U.S. 415, 432–33 (1963). Here, the threat of prosecution for entering into a settlement agreement with FLOC will deter both FLOC and agricultural producers from entering into settlement agreements, which means that FLOC will be less likely to bring affirmative litigation in the first place. Even if this Court adopts Defendant's proposed narrowing construction, its interpretation of the Act is not binding on North Carolina courts, and the threat of prosecution will continue to chill FLOC's First Amendment protected activity. *See Gooding v. Wilson*, 405 U.S. 518, 520–22 (1972); *see also Button*, 371 U.S. at 433–34 (refusing to accept Virginia's proposed narrowing construction of a state law regulating legal solicitation, where the narrowing construction was not apparent from the Virginia courts' authoritative construction of the statute).

## B. The Settlement Provision Violates the First Amendment Rights of FLOC and Its Members Under Any Construction.

However it is construed, the Settlement Provision violates Plaintiffs' First Amendment rights. As Defendant himself acknowledges, the Provision is designed to deter FLOC and its members from participating in litigation by making it impossible for them to realize their goals through settlement. *See, e.g.,* DE 129 at 12–14, 18–19. The Settlement Provision accomplishes this illegitimate goal by prohibiting FLOC and its members from entering into otherwise lawful agreements when those agreements concern the settlement of litigation. Because the First Amendment protects the right of FLOC and its members to engage in expressive litigation, and to band together for the purpose of obtaining meaningful access to the courts, the Provision's direct and intentional impairment of their ability to conduct litigation must be enjoined.

The First Amendment protects the right of FLOC and its members to pursue their shared interests through litigation. In *Button*, the Supreme Court held that the NAACP's assistance with anti-segregation lawsuits was "a form of political expression" and "political association" fully protected by the First Amendment. 371 U.S. at 429, 431. Although "[t]he NAACP is not a conventional political party," the Court recognized that "the litigation it assists, while serving to vindicate the legal rights of members of the [Black] community, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society." *Id*. at 431. Similarly, in *In re Primus*, the Court held that the ACLU's solicitation of clients was protected by the First Amendment because "[t]he ACLU engages in litigation as a vehicle for effective political

11

expression and association, as well as a means of communicating useful information to the public" about civil liberties. 436 U.S. 412, 431 (1978).

In other words, "an entity's litigation-related activities warrant first amendment protection where, inter alia, the entity 'engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public.'" DE 124 at 49. Here, as the Magistrate Judge correctly observed, FLOC likewise "'engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public,' bringing its litigation efforts 'within the generous zone of First Amendment protection reserved for associational freedoms.'" *Id.* at 50 (quoting *In re Primus*, 436 U.S. at 431) (citations omitted); *see also* DE 109 (Pls. Summ. J. Br.) at 28–31.

Another line of cases recognizes that "unions and union members have rights under the First Amendment to associate and to act collectively to pursue legal action." *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 187 (2d Cir. 2017). As the Magistrate Judge noted, "[t]he Supreme Court has repeatedly recognized 'the basic right to group legal action,' including the fact 'that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment.'" DE 124 at 47–48 (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)). "This right has attached to the activities of workers who associate with each other to obtain counsel and further their litigation ends, and to the union as a proxy for the workers in the exercise of associational rights." *Jacoby & Meyers*, 852 F.3d at 185; *see*

Case 1:17-cv-01037-LCB-LPA   Document 132   Filed 03/25/21   Page 12 of 28

*also Capital Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281, 290 (M.D.N.C. 2015).

Thus, when FLOC and its members pursue their shared interests through litigation, they are also exercising their First Amendment right to associate for the purpose of obtaining meaningful access to the courts.

These First Amendment rights are infringed by restrictions on the ability to enter into otherwise lawful agreements for the purpose of settling litigation. Settlements are an essential part of litigation, serving "an important function in our judicial system." DE 124 at 51. *See also Marek v. Chesny*, 473 U.S. 1, 10 (1985) (observing that Federal Rule of Civil Procedure 68 "expresses a clear policy of favoring settlement of all lawsuits," which "help[s] to lessen docket congestion," and that, in addition to reducing judicial system burdens, "settlements rather than litigation will serve the interests of plaintiffs as well as defendants" (internal quotation marks omitted)); *accord Jenkins v. Fields*, 83 S.E.2d 908, 910–11 (N.C. 1954) ("The law looks with favor on litigants compromising and settling their differences."); N.C. Gen. Stat. § 95-32 ("It is hereby declared as the public policy of this State that the best interests of the people of the State are served by the prevention or prompt settlement of labor disputes [.]"). And, as both the Magistrate Judge and Defendant recognize, "[l]itigation can be complex, time consuming, uncertain, and expensive." DE 124 at 51; DE 129 at 18. The availability of settlement significantly reduces the costs and uncertainty of litigation, while simultaneously lessening the burden on the judicial system.

As the Magistrate Judge reasoned, "by depriving FLOC of the right to enter into settlement agreements with agricultural providers, the Settlement Provision interferes with

FLOC and its members' collective activity undertaken to obtain meaningful access to the courts, which is a fundamental right within the protection of the First Amendment." DE 124 at 51 (cleaned up). This reasoning stands even if the Court were to accept Defendant's proposed narrowing construction, as the Settlement Provision would still unconstitutionally hinder FLOC and its members from exercising their First Amendment right to participate in litigation. It is undisputed that the Act prevents *both* FLOC and its members from securing union recognition as a condition of settlement. It is also undisputed that the Act prevents FLOC's members from conditioning settlement on an agricultural producer's entry into an additional, otherwise lawful agreement with FLOC. Thus, even under Defendant's interpretation, the Act prevents FLOC's members from conditioning settlement on an agricultural producer's entry into a collective bargaining agreement, an agreement to remain neutral during a union campaign, or an agreement establishing grievance procedures designed specifically to avoid future litigation. *See* DE 109 at 30-31 In other words, the Act prevents FLOC and its members from realizing any of their shared goals through settlement.

Defendant argues that "the Settlement Provision regulates the terms of contracts, not the content of speech." DE 129 at 17; *see also* DE 107 at 20. But the Settlement Provision is not a generally applicable regulation of contracts; rather, it explicitly restricts agreements to "settle litigation" and also prevents a settlement premised on an agreement with a union, an organization that is "an archetype of an expressive association." *Kidwell v. Transp. Commc'ns Int'l Union*, 946 F.2d 283, 301 (4th Cir. 1991); *see also Cap.*

*Associated Indus., Inc. v. Stein*, 922 F.3d 198, 205 (4th Cir. 2019) (discussing cases recognizing that unions may facilitate "collective activity . . . to obtain meaningful access to the courts" and "enforcement of legal and constitutional rights," distinguishing their legal activities from commercial legal activities).

Furthermore, as Defendant himself acknowledges, the Settlement Provision was designed to deter litigation by restricting the range of outcomes that can be achieved through settlement. DE 129 at 18–19. In other words, the Provision intentionally suppresses litigation to vindicate farmworkers' rights by invalidating *otherwise lawful* agreements when those agreements are conditions in a settlement of legal claims. Defendant has not identified any authority holding that a state may restrict an expressive association's ability to enter into, or benefit from, otherwise lawful agreements when they are entered into as a condition of settling litigation.

Because the Settlement Provision impairs the right of access to the courts for FLOC and its members, the provision "must withstand the 'exacting scrutiny applicable to limitations on core First Amendment rights.'" DE 124 at 52 (quoting *In re Primus*, 436 U.S. at 432). The Settlement Provision fails exacting scrutiny because the statutory means employed to serve the stated goal (discouraging litigation aimed at securing collective bargaining agreements) are not "closely drawn to avoid unnecessary abridgment of associational freedoms." *In re Primus*, 436 U.S. at 432 (internal quotations omitted).

Defendant does not dispute that the Settlement Provision unconstitutionally infringes FLOC's First Amendment rights insofar as it prohibits FLOC from entering into

any settlement agreements with agricultural producers. Correctly interpreted, the Settlement Provision is indefensible. But even if the Court were to adopt Defendant's narrowing construction, the Provision fails exacting scrutiny because Defendant's goal of discouraging worker rights litigation by FLOC and its members is fundamentally illegitimate.

Defendant argues that settlement agreements benefitting FLOC must be suppressed because they are purportedly "coercive." DE 129 at 10. This is a self-serving characterization unsupported by evidence. While agricultural producers may not like it when their employees offer to settle claims under the Fair Labor Standards Act and the North Carolina Wage and Hour Act in exchange for a collective bargaining agreement, they are ultimately free to reject any settlement offer proposed to them, and the record reflects that they have done so. *See* DE 124 at 15–16. Tellingly, Defendant has not identified any examples of actual coercion. Indeed, courts repeatedly found that FLOC members' settlements with agricultural producers are fair and reasonable. DE 112 (Pls. Opp'n to Def.'s Mot. for Summ. J.) at 4–5; DE 112-8 – DE 112-15. The government cannot justify a restriction on the exercise of First Amendment rights simply by characterizing the exercise of those rights as "coercive." *See Button*, 371 U.S. at 438 ("[T]he State's attempt to equate the activities of the NAACP and its lawyers with common-law barratry, maintenance and champerty, and to outlaw them accordingly, cannot obscure the serious encroachment worked by Chapter 33 upon protected freedoms of expression."). No matter how the Settlement Provision is interpreted, it violates the First Amendment.

Finally, for all the reasons discussed in Plaintiffs' summary judgment briefing and their objections to the Opinion's recommended ruling on the Dues Checkoff Provision, the Settlement Provision violates the First Amendment rights because it imposes a selective burden on a single expressive association, FLOC, without justification. *See* DE 109 at 23–28, 31; DE 112 at 9–13; DE 115 (Pls. Summ. J. Reply) at 8–11; DE 130 (Pls. Rule 72 Objs.) at 3–9.

Defendant's Objection to the portion of the Opinion recommending summary judgment for Plaintiffs should be overruled.

## II.    **Defendant's Objections to the Opinion's Background Section are Meritless and Unspecific.**

Defendant objects to the Magistrate Judge's "failure to address or adopt" several facts, namely: (1) "[f]acts regarding the importance of the agricultural industry to North Carolina;" (2) "[f]acts regarding farming being a difficult business;" (3) "[f]acts regarding the costs and burdens of administering dues checkoffs," including "relational costs;" and (4) "[f]acts regarding the use of litigation against farmers to induce their entry into collective bargaining agreements." DE 129 at 3-4. Defendant cursorily argues that such facts "place Section 20.5 in its proper context" and support "an important and rational basis for Section 20.5." *Id.* at 4. [2]

---

[2] Although Defendant fails to develop this argument in his Objections beyond referencing it briefly in his introduction, Defendant also advances a state "right to work" (RTW) law rationale in support of Section 20.5. This is nonsensical, as none of the purely voluntary agreements outlawed by Section 20.5 compel anyone to become a union member. *See* DE 56 at 72 (recognizing that the dues checkoff and settlement activities prohibited by Section 20.5 "arose from voluntary agreements between farmers,

Of course, a judge considering summary judgment motions is not required to explicitly address each fact asserted by a party. *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (courts are "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage."). Other than gesturing at standards related to equal protection (a claim on which the Magistrate Judge recommended Defendant prevail except as to First Amendment-related violations), Defendant does not explain why "address[ing] or adopt[ing]" these purported facts would change the Magistrate Judge's determination that the Settlement Provision does not comport with the First Amendment or the strict scrutiny applicable to Plaintiffs' First Amendment-related equal protection claims. Because Defendant does not explain why the Magistrate Judge's failure to "address or adopt" his version of the facts constitutes material legal or factual error, his objections do not comply with Rule 72(b)(2)'s requirement that objections be specific. *See United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007) (to properly object, "a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.").

---

farmworkers, and/or FLOC rather than any regulatory mandate"); DE 108-1 (Jt. Stip.) ¶¶ 13–17, 21 (explaining impact of the RTW law and voluntary nature of dues checkoffs and union agreements in agriculture). Moreover, as explained in Plaintiffs' summary judgment briefing, North Carolina's RTW law protects the rights of *employees* to choose whether to join a union by imposing liability on *employers*—not on employees, and not on unions— for interfering with those rights. *See* DE 112 at 24–26; DE 115 at 6. Section 20.5 thus undermines the state's RTW policy, by criminalizing efforts by farmworkers to enter into voluntary dues checkoff and settlement agreements that would allow them to exercise their state-guaranteed rights to affiliate with unions. *See* N.C. Gen. Stat. §§ 75-1, 75-9–7516 (specifying penalties for engaging in conduct deemed "in restraint of trade").

Even if Defendant's fact-related objections cleared Rule 72's specificity threshold, the facts alleged are either immaterial or materially disputed by Plaintiffs; the Magistrate Judge did not err by failing to address them.

*First*, while Plaintiffs do not dispute that the agricultural industry is important in North Carolina, the fact remains that workers in multiple other comparably important— even essential—industries in the state have not been similarly stripped of their rights to enter into dues checkoff and settlement agreements. For example, as this Court noted when it granted Plaintiffs' motion for a preliminary injunction, no other workers in the food supply chain are similarly restricted. DE 56 at 72–73.[3] *See also* DE 109 at 19-20.

Moreover, Defendant's argument regarding economic importance weighs heavily against the selective exclusion of farmworkers from contractual rights enjoyed by every

---

[3] Notably, sources cited by Defendant as supporting the importance of agriculture were cited in the Opinion. *See* DE 124 at 9. Scrutiny of those figures reveals, however, that numerous industries clearly outside the category of "agricultural producers" covered by Section 20.5 — such as restaurants, food and fiber manufacturing, and retail — were relied on by Defendant as proof of agriculture's economic importance. *See* Michael Walden, *Agriculture and Agribusiness*, June 2020, available at https://cals.ncsu.edu/wp-content/uploads/sites/31/2020/07/2020-WaldenAgBusinessReport-061220.pdf (reflecting that only 18% of NC's "agriculture and agribusiness" income, or 3% of NC's total income, is attributable to "farming"). More precise state data indicates that many non-farming industries are comparably or more important to the state's economy. *See, e.g.*, N.C. Dep't of Commerce, *North Carolina Annual Economic Report: A Year in Review 2018*, at 5, 8 https://files.nc.gov/nccommerce/documents/LEAD/Annual-Economic-Report/NC-2018-Economic-Report.pdf (listing finance and manufacturing as the largest contributors to state GDP; listing health care and social assistance, retail trade, and manufacturing as North Carolina's three largest sectors by employment figures); *see also id.* at 3 ("Over the previous century, [North Carolina] has transformed from an agricultural state with a manufacturing base in tobacco, textiles, and furniture to an advanced economy with strengths in finance, biotechnology, advanced manufacturing, and the knowledge economy more broadly.")

other private sector worker in the state. If agriculture is important, then farmworkers are equally important—at least as important as farmers, since it is through farmworkers' hands-on labor that the industry functions. It serves no legitimate public purpose that a population of essential workers, who historically and currently suffer high rates of poverty, wage theft, and workplace injury, should be deprived of the right to enter into entirely voluntary agreements facilitating their ability to benefit from the aid of unions in enforcing their workplace rights. *See* DE 109 at 4-5; DE 112 at 2; DE 130 at 15, 18-19. Defendant's characterization of farmworker litigation and dues checkoffs as threatening to undermine agriculture is unsupported and simply underscores that Section 20.5 was impermissibly motivated by anti-union animus. *See* DE 109 at 8–11, 20–22; DE 112 at 25–26, 30–31; DE 115 at 3, 5; DE 130 at 20-21.

*Second*, Plaintiffs dispute that "farming is a difficult business," at least insofar as this is plausibly relevant to whether Section 20.5 is reasonably related to a legitimate governmental purpose. *See* DE 112 at 6, 23. The "difficulties" cited by Defendant in its summary judgment briefing largely concern events that followed the passage of Section 20.5 (such as trade disputes, a hurricane, and the current pandemic) and could not have constituted a rational basis for its enactment. DE 112 at 23 n.7. Plaintiffs cited evidence showing that, because of their outsize political influence, farmers benefit from specialized subsidies, relief packages, and other taxpayer-funded benefits that provide a buffer in times of hardship. DE 112 at 6. And, as discussed above, the economic difficulties cited by Defendant are dwarfed by the economic difficulties experienced by farmworkers, who are

20

politically disenfranchised, suffer high rates of poverty, and are chronically vulnerable to violation of their rights at work. *See* DE 109 at 4-5, 12; DE 112 at 2, 7, 17; DE 130 at 15-19. Indeed, the U.S. Department of Labor Wage and Hour Division recently reported that it found labor law violations in **78%** of all inspections it conducted among southeastern agricultural employers in 2020.[4] This means that, in many cases, North Carolina farmworkers are simply not receiving even the minimum wages owed them under the law—something increased access to union representation and collective bargaining might well ameliorate. *See, e.g.* DE 108-2 (Arcury Rept.) ¶ 29 (observing better working conditions among H-2A workers covered by a FLOC CBA). The heavily disputed and largely irrelevant facts that Defendant asks this Court to adopt cannot provide a rational – much less compelling – justification for Section 20.5's punitive obstruction of voluntary dues checkoff agreements and settlements that might facilitate union organizing and collective bargaining. *See* DE 109 at 18–22; DE 112 at 22–24.

*Third*, Defendant's objection to the Magistrate Judge's purported failure to examine "relational costs" as part of "administrative costs" allegedly related to dues checkoffs is meritless. *See* DE 129 at 4. Because the Magistrate Judge recommended that Defendant prevail under a rational basis review standard based on the proffered "administrative costs" rationale, Defendant's objection is legally irrelevant. Nevertheless, while Defendant broadly asserts that dues deductions "harm farmers' relationships with their workers," *id.,*

---

[4] Wage and Hour Div., U.S. Dep't of Labor, *U.S. Department of Labor Education, Enforcement Campaign Seeks to Increase Southeast Agricultural Industry's Compliance,* March 8, 2021, https://www.dol.gov/newsroom/releases/whd/whd20210308

he has failed to provide any actual evidence in his summary judgment briefing or his Objections showing that, as a result of difficult conversations about dues checkoffs, a single farmworker has quit, refused to work, or obstructed farm operations in any way. On the other hand, Plaintiffs have provided ample evidence that farmworkers face persistent mistreatment or exploitation by employers, *supra* pp. 20–21, and are subject to firing, blacklisting, and deportation for speaking out against illegal conditions. *See* DE 109 at 4, DE 112 at 2. Given the persistence of substandard working conditions in agriculture, Plaintiffs dispute that farmers consider relationships with their workers "central to successful farming," and it is implausible that these already problematic employee-employer relationships would be more harmonious if farmers were spared awkward conversations about dues checkoffs.

As Plaintiffs addressed at length in their summary judgment briefing, even if such "costs" were supported by evidence, Defendant's "administrative costs" rationale, including asserted "relational costs," should be rejected by the Court. *See* DE 109 at 18–19; DE 112 at 3–4, 26–28; DE 115 at 6–7; *see also* DE 130 at 22–23. The Magistrate Judge did not err by failing to discuss or rely on Defendant's specious "relational costs" argument.

*Fourth*, Defendant contends that the Magistrate Judge did not sufficiently consider "the use of litigation against farmers to induce their entry into collective bargaining agreements." DE 129 at 4. The Opinion reflects the opposite. Throughout, the Magistrate Judge quoted and cited numerous exhibits related to FLOC members' litigation and settlement agreements, including a demand letter that proposed entry into a CBA as part of

22

a settlement. *See* DE 124 at 11–12, 15–16, 50. And, as set forth above and in Plaintiffs' briefing, litigation by FLOC members advances multiple goals beyond attaining CBAs: to ensure workers are compensated for wage theft and other violations; to educate the public about farmworkers' struggles; and to achieve union organizing goals other than CBAs, such as an agreement by farmers to remain neutral and not interfere with workers' decisions to join FLOC, or an agreement simply to recognize and negotiate with the union. *See, e.g.*, DE 108-3 ¶¶ 19–21, 54; *see also* DE 109 at 7, 13–14, 30. The Magistrate Judge did not err by declining to adopt Defendant's inaccurate characterization of the evidence related to FLOC's members' settlement negotiations.

In addition, Defendant lodges two objections to the Opinion's Background section insofar as it cites testimony by FLOC and Plaintiffs' expert Dr. Thomas Arcury. First, Defendant asserts that the Magistrate Judge relied on FLOC's "self-serving statements" regarding its efforts to explore alternatives to dues checkoffs, efforts which Defendant considers belated.[5] DE 129 at 5. Defendant does not bother to explain why this is legally

---

[5] The evidence shows that FLOC did in fact consider alternatives to dues checkoffs at the time of Section 20.5's enactment but none were realistic. *See* DE 108-11 at 185:10–199:16. Defendant appears to take issue with part of a declaration submitted by FLOC Vice President Justin Flores that was specifically prepared to rebut Defendant's expert's unfounded opinion that farmworkers could easily use bill pay services or other money-sending services to transmit dues to FLOC. Mr. Flores's declaration explains in detail why these methods are not in fact feasible, providing additional, current factual support for his already well-informed opinion on feasibility. *See* DE 108-3 ¶¶ 58-61. It was not improper for the Magistrate Judge to cite these facts, especially since the truth of Mr. Flores's statements in the declaration was never disputed by Defendant and is easily confirmed by basic internet research.

23

important—or why he is objecting to analysis that is only relevant to a claim on which the Magistrate Judge recommended he prevail.

Defendant also objects to any reliance by the Magistrate Judge on statements by Plaintiffs' expert Dr. Arcury related to FLOC, its membership, dues collecting methods, and/or its operations, pointing to his lack of personal knowledge on these topics. DE 129 at 5. Once again, Defendant does not explain why this purported reliance is legally significant. Moreover, the Opinion did not cite to any such statements by Dr. Arcury. The Magistrate Judge only cited Dr. Arcury's testimony related to farmworker living conditions, location of farmworker camps, and farmworker demographics. *See* DE 124 at 8, 60. Furthermore, Dr. Arcury's expert opinion— "*Based on my research*, I conclude that residential isolation and wide geographic distribution of farmworker camps, farmworkers' lack of personal transportation, their limited English language skills, and their lack of access to banking services will make it difficult for them to pay union dues without employer deduction. It will also place an extreme burden on any union that is required to collect dues from individual workers in person"—is drawn from his decades of field research and study related the living conditions of farmworkers in North Carolina, for which he clearly has personal knowledge. DE 108-2 ¶ 46. Regardless, an expert need not have personal knowledge for the court to rely on their opinion, so long as that person's testimony is sufficiently relevant and reliable. Fed. R. Evid. 702; *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000).

Because Defendant's objections to the Opinion's Background section and citation of facts are baseless, this Court should overrule them.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request that Defendant's Objections to the Opinion be overruled.

Respectfully submitted this 25th day of March, 2021,

/s/ Kristi Graunke
Kristi Graunke
North Carolina Bar No. 51216
kgraunke@acluofnc.org
Jaclyn Maffetore
North Carolina Bar No. 50849
jmaffetore@acluofnc.org
ACLU of North Carolina Legal
Foundation
P. O. Box 28004
Raleigh, NC 27611-8004
Tel: 919-834-3466

Julia Solórzano
Georgia Bar No. 928725
julia.solorzano@splcenter.org
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30030-1287
Tel: 404-521-6700

Meredith B. Stewart
Louisiana Bar No. 34109
meredith.stewart@splcenter.org
Southern Poverty Law Center
201 St. Charles Ave, Ste. 2000
New Orleans, LA 70170
Tel.: 504-486-8982

Carol Brooke
North Carolina Bar No. 29126
carol@ncjustice.org
Clermont Ripley
North Carolina Bar No. 36761
clermont@ncjustice.org
North Carolina Justice Center
PO Box 28068
Raleigh, NC 27611
Brooke Tel: 919-856-2144
Ripley Tel.: 919-856-2154
Fax: 919-856-2175

Brian Hauss                                    Robert J. Willis
New York Bar No. 5437751                       North Carolina Bar No. 10730
bhauss@aclu.org                                rwillis@rjwillis-law.com
Arianna Demas                                  Law Office of Robert J. Willis, P.A.
ademas@aclu.org                                P.O. Box 1828
American Civil Liberties Union                 Pittsboro, NC 27312
Foundation                                     Tel: 919-821-9031
125 Broad Street, 18th Floor                   Fax: 919-821-1763
New York, NY 10004
Tel.: 212-549-2500
Fax: 212-549-2650


*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATIONS OF LR 7.3(d)

Relying on the word count function of Microsoft Word, I hereby certify that this brief is under the 8,000 word limit as set forth in the Court's March 3, 2021 text order.

<u>/s/ Kristi L. Graunke</u>
*One of the Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on March 25, 2021, I electronically filed the foregoing and an exhibit with the Clerk of the Court using the CM/ECF system, which will serve counsel for Defendant.

/s/ Kristi Graunke
*Counsel for Plaintiffs*